Robert L. Sills (RS 8896)
Steven J. Fink (SF 3497)
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Attorneys for Plaintiff



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

E.T.I. EURO TELECOM INTERNATIONAL N.V.,

    Plaintiff,

-against-

REPUBLIC OF BOLIVIA and
EMPRESA NACIONAL DE
TELECOMUNICACIONES ENTEL S.A.,

    Defendants.

08 CV



**COMPLAINT FOR ORDER OF ATTACHMENT
IN AID OF INTERNATIONAL ARBITRATION**

    For its Complaint in this action, Plaintiff E.T.I. Euro Telecom International N.V. ("ETI") states as follows:

    1.    This is an action for an order of attachment in aid of arbitration with respect to assets expropriated without compensation by the Republic of Bolivia ("Bolivia"). Plaintiff ETI is a 50% shareholder in Defendant Empresa Nacional de Telecomunicaciones Entel S.A. ("Entel"), a Bolivian telecommunications company. Bolivia has expropriated ETI's equity interest in Entel through a series of actions taken over the past year that culminated in Bolivian President Evo Morales's public proclamation on May 1, 2008 of a decree that expressly nationalized ETI's shares. The Bolivian government has not paid anything to ETI for this

valuable asset, which it has now taken by force. To the contrary, representatives of the Bolivian government repeatedly have said, both publicly and privately, that Bolivia does not plan to pay anything for ETI's stake in Entel.

2. In October 2007, ETI brought an arbitration against Bolivia in the World Bank's International Center for Settlement of Investment Disputes ("ICSID") in Washington, DC. That proceeding is pending. Bolivia, however, has refused to participate in that proceeding.

3. Among Entel's assets are approximately $35.8 million held in time deposits maintained in the Manhattan branches of JP Morgan Chase Bank N.A., Unicredit S.p.A. and Intesa Sanpaolo S.p.A., which Bolivia has not seized. ETI seeks an order attaching those New York assets pending the resolution of its ICSID arbitration against Bolivia pursuant to Rule 64 of the Federal Rules of Civil Procedure and Articles 62 and 15 of New York's Civil Practice Law and Rules (the "CPLR").

## THE PARTIES

4. Plaintiff ETI is a corporation organized and existing under the laws of the Kingdom of the Netherlands, having its principal place of business in Amsterdam, the Netherlands. ETI is an indirect, wholly-owned subsidiary of Telecom Italia S.p.A., a corporation organized and existing under the laws of Italy having its principal place of business in Milan, Italy.

5. Defendant Entel is a corporation organized and existing under the laws of Bolivia with its principal place of business in La Paz, Bolivia.

6. Defendant Bolivia is a sovereign nation.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1331 and 9 U.S.C. § 203 because this action falls under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), reprinted following 9 U.S.C. § 201, and 22 U.S.C. § 1650(a), and arises under the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States (the "ICSID Convention"), 17 U.S.T. 1270, 575 U.N.T.S 15 (1966).

8. Debt or property belonging to Defendants Entel and/or Bolivia is within the jurisdiction of this Court.

9. Venue is appropriate in this District because this District is one in which, save for the arbitration agreement between the parties, an action or proceeding with respect to the controversy could have been brought pursuant to 28 U.S.C. § 1391(b) because all of the property that is the subject of this action is situated within the District, and pursuant to 28 U.S.C. § 1391(d), because an alien may be sued in any district.

## FACTUAL BACKGROUND

### The Privatization of Entel

10. ETI obtained its equity interest in Entel in 1995 through a privatization transaction in which it subscribed and paid in a capital increase of Entel. By virtue of its 50% shareholding, ETI also has, under Bolivian law, the right to appoint a majority of Board Members.

11. The privatization of Entel was structured by the Bolivian Government as a payment by ETI to Entel of $610 million to subscribe to 50% of Entel's shares and Board control. The remaining shares were held by two Bolivian pension funds (about 47.5% of the

share capital) and by local shareholders and employees of Entel (about 2.5% of the share capital).

12. Entel made substantial investments in Bolivia's telecommunications sector in the years that followed the privatization. By December 2007, Entel had made investments in infrastructure and technology, on a consolidated basis, in an amount exceeding $741 million and employed 1,500 Bolivians. This comprised the largest infrastructure investment program in the history of Bolivian telecommunications, and Entel became a leading telecommunications company in the region, providing greatly improved and expanded service to all regions of Bolivia. From 1996 to 2007, the fixed and mobile telecommunications services penetration in Bolivia grew from 5% to 45% of the population, and the mobile telecommunications services penetration in Bolivia grew from less than 1% to over 38%.

13. In May 2005, the Bolivian government issued Supreme Decree No. 28172, providing the Ministry of Economic Development with power to determine if Entel had fulfilled its investment obligations undertaken as part of the privatization. In accordance with that grant, in August 2005, the Ministry of Economic Development confirmed, in its Ministerial Resolution No. 194, that Entel had met all of its commitments in connection with the privatization. Four members of the Bolivian Senate then filed a proceeding before the Constitutional Tribunal – Bolivia's court of last resort – requesting that Supreme Decree 28172 and Ministerial Resolution 194 be declared unconstitutional. On January 18, 2006, the Constitutional Court ruled that Supreme Decree 28172 was valid, and that the Court lacked jurisdiction to review to Ministerial Resolution. Those instruments, issued by the Bolivian government and having the force of law, stand as Bolivia's legal certification that Entel met its obligations under the privatization program.

14. In reliance on Bolivia's official actions, the shareholders of Entel (including the Bolivian pension funds and Entel's employee shareholders), voted to carry out a reduction of the company's capital in September 2005. Corresponding amounts of capital were thereafter distributed to Entel's shareholders, with approximately $200 million distributed to the Bolivian shareholders, and the $200 million balance distributed to ETI. The Bolivian government imposed no taxes on the distribution at the time it was made, and two prominent international accounting firms provided their opinions that the transaction was not a distribution of dividends, but was a distribution of capital of foreign origin, and therefore was not taxable.

15. Under ETI's ownership, Entel has continued to flourish. In May 2007, ABN AMRO Bank N.V ("ABN AMRO"), a leading international bank, was engaged to value ETI's stake in Entel. That analysis, which was based on conservative assumptions, concluded that Entel's business had an equity value, as of that date, between $587 million and $650 million, so that ETI's interest was worth between $294 million and $325 million. The current US Dollar value of the company is now significantly greater than the ABN AMRO valuation due to an improved cash position, the fact that the company's performance exceeded the business plan upon which the valuation was based, and the recent devaluation of the US dollar.

### The Bilateral Investment Treaty Between Bolivia and the Netherlands

16. The Agreement on Encouragement and Reciprocal Protection of Investments between the Kingdom of the Netherlands and the Republic of Bolivia (the "Bilateral Investment Treaty," or "BIT") was signed on March 10, 1992 and entered into force on November 1, 1994. The BIT remains in force today.

17. The BIT governs the legal relationships between Bolivia and Dutch nationals who make investments in Bolivia, and includes various protections for Dutch nationals investing in Bolivia. These protections include that:

- Bolivia shall "ensure fair and equitable treatment to the investments of nationals of [the Netherlands] and shall not impair, by unreasonable or discriminatory measures, the operation, management, maintenance, use, enjoyment or disposal thereof by those nationals;"

- Bolivia shall "accord to such investments full security and protection which in any case shall not be less than that accorded either to investments of its own nationals or to investments of nationals of any third State, whichever is more favorable to the investor;"

- Bolivia shall not "take any measures depriving, directly or indirectly, nationals of [the Netherlands] of their investments unless . . . the measures are accompanied by provision for the payment of just compensation."

18. The BIT also includes a dispute resolution mechanism. The dispute resolution mechanism provides for arbitration to resolve any disputes between either Bolivia or the Netherlands, on the one hand, and an investor from the other state, arising out of an expropriation. The BIT goes on to provide that:

> If both Contracting Parties have acceded to the Convention on the Settlement of Investment Disputes between States and Nationals of other States of 18 March 1965, any disputes that may arise from investment between one of the Contracting Parties and a national of the other Contracting Party shall, in accordance with the provisions of that convention, be submitted for conciliation or arbitration to the International Center for Settlement of Investment Disputes.

19. Pursuant to the ICSID Convention, ICSID was established to hear disputes between investors and states under bilateral investment treaties. ICSID is a part of the World Bank, and has its seat in Washington, D.C.

### Bolivia's Actions Against ETI and Entel

20. In January 2006, President Evo Morales, the leader of the "Movement Towards Socialism," took office in Bolivia on a platform advocating significant state intervention in the Bolivian economy. In June of that same year, Bolivia published a national development plan that contemplated the re-nationalization of various formerly state-owned enterprises that had

been privatized in the 1990s. The Bolivian government began to execute this National Development Plan by nationalizing Bolivia's oil and gas reserves shortly after President Morales took office.

21. In July 2006, the Bolivian government began to take measures that adversely affected the value of ETI's investment in Entel, and were intended to expropriate that interest without paying fair compensation. These measures included:

(a) On July 7, 2006, Bolivian authorities notified Entel that Bolivia was imposing on Entel approximately $26 million in purported withholding taxes for the capital distribution made in September 2005. Although no prior notice had been given, Bolivia nevertheless additionally sought approximately $30 million in penalties and interest. Entel challenged the imposition of these taxes, penalties and interest.

(b) On March 28, 2007, Bolivia issued Supreme Decree No. 29087, which established an ad hoc commission (the "Commission") mandated to negotiate the "recovery" of Entel for the Bolivian State within 30 days. The Commission was comprised of three ministerial and two vice-ministerial members of the Bolivian government. The Decree also referred to a supposed investigation of Entel which purportedly revealed "serious . . . irregularities in [its] management and operations . . . ." Entel first learned of this supposed investigation after the fact, upon the promulgation of Supreme Decree No. 29087.

(c) On April 4, 2007, the Commission invited ETI to meet in La Paz on April 11, 2007 for negotiations. The Bolivian Commission did not offer at the April 2007 meeting to pay anything for ETI's controlling stake in Entel, nor has it done so since. Indeed, the Commissioners never specified the extent of the interest that

they sought to acquire. Instead, the Commission used the meeting as an opportunity to level baseless accusations against ETI and the incumbent management of Entel. In particular, the Commission made a PowerPoint presentation claiming that various "irregularities" required adjustments to the reported value of Entel of at least $645 million, which was close to the equity value for the company determined by ABN AMRO. The Commission members expressly stated that Bolivia would not pay anything to compensate ETI for the expropriation of its equity stake in Entel in light of the supposed "irregularities." Not surprisingly, the meetings concluded without any agreement between the two sides.

(d)  ETI then accepted a second invitation from the Commission to engage in discussions regarding Entel. The meeting was to be held on April 23, 2007. Only hours before that meeting was to begin, the Bolivian government issued two new Decrees directly impacting ETI's interests in Entel:

   (i)  <u>Supreme Decree No. 29100</u>, which purports to abrogate Supreme Decree No. 28172 and Ministerial Resolution No. 194. Supreme Decree No. 28172 and Ministerial Resolution No. 194, as discussed above, collectively confirmed that Entel had fully performed its obligations in connection with the privatization. Bolivia issued that Decree despite the fact that, as set forth above, a challenge to the constitutionality of Supreme

Decree No. 28172 and Ministerial Resolution No. 194 had been rejected by Bolivia's highest court.

(ii) Supreme Decree No. 29101, which purports to abrogate several earlier Decrees that authorized Entel's privatization.

In light of these events, the proposed meeting did not go forward.

## The ICSID Proceeding

22. On May 2, 2007, Bolivia submitted to ICSID its formal denunciation of the ICSID Convention. Pursuant to the ICSID Convention, that denunciation took effect six months after it was received by ICSID, on November 2, 2007.

23. On October 12, 2007, ETI submitted to ICSID a Request for Arbitration against Bolivia. Asserting its rights under the BIT, ETI sought to recover money damages against Bolivia to compensate it for its injuries arising from Bolivia's conduct summarized above.

24. On October 29, 2007, Bolivia submitted to ICSID a nine page letter objecting to ICSID jurisdiction. In that letter, Bolivia took the position that:

> In denouncing the Convention in full exercise of its sovereign rights, Bolivia does not surrender to arbitration but chooses to leave a system that, from its experience and studied standpoint, suffers from serious flaws. It is no secret that Contracting States, eminent legal authorities, and even referees are pouring comments and questions about fairness, consistency and economies of the arbitration proceedings at the Centre. Bolivia offers arbitration and offers remedies to the Company and all investors, within their national laws and international standards.

25. On October 31, 2007, ICSID registered ETI's Request for Arbitration, thereby initiating the ICSID arbitration proceeding, over Bolivia's objection. Since then, Bolivia has

---

Supreme Decree 29100 also transferred the 47.5% interest in Entel held by two Bolivian

refused to participate in the ICSID proceeding, taking the position that its denunciation of the ICSID Convention left ICSID without jurisdiction to hear the dispute. Bolivia never responded to ETI's efforts to reach agreement on a procedure for constituting the arbitral tribunal, as required by the ICSID rules, and the arbitral tribunal has not yet been constituted. Indeed, other than its rejected jurisdictional argument, Bolivia has not filed any papers in the ICSID proceeding.

### Recent Events Leading up to This Application

26. On May 1, 2008, Bolivian President Morales publicly announced, at a May Day rally in La Paz carried on Bolivian television, that Bolivia was nationalizing ETI's interest in Entel. As part of that announcement, he publicly proclaimed the text of Supreme Decree No. 29544 (the "Nationalization Decree"). The Decree, which became immediately effective by virtue of this public pronouncement, provides among other things, that:

- "The stock of the capitalizing company ETI EUROTELECOM INTERNATIONAL NV is hereby nationalized in its entirety and said company is transformed into Entel SAM; all the shares of this capitalizing company shall be transferred to the Bolivian state, being temporarily held by the Ministry of Public Works, Utilities and Housing...;" and

- "Any individual that, in any way, may interrupt or disturb the normal business of the company, or engage in acts that cause detriment or prejudice to its corporate assets must be denounced before the Public Ministry under the offense of 'Attempt against the security of public services', 'Anti-Economic Behavior', 'Aggravated Damage' and other offences typified in the Criminal Code."

pension funds to the Bolivian government.

27. Also on May 1, the Bolivian police took control of Entel's main offices, blocking access to, or exit from, the building. In addition, again on May 1, SITTEL, the Bolivian telecommunications regulator, issued Administrative Regulatory Resolution No. 2008/1056 and served it on Entel. The resolution provides, on the authority of the nationalization Decree, that an agent for SITTEL would immediately assume the management of Entel for a period of ninety days.

28. Although Article 3 of the Nationalization Decree states that compensation for ETI's shares will be paid within 60 days based on an "evaluation," it does not provide any mechanism for fixing that payment. However, ETI has obtained a copy of a Bolivian government document entitled "Executive Summary – Recovery of Entel S.A.", which states that the governmental "work group" proposed that ETI would receive "[c]ompensation 0, due to the irregularities found."

29. That statement, that the Bolivian government's strategy is to seize ETI's Entel shares without compensation, is consistent with the position taken by the government representatives in the course of "negotiations" in April 2007, described above at page 7. Moreover, Article 4 of the Nationalization Decree includes a proviso, that "[t]he financial, tax, labor, commercial and regulatory liabilities" of Entel, "both payable and contingent, shall be deducted at the time of effecting the final liquidation for the payment to be made to [ETI]. . . ." This appears to be nothing more than the predicate for paying nothing for the expropriated shares. Indeed, only a few days before the Nationalization Decree was issued, the Bolivian tax authorities ordered payment within three days of approximately $60 million for the purported withholding taxes, penalties and interest retroactively assessed for the September 2005 capital reduction and distribution, as discussed above. The Bolivian government presumably will use

that purported obligation, as well as the portions of the $645 million in purported "irregularities" identified during the April 2007 meetings, to further reduce its valuation of the company.

### Entel Bank Accounts in New York

30. For several years, in the regular course of its business, Entel has maintained significant cash reserves in deposit with financial institutions in New York. These funds have not been used for day-to-day operating expenses. ETI is currently aware of four such accounts. The first account, bearing account number 304-279-757, is maintained at JP Morgan's New York branch located at 4 New York Plaza, Floor 15, New York, New York 10004. The balance of that account is $1,681,000. The second account, bearing account number 3100042572, is maintained at Unicredit's New York branch located at 150 East 42nd Street, New York, New York 10017. The outstanding time deposit with Unicredit amounts to €4,856,596 (principal plus interest); at maturity on May 29, 2008, Unicredit will reimburse principal and pay interest for the total above-mentioned amount to the Euro account number 3100042572 (approximately $7,480,000 at today's exchange rate). The third account, bearing account number 8601-081-0099, is maintained at Intesa's New York branch located at One William Street, New York, New York, 10004. The outstanding time deposit in Euros with Intesa amounts to €10,075,556 (principal plus interest); at maturity on June 16, 2008, Intesa will reimburse the principal and pay interest for the total above-mentioned amount to the Euro account 8601-081-0099 (approximately $15.5 million at today's exchange rate). The fourth account, bearing account number 8601-081-0001, is also maintained at the William Street branch of Intesa. The outstanding time deposit with Intesa amounts to $11,203,102 (principal plus interest); at maturity on May 16, 2008, Intesa will reimburse principal and pay interest for the total above-mentioned amount to account number 8601-081-0001. The total amount held in those four New York accounts is approximately $36 million.

31. Once the Bolivian police physically seized Entel's headquarters in La Paz, the finance director was called in for an individual interview and was pressed for detailed information regarding Entel's foreign accounts, including the names of authorized signatories. Then, on Friday, May 2, Mr. Joel Flores Carpio, the "administrator" appointed by the Bolivian government to manage Entel following the seizure of ETI's shares, wrote to the banks in New York, asserting that he was the sole signatory for each of the relevant accounts, and asking the banks in question to provide him with the necessary documents to formalize his authority. The logical inference to be drawn from these events is that the Bolivian government intends to move the funds in question as quickly as possible, particularly viewed in the context of Bolivia's campaign to seize ETI's stake in Entel without paying for it..

## CLAIM FOR AN ORDER OF ATTACHMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 64, CPLR § 7502(c) AND CPLR ARTICLE 62

32. ETI realleges and incorporates Paragraphs 1-31 of the Complaint as if set forth fully herein.

33. ETI has commenced an ICSID arbitration proceeding against Defendant Bolivia.

34. ETI has asserted causes of action against Bolivia for violations of the BIT.

35. It is probable that ETI will succeed on the merits of its arbitration claims because Bolivia has breached the express terms of its BIT with the Netherlands by expropriating ETI's interest in Entel without compensation and has treated ETI unfairly and inequitably, and continues to do so.

36. Without an order of attachment, the arbitral award will be rendered ineffectual because, among other reasons, (1) Bolivia has repeatedly stated that no compensation will be

paid to ETI for the expropriated Entel shares, has denounced the ICSID treaty and has taken the position that ICSID lacks jurisdiction over it; (2) Bolivia repeatedly has acted contrary to its own legal processes in the course of expropriating ETI's interest in Entel; and (3) the monies on deposit in Entel's New York bank accounts easily can be – and likely will be – transferred out of ETI's reach by Bolivia at its first opportunity.

37.  The amount demanded from Bolivia exceeds all legitimate counterclaims known to ETI.

38.  Plaintiff has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, ETI respectfully requests that this Court issue an ex parte Order of Attachment including the terms set forth in the proposed order submitted herewith, including:

(a) Attaching property, including without limitation the funds held in (i) account number 304-279-757 maintained at JP Morgan Chase Bank N.A.'s New York branch located at 4 New York Plaza, Floor 15, New York, New York, 10004; (ii) account number 3100042572 maintained at Unicredit S.p.A.'s New York branch located at 150 East 42nd Street, New York, New York, 10017; (iii) account number 8601-081-0099 maintained at Intesa Sanpaolo S.p.A.'s New York branch located at One William Street, New York, New York, 10004; and (iv) account number 8601-081-0001 maintained at Intesa Sanpaolo S.p.A.'s New York branch located at One William Street, New York, New York, 10004;

(b) Consistent with the requirements of CPLR § 6211(b), a direction that ETI make a motion to confirm the attachment no later than five days after the levy is served;

(c) Consistent with the requirements of CPLR § 6212(b), a direction that ETI "give an undertaking, in a total amount fixed by the court, but not less than five hundred dollars . . . ;"

(d) Consistent with the requirements of CPLR § 6212(e), a direction that ETI must file the Order of Attachment, declarations and other papers upon which the Order was based, including the summons and complaint, within ten days after the Order is granted;

(e) Consistent with the requirements of CPLR § 6219, a direction that JP Morgan Chase Bank N.A., Unicredit S.p.A. and Intesa Sanpaolo S.p.A.'s garnishee statements be served on ETI within ten days after service of ETI's Order of Attachment; and

(f) Such further and additional relief as the Court deems just and proper.

Dated: New York, New York
May 5, 2008

          ORRICK, HERRINGTON & SUTCLIFFE LLP

          By: /s/ Robert L. Sills
          Robert L. Sills (RS 8896)
          Steven J. Fink (SF 3497)
          ORRICK, HERRINGTON & SUTCLIFFE LLP
          666 Fifth Avenue
          New York, New York 101013
          Telephone: 212 506 5000
          Facsimile: 212 506 5151

          Attorneys for Plaintiff E.T.I. Euro Telecom International N.V.