Robert L. Sills (RS 8896)
Steven J. Fink (SF 3497)
Ryan S. Lester (RL 5603)
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **E.T.I. EURO TELECOM INTERNATIONAL N.V.,** | |
| Plaintiff, | |
| -against- | CIVIL ACTION NO. 08-CV-4247 (LTS) |
| **REPUBLIC OF BOLIVIA** and **EMPRESA NACIONAL DE TELECOMUNICACIONES ENTEL S.A.,** | **DECLARATION OF ROBERT L. SILLS IN SUPPORT OF MOTION TO CONFIRM ORDER OF ATTACHMENT** |
| Defendants. | |

ROBERT L. SILLS declares the following to be true:

1.      I am a member of the bar of this Court and of Orrick, Herrington & Sutcliffe LLP,

attorneys for plaintiff E.T.I. Euro Telecom International N.V. ("ETI") in the above-entitled

action.  I make this Declaration in support of ETI's Motion to Confirm Order of Attachment.

2.      On May 5, 2008, this Court issued, on ETI's application, an *Ex Parte* Order of

Attachment attaching approximately $36 million in assets of Defendant Empresa Nacional de

Telecomunicaciones Entel S.A. ("Entel") maintained on deposit with the New York branches of

JP Morgan Chase Bank N.A. ("JP Morgan Chase"), Unicredito Italiano S.p.A. d/b/a Unicredit

S.p.A. and Intesa Sanpaolo S.p.A. d/b/a Banca Intesa (collectively the "Garnishees"). A copy of that order is attached as Exhibit A.

      3.    Copies of the *Ex Parte* Order of Attachment were served on the Garnishees on May 5, 2008.[1] Copies of the certificates of service signed by Thomas Backiel and Arthur Bernard, the two employees of this firm appointed by the May 5, 2008 *Ex Parte* Order of Attachment to serve said Order upon Garnishees, are attached collectively as Exhibit B.

      4.    Pursuant to CPLR § 6212 and the May 5, 2008 *Ex Parte* Order of Attachment, ETI has today deposited with the Clerk of the Court a standby Letter of Credit, in a form approved by the Clerk, in the amount of $250,000, naming Entel as beneficiary. A copy of said standby Letter of Credit is attached as Exhibit C.

      5.    The facts supporting ETI's motion are set forth in: (a) the Declaration of Franco Bertone dated May 4, 2008, and the accompanying exhibits (attached as Exhibit D), (b) the Declaration of Fabio Incutti dated May 5, 2008 and the accompanying exhibit (attached as Exhibit E), and (c) my Declaration dated May 5, 2008 and the accompanying exhibits (attached as Exhibit F), all of which were previously submitted in support of ETI's application for the *Ex Parte* Order of Attachment.

      6.    On May 7, 2008, ETI sought similar relief in the English courts. That same day, the High Court of Justice, Queen's Bench Division, Commercial Court, granted an order, on ETI's application, freezing approximately $49 million in Entel's funds maintained at Deutsche Bank AG's London branch. A copy of the High Court's order, as formally entered on May 9, 2008, is attached as Exhibit G.

---

[1]    A second service was made upon CT Corporation, the designated agent for service of JP Morgan Chase, at JP Morgan Chase's request, on May 8, 2008. See Exhibit B.

7.    Counsel for Plaintiff have not endeavored to satisfy the requirements of Rule 2(B) of this Court's Individual Practices, because the May 5, 2008 *Ex Parte* Order of Attachment, as well as CPLR § 6211, require ETI to move for confirmation of the *Ex Parte* Order of Attachment.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 12, 2008 at New York, New York.

Robert L. Sills

# EXHIBIT A

Robert L. Sills (RS 8896)
Steven J. Fink (SF 3497)
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------

E.T.I. EURO TELECOM INTERNATIONAL N.V.,

        Plaintiff,

        -against-

REPUBLIC OF BOLIVIA and
EMPRESA NACIONAL DE
TELECOMUNICACIONES ENTEL S.A.,

        Defendants.

-----------------------------------------------------------

08 CV 42 47 (LTS )

**EX PARTE**
**ORDER OF ATTACHMENT**

        Upon the declaration of Franco Bertone executed on May 4, 2008, the declaration of Robert L. Sills executed on May 5, 2008, the declaration of Fabio Incutti, executed on May 5, 2008, and upon all prior papers and proceedings heretofore had herein, it is

        ORDERED, that E.T.I Euro Telecom International N.V.'s motion for the issuance of an *ex parte* Order of Attachment be and hereby is granted;  and it is further

        ORDERED that the amount to be secured by this order of attachment is an amount no less than approximately $12,803,102 and €14,932,152; and it is further

        ORDERED that the United States Marshal for the Southern District of New York, or any person appointed to act in his place or stead, shall levy within this jurisdiction upon such monies, property, and/or interest in the property of Defendants Empresa Nacional de Telecomunicaciones Entel S.A. ("Entel") and the Republic of Bolivia ("Bolivia") as are on deposit, including without

limitation time deposits, with the New York branch of JP Morgan Chase Bank N.A. ("JP

Morgan"), located at 4 New York Plaza, Floor 15, New York, New York, 10004, including

without limitation account number 304-279-757; the New York branch of Unicredito Italiano

S.p.A. d/b/a Unicredit S.p.A. ("Unicredito"), located at 150 East 42nd Street, New York, New

York 10017, including without limitation account number 3100042572; and the New York

branch of Intesa Sanpaolo S.p.A. d/b/a Banca Intesa (collectively with JP Morgan and

UniCredito, the "Garnishees"), located at One William Street, New York, New York 10004,

including without limitation account numbers 8601-081-0001 and 8601-081-0099; and shall pay

or deliver all such funds, monies, property, and/or interests in property to the Clerk of this Court

for the purpose of satisfying any arbitral award that may be obtained against Bolivia by ETI; and

it is further

ORDERED that, the Court hereby appoints the following persons to act in the place and

stead of the U.S. Marshal for the purpose of serving this Order and effecting the levy ordered

hereby: Arthur Bernard and Thomas Backiel, both of whom are employed by counsel for

Plaintiff; and it is further

ORDERED that service of a copy of this Order upon Garnishees by facsimile, electronic

transmission, overnight courier, or personal delivery, shall be deemed sufficient service thereof;

and it is further

ORDERED that the statement required by CPLR § 6219 shall be served by Garnishees

upon the U.S. Marshal, and a copy served on Orrick, Herrington & Sutcliffe LLP, Plaintiff's

counsel, within five (5) days after service of this Order; and it is further

ORDERED that, pursuant to CPLR § 6211, Plaintiff shall move within a period not to

exceed five days after levy, for an order confirming the order of attachment, with notice of _15_ business days

-2-

days to Defendants and Garnishees, and serve on Defendants all papers upon which this Order is

based; and it is further

ORDERED that Defendants and Garnishees shall serve and file papers, if any, in

opposition to such motion within _10_ business days after such service, and that Plaintiff shall

serve and file its reply papers, if any, within _3_ business days after receipt by Plaintiff's counsel of such

papers in opposition; and it is further

ORDERED that service of such motion and the papers on which this order is based upon

the Garnishees shall be made by hand, and upon Defendants by Federal Express or other

recognized international courier service for the promptest available delivery, addressed as

follows:

> His Excellency
> David Choquehuanca Cespedes
> Ministero de Relaciones Exteriores y Culto
> Plaza Murillo – c. Ingavi esq. c. Junin
> La Paz
> Bolivia
>
> -and-
>
> His Excellency
> Ambassador Gustavo Guzman
> Embassy of the Republic of Bolivia
> 3014 Massachusetts Avenue, NW
> Washington, DC 20008

in the case of Republic of Bolivia; and

> Empresa Nacional de Telecomunicaciones Entel S.A.
> Edificio Tower
> Calle Federico Zuazo No. 1771
> La Paz
> Bolivia

in the case of Entel, and that such service shall, in all respects, be deemed good and sufficient;

and it is further

ORDERED that, pursuant to CPLR § 6212, Plaintiff shall deposit with the Clerk of the

Court, within five (5) business days, a standby Letter of Credit or other undertaking in the

amount of $ _____ 259,000 _____ as security.

IT IS SO ORDERED.


Dated: New York, New York
       May __5__, 2008

Issued at 2:36 p.m.

_____
United States District Judge

Part I

-4-

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

E.T.I. EURO TELECOM INTERNATIONAL N.V.,

          Plaintiff,

       -against-

**REPUBLIC OF BOLIVIA** and
**EMPRESA NACIONAL DE
TELECOMUNICACIONES ENTEL S.A.,**

         Defendants.

---

08 CV 4247 (LTS)


**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK  )
               : ss.:
COUNTY OF NEW YORK )

Arthur Bernard, being duly sworn, deposes and says:

1.  I am over the age of 18 years, am not a party to this action and am employed by Orrick, Herrington & Sutcliffe LLP, 666 Fifth Avenue, New York, NY 10103.

2.  On the 8th day of May, 2008, I served a true and correct copy of the Ex Parte Order Of Attachment, dated 5/5/08 upon  JP Morgan Chase N.A. located at 4 New York Plaza, New York, New York 10004 as an additional service immediately upon learning that JP Morgan Chase raised an issue about whether service was effective, via hand delivery upon their agent for service of process:

         CT Corporation
         111 Eight Avenue
         New York, NY 10011

by personally delivering a true and correct copy to Nora Dindyal, the Process Specialist thereof, who is authorized to accept process.

 I describe Ms. Dindyal as Indian, black hair, approximately 39 years old, 5 feet 4 inches tall and weighing approximately 140 lbs.

                                     Arthur Bernard

Sworn to before me this
9th day of May, 2008

     Notary Public
      **BEVERLY H. CHOW**
  **Notary Public, State of New York**
      **No. 02CH6102203**
  **Qualified in Westchester County**
**Commission Expires December 01, 20 ʼʼ**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

E.T.I. EURO TELECOM INTERNATIONAL N.V.,

           Plaintiff,

         -against-

REPUBLIC OF BOLIVIA and
EMPRESA NACIONAL DE
TELECOMUNICACIONES ENTEL S.A.,

          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

08 CV 4247 (LTS)


**AFFIDAVIT OF SERVICE**


STATE OF NEW YORK   )
               : ss.:
COUNTY OF NEW YORK )

     Arthur Bernard, being duly sworn, deposes and says:

     1.  I am over the age of 18 years, am not a party to this action and am employed by Orrick, Herrington & Sutcliffe LLP, 666 Fifth Avenue, New York, NY 10103.

     2.  On the 5th day of May, 2008, I served a true and correct copy of the Ex Parte Order Of Attachment, dated 5/5/08 via hand delivery upon:

Uni Credit
150 East 42nd Street
New York, NY 10017

by personally delivering a true and correct copy to Jane R. Capraro, Vice President,  who is authorized to accept service.

 I describe Ms. Capraro as Caucasian female, brown hair, approximately 42 years old, 5 feet 4 inches tall and weighing approximately 140 lbs.

                                  Arthur Bernard

Sworn to before me this
7th day of May, 2008

   Notary Public

THOMAS BACKIEL
Notary Public, State of New York
No. 01BA6083754
Qualified in Queens County
Commission Expires Nov. 25, 2010

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

E.T.I. EURO TELECOM INTERNATIONAL N.V.,

        Plaintiff,

        -against-

REPUBLIC OF BOLIVIA and
EMPRESA NACIONAL DE
TELECOMUNICACIONES ENTEL S.A.,

        Defendants.

---

08 CV 4247 (LTS)


**AFFIDAVIT OF SERVICE**

STATE OF NEW YORK    )
                : ss.:
COUNTY OF NEW YORK )

    Thomas Backiel, being duly sworn, deposes and says:

    1.  I am over the age of 18 years, am not a party to this action and am employed by Orrick, Herrington & Sutcliffe LLP, 666 Fifth Avenue, New York, NY 10103.

    2.  On the 5th day of May, 2008, I served a true and correct copy of the Ex Parte Order Of Attachment, dated 5/5/08 via hand delivery upon:

Intesa Sanpaolo S.p.A. d/b/a Banca Intesa
One William Street
New York, NY 10004

by personally delivering a true and correct copy to Ann T. Stefan, First Vice President at One William Street, New York, NY, who is authorized to accept service.

 I describe Ms. Ann T. Stefan as Caucasian female, brown hair, approximately 45 years old, 5 feet 4 inches tall and weighing approximately 170 lbs.

    3.  On the 5th day of May, 2008, I also served a true and correct copy of the Ex Parte Order Of Attachment, dated 5/5/08 via hand delivery upon:

JP Morgan Chase Bank N.A.
4 New York Plaza
New York, NY 10004

by personally delivering a true and correct copy to Carl Del Vecchio, Assistant Vice President at 1 Chase Manhattan Plaza, New York, NY, who is authorized to accept service.

I describe Mr. Carl Del Vecchi as Caucasian male, brown hair, approximately 47 years old, 5 feet 10 inches tall and weighing approximately 210 lbs.

_____
Thomas Backiel

Sworn to before me this
6th day of May, 2008

_____
Notary Public

BEVERLY H. CHOW
Notary Public, State of New York
No. 02CH6102203
Qualified in Westchester County
Commission Expires December 01, 2011

# EXHIBIT C

**JPMorganChase** 🟦

JPMorgan Chase Bank, N.A.
c/o JPMorgan Treasury Services
Global Trade Services
10420 Highland Manor Drive
Tampa, FL 33610

MAY 12, 2008
OUR L/C NO.: TPTS-610305

TO:                              APPLICANT:
EMPRESA NACIONAL DE              E.T.I. EURO TELECOM
TELECOMUNICACIONES ENTEL S.A.    INTERNATIONAL N.V.
(REFER TO LC FOR FULL DETAILS)   STRAWINSKYLAAN 1627
LA PAZ - BOLIVIA                 1077 XX AMSTERDAM
                                 THE NETHERLANDS

WE ENCLOSE HEREWITH (AS A PERMANENT PART OF THIS LETTER OF CREDIT) AN
IRREVOCABLE STANDBY LETTER OF CREDIT OPENED IN YOUR FAVOR SUBJECT TO ISP98

TRANSACTION REFERENCE NUMBER:    TPTS-610305

DATE AND PLACE OF EXPIRY:        MAY 12, 2009
                                 AT OUR COUNTER

DOCUMENTARY CREDIT AMOUNT:       USD250,000.00

AUTO EXTENSION:                  YES

EXTENSION PERIOD:                12 MONTH(S)

NOTIFICATION PERIOD:             30 DAY(S)

FINAL EXPIRY DATE:               MAY 31, 2011

EXCEPT AS FAR AS OTHERWISE EXPRESSLY STATED HEREIN, THIS LETTER OF CREDIT
IS SUBJECT TO THE INTERNATIONAL STANDBY PRACTICES ("ISP98"), INTERNATIONAL
CHAMBER OF COMMERCE PUBLICATION NO. 590 AND AS TO MATTERS NOT ADDRESSED BY
THE ISP98 THIS LETTER OF CREDIT SHALL BE GOVERNED BY, AND CONSTRUED IN
ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO
PRINCIPLES OF CONFLICT OF LAWS.

PLEASE REVIEW THE DETAILS OF THIS ENCLOSURE AND THE ATTACHED LETTER OF
CREDIT IMMEDIATELY AND CONTACT OUR CLIENT SERVICE GROUP AT THE TELEPHONE
NUMBER OR E-MAIL ADDRESS PROVIDED WITHIN THE LETTER OF CREDIT IF YOU HAVE

**JPMorganChase**

**JPMorgan Chase Bank, N.A.**
c/o JPMorgan Treasury Services
Global Trade Services
10420 Highland Manor Drive
Tampa, FL 33610

MAY 12, 2008
OUR L/C NO.: TPTS-610305

ANY QUESTIONS.

_____
AUTHORIZED SIGNATURE

**JPMorganChase** 🌐

JPMorgan Chase Bank, N.A.
c/o JPMorgan Treasury Services
Global Trade Services
10420 Highland Manor Drive
Tampa, FL 33610

MAY 12, 2008
OUR L/C NO.: TPTS-610305

BENEFICIARY:
EMPRESA NACIONAL DE TELECOMUNICACIONES ENTEL S.A.
EDIFICIO TOWER
CALLE FEDERICO ZUAZO NO 1771 ESQ. CALLE TIHUANACU
LA PAZ - BOLIVIA

APPLICANT:
E.T.I. EURO TELECOM INTERNATIONAL N.V.
STRAWINSKYLAAN 1627
1077 XX AMSTERDAM
THE NETHERLANDS

AMOUNT:
USD250,000.00 (TWO HUNDRED AND FIFTY THOUSAND UNITED STATES DOLLARS)

RE: E.T.I. EURO TELECOM INTERNATIONAL N.V. V. REPUBLIC OF BOLIVIA
UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

FOR THE ACCOUNT OF E.T.I. EURO TELECOM INTERNATIONAL N.V, WE HEREBY ISSUE
OUR IRREVOCABLE STANDBY LETTER OF CREDIT NO. TPTS-610305 IN FAVOR OF
EMPRESA NACIONAL DE TELECOMUNICACIONES ENTEL S.A. (''BENEFICIARY''), IN
THE AMOUNT OF USD 250,000.00 (TWO HUNDRED AND FIFTY THOUSAND UNITED STATES
DOLLARS) (THE ''MAXIMUM AMOUNT'') EXPIRING AT OUR COUNTERS ON MAY 12,
2009, SUBJECT TO EXTENSION OR EARLY EXPIRATION AS DESCRIBED BELOW.

WE HAVE BEEN ADVISED AND HAVE NOT INDEPENDENTLY VERIFIED THAT THIS LETTER
OF CREDIT HAS BEEN ISSUED TO SECURE APPLICANT'S OBLIGATION TO PAY
BENEFICIARY ALL COSTS AND DAMAGES, INCLUDING REASONABLE ATTORNEY'S FEES,
WHICH MAY BE SUSTAINED BY REASON OF APPLICANT'S ATTACHMENT OF CERTAIN OF
BENEFICIARY'S PROPERTY IF BENEFICIARY RECOVERS JUDGMENT OR IT IS FINALLY
DECIDED THAT APPLICANT WAS NOT ENTITLED TO ATTACHMENT OF BENEFICIARY'S
PROPERTY.

THIS STANDBY LETTER OF CREDIT IS AVAILABLE AGAINST PRESENTATION OF YOUR
DRAFT DRAWN AT SIGHT ON JPMORGAN CHASE BANK, N.A. BEARING OUR STANDBY
LETTER OF CREDIT NO. TPTS-610305, ACCOMPANIED BY:

JPMorgan Chase Bank, N.A.
c/o JPMorgan Treasury Services
Global Trade Services
10420 Highland Manor Drive
Tampa, FL 33610

MAY 12, 2008
OUR L/C NO.: TPTS-610305

A) A WRITTEN STATEMENT SIGNED BY AN AUTHORIZED REPRESENTATIVE OF
BENEFICIARY STATING ''PAYMENT IS DUE TO US FROM E.T.I. EURO TELECOM
INTERNATIONAL N.V. PURSUANT TO THAT FINAL AND NON-APPEALABLE ORDER IN THE
MATTER OF E.T.I. EURO TELECOM INTERNATIONAL N.V. V. REPUBLIC OF BOLIVIA,
UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK. THE AMOUNT OF
THE SIGHT DRAFT DOES NOT EXCEED THE AMOUNT AWARDED TO THE BENEFICIARY BY
THE DISTRICT COURT. AT LEAST 3 DAYS PRIOR TO THE DATE OF OUR DEMAND,
WRITTEN NOTICE OF OUR INTENTION TO DRAW HEREUNDER WAS SENT TO E.T.I. EURO
TELECOM INTERNATIONAL N.V.''

B) COPY OF THE ORDER OF THE UNITED STATES DISTRICT COURT SOUTHERN DISTRICT
OF NEW YORK REFERRED TO IN PARAGRAPH (A) ABOVE.

ALL CORRESPONDENCE AND ANY DRAWINGS HEREUNDER ARE TO BE DIRECTED TO
JPMORGAN TREASURY SERVICES, STANDBY LETTER OF CREDIT DEPT.  4TH FL. 10420
HIGHLAND MANOR DRIVE, TAMPA, FLORIDA 33610.  CUSTOMER INQUIRY NUMBER IS 1-
866-632-5101 AND CHOOSE OPTION NO.  3.

WE HEREBY AGREE WITH YOU THAT DRAFTS DRAWN UNDER AND IN COMPLIANCE WITH
THE TERMS AND CONDITIONS OF THIS LETTER OF CREDIT WILL BE DULY HONORED.

MULTIPLE DRAWINGS UNDER THIS LETTER OF CREDIT ARE NOT PERMITTED.

IT IS A CONDITION OF THIS IRREVOCABLE LETTER OF CREDIT THAT IT SHALL
AUTOMATICALLY BE EXTENDED WITHOUT AMENDMENT FOR ADDITIONAL ONE YEAR
PERIODS FROM THE PRESENT OR EACH FUTURE EXPIRATION DATE, UNLESS AT LEAST
THIRTY (30) DAYS PRIOR TO SUCH DATE WE SEND YOU NOTICE IN WRITING BY
REGISTERED MAIL RETURN RECEIPT REQUESTED OR HAND DELIVERY AT THE ABOVE
ADDRESS, THAT WE ELECT NOT TO EXTEND THIS LETTER OF CREDIT FOR SUCH
ADDITIONAL PERIOD.  HOWEVER IN NO EVENT SHALL THIS LETTER OF CREDIT BE
EXTENDED BEYOND THE FINAL EXPIRY DATE OF MAY 31, 2011.

NOTWITHSTANDING ANY OTHER PROVISION HEREIN, THIS LETTER OF CREDIT SHALL
EXPIRE UPON OUR RECEIPT OF A WRITTEN STATEMENT BEARING OUR STANDBY LETTER
OF CREDIT NO. TPTS-610305 AND SIGNED BY AN AUTHORIZED REPRESENTATIVE OF
(A) APPLICANT STATING THAT THIS LETTER OF CREDIT IS NO LONGER REQUIRED,
WHICH STATEMENT MUST BE ACCOMPANIED BY A COPY OF A FINAL AND NON-

JPMorgan Chase

JPMorgan Chase Bank, N.A.
c/o JPMorgan Treasury Services
Global Trade Services
10420 Highland Manor Drive
Tampa, FL 33610

                                        MAY 12, 2008
                            OUR L/C NO.: TPTS-610305

APPEALABLE ORDER OF THE UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF
NEW YORK CONFIRMING THAT THIS LETTER OF CREDIT IS NO LONGER REQUIRED,
ACCOMPANIED BY THE ORIGINAL LETTER OF CREDIT INSTRUMENT AND ALL
AMENDMENTS, IF ANY, OR (B) EACH OF BENEFICIARY AND APPLICANT STATING THAT
THIS LETTER OF CREDIT IS NO LONGER REQUIRED, ACCOMPANIED BY THE ORIGINAL
LETTER OF CREDIT INSTRUMENT AND ALL AMENDMENTS, IF ANY.

AFTER EXPIRATION, THIS LETTER OF CREDIT WILL BE NULL AND VOID IRRESPECTIVE
OF THE ACTUAL RETURN OF THIS DOCUMENT, AND NO NOTICE OF CANCELLATION WILL
BE REQUIRED.

EXCEPT AS FAR AS OTHERWISE EXPRESSLY STATED HEREIN, THIS LETTER OF CREDIT
IS SUBJECT TO THE INTERNATIONAL STANDBY PRACTICES ("ISP98"), INTERNATIONAL
CHAMBER OF COMMERCE PUBLICATION NO. 590 AND AS TO MATTERS NOT ADDRESSED BY
THE ISP98 THIS LETTER OF CREDIT SHALL BE GOVERNED BY, AND CONSTRUED IN
ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO
PRINCIPLES OF CONFLICT OF LAWS.

THE NUMBER AND THE DATE OF OUR CREDIT AND THE NAME OF OUR BANK MUST BE
QUOTED ON ALL DRAFTS REQUIRED.

                                        _____
                                          AUTHORIZED SIGNATURE

141808 Lily Phu                                              Page 3 of 3

# EXHIBIT D

Robert L. Sills (RS 8896)
Steven J. Fink (SF 3497)
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000
Facsimile:  (212) 506-5151
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------

**E.T.I. EURO TELECOM INTERNATIONAL N.V.,**

Plaintiff,

-against-

**REPUBLIC OF BOLIVIA and
EMPRESA NACIONAL DE
TELECOMUNICACIONES ENTEL S.A.,**

Defendants.

--------------------------------------------------------

08 CV

**DECLARATION OF
FRANCO BERTONE**

**FRANCO BERTONE**, declares the following to be true:

1.      I am an Italian citizen and reside in La Paz, Bolivia.

2.      I am currently employed as Chief Executive Officer of Empresa Nacional de
Telecomunicaciones Entel S.A. ("Entel").  I assumed this position in May 2006.

3.      I am familiar with the matters set forth below, which are set forth to the best of
my knowledge.

4.      E.T.I. Euro Telecom International N.V. ("ETI") is a corporation incorporated in
the Netherlands.  ETI owns, or owned, 50% of the share capital of Entel, the largest Bolivian
telecommunications operator.  By virtue of its 50% shareholding, ETI also has, under Bolivian
law, the right to appoint a majority of Board Members.  ETI acquired its ownership interest and

management control over Entel in a privatization transaction in November 1995, through subscribing and paying in a capital increase of Entel.

5.    The privatization of Entel was structured by the Bolivian Government as a payment by ETI to Entel of $610 million to subscribe to 50% of Entel's shares and Board control.  The remaining shares were held by two Bolivian pension funds (about 47.5% of the share capital) and by local shareholders and employees of Entel (about 2.5% of the share capital).

6.    Entel made substantial investments in Bolivia's telecommunications infrastructure in the years that followed the privatization.  By December 2007, Entel had made investments in infrastructure and technology, on a consolidated basis, in an amount exceeding $741 million and employed 1,500 Bolivians.  This comprised the largest infrastructure investment program in the history of Bolivian telecommunications, and Entel became a leading telecommunications company in the region, providing greatly improved and expanded service to all regions of Bolivia.  From 1996 to 2007, the fixed and mobile telecommunications services penetration in Bolivia grew from 5% to 45% of the population, and the mobile telecommunications services penetration in Bolivia grew from less than 1% to over 38%.

7.    Entel's compliance with its obligations undertaken at the time of the privatization were confirmed by the government of Bolivia in May 2005, when it issued Supreme Decree No. 28172 providing the Ministry of Economic Development with power to determine if Entel had fulfilled those obligations, followed in August 2005 by the Ministry of Economic Development's issuance of Ministerial Resolution No. 194 which declared that Entel had met all of its commitments undertaken in connection with the privatization.  Four members of the Bolivian Senate subsequently challenged the constitutionality of the Supreme Decree and Ministerial

Resolution in Bolivia's court of last resort, the Constitutional Tribunal. On January 18, 2006, the Constitutional Tribunal upheld the validity of Supreme Decree 28172, ruled that the court lacked jurisdiction to review the Ministerial Resolution, and rejected the Senators' challenge. Accordingly, these instruments, issued by the Bolivian government and having the force of law, stand as Bolivia's legal certification that Entel met its obligations under the privatization program.

8.     In reliance on those official acts of the Bolivian government, the shareholders of Entel (including the Bolivian pension funds and Entel's employee shareholders) voted to carry out a reduction of the company's capital in September 2005. Corresponding amounts of capital were thereafter distributed to Entel's shareholders, with approximately $200 million distributed to the Bolivian shareholders, and the $200 million balance distributed to ETI. The excess cash that was distributed was available because of the amount of ETI's $610 million capital contribution, the company's improving cash position as a result of substantially completing the investments required in connection with the privatization program, and the Bolivian government's certification that the company had made the required level of investments and met its other obligations. The Bolivian government imposed no taxes on the distribution at the time it was made, and two prominent international accounting firms provided their opinions that the transaction was not a distribution of dividends, but was a distribution of capital of foreign origin, and therefore was not taxable.

9.     In 2007, ETI retained ABN AMRO Bank N.V. ("ABN AMRO") to prepare a valuation of Entel. As reflected in ABN AMRO's Valuation Report of Entel S.A., a copy of which is attached as Exhibit 1, the equity value of Entel's business was estimated, based on conservative assumptions, in the range from $587 million to $650 million at then-current

exchange rates, with Entel's 50% interest worth an amount in the range from $294 million to $325 million. In light of the company's improved cash position, the fact that the company's performance exceeded the business plan upon which the valuation was based, and the recent devaluation of the US Dollar, I believe that the current value in US Dollars is significantly greater than that reflected in the ABN AMRO Valuation Report. I also note that the company holds cash of approximately $80,000,000, including the $34.2 million that is the subject of this motion.

10.    In January 2006, President Evo Morales, the leader of the "Movement Towards Socialism," took office in Bolivia on a platform advocating significant intervention in the Bolivian economy. In June of that same year, Bolivia published a national development plan that contemplated the re-nationalization of various formerly state-owned enterprises that had been privatized in the 1990s. The Bolivian government began to execute this National Development Plan by nationalizing Bolivia's oil and gas reserves shortly after President Morales took office.

11.    In July 2006, the Bolivian government began to take measures that adversely affected the value of ETI's equity interest in Entel. Specifically, on July 7, 2006, Bolivian authorities notified Entel that Bolivia was imposing on Entel approximately $26 million in purported withholding taxes (at today's exchange rates) for the capital distribution made in September 2005. Although no prior notice of the tax had been given, Bolivia also assessed penalties and interest that added approximately another $30 million. Entel petitioned the Bolivian tax authorities to reconsider the imposition of these taxes, penalties and interest, although the taxing authority ultimately demanded immediate payment, as discussed below.

12.    On March 28 2007, Bolivia issued Supreme Decree No. 29087, which established

an ad hoc commission (the "Commission") mandated to negotiate the "recovery" of Entel for the

Bolivian State within 30 days.  The Commission was comprised of three ministerial and two

vice-ministerial members of the Bolivian government.  The Decree also referred to a supposed

investigation of Entel which purportedly revealed "irregularities in [its] administration and

operations . . . ."  I first learned of this supposed investigation after the fact, upon the

promulgation of Supreme Decree No. 29087.  A copy of Supreme Decree No. 29087, with an

English translation is attached as Exhibit 2.

13.    On April 4, 2007, the Bolivian Commission invited ETI to meet in La Paz on

April 11, 2007 for "negotiations."  I attended the meetings that were conducted beginning on

April 11.  They lasted for three days.

14.    The Bolivian Commission did not offer at the April 2007 meetings to pay

anything for ETI's controlling stake in Entel, nor has it done so since.  Indeed, the

Commissioners never specified the extent of the interest that they sought to acquire.  Instead, the

Commission used the meeting as an opportunity to level baseless accusations against ETI and the

incumbent management of Entel.  The Commissioners made these accusations both at the

meeting and during a press conference that Bolivian Minister Quintana held while the meetings

were underway.  He held this press conference despite Bolivia's insistence that the meetings

should be held confidential, to which all parties had agreed.

15.    The Bolivian Commission also presented at the April 2007 meeting its "findings"

as to Entel's purported financial "irregularities."  These findings are reflected in a PowerPoint

presentation, a copy of which, together with an English translation, is attached as Exhibit 3.  As

reflected in the PowerPoint, according to the Commission, the "irregularities" required

adjustments to the reported value of the company in the aggregate amount of $645 million – the approximate value of the company at the time. (Exhibit 3, Slide 16).

16.    The Bolivian Commissioners expressly stated that Bolivia would not pay anything to compensate ETI for the expropriation of its equity stake in Entel in light of the supposed "irregularities."

17.    The Bolivian government then requested a second meeting to discuss ETI's shareholding in Entel. This meeting was to be held on April 23, 2007. Only hours before that meeting was to begin, the Bolivian government issued two new Decrees directly impacting ETI's interests in Entel:

   (1)    Supreme Decree No. 29100, which purports to abrogate Supreme Decree No. 28172 and Ministerial Resolution No. 194 – which collectively confirmed that Entel had fully performed its obligations undertaken in connection with the privatization. Bolivia issued this Decree despite the fact that the Bolivian Constitutional Tribunal had already rejected a constitutional challenge to the Supreme Decree and Ministerial Resolution, as discussed above[1]; and

   (2)    Supreme Decree No. 29101, which purports to abrogate several earlier Decrees that authorized Entel's privatization.

Copies of these Supreme Decrees, with English language translations, are attached as Exhibits 4 and 5, respectively. In light of those events, the proposed meeting did not go forward.

---

[1]  Supreme Decree 29100 also transferred the 47.5% interest in Entel held by two Bolivian pension funds to the Bolivian government.

18.    The Decrees paved the way to the nationalization of Entel without any compensation for ETI.  As a consequence, on April 28, 2007, ETI gave Bolivia notice of the existence of a dispute under the bilateral investment treaty between Bolivia and the Netherlands (the "BIT") for unfair treatment and *de facto* expropriation of its investment.  ETI commenced an arbitration against Bolivia later that year, asserting those claims under the BIT, in the World Bank's International Centre for Settlement of Investment Disputes.  As a result of the notice and of the filing of the arbitration before ICSID, the nationalization plan was delayed.

19.    During a televised May Day rally in La Paz, Bolivia on Thursday, May 1, 2008, President Morales signed Supreme Decree No. 29544 (the "Nationalization Decree"), which immediately nationalized ETI's equity interest in Entel.  He also read the text of the Nationalization Decree out loud for the live and television audiences.  This public proclamation gave the Nationalization Decree immediate effect.

20.    A copy of the Nationalization Decree, with an English language translation, is attached as Exhibit 6.  The operative provisions of the Nationalization Decree include:

- "The stock of the capitalizing company ETI EUROTELECOM INTERNATIONAL NV is hereby nationalized in its entirety and said company is transformed into Entel SAM; all the shares of this capitalizing company shall be transferred to the Bolivian state, being temporarily held by the Ministry of Public Works, Utilities and Housing...." (Nationalization Decree, Article 2); and

- "Any individual that, in any way, may interrupt or disturb the normal business of the company, or engage in acts that cause detriment or prejudice to its corporate assets must be denounced before the Public Ministry under the offense of 'Attempt against the security of public services', 'Anti-Economic Behavior', 'Aggravated Damage'

and other offences typified in the Criminal Code." (Nationalization Decree, Article 7, paragraph II).

21.    The Nationalization Decree further provides: "The Bolivian state shall pay the capitalizing company ETI EUROTELECOM INTERNATIONAL NV the value of the nationalized shares of stock; to this end, an evaluation shall be performed no later than 60 days as from the day this Supreme Decree comes into effect." (Nationalization Decree, Article 3). It also provides, however: "The financial, tax, labor, commercial and regulatory liabilities of ENTEL S.A., both payable and contingent, shall be deducted at the time of effecting the final liquidation for the payment to be made to the company ETI EUROTELECOM INTERNATIONAL NV." (Nationalization Decree, Article 4).

22.    It is clear to me from the position taken by the Bolivian Government at the meetings in April 2007 that it does not plan to pay anything to Entel. This is confirmed by the Bolivian Government's own internal documents.

23.    In early April 2008, I was provided with a draft Supreme Decree of the Bolivian government that, if issued, would have provided for the government to take management control over Entel. I was also provided, along with the Decree, with an "Explanatory Memorandum." A copy of the Explanatory Memorandum, together with an English language translation, is attached as Exhibit 7. The Explanatory Memorandum describes various strategies that the Bolivian government was considering to accomplish its goal of nationalizing ETI's interest in Entel.

24.    The Explanatory Memorandum identifies the following objectives: "1. Recovering the ownership of the company for the State; 2. Compensation 0, due to the irregularities found; and 3. Protection of company assets." (Explanatory Memorandum, page 2).

25.    I anticipate that at the end of the 60 day period, the Bolivian government will again take the position that in light of the supposed financial "irregularities," ETI is not entitled to anything at all.  Indeed, only a few days before the Nationalization Decree was issued, the Bolivian tax authorities ordered payment within three days of approximately $60 million for the purported withholding taxes, penalties and interest retroactively assessed, without basis, for the September 2005 capital reduction and distribution.  I expect that the Bolivian government will use this purported obligation, in addition to the $645 million in purported "irregularities," to further reduce its valuation of the company.

26.    Concurrently with the proclamation of the Nationalization Decree on May 1, the Bolivian police took physical control of Entel's main offices and premises, blocking any access or exit to the buildings.

27.    Also on May 1, Administrative Regulatory Resolution No. 2008/1056 (the "Administrative Resolution") was issued by the Superintendencia de Telecomunicaciones ("SITTEL") – the telecommunications regulatory agency of Bolivia – and served on Entel.  The Administrative Regulatory Resolution ordered, on the authority of the Nationalization Decree, that Mr. Joel Flores Carpio, an agent for SITTEL, assume management of Entel and run the company until the formal transfer of ETI's shares in Entel is effected.  A copy of the Administrative Regulatory Resolution is attached as Exhibit 8.  This Administrative Regulatory Resolution was issued despite the fact that the conditions upon which the appointment of a commissioner to assume control of a telecommunications company under Bolivian law were not present.

28.    I am advised by several of Entel's senior managers that on Friday, May 2, 2008, Mr. Carpio arrived at Entel's offices accompanied by police and a group of telecommunications

specialists from several different countries. They immediately instructed the company's internal security officers to provide them with access to all of the company's systems. Among other things, they made copies of the information on the personal computers of the company's senior managers. Mr. Carpio also required the IT department of Entel to shut down my corporate email account and deny service to my Blackberry PDA device, and also disconnected my cell phone service, and took similar steps for the other senior members of Entel management.

29. Mr. Carpio made an announcement on Friday to those of the company's employees who were present in the office that day – a holiday in Bolivia – about how the company would be run going forward.

30. Mr. Carpio also called the company's senior managers into the office and spoke with them as a group. He then called them in to speak with him individually. I was not in Bolivia at the time and have not spoken with Mr. Carpio since the Administrative Resolution was issued.

31. I am advised by company personnel that Mr. Carpio asked for a list of the company's bank accounts and details on those accounts, including authorized signatories. According to those company personnel with whom I spoke, Mr. Carpio was particularly interested in accounts located outside Bolivia. I do not know whether he has yet obtained the information necessary to effect a transfer to Bolivia of the funds in Entel's accounts located outside Boliva, but expect that if he has not yet done so, he will succeed in doing so shortly.

32. I am further advised by company personnel that Mr. Carpio attempted to have ETI's shares transferred to the Bolivian government that same day. I understand that has not yet happened, but that Mr. Carpio treated transferring the shares as a matter of great urgency.

33.     It is clear to me that Bolivia will appoint a new Entel Board of Directors as soon as it succeeds in transferring ETI's shares. Bolivia recently obtained the 47.5% of the shares of Entel that had previously been held by two public pension plans. With ETI's shares in addition to the 47.5% that it already holds, Bolivia will be in a position to replace ETI's entire Board.

34.     I anticipate that once the Bolivian government appoints its own designees to the Entel Board, one of the Board's first acts will be to direct a transfer to Bolivia of Entel's assets held outside the country.

35.     The assets held outside the country include approximately $34.2 million held in bank accounts maintained in New York City. The first account, bearing account number 3100042572, is maintained at UniCredit's New York branch located at 150 East 42nd Street, New York, New York, 10017, is denominated in Euros, and has a balance of approximately €4,856,596 (approximately $7.5 million at today's exchange rate). The second account, bearing account number 8601-081-0099, is maintained at Intesa Sanpaolo S.p.A.'s branch located at One William Street, New York, New York, 10004, is denominated in Euros, and has a balance of approximately €10,075,556 (approximately $15.5 million at today's exchange rate). The third account, bearing account number 8601-081-0001, is also maintained at the William Street branch of Intesa Sanpaolo S.p.A., is denominated in US Dollars, and has a current balance of approximately $11,203,102. The total amount held in those three New York accounts is $34,203,102.

36.     For as long as I have been the Chief Executive Officer, the company has maintained similar amounts of excess cash in accounts in New York. Those are not the general operating funds of the company, and, accordingly, freezing those funds will not harm the company or affect its operations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 4th, 2008

Franco Bertone

# EXHIBIT 1

# E.T.I EUROTELECOM INTERNATIONAL N.V.

## Valuation report of Entel S.A.

STRICTLY PRIVATE & CONFIDENTIAL

21 May 2007

**ABN·AMRO**

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Disclaimer

ABN AMRO Bank N.V. ("ABN AMRO") has been retained by E.T.I. Eurotelecom International N.V. ("ETI"), a wholly-owned subsidiary of Telecom Italia S.p.A. ("Telecom Italia" or "TI" or, together with its wholly-owned subsidiaries, "Telecom Italia Group") to render an independent valuation analysis (the "Valuation") of Entel S.A. ("Entel" or the "Company"). The purpose of the Valuation is to estimate the Company's equity value in accordance with the Engagement letter's purposes only, signed by ETI and ABN AMRO.

This Valuation is provided solely to and for the benefit of ETI and is not on behalf of, and shall not confer rights or remedies upon any shareholder, employee or creditor of Telecom Italia Group and/or the Company or any other person, or be used for any other purpose without ABN AMRO's prior written consent as provided by the Engagement letter signed by ETI and ABN AMRO.

This Valuation constitutes proprietary information of ABN AMRO and shall not be disclosed or referenced to third parties, nor distributed, reproduced or used for any other purpose, without the prior written consent of ABN AMRO. This Valuation does not constitute a judgment, opinion or recommendation to the management of Telecom Italia / ETI, the Company or their shareholders and is not intended to support any investment decision.

ABN AMRO is not responsible for any direct or indirect losses arising from of the use of the Valuation.

The rendering of financial-economic valuation is a complex process that involves subjective judgments and is not suitable for partial analyses or summarized descriptions. ABN AMRO did not place special emphasis on any specific factors considered in the Valuation, but rather performed a qualitative assessment of the importance and relevance of all factors considered therein. In this context, the Valuation should be considered as a whole and the review of selected portions, summaries or specific aspects of the Valuation, without acknowledging and analyzing the Valuation as a whole, may result in a misleading and incomplete understanding of the analyses and their conclusions.

The Company was valued on a stand-alone basis and, therefore, the results of the Valuation does not include any operational, tax or any other losses or gains.

ABN AMRO has not performed any independent inspection nor due diligence, and does not assume any responsibility for the accuracy, veracity, integrity and precision of the information, financial projections or any other information provided by Telecom Italia and/or the Company or in any way made available. In addition, ABN AMRO does not assume any responsibility in (i) leading or conducting any asset or liability valuation (contingencies or not) of the Company, its subsidiaries, directly or indirectly controlled companies and affiliates; (II) reviewing or auditing of the financial statements, and the documents that based the elaboration of the Company's financial statements of December 31st, 2006; (III) technical auditing of Company's operations; (iv) evaluating the solvency of the Company, its subsidiaries, directly or indirectly controlled companies and affiliates, pursuant any state or federal or national legislation related to bankruptcy, insolvency, or similar issues, or (v) any physical inspection of properties, installations or assets of the Company, its subsidiaries, directly or indirectly controlled companies and affiliates.

**ABN·AMRO**

2

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Disclaimer (cont'd)

ABN AMRO assumes that the financial projections furnished by Telecom Italia / ETI and/or the Company were reasonably prepared, and reflect the best estimates at the time they were made available, as well as the best judgment of the Company's management in regards to their expected future financial performance. It is uncertain whether the estimates and projections used for the purpose of the Valuation, especially those which depend on the occurrence of future and uncertain events beyond the control of the Company, will actually be achieved. The actual future results of the Company may differ significantly from the forecasted results used in connection with the Valuation. Therefore, ABN AMRO does not assume any responsibility should the future results be substantially different from those used in connection with the Valuation.

ABN AMRO does not and will not, expressly or implicitly, make any representation or statement regarding the information (including projections or forecasts of the Company or assumptions and estimates on which such projections and forecasts were based) used in preparing the Valuation, nor assumes any responsibility or obligation to indemnify any party for the content, accuracy, veracity, completeness, consistency, sufficiency and precision of such information.

ABN AMRO shall not be bound, at any time, to update, review or correct any information contained in the Valuation, nor to provide any additional information on the Valuation.

As informed by Telecom Italia / ETI, ABN AMRO assumes that at present, there were no material changes on the Company's financial condition, assets, liabilities, business perspectives, commercial transactions or any other facts that can modify the information or financial projections provided by Telecom Italia and/or the Company to ABN AMRO, or in any way made available or discussed with ABN AMRO, or made them incorrect or inexact in any material aspect that in any way can cause a material effect on the results of the Valuation.

The research departments, as well as other divisions within ABN AMRO, including its related companies, may use in their analyses reports and publications, estimates, projections and methodologies other than those used in the Valuation, and therefore, such analyses, reports and publications may contain results that differ from those described in the Valuation.

ABN AMRO has rendered, directly or through its related companies, certain financial services and/or investment banking services to the Company and/or their direct or indirect controlling shareholders, subsidiaries and affiliates, for which it received a compensation, and it shall continue to render such services and may, at any time, render additional services. ABN AMRO is, and may become at any time, directly or through its related companies, a creditor of Telecom Italia Group and/or the Company and their direct or indirect controlling shareholders, subsidiaries and affiliates in certain financial transactions.

During its regular course of business, ABN AMRO may trade or hold, directly or through its related companies, on its behalf or on behalf of third parties, securities of Telecom Italia and/or its affiliated companies, and, as consequence thereof, may hold, at any time, long or short positions in these securities.

**ABN·AMRO**

3

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Table of contents

Introduction to the document                                5

1   Brief overview of the Bolivian telecommunication sector  7

2   Entel historical financial highlights                   13

3   Company's Business Plan                                  21

4   Assessment of Business Plan                             32

5   Valuation methodology and results                       46

6   Conclusions                                             61

**Appendices**

A1  DCF Methodology & WACC details                          64

4



**ABN·AMRO**

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Introduction to the document

- ABN AMRO Bank N.V. ("ABN AMRO" or "AA") is pleased to present to E.T.I. Eurotelecom International N.V. ("ETI") and Telecom Italia S.p.A. ("TI", "Telecom Italia" or together with its fully owned subsidiaries, the "Group") a valuation report on Entel S.A. ("Entel" or the "Company") in connection with the Engagement between ABN AMRO and ETI to perform an independent valuation analysis on the Group's 50% shareholding in Entel

- The purpose of this analysis is to determine a valuation range of the Company for TI's internal purposes only and is not prepared to support any transaction or investment decision

- In respect of information provided by TI or ETI, ABN AMRO has assumed that the information has been reasonably prepared on bases reflecting the best available estimates and judgment of the management of Entel. The financial projections of the Business Plan have been reviewed and discussed with Telecom Italia and ETI

- In order to perform a proper valuation exercise, ABN AMRO has made an analysis of the Company's market and sector and has tested main drivers of the Business Plan against sector benchmarks and expected future trends. ABN AMRO has factored into its analysis the information provided by the Company, including Business Plan, audited and managerial financial statements and market research reports

- This valuation exercise has been done on a "stand alone" basis, i.e. does not include any additional benefits / synergies that could arise from a combination of the Company with another major player in the sector. The intercompany relationships between Entel and the Group, as discussed with both TI / ETI and Entel management, is assumed to be no material from a valuation point of view

- The value range may be subject to even significant change, in the event that the key assumptions of the Business Plan are modified

- The projections are expressed in local currency nominal terms

- The valuation base date is 31 March 2007 and forecasted period refers from the period starting in 31 December 2006 and ending in 2014

**ABN·AMRO**

5

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

## Introduction to the document (cont'd)

- In order to render the Valuation, ABN AMRO relied on the following information, prepared by Telecom Italia / ETI and/or the Company's management team, provided by Telecom Italia or ETI as listed thereafter (referred to jointly as the "Information"):

   i.    Plan Estrategico 07-09 (Diciembre 2006)

   ii.   Decreto Supremo

   iii.  Contingent Liabilities

   iv.   Financial Statements

   v.    Financial Info

   – P&L, BS, CF Group 04-06A – 07-09SP, P&L, BS, CF Wireline 04-06A – 07-09SP, P&L, BS, CF Mobile 04-06A – 07-09SP, Fixed Assets Wireline 04-05A, Fixed Assets Mobile 04-05A, Operating costs Wireline 04-06A – 07-09SP

   vi.   Business Info

   – KPIs Wireline 04-06A – 07-09SP, KPIs Mobile 04-06A – 07-09SP

   vii.  Reporte Gestional Diciembre 2006

   viii. Updated financial information

   – P&L, BS, CF Group 06A – 07-09SP, P&L, BS, CF Wireline 06A – 07-09SP, P&L, BS, CF Mobile 06A – 07-09SP

   ix.   Gestion 2006 – Ejecucion Febrero 2007 y FCST1 2007-2009

   x.    Plan Estrategico 2007-2009 – Forecast I 2007 – Reformulacion 2008-2009 (March 2007)

   xi.   Market research on Bolivian population: APOYO Opinion Y Mercado Bolivia

**ABN·AMRO**

6

7

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

**1**

# Brief overview of the Bolivian telecommunication sector



ABN·AMRO





*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Bolivia's telecom market was fully liberalized in November 2001 and competition was created in the mobile sector with 3 players

## Bolivian Market

*Entel is the country's leading domestic and international long-distance telecom operator*

*The primary trunk system employs digital microwave relay and some areas are served by fibre optic cable*

*There are over 1,000 villages in Bolivia connected to the phone network through Entel's STM satellite system*

### Entel

- privatized in 1995
- Telecom Italia: 50% ownership
- Entel Móvil was launched in 1996
- operates TDMA/GSM network
- 2006 mobile subscribers equal to 1,443k
- assumed 2006 market share 50.5%
- blended 2006 ARPU (core) Bs 54.7

### Cooperatives

- 15 local telephone cooperatives granted 6-year exclusivity in 1995
- Telecommunications Law: 1995 – 2001
- Cotel, Cotas, Cotes and Comteco are the largest ones
- non-profits, privately owned

### Viva (Nuevatel)

- launched services in November 2000
- Alltel and Comteco: 71.5 and 28.5% ownership, respectively
- first GSM operator in Bolivia
- offers domestic and international phone service since 2002
- expected 2006 subscribers higher than 500k
- assumed 2006 market share 18.4%
- assumed 2006 ARPU Bs 109.1

### Telecel

- launched services in 1991
- Millicom International: 100% owner
- operates TDMA/GSM network
- offers fixed long distance since 2002
- expected 2006 subscribers higher than 830k
- assumed 2006 market share 30.0%
- assumed ARPU Bs 69.9

### AXS Bolivia

- founded in 2001
- originally called AES Communications Bolivia
- holds license for national and LD service

*Source: Paul Budde Communication Report*



ABN·AMRO

9

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Overview of Decreto Supremo 28994

- On 26 December 2006, the Bolivian Government issued a Supreme Decree ("Decreto Supremo n° 28994") with the purpose of modifying the existing telecommunication regulation ("Reglamento de las Telecomunicaciones") in the country

- Based on our understanding of the Supreme Decree, the main modifications to current telecommunication regulation can be summarized as follows



| Resolutions | Impacts per Business Line (if applicable) | |
|---|---|---|
| | Revenues | Costs (Interconnection) |
| Tariffs will be charged on the effective time of usage to be measured per second | | |
| The whole country area will now be considered as local area | Negative (local) | Neutral/ Positive |
| No LDN tariff on mobile can be charged as all domestic mobile calls are now local | Negative (LDN) | Neutral |

| Operations |
|---|
| Wireline |
| Wireless |

**ABN·AMRO**

10

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Entel is expected to suffer from competition of new Bolivian telecom players

## Competitive context

- Fixed telecommunications market remains fairly concentrated in the hands of incumbent local operators (the cooperatives)
- The more competitive market is long-distance, as newcomers like Teledata (Cotas), AES and Nuevatel emerge as serious contenders to incumbent Entel
- Entel will be challenged in the Internet space with new players offering high-speed Internet services
  - given strong regional presences of Cotas, Comteco and Cotel, they are likely to become preferred high-speed Internet providers in their respective market

| | | | | Pay TV | | Internet access | E-Commerce Portals | Media & Internet content | |
|---|---|---|---|---|---|---|---|---|---|
| **Leaders** | | | | | | | | | |
| Entel Teledata (Cotas) AXS Unete Cotel ITS | Entel Cotas | Cooperatives | Entel Móvil | Multivisión Cotas Cable TV Comteco | Datacom (Entel) Teledata (Cotas) | Entelnet Cotasnet Cotel | Boliviaweb Bolviamall | Bolivia.com Cotas.net La Razón El Deber | Entel |
| **Challengers** | | | | | | | | | |
| Boliviatel (Comteco) AXS Unete Cotel ITS | Megalink Bolivia Internet | Entel | Telecel Viva (Nuevate) Cotas | Cablesat Supercanal | Comteco Multitel Unete | Comteco AXS Unete Megalink | B2Bolivia | El Diario La Prensa | Cotas Global Crossing |

*Source: Pyramid Research*



ABN·AMRO

11

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Cotel, Cotas and Comteco are the leaders in number of fixed lines in service in Bolivia

*Strong local presence of the cooperatives*

## The cooperatives

| Cooperative name | Main Area of Operation | Lines in Service 2004 | Lines in Service 2005 |
|---|---|---|---|
| Cooperativa de Telefonos Automaticos La Paz (COTEL) | La Paz | 204,984 | 208,355 |
| Cooperativa de Telefonos Automaticos de Santa Cruz de La Sierra (COTAS) | Santa Cruz | 152,525 | 157,312 |
| Cooperativa Mixta de Telefonos de Cochabamba (COMTECO) | Cochabamba | 149,531 | 154,267 |
| Cooperativa de Telefonos de Sucre (COTES) | Chuquisaca | 28,879 | 30,225 |
| Cooperativa de Telefonos de Oruro (COTEOR) | Oruro | 27,316 | 28,636 |
| Cooperativa de Telefonos de Tarija (COSETT) | Tarija | 17,569 | 18,388 |
| Cooperativa de Telefonos Automaticos de Trinidad (COTEAUTRI) | Beni | 7,599 | 7,953 |
| Cooperativa de Telefonos Automaticos de Potosi (COTAP) | Potosi | 4,020 | 4,207 |
| Cooperativa de Telefonos de Riberalta (COTERI) | Beni | 1,851 | 1,937 |
| Cooperativa de Telefonos de Guayaramerin (COTEGUA) | Beni | 1,325 | 1,386 |

*Source: Pyramid Research*

**ABN·AMRO**

12

13

**2**

# Entel historical financial highlights

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

 **ABN·AMRO**

E.T.I
EUROTELECOM
INTERNATIONAL N.V.

## Entel S.A. shareholding structure

Telecom Italia stake dates back to 1995, when the former ETI-STET International bought 50% of Entel SA

Source: Company data

ABN·AMRO

14

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Entel realized total revenues of Bs 1,966m and EBITDA of Bs 879m in 2006

| Business area | Description | Revenues* 2006A | EBITDA* 2006A |
|---|---|---|---|
| Mobile | | | |
| Fixed line | | | |
| Internet | | | |
| Business and Data Services | | | |
| Public services | | | |
| Other players (wholesale) | | | |

*Source: Company data*

**ABN·AMRO**

*Based on Local GAAP
**According to IAS Accounting Principles, total revenues amounted to Bs 1,922m (-Bs 44m compared to local GAAP), whilst EBITDA were equal to Bs 816m (-Bs 63m compared to local GAAP)

Exchange rate 6/Bs at 31/12/2006: 0.09869

15

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Revenues and EBITDA overview



Revenues breakdown 2004-2006

EBITDA breakdown 2004-2006

Revenues growth 2005-2006

EBITDA margin 2004-2006

Over the last 3 years, Entel posted double digit growth in both revenues and EBITDA

Revenue growth was mainly driven by the wireless business which accounted for over 50% of total sales in 2006

Entel market share in the wireless business in 2006 was equal to 51%, in a market populated by three other competitors (Telecel, Viva and Cotas, a purely virtual operator)

EBITDA margin slightly decreased in 2006, reflecting lower margin contribution of the wireline business

Note: excluding inter-company eliminations

Source: Telecom Italia, based on IAS Accounting Principles Reporting format



ABN·AMRO

16

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Total operating costs

In 2006, total operating costs increased by 14% compared to 2005

The increase in interconnection costs, which accounted for almost 44% of total service costs in 2006, was mainly driven by growth in Long Distance traffic

Advertising and promotion costs include the launch of a new advertising campaign in November 2006

The reduction in personnel costs in 2006 is the result of a restructuring of senior positions and the decision to internalize some activities, which in the past were outsourced to external parties (i.e. call center)

Note: excluding inter-company eliminations











Service costs 2004-2006

Service costs 2004-2006 as % of revenues

Other operating costs 2004-2006

Other operating costs 2004-2006 as % of revenues

*Source: Telecom Italia, based on IAS Accounting Principles Reporting format*

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Consolidated NWC and Capex

NWC showed a considerable improvement in the last year thanks to a significant reduction in average receivable days (from 120 to 99 days)

The improvement was mainly driven by an improvement of NWC in the wireless business (while NWC of the wireline was already more efficient)

Capex in 2006 was considerably higher than in the previous 2 years for both the wireline and wireless businesses, mainly due to the start of investments related to rural coverage (October 2006) as well as to the optimization of existing network



**NWC average days 2004-2006**

**NWC evolution 2004-2006**

**Capex 2004-2006**

*Source: Telecom Italia, based on IAS Accounting Principles Reporting format*



**ABN·AMRO**

18

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Wireline operating costs

*The increase in service costs in 2006 was mainly driven by interconnection costs (+40% yoy; 46% of total wireline service costs), while other items were substantially in line with the previous year*





*Source: Telecom Italia, based on IAS Accounting Principles Reporting format*







**ABN·AMRO**

19







# Company's Business Plan

**3**

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

ABN·AMRO

21

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Introduction to the Company's business plan

- This section presents the main drivers and expected results for Entel over the 2007-2009 period based on the Business Plan (Plan Estrategico 2007-2009) that was prepared by Entel management in March 2007

  – These projections were included in the reporting system of Telecom Italia and based on IAS accounting principles. The projections utilized in this document are the one based on IAS accounting principles

- These projections were prepared by Entel management after the issuance of the Decreto Supremo 28994 of December 2006 which modified the existing telecommunication regulation in the country

  – 2007 results were prepared on the basis of the first two months actual results, and represent the Forecast 1 of the Company

- We have reviewed and analyzed the financial projections of the Business Plan and we have discussed both the overall results as well as the main drivers of revenues, costs, capex and net working capital with Telecom Italia and ETI

- Furthermore we have performed an analysis of the Business Plan based on

  – External sector research;

  – Specific KPI benchmarks of the sector; and

  – Performance of other telecom companies involved in the same sector in the same region

**ABN·AMRO**

22

*E.T.I EUROTELECOM INTERNATIONAL N.V.*

# Business Plan: Revenues and EBITDA overview

*According to Company's Business Plan 2007-2009, consolidated revenues and EBITDA are expected to grow, +11% and 13% in the 2006-2009 period, respectively*

*Main drivers of growth in wireline is Voice, including VoIP, (+42m in 2009 vs 2006) and internet (+92m in 2009 vs. 2006)*

*Main drivers of growth in wireless is the increased penetration rate (from 30% in 2006 to 39% in 2009) and Entel's market share from 51% to 55%*





Note: excluding inter-company eliminations



ABN-AMRO

*Source: Telecom Italia, based on IAS Accounting Principles Reporting format*

23

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Business Plan: Total operating costs

*During the period 2007-2009, a significant increase of interconnection and commercial costs is forecasted, as a consequence of the expected increase in traffic and sales*

*Despite the increase in customer base (wireline and wireless), advertising expenses, in terms of revenues, are expected to be maintained constant (i.e 2% of revenues), while advertisement will remain focussed on delivering key messages to consumers without significantly increasing advertisement volumes*

Note: excluding inter-company eliminations





Source: Telecom Italia, based on IAS Accounting Principles Reporting format



**ABN·AMRO**

24

E.T.I
EUROTELECOM
INTERNATIONAL N.V.

# Business Plan: Consolidated NWC and Capex

Consolidated NWC is expected to increase slightly as a percentage of revenues in the period 2007-2009

2007-2009 capex are expected to remain in line as percentage of total revenues (appr. 12%)

In particular, capex are mainly related to optimization of existing network and to investments for rural coverage based on commitments with the Bolivian Government (started at the end of 2006 for a total amount of Bs 93m until mid 2008)







Source: Telecom Italia, based on IAS Accounting Principles Reporting format



ABN·AMRO

25





*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Wireline Business (cont'd)



Internet revenues are expected to strongly increase until 2009, mainly driven by growth in ADSL subscribers, which more than compensates the expected decrease in ARPU due to aggressive commercial offers. In 2006, Entel's market share in the internet business was equal to approx. 37%

Data revenues are expected to remain in line with 2006 level, with the number of connections considerably increasing until 2009 offset by lower prices. In 2006 Entel market share in the data business was equal to approx. 80%



*Include Free, Edge rural and other (Portal, B2B, etc.)
** Include Free and Edge rural subscribers
***On Line ARPU not included and ranges between Bs 4,124 and Bs 3,500 for the period 2005-2008

*Source: Telecom Italia, based on IAS Accounting Principles Reporting format*




**ABN·AMRO**

27



*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Business Plan: Wireline operating costs

Service costs are expected to remain relatively stable as percentage of revenues

Interconnection costs increase is mainly related to the growth in Long Distance traffic, in particular to incoming traffic generated by Bolivian people emigrating to other countries

**Service costs 2006-2009**

**Service costs 2006-2009 as % of revenues**

**Other operating costs 2006-2009**

**Other operating costs 2006-2009 as % of revenues**

*Source: Telecom Italia, based on IAS Accounting Principles Reporting format*

ABN·AMRO

28



*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*   **Wireless Business**



- Expected wireless revenues' growth is mainly driven by an increase in mobile penetration, expected to reach 39% in 2009 (from 19% in 2004)

- However, the increase in the penetration rate is held down by lack of subsidies for handsets. This represents a strong barrier, since the cost of a handset (despite decreasing over the past few years) is still too high for many Bolivian people

- It must be pointed out that although mobile penetration in Bolivia is the lowest in the Latam area, when related to GDP per capita it becomes very high (for example compared to Brazil is three times higher)

*Source: Telecom Italia, based on IAS Accounting Principles Reporting format*

*Includes Visitors, Recharge and Other revenues
**Includes Visitors, VAS, Recharge and Other ARPUs*




ABN·AMRO

29

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*  **Wireless Business (cont'd)**



- Declining market share in 2006 was mainly due to an aggressive commercial campaign launched by Telecel/Tigo starting from December 2005 in the GSM market (with a 850 Mhz offer) luring away many customers

- From 2006, market share is expected to present slight increase as Entel benefits from its leading position although facing fierce competition

*Source: Telecom Italia, based on IAS Accounting Principles Reporting format*

*Based on average customer base

**ABN·AMRO**

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Business Plan: Wireless operating costs

Service costs and other operating costs are expected to show a significant increase over the 2006-2009 period, at a CAGR of respectively 17% and 9%

## Service costs 2006-2009

## Other operating costs 2006-2009

## Service costs 2006-2009 as % of revenues

## Other operating costs 2006-2009 as % of revenues

*Source: Telecom Italia, based on IAS Accounting Principles Reporting format*



31

32

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# 4 Assessment of Business Plan





**ABN·AMRO**



E.T.I
EUROTELECOM
INTERNATIONAL N.V.    Overall assessment of the Business Plan

34

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# 4a

## Wireline

ABN·AMRO 

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Wireline: Local lines

- As per Entel's Business Plan, Local voice revenues in 2009 are expected to be equal to Bs 198m, compared to Bs 149m in 2006 (CAGR equal to 10%)

- Entel's local telephony subscribers, as per the company's business plan, is expected to outpace overall Bolivian local telephony industry growth

  - as a result, Entel would slightly increase its 2006 market share

- As per the business plan, Entel would also present a 8% increase in its MOU from 2006 to 2009, whilst independent research estimates the overall Bolivian industry's MOU to remain relatively stable (no growth)



Note: Entel figures based on Entel Business Plan 2007-2009
Source: Pyramid Research

**ABN·AMRO** 

35

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*    **Wireline: Local lines (cont'd)**

- Entel's average ARPM is expected to increase from 0.56 in 2006 to 0.62 in 2007, thereafter it is expected to decrease back to the 2006 level in 2008 and 2009 compared to an expected flat industry trend at a level significantly below the ARPM of Entel

- Entel's higher customer base and MOU lead to fast-growing traffic volume at 18% CAGR from 2006-09 vs. industry's 2.5%



*Note: Entel figures based on Entel Business Plan 2007-2009*
*Source: Pyramid Research*




36

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Wireline: Long Distance National lines

- As per Entel's Business Plan, LDN revenues in 2009 are expected to be equal to Bs 260m, compared to Bs 322m in 2006 (CAGR equal to -7%)

- Entel's business plan suggests Long Distance National traffic being negatively impacted in 2007 by the Decreto Supremo, and, afterwards, converging to traffic as estimated by Pyramid's research

- In line with its total traffic projections, Entel's business plan indicates a gradual and slight decrease in market share from 2006 level

  - Entel's business plan contemplates the deployment of VOIP and a more aggressive price policy, that combined result in a 14% reduction on ARPM from 2006 to 2009



Long Distance National Bolivia Total Traffic: Pyramid vs Entel Mgmt



Long Distance National ARPM



LDN: Implied Mkt Share (Entel traffic) based on Pyramid vs. Entel mgmt total mkt forecast

*Note: Entel figures based on Entel Business Plan 2007-2009*
*Source: Pyramid Research*



ABN·AMRO

37

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Wireline: Long Distance International (outgoing) lines

- As per Entel's Business Plan, LDI revenues in 2009 are expected to be equal to Bs 68m, compared to Bs 79m in 2006 (CAGR equal to -4.7%)

- Contrary to the Latam industry trend of Long Distance International Outgoing traffic, Entel is expected to recover its total LDI traffic in the near future

  – market share, as per the business plan decreases from 61% in 2006 to 53% in 2009; whilst as per Pyramid's total traffic estimates, Entel would recoup its market share up to 2005 level

- As to withstand competition from new entrant medias, and as a result of the deployment of its VOIP services, Entel's ARPM decreases throughout 2009, maintaining at levels below industry average



Note: Entel figures based on Entel Business Plan 2007-2009
Source: Pyramid Research



ABN·AMRO

38

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Wireline: Subscribers and Internet Accounts

*Broadband service will be Bolivia's fixed local telephony growth driver in the coming years, similarly with other Latam countries*

*Bolivia's low GDP per capita will limit expansion potential of this service*

*Entel is expected to boost its internet business based on an aggressive expansion plan*

*It must be noted that Entel management currently expects a 6 months' delay (compared to the business plan) in deploying its infrastructure (in particular Wifi and GSM 3rd generation)*

**ABN·AMRO**



### Internet Accounts ('000) and Entel Implied Market Share based on TI Projections (%)



### Internet Account Growth Rate: Bolivia vs. Entel



### Internet service ARPS broadband

### Internet service ARPS narrowband

*Note: Entel figures based on Entel Business Plan 2007-2009*
*Source: Pyramid Research*



39

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*   **Benchmarking analysis**

## Benchmarking analysis of different Latam wireline markets compared with Company's Business Plan

| | | Entel | Bolivia | LatAm | Argentina | Brazil | Chile | Colombia | Ecuador | Mexico | Peru | Venezuela |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Telephony Services Penetration | 2006E | n.a. | | 17.2% | 21.9% | 19.9% | 20.0% | 17.3% | 13.4% | 19.1% | 8.6% | 15.6% |
| | 2009E | n.a. | | 17.2% | 21.3% | 19.4% | 19.1% | 15.3% | 14.0% | 20.4% | 9.7% | 17.4% |
| Local Traffic | '06E-'09E CAGR | 17.6% | | -2.0% | -8.0% | -4.1% | -3.7% | -1.5% | 1.9% | -0.3% | -2.4% | 3.5% |
| LDN Traffic | '06E-'09E CAGR | -2.0% | | -1.0% | 1.2% | -3.5% | 0.4% | -5.2% | 4.0% | 0.1% | 2.8% | 4.3% |
| LDI Outgoing Traffic | '06E-'09E CAGR | 6.1% | | 2.6% | 1.6% | -0.2% | 4.2% | -2.3% | 5.3% | 3.1% | 3.0% | 2.7% |
| Local Avg. Price (US$ /minute) | 2006E | 0.07 | | 0.04 | 0.01 | 0.06 | 0.03 | 0.03 | 0.02 | 0.16 | 0.07 | 0.03 |
| | 2009E | 0.06 | | 0.04 | 0.01 | 0.05 | 0.04 | 0.03 | 0.02 | 0.12 | 0.10 | 0.03 |
| LDN Avg. Price (US$ /minute) | 2006E | 0.16 | | 0.12 | 0.06 | 0.18 | 0.07 | 0.14 | 0.05 | 0.06 | 0.07 | 0.08 |
| | 2009E | 0.13 | | 0.11 | 0.06 | 0.17 | 0.06 | 0.14 | 0.05 | 0.05 | 0.07 | 0.08 |
| LDI Outgoing Avg. Price (US$ /minute) | 2006E | 0.46 | | 0.23 | 0.24 | 0.30 | 0.32 | 0.47 | 0.25 | 0.16 | 0.19 | 0.19 |
| | 2009E | 0.32 | | 0.20 | 0.24 | 0.22 | 0.28 | 0.45 | 0.21 | 0.14 | 0.17 | 0.16 |
| Internet Accounts Penetration | 2006E | n.a. | | 5.4% | 7.1% | 7.6% | 8.9% | 2.7% | 1.6% | 4.2% | 2.3% | 3.2% |
| | 2009E | n.a. | | 7.6% | 10.4% | 9.8% | 13.8% | 4.9% | 3.0% | 6.9% | 3.4% | 4.4% |
| Internet Accounts ('000 Accounts) | 2006E | 22 | | 58,924 | 5,625 | 28,312 | 2,795 | 2,378 | 430 | 8,738 | 1,288 | 1,711 |
| | 2009E | 68 | | 87,441 | 8,460 | 38,378 | 4,474 | 4,640 | 839 | 14,935 | 1,998 | 2,483 |
| | '06E-'09E CAGR | 46.4% | | 14.1% | 14.5% | 10.7% | 17.0% | 25.0% | 24.9% | 19.6% | 15.8% | 13.2% |
| Internet Avg. Revenue per Account (US$ /account) | 2006E | 38.68 | | 20.74 | 18.29 | 17.16 | 20.73 | 21.88 | 34.27 | 26.50 | 31.53 | 31.41 |
| | 2009E | 26.00 | | 22.64 | 24.81 | 18.01 | 20.50 | 23.38 | 31.90 | 28.84 | 30.31 | 32.22 |

- To properly assess Entel Business Plan we have also carried out a benchmarking analysis vs other Latam wireline markets

*Note: Local avg price for Colombia, Mexico, Peru and Venezuela refer to residential business*

*Source: Pyramid Research, Company*



**ABN·AMRO**

40

41

E.T.I
EUROTELECOM
INTERNATIONAL N.V.

# 4b

# Wireless



ABN·AMRO

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Wireless: Users

- Bolivia's mobile service will continue outpacing the fixed line telephony, widening the gap between fixed and mobile penetration

- Compared with Pyramid Research estimates, Entel's business plan contemplates more conservative estimates for the Bolivian wireless market and its total subscriber base

- Nonetheless, Entel's business plan assumes that its subscriber base will present higher growth rates (higher market share in net adds) than the market, leading to higher market share





*Note: Entel figures based on Entel Business Plan 2007-2009*
*Source: Pyramid Research*

**ABN·AMRO**



42

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Wireless: Average Revenue per User (ARPU)

*Expected ARPU does not include the increase deriving from National Roaming, which is still uncertain how it will be developed*

*In particular, Entel (whose coverage will strongly grow thanks to expected rural investments to be completed by mid 2008) could take advantage from the collection of traffic from customers of other operators which do not have coverage in Bolivia*

- Bolivia's ARPU is expected to present a decreasing trend due to expansion in lower segments of the market
- Entel's ARPU is expected to:
  - Pre-paid: converge to industry's levels as per independent research report, although still lower than market average ARPU
  - Post-paid: superior client base assures Entel Bolivia significantly higher (~2x) ARPU when compared to industry's average, as estimated by Pyramid
- As a result, Entel's blended ARPU remains slightly above industry's overall ARPU







*Note: Entel figures based on Entel Business Plan 2007-2009*
*Source: Pyramid Research*

*Excludes visitors



**ABN·AMRO**

43

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Wireless: Churn rate and market share net additions

- Entel's business plan assumes that the company will be able to withstand fierce competition from Millicom's mobile operator, which is aggressively deploying its GSM services

  - Management assumes higher market share in net additions when compare to Pyramid Research

- As a result of such disproportionate market share in net additions, Entel is able to resume its leadership position in the industry

- Pyramid estimates a strong increase in GSM technology as a result of aggressive deployment of GSM network by main players as well as a significant substitution from TDMA to GSM-based technology than does the business plan



Churn Rate: Bolivia vs. Entel



Market share net additions

*Note: Entel figures based on Entel Business Plan 2007-2009*
*Source: Pyramid Research*

**ABN·AMRO**

44

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*    **Benchmarking analysis**

## Benchmarking analysis of different Latam wireless markets compared with Company's Business Plan

|  | Entel | Latam avg | Argentina | Brazil | Chile | Colombia | Ecuador | Mexico | Peru | Venezuela |
|---|---|---|---|---|---|---|---|---|---|---|
| **Number of wireless players** |  | n.a. | 3 | 6 | 3 | 3 | 3 | 4 | 3 | 4 |
| **Penetration** |  |  |  |  |  |  |  |  |  |  |
| 2006E | 30.2% | 57.5% | 75.0% | 55.1% | 83.5% | 72.0% | 68.5% | 53.6% | 29.2% | 70.0% |
| 2009E | 39.4% | 73.1% | 92.0% | 67.1% | 94.0% | 82.3% | 84.6% | 73.1% | 51.0% | 88.9% |
| **Subscriber** |  |  |  |  |  |  |  |  |  |  |
| 2006E | 1,443 | 285,475 | 29,817 | 103,306 | 13,118 | 31,214 | 9,186 | 40,477 | 8,281 | 18,879 |
| 2009E | 2,138 | 379,762 | 37,435 | 131,059 | 15,284 | 38,806 | 11,842 | 66,194 | 15,123 | 25,230 |
| '06E-'09E CAGR | 14.0% | 10.0% | 8.1% | 8.3% | 5.2% | 7.5% | 8.8% | 17.8% | 22.2% | 10.1% |
| **Prepaid** |  |  |  |  |  |  |  |  |  |  |
| 2006E | 1,381 | 211,249 | 21,289 | 82,806 | 10,849 | 25,827 | 8,089 | 34,877 | 6,857 | 17,849 |
| 2009E | 2,069 | 287,829 | 27,780 | 104,316 | 12,707 | 32,727 | 10,465 | 57,796 | 12,858 | 23,823 |
| '06E-'09E CAGR | 14.4% | 10.9% | 9.3% | 8.0% | 5.4% | 8.2% | 9.0% | 18.3% | 23.3% | 10.5% |
| **Prepaid %** |  |  |  |  |  |  |  |  |  |  |
| 2006E | 95.7% | 76.3% | 71.9% | 80.2% | 82.7% | 82.7% | 88.1% | 86.2% | 82.8% | 93.5% |
| 2009E | 96.8% | 78.9% | 74.2% | 79.6% | 83.1% | 84.3% | 88.4% | 87.3% | 85.0% | 94.4% |
| **Churn rate (annual)** |  |  |  |  |  |  |  |  |  |  |
| 2006E | 61.7% | 32.6% | 28.2% | 36.2% | 23.3% | 20.5% | 39.0% | 35.7% | 33.1% | 32.6% |
| 2009E | 40.9% | 29.1% | 24.4% | 31.1% | 24.7% | 18.3% | 33.4% | 32.6% | 28.3% | 27.8% |
| **MOU** |  |  |  |  |  |  |  |  |  |  |
| 2006E | 63 | 100 | 115 | 75 | 92 | 122 | 54 | 116 | 79 | 72 |
| 2009E | 57 | 103 | 118 | 76 | 94 | 112 | 52 | 135 | 76 | 71 |
| **ARPU (US$)** |  |  |  |  |  |  |  |  |  |  |
| 2006E | 7.2 | 13.7 | 14.9 | 12.1 | 15.7 | 9.1 | 11.0 | 18.2 | 12.7 | 17.5 |
| 2009E | 7.5 | 12.7 | 15.2 | 11.2 | 15.6 | 8.4 | 9.4 | 17.0 | 11.1 | 15.0 |

*Source: Pyramid Research, Company*

- To properly assess Entel Business Plan we have also carried out a benchmarking analysis vs other Latam wireless markets

*Note: Latam avg prepaid subscriber base excludes El Salvador and Guatemala*



**ABN·AMRO**

45



**5**

# Valuation methodology and results

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

**ABN·AMRO**

46

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*  **Considerations on valuation methodologies**

| Methodology | Advantages | Disadvantages | Applicability |
|---|---|---|---|
| Discounted Cash Flow | | | Higher |
| Listed Companies Trading Multiples | | | Lower |
| Implied Transaction Multiples | | | Lower |

- ABN AMRO favors the Discounted Cash Flow analysis as such methodology correctly captures the operational and financial specificities of the Company, as well as, the growth prospect intrinsic to the Company and the industry it operates within


ABN·AMRO

47

48

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*



# Discounted Cash Flow methodology



ABN·AMRO

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Introduction to the DCF Valuation section

- In order to perform a proper DCF valuation we have extended the financial projections of the Business Plan for 5 additional years until 2014

- We have discussed with Telecom Italia and ETI main assumptions and drivers of the expected 2010-2014 results both in terms of

  – Market growth,

  – Company positioning, and

  – Financial targets in terms of sales, margins, capex and net working capital requirements

- In addition to that, future long term 2010-2014 projections have been extrapolated from the Company's business plan also in light of

  – Company's long term operational performance to be consistent with trends apparent in the Business Plan

  – Sector benchmarks, and

  – Comparable companies performances

- We have cross-checked the resulting 2010-2014 Entel's projections against historical and forecast data regarding other operators and other Latam telco markets in order to assess the consistency of the projections with external data and expected trends

**ABN·AMRO**

49

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Overview of Consolidated Business Plan underlying the DCF valuation for Entel

| Year to 31st December — Bolivians m | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | 1,711.0 | 1,921.8 | 2,076.6 | 2,320.2 | 2,605.4 | 2,750.8 | 2,831.4 | 2,894.7 | 2,952.9 | 3,003.6 |
| EBITDA | 749.1 | 816.2 | 892.6 | 998.7 | 1,167.1 | 1,208.5 | 1,212.3 | 1,219.7 | 1,216.6 | 1,218.9 |
| EBIT before goodwill amortization | 336.0 | 442.6 | 558.8 | 677.3 | 858.3 | 882.4 | 883.9 | 889.1 | 883.1 | 883.2 |
| EBIT | 336.0 | 442.6 | 558.8 | 677.3 | 858.3 | 882.4 | 883.9 | 889.1 | 883.1 | 883.2 |
| Net profit (excl. extra-ordinary items) | 369.1 | 364.9 | 444.0 | 542.9 | 692.3 | 722.6 | 736.2 | 753.5 | 782.7 | 777.3 |
| | | | | | | | | | | |
| CBNI | 572.5 | 531.8 | 497.4 | 570.1 | 699.3 | 703.7 | 693.9 | 690.9 | 681.2 | 678.0 |
| Total new investments | 76.5 | 214.3 | (14.9) | (32.3) | (24.9) | (50.2) | (75.0) | (73.7) | (84.3) | (51.0) |
| Free Cash Flow | 649.0 | 746.1 | 482.5 | 537.8 | 674.4 | 653.5 | 618.9 | 617.1 | 616.8 | 627.1 |
| | | | | | | | | | | |
| Sales growth | na | 12.3% | 8.1% | 11.7% | 12.3% | 5.6% | 2.9% | 2.2% | 2.0% | 1.7% |
| EBITDA margin | 43.8% | 42.5% | 43.0% | 43.0% | 44.8% | 43.9% | 42.8% | 42.1% | 41.2% | 40.6% |
| EBIT margin (before goodwill amortization) | 19.6% | 23.0% | 26.9% | 29.2% | 32.9% | 32.1% | 31.2% | 30.7% | 29.9% | 29.4% |
| EBIT margin | 19.6% | 23.0% | 26.9% | 29.2% | 32.9% | 32.1% | 31.2% | 30.7% | 29.9% | 29.4% |
| Net profit margin (excl. extra-ordinary items) | 21.6% | 19.0% | 21.4% | 23.4% | 26.6% | 26.3% | 26.0% | 26.0% | 25.8% | 25.9% |

## Comments

The table above shows a summary of the key consolidated financials of Entel from 2005 to 2014:

- 2005 – 2009 financials are derived from the IAS management reporting system used by Telecom Italia for their internal reporting

  - Underlying these projections are a set of assumptions and key business drivers as included in the Plan Estrategico 2007-2009 and the IAS reporting system. However, for our DCF valuation the IAS reporting set has been the leading source of information as agreed with Telecom Italia

- 2010 – 2014 financials are the result of an extrapolation of the 2009 results made by ABN AMRO, supported by discussions with Telecom Italia and ETI



**ABN·AMRO**















ABN·AMRO

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*  **Base Case Valuation and WACC & Terminal Value assumptions**

| Year to 31st December   Bolivians m | Notes | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | Terminal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | | 1,711.0 | 1,921.8 | 2,076.6 | 2,320.2 | 2,605.4 | 2,750.8 | 2,831.4 | 2,894.7 | 2,952.9 | 3,003.6 | 3,033.2 |
| Adjusted EBIT | | 338.0 | 442.6 | 558.8 | 677.3 | 856.3 | 882.4 | 883.9 | 888.1 | 883.1 | 883.2 | 891.9 |
| Goodwill amortisation | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Depreciation | | 413.0 | 373.6 | 333.8 | 321.4 | 308.8 | 326.0 | 328.4 | 330.6 | 333.5 | 335.7 | 339.0 |
| Amortisation of other intangible assets | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Sustaining investments in tangible assets | | (136.4) | (197.6) | (269.9) | (275.0) | (266.6) | (284.0) | (297.1) | (306.3) | (314.3) | (319.7) | (322.8) |
| Sustaining investments in intangible fixed assets | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Exceptional items & extra-ordinary results after-tax (operating) | | 0.5 | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Increase (decrease) in other provisions & long-term liabilities | | (5.7) | 7.1 | 14.3 | 15.7 | 15.7 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Cash operating profit (CBIT) | | 607.5 | 626.2 | 636.9 | 739.4 | 914.2 | 924.6 | 916.1 | 913.4 | 902.3 | 880.2 | 908.1 |
| Cash taxes | | (35.0) | (94.0) | (139.5) | (169.3) | (214.8) | (220.6) | (221.2) | (222.6) | (221.2) | (221.2) | (223.0) |
| Cash flow before new investment (CBNI) | | 572.6 | 531.8 | 497.4 | 570.1 | 699.3 | 703.7 | 693.9 | 690.9 | 681.2 | 678.0 | 686.1 |
| Expansion capex (including acquisitions and divestments) | | 0.0 | 0.0 | (4.0) | (4.2) | (17.9) | (68.1) | (56.8) | (55.3) | (45.2) | (45.3) | (46.2) |
| Expansion investments other intangible assets | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Working capital investment | | 78.5 | 214.3 | (11.0) | (28.1) | (7.0) | 17.8 | (18.2) | (18.4) | (19.1) | (5.6) | (5.7) |
| Total new investments | | 78.5 | 214.3 | (14.9) | (32.3) | (24.9) | (50.2) | (75.0) | (73.7) | (64.3) | (51.0) | (52.0) |
| Free cash flow | | 649.0 | 746.1 | 482.5 | 537.8 | 674.4 | 653.5 | 618.9 | 617.1 | 616.9 | 627.1 | 633.1 |

**Base case**

| | | |
|---|---|---|
| Terminal discount rate | | 13.1% |
| CBNI growth rate stage 1 | | 1.0% |

| | | |
|---|---|---|
| PV of cash flows years 2007 - 2014 | 2,924 | 59% |
| PV of terminal cash flows | 2,002 | 41% |
| Value of operations | 4,926 | |

| Implied multiples | 2006 | 2007 | 2008 |
|---|---|---|---|
| EV / Sales | 2.6x | 2.4x | 2.1x |
| EV / EBITDA | 6.0x | 5.5x | 4.9x |
| EV / EBIT | 11.1x | 8.6x | 7.3x |

Sensitivity on WACC

Bs m

## Comments

- We have used a DCF valuation to value the consolidated cash flows for the wireline and wireless business of Entel based on the key business value drivers presented previously

- Our base case DCF valuation is based on the business plan 2007 – 2009 of local management of Entel as provided to us by Telecom Italia / ETI and an extrapolation of the business plan for 2010-2014, based on discussions with and guidance from TI / ETI

- Our DCF calculation has used the free cash flows as calculated in the table above

- In order to discount the free cash flows to the present we have used a WACC of 13.1% (details in Appendix 1)

- Our terminal growth rate ("Cash Before New Investments growth rate") assumed is 1.0% while Return On New Invested Capital is assumed to be equal to WACC after the forecast period

- Our base case enterprise valuation values Entel Boliva at Bs 4.9bn which equals 5.5x EBITDA 2007

**ABN·AMRO**

56

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Sensitivities on main business drivers for Wireline & Wireless

- Table below summarizes the combined effect on the Company's Enterprise value arisen from changes in the main assumptions for both the wireline and wireless Business Plan
- Main reason of this analysis was to check robustness of the Business Plan's drivers and results and to verify Company's enterprise value based on a more conservative approach
- We have kept margins substantially in line compared to the Base Case



**ABN·AMRO**

57

58

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# 5b

# Listed Companies Trading & Transaction Multiples

**ABN·AMRO**

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

## Introduction to Comparable Multiples

- Valuation based on multiples should not, in any case, be considered as an analysis per se, given its various limitations

- Nonetheless, it can be useful as benchmark or as a consistency check. For that, it is important to have really comparable companies or transactions when analyzing the implied value of a company based on inferred multiples

- In the case of Entel, the most comparable companies possible in terms of operations and segment exposure (wireline, wireless, long distance carrier) were considered

- We concentrated our analysis in LatAm peers as, to certain extent, they are exposed to the inherent macroeconomic volatility of emerging markets

- The same rationale was applied when assessing the comparable transactions that can be used as a reference when performing an implied multiple analysis for Entel

   - we used recent transactions involving Integrated Telecom players in LatAm

- The valuation ranges inferred for Entel were based on the average of each set of multiples:

   - Valuation estimated by multiplying the EBITDA 2007E per the implied multiple range for transactions and comparable companies

ABN AMRO favors the Discounted Cash Flow analysis as sole methodology considering it captures the operational and financial specificities of the company as well as the inherent risk involved in the industry it operates within

**ABN·AMRO**

59

E.T.I
EUROTELECOM
INTERNATIONAL N.V.  **Comparable trading and transaction multiples**

## Selected Comparable Companies: Trading and Transaction

| | Country | Customers (%) Wireline | Wireless | Revenues (%) Wireline | Wireless |
|---|---|---|---|---|---|
| **Trading** | | | | | |
| Brasil Telecom Part. | Brazil | 71% | 29% | 80% | 20% |
| Tele Norte Leste Part. (Telemar) | Brazil | 52% | 48% | 84% | 16% |
| Telecom Argentina | Argentina | 30% | 70% | 58% | 41% |
| Entel Chile | Chile | 3% | 97% | 31% | 69% |
| **Transaction** | | | | | |
| Verizon Dominicana | Dominican Republic | 26% | 74% | n.a. | n.a. |
| CTE | El Salvador | 24% | 76% | n.a. | n.a. |
| Entel Chile | Chile | 3% | 97% | n.a. | n.a. |

Note: (1) Wireline revenues include revenues from LDN and LDI services, (2) Telecom Argentina wireless figures include its operations in Paraguay; Telecom Argentina revenues does not add up to 100% as it does not include Publicom's (yellow pages) revenues; (3) Figures for transaction comparable companies refer to period when transaction occurred

## Implied Comparable EV/EBITDA Multiples

**Trading (EV/EBITDA 2007E)**

- Brasil Telecom Par 4.4x — 5.2x
- Telemar (TNL) 4.0x
- Telecom Argentina 5.9x
- Entel Chile 6.4x

**Transactions**

- AMX / CTE 5.4x
- Almendra / Entel
- AMX / VD

## Implied EV/EBITDA 2007E Valuation Ranges

- Transaction: 5.0x – 5.8x
- Trading: 4.8x – 5.6x

## Implied EV Valuation Range based on Entel's EBITDA 2007E (Bs. million)

- Transaction: 4,465 – 5,179
- Trading: 4,286 – 5,001

*Source: Companies, Research Analysts Consensus, Bloomberg, and ABN AMRO estimates*

 ABN·AMRO

60



# 6 Conclusions

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*



**ABN·AMRO**

E.T.I
EUROTELECOM
INTERNATIONAL N.V.

## Conclusions (1/2) – Enterprise valuation range

- Discounted Cash Flow valuation is considered by ABN AMRO as the correct methodology to capture the operational and financial specificities of the Company, as well as, the growth prospect intrinsic to the Company and the industry it operates within

- Since there are no real comparable companies or transactions, implied multiples valuation methodologies are used only as benchmark or consistency check

- The graphs below show Enterprise Value range for Entel based on the DCF methodology compared to the results of the implied multiple valuation ranges illustrated in the previous page



- Based on the projections and the valuation methodologies used, we reached an Enterprise Value range for Entel between Bs 4,300-4,800m (US$ 538-600m*), equivalent to 4.8x-5.4x 2007 EBITDA

*Exchange rate Bs/US$ at 21/05/2007: 7.995
As a reference exchange rate Euro/US$ at 21/05/2007: 0.74316
Source: Bloomberg

**ABN·AMRO**

62

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

## Conclusions (2/2) – Equity Value range

- In order to calculate the Equity Value of the Company we have considered an adjusted net financial position of the Company. In particular, we have taken into account

  – existing cash as of 31 December 2006 equal to Bs 859m

  – the amount of dividends distributed to shareholders on 27 February 2007 for a total amount of Bs 386m

  – contingent liabilities recognized on the Company 2006 results equal to Bs 9m, and

  – pension liabilities recorded in the 2006 annual reports equal to Bs 67m

- On the basis of the above, the Equity Value range of the Company would be equal to Bs 4,697-5,197m (US$ 587-650m*), hence **the value of the 50% participation held by ETI N.V. (100% indirectly controlled by Telecom Italia) in Entel would be equal to Bs 2,349-2,599m (US$ 294-325m)**

- As a reference, the average value of TI stake in Entel estimated by broker reports over the past year is equal to Euro 262m and the book value of the participation is Euro 123.5m

*Exchange rate Bs/US$ at 21/05/2007: 7.995
As a reference exchange rate Euro/US$ at 21/05/2007: 0.74316
Source: Bloomberg

**ABN·AMRO**

63

64

**A1**

# DCF Methodology & WACC details

E.T.I
EUROTELECOM
INTERNATIONAL N.V.



**ABN·AMRO**

*E.T.I.*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Discounted free cash flow methodology (DCF)

- The Valuation of the Company is based on DCF methodology
- The DCF method calculates the value of a business as the net present value of its future cash flows discounted by its respective WACC. We have discounted the Company's Free Cash Flow ("FCF") to determine its total economic value (Enterprise Value). FCF is defined as follows:

Earning before taxes (EBIT)
+ Depreciation and Amortization
= EBITDA
- Sustaining investments in tangible assets
+/- Exceptional items & extra-ordinary results after-tax (operating)
+/- Other provisions & long term liabilities
= Cash operating profit (CBIT)
- Corporate Taxes (after financial expenses and other non-operational items)
= Cash flow before new investment (CBNI)
- Capital Expenditures ("Capex")
+/- Change in working capital
= Free Cash Flow

Discounted free cash flow methodology



ABN·AMRO

65

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

## Discounted free cash flow methodology (DCF) (cont'd)

- The DCF methodology provides information on the valuation of the business through time. The projections can be divided into two different stages:

  - Stage 1: the value of the business is determined by the explicit forecast period in which the model is driven by the profit and loss, cash flow and balance sheet projections. This stage covers the projection period in which the company presents higher volatility or growth in FCF

  - Stage 2: the value of the "remaining" or "existing" business ("Terminal Value") after the explicit forecasted period, which is a proxy of the value of the cash flows that would be generated after the forecasted period. This stage reflects the company reaching a more stable cash flow generation capacity

- ABN AMRO based its forecasts on the Company's Business Plan furnished by the Entel management team

- We have forecasted the Company's performance for the 2007-2009 period, based on the Business Plan. We have subsequently extrapolated the business plan for the period 2010-2014, assuming the Company's long term operational performance to be in line with trends apparent in the Business Plan, bringing the business into a more stable performance by the end of the forecast period

- We have forecasted the Company's cash flows in nominal local currency to be consistent with the Business Plan

**Discounted free cash flow methodology**

**Forecasted period**

**ABN·AMRO**

66

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

## Weighted average cost of capital (WACC)

- The WACC is determined as the weighted average of a company's costs of equity and debt. Such costs are weighted by the respective proportion of equity and debt in the company's capital structure, according to the following formula:

$$WACC = \left(\frac{E}{D+E}\right) \times Re + \left(\frac{D}{D+E}\right) \times Rd$$

  D : Value of Debt

  E : Value of Equity

  Re : Cost of Equity

  Rd : Cost of Debt before taxes

- In the case of Entel, under the current circumstances, the Company is not able to optimize its capital structure by reducing its net cash balance to a net debt balance

- As a result, and to be in line with our projections, in which Entel does not incur in any debt in the long-term, we have assumed the capital structure to be 100% Equity / 0% Debt

- Entel WACC, then, is equal to its estimated cost of equity

WACC

ABN·AMRO



67

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

## Cost of equity (Re)

- Our calculations of cost of equity are derived from the CAPM formula:

$$Re = Rf + ß*(Rm - Rf) + Z$$

Re: Cost of Equity

Rf : Risk-free rate

Rm – Rf : Equity risk premium

ß : Estimated beta for the non-diversifiable risk of a company measured by the correlation of its return versus market return

Z : Political risk premium ("country risk")

Cost of equity (Re)

ABN·AMRO



68

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Risk free rate (Rf)



- We believe the yield of the US government bond is the best estimate for the risk-free rate of return. We use the 10-year US Treasury because:
  - it is a long-term bond with the closest duration to the projected FCF for selected company;
  - its maturity is close to a long-term government bond (10 years);
  - the 10-year T-Bond differently from the T-Bill, is not used as a monetary toll; and
  - its yield is less affected by changes in expected inflation than the 30-year T-bond.
- The current 1-year average yield of the 10-year US Treasury is ~ 4.8% p.a.

10-year U.S. Treasury Bond yield to maturity (%)

Mar-06  Apr-06  May-06  Jun-06  Jul-06  Aug-06  Sep-06  Oct-06  Nov-06  Dec-06  Jan-07  Feb-07  Mar-07

3.5  4.0  4.5  5.0  5.5

*Source: Bloomberg*

Risk free rate of return (Rf)

**ABN·AMRO**

69

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

# Country Risk (Z)

- We believe the best estimate for the country risk is the 1-year average spread between the country's long-term sovereign debt security and the 10-year US T-Bond

- Nonetheless, in the analysis of the Company's cost of capital, the methodology above mentioned cannot be deployed as Bolivia does not have sovereign debt securities traded in the international market

- Alternatively, we have used Bolivia's sovereign credit rating attributed by rating agencies as a proxy to estimate Bolivia's country risk (spread) over US T-Bond (AAA debt security)

- As per Moody's, Bolivia's credit rating would be equivalent to B3 (B- as per S&P rating), which would represent an average historical spread of 345 bps (3.45%)



**Average Historical Spread over AAA Securities**

*Source: Moody's, August 2006*

**Country Risk**

**ABN·AMRO**

70

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.* **Beta**



- Beta measures the market risk / systematic risk / non-diversifiable risk. It is a coefficient that attempts to indicate to what extent the volatility of a company's share price may be explained by the volatility in the market portfolio

- It is calculated through a linear regression between the series of variations in the share price and the series of variations in the market portfolio (Index)

- For illiquid stocks and markets, the best approach to calculate the company's beta is to determine a set of comparable companies to build an industry unlevered beta. This beta is then levered in accordance with the optimal capital structure defined for the Company

- Beta is composed of operational and financial risk. In order to factor the operational risk of the business, the "full" beta is unlevered based on the selected companies debt/equity structure and income tax:

$$\beta\,U = \beta\,L\,/\,(1+(1 - Tax\ Rate)*(Debt/Equity))$$

- The average unlevered beta of the set of comparable companies is then levered to the resulting debt/equity structure, if applicable:

$$\beta\,L = \beta\,U\ (Industry) * (1+(1 - Tax\ Rate)*(Debt/Equity))$$

**Unlevered Beta of Selected Telecom Players**






| Company | Beta |
|---|---|
| Deutsche Telekom | 0.70 |
| Telefonica | 0.75 |
| Telecom Italia | 0.92 |
| Portugal Telecom | 1.20 |
| Brasil Telecom Participações | 0.95 |
| Tele Norte Leste Participações | 0.78 |
| Entel | 1.01 |
| Telecom Argentina | 0.85 / 0.89 |

**ABN·AMRO**

71

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.*

## Market risk premium

- Market risk premium refers to the additional return required by an investor as to compensate investors for incurring into greater element of uncertainty (risk) involved in equity investments vis-à-vis investments in the US Treasury (risk-free investment)

- An estimate of market risk premium is the long-term historical arithmetic average spread between the return of the S&P-500 and the return of the long-term government bonds during the 1900-2004 period

- ABN AMRO favours the longer time frame (since 1900) versus the medium time frame because the former reflects a more diverse set of economic circumstances such as wars, depressions and booms which are not as well reflected by shorter time periods. Although there is empirical evidence that the market premium has changed downwards since the 50's, it has not changed in a predictable fashion. Since we believe market risk behaviour is essentially random, the longest time frame possible would be the best estimate of the future

- We prefer the historic approach versus forward looking since we do not believe the market risk premium is predictable beyond a 3-4 year period. As market premium presents a random walk behaviour, historic data is considered the best estimate of the future according to "Global Investments Return Yearbook 2005", prepared by ABN AMRO in conjunction with London Business School

Market risk
premium

**ABN·AMRO**



72

*E.T.I*
*EUROTELECOM*
*INTERNATIONAL N.V.* **WACC**

| Cost of Equity (US$) | |
| --- | --- |
| Risk-free (US T-Bond) | 4.8% |
| Market risk premium[1] | 5.1% |
| **Beta** | |
| Unlevered Beta | 0.89 |
| Tax | 25.0% |
| Levered Beta | 0.89 |
| **Cost of Equity Pre-Country Risk** | **9.4%** |
| Country risk [2] | 3.5% |
| **Cost of Equity Adjusted by Country Risk** | **12.8%** |

| Cost of Debt (US$) | |
| --- | --- |
| Cost of Debt (pre-tax) | 9.3% |
| **Capital Structure** | |
| % Equity | 100.0% |
| % Debt | 0.0% |

**Weighted Average Cost of Capital - WACC (Local Currency)**

| | |
| --- | --- |
| WACC (US$ nominal) | 12.8% |
| Average FX Devaluation (Bolivianos/US Dollar) | 0.2% |
| WACC (BOB nominal) | 13.1% |

Note: (1) London Business School 2005 Investment Returns Global Yearbook equivalent to S&P B-
(2) Estimated based on Moody's inferred Bolivia's sovereign credit rating (B3 equivalent to S&P B-)

*Source: ABN AMRO estimates*

WACC (in US dollar nominal terms)



**ABN·AMRO**

73

# EXHIBIT 2

## SUPREME DECREE N° 29087
## EVO MORALES AYMA
## CONSTITUTIONAL PRESIDENT OF THE REPUBLIC

**WHEREAS:**

That the authority 1° stated in Article 96 of the Political Constitution of the State sets forth that the President of the Republic has the power and authority to execute and enforce the laws, and issue all the decrees and laws deemed convenient, without defining exclusive rights, altering the ones stated by the Law or performing any act contrary to the Law, observing the limitations stated in the Constitution.

That Act N° 3351, Article 4, subsections a) and [illegible] of February 21st, 2006, Organization of the Executive Branch Act, states that the Ministry of the Presidency has the power and authority to coordinate all the political-administrative actions of the Presidency of the Republic with the Ministers , Chiefs of Departments, Municipal Districts and communities, as well as to steer, coordinate and supervise actions and policies with the rest of the Ministers of the State pursuant to the Presidential instruction.

That Supreme Decree N° 28631, Article 45, subsection b) of March 8th, 2006, Implementing Regulation to the Act of Organization of the Executive states that the Vice-Minister of Governmental Coordination has the function of assisting the Minister in the coordination of political-administrative actions of the Presidency of the Republic with its Ministries.

That Act N° 3351, Article 4, subsection b) states that the Minister of Finance has the power and authority to formulate, execute and control the national tax policy as regards treasury, national debt, integrated accountings, planning and execution of budget, taxation and tariff policy; as well as to coordinate, together with the Minister of Development Planning, the monitoring and assessment of the national strategy of development.

That Act N° 3351, Article 4, subsection f) states that the Minister of Public Works, Utilities and Housing has the power to formulate, execute and assess the telecommunications policies.

That Supreme Decree N° 28631, Article 69, subsection a) sets forth that the Telecommunications Vice-Minister has the authority to formulate policies regarding telecommunications, fostering the integral development of the country.

That within the framework of the National Development Plan, the policy as regards capitalized companies is to recover and gain control of the company management and to capture the capital surplus of capitalized companies through shareholding control of said companies, with the prior technical and financial audit of the companies mentioned in order to determine the real value of their net worth.

That exercising its powers and authority, the Superintendence of Telecommunications and the Minister of Public Works, Utilities and Housing performed a technical, financial and legal review, the result of which shows (illegible) signs of irregularities in the administration and operations of Empresa Nacional de

Telecomunicationes Sociedad Anónima- ENTEL S.A., which affect its financial investments and threaten the national tax regime.

IN COUNCIL OF MINISTERS

**DECREES:**

**ARTICLE 1.- (OBJECT).** The object of this Supreme Decree is the creation of an Ad hoc Commission in charge of the negotiations with the company EURO TELECOM INTERNATIONAL N.V (ETI), in order to recover Empresa Nacional de Telecomunicationes Sociedad Anónima- ENTEL S.A. for the State.

**ARTICLE 2.- (MEMBERS OF THE COMMISSION).** The Ad hoc Commission will be internally organized and constituted by the following members:
1. Minister of the Presidency
2. Minister of Finance
3. Minister of Public Works, Utilities and Housing
4. Vice-Minister of Governmental Coordination.
5. Vice-Minister of Telecommunications.

**ARTICLE 3.- (FUNCTIONS).** The Ad hoc Commission will have the following functions:
a) Formulate a negotiation Plan, based on the research and analysis performed on that area by the Minister of Public Works, Utilities and Housing and the Superintendence of Telecommunications.
b) Start, maintain and conclude the negotiations with the representatives of the Company EURO TELECOM INTERNATIONAL N.V. (ETI) or any other corresponding person, with the sole purpose of defining the conditions to recover Empresa Nacional de Telecomunicationes Sociedad Anónima- ENTEL S.A. for the State.
c) Periodically inform the President and Vice-president of the Republic of the course and state of the negotiations, as well as submit a final report of the negotiations with the recommendations to follow.

**ARTICLE 4.- (POWERS).** The Ad hoc Commission will have the following powers for the execution of its functions:
a) Access to the documentation and information that ENTEL S.A. must submit and that the Commission may deem decisive for its function, according to the legal provisions.
b) Demand the participation of public authorities and officers that the Commission may deem necessary for the respective technical and juridical assistance.
c) Demand from the pertinent public entities all the documentation and information the Commission may deem necessary to perform its function, according to the legal provisions.

**ARTICLE 5.- (TERM).** The negotiation process must conclude within the term of thirty (30) calendar days from the publication date of this supreme decree.

The Ministers of the State, in the offices of the Presidency and Public Works, Utilities and Housing are in charge of the execution and enforcement of this Supreme Decree.

Issued in the Governmental Palace in the city of La Paz on this twenty-eighth day of the month of March of the year two thousand and seven.

SIGNED BY: EVO MORALES AYMA, David Choquehuanca Céspedes, Juan Ramón quintana Taborga, Alfredo Octavio Rada Vélez, Walker San Miguel Rodríguez, Celima Torrico Rojas, Gabriel Loza Tellería, Luís Alberto Arce Catacora, Abel Ma(illegible) Marca, (illegible) Sosa Lunda, Jerges Mercado Suárez, Susana Rivero Guzmán, Carlos Villegas Quiroga, Luís Alberto Echazú Alvarado, Walter Juven(illegible) Delgadillo Terceros, Victor Cáceres Rodrigue(illegible), Nila Heredia Miranda.

**DECRETO SUPREMO Nº 29087**

**EVO MORALES AYMA**
**PRESIDENTE CONSTITUCIONAL DE LA REPÚBLICA**

**CONSIDERANDO:**

Que la atribución 1ª del Artículo 96 de la Constitución Política del Estado, establece que es atribución del Presidente de la República entre otras, ejecutar y hacer cumplir las leyes, expidiendo los decretos y órdenes convenientes, sin definir privativamente derechos, alterar los definidos por Ley ni contrariar sus disposiciones, guardando las restricciones consignadas en la Constitución.

Que los incisos a) y c) del Artículo 4 de la Ley Nº 3351 de 21 de febrero de 2006, de Organización del Poder Ejecutivo, establecen que el Ministerio de la Presidencia, tiene la atribución de coordinar las acciones político – administrativas de la Presidencia de la República con los Ministros de Estado, Prefecturas de Departamento, Municipios y comunidades; así también la de orientar, coordinar y supervisar acciones y políticas con los demás Ministros de Estado de acuerdo con la instrucción Presidencial.

Que el inciso b) del Artículo 45 del Decreto Supremo Nº 28631 de 8 de marzo de 2006, Reglamento a la Ley de Organización del Poder Ejecutivo, establece que el Viceministro de Coordinación Gubernamental, tiene la función de apoyar al Ministro en la coordinación de las acciones político – administrativas de la Presidencia de la República con los Ministerios.

Que el inciso a) y h) del Artículo 4 de la Ley Nº 3351, establece que el Ministerio de Hacienda, tiene la atribución de formular, ejecutar y controlar la política fiscal nacional en materia de tesorería, crédito público, contabilidad integrada, elaboración y ejecución presupuestaria, política tributaria y arancelaria; así también la de coordinar con el Ministerio de Planificación del Desarrollo el seguimiento y evaluación a la estrategia nacional de desarrollo.

Que el inciso f) del Artículo 4 de la Ley Nº 3351, establece que el Ministerio de Obras Públicas, Servicios y Vivienda, tiene la atribución de formular, ejecutar y evaluar políticas de telecomunicaciones.

Que el inciso a) del Artículo 69 del Decreto Supremo Nº 28631, establece que el Viceministro de Telecomunicaciones, tiene la función de elaborar políticas en materia de telecomunicaciones, promoviendo el desarrollo integral del país.

2

Derecho*teca.com*

Que dentro del marco del Plan Nacional de Desarrollo, la política sobre las empresas capitalizadas establece recuperar y ejercer el control de la gestión empresarial y la captura del excedente económico de las empresas capitalizadas a través del control accionario de las mismas, previo proceso de auditoría técnica y financiera de estas empresas con el objeto de establecer el valor real de su patrimonio neto.

Que en uso de sus facultades y atribuciones, la Superintendencia de Telecomunicaciones y el Ministerio de Obras Públicas, Servicios y Vivienda, llevaron adelante un proceso de revisión técnica, financiera y legal cuyo resultado muestra serios indicios de irregularidades en la administración y en las operaciones de la Empresa Nacional de Telecomunicaciones Sociedad Anónima - ENTEL S.A., que afectan sus inversiones financieras y atentan al régimen impositivo nacional.

## EN CONSEJO DE MINISTROS,

## DECRETA:

**ARTÍCULO 1.- (OBJETO).** El presente Decreto Supremo tiene por objeto la creación de la Comisión Ad hoc encargada de las negociaciones con la sociedad EURO TELECOM INTERNATIONAL N.V (ETI), a fin de recuperar la Empresa Nacional de Telecomunicaciones Sociedad Anónima - ENTEL S.A. a favor del Estado.

**ARTÍCULO 2.- (MIEMBROS DE LA COMISIÓN).** La Comisión Ad hoc se organizará de manera interna y estará integrada por los siguientes miembros:

1. Ministro de la Presidencia.
2. Ministro de Hacienda
3. Ministro de Obras Públicas, Servicios y Vivienda.
4. Viceministro de Coordinación Gubernamental.
5. Viceministro de Telecomunicaciones.

**ARTÍCULO 3.- (FUNCIONES).** La Comisión Ad hoc tendrá las siguientes funciones:

a) Formular un Plan de negociación, con base en los estudios y análisis realizados sobre el particular por el Ministerio de Obras Públicas, Servicios y Vivienda y la Superintendencia de Telecomunicaciones.

b) Iniciar, sostener y concluir las negociaciones con los representantes de la sociedad EURO TELECOM INTERNATIONAL N.V (ETI) o cualquier

3

Derecho*teca.com*

otra persona que corresponda, con el único fin de definir las condiciones para recuperar la Empresa Nacional de Telecomunicaciones Sociedad Anónima - ENTEL S.A. a favor del Estado.

c) Informar periódicamente al Presidente y Vicepresidente de la República del estado y curso de las negociaciones, así como presentar un informe final de las mismas con las recomendaciones a seguir.

**ARTÍCULO 4.- (ATRIBUCIONES).** La Comisión Ad hoc tendrá las siguientes atribuciones para el cumplimiento de sus funciones:

a) Acceso a la documentación e información que debe presentar ENTEL S.A. y que la Comisión considere decisiva para su función, con arreglo a las disposiciones legales.

b) Requerir la participación de autoridades y funcionarios públicos que la Comisión considere necesaria para el asesoramiento técnico – jurídico respectivo.

c) Requerir a las entidades públicas pertinentes, la documentación e información que la Comisión considere necesaria para su función, con arreglo a las disposiciones legales.

**ARTÍCULO 5.- (PLAZO).** El proceso de negociaciones debe concluir dentro de un plazo de treinta (30) días calendario, a partir de la publicación del presente decreto supremo.

Los Señores Ministros de Estado, en los despachos de la Presidencia y Obras Públicas, Servicios y Vivienda, quedan encargados de la ejecución y cumplimiento del presente Decreto Supremo.

Es dado en el Palacio de Gobierno de la ciudad de La Paz, a los veintiocho días del mes de marzo del año dos mil siete.

FDO. EVO MORALES AYMA, David Choquehuanca Céspedes, Juan Ramón Quintana Taborga, Alfredo Octavio Rada Vélez, Walker San Miguel Rodríguez, Celima Torrico Rojas, Gabriel Loza Tellería, Luis Alberto Arce Catacora, Abel Mamani Marca, Celinda Sosa Lunda, Jerges Mercado Suárez, Susana Rivero Guzmán, Carlos Villegas Quiroga, Luis Alberto Echazú Alvarado, Walter Juvenal Delgadillo Terceros, Víctor Cáceres Rodríguez, Nila Heredia Miranda.

Derecho*teca*.com

## DECLARATION OF ACCURACY

I, Silvia Gil De Cwilich, hereby declare as follows:

I am fluent in Spanish and English and the following is, to the best of my knowledge and belief, a true and accurate translation from Spanish to English of Supreme Decree No. 29087 of the Constitutional President of the Republic, dated March 28, 2007.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on May 4th, 2008.

_____

Silvia Gil De Cwilich

# EXHIBIT 3

REPUBLIC OF BOLIVIA
MINISTRY OF PUBLIC WORKS, SERVICES AND HOUSING
Vice-ministry of Telecommunications

Recovery of ENTEL in favor of the Bolivian State

FINDINGS

April 13, 2007

Slide 1

Slide 2

Framework

- According to the Administration Contract, clause 1.1, "ENTEL agrees to entrust the Administrator, who accepts, with the direction of the administration, management, operations and business of ENTEL..."
- Article 10, subsection d) of Law N° 1600 of the SIRESE establishes the jurisdiction of the Superintendence to "Oversee that services are correctly provided... and that contractual obligations are met, including the execution of the agreed investment plan..."

Slide 3
Investment Auditing
Consulting firms that conducted ENTEL audits, ordered by Sittel:

| Year | Name |
|------|------|
| 1996 | Tudela Zenteno Asociados |
| 1997 | Tudela Zenteno Asociados |
| 1998 | Tudela Zenteno Asociados |
| 1999 | Verna Asociados |
| 2000 | Individual consultants |
| 2001 | Tudela Zenteno Asociados |
| 2002 | Pozo Asociados |
| 2003 | Pozo Asociados |

Slide 4

Difference in investments

(in thousands of dollars)

| Year | Reported by ENTEL | Verified by SITTEL | Differences in values audited |
|------|------------------:|-------------------:|------------------------------:|
| 1996 | 58,011 | 50,470 | -7,541 |
| 1997 | 147,192 | 129,529 | -17,663 |
| 1998 | 105,864 | 89,984 | -15,880 |
| 1999 | 143,675 | 76,345 | -67,330 |
| 2000 | 61,549 | 54,084 | -7,465 |
| 2001 | 73,071 | 67,955 | -5,166 |
| 2002 | 25,689 | 18,889 | -6,800 |
| 2003 | 25,863 | 9,674 | -16,189 |
| Total | 640,914 | 496,930 | -143,984 |

Slide 5

Difference in Investments (2)

ENTEL Investments 1996–2006 (in millions of [ ])

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reported by ENTEL (March 2007) | 58.00 | 147.00 | 107.00 | 144.00 | 63.00 | 76.00 | 29.00 | 28.00 | 20.00 | 23.00 | 25.00 | 719.00 | |
| Reported by Entel to Sittel | 58.01 | 147.19 | 105.86 | 143.67 | 61.54 | 73.07 | 25.68 | 25.86 | | | | 640.88 | |
| Verified by consulting firms | 50.47 | 129.53 | 89.98 | 76.34 | 54.08 | 67.95 | 18.88 | 9.67 | | | | 496.9 | 143.98 |

652,00
11,12

Difference between the report to Sittel and the 2007 report

Slide 6
Wholesale Purchase Auditing
Consulting firms that audited ENTEL ordered by Sittel:

| Year | Name |
|------|------|
| 1996 | Alfa Centauro |
| 1997 | Alfa Centauro |
| 1998 | Tudela Zenteno Asociados |
| 1999 | Verna Asociados |
| 2000 | Tudela Zenteno Asociados |
| 2001 | Tudela Zenteno Asociados |
| 2002 | Pozo Asociados |
| 2003 | Pozo Asociados |

Source: developed in-house using data from Sittel

Slide 7

Surcharges on Wholesale Purchases

(in thousands of dollars)

| Year | Purchase volumes reported by ENTEL | Surcharges determined at the audits |
|------|------|------|
| 1996 | 159,676 | 10,536 |
| 1997 | 88,653 | |
| 1998 | 45,017 | 2,647 |
| 1999 | 48,411 | 547 |
| 2000 | 44,008 | 4,314 |
| 2001 | 30,984 | 3,164 |
| 2002 | 9,605 | 364 |
| 2003 | 1,884 | 0 |
| Total | 428,238 | 21,572 |

Source: prepared in-house using data from the audits and Siltel

Slide 8
Capital Reduction

- Ministerial Resolution 194/2005 of August 12, 2005 from the Ministry of Economic Development, certifies ENTEL investments, according to the attribution of Supreme Decree 28172.
- SIRESE Law establishes the jurisdiction of the Superintendence to "Oversee that services are correctly provided… and that contractual obligations are met, including the execution of the agreed investment plan…"
- Supreme Decree 28172 and Ministerial Resolution 194/2005 should have been declared unconstitutional for breaching what is established in SIRESE Law N° 1600.
- The Constitutional Court issues a Ruling declaring S.D. 28172 constitutional and declares the appeal against M.R. 194/2005 inadmissible.

Slide 9

Capital reduction (2)

- On September 20, 2005, the Extraordinary ENTEL Shareholder Meeting authorizes capital reduction to Bs 3,202,247,000, when total net worth is Bs 2,855,052,075.
- The capital reduction involved the equivalent of Bs 250 per share, which was distributed to the shareholders.
- For approval, according to ENTEL bylaws, there was participation of 98.9670% of total shares.
- The Stock Subscription Agreement, clause 5.8 states that "the Subscriber commits to and accepts that ENTEL assign at book value the stock premium corresponding to the subscription price of a non-distributable reserve…"

Slide 10

Failure to meet contract goals

- Audits hired by Sittel:
    - 1996 None
    - 1997 DETECON
    - 1998 ITTH
    - 1999 ITTH
    - 2000 DYSER SRL
    - 2001 DYSER SRL
    - 2002 DYSER SRL
    - 2003 DYSER CSI

Slide 11
Failure to meet contract goals (2)

| Year | Fines (Bs) according to Sittel | Unpaid Fines (USD) |
|---|---|---|
| 1996 | 5,900,000 | |
| 1997 (*) | No data | 1,923,412 |
| 1998-1999 | 24,402,000 | 3,038,854 |
| 2000-2001 | 42,831,000 | 5,333,873 |
| 2002-2003 | 51,710,000 | 6,439,601 |
| Total | | 16,735,741 |

*Quantified based on the information of the consulting firm DETECON.

Slide 12

Technical Assistance

- ENTEL signed contracts for know-how transfer, assistance in the development and implementation of activities in the telecommunications market and assistance with optimization of average liquid availability of financial resources, with STET I Spa, between 1996 and 2001.
- ENTEL signed a contract for technical assistance and administration with Telecom Italia, for the year 2002.
- The amount of these contracts is USD 109 M, with an average 8.13% of the earnings.
- According to the Stock Subscription Agreement, clause 5.6.1, ENTEL could hire on onerous conditions, access to technology, brands, patents, know-how and other technical knowledge and industrial property, as well as managerial, political, operational, technical and market expertise.

Slide 13
Technical Assistance (2)

TECHNICAL ASSISTANCE
(in thousands of dollars)

| ITEM | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|------|------|------|------|------|------|------|------|
| GROSS INCOME | 146,273 | 204,518 | 232,810 | 218,552 | 204,167 | 187,987 | 160,955 |
| CONTRACTS | 15,267 | 14,991 | 17,110 | 19,524 | 16,876 | 14,852 | 10,773 |
| % of income | 10.44% | 7.33% | 7.35% | 8.93% | 8.27% | 7.90% | 6.69% |
| Total | | | | | | 98,620 | 109,393 |

Slide 14
Tax default

| Nº | AMOUNT (Bs.) | FINES, ACCESSORIES AND PENALTIES (Bs.) | TOTAL AMOUNT (BS.) | TOTAL AMOUNT (USD) | RULING | DATE | FILE |
|---|---|---|---|---|---|---|---|
| 1 | | 149,406 | 149,406 | 18,606 | LPZ 0027/2005 | March 31 2005 | STRLPZ 0127/2004 |
| 2 | 200,140,438 | 234,332,304 | 434,472,742 | 54,106,195 | STR/LPZ/RA 0316/2006 | March 14 2007 | STRLPZ 0378/2006 |
| 3 | | 181,297 | 181,297 | 22,577 | In process | | STRLPZ 0406/2006 |
| 4 | 1,747,669 | 2,108,082 | 3,855,751 | 480,168 | In process | | STRLPZ 0052/2007 |
| 5 | 90,766,661 | 130,711,191 | 221,477,852 | 25,581,302 | In process | | STRLPZ 0109/2007 |
| TOTAL | 292,654,768 | 367,482,280 | 660,137,048 | 82,208,848 | | | |

Source: Report from Tax Superintendence, April 9, 2007

Slide 15

Accounts receivable

- According to the ENTEL Financial Statements that were audited up to December 31, 2006, Commercial Accounts Receivable were Bs 602.34 M and the Estimated Uncollected Receivables were Bs 86.37 M.
- Net Commercial Accounts Receivable are Bs 515.96 M (USD 64.2 M).
- According to the historical behavior of this item, the USD 64.2 M will be set aside or penalized in the mid-term.
- This penalty affects company results, reducing profits, and therefore also affects the Corporate Profit Tax – IUE – by about USD 9.6 M.

Slide 16
Summary of irregularities

| | ITEM | AMOUNT (USD X M) | SOURCE |
|---|---|---|---|
| 1. | Difference in investments executed 1996-2003 | 144.0 | Investment auditing, hired by SITTEL |
| 2. | Surcharges on purchases greater than USD 500,000, 1996-2003 | 21.5 | Auditing of wholesale purchases, hired by SITTEL |
| 3. | Capital Reduction in the year 2005, worth USD 396 million | 198.0 | Board of Directors Record of September 20, 2005, of ENTEL S.A. |
| 4. | Fines and Penalties for failure to meet Goals, 1997-2003 | 16.7 | SITTEL Technical Reports and Resolutions |
| 5. | Technical Assistance Contracts for the transfer of know-how | 109.0 | Capitalization Office Report |
| 6. | Accounts receivable | 64.2 | Balance Sheets and Financial Statements of ENTEL S.A. |
| 7. | Unpaid taxes (bad debt) | 9.6 | Own estimate |
| 8. | Tax default to the SIN | 82.2 | Tax Superintendence |
| | TOTAL | 645.2 | |

Slide 17
Other findings

- To be quantified: fines for failure to meet goals 1996, 2004 to 2006; surcharges on wholesale purchases 2004 to 2006.
- USD 10.3 M investment in Cable TV (1996-97), a service that was not implemented.
- Of total planned investments, 50% were oriented to financial markets with low rates of return (1.3% to 5%), when according to the contract, the investments should have been made in telecommunications.
- ENTEL, CONACYT and Bolnet agreement (December 18, 1996) for jointly providing Internet Service (Entelnet), with a 40% share of income from monthly subscriptions and 15% of additional traffic for Bolnet.

**REPÚBLICA DE BOLIVIA**
**MINISTERIO DE OBRAS PÚBLICAS, SERVICIOS Y VIVIENDA**
**Viceministerio de Telecomunicaciones**



# Recuperación de ENTEL a favor del Estado Boliviano

# HALLAZGOS

13 de abril de 2007



**Marco**

- Según el Contrato de Administración, cláusula 1.1, *"ENTEL acuerda encomendar al Administrador, que acepta, la dirección de la administración, gerencia, operaciones y negocios de ENTEL, ..."*

- Art. 10 inc. d) de la Ley N° 1600 del SIRESE establece la competencia de la Superintendencia para: *"Vigilar la correcta prestación de los servicios ... y el cumplimiento de sus obligaciones contractuales, incluyendo la ejecución del plan de inversiones comprometido ..." .*

2

# Auditorías de las Inversiones

3

Empresas consultoras que realizaron auditorias a ENTEL por encargo de Sittel:

| Gestión | Nombre |
|---------|--------|
| 1996 | Tudela Zenteno Asociados |
| 1997 | Tudela Zenteno Asociados |
| 1998 | Tudela Zenteno Asociados |
| 1999 | Verna Asociados |
| 2000 | Consultores Individuales |
| 2001 | Tudela Zenteno Asociados |
| 2002 | Pozo Asociados |
| 2003 | Pozo Asociados |

## Diferencia de inversiones

**(en miles de dólares)**

| Año | Reportadas por ENTEL | Verificadas por SITTEL | Diferencias de valores auditados |
|---|---|---|---|
| 1996 | 58.011 | 50.470 | -7.541 |
| 1997 | 147.192 | 129.529 | -17.663 |
| 1998 | 105.864 | 89.984 | -15.880 |
| 1999 | 143.675 | 76.345 | -67.330 |
| 2000 | 61.549 | 54.084 | -7.465 |
| 2001 | 73.071 | 67.955 | -5.116 |
| 2002 | 25.689 | 18.889 | -6.800 |
| 2003 | 25.863 | 9.674 | -16.189 |
| Total | 640.914 | 496.930 | -143.984 |

4



# Diferencia de Inversiones (2)

**Inversiones ENTEL S.A: 1996- 2006 (en millones de dólares)**

|  | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reportadas por Entel (marzo 2007) | 58,00 | 147,00 | 107,00 | 144,00 | 63,00 | 76,00 | 29,00 | 28,00 | 20,00 | 23,00 | 25,00 | 719,00 |
| Reportadas por Entel a la Sittel | 58,01 | 147,19 | 105,86 | 143,67 | 61,54 | 73,07 | 25,68 | 25,86 |  |  |  | 640,88 |
| Verificadas por las consultoras | 50,47 | 129,53 | 89,98 | 76,34 | 54,08 | 67,95 | 18,88 | 9,67 |  |  |  | 496,9 |

143,98

**652,00**

**11,12**

Diferencia con lo reportado a la Sittel y el informe 2007

5

# Auditorías de Compras Mayores

Empresas consultoras que realizaron auditorias a ENTEL por encargo de Sittel:

| Gestión | Nombre |
|---------|--------|
| 1996 | Alfa Centauro |
| 1997 | Alfa Centauro |
| 1998 | Tudela Zenteno Asociados |
| 1999 | Verna Asociados |
| 2000 | Tudela Zenteno Asociados |
| 2001 | Tudela Zenteno Asociados |
| 2002 | Pozo Asociados |
| 2003 | Pozo Asociados |

Fuente: elaboración propia con datos de Sittel

6

# Sobreprecios en Compras Mayores

(en miles de dólares)

| Año | Volumen de compras reportadas por ENTEL | Sobreprecios determinados en las auditorias |
|-----|------|------|
| 1996 | 159.676 | 10.536 |
| 1997 | 88.653 | |
| 1998 | 45.017 | 2.647 |
| 1999 | 48.411 | 547 |
| 2000 | 44.008 | 4.314 |
| 2001 | 30.984 | 3.164 |
| 2002 | 9.605 | 364 |
| 2003 | 1.884 | 0 |
| Total | 428.238 | 21.572 |

Fuente: elaboración propia con datos de las auditorias y Sittel

7

## Reducción de capital

- Resolución Ministerial 194/2005 de 12-Ago-2005 del Ministerio de Desarrollo Económico, certifica las inversiones de ENTEL, según atribución del D.S. 28172.

- Ley SIRESE establece la competencia de la Superintendencia para: "Vigilar la correcta prestación de los servicios ... y el cumplimiento de sus obligaciones contractuales, incluyendo la ejecución del plan de inversiones comprometido ... ".

- El D.S. 28172 y la R.M. 194/2005 debió ser declaradas inconstitucionales, por vulnerar lo establecido por la Ley N° 1600 del SIRESE.

- El Tribunal Constitucional emite Sentencia que declara la constitucionalidad del D.S. 28172 y declara improcedente el recurso contra la R.M. 194/2005.

8

## Reducción de capital (2)

- El 20-Sep-2005, la Junta Extraordinaria de Accionistas de ENTEL autoriza la reducción de capital a Bs 3.202.247.000, siendo el total del patrimonio neto Bs 2.855.052.075.

- La reducción de capital implicó un equivalente de Bs 250 por cada acción, que fue distribuido a los accionistas.

- Para la aprobación, de acuerdo a Estatutos de ENTEL, se tuvo la participación del 98.9670% del total de las acciones.

- El Contrato de Suscripción de Acciones, cláusula 5.8, indica que "el Suscriptor se compromete y da su aceptación para que ENTEL asigne contablemente la prima de emisión correspondiente al precio de suscripción a una reserva no distribuible ..."

9

# Incumplimiento metas contractuales

- Auditorias contratadas por Sittel:
  - 1996 Ninguna
  - 1997 DETECON
  - 1998 ITTH
  - 1999 ITTH
  - 2000 DYSER SRL
  - 2001 DYSER SRL
  - 2002 DYSER SRL
  - 2003 DYSER CSI

10

# Incumplimiento metas contractuales (2)

| Gestión | Multas (Bs) según Sittel | Multas No Pagadas ($us) |
|---|---|---|
| 1996 | 5.900.000 | |
| 1997 (*) | sin dato | 1.923.412 |
| 1998-1999 | 24.402.000 | 3.038.854 |
| 2000-2001 | 42.831.000 | 5.333.873 |
| 2002-2003 | 51.710.000 | 6.439.601 |
| Total | | 16.735.741 |

* Cuantificado en base al informe de consultora DETECON

11

## Asistencia técnica

- ENTEL firmó contratos de transferencia de know how, asistencia en el desarrollo e implementación de actividades en el mercado de telecomunicaciones y asistencia en la optimización de la disponibilidad financiera líquida promedio, con STET I Spa, entre 1996 a 2001.

- ENTEL firmó contrato de asistencia técnica y administración con Telecom Italia, para el año 2002.

- El monto de estos contratos es de $us 109 MM, con un promedio de 8,13% de los ingresos.

- Según Contrato de Suscripción de Acciones, cláusula 5.6.1, ENTEL podía contratar en condiciones onerosas el acceso a tecnología, marcas, patentes, "know-how" y otros conocimientos técnicos y propiedad industrial, así como a toda la experiencia gerencial, política, operacional, técnica y de mercado.

12

## ASISTENCIA TECNICA (2)

## ASISTENCIA TECNICA
### (en miles de dólares)

| CONCEPTO | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|
| INGRESOS B. | 146.273 | 204.518 | 232.810 | 218.552 | 204.167 | 187.987 | 160.955 |
| CONTRATOS | 15.267 | 14.991 | 17.110 | 19.524 | 16.876 | 14.852 | 10.773 |
| % de ingresos | 10,44% | 7,33% | 7,35% | 8,93% | 8,27% | 7,90% | 6,69% |
| Total | | | | | | | |

13



Incumplimientos tributarios

| Nº | MONTO (Bs.) | MULTAS ACCESORIOS Y SANCIONES (Bs.) | MONTO TOTAL (Bs) | MONTO TOTAL ($us) | RESOLUCIÓN | FECHA | EXPEDIENTE |
|---|---|---|---|---|---|---|---|
| 1 | | 149.406 | 149.406 | 18.606 | LPZ 0027/2005 | 31/03/2005 | STRLPZ 0127/2004 |
| 2 | 200.140.438 | 234.332.304 | 434.472.742 | 54.106.195 | STR/LPZ/RA 0316/2006 | 14/03/2007 | STRLPZ 0378/2006 |
| 3 | | 181.297 | 181.297 | 22.577 | En proceso | | STRLPZ 0406/2006 |
| 4 | 1.747.669 | 2.108.082 | 3.855.751 | 480.168 | En proceso | | STRLPZ 0052/2007 |
| 5 | 90.766.661 | 130.711.191 | 221.477.852 | 27.581.302 | En proceso | | STRLPZ 0109/2007 |
| Total | 292.654.768 | 367.482.280 | 660.137.048 | 82.208.848 | | | |

Fuente: Informe de la Superintendencia Tributaria de 9 de abril del 2007

14

## Cuentas por cobrar

- Según Estados Financieros auditados de ENTEL, al 31-12-2006, las Cuentas por Cobrar Comerciales alcanzan a Bs 602,34 MM y la Previsión para Cuentas Incobrables Bs 86,37 MM.

- Las Cuentas por Cobrar Comerciales Netas resultan Bs 515.96 MM ($us 64,2 MM).

- Conforme al comportamiento histórico de este concepto, los $us 64,2 MM serán previsionados o castigados en el mediano plazo.

- Este castigo, incide en los resultados de la empresa, disminuyendo las utilidades y, por tanto, en el IUE por un monto aproximado de $us 9,6 MM.

15

# Resumen de Irregularidades

| | CONCEPTO | MONTO ($us.MM) | FUENTE |
|---|---|---|---|
| 1. | Diferencia en las inversiones ejecutadas 1996-2003. | 144,0 | Auditorías a las Inversiones, contratadas por SITTEL |
| 2. | Sobreprecios en compras mayores a $us 500.000, 1996-2003 | 21,5 | Auditorías a las compras mayores, contratadas por SITTEL |
| 3. | Reducción de Capital en el año 2005, por un valor de $us 396 millones | 198,0 | Acta de Directorio del 20-09-2005 de ENTEL S.A. |
| 4. | Multas y Sanciones por incumplimiento de Metas, 1997–2003 | 16,7 | Informes Técnicos y Resoluciones de SITTEL |
| 5. | Contratos de Asistencia Técnica por transferencia de know how | 109,0 | Informe de la Oficina de Capitalización |
| 6. | Cuentas por cobrar | 64,2 | Balances y Estados de ENTEL S.A. |
| 7. | Impuestos no pagados (incobrables) | 9,6 | Estimación propia |
| 8. | Incumplimientos Tributarios al SIN | 82,2 | Superintendencia Tributaria |
| | TOTAL | 645,2 | |

16

## Otros hallazgos

- Por cuantificar: multas por incumplimiento de metas 1996, 2004 a 2006; sobreprecios en compras mayores 2004 a 2006.

- Inversión de $us 10.3 MM en TV Cable (1996-97), servicio que no se implementó.

- Del total de inversiones programadas, un 50% se orientó a mercados financieros a bajas tasas de rendimiento (1.3% al 5%), siendo que las inversiones según contrato, deberían haber sido invertidos en telecomunicaciones.

- Convenio ENTEL, CONACYT y Bolnet (18/12/96) para provisión conjunta del Servicio Internet (Entelnet), con participación para Bolnet del 40% de ingresos por abono mensual y 15% del tráfico adicional.

17

## DECLARATION OF ACCURACY

I, Silvia Gil De Cwilich, hereby declare as follows:

I am fluent in Spanish and English and the following is, to the best of my knowledge and belief, a true and accurate translation from Spanish to English of the Bolivian Commission PowerPoint Slide Presentation, dated April 13, 2007.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on May 16, 2008.

_____
Silvia Gil De Cwilich

# EXHIBIT 4

## BOLIVIA OFFICIAL GAZETTE

[Continued text from previous page:]

THEREFORE, I enact it to be regarded and enforced as Law of the Republic.

Given at the Government Palace, in La Paz City, on this thirteenth day of April of the year two thousand and seven.

**SIGNED, EVO MORALES AYMA**, Juan Ramón Quintana Taborga, Susana Rivero Guzmán, Víctor Cáceres Rodríguez.

## SUPREME DECREE No. 29100

## EVO MORALES AYMA
## CONSTITUTIONAL PRESIDENT OF THE REPUBLIC

**WHEREAS,**

The process of capitalization of public companies involved the signature of agreements over underwriting of shares and management, in which transnational companies were required to invest the amounts approved in the respective bidding processes;

Paragraph d) of Section 10 of Sectorial Regulation System Act No. 1600 dated October 28, 1994 sets forth that it is the competence of Sectorial Superintendencies to oversee the investment plan committed to by utility companies;

Section 31 of the Political Constitution of the State specifies that the acts of those who usurp functions that are not within their competence and the acts of those who exercise a jurisdiction or power other than that emanating from the Law are null and void;

The First Prerogative of Section 96 of the Political Constitution of the State states that the Executive Branch, in the exercise of its regulatory power, must clearly signal the limits without contradicting the normative hierarchy;

It is the duty of every public authority to enforce preemptively the Political Constitution of the State and the Laws of the Republic, as mandated by Section 228 of the Fundamental Law, a precept that was infringed with the issuance of Supreme Decree No. 28172 dated May 19, 2005, which was issued deviating from the provisions of Sectorial Regulation System Act No. 1600 dated October 28, 1994, a legal provision that to date remains unalterably in force in our legislation structure.

[page 12]

## No 2987 - BOLIVIA OFFICIAL GAZETTE

Former President Carlos Mesa Gisbert approved Supreme Decree No. 28172, authorizing the former Economic Development Minister to take all steps required to assess compliance with the obligations and terms of the agreement over the underwriting of shares and management of capitalized companies;

Former Economic Development Minister Carlos Díaz Villavicencio terminated the Agreement over the Underwriting of Shares upon certifying compliance with the obligations of ENTEL and underwriter EURO TELECOM INTERNATIONAL NV-ETI regarding the Agreement over the Underwriting of Shares dated November 27, 1995, emerging from the process of capitalization of the telecommunications sector in the Republic of Bolivia, by means of Ministry Resolution No. 194/2005;

The ramifications of the abovementioned acts may be penalized pursuant to the national body of laws, and must therefore be processed by the applicable means;

The National Government has the duty to reverse illegal acts, without the exercise of this power implying any conflict with constitutional regulations or rulings.

### AT A CABINET MEETING,

**DECREES:**

SOLE SECTION. Supreme Decree No. 28172 dated May 19, 2005 and Ministry Resolution no. 194 dated August 12, 2005 issued by former Economic Development Minister, together with every other Resolution based on Supreme Decree No. 28172, are hereby repealed.

The Ministers of the State, in their respective Offices, are in charge of the execution and enforcement of this Supreme Decree.

Given at the Government Palace, in La Paz City, on this twenty-third day of April of the year two thousand and seven.

**SIGNED, EVO MORALES AYMA,** David Choquehuanca Céspedes, Juan Ramón Quintana Taborga, Alfredo Octavio Rada Vélez, Walker San Miguel Rodríguez, Celina Torrico Rojas, Gabriel Loza Tellería, Luis Alberto Arce Catacora, Abel Mamani Marca, Celinda Sosa Lunda, Jerges Mercado Suárez, Susana Rivero Guzmán, Carlos Villegas Quiroga, Luis Alberto Echazú Alvarado, Walter Juvenal Delgadillo Terceros, Víctor Cáceres Rodríguez, Nila Heredia Miranda.

[page 13]

G A C E T A    O F I C I A L    D E    B O L I V I A

Por tanto, la promulgo para que se tenga y cumpla como Ley de la República.

Palacio de Gobierno de la ciudad de La Paz, a los trece días del mes de abril de dos mil siete años.

FDO. EVO MORALES AYMA, Juan Ramón Quintana Taborga, Susana Rivero Guzmán, Víctor Cáceres Rodríguez.

### DECRETO SUPREMO N° 29100

### EVO MORALES AYMA
### PRESIDENTE CONSTITUCIONAL DE LA REPUBLICA

CONSIDERANDO:

Que el proceso de capitalización de las empresas públicas implicó la firma de contratos de suscripción de acciones y de administración, en los que las empresas transnacionales se obligaban a invertir los montos aprobados en los respectivos procesos licitatorios.

Que el inciso d) del Artículo 10 de la Ley N° 1600 de 28 de octubre de 1994, del Sistema de Regulación Sectorial, establece que es competencia de las Superintendencias Sectoriales vigilar el plan de inversiones comprometido por las empresas que prestan servicios públicos.

Que el Artículo 31 de la Constitución Política del Estado, establece que son nulos los actos de los que usurpen funciones que no les competen, así como los actos de los que ejerzan jurisdicción o potestad que no emane de la Ley.

Que la Atribución Primera del Artículo 96 de la Constitución Política del Estado, establece que el Poder Ejecutivo, en su potestad reglamentaria debe señalar claramente los límites sin contrariar la jerarquía normativa.

Que es deber de toda autoridad. pública aplicar preferentemente la Constitución Política del Estado y las Leyes de la República, como manda el Artículo 228 de la Ley fundamental, precepto que fue vulnerado con la emisión del Decreto Supremo N° 28172 de 19 de mayo de 2005, que fue emitido apartándose de lo dispuesto por la Ley N° 1600 de 28 de octubre de 1994, del Sistema de Regulación Sectorial, disposición legal que a la fecha mantiene inalterable vigencia en nuestro ordenamiento jurídico.

12

Nº 2987   G A C E T A    O F I C I A L    D E    B O L I V I A

Que el ex Presidente Carlos Mesa Gisbert aprobó el Decreto Supremo Nº 28172, por el que autorizó al ex Ministro de Desarrollo Económico, realizar todos los actos necesarios para la evaluación del cumplimiento de las obligaciones y condiciones de los contratos de suscripción de acciones y de administración de las empresas capitalizadas.

Que el ex Ministro de Desarrollo Económico, Carlos Díaz Villavicencio, extinguió el Contrato de Suscripción de Acciones al certificar el cumplimiento de las obligaciones por parte de ENTEL y el suscriptor EURO TELECOM INTERNATIONAL NV – ETI, en relación al Contrato de Suscripción de Acciones de 27 de noviembre de 1995, emergente del proceso de capitalización en el sector de telecomunicaciones en la República de Bolivia, mediante Resolución Ministerial Nº 194/2005.

Que las derivaciones de los actos descritos son punibles conforme al ordenamiento nacional, por lo que deben procesarse en la vía correspondiente.

Que el Gobierno Nacional tiene el deber de revertir los actos ilegales, sin que el ejercicio de esta potestad implique contradicción con normas o sentencias constitucionales.

### EN CONSEJO DE MINISTROS,

**D E C R E T A:**

**ARTÍCULO ÚNICO.-** Se abroga el Decreto Supremo Nº 28172 de 19 de Mayo de 2005; así como la Resolución Ministerial Nº 194 de 12 de agosto de 2005, emitida por el titular del ex Ministerio de Desarrollo Económico y toda otra Resolución que se funde en el Decreto Supremo Nº 28172.

Los Señores Ministros de Estado, en sus respectivos Despachos, quedan encargados de la ejecución y cumplimiento del presente Decreto Supremo.

Es dado en el Palacio de Gobierno de la ciudad de La Paz, a los veintitrés días del mes de abril del año dos mil siete.

**FDO. EVO MORALES AYMA,** David Choquehuanca Céspedes, Juan Ramón Quintana Taborga, Alfredo Octavio Rada Vélez, Walker San Miguel Rodríguez, Celima Torrico Rojas, Gabriel Loza Tellería, Luis Alberto Arce Catacora, Abel Mamani Marca, Celinda Sosa Lunda, Jerges Mercado Suárez, Susana Rivero Guzmán, Carlos Villegas Quiroga, Luis Alberto Echazú Alvarado, Walter Juvenal Delgadillo Terceros, Víctor Cáceres Rodríguez, Nila Heredia Miranda.

13

## DECLARATION OF ACCURACY

I, Silvia Gil De Cwilich, hereby declare as follows:

I am fluent in Spanish and English and the following is, to the best of my knowledge and belief, a true and accurate translation from Spanish to English of Supreme Decree No. 29100 of the Constitutional President of the Republic, dated April 23, 2007.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on May 4th, 2008.

_____

Silvia Gil De Cwilich

# EXHIBIT 5

OFFICIAL GAZETTE OF BOLIVIA

SUPREME DECREE N° 29101

**EVO MORALES AYMA**

**CONSTITUTIONAL PRESIDENT OF THE REPUBLIC**

**RECITALS:**

Whereas Article 133 of the Political Constitution of the State states that the object of the use of natural and human resources shall be national independence and the development of the country, in order to safeguard State security and seek the welfare of the Bolivian people;

Whereas Article 135 of the fundamental Law states that all companies established for exploitation, utilization or business in the country shall be considered national and subject to the sovereignty, Laws and authorities of the Republic;

Whereas notwithstanding the abovementioned constitutional precepts, during the neo-liberal period of the past two decades, there was systematic dismantling of strategic State-owned companies which led to their being transferred into private hands through the anti-national processes of privatization and capitalization;

Whereas under the protection of Law of Capitalization N° 1544 of March 21, 1994, the capitalization was ordered of, among others, the National Telecommunications Company – ENTEL, created on December 22, 1965, with the purpose of developing telecommunications in the national territory;

Whereas this process of capitalization meant that the State lost the management of its companies that were capitalized, and as part of the process a pseudo-transfer of shares was made in favor of Bolivian citizens who were of age on December 31, 1995; and

Whereas Bolivian citizens never had any shares in their power and therefore never participated in the Board of Directors or the Shareholders' Meetings of the capitalized company, while Pension Fund Managers undertook management without any mandate or legal representation, thus denaturalizing the nature of joint stock corporation boasted by capitalized companies, and not complying with the provisions of Article 137 of the Code of Commerce;

Nº 2987 OFFICIAL GAZETTE OF BOLIVIA

## IN COUNCIL OF MINISTERS
NOW, THEREFORE, DECREES:

**ARTICLE 1.- (OBJECT).** The object of this Supreme Decree is to transfer to the Bolivian State, for no consideration, Bolivian citizens' shares that once formed part of the Collective Capitalization Fund at ENTEL S.A., the National Telecommunications Stock Corporation, and are currently managed by the Pension Fund Managers Futuro de Bolivia S.A. AFP and BBVA Previsión AFP S.A.

**ARTICLE 2.- (TRANSFER OF SHARES).**

I. The Pension Fund Managers Futuro de Bolivia S.A. AFP and BBVA Previsión AFP S.A. must transfer the management of the shares indicated in the preceding Article to the Ministry of Public Works, Services and Housing, within the term of one accountable administrative working day as from the enforcement of this Supreme Decree.

II. The Pension Fund Managers shall make the transfer by instructing the Bolivian Securities Depository stock corporation, EDV S.A., to change the ownership of the shares that currently figure as "BBVA Previsión AFP S.A. for the Collective Capitalization Fund" and "AFP Futuro de Bolivia S.A. for the Collective Capitalization Fund" to "Ministry of Public Works, Services and Housing for the Bolivian State".

III. Once said shares are under the management of the Ministry of Public Works, Services and Housing, the Bolivian Securities Depository stock corporation, EDV S.A., shall materialize them and send them under custody to the Central Bank of Bolivia, BCB, having previously complied with the required formalities.

IV. The Ministry of Public Works, Services and Housing shall hold the ENTEL shares until the public company "Bolivian National Telecommunications Company - ENTELBO" is formed. Once it has been established, the stock ownership shall be transferred to this company, for no consideration.

**ARTICLE 3.- (MODIFICATION OF THE FINANCIAL STRUCTURE OF THE COLLECTIVE CAPITALIZATION FUND).** The Bolivian State's shares in ENTEL, as from their transfer, shall not form part of the financial structure of the Collective Capitalization Fund.

**ARTICLE 4.- (GUARANTEE OF BONOSOL FINANCING).** The Bolivian State, in its capacity as ENTEL shareholder, shall restore the contributions for dividends to the Collective Capitalization Fund – FCC, with the aim of guaranteeing the payment of BONOSOL and funeral expenses.

**ARTICLE 5.- (NON-COMPLIANCE).** The Superintendence of Pensions, Securities and Insurance will place under government control any Pension Fund Manager that does not comply with the provisions of this Supreme Decree, according to subsection a) of Article 34 of the Law of Pensions Nº 1732 of November 29, 1996, consistent with subsection s) of Article 31 of the same Law.

## ABROGATION AND DEROGATION PROVISIONS

**ABROGATION PROVISIONS.-** The following legal provisions are abrogated:

- Supreme Decree N° 24025 of June 7, 1995 (Formation of ENTEL S.A.M.).
- Supreme Decree N° 24133 of September 29, 1995 (Provides for the Capitalization of ENTEL S.A.).
- Supreme Decree N° 24700 of July 7, 1997 (Pension Fund Managers Trust )

**DEROGATION PROVISIONS.-** Any provision contrary to this Supreme Decree is derogated.

The Minister of State, at the Public Works, Services and Housing Office, shall be in charge of the execution of and compliance with this Supreme Decree.

Issued at the Government Palace of La Paz City, on April twenty third of the year two thousand seven.

**SIGNED EVO MORALES AYMA,** David Choquehuanca Céspedes, Juan Ramón Quintana Taborga, Alfredo Octavio Rada Vélez, Celima Torrico Rojas, Gabriel Loza Tellería, Luis Alberto Arce Catacora, Abel Mamani Marca, Celinda Sosa Lunda, Jerges Mercado Suárez, Susana Rivero Guzmán, Carlos Villegas Quiroga, Luis Alberto Echazú Alvarado, Walter Juvenal Delgadillo Terceros, Walter Juvenal Delgadillo Terceros, Nila Heredia Miranda.

# GACETA OFICIAL DE BOLIVIA

## DECRETO SUPREMO N° 29101

### EVO MORALES AYMA
### PRESIDENTE CONSTITUCIONAL DE LA REPÚBLICA

**CONSIDERANDO:**

Que la Constitución Política del Estado, en su Artículo 133 señala que el aprovechamiento de los recursos naturales y humanos tendrá como objetivo la independencia nacional y el desarrollo del país en resguardo de la seguridad del Estado y en procura del bienestar del pueblo boliviano.

Que el Artículo 135 de la Ley fundamental señala que todas las empresas establecidas para explotaciones, aprovechamiento o negocios en el país se considerarán nacionales y estarán sometidas a la soberanía, a las Leyes y a las autoridades de la República.

Que no obstante de los preceptos constitucionales mencionados, en el periodo neoliberal de las dos últimas décadas, se ha producido un sistemático desmantelamiento de las empresas estratégicas del Estado que se materializó en su transferencia a manos privadas, a través de los procesos antinacionales de privatización y capitalización.

Que al amparo de la Ley N° 1544 de 21 de marzo de 1994, de Capitalización, se dispuso la capitalización, entre otras, de la Empresa Nacional de Telecomunicaciones – ENTEL, creada en 22 de diciembre de 1965, con la finalidad de desarrollar las telecomunicaciones en territorio nacional.

Que este proceso de capitalización implicó la pérdida de la administración por parte del Estado, de sus empresas que fueron capitalizadas, y como parte del proceso se efectuó una seudo transferencia de las acciones en favor de los ciudadanos bolivianos mayores de edad al 31 de diciembre de 1995.

Que los ciudadanos bolivianos nunca tuvieron en su poder acción alguna y consiguientemente, nunca participaron en el Directorio ni en la Junta de Accionistas de la empresa capitalizada, siendo las Administradoras de Fondos de Pensiones, las que asumieron la administración sin ningún mandato ni representación legal, desnaturalizando de esta manera la naturaleza de sociedad anónima que ostentan las empresas capitalizadas, y que no se adecuan a lo dispuesto por el Artículo 137 del Código de Comercio.

14

**EN CONSEJO DE MINISTROS,**

**D E C R E T A:**

**ARTÍCULO 1.- (OBJETO).** El presente Decreto Supremo tiene por objeto transferir en favor del Estado boliviano, a título gratuito, las acciones de los ciudadanos bolivianos que formaban parte del Fondo de Capitalización Colectiva en la Empresa Nacional de Telecomunicaciones Sociedad Anónima – ENTEL S.A., actualmente administradas por las Administradoras de Fondos de Pensiones Futuro de Bolivia S.A. AFP y BBVA Previsión AFP S.A.

**ARTÍCULO 2.- (TRANSFERENCIA DE LAS ACCIONES).**

I.    Las Administradoras de Fondos de Pensiones, Futuro de Bolivia S.A. AFP y BBVA Previsión AFP S.A. están obligadas a transferir la administración de las acciones señaladas en el Artículo anterior al Ministerio de Obras Públicas, Servicios y Vivienda, en el plazo de un día hábil administrativo computable a partir de la vigencia del presente Decreto Supremo.

II.   Las Administradoras de Fondos de Pensiones realizarán la transferencia instruyendo a la Entidad de Depósito de Valores de Bolivia Sociedad Anónima – EDV S.A., sustituir la titularidad de las acciones que actualmente figuran como "BBVA Previsión AFP S.A. para el Fondo de Capitalización Colectiva" y "AFP Futuro de Bolivia S.A. para el Fondo de Capitalización Colectiva" por "Ministerio de Obras Públicas, Servicios y Vivienda por el Estado boliviano".

III.  Una vez que dichas acciones estén bajo la administración del Ministerio de Obras Públicas, Servicios y Vivienda, la Entidad de Depósito de Valores de Bolivia Sociedad Anónima – EDV S.A., deberá materializar las mismas y remitirlas en custodia al Banco Central de Bolivia – BCB, previo cumplimiento de las formalidades de rigor.

IV.   El Ministerio de Obras Públicas, Servicios y Vivienda ejercerá la titularidad de las acciones en ENTEL hasta que se conforme la empresa pública "Empresa Nacional de Telecomunicaciones Bolivia – ENTELBO". Una vez constituida ésta, el paquete accionario será transferido a la mencionada empresa, a título gratuito.

**ARTÍCULO 3.- (MODIFICACIÓN DE LA ESTRUCTURA FINANCIERA DEL FCC).** Las acciones del Estado boliviano en ENTEL, desde su transferencia, no formarán parte de la estructura financiera del Fondo de Capitalización Colectiva.

**ARTÍCULO 4.- (GARANTÍA DE FINANCIAMIENTO DEL BONOSOL).** El Estado boliviano, en su calidad de accionista de ENTEL, repondrá

15

los aportes por dividendos al Fondo de Capitalización Colectiva – FCC, con el fin de garantizar el pago del BONOSOL y los gastos funerarios.

**ARTÍCULO 5.- (INCUMPLIMIENTO).** La Superintendencia de Pensiones, Valores y Seguros intervendrá a la Administradora de Fondos de Pensiones que incumpla lo dispuesto por el presente Decreto Supremo, de conformidad al inciso a) del Artículo 34 de la Ley Nº 1732 de 29 de noviembre de 1996, de Pensiones, concordante con el inciso s) del Artículo 31 de la misma Ley.

### DISPOSICIONES ABROGATORIAS Y DEROGATORIAS

**DISPOSICIONES ABROGATORIAS.-** Se abrogan las siguientes disposiciones legales:

- Decreto Supremo Nº 24025 de 7 de junio de 1995 (Formación de ENTEL S.A.M.).
- Decreto Supremo Nº 24133 de 29 de septiembre de 1995 (Dispone la Capitalización de ENTEL S.A.).
- Decreto Supremo Nº 24700 de 7 de julio de 1997 (Fideicomiso AFPs).

**DISPOSICIONES DEROGATORIAS.-** Quedan derogadas todas las disposiciones contrarias al presente Decreto Supremo.

El Señor Ministro de Estado, en el Despacho de Obras Públicas, Servicios y Vivienda, queda encargado de la ejecución y cumplimiento del presente Decreto Supremo.

Es dado en el Palacio de Gobierno de la ciudad de La Paz, a los veintitrés días del mes de abril del año dos mil siete.

**FDO. EVO MORALES AYMA**, David Choquehuanca Céspedes, Juan Ramón Quintana Taborga, Alfredo Octavio Rada Vélez, Celima Torrico Rojas, Gabriel Loza Tellería, Luis Alberto Arce Catacora, Abel Mamani Marca, Celinda Sosa Lunda, Jerges Mercado Suárez, Susana Rivero Guzmán, Carlos Villegas Quiroga, Luis Alberto Echazú Alvarado, Walter Juvenal Delgadillo Terceros, Walter Juvenal Delgadillo Terceros, Nila Heredia Miranda.



PRECIO OFICIAL PARA TODO EL PAIS Bs. 5.-

*Impreso en Imprenta de Gaceta*
*Oficial de Bolivia*
*Calle Mercado Nº 1121*
*Edificio Guerrero*
*TELÉFONO 2147935*
*CASILLA Nº 4007*

## DECLARATION OF ACCURACY

I, Silvia Gil De Cwilich, hereby declare as follows:

I am fluent in Spanish and English and the following is, to the best of my knowledge and belief, a true and accurate translation from Spanish to English of Supreme Decree No. 29101 of the Constitutional President of the Republic, dated April 23, 2007.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on May 4th, 2008.

Silvia Gil De Cwilich

# EXHIBIT 6

### SUPREME DECREE N° 29544
### EVO MORALES AYMA
### CONSTITUTIONAL PRESIDENT OF THE REPUBLIC

**WHEREAS:**

That Act N° 1544, Capitalization Act, dated March 21st of 1994, provided the capitalization of several public utilities, among them, the Empresa Nacional de Telecomunicaciones (National Telecommunications Company) – ENTEL.

That, to such effect, it was provided to transform ENTEL into a mixed economy company, and the workers were made stockholders up to the amount of their social benefits, ENTEL later becoming a stock corporation through the signature of a capitalization contract with a strategic partner and a pseudo-transference of stock to those Bolivians who were elderly citizens by December 31st of 1995, which had no other purpose than to deprive the State of its stake in the capitalized company and leave the latter in the hands of private interests.

That shares of stock were never issued in favor of the Bolivian citizens and, therefore, these never received any dividends, nor did they participate or delegate their participation in the Board of Directors or the Stockholder Meetings of the capitalized company, something which distorted the character of stock corporation ENTEL is supposed to have and which does not comply with the provisions of Article 137 of the Code of Commerce.

That the Subscription Agreement dated November 27th of 1995 demanded that the capitalizing company should invest the amount of the shares subscription in the telecommunications sector for the benefit of ENTEL, said Agreement providing the existence of a reserve fund as share premium, amount which was finally distributed among the stockholders through the voluntary capital reduction process, agreed on by the Stockholder Meeting that took place on September 16th and 20th of 2005, which caused the decapitalization of the company.

That, in the foregoing scenario, the National Government, by Supreme Decree N°29087, dated march 28th of 2007, ordered the creation of an Ad Hoc Committee to conduct the negotiations aimed at recovering the shares of stock of ETI EUROTELECOM INTERNATIONAL NV in ENTEL S.A.

That, in spite of having given its consent to the negotiation process, having officially authorized its representatives and participated in three meetings with the government Committee, the capitalizing company unilaterally interrupted the negotiations.

That the National Government, by Supreme Decree N°29101 dated April 23rd of 2007 provided the transfer in favor of the Bolivian State, for no consideration, of the shares of stock belonging to the Bolivian citizens that were part of the Collective Capitalization Fund [*Fondo de Capitalización Colectiva*] in ENTEL S.A., shares of stock that were managed by the pension fund administration companies "Futuro de Bolivia S.A. AFP" and "BBVA Previsión AFP S.A.".

That the Political Constitution of the State establishes in Article 133 that the use of the natural and human resources shall be aimed at the independence of the nation and the development of the country, preserving the security of the State and seeking the well-being of the Bolivian people.

That, according to Articles 24 and 135 of the Political Constitution of the State, all the companies established in the country are considered to be national and are subject to the sovereignty, laws and authorities of the Republic.

### IN COUNCIL OF MINISTERS

**DECREES:**

**ARTICLE 1. (OBJECT).**
The aim of this Supreme Decree is to nationalize the stock of the company ETI EUROTELECOM INTERNATIONAL NV to transform the latter into the Empresa Nacional de Telecomunicaciones Sociedad Anónima -Entel S.A.

**ARTICLE 2. (NATIONALIZATION).**
The stock of the capitalizing company ETI EUROTELECOM INTERNATIONAL NV is hereby nationalized in its entirety and said company is transformed into Entel SA; all the shares of this capitalizing company shall be transfered to the Bolivian state, being temporarily held by the Ministry of Public Works, Utilities and Housing while the legal nature of ENTEL S.A. is changed into ENTEL SAM. By virtue of this measure, all of the subsidiary companies of ENTEL S.A., in Bolivia or abroad, are also hereby nationalized in their respective stakes.

**ARTICLE 3.(PAYMENT FOR THE VALUE OF THE SHARES OF STOCK).**
The Bolivian state shall pay the capitalizing company ETI EUROTELECOM INTERNATIONAL NV the value of the nationalized shares of stock; to this end, an evaluation shall be performed no later than 60 days as from the day this Supreme Decree comes into effect.

**ARTICLE 4. (LIABILITIES).**
The financial, tax, labor, commercial and regulatory liabilities of ENTEL S.A., both payable and contingent, shall be deducted at the time of effecting the final liquidation for the payment to be made to the company ETI EUROTELECOM INTERNATIONAL NV, since the General National Treasury assumed all the liabilities of the public company ENTEL before its capitalization.

**ARTICLE 5. (DIVIDENDS).**
Dividends arising from the nationalized stock will be re-invested and allocated to foster the technologic development and growth of the company, according to the Development National Plan, the new By-laws and the new strategic institutional plan. On the other hand, the dividends corresponding to the shares recovered by the State by Supreme Decree N° 29101 of April 23rd, 2007 must continue being allocated in the "Fondo de Renta Dignidad" [NdT 1]

**ARTICLE 6. (ENTEL SAM).**

I. ENTEL S.A. must be transformed into a Mixed Economy Corporation, pursuant to the provisions of the Code of Commerce. For that purpose, the Stockholders' Meeting must adapt the incorporation and statutory regulations within the term of 180 calendar days form the date this Supreme Decree comes into effect.

II. The Ministry of Public Works, Services and Housing will exercise the legal protection of ENTEL S.A.M.

**ARTICLE 7. (CONTINUITY OF SERVICES).**

I. The continuity of all the services provided by ENTEL is hereby guaranteed, and it is within the responsibility of the regulatory entity of the area of telecommunications to ensure that the statements of this paragraph are complied with, pursuant to the Telecommunications Act and its regulatory decrees.

II. Any individual that, in any way, may interrupt or disturb the normal business of the company, or incur in acts that cause detriment or prejudice to its corporate assets must be denounced before the Public Ministry under the offense of "Attempt against the security of public services", "Anti-Economic Behavior", "Aggravated Damage" and other offences typified in the Criminal Code.

**ARTICLE 8. (EMPLOYMENT)**

I. The continuity of employment is hereby guaranteed to ENTEL employees, according to the provisions of Supreme Decree N 28699, article 11 of May 1st, 2006.

II. The provisions of paragraph I above do not apply to the hierarchical and management staff of the capitalizing company.

**ARTICLE 9. (REGULATORY FRAMEWORK)**
The nationalized company is subject to the laws, regulations and authorities that regulate the telecommunications area.

**ARTICLE 10. (ADMINISTRATION).**

I. The Minister of Public Works, Services and Housing, through the Vice-Ministry of Telecommunications, shall adopt all the necessary measures to secure the transitory administration of the company and the regular provision of services, until the corporate nature of the company is transformed.

II. The contracts executed by ENTEL S.A. by virtue of which some services are granted to third parties will continue in effect. Those contracts executed with companies related to the group ETI EUROTELECOM INTERNACIONAL N.V. will be analyzed, on a case by case basis, and then ratified or nullified with the prior issuance of technical and legal reports.

III. Furthermore, the contracts of provision of services or consultancy executed with professionals and associations will continue in full force and effect, as long as there are not legal incompatibilities.

The Ministers of the State, at their respective Offices, are in charge of the execution and enforcement of this Supreme Decree.

Issued at the Government Palace in the city of La Paz on this first day of the month of May of the year two thousand and eight.

SIGNED BY: EVO MORALES AYMA, David Choquehuanca Céspedes, Juan Ramón quintana Taborga, Alfredo Octavio Rada Vélez, Walker San Miguel Rodríguez, Celima Torrico Rojas, Graciela Toro Ibañez, Luís Alberto Arce Catacora, René Gonzalo Orellana Halky[illegible], Angel Javier Hurtado Mercado, Oscar Coca Antezana, Susana Rivero Guzmán, Carlos Villegas Quiroga, Luís Alberto Echazú Alvarado, Walter J. Delgadillo Terceros, María Magdalena Cajías de la Vega, Walter Selum Rivero.
[There is a seal that says:] Official Printing [illegible]
OFFICIAL PRICE FOR ALL THE COUNTRY Bs. 10
Printed in the Printing Plant of the Official Gazette of Bolivia. Adress: Calle MERCADO Nº 1121, Edificio Guerrero Planta Baja.

[NdT1] Benefit payable to Bolivian citizens, without exception, at the age of 60.

## DECRETO SUPREMO N° 29544
## EVO MORALES AYMA
## PRESIDENTE CONSTITUCIONAL DE LA REPÚBLICA

**C O N S I D E R A N D O:**

Que mediante Ley N° 1544 de Capitalización de 21 de marzo de 1994 se dispuso la capitalización de varias empresas públicas, entre ellas de la Empresa Nacional de Telecomunicaciones – ENTEL.

Que a este efecto se dispuso la transformación de ENTEL en sociedad anónima mixta, convirtiendo a los trabajadores en accionistas hasta el monto de sus beneficios sociales, produciéndose posteriormente su conversión en sociedad anónima, a través de la firma de un contrato de capitalización con un socio estratégico y una seudo transferencia de las acciones en favor de los ciudadanos bolivianos mayores de edad al 31 de diciembre de 1995, que tuvo el único propósito de despojar al Estado de su participación en la empresa capitalizada y de dejarla librada a intereses privados.

Que nunca se emitieron acciones en favor de los ciudadanos bolivianos y por consiguiente éstos nunca recibieron dividendos ni participaron o delegaron su participación en el Directorio ni en las Juntas de Accionistas de la empresa capitalizada, desvirtuándose de esta manera la naturaleza de sociedad anónima que ostenta ENTEL S.A. y que no se adecua a lo dispuesto por el Artículo 137 del Código de Comercio.

Que el Contrato de Suscripción de Acciones de 27 de noviembre de 1995 exigía que la empresa capitalizadora invierta el monto de la suscripción de acciones en el sector de telecomunicaciones en beneficio de ENTEL, disponiéndose en este contrato la existencia de un fondo de reserva por concepto de prima de emisión, monto que finalmente fue distribuido entre los accionistas a través del proceso de reducción voluntaria de capital, acordada por la Junta de Accionista realizada los días 16 y 20 de septiembre de 2005, provocando la descapitalización de la empresa.

Que en el marco descrito, el Gobierno Nacional, mediante Decreto Supremo N° 29087 de 28 de marzo de 2007 dispuso la creación de una Comisión Ad Hoc de negociación para la recuperación de las acciones de ETI EUROTELECOM INTERNATIONAL NV en ENTEL S.A.

Que no obstante de haber dado su consentimiento al proceso de negociación, acreditado oficialmente a sus representantes y participado en tres reuniones con la Comisión gubernamental, la empresa capitalizadora interrumpió unilateralmente el curso de las negociaciones.

Que el Gobierno Nacional, mediante Decreto Supremo N° 29101 de 23 de abril de 2007, dispuso la transferencia en favor del Estado boliviano, a título gratuito, de las acciones de los ciudadanos bolivianos que formaban parte del Fondo de Capitalización Colectiva en ENTEL S.A., administradas por las Administradoras de Fondos de Pensiones "Futuro de Bolivia S.A. AFP" y "BBVA Previsión AFP S.A.".

Que la Constitución Política del Estado, en su Artículo 133 señala que el aprovechamiento de los recursos naturales y humanos tendrá como objetivo la independencia nacional y el desarrollo del país en resguardo de la seguridad del Estado y en procura del bienestar del pueblo boliviano.

Que de acuerdo a los Artículos 24 y 135 de la Constitución Política del Estado, todas las empresas establecidas en el país se consideran nacionales y están sometidas a la soberanía, leyes y autoridades de la República.

### EN CONSEJO DE MINISTROS

DECRETA:

**ARTÍCULO 1. (OBJETO).** El presente Decreto Supremo tiene por objeto nacionalizar el paquete accionario que tiene la empresa ETI EUROTELECOM INTERNATIONAL NV en la Empresa Nacional de Telecomunicaciones Sociedad Anónima – ENTEL S.A.

**ARTÍCULO 2. (NACIONALIZACIÓN).** Se nacionaliza la totalidad del paquete accionario de la capitalizadora ETI EUROTELECOM INTERNATIONAL NV en ENTEL S.A., debiendo las acciones de esta empresa capitalizadora ser transferidas al Estado boliviano bajo la titularidad transitoria del Ministerio de Obras Públicas, Servicios y Vivienda mientras se realice la transformación de la naturaleza jurídica de ENTEL S.A. a ENTEL SAM. En virtud de esta medida todas las empresas subsidiarias de ENTEL S.A., en Bolivia o en el extranjero, quedan también nacionalizadas en la cuota parte respectiva.

**ARTÍCULO 3. (PAGO POR EL VALOR DE LAS ACCIONES).** El Estado boliviano pagará el valor de las acciones nacionalizadas a la empresa capitalizadora ETI EUROTELECOM INTERNATIONAL NV., debiendo efectuarse a este efecto una valuación en un plazo no mayor a 60 días a partir de la vigencia del presente Decreto Supremo.

**ARTÍCULO 4. (PASIVOS).** Los pasivos financieros, tributarios, laborales, comerciales y regulatorios de ENTEL S.A., tanto exigibles como contingentes, serán deducidos a tiempo de efectuar la liquidación final para el pago a la empresa ETI EURO-

Gaceta N° 3048

TELECOM INTERNATIONAL NV, toda vez que el Tesoro General de la Nación asumió todos los pasivos de la empresa pública ENTEL antes de la capitalización.

**ARTÍCULO 5. (DIVIDENDOS).** Los dividendos que generen las acciones nacionalizadas serán destinados a la reinversión, el desarrollo tecnológico y el crecimiento de la empresa, de conformidad al Plan Nacional de Desarrollo, los nuevos Estatutos y el nuevo plan estratégico institucional. En tanto que los dividendos que corresponden a las acciones recuperadas por el Estado por Decreto Supremo No. 29101 de 23 de abril de 2007 continuarán siendo destinados al Fondo de Renta Dignidad.

**ARTÍCULO 6. (ENTEL SAM).**

I.     ENTEL S.A. deberá ser transformada a la tipología de Sociedad Anónima Mixta, conforme a las previsiones del Código de Comercio, a cuyo efecto la Junta de Accionistas deberá adecuar sus normas constitutivas y estatutarias en el plazo de 180 días calendario, que será computable a partir de la vigencia del presente Decreto Supremo.

II.    El Ministerio de Obras Públicas, Servicios y Vivienda ejercerá la tuición sobre ENTEL S.A.M.

**ARTÍCULO 7. (CONTINUIDAD DE LOS SERVICIOS).**

I.     Se garantiza la continuidad de todos los servicios que presta ENTEL, siendo responsabilidad del órgano regulador del sector de telecomunicaciones velar por lo dispuesto en el presente parágrafo, de conformidad con la Ley de Telecomunicaciones y sus decretos reglamentarios.

II.    Las personas que de cualquier modo impidan o perturben el normal desenvolvimiento de la empresa o las que incurran en actos que denoten perjuicio o detrimento a su patrimonio, serán denunciadas ante el Ministerio Público por los delitos de "Atentado contra la seguridad de los servicios públicos", "Conducta antieconómica", "Daño calificado" y otras conductas delictivas tipificadas en el Código Penal.

**ARTÍCULO 8. (SITUACIÓN LABORAL).**

I.     Se garantiza la continuidad laboral de los trabajadores de ENTEL, conforme dispone el artículo 11 del Decreto Supremo No.28699 de 1ro de mayo de 2006.

II.    Se exceptúan de lo dispuesto en el parágrafo precedente a los funcionarios jerárquicos y directivos de la empresa capitalizadora.

**ARTÍCULO 9. (MARCO REGULATORIO).** La empresa nacionalizada estará sujeta a las leyes, reglamentos y autoridades que rigen en el sector de telecomunicaciones.

GACETA OFICIAL DE BOLIVIA

*Oficial*
*Gaceta Oficial*
*De Bolivia*

**ARTÍCULO 10. (ADMINISTRACIÓN).**

I. El Ministerio de Obras Públicas, Servicios y Vivienda, a través del Viceministerio de Telecomunicaciones, adoptará las medidas necesarias para garantizar la administración transitoria de la empresa y la normal provisión de los servicios, hasta que sea transformada su naturaleza societaria.

II. Los contratos suscritos por ENTEL S.A. en virtud de los cuales ciertos servicios son otorgados a terceros continuarán vigentes. Aquellos contratos suscritos con empresas vinculadas al grupo ETI EUROTELECOM INTERNATIONAL N.V. serán analizados caso por caso y en su caso ratificados o dejados sin efecto, previa emisión de informes técnicos y legales.

III. Asimismo continuarán vigentes los contratos de prestación de servicios o de consultoría suscritos con profesionales o firmas, siempre y cuando no existan incompatibilidades legales.

Los Señores Ministros de Estado, en sus respectivos Despachos, quedan encargados de la ejecución y cumplimiento del presente Decreto Supremo.

Es dado en el Palacio de Gobierno de la ciudad de La Paz, al primer día del mes de mayo del año dos mil ocho.

FDO. EVO MORALES AYMA, David Choquehuanca Céspedes, Juan Ramón Quintana Taborga, Alfredo Octavio Rada Vélez, Walker San Miguel Rodríguez, Celima Torrico Rojas, Graciela Toro Ibañez, Luis Alberto Arce Catacora, René Gonzalo Orellana Halkyer, Angel Javier Hurtado Mercado, Oscar Coca Antezana, Susana Rivero Guzmán, Carlos Villegas Quiroga, Luis Alberto Echazú Alvarado, Walter J. Delgadillo Terceros, María Magdalena Cajías de la Vega, Walter Selum Rivero.



*Impresión*
*Oficial*
*Gaceta Oficial*
*De Bolivia*

**PRECIO OFICIAL PARA TODO EL PAIS Bs. 1**

Impreso en Talleres de
Gaceta Oficial de Bolivia
Dirección:
Calle MERCADO Nº 1121
Edificio Guerrero Planta Baja

## DECLARATION OF ACCURACY

I, Silvia Gil De Cwilich, hereby declare as follows:

I am fluent in Spanish and English and the following is, to the best of my knowledge and belief, a true and accurate translation from Spanish to English of Supreme Decree No. 29544 of the Constitutional President of the Republic, dated May 1, 2008.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on May 2008.

_____

Silvia Gil De Cwilich

# EXHIBIT 7

<u>**EXECUTIVE SUMMARY**</u>
<u>**RECOVERY OF ENTEL S.A.**</u>

**SITUATION ANALYSIS**

- During the term of President Carlos Mesa Gisbert, by means of Supreme Decree N° 28172, the Minister of Economic Development was authorized to issue a Ministerial Resolution to certify the compliance or non-compliance with the obligations and conditions of the other parties in the Agreements on Stock Subscription and Administration of capitalized companies and any other legal relationship in which the Republic of Bolivia is a party or in which it has legitimate interest, and is related to those agreements.

- The Minister of Economic Development Carlos Díaz Villavicencio, through Ministerial Resolution N° 194 of August 12, 2005, established: "FIRST.- Compliance with obligations by ENTEL and the Subscriber (E.T.I. EURO TELECOM INTERNATIONAL N.V.) is certified with relation to the Stock Subscription Agreement dated November 27, 1995, which emerges from the Process of Capitalization in the Telecommunications sector in the Republic of Bolivia; consequently, the Stock Subscription Agreement is discharged by fulfillment of object..."

- Based on the aforesaid, as the discharge of the Stock Subscription Agreement had been established by Ministerial Resolution N° 194, at the ENTEL S.A. Shareholders Meeting held on September 20, 2005, it was unanimously resolved to:
  "Eliminate article 13 from Company Bylaws".

*NOTE: The article that was eliminated established that the stock subscription amounts could not be used for distributions to shareholders, including, but not limited to, capital reductions, dividends, loans and advances to shareholders.*

The Shareholders Meeting also established the increase in Company Authorized Capital up to the sum of 4,5000,000,000; the increase in Company Paid Capital up to the sum of Bs 4,483,145,800; the voluntary reduction of paid capital in the sum of Bs 3,202,247,000, setting the new company paid capital at the sum of Bs 1,280,898,800; approving that the amount of capital reduction established in the previous point, for a total sum of Bs 3,202,247,000 be distributed to shareholders, in proportion to their shareholding, at the amount of Bs 250 per share, with ready Cash".

Finally, the ENTEL S.A. Shareholders Meeting determined the reduction of Authorized Capital to a sum of Bs 2,561,797,600; as well as the amendment of article 5 of the Company Bylaws as follows: *"ARTICLE 5: AUTHORIZED CAPITAL AND NOMINAL SHARE VALUE..- The Company's Authorized Capital is Two billion, five hundred and sixty one million, seven hundred and ninety seven thousand, six hundred 00/10 Bolivianos (Bs 2,561,797,600). As capital contributions are made, necessarily nominative shares shall be issued, with a nominal value of one hundred 00/100 Bolivianos (Bs 100) each".*

- Besides the proceedings described, there are signs of non-compliance with concession contracts by ENTEL S.A.; fines, a difference of USD 144,000,000 in the investments executed according to information from SITTEL, apparent

surcharges on the purchase of goods; linked technical assistance contracts, unpaid taxes on contingencies (bad debt); accounts receivable and other irregularities.

## STRATEGIES PROPOSED

As a result of the work sessions and taking into account the magnitude of the irregularities found, the work group adopted the following premises:

1. Recovering the ownership of the company for the State;
2. Compensation 0 due to the irregularities found; and
3. Protection of company assets.

Consequently, the options for State intervention are the following:

## OPTION 1 (Intervention due to risk of damage to assets)

- Special Administrative Intervention, under the general state "intervention" powers of the Executive Power.
- It would be established as a decision of the Executive Power by means of a Supreme Decree.
- This intervention would be done without the participation of the Telecommunications Superintendence and would not operate under the regulatory framework of Telecommunications Law N° 1632 and its connected and complementary rules.
- The Government-appointed Manager ["Interventor"] would be named by means of a Supreme Resolution.

## ADVANTAGES
- It expresses the position of the Government.
- Direct action to take precautions related to public interest and company assets.
- Closer to nationalization.
- Does not commit to the Regulation System.
- Does not need to force the interpretation of the grounds for preventive intervention of Art. 17 of Telecommunications Law N° 1632 and Art. 104 of the regulation of said Law.

## DISADVANTAGES

- The Investment Protection Agreement signed with Italy would be invoked.
- National law suits would be filed.
- It is not channeled through the regulatory regime and is supported by the general powers of the Executive Power.

## OPTION 2 (Preventive Intervention provided for in the regulatory framework)

- Preventive Administrative Intervention carried out within the framework of Law N° 1600 of the Sectorial Regulation System (SIRESE; Telecommunications Law

Nº 1632; Supreme Decree Nº 24132 (Regulations of the Telecommunications Law) and other connected and complementary rules.

- It requires a Supreme Decree establishing the amendment of article 104 of the Regulation of the Telecommunications Law, to grant power to the Telecommunications Superintendence to intervene preventatively if there is a risk of damage to assets that compromises Bolivian capital stock.
- The intervention would be established by means of a Regulatory Administrative Resolution from the Superintendence of Telecommunications.

## ADVANTAGES

- ENTEL S.A. is a company that is subject to regulation and to date, the 5 concession contracts are in force, therefore the regulatory framework is applicable.
- State action would be within the legislation framework in force in the country, which regulates the Telecommunications Sector.
- It would enable all the existing regulatory proceedings and antecedents to be included, specifically the difference of USD 144,000,000 reported by SITTEL and which was not considered by the Minister of Economic Development at the time the investments were certified.

## DISADVANTAGES

- The Investment Protection Agreement could be invoked
- National law suits being filed
- It delays the project presented by the Ministry of Public Works, Services and Housing regarding the disappearance of SITTEL
- It involves more actors (General Superintendence of SIRESE)
- Intervention would be subject to regulatory procedures and terms
- The conclusion of the intervention would lead to the concession lapsing or the return of the current administration

## AGREEMENT ON PROMOTION AND PROTECTION OF INVESTMENTS SUBSCRIBED BETWEEN THE GOVERNMENTS OF BOLIVIA AND ITALY

Article 5 of this agreement establishes that the investments that are the object of said Agreement cannot be subject to any measure limiting, within any determined or undetermined period of time, the right to property, possession, control or enjoyment related to the investments, except for specific provisions of the laws, as well as rulings and ordinances issued by the competent court.

The Agreement also establishes that the investments of investors of one of the Contracting Parties shall not be directly or indirectly nationalized, expropriated, seized or subject to measures that have equivalent effects in the territory of the other contracting party, except if the aforesaid is done for public purposes, in the interest of the nation and by means of an immediate, full and effective compensation, and providing that said measures are taken on a non-discriminatory base and according to legal procedures.

**CONCLUSION**

By reason of the antecedents and irregularities described, it is necessary for the Executive Power to take urgent measures to protect the institutional assets of the capitalized company, in order to protect the interest of Bolivian shareholders, subscribers, users and the State itself.

Nevertheless, whichever path the Executive Power takes, if it involves the State exercising the administration or control of the capitalized company, it runs the risk of incurring in the provision contained in the Investment Promotion and Protection Agreement subscribed between the Governments of Bolivia and Italy.

## EXECUTIVE SUMMARY

### OPTION 1
### ACTION WITHIN THE FRAMEWORK OF THE SECTORIAL REGULATIONS, BY THE COMPETENT INSTANCES

Direct action through the Minister of the Area and the Regulating Body, within the framework of the regulations in force in the Sector.

- Compliance with Concession Contracts
- Review of existing regulatory antecedents
- Penalty regime (historical and pending)
- Analysis of the Capital Reduction process
- Report on the Investment Certification process
- Technical and Legal Analysis of the consequences of Capital Reduction and Investment Certification; as well as compliance with Concession Contracts
- Proposal of course of action with the Minister of the Area in charge

### OPTION 2
### SUPREME DECREE EXTENDING THE POWERS OF THE MINISTER OF THE AREA AND THE REGULATORY BODY

- Evaluate the degree of compliance with the Concession Contracts
- Analyze the Capital Reduction Process
- Perform or order the performance of a Comprehensive Audit (technical, operative, legal and financial)
- Analyze the Investment Certification process
- Normative proposal
- Requires further analysis of the legal framework in force

### OPTION 3
### SUPREME DECREE ESTABLISHING PREVENTIVE INTERVENTION WITHOUT POWERS OF ADMINISTRATION

- Requires amendment of the Preventive Intervention Regime contained in Articles 104 and following in Supreme Decree N° 24132 (Regulation of Telecommunications Law and other connected and complementary rules)
- The current administration subsists
- Requires the definition of criteria for designating the government-appointed manager ["Interventor"]
- Would enable information to be gathered and processed regarding: Compliance with Concession Contracts, Capital Reduction Process and Investment Certification
- Orders the adoption of certain measures for the protection of the assets of the company intervened
- Comprehensive auditing
- Normative proposal

**OPTION 4**
**SUPREME DECREE ESTABLISHING SPECIAL ADMINISTRATIVE**
**INTERVENTION**

- Requires amendment of the Preventive Intervention Regime contained in Articles 104 and following of Supreme Decree N° 24132 (Regulation of Telecommunications Law and other connected and complementary rules)
- Grants power to the government-appointed manager ["Interventor"] to perform administration and make arrangements
- Requires criteria to be defined for the designation of the government-appointed manager ["Interventor"]
- Review of the Capital Reduction Process
- Analysis of the Investment Certification Process
- Comprehensive Audit

**OPTION 5**
**NATIONALIZATION**

There are two ways of doing it:

**1) If it were done following the Hydrocarbon Nationalization line:**
- It would require a Law amending Telecommunications Law N° 1632
- The Executive Power could subsequently act by means of a Supreme Decree
- In contrast to Hydrocarbons, in this case there is no plan for subscribing new contracts

**2) If it were done as an action of the Executive Power:**
- It would be a very generic rule showing the Government's decision and firm political will to review the actions emerging from the Capitalization of State companies
- It would grant power to the Minister of the Area and the regulating body to review and analyze the processes of: Capital Reduction, Investment Certification and Compliance with Concession Contracts
- It would grant power to protect company assets

## RESUMEN EJECUTIVO
## RECUPERACIÓN ENTEL S.A.

### · ANÁLISIS DE SITUACIÓN

- En la gestión del Presidente Carlos Mesa Gisbert, mediante Decreto Supremo N° 28172, se autorizó al Ministro de Desarrollo Económico a emitir la Resolución Ministerial que certifique el cumplimiento o incumplimiento de las obligaciones y condiciones de las otras partes en los Contratos de Suscripción de Acciones y de Administración de las empresas capitalizadas y de cualquier otra relación jurídica donde la República de Bolivia sea parte o tenga interés legítimo y que se relacionen con esos contratos.

- El Ministro de Desarrollo Económico Carlos Díaz Villavicencio, mediante Resolución Ministerial N° 194 de 12 de agosto de 2005, dispuso: "PRIMERO.- Se certifica el cumplimiento de las obligaciones por parte de la empresa ENTEL y el Suscriptor (E.T.I. EURO TELECOM INTERNATIONAL N.V.) en relación al Contrato de Suscripción de Acciones de fecha 27 de noviembre de 1995, emergentes del Proceso de Capitalización en el sector de Telecomunicaciones en la República de Bolivia, en consecuencia, el Contrato de Suscripción de Acciones queda extinguido por cumplimiento de objeto...".

- Sobre la base anterior, la Junta de Accionistas de ENTEL S.A., de fecha 20 de septiembre de 2005, al haberse dispuesto la extinción del Contrato de Suscripción de Acciones mediante la Resolución Ministerial N° 194, por unanimidad resolvió:

  "Eliminar el artículo 13 de los Estatutos de la Sociedad".

  *NOTA: El artículo eliminado establecía que los montos de suscripción de acciones no podían ser utilizados para distribuciones a los accionistas, incluyendo pero no limitándose a reducciones de capital, dividendos, préstamos y anticipos a los accionistas.*

  La Junta de Accionista dispuso también el aumento del Capital Autorizado de la Sociedad hasta el monto de 4.500.000.000; el aumento del Capital Pagado de la Sociedad hasta el monto de Bs4.483.145.800; la reducción voluntaria del capital pagado en el monto de Bs3.202.247.000, determinando el nuevo capital pagado de la sociedad en la suma de Bs1.280.898.800; aprobar que el monto de la reducción de capital dispuesto en el punto anterior, por el monto total de Bs3.202.247.000, sea distribuido a los accionistas, en proporción a su participación accionaria en el monto de Bs250 por acción, con disponibilidades de Caja";

Finalmente, la Junta de Accionistas de ENTEL S.A. determinó la reducción del Capital Autorizado hasta un monto de Bs2.561.797.600; así como la modificación del artículo 5 de los Estatutos de la Sociedad, por el siguiente texto: *"ARTÍCULO 5: CAPITAL AUTORIZADO Y VALOR NOMINAL DE LAS ACCIONES.- El Capital Autorizado de la Sociedad es de Dos mil quinientos sesenta y un millones setecientos noventa y siete mil seiscientos 00/100 Bolivianos (Bs2.561.797.600). Conforme se realicen los aportes de capital, se emitirán acciones necesariamente nominativas, con un valor nominal de Cien 00/100 Bolivianos (Bs100) cada una"*.

- Al margen de las actuaciones señaladas, existen indicios de incumplimiento de los contratos de concesión por parte de ENTEL S.A.; multas, diferencia de US$144.000.000 en las inversiones ejecutadas de acuerdo a información de SITTEL, aparentes sobreprecios en compras de bienes; contratos de asistencia técnica vinculados; impuestos no percibidos por contingentes (incobrables); cuentas por cobrar y otras irregularidades.

## ESTRATEGIAS PROPUESTAS:

Como resultado de las reuniones de trabajo y tomando en cuenta la magnitud de las irregularidades advertidas, el grupo de trabajo adoptó las siguientes premisas:

1. Recuperación para el Estado de la propiedad de la empresa;
2. Compensación 0, por las irregularidades encontradas; y
3. Resguardo del patrimonio de la empresa.

En consecuencia, las opciones de intervención del Estado son las siguientes:

## OPCIÓN 1 (Intervención por riesgo de detrimento patrimonial)

- Intervención Administrativa Especial, amparada en las facultades generales de "intervención" estatal del Poder Ejecutivo.
- Se dispondría como decisión del Poder Ejecutivo mediante Decreto Supremo.
- Esta intervención se realizaría sin participación de la Superintendencia de Telecomunicaciones y no operaría bajo el marco regulatorio de la Ley N°1632 de Telecomunicaciones y de sus normas conexas y complementarias.
- El Interventor sería nombrado mediante Resolución Suprema.

## VENTAJAS
- Expresa la posición del Gobierno
- Acción directa para precautelar el interés público y el patrimonio de la empresa
- Más cerca de la nacionalización
- No se compromete con el Sistema de Regulación

- No necesita forzar la interpretación de la causal de intervención preventiva del Art. 17 de la Ley N° 1632 de Telecomunicaciones y del Art. 104 del Reglamento de dicha Ley.

**DESVENTAJAS**

- Se invocaría el Acuerdo de Protección de Inversiones suscrito con Italia
- Interpondrían demandas nacionales
- No va por régimen regulatorio y se sustenta en las facultades generales del Poder Ejecutivo

**OPCIÓN 2 (Intervención Preventiva prevista por el marco regulatorio)**

- Intervención Administrativa Preventiva realizada en el marco de la Ley N°1600 del Sistema de regulación Sectorial (SIRESE; Ley N° 1632 de Telecomunicaciones; Decreto Supremo N° 24132 (Reglamento de la Ley de Telecomunicaciones) y demás normas conexas y complementarias.
- Requiere Decreto Supremo que disponga la modificación del artículo 104 del Reglamento de la Ley de Telecomunicaciones, para incorporar la facultad de la Superintendencia de Telecomunicaciones de intervenir preventivamente en caso de existir riesgo de detrimento patrimonial que comprometa el capital accionario boliviano.
- La intervención sería dispuesta mediante Resolución Administrativa Regulatoria de la Superintendencia de Telecomunicaciones.

**VENTAJAS**

- ENTEL S.A. es una empresa sujeta a regulación y a la fecha los 5 contratos de concesión se encuentran vigentes, por lo que es aplicable todo el marco regulatorio.
- La acción estatal estaría enmarcada en legislación vigente en el país, que regula el Sector de Telecomunicaciones.
- Permitiría incorporar todas las actuaciones y antecedentes regulatorios existentes, específicamente la diferencia de US$144.000.000 reportada por la SITTEL y que no fue considerada por el Ministerio de Desarrollo Económico a tiempo de certificar las inversiones.

**DESVENTAJAS**

- Podría invocarse el Acuerdo de Protección de Inversiones
- Interposición de demandas nacionales
- Retrasa el proyecto presentado por el Ministerio de Obras Públicas, Servicios y Vivienda, con relación a la desaparición de la SITTEL.
- Involucra más actores (Superintendencia General del SIRESE)
- La intervención se sujetaría a procedimientos y plazos regulatorios.

- La conclusión de la intervención derivaría en caducidad de la concesión o en el retorno de la actual administración.

## ACUERDO SOBRE PROMOCIÓN Y PROTECCIÓN DE LAS INVERSIONES, SUSCRITO ENTRE LOS GOBIERNOS DE BOLIVIA E ITALIA

Este Acuerdo establece en su artículo 5º que las inversiones objeto de dicho Acuerdo no pueden estar sujetas a ninguna medida que límite, a tiempo determinado o indeterminado, el derecho de propiedad, de posesión, de control o de goce, relacionados con ellas, salvo disposiciones específicas de las leyes, como también de sentencias y ordenanzas dictadas por el tribunal competente.

El Acuerdo dispone también que las inversiones de inversionistas de una de las Partes Contratantes no serán directa o indirectamente nacionalizadas, expropiadas, incautadas o sujetas a medidas que tengan efectos equivalentes en el territorio de la otra parte contratante, a no ser que lo mencionado se realice para fines públicos, en el interés nacional y mediante una inmediata, completa y efectiva indemnización, y a condición de que tales medidas se tomen sobre base no discriminatoria y de acuerdo a los procedimientos legales.

## CONCLUSIÓN

En mérito a los antecedentes expuestos y por las irregularidades descritas, es necesario que el Poder Ejecutivo asuma medidas urgentes en resguardo del patrimonio institucional de la empresa capitalizada, para precautelar los intereses de los accionistas bolivianos, abonados, usuarios y del propio Estado.

Sin embargo, sea cual sea la vía de actuación del Poder Ejecutivo, si la misma implica el ejercicio de la administración o del control de la empresa capitalizada por parte del Estado, se corre el riesgo de incurrir en la previsión contenida en el Acuerdo sobre Promoción y Protección de las Inversiones suscrito entre los Gobiernos de Bolivia e Italia.

# RESUMEN EJECUTIVO

**OPCIÓN 1**
**ACCIONES EN EL MARCO DE LA NORMATIVA SECTORIAL A CARGO DE LAS INSTANCIAS COMPETENTES**

Accionar directo a través del Ministerio del Área y del Ente Regulador, en el marco de la normativa vigente en el Sector.

- Cumplimiento de Contratos de Concesión
- Revisión de antecedentes regulatorios existentes
- Régimen de sanciones (histórico y pendiente)
- Análisis del proceso de Reducción de Capital
- Informe sobre proceso de Certificación de Inversiones
- Análisis Técnico y Legal de las consecuencias de la Reducción de Capital, de la Certificación de Inversiones; así como del cumplimiento de los Contratos de Concesión
- Propuesta de curso de acción a cargo del Ministerio del Área

**OPCIÓN 2**
**DECRETO SUPREMO QUE AMPLIA FACULTADES DEL MINISTERIO DEL ÁREA Y DEL ÓRGANO REGULADOR:**

- Evaluar grado de cumplimiento de los Contratos de Concesión
- Analizar Proceso de Reducción de Capital
- Realizar o instruir la realización de Auditoria Integral (técnica, operativa, legal y financiera)
- Analizar proceso de Certificación de Inversiones
- Proposición normativa
- Requiere mayor análisis del marco legal vigente

**OPCIÓN 3**
**DECRETO SUPREMO QUE DISPONE LA INTERVENCIÓN PREVENTIVA SIN FACULTADES DE ADMINISTRACIÓN**

- Requiere modificación del Régimen de Intervención Preventiva contenido en los Arts. 104 y s.s. del Decreto Supremo N°24132 (Reglamento a la Ley de Telecomunicaciones y demás normas conexas y complementarias)
- Subsiste la actual administración
- Exige definir criterio de designación de Interventor
- Permitiría recabar y procesar información relativa a: Cumplimiento de Contratos de Concesión; Proceso de Reducción de Capital y Certificación de Inversiones
- Instruye la adopción de determinadas medidas en resguardo del patrimonio de la empresa intervenida
- Auditoria integral
- Proposición normativa

**OPCIÓN 4**
**DECRETO SUPREMO QUE DISPONE LA INTERVENCIÓN ADMINISTRATIVA ESPECIAL**

- Requiere modificación del Régimen de Intervención Preventiva contenido en los Arts. 104 y s.s. del Decreto Supremo N°24132 (Reglamento a la Ley de Telecomunicaciones y demás normas conexas y complementarias)
- Faculta al Interventor a realizar actos de administración y disposición
- Exige definir criterio de designación de Interventor
- Revisión del Proceso de Reducción del Capital
- Análisis del Proceso de Certificación de inversiones
- Auditoria Integral

**OPCIÓN 5**
**NACIONALIZACIÓN**

Tiene dos vertientes:

1) **Si se realiza en la línea de la Nacionalización de Hidrocarburos:**

- Requeriría una Ley Modificatoria de la Ley N° 1632 de Telecomunicaciones
- Posteriormente el Poder Ejecutivo podría actuar mediante Decreto Supremo
- A diferencia con Hidrocarburos, en este caso no se tiene prevista la suscripción de nuevos contratos

2) **Si se realiza como acción del Poder Ejecutivo:**

- Sería una norma muy genérica que muestre la decisión y firme voluntad política del Gobierno de revisar las acciones emergentes de la Capitalización de las empresas del Estado
- Facultaría al Ministerio del Área y al órgano regulador a revisar y analizar los procesos de: Reducción de Capital; Certificación de Inversiones y Cumplimiento de Contratos de Concesión
- Otorgaría facultades para resguardar el patrimonio de la empresa

## <u>DECLARATION OF ACCURACY</u>

I, Silvia Gil De Cwilich, hereby declare as follows:

I am fluent in Spanish and English and the following is, to the best of my knowledge and belief, a true and accurate translation from Spanish to English of the Executive Summary, Recovery of Entel S.A.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on May 4th, 2008.

_____
Silvia Gil De Cwilich

# EXHIBIT 8

SUPERINTENDENCE OF TELECOMMUNICATIONS
OFFICIAL NOTICE

In the city of La Paz, at 3:10 pm on May 1st, 2008, I officially notified Javier Castro
Zaconeta, of behalf of ENTEL S.A., at the stated domicile: Federico Zuazo Nº 1771,
Edificio Tower, piso 09, "RAR" Number 2008/1056 of May 1st, 2008, stated in four
pages, under the title: "Orders the Intervention of ENTEL S.A. with express
extraordinary authorization, who is hereby duly notified.

The interested party is hereby requested to take into account that, pursuant to the
statements of Law 2341 of Administrative Procedures article 21, part 2, all the terms
and dates start being counted from the day after [illegible] the notice and expire at the
end of the last hour on the expiration date.

[Handwritten Text:]

After I appeared at the stated address, and obtained no answer at the doors of the Legal
Manager's Office and Regulatory Manager's Office, the officer [illegible], refused to
receive this notice. Therefore, this notice [illegible] under the door of the Legal
Manager's Office.

[There is an illegible signature:] Dr. Mónica Ayo Caso, Proceedings Officer, [illegible].

[On the top left hand margin there is a logo that reads:] SITTEL, Superintendence of
Telecommunications.

Regulatory Administrative Resolution Nº 2008/1056. La Paz, May 1st, 2008.

Considering:

The nationalization of ENTEL S.A ordered by the Supreme Government through
Supreme Decree Nº 29544 of May 1st, 2008, entrusting the Department of Public
Works, Services and Housing the temporary administration of the abovementioned
company until the adjustment of its By-laws and re-appointment of its Directors and
Trustees and the appointment of its President, pursuant to the legislation that regulates
the action of public and mixed companies.

The duty of the Superintendence of Telecommunications is to preserve the continuity of
the provision of Telecommunications Services to the society, in order to guarantee the
citizen's right of access to the telecommunications services, as a collective need.

WHEREAS:

Law Nº1600 (SIRESE), article 10, subsection f) sets forth that one of the general
powers of the Sectional Superintendences is to intervene the business associations and
entities under its regulatory jurisdiction and appoint the state administrators, according
to the sectional legislation;

in that regard, the Telecommunications Law N° 1632, article 17 states that, in case the continuity of the provision of Telecommunications Services to the people is at risk, the Superintendence of Telecommunications, within its competence, must appoint a state administrator for the period of 90 days, according to the procedure set forth in the regulation and the respective concession contracts, through a dully based Administrative Resolution and previous notice to the concessionaire;

the preventive intervention is regulated in the Regulation of the Telecommunications Law (passed by D.S. 24132 and modified by D.S. 29543) that establish that a state administrator shall be appointed should it be proved that the concessionaire put at risk the continuity of the provision of a service;

D.S. 27172, article 12 states that in case of an emergency that puts at risk the continuity or regularity of the provision of public services, the Superintendents, officially or upon the request of a party, shall adopt urgent resolutions necessary to mitigate the emergency and avoid prejudices to the administered society.

WHEREAS:

the Superintendence of Telecommunications has executed concession contracts with ENTEL S.A. on November 24th, 1995, for the provision of Local Services (including circuit leases, rural services and satellite services) of Public Telephones, Movil Services, Personal communications, Long Distance Communications and Data Transmission within the whole territory of Bolivia;

[There are three illegible signatures]

[The following information appears at the bottom of the page:] Calle 13 N° 8260 y 8280, Calacoto. Telephone number: (591-2)2772266. Fax number: 591-2-2772299. Email address: info@sittel.gov.bo. www.sittel.gov.bo. Mail box: 6692. La Paz- Bolivia.

by virtue of the scope of the regulations in force, the regulating body declared the company Entel S.A. as the dominant operator in the following services: National and International Long Distance Communications, Public Phones, Data Transmission, Premises and Circuit Rental (in some areas); all of which are therefore considered to be non competitive;

additionally, it should be noted that the aforementioned company is at present the main entity in charge of carrying most of the National and International Long Distance calls of the telecommunications market operators, as well as of other telecommunications services;

WHEREAS:

considering that the government has resolved to nationalize ENTEL S.A., which involves transferring private shares to the Bolivian state, the probability exists that some people, or groups of people, believing to be affected by this measure may interrupt the normal provision of telecommunications services, situation that could even generate the interruption of the services provided by the rest of the market operators interconnected

to ENTEL S.A. or using the ENTEL network to carry their calls or other communications;

in this scenario, the users and or paying customers of the telecommunications sectors would be deprived of their right to communicate, as a result of which the legislation about this public utility would be rendered meaningless by the failure to ensure the effective provision of the service and the subsequent satisfaction of the collective needs, which must be protected;

WHEREAS:

as expressed in the foregoing analysis, the release of Supreme Decree N° 29544 may put at risk the continuity or regularity of the supply of public utilities, a situation that constitutes an emergency, which is the reason why the pressing need arises for the Superintendence of Telecommunications to pass an urgent Administrative Resolution (considering the scope of article 12 of SD 27172), to order the state intervention of ENTEL S.A., taking into account the provisions of the Regulations for the Telecommunications Act and in accordance with the scope of article 17 of the Telecommunications Act, said Resolution having the obligation to appoint a state administrator, who may be or not an official of this regulating body, for a term of ninety (90) administrative business days;

by virtue of the provisions of article 104 of the Regulations for the Telecommunications Act, the Superintendence of Telecommunications shall pay a guaranty for a value established in the corresponding concession contract, which shall not exceed the sum provided in the aforementioned article, in order to guarantee the state administrator ability to operate;

additionally, it is worth warning that Supreme Decree N° 29544 commands the Telecommnications Authority to take all the necessary steps in order to, under the law, ensure the continuity of the services provided by ENTEL S.A., so as to preserve a collective interest, which is access to communications, both at the national and international level;

WHEREAS:

it being probable that the continuity or regularity of the provision of public utilities may be at risk, a situation which constitutes an emergency, the pressing need arises for the Superintendence of Telecommunications to pass an urgent Administrative Resolution (considering the scope of article 12 of SD 27172), with an end to order the state intervention of ENTEL S.A.,

besides, taking into account that the Supreme Decree was released on May 1st 2008, that is, on an extraordinary day, the regulating body must make extraordinary days and hours fit for the passing of the present administrative resolution, its notice and the start of the activities related to the intervention, in accordance with the rights granted by article 19 of the Administrative Procedure Act;

WHEREAS:

taking into account the foregoing considerations, it is adequate for the Superintendence of Telecommunications to pass an urgent Administrative Regulating Resolution in order to resolve the preventive intervention of ENTEL S.A. by the state and thus guarantee the provision of all the telecommunications services which this company supplies at present, having therefore the obligation to appoint a state administrator who shall have the rights granted to him by the regulations currently in force, for the term of ninety (90) administrative business days, indicating that ENTEL S.A. shall cancel his compensation; additionally, the regulating body shall order the payment of the corresponding guaranty as a guarantee that the state administrator will be able to operate;

considering the urgency of the aforementioned resolution, since Decree N°29544 was released on May 1st, that is, on an extraordinary day, it is adequate to make such date, as well as extraordinary hours, fit for the passing of the present Administrative Regulating Resolution, the notice of this administrative act and the start of the activities related to the state intervention;

THEREFORE

The Superintendence of Telecommunications, by virtue of the rights granted to it by law:

RESOLVES:

FIRST.- TO ORDER the preventive intervention of the Empresa Nacional de Telecomunicaciones Sociedad Anónima (ENTEL S.A.), so that the corresponding steps can be taken in order to guarantee the provision of all the telecommunications services which such company supplies.

SECOND.- TO APPOINT as state administrator Mr. JOEL FLORES CARPIO, identity card 2685945-LP, who shall exercise the rights granted to him by article 106 of the Regulations for the Telecommunications Act, as well as other rights under SD 29544 and other existing regulations currently in force, for the term of ninety (90) administrative business days. His compensation shall be set at the same level as that of the Superintendent, according to the entity current salary scale.

[Illegible signatures].

*SUPERINTENDENCIA DE TELECOMUNICACIONES*

# CEDULA DE NOTIFICACION

En la ciudad de La Paz, a horas [illegible] del día 01 de mayo de 2008, notifico mediante cédula a Javier Castro Zacconeta, en representación de ENTEL S.A., en el domicilio señalado: Federico Zuazo N° [illegible], Edificio [illegible], piso 09, con RAR No. 2008/1056 de 1ro. de mayo de 2008, consistente en cuatro fojas, contenido de: Dispone Intervención de ENTEL S.A. con expresa habilitación extraordinaria; quien se tiene por notificado.

- *Se requiere que la parte interesada tome en cuenta que de conformidad a lo dispuesto por el numeral II del art. 21 de la Ley 2341 de Procedimiento Administrativo, los términos y plazos comienzan a correr a partir del día siguiente hábil a la notificación y concluyen al final de la última hora del día de su vencimiento.*

Constituido en el domicilio señalado, [illegible] al llamado de las puertas de [illegible] [illegible] Ing. Hugo Martínez [illegible], [illegible] la presente cédula [illegible]
[illegible] entregada
[illegible]



Resolución Administrativa Regulatoria Nº 2008/0490
La Paz, 04 de mayo de 2008

**Vistos:**

La nacionalización de ENTEL S.A. dispuesta por el Supremo Gobierno por Decreto Supremo Nº 29544 de 1ro de mayo de 2008, encomendando al Ministerio de Obras Públicas, Servicios y Vivienda la administración temporal de dicha empresa hasta tanto se readecúen sus estatutos y se renueven o sean Directorio y Síndicos y se apruebe a su presidente, conforme a lo establecido por las leyes que rigen el desenvolvimiento de las empresas públicas y mixtas.

El Superior de la Nación ...

**Considerando:**

Que, el artículo ... de la Ley ... (SIRESE) establece como ... las atribuciones generales de los Superintendentes Sectoriales, la de intervenir las empresas y entidades bajo su jurisdicción regulatoria y designar a los interventores, según lo dispongan las normas legales sectoriales.

Que, en este ámbito, el artículo 17 de la Ley de Telecomunicaciones Nº 1632 prescribe que, en caso de ponerse en riesgo la continuidad en la provisión de Servicios de Telecomunicaciones al Público, la Superintendencia de Telecomunicaciones, en el marco de su competencia, designará un interventor por el plazo de 90 días, de acuerdo a procedimiento establecido en reglamento y los respectivos contratos de concesión, mediante Resolución Administrativa debidamente fundamentada y previa notificación al concesionario;

Que, la intervención prevenida se encuentra reglamentada en el Reglamento de la Ley de Telecomunicaciones aprobado mediante D.S. 24132 y modificado por el D.S. 29583, a través de los cuales se establece que se designará un interventor cuando se compruebe que el titular de una concesión para un servicio ha puesto en riesgo la continuidad de su provisión;

Que, el artículo 12 del D.S. 27172 establece que en caso de emergencia que conlleve a riesgo para la continuidad o regularidad en la prestación de servicios públicos, los Superintendentes de oficio o a pedido de parte adoptarán resoluciones urgentes necesarias para atender la emergencia y evitar perjuicios a los administrados.

**Considerando:**

Que, la Superintendencia de Telecomunicaciones suscribió contratos de concesión con ENTEL S.A. en fecha 24 de noviembre de 1995, para la prestación de los Servicios Local (incluyéndose los servicios de alquiler de circuitos, servicios rurales y servicios satelitales) de Teléfonos Públicos, Móvil Celular, Comunicaciones Personales, Larga Distancia y Transmisión de Datos en todo el territorio de la República de Bolivia.

Que, en mérito a lo precedentemente mencionado [...] diferencia la empresa ENTEL S.A. es la que administra el Servicio de Larga Distancia Nacional e Internacional, observándose algunos de los servicios relevantes de Circuitos y Local, en algunas áreas, por tanto todos ellos constituyen comparables.

Que, adicionalmente, corresponde señalar que la citada empresa actualmente se constituye en el principal proveedor de los servicios de operadores en las llamadas de Larga Distancia Nacional como Internacional, así como de los operadores del mercado de telecomunicaciones del país [...]

**Considerando:**

Que, considerando que el contrato de operación del programa de ENTEL S.A. que implica la transferencia de las acciones patrimoniales del Estado boliviano, existe la probabilidad de que al transnacionalizar o empleos o personas que creyeren verse afectadas interrumpan la prestación normal de los servicios de telecomunicaciones situación que podría generar incluso la interrupción de los servicios que prestan los restantes operadores del mercado que se encuentran interconectados a ENTEL S.A. lo que utilizan su red como medio de transporte de sus llamadas y otras comunicaciones;

**Que, en este escenario, los usuarios y/o abonados del sector de telecomunicaciones se verían privados de ejercer su derecho de comunicarse, por lo que, la configuración del régimen jurídico del servicio público quedaría desprovista de sentido si no se asegura la prestación efectiva del mismo y la consecuente satisfacción de las necesidades colectivas objeto que se debiera garantizar.**

**Considerando:**

Que, como se manifestó en el análisis, la publicación del Decreto Supremo N° 29544 puede conllevar a un riesgo en la continuidad o regularidad en la prestación de servicios públicos, situación que constituye un caso de emergencia, razón por la cual surge la necesidad imperiosa de que la Superintendencia de Telecomunicaciones pronuncie una Resolución Administrativa urgente [...] a los alcances del artículo 12 del D.S. 27172, con la finalidad de disponer la intervención de ENTEL S.A., en atención a las disposiciones del Reglamento a la Ley de Telecomunicaciones, y de acuerdo a los alcances del artículo 17 de la Ley de Telecomunicaciones, debiendo designar un interventor, al efecto, sea o no funcionario de este ente regulador por el plazo de 90 días hábiles administrativos;

Que, en mérito a las determinaciones del artículo 104 del Reglamento de la Ley de Telecomunicaciones, la Superintendencia de Telecomunicaciones deberá entregar una fianza por un valor establecido en el contrato de concesión respectivo, no pudiendo ser el mismo superior a lo dispuesto por el referido artículo, con el objeto de garantizar el desenvolvimiento del interventor;

Que, adicionalmente, es pertinente advertir que el Decreto Supremo N° 29544 encomienda a la Superintendencia de Telecomunicaciones a asumir todas las acciones necesarias que en el marco de la Ley permitan asegurar la continuidad de los servicios prestados por ENTEL S.A., a fin de preservar un interés colectivo que es el acceso a las comunicaciones tanto a nivel local, nacional como internacional.

**Considerando:**

R.A.R. 2008/1058
3/4

Que, existiendo la probabilidad de que la continuidad o regularidad en la prestación de servicios públicos se encuentren en desgo, situación que constituye un caso de emergencia, surge la necesidad imperiosa de que la Superintendencia de Telecomunicaciones pronuncie una Resolución Administrativa dispone en adecuada a los alcances del artículo 21 de la Ley 2341, con la finalidad de disponer la intervención preventiva de ENTEL S.A.

[illegible paragraph]

Procedimiento Administrativo.

Considerando:

Que, en atención a las consideraciones expuestas corresponde que la Superintendencia de Telecomunicaciones pronuncie una Resolución Administrativa Regulatoria urgente con la finalidad de disponer la intervención de ENTEL S.A. [illegible] igualmente garantizar la continuidad de la prestación de todos los servicios de telecomunicaciones actualmente presta esta empresa debiendo el Interventor designado al momento de [illegible] ejercer las atribuciones conferidas por el artículo 706 del [illegible] por un plazo de noventa (90) días hábiles administrativos, prorrogables [illegible] como garantía del desenvolvimiento de la intervención.

Que, considerando la urgencia del referido pronunciamiento, en mérito a que el Decreto N° 29544 es del día 1ro. de mayo, es decir es un día extraordinario, corresponde disponer la habilitación del mismo así como de horas extraordinarias, a efectos del pronunciamiento de la presente Resolución Administrativa Regulatoria, notificación de este acto administrativo e inicio de actividades relativas a la intervención;

## POR TANTO:

La Superintendencia de Telecomunicaciones, en ejercicio de sus facultades conferidas por ley:

## RESUELVE:

PRIMERO.- DISPONER la intervención preventiva de la Empresa Nacional de Telecomunicaciones Sociedad Anónima (ENTEL S.A.) con la finalidad de adoptar las acciones pertinentes para garantizar la prestación de todos los servicios de telecomunicaciones que presta dicha empresa.

SEGUNDO.- DESIGNAR como Interventor al señor Ing. JOEL FLORES CARPIO con CI 2626845 LP, debiendo ejercer éste las atribuciones conferidas por el artículo 706 del Reglamento a la Ley de Telecomunicaciones, así como otras enmarcadas en el D.S. 28544 y demás normativa vigente, por el plazo de noventa (90) días hábiles administrativos. Su remuneración, es fijada en el nivel que corresponde al del Superintendente de Telecomunicaciones de acuerdo a la escala salarial vigente de la entidad.



## DECLARATION OF ACCURACY

I, Silvia Gil De Cwilich, hereby declare as follows:

I am fluent in Spanish and English and the following is, to the best of my

knowledge and belief, a true and accurate translation from Spanish to English of the

Official Notice from the Superintendence of Telecommunications, dated May 1, 2008.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing

is true and correct. Executed on May 6, 2008.

_____

Silvia Gil De Cwilich

# EXHIBIT E

Robert L. Sills (RS 8896)
Steven J. Fink (SF 3497)
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------

**E.T.I. EURO TELECOM INTERNATIONAL N.V.,**

Plaintiff,

-against-

**REPUBLIC OF BOLIVIA and
EMPRESA NACIONAL DE
TELECOMUNICACIONES ENTEL S.A.,**

Defendants.

--------------------------------------------

08 CV

**DECLARATION OF
FABIO INCUTTI**

**FABIO INCUTTI** declares the following to be true:

1.      I am admitted to the Italian bar employed as Vice-President for International

Legal Affairs – Litigation & Disputes at Telecom Italia S.p.A., the corporate parent of Plaintiff

E.T.I. Euro Telecom Internaional N.V. ("ETI"). I make this declaration in support of ETI's

motion for an <u>ex parte</u> order of attachment regarding the funds held on deposit at four New York

banks by Defendant Empresa Nacional de Telecomunicaciones Entel S.A. ("Entel").

2.      Only this morning, I was informed that Mr. Joel Carpio, the state "Inspector" of

Entel installed following the company's seizure by the Bolivian government, is attempting to

assert control over the funds in question. In particular, last Friday, May 2, he sent each bank a

facsimile stating that the powers of the existing signatories have been revoked, that "only the

undersigned has the legal signature for this account," and asking the banks to provide him, "as soon as possible," with the documents required to replace the existing signatories. I am advised that Mr. Carpio followed up on that request today by phone.

    3.      A copy of the facsimile that Mr. Carpio sent to Intesa San Paolo's New York branch is attached hereto as Exhibit A. I understand that a similar letter was sent to each bank.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

    Executed on May ___5___, 2008

Fabio Incutti

# EXHIBIT A



May, 2ⁿᵈ. 2008

To: Intesa San Paolo SpA – NY Branch
One William Street
New York, NY 10028
Attn: Mr. Giancarlo Baiocchi
Tel: 001-212-607.3610
Fax: 001-212-809.2124

Subject. Bank Account N° 8501-081 0099

Dear Sir,

The Presidential Decree (n 29544), published on may 1st, 2008 with immediate effect, has transferred 50% of ENTEL's capital to the Bolivian state. These stakes were previously owned by ETI EuroTelecom International N.V. The State of Bolivia controls now 97% of the shares of ENTEL S.A.

The Authority Regulatory National of Bolivia (SITTEL), following the articles 10,12 and 17 of the Law number 1600 published the same day a resolution appointing the undersigned as inspector, with all the legal representative power for a period of 90 days.

The current authorized signatures appearing in your records are no longer valid. Starting on May 1st onwards for the period of 90 days, only the undersigned is entitled and has the legal signature for this account.

Please send to my office all documents to be amended as soon as possible.

Best regards,

Joel Flores
Interventor
Entel S.A.

Attachment: Presidential Decree and SITTEL Resolution

Entel S.A.    C. Federico Zuazo N°1771, La Paz, Bolivia

# EXHIBIT  F

Robert L. Sills (RS 8896)
Steven J. Fink (SF 3497)
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------

**E.T.I. EURO TELECOM INTERNATIONAL N.V.,**

Plaintiff,

-against-

**REPUBLIC OF BOLIVIA and
EMPRESA NACIONAL DE
TELECOMUNICACIONES ENTEL S.A.,**

Defendants.

--------------------------------------------------------

08 CV

**DECLARATION OF
ROBERT L. SILLS**

ROBERT L. SILLS declares the following to be true:

1.    I am a member of the bar of this Court and of Orrick, Herrington & Sutcliffe LLP,

attorneys for plaintiff E.T.I. Euro Telecom International N.V. ("ETI") in the above-entitled

action.  I make this Declaration in support of ETI's motion for an order of attachment without

notice.

### The Underlying Arbitration

2.    On October 12, 2007, ETI filed its Request for Arbitration (the "Request") with

the International Center for Settlement of Investment Disputes ("ICSID").  A copy of the

Request, without exhibits, is attached hereto as Exhibit A.

3.    In its Request, ETI asserted causes of action against the Republic of Bolivia ("Bolivia") for violations of the Bilateral Investment Treaty between the Netherlands and Bolivia ("BIT"). For the Court's convenience I attach as Exhibit B a copy of that treaty.

4.    On October 29, 2007, Bolivia sent a nine page letter to ICSID, arguing that ICSID had no jurisdiction to proceed on ETI's claim because Bolivia had denounced the Convention on the Settlement of International Disputes Between States and Nationals of other States (the "ICSID Convention"), with an effective date for that denunciation of November 2, 2007. A copy of Bolivia's letter is attached as Exhibit C.

5.    By letter from ICSID's Secretary General, ICSID rejected Bolivia's argument and registered the Request, therefore beginning the arbitration process. A copy of that letter is attached as Exhibit D.

6.    Despite that registration, Bolivia has failed to appear or participate in the ICSID proceeding in any way. Instead, it has waged a campaign in the media, attacking ETI's good faith and claiming that ICSID is a means by which wealthy nations and their investors oppress the poor.

7.    Bolivia has not responded to ETI's efforts to reach agreement on a procedure for constituting the tribunal under the framework of the ICSID rules, and the arbitral tribunal has not yet been constituted. Indeed, other than its rejected jurisdictional argument, Bolivia has not filed any papers in the ICSID proceeding.

8.    Bolivia's consent to arbitration is set forth in the BIT.

9.    It is probable that ETI will succeed on the merits of its arbitration claims because Bolivia has breached the express terms of the BIT by expropriating ETI's interest in Defendant

Empresa Nacional de Telecomunicaciones Entel S.A. ("Entel") without compensation and has treated ETI unfairly and inequitably, and continues to do so.

### Further Statement of Counsel

10.    This motion is brought on <u>ex parte</u>, without notice, because ETI seeks an order of attachment with respect to bank accounts held in New York in the name of Defendant Entel. Control of Entel has been seized by Bolivia. As set forth in the accompanying motion papers, if regular notice were to be provided, there is a substantial likelihood that as soon as the Bolivian officials now in charge of Entel were able, they would move the funds as to which attachment is sought out of this jurisdiction.

11.    Only this morning, ETI confirmed that an additional Entel bank account is maintained in Manhattan at JP Morgan Chase Bank N.A., 4 New York Plaza, Floor 15, New York, New York 10004, with account number 304-279-757. This account currently has a balance of approximately $1,681,000. Because the existence of this account was so recently confirmed, it is not described in the May 4, 2008 Declaration of Franco Bertone, filed simultaneously herewith.

12.    I am not aware of any just counterclaims available to Bolivia.

13.    No previous application for the relief sought herein, or similar relief, has been presented to this or any other court.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 5, 2008 at New York, New York.

Robert L. Sills

-3-

# EXHIBIT A

**OFFICE COPY**

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**
Washington, D.C.

In the Arbitration between

**E.T.I. EURO TELECOM INTERNATIONAL N.V.,**
**Claimant,**

- and -

**REPUBLIC OF BOLIVIA,**
**Respondent.**

Case No._____

---

## REQUEST FOR ARBITRATION

---

International Centre for Settlement
of Investment Disputes

OCT 12 2007,

Received By:
ICSID

Robert L. Sills
Steven J. Fink
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
666 Fifth Avenue
New York, NY 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Email: rsills@orrick.com

Attorneys for Claimant
E.T.I. Euro Telecom International N.V.

## I.     INTRODUCTION

1. E.T.I. Euro Telecom International N.V. (the "Claimant"), a national of the Kingdom of the Netherlands, submits this Request for Arbitration (the "Request") to the Secretary-General of the International Centre for Settlement of Investment Disputes ("ICSID" or the "Centre") in accordance with Article 36, paragraph 1 of the Convention for the Settlement of Investment Disputes between States and Nationals of Other States (the "Convention").

2. As described below, the Request concerns a legal dispute between the Claimant and the Republic of Bolivia (the "Respondent"), under the terms of the Agreement on Encouragement and Reciprocal Protection of Investments between the Kingdom of the Netherlands and the Republic of Bolivia (the "BIT"),[1] arising directly out of the Claimant's investment in Empresa Nacional de Telecomunicaciones Entel S.A. (the "dispute").  Empresa Nacional de Telecomunicaciones Entel S.A. ("ENTEL") is the leading telecommunications services provider in Bolivia.

3. Following this Introduction, the other sections of this Request deal with (I) the Parties; (II) the consent by the Claimant and the Respondent (together, "the Parties") to the jurisdiction of the Centre; (III) the existence of a legal dispute between the Parties arising directly out of an investment; (IV) the jurisdiction of the Centre; (V) the constitution of the Tribunal; (VI) other particulars; and (VII) submissions.  This Request is accompanied by the Annexes listed at paragraph 76 below.

## II.     THE PARTIES

Name and Address of the Parties

4. The Claimant is E.T.I. Euro Telecom International N.V., a legal or juridical person (such terms being synonymous) constituted in accordance with the law of the Netherlands.  The Claimant's address is:

> Strawinskylaan 1627
> 1077 XX  Amsterdam
> The Netherlands
> Attn: Jerry Surowiec
> Facsimile: +31-20-30-10951
> Telephone: +31-20-30-10950
> E-mail address:  j.surowiec@timint.nl

5. The Respondent is the Republic of Bolivia.  The Respondent's address is:

> c/o His Excellency
> Evo Morales Ayma
> Presidente Constitucional de la Republica
> Palacio de Gobierno
> La Paz, Bolivia

---

[1] Signed on March 10, 1992; entered into force on November 1, 1994.  A copy of the BIT is attached as Annex A.

and

c/o His Excellency
David Choquehuanca Céspedes
Ministero de Relaciones Exteriores y Culto
Plaza Murillo - c. Ingavi esq. c. Junín
La Paz, Bolivia
Telephone: +(591)(2) 2408900 - 2409114 -2408397 - 2408595 - 2408405
Facsimile: + (591)(2) 2408642 -2408905 - 022112163
E-mail: mreuno@rrce.gov.bo

*The Respondent is a Contracting State*

6. The Respondent has been a Contracting State to the Convention (a "Contracting State") since July 23, 1995 and remains a Contracting State at the date of the Request.[2]

7. On May 2, 2007, the World Bank, the depositary of the Convention, received the Respondent's notice of denunciation of the Convention.[3] In accordance with Article 71 of the Convention, the denunciation will take effect on November 3, 2007. In accordance with Article 72 of the Convention, however, the Respondent's notice of denunciation does not affect Respondent's rights or obligations under the Convention arising out of Respondent's consent to the jurisdiction of the Centre given by Respondent before the notice of denunciation was received by the depositary. The Respondent gave its consent to the jurisdiction of the Centre on November 1, 1994 upon the entry into force of the BIT. The Respondent's denunciation of the Convention, therefore, does not affect its rights or obligations arising out of its consent, including its obligation to have the present dispute settled through arbitration in accordance with the Convention.

*The Claimant is a National of Another Contracting State*

8. The Convention does not provide a complete set of criteria for determining the nationality of a juridical person. Place of constitution or incorporation and place of registered seat have been generally accepted as criteria for determining the nationality of juridical persons under international law. Having been constituted in the Netherlands, the Claimant is a national of the Netherlands in accordance with those generally accepted criteria.

9. In addition, it is generally accepted that the parties to a dispute may agree on the nationality of a juridical person for the purposes of the Convention within reasonable bounds. It is well-settled that an agreement on place of constitution or incorporation

---

[2]     The Convention uses the expression "Contracting State" to refer to each State party to the Convention in the meaning given to "party" by Article 2(1)(g) of the Vienna Convention on the Law of Treaties: "'party' means a State which has consented to be bound by the treaty and for which the treaty is in force".

[3]     *See* the ICSID News Release dated May 16, 2007, accessible from ICSID's web site at  http://www.worldbank.org/icsid/highlights.05-16-07.htm.

as the applicable criteria is reasonable and would be binding on the Parties under the Convention.

10. In this case, the Parties have agreed, pursuant to Article 1(b)(ii) of the BIT, that the term "nationals" of a Contracting State to the BIT shall include, with regard to each Contracting State, legal persons constituted in accordance with the law of that Contracting State. This agreement of the Parties applies to conciliation and arbitration under the Convention by virtue of Article 9(6) of the BIT. In accordance with the agreement of the Parties, therefore, the Claimant is a national of the Netherlands.

11. The Netherlands has been a Contracting State since October 14, 1966 and remains a Contracting State at the date of the Request.

12. The Claimant is a national of the Netherlands, and has been a national of the Netherlands since it was constituted in accordance with the laws of the Netherlands in March 1995.

13. The Claimant is, therefore, a national of another Contracting State (that is, a national of a Contracting State other than the Respondent) as provided for in Article 25(2) of the Convention.

14. The beneficial owner of Claimant is Telecom Italia S.p.A. ("TI"), a company organized under the laws of the Republic of Italy. TI's beneficial ownership interest in the Claimant is held as follows. TI owns 100% of Telecom Italia International N.V. ("TII"), a company organized under the Laws of the Netherlands, which holds investments in several telecommunications companies worldwide. TII owns 100% of International Communication Holding N.V. ("ICH"), also a company organized under the Laws of the Netherlands. ICH, in turn, owns 100% of the Claimant.

15. In light of the well-accepted international law principles and the unambiguous terms of the BIT described above, there can be no reasonable dispute that the Claimant is a national of the Netherlands given that the Claimant is constituted in accordance with the laws of the Netherlands. Nonetheless, the Claimant anticipates that the Respondent may assert that Claimant is a national not of the Netherlands, but of Italy. Although, for the reasons set out above, any such argument would be unfounded, Claimant notes that the Treaty Between the Government of the Republic of Italy and the Government of the Republic of Bolivia Regarding the Promotion and Protection of Investments, signed April 30, 1990, and entered into force February 22, 1992 (the "Italy-Bolivia BIT"), is in full force and effect. The Italy-Bolivia BIT provides Claimant with substantially the same rights to proceed before the Centre as the BIT, and would, if applicable, likewise constitute consent by Respondent to the jurisdiction of the Centre, as described below.

16. The Claimant has taken all necessary internal actions to authorize the Request, as evidenced in the resolution of its Board of Directors attached as Annex B, and in conformity with Institution Rules 2(1)(f) and 2(2).

## III.   THE PARTIES' CONSENT TO THE JURISDICTION OF THE CENTRE

*The Respondent's Consent*

17. The Respondent has given its consent to submit the dispute to the Centre, for arbitration in accordance with the Convention, in Article 9(6) of the BIT, which provides:

> "If both Contracting Parties have acceded to the Convention on the Settlement of Investment Disputes between States and Nationals of other States of March 18, 1965, any disputes that may arise from investment between one of the Contracting Parties and a national of the other Contracting Party shall, in accordance with the provisions of that Convention, be submitted for conciliation or arbitration to the international Centre for Settlement of Investment Disputes."

18. The Respondent's consent became effective upon the combination of the entry into force of the BIT, on November 1, 1994, and the entry into force for the Respondent of the Convention on July 23, 1995. The Respondent's consent given in Article 9(6) of the BIT has already been determined to provide the basis for the jurisdiction of the Centre in an arbitration proceeding entitled *Aguas del Tunari S.A. v Republic of Bolivia* (ICSID Case No. ARB/02/3). The Arbitral Tribunal in that proceeding issued a decision dated October 21, 2005, upholding its jurisdiction. A copy of the Decision on Respondent's Objections to Jurisdiction in that matter is available at http://www.worldbank.org/icsid/cases/adt_en.pdf.

*The Claimant's Consent*

19. The Claimant gave its consent to submit the dispute to the Centre, for conciliation or arbitration in accordance with the Convention, by, *inter alia*, its letter to the Respondent dated April 30, 2007, a copy of which is attached as Annex C. In its letter dated April 30, 2007, the Claimant raised the dispute with the Respondent in the precise terms of the BIT, and accordingly became bound as of that date to submit the dispute for conciliation or arbitration to the Centre in accordance with Article 9(6) of the BIT.

20. This Request for Arbitration restates in writing the Claimant's consent to submit the dispute to the Centre for arbitration in accordance with the Convention. If for any reason the Claimant's letter dated April 30, 2007 were determined not to constitute a written consent in accordance with the Convention, then this Request constitutes such written consent.

*The Date of Consent of the Parties*

21. The Respondent acted to consent to submit the dispute to the Centre on November 1, 1994, such consent becoming effective on July 23, 1995. The Claimant acted to consent to submit the dispute to the Centre on April 30, 2007. It follows that the "date of consent" of the Parties for the purposes of the Convention is April 30, 2007, the date on which the second of the Parties acted to give consent, in accordance with Institution Rule 2(3). Alternatively, the "date of consent" is October 12, 2007, the date of this Request for Arbitration.

22. It follows, accordingly, that the Parties have consented in writing to submit the dispute to the Centre for settlement by arbitration in accordance with the Convention, as set forth in Article 9(6) of the BIT and that the Claimant is entitled to initiate arbitration proceedings by means of this Request in accordance with the Convention.

## IV.   THERE IS A LEGAL DISPUTE BETWEEN THE PARTIES ARISING DIRECTLY OUT OF AN INVESTMENT

*There Is a Legal Dispute between the Parties*

23. To qualify as a "legal dispute" for the purposes of Article 25(1) of the Convention, a dispute:

> "must concern the existence or scope of a legal right or obligation or the nature or extent of the reparation to be made for breach of a legal obligation."[4]

24. The dispute in this case concerns the Respondent's breaches of its obligations under the BIT and the Respondent's violations of the Claimant's rights under the BIT, with respect to the Claimant's investment in Bolivia, as well as the Respondent's obligation to pay compensation to the Claimant as reparation for the Respondent's breaches of the BIT.

25. The dispute thus concerns the scope of the Claimant's rights and the scope of the Respondent's obligations under the BIT and the extent of reparations to be made by the Respondent for breach of its legal obligations under the BIT. There is therefore a legal dispute between the Parties.

*The Claimant has made a substantial investment in Bolivia*

26. In the 1990s, the Respondent instituted a program to reform and reorganize the State-owned sectors of the economy. The Respondent's program included plans for the privatization of certain State-owned enterprises through the sale of a controlling interest in their stock, together with a commitment by the purchaser to cause the acquired enterprise to make investments in infrastructure in accordance with the agreement of the parties. In light of such commitments to invest by the prospective purchasers of shares, the program was known in Bolivia as the program for the "capitalization" of State-owned enterprises. The capitalization program was implemented through the Respondent's Law No. 1544, dated March 21, 1994.

27. One of the enterprises subject to the capitalization program was the incumbent telecommunications service provider, "ENTEL". Founded in 1965 as a State-owned company, ENTEL became a State enterprise under ministerial control in 1966. The development of infrastructure and services over the following 30 years was moderate at best. In June 1995, ENTEL again became a partially State-owned company for the purposes of the Respondent's capitalization program. Following its successful capitalization, in which the Claimant acquired a controlling interest through subscribing for and paying into the company a capital increase of USD 610 million,

---

[4]    Report of the World Bank Executive Directors submitting the Convention to the signature and ratification of the World Bank member States, March 18 1965, at paragraph 26.

ENTEL experienced the largest infrastructure investment program in the history of Bolivian telecommunications. In 1996, ENTEL entered the Bolivian mobile telephony market, of which it now has by far the largest share due to leading technology and infrastructure. ENTEL retained its long distance monopoly until November 2001, when long distance service was deregulated and opened to competition.

28. On June 6, 1995, the Respondent invited the Claimant to participate in an international tender for bids to acquire a 50% shareholding in ENTEL with management control. The Claimant duly submitted its bid pursuant to the tender, and, on September 29, 1995 the Respondent notified the Claimant that its bid had been preferred. On November 27, 1995, the Claimant entered into a Share Subscription Agreement (the "Share Subscription Agreement") among Claimant, Respondent and ENTEL to subscribe and acquire a 50% shareholding in ENTEL, as well as management control. In accordance with the Share Subscription Agreement, the Claimant subsequently invested USD 610 million in ENTEL, and ENTEL issued new shares to ETI so that ETI held 50%. The remaining 50% of the shareholding in ENTEL was managed by two Bolivian pension fund administrators on behalf of the entire over-age population of Bolivia (approximately 47.5%) and by the employees of ENTEL (approximately 2.5%). The shares held by the pension fund administrators, however, have now been transferred to the Respondent by virtue of Supreme Decree No. 29101.

29. In accordance with the terms of its investment, the Claimant proceeded to cause ENTEL to make substantial investments in Bolivia's telecommunications infrastructure. By August 2007, ENTEL had made such investments, on a consolidated basis, in an amount exceeding USD 725 million.

30. The Respondent, by its Supreme Decree No. 28172 dated May 19, 2005 and Ministerial Resolution No. 194 dated August 12, 2005, confirmed that ENTEL and the Claimant had fulfilled their obligations under the Share Subscription Agreement. In reliance on those official actions by the Respondent, on September 25, 2005 the shareholders of ENTEL carried out a reduction in its capital and a distribution of the corresponding amounts of capital to all of its shareholders.

31. As a result of Claimant's investment in ENTEL, and the benefits that flowed from ENTEL's association with Telecom Italia, one of the most prominent telecommunications operators, Respondent and the inhabitants of Bolivia enjoy a dramatically improved telecommunications infrastructure. ENTEL's achievements include a significant increase in the penetration of telephone services in Bolivia; the development of new, modern and efficient services, including internet and mobile telephone services; consistent growth as a leading telecommunications company in the region; a source of employment and high-value technical training for Bolivian citizens; and, through the shareholding of Bolivian stakeholders (until such shares were transferred to Respondent), becoming a secure, efficient and economically sound source of revenue for such stakeholders. For example, in October 2006, ENTEL undertook to provide mobile phone coverage and internet access to more than 1,000 local communities throughout the nine administrative districts of the territory of Bolivia over a period of 24 months.

*The Claimant has an investment for the purposes of the Convention*

32. The Convention does not define the term "investment". The ordinary meaning of the term, however, includes the purchase of an equity interest in a company. When such a purchase is substantial and made abroad for the long term, as in the case of the Claimant's purchase of a 50% equity participation in ENTEL, it qualifies under well-accepted usage as a form of foreign direct investment.[5]    In the consistent jurisprudence of arbitral tribunals constituted pursuant to the Convention, it has never been questioned that foreign direct investment qualifies as a form of "investment" for the purpose of Article 25(1) of the Convention.[6]

33. In addition, and without limitation, by virtue of Article 1(a)(ii) of the BIT, the Parties have agreed to include, *inter alia*, "rights derived from shares, bonds and other kinds of interests in companies and joint ventures," such as the rights that the Claimant enjoys from its shareholding in ENTEL, as forms of investments for the purposes of the BIT.    This definition applies to Article 9(6) of the BIT, which sets forth Respondent's consent to arbitrate before ICSID, in accordance with the provisions of the Convention, "any disputes that may arise from investment between one of the Contracting Parties and a national of the other Contracting Party . . . ." In light of the fact that the term "investment" is not defined in the Convention, leading commentary and the jurisprudence of arbitral tribunals has given effect to this type of agreement when it falls, as it does in this case, within reasonable bounds.

34. Accordingly, the Claimant has an investment for the purposes of the Convention.

*The Respondent took measures against the Claimant's investment in violation of the BIT*

35. On January 22, 2006, President Evo Morales, the leader of the "Movement Towards Socialism", took office in Bolivia on an electoral platform advocating significant State intervention in the Bolivian economy. The Respondent's initial implementation of this platform was aimed at the nationalization of the hydrocarbons industry. On May 1, 2006 the Respondent issued Supreme Decree No. 28701 nationalizing the country's hydrocarbon resources.[7]

36. In June 2006, the Respondent published a national development plan which contemplated the re-nationalization of various formerly State-owned enterprises that had been privatized under the capitalization program in accordance with Law No. 1544, enacted on March 21, 1994.    Rather than enact new legislation to implement that change of policy, however, the national development plan foresaw that re-nationalization would take place through administrative action through the reversion to the State, where applicable, of the shares managed by the pension fund administrators on behalf of the over-age population of Bolivia and through the purchase of additional shares necessary to give the State at least a 51% shareholding in each company.

---

[5]    *See* World Bank Guidelines on the Treatment of Foreign Direct Investment, 1992.

[6]    *See Fedax N.V. v. Venezuela* (ICSID Case No. ARB/96/3), Decision on Jurisdiction dated July 11, 1997; *Telenor Mobile Communications AS v Republic of Hungary* (ICSID Case No. ARB/04/15), Award dated September 13, 2006, at paragraph 60.

[7]    *Reprinted in* 45 International Legal Materials 1020 (2006).

37. In the months following the publication of the national development plan, the Respondent initiated a campaign of unfair and inequitable conduct intended to impair the value of the Claimant's equity interest in ENTEL and to pressure the Claimant to surrender its interest in ENTEL to the Respondent for little or no compensation, as outlined below.

38. First, on July 7, 2006, the Respondent notified ENTEL that it was imposing on ENTEL the equivalent, at current exchange rates, of USD 25 million in purported withholding taxes associated with the capital distribution made to the Claimant as part of the 2005 capital reduction described above. The Respondent made that claim despite the fact that the transaction was not taxable (two prominent international accounting firms had provided their opinions, at the time of the capital reduction and associated capital distribution, in this respect); the previous confirmation by appropriate agencies of the Bolivian government that all conditions necessary for such distribution had been met; and the fact that the Respondent had made no previous suggestion that that transaction was taxable. The Respondent now claims that a total of USD 25 million (at current exchange rates) in withholding taxes is due in connection with that transaction, together with USD 26 million (at current exchange rates) in penalties and interest.

39. On April 1, 2005; on May 11, 2007; and on May 15, 2007 Respondent, through the "Superintendencia de Telecomunicaciones" ("SITTEL"), the agency of the Bolivian government in charge of regulating and overseeing the Bolivian telecommunications market, stated that it was imposing substantial fines on ENTEL, purportedly because of ENTEL's failure either to provide telecommunications service of adequate quality to various areas in Bolivia or for the alleged failure to meet service deployment commitments. According to Sittel, the alleged failures took place, in substantial part, in the years 1998 through 2003. For each of those years, ENTEL made a timely, detailed and satisfactory filing with SITTEL of all required reports regarding the provision of telecommunications service and the fulfilment of deployment commitments, and SITTEL took no adverse action against ENTEL with respect to such matters prior to April 1, 2005. SITTEL's current claims are unfounded and untimely.

40. On March 30, 2007, the Respondent published Supreme Decree No. 29087, establishing an ad hoc commission (the "Commission") mandated to negotiate the "recovery" of ENTEL for the Bolivian State within a period of thirty days. The Commission consisted of three ministerial and two vice-ministerial members of the Bolivian Government. It has been presided over by the Respondent's Minister of the Presidency, Sr. Juan Ramón Quintana.

41. The Claimant was surprised and concerned by the sudden promulgation of Supreme Decree No. 29087. The Claimant was also surprised and concerned by the brief, thirty-day timeframe provided in Supreme Decree No. 29087 for the Commission to carry out its mandate of acquiring the Claimant's shares in and control of ENTEL. The thirty day period provided for in the Decree was an unrealistically aggressive time frame within which to conduct such a process, and it would have been essentially impossible to do so in a fair and equitable manner.

42. The preamble of Supreme Decree No. 29087 referred to a supposed "process of technical, financial and legal review, the results of which show serious indications of

irregularities in the management and operations of ... ENTEL S.A., which affect its financial investments and undermine the national tax system" (Claimant's translation). Supreme Decree No. 29087 states that this review was carried out by SITTEL and the Respondent's Ministry of Public Works, Services and Housing. The Claimant, however, was never notified about that supposed review, or about the procedures followed in the course of this supposed review. It is implausible that the Respondent could have conducted such a review without the Claimant's or ENTEL's participation or knowledge.

43. On April 4, 2007, the Commission wrote to the Claimant inviting it to meet in La Paz on April 11, 2007 for "negotiations." The Commission's invitation contained no agenda, no background documentation and no specific proposals from the Respondent. Nonetheless, the Claimant was willing to listen in good faith to what the Respondent, through the Commission, had to say about its plan to recover ENTEL for the Bolivian State through negotiations with the Claimant. The Claimant therefore sent a delegation to La Paz to meet with the Respondent's Commission. The Claimant held meetings with the Respondent's Commission from April 11 to April 13, 2007.

44. On April 11, 2007, the Respondent's Commission began the discussions with cordial introductory remarks. The main subject of discussion was the Respondent's request that the parties maintain confidentiality in regard to their discussions, to which the Claimant agreed. Then, on April 12, the Respondent proceeded to launch a vehement attack against the Claimant and its delegation at the meeting. This included incendiary and abusive statements to the press by Minister Quintana against the Claimant while the meeting was still underway, despite Respondent's previous insistence on confidentiality. The Respondent continued its hostile media campaign against the Claimant for several days thereafter.

45. On April 13, 2007, the Respondent presented the Claimant with a set of power point slides titled "Recuperation of ENTEL in Favour of the Bolivian State: Findings" (Recuperación de ENTEL a favor del Estado Boliviano: Hallazgos). Instead of setting out any proposals for the Claimant to consider, this document set out a series of alleged, but completely unfounded, "irregularities" of which the Respondent accused the Claimant.

46. At no point in its initial meetings with Respondent's representatives did the Respondent propose to discuss a plan with the Claimant for the negotiated acquisition of the Claimant's controlling interest in ENTEL. At no point did the Respondent acknowledge the Claimant's successful management of ENTEL. Instead, it appears that the Respondent had invited the Claimant to La Paz for the sole purpose leveling baseless accusations at it, including making such accusations through the media.

47. A further meeting was scheduled to be held in La Paz on April 23, 2007. Despite the Respondent's continuing failure to provide either an agenda or any proposals for how it might go about acquiring the Claimant's interest in ENTEL, or the amount to be paid in compensation, the Claimant prepared in good faith to attend this meeting. However, a few hours before the meeting was due to begin, the Respondent issued two further presidential decrees directly affecting the Claimant's investments in ENTEL. These decrees were the following:

a. Supreme Decree No. 29101, which purports to abrogate Supreme Decree 24025 dated June 7, 1995 (on the constitution of ENTEL's partially State-owned predecessor, ENTEL S.A.M.); Supreme Decree No. 24133 dated September 29, 1995 (on the subscription of capital in ENTEL S.A. through the Share Subscription Agreement); and Supreme Decree No. 24700 dated July 7, 1997 (on the trusts managed by the pension fund administrators). The Supreme Decrees that Supreme Decree No. 29101 purports to abrogate were enacted in connection with the original capitalization of ENTEL and the Claimant's purchase of shares in ENTEL. Their purported abrogation directly undermines the security of the Claimant's investment in Bolivia. Supreme Decree No. 29101 furthermore purports to transfer to the Bolivian State the shares in ENTEL managed by two pension fund administrators; and

b. Supreme Decree No. 29100, which purports to abrogate Supreme Decree No. 28172 dated May 19, 2005, Ministerial Resolution No. 194 of August 12, 2005 and all other resolutions based on that abrogated Decree. Supreme Decree No. 28172 and Ministerial Resolution No. 194 were the basis upon which the Respondent had certified that the Claimant and ENTEL had fulfilled their commitments under the Share Subscription Agreement, including all required investments in and through ENTEL, and upon which the Respondent terminated the Share Subscription Agreement, on the grounds that it had been fully performed. In reliance on the Decree and Resolution, ENTEL lawfully decreased its share capital with an associated distribution of capital on a pro rata basis to its shareholders, including the pension funds and other minority shareholders. Supreme Decree No. 29100 furthermore purports to declare Supreme Decree No. 28172 unconstitutional and illegal and declares that acts derived from it "are punishable in accordance with the national legal order, due to which they should be prosecuted by the appropriate means" (Claimant's translation).

48. Claimant notes that, before the promulgation of Supreme Decree No. 29100, a determination by the Courts of Bolivia that Supreme Decree No. 28172 and Ministerial Decree No. 194 were invalid and unenforceable was sought. In January 2006, the Tribunal Constitucional, the highest court in Bolivia, confirmed the validity of such acts.

49. The Respondent's Supreme Decrees Nos. 29100 and 29101, together with the other actions described above, effectively destroyed the value of the Claimant's investment in ENTEL. They inappropriately and incorrectly call into question the legality and propriety of the Claimant's conduct and that of its officers and other representatives. The timing of the promulgation of the Supreme Decrees suggests that the Respondent intended deliberately to surprise the Claimant with them during the meeting scheduled to be held on the same day with the Commission.

50. Notwithstanding Claimant's expressed willingness to meet with representatives of the Respondent to attempt an amicable discussion and resolution of the issues, Respondent never responded substantively to Claimant's proposals as to the place or agenda of any such meeting, and never advanced any such proposals of its own. Accordingly, it proved impossible to hold any further meetings.

51. On April 27, 2007, the Bolivian on-line newspaper *El Deber* published an interview with the Respondent's Minister of Public Works, Services and Housing, Sr. Jerges Mercado.  It was Minister Mercado's Ministry which had, together with the Respondent's telecommunications regulator, undertaken the supposed "review" of ENTEL's operations and investments.  Minister Mercado stated that it was his mandate to recover the 50% of ENTEL's shares which are owned by the Claimant, but that Respondent did not contemplate paying for such shares.  He added that the Respondent had made a proposal to the Claimant regarding its shares in ENTEL.  However, no such proposal had been made.

52. Minister Mercado's statements revealed several things about the Respondent's actions.  First, the Respondent had begun a process of nationalizing all of the Claimant's shares in ENTEL and not only those needed to gain control of ENTEL.  Second, that instead of seeking to negotiate with the Claimant in good faith to acquire its shares in ENTEL as a vibrant and successful company, the Respondent opted to make unfounded allegations against the Claimant's management of ENTEL, and to pressure Claimant through, *inter alia*, unfounded tax claims and fines, in order to coerce the Claimant to relinquish its investment without compensation.

*The Dispute Arises Directly out of an Investment*

53. On April 30, 2007, the Claimant wrote to the Respondent to raise the dispute under the terms of the BIT.  In its letter, the Claimant placed the Respondent on notice that the Respondent's actions in connection with the Claimant's investment in Bolivia had breached various provisions of the BIT, including:

   a.  Article 3(1), requiring the Respondent to ensure fair and equitable treatment to the Claimant's investment and not to impair, by unreasonable or discriminatory measures, the operation, management, maintenance, use, enjoyment or disposal of the Claimant's investment;

   b.  Article 3(2), requiring the Respondent to accord to the Claimant's investment full security and protection in any case not less than that accorded to investments of the Respondent's own nationals or to investments of nationals of any third State, whichever is the most favourable to the Claimant;

   c.  Article 3(4), requiring the Respondent to observe any obligation it may have entered into with regard to the Claimant's investment; and

   d.  Article 6, requiring the Respondent not to take any measure depriving, directly or indirectly, the Claimant of its investment unless, <u>inter alia</u>, the measures are taken under due process of law, are not discriminatory or contrary to any undertaking which the Respondent may have given and are accompanied by provision for the payment of just compensation representing the genuine value of the Claimant's investment to be paid without undue delay.

54. The Claimant's investment falls within the terms of the BIT.  Under the BIT, the Respondent has assumed a number of binding international legal obligations with respect to the Claimant's investment.  The Respondent's breaches of its obligations under the BIT, and the Respondent's consequent duty to provide reparation to the Claimant for those breaches, have given rise to the dispute.  It follows, therefore, that

the dispute arises directly out of an investment as required by Article 25(1) of the Convention.

55. In its letter dated April 30, 2007, the Claimant invited the Respondent to settle the dispute amicably through consultation, as envisaged by Article 9(1) of the BIT. Acting in good faith, the Claimant proposed to the Respondent to resolve the major part of the Respondent's allegations by means of reports to be prepared by independent advisors of international standing, to be jointly appointed by the Parties. The Respondent, however, declined to accept the Claimant's proposals, and declined to respond to the Claimant's follow-up communications for advancing consultations. It has not been possible to settle the dispute amicably with the Respondent through consultation.

56. Once applicable, Article 9(6) of the BIT imposes no additional conditions or waiting periods for submitting a dispute to arbitration under the Convention.  Article 9 provides for two distinct procedures for settling investment disputes under the BIT. The two procedures are available to eligible investors successively and not concurrently.

57. The first procedure, set forth in Article 9(2) to 9(5) of the BIT, consisted in submitting investment disputes, after a six-month period in which settlement should be attempted, to an ad hoc arbitration tribunal. This first procedure applied up until the time at which the Respondent became an ICSID Contracting State on 23 July 1995.

58. The second procedure, set forth in Article 9(6) of the BIT, has applied from 23 July 1995 onwards and consists in submitting "any disputes" between the Parties "that may arise from investment" to ICSID "for conciliation or arbitration".   The phrase "conciliation or arbitration" on its face allows either form of settlement to be chosen by the Claimant.

59. Because an amicable settlement through consultation has already proven to be unavailable, the Claimant is compelled to seek redress through arbitration in accordance with the Parties' consent. The Claimant seeks the full value of the loss caused to it by the Respondent's actions.

60. The Claimant's investment in ENTEL is now effectively worthless by virtue of the Respondent's statements that it would nationalize the Claimant's shares in ENTEL, the promulgation of Supreme Decree No. 29087, and the other steps taken by the Respondent to interfere with the Claimant's operation, management, maintenance, use, enjoyment and disposal of its investment as described above.

61. The Claimant reserves its right to state its claim in full at the appropriate juncture of the proceeding, including a full quantification of its damages and including by means of the pleadings, argument and presentation of evidence contemplated by Rules 31 and 32 of the Arbitration Rules adopted in accordance with the Convention.

## V.    THE DISPUTE IS WITHIN THE JURISDICTION OF THE CENTRE

62. Article 36(3) of the Convention provides that the Secretary-General shall register a request for arbitration unless she finds that, on the basis of the information contained in the request, the dispute is "manifestly outside" the jurisdiction of the Centre.

63. The extent of the jurisdiction of the Centre is governed by Article 25(1) of the Convention, which provides as follows:

> "The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally."

64. As discussed above at paragraphs 23 to 25, there is a legal dispute between the Parties.

65. As discussed above at paragraphs 26 to 34, the Parties' dispute arises directly out of an investment.

66. As discussed above at paragraphs 6 to 15, the Parties are, on the one hand a Contracting State (the Respondent) and on the other hand a national of another Contracting State (the Claimant).

67. As discussed above at paragraphs 17 to 22, the Parties have consented in writing to submit the dispute to the Centre to be settled by arbitration in accordance with the Convention.

68. It follows that in this case the dispute meets all the requirements of Article 25(1) of the Convention to fall within the jurisdiction of the Centre. The dispute is therefore not "manifestly outside" the jurisdiction of the Centre.

## VI.    CONSTITUTION OF THE TRIBUNAL

69. The Parties have not agreed to provisions regarding the number of arbitrators or the method of their appointment.

70. In accordance with Arbitration Rule 2(1)(a), the Claimant hereby proposes to the Respondent that the Arbitral Tribunal be composed of three arbitrators, one arbitrator to be appointed by each of the Parties and the third arbitrator, who shall be the President of the Tribunal, to be appointed by agreement of the party-nominated arbitrators. In the case of Claimant, the nominated arbitrator shall not be a national or resident of the Netherlands, and in the case of Respondent, the nominated arbitrator shall not be a national or resident of Bolivia. Each party shall nominate its arbitrator within 30 days of the registration of this request. If the parties' two party-nominated arbitrators are not able to agree on the President of the Tribunal within 60 days after registration of this request, then the President of the Tribunal, who shall not be a national or resident of either the Netherlands or Bolivia, shall be appointed by the Chairman of the Administrative Counsel of ICSID. Except as expressly set forth herein, the provisions of Arbitration Rule 4 shall apply.

71. In accordance with Arbitration Rule 2(1)(b), the Respondent should respond to this proposal within 20 days of its receipt of the Notice of Registration.

## VII.    OTHER PARTICULARS

### A.    *Appointment of counsel*

72. The Claimant hereby, and pursuant to a Power of Attorney and Appointment of Counsel, appoints as counsel with full powers of representation in connection with the Request and the ensuing arbitration proceeding Robert L. Sills and Steven J. Fink of Orrick, Herrington & Sutcliffe LLP.

### B.    *Language*

73. Pursuant to Arbitration Rule 22, Claimant selects English as the language to be used in the proceeding, and requests Respondent to agree that English will be so used.

### C.    *Required copies and payment*

74. In accordance with Institution Rule 4, this Request is submitted in an original and five copies.

75. This Request is accompanied by the prescribed lodging fee of USD25,000.

76. This Request is accompanied by the following Annexes:

   a.   The BIT.

   b.   Resolution of E.T.I.'s Board of Directors.

   c.   Letter from Claimant to Respondent, dated April 30, 2007.

## VIII.    SUBMISSION

77. On the basis of the above information, the Claimant requests that the Secretary-General of the Centre:

   a.   Acknowledge receipt of this Request;

   b.   Transmit a copy of the Request and its accompanying documentation to the Respondent; and

   c.   Proceed to register the Request as soon as possible in the Arbitration register, and on the same date notify the Parties of the registration, in accordance with Institution Rule 6(1).

Dated:  October 12, 2007

Signed:  *Robert L. Sills*
Robert L. Sills
By and on behalf of E.T.I. Euro Telecom International N.V.

# EXHIBIT B

# Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Republic of Bolivia

The Government of the Kingdom of the Netherlands
and
The Government of the Republic of Bolivia,

Desiring to strengthen the traditional ties of friendship between their countries, to extend and intensify the economic relations between them particularly with respect to investments by the nationals of one Contracting Party in the territory of the other Contracting Party.

Recognizing that agreement upon the treatment to be accorded to such investments will stimulate the flow of capital and technology and the economic development of the Contracting Parties and that fair and equitable treatment of investment is desirable,

Have agreed as follows:

## Article 1

For the purposes of the present Agreement:

(a) the term "investments" shall comprise every kind of asset and more particularly, though not exclusively:

   i. movable and immovable property as well as any other rights in rem in respect of every kind of asset;
   ii. rights derived from shares, bonds and other kinds of interests in companies and joint ventures;
   iii. title to money, goodwill and other assets and to any performance having an economic value;
   iv. rights in the field of intellectual property, technical processes and know-how;
   v. rights granted under public law, including rights to prospect, explore, extract and exploit natural resources.

(b) the term "nationals" shall comprise with regard to either Contracting Party:

   i. natural persons having the nationality of that Contracting Party in accordance with its law;
   ii. without prejudice to the provisions of (iii) hereafter, legal persons constituted in

1

accordance with the law of that Contracting Party;
iii.  legal persons controlled directly or indirectly, by nationals of that Contracting
      Party, but constituted in accordance with the law of the other Contracting Party,

the term "territory" includes the maritime areas adjacent to the coast of the State
concerned, to the extent to which that State may exercise sovereign rights or jurisdiction
in those areas according to international law.

## Article 2

Either Contracting Party shall, within the framework of its law and regulations, promote
economic cooperation through the protection in its territory of investments of nationals of
the other Contracting Party. Subject to its right to exercise powers conferred by its laws
or regulations, each Contracting Party shall admit such investments.

## Article 3

1)  Each Contracting Party shall ensure fair and equitable treatment to the investments of
    nationals of the other Contracting Party and shall not impair, by unreasonable or
    discriminatory measures, the operation, management, maintenance, use, enjoyment or
    disposal thereof by those nationals.

2)  More particularly, each Contracting Party shall accord to such investments full
    security and protection which in any case shall not be less than that accorded either to
    investments of its own nationals or to investments of nationals of any third State,
    whichever is more favourable to the investor.

3)  If a Contracting Party has accorded special advantages to nationals of a third State by
    virtue of agreements establishing customs unions, economic unions or similar
    institutions, or on the basis of interim agreements leading to such unions or
    institutions, that Contracting Party shall not be obliged to accord such advantages to
    nationals of the other Contracting Party.

4)  Each Contracting Party shall observe any obligation it may have entered into with
    regard to investments of nationals of the other Contracting Party.

5)  If the provisions of law of either Contracting Party or obligations under international
    law existing at present or established hereafter between the Contracting Parties in
    addition to the present Agreement contain a regulation, whether general or specific,

entitling investments by investors of the other Contracting Party to a treatment more favourable than is provided for by the present Agreement. such a regulation shall, to the extent that it is more favourable, prevail over the present Agreement.

## Article 4

With respect to taxes-, fees, charges and to fiscal deductions and exemptions, each Contracting Party shall accord to nationals of the other Contracting Party, who are engaged in any economic activity in its territory, treatment not less favourable than that accorded to its own nationals or to those of any third State, whichever is more favourable to the nationals concerned. For this purpose, however, there shall not be taken into account any special fiscal advantages accorded by that Party under an agreement for the avoidance of double taxation, by virtue of its participation in a customs union, economic union or similar institution, or on the basis of reciprocity with a third State.

## Article 5

The Contracting Parties shall guarantee that payments related to an investment may be transferred. The transfers shall be made in a freely convertible currency, without undue restriction and delay. Such transfers include in particular though not exclusively:

(a) profits, interest, dividends and other current income;

(b) funds necessary

    i.   for the acquisition of raw or auxiliary-materials, semi-fabricated or finished products, or
    ii.  to replace capital assets in order to safeguard the continuity of an investment;

(c) additional funds necessary for the development of an investment;

(d) funds in repayment of loans;

(e) royalties or fees;

(f) earnings of natural persons;

(g) the proceeds of sale or liquidation of the investment.

## Article 6

Neither Contracting Party shall take any measures depriving, directly or indirectly, nationals of the other Contracting Party of their investments unless the following conditions are complied with:

(a)  the measures are taken in the public interest and under due process of law;

(b)  the measures are not discriminatory or contrary to any undertaking which the former Contracting Party may have given;

(c)  the measures are accompanied by provision for the payment of just compensation. Such compensation shall represent the genuine value of the investments affected and shall, in order to be effective for the claimants, be paid and made transferable, without undue delay, to the country designated by the claimants concerned and in the currency of the country of which the claimants are nationals or in any freely convertible currency accepted by the claimants.

## Article 7

Nationals of the one Contracting Party who suffer losses in respect of their investments in the territory of the other Contracting Party owing to war or other armed conflict, revolution, a state of national emergency, revolt, insurrection or riot shall be accorded by the latter Contracting Party treatment, as regards restitution, indemnification, compensation or other settlement, no less favourable than that which that Contracting Party accords to its own nationals or to nationals of any third State, whichever is more favourable to the nationals concerned.

## Article 8

If the investments of a national of the one Contracting Party are insured against non-commercial risks under a system established by law, any subrogation of the insurer or re-insurer into the rights of the said national pursuant to the terms of such insurance shall be recognized by the other Contracting Party.

## Article 9

1) For the purpose of resolving disputes that may arise from investments between one Contracting Party and a national of the other Party to the present Agreement, consultation will be held with a view to settling, amicably the conflict between the parties to the dispute.

2) If a dispute cannot be settled within a period of six months from the date on which the interested national shall have formally notified it, the dispute shall, at the request of the interested national, be submitted to an arbitral tribunal.

3) The arbitral tribunal shall be constituted ad hoc, in such a way that each party shall nominate an arbitrator, and the arbitrators shall agree on the choice of a national of a third State as chairman of the tribunal. The arbitrators shall be nominated within a period of two months, and the chairman within a period of three months, from the time the interested national shall have communicated his wish to submit the dispute to an arbitral tribunal.

4) If the time limits provided for in paragraph 3 are not observed, either of the parties to the dispute shall, if no other provisions apply between the parties to the dispute, be empowered to request the President of the Court of Arbitration of the Paris International Chamber of Commerce to proceed to make the necessary appointments.

5) Paragraphs 4 to 7 of article 13 of the present Agreement shall apply mutatis mutandis.

6) If both Contracting Parties have acceded to the Convention on the Settlement of Investment Disputes between States and Nationals of other States of 18 March 1965, any disputes that may arise from investment between one of the Contracting Parties and a national of the other Contracting Party shall, in accordance with the provisions of that Convention, be submitted for conciliation or arbitration to the international Centre for Settlement of Investment Disputes.

## Article 10

The provisions of this Agreement shall, from the date of entry into force there of, also apply to investments, which have been made before that date.

## Article 11

As regards the Kingdom of the Netherlands, the present Agreement shall apply to the part of the Kingdom in Europe, the Netherlands Antilles and to Aruba.

## Article 12

Either Contracting Party may propose the other Party to consult on any matter concerning the interpretation or application of the Agreement. The other Party shall accord sympathetic consideration to and shall afford adequate opportunity for such consultation.

## Article 13

1) Any dispute between the Contracting Parties concerning the interpretation or application of the present Agreement which cannot be settled, within a reasonable lapse of time, by means of diplomatic negotiations, shall, unless the Parties have otherwise agreed, be submitted, at the request of either Party, to an arbitral tribunal, composed of three members. Each Party shall appoint one arbitrator and the two arbitrators thus appointed shall together appoint a third arbitrator as their chairman who is not a national of either Party.

2) If one of the Parties fails to appoint its arbitrator and has not proceeded to do so within two months after an invitation from the other Party to make such appointment, the latter Party may invite the President of the International Court of Justice to make the necessary appointment.

3) If the two arbitrators are unable to reach agreement, in the two months following their appointment, on the choice of the third arbitrator, either Party may invite the President of the International Court of Justice, to make the necessary appointment.

4) If, in the cases provided for in the second and third paragraph of this Article, the President of the International Court of Justice is prevented from discharging the said function or is a national of either Contracting Party, the Vice-President shall be invited to make the necessary appointments. If the Vice-President is prevented from discharging the said function or is a national of either Party the most senior member of the Court available who is not a national of either Party shall be invited to make the necessary appointments.

5) The tribunal shall decide on the basis of respect for the law, including in particular the present Agreement and any other relevant agreement between the Contracting Parties as well as the generally recognized rules and principles of International Law. Before the tribunal decides, it may at any stage of the proceedings propose to the Parties that the dispute be settled amicably. The foregoing provisions shall not prejudice the power of the tribunal to decide the dispute *ex aequo et bono* if the Parties so agree.

6) Unless the Parties decide otherwise, the tribunal shall determine its own procedure.

7) The tribunal shall reach its decision by a majority of votes. Such decision shall be final and binding on the Parties.

## Article 14

1) The present Agreement shall enter into force on the first day of the second month following the date on which the Contracting Parties have informed each other in writing that the procedures constitutionally required therefor in their respective countries have been complied with, and shall remain in force for a period of fifteen years.

2) Unless notice of termination bas been given by either Contracting Party at least six months before the date of the expiry of its validity, the present Agreement shall be extended tacitly for periods of ten years, each Contracting Party reserving the right to terminate the Agreement upon notice of at least six months before the date of expiry of the current period of validity.

3) In respect of investments made before the date of the termination of the present Agreement the foregoing Articles thereof shall continue to be effective for a further period of fifteen years from that date.

4) Subject to the period mentioned in paragraph (2) of this Article, the Government of the Kingdom of the Netherlands shall be entitled to terminate the application of the present Agreement separately in respect of one of the parts of the Kingdom.

IN WITNESS WHEREOF, the undersigned representatives, duly authorized thereto, have signed the present Agreement.

DONE in duplicate at (place) , on (date) in the Netherlands, Spanish and English language, the three texts being equally authentic. In case of difference of interpretation the English text will prevail.


For the Government of
the Kingdom of the Netherlands

For the Government
of the Republic of Bolivia

# EXHIBIT C



EMBAJADA DE BOLIVIA

Washington DC, October 29th of 2007

Ms.
Dr. Ana Palacio
Secretary General
International Centre for Settlement
of Investment Disputes (CIADI – ICSID)
1818 H Street N.W.
MSN U3-301
Washington, D.C. 20433
U.S.A.

Phone No. (202) 458-1534
Fax No.    (202) 522-2615

Re: *Request for Arbitration filed by ETI Euro Telecom International, N.V.*

C.c. Robert B. Zoellick
President of the World Bank
Washington, DC 20433 USA
Phone No  (202) 473-1000
fax: (202) 47-6391

Dear Ms. Secretary General,

I am writing to express the position of my government with regard to the Request for Arbitration (the "Request") filed with the International Centre for Settlement of Investment Disputes (ICSID or the "Center") by the company ETI Euro Telecom International, N.V. (the "Company") and sent by you on the past October 15th, which we consider to be manifestly outside the jurisdiction of the Centre and which, therefore, should not be registered.

## I. Manifest Lack of Consent

The Request should not be registered because it is manifestly clear, from the content of the Request itself, that the consent needed to submit the alleged dispute to the Centre was never perfected.

*A. The Letter Sent by the Company on April 30th of 2007*

The lack of consent is evident and recognized by the Company itself, which thus presents two untenable theories about the date when it supposedly gave its consent for submitting the case to



the Centre. First, the Company claims that it gave its consent on April 30th of 2007, in a letter bearing that date, attached to the Request as Annex C. However, this letter, which is an integral part of the Request, says absolutely nothing about the Centre, about the arbitration or about the consent to submit this or any other dispute to the Centre; this conclusion can be confirmed by simply reading the letter. At no point does the Company explicitly express its consent to submit the dispute to the Centre. According to Professor Schreuer, in order to be valid, consent must be in writing and explicit: "Consent in writing must be explicit and not merely construed"[1] [p. 94. par. 248; (a)].

The mere existence of a provision in a treaty about the resolution of controversies, which includes the possibility to submit disputes to the Centre, does not suffice to establish the investor's consent. According to Professor Schreuer: "The treaty provision cannot replace the need for consent by the foreign investor"[2] [p. 218, par. 302, (a)]. Although the letter dated April 30th mentions the Bilateral Investment Treaty between Bolivia and the Netherlands, it makes no reference to the Centre, or to the arbitration, or to the treaty provision about the Centre.

Consequently, it is manifestly clear, from the Request itself, that the letter dated April 30th of 2007 does not constitute any expression of the consent required to submit this dispute to the Centre. And, it should be repeated, this is so recognized by the claimant.

This is why the Company presents a second theory about the date of consent, which is its true argument: that it gave its consent to submit the dispute to the Centre on October 12th of 2007, the date when the Request for Arbitration was filed. It is clear that the Request for Arbitration dated October 12th is the first written and explicit expression of the consent by the Company to submit its claims against Bolivia to the Centre.

*B. The Denunciation of the Convention made on May 2nd*

By October 12th of 2007, the Company was the only party to give its consent to submit the dispute to the Centre, since, by that date, consent on the part of Bolivia no longer existed, it being manifestly clear, from the information contained in the Request, that Bolivia withdrew its consent to submit disputes of any kind to the Centre on May 2nd of 2007. As admitted by the Company: "On May 2, 2007, the World Bank, the depositary of the Convention, received the Respondent's notice of denunciation of the Convention".[3] [p. 2, par. 7, (a)]. The denunciation was communicated to the President of the World Bank through a letter sent by the Honorable Minister of Foreign Affairs and Cult, who said: "I am writing in order to inform you that, under article 71 of the Convention on Settlement of Investment Disputes between States and Nationals

---

[1] [T.N.: in the original, this footnote contains the quotation in English, which is translated into Spanish in the body of the text.]

[2] [T.N.: in the original, this footnote contains the quotation in English, which is translated into Spanish in the body of the text.]

[3] [T.N.: in the original, this footnote contains the quotation in English, which is translated into Spanish in the body of the text.]



EMBAJADA DE BOLIVIA

of Other States, the Republic of Bolivia denounces this Convention, which it joined on May 3rd of 1991 and that came into force for Bolivia on July 23rd of 1995".

While the text of Article 71 states that "The denunciation shall take effect six months after receipt of such notice" and, therefore, the denouncing State remains a party of the convention and bound to its obligations for a term of six months after the receipt of its denunciation, in no way does this text imply that consent by the denouncing State to submit disputes to the Centre remains in force after its denunciation.

This is confirmed by Professor Schreuer in his masterly work about the Convention, where, in his comments to Article 72[4], he points out:

> *4.    In order to benefit from the continued validity under Art. 72, consent must have been given before the denunciation of the Convention or exclusion of a territory. Consent is only perfected after it has been accepted by both parties. Therefore, a unilateral offer of consent by the host State through legislation or a treaty under Arts. 70 or 71 would not suffice. The effect of the continued validity of consent under Art. 72 would only arise if the offer was accepted in writing by the investor before the notice of denunciation or exclusion.*

> *5.    The provision in Art. 71 that the denunciation of the Convention by a State party will take effect only six months after notice has been give, does not afford an opportunity to perfect consent before the expiry of this time limit. In particular, an investor's attempt to accept a standing offer of consent by the host State that may exist under legislation or a treaty during this period will not succeed. In order to be preserved by Art. 72 consent must have been perfected before the notice of denunciation or exclusion was received." (p. 1286, (a))[5]*

Professor Schreuer's conclusions are evidently logic and correct, since they are based on the recognition of two indisputable points: that a sovereign state cannot be forced to submit a dispute to arbitration without its consent, and that a denunciation of the convention is necessarily [T.N.: prose unclear] and is, for that reason, a withdrawal of its consent to submit disputes to the Centre. It would not be reasonable to adopt a position to the contrary, since it is undeniable that the State has a right, not only to denounce the Convention, [T.N.: prose unclear], pursuant to Article 25, "notify the Centre of the class or classes of disputes which it would or would not consider submitting to the jurisdiction of the Centre", with immediate effect, once it has ratified the Convention, "at any time thereafter".

---

[4] "Notice by a Contracting State pursuant to Articles 70 or 71 shall not affect the rights or obligations under this Convention of that State or of any of its constituent subdivisions or agencies or of any national of that State arising out of consent to the jurisdiction of the Centre given by one of them before such notice was received by the depositary."

[5] 4. [T.N.: in the original, this footnote contains the quotation in English, which is translated into Spanish in the body of the text.]



EMBAJADA DE BOLIVIA

Of course, Article 25 states that "When the parties have given their consent, no party may withdraw its consent unilaterally", that is, once consent has been perfected, neither of the parties can withdraw it unilaterally. However, as we have seen, by May 2nd of 2007, consent had not been perfected because the Company had not consented explicitly to submit the alleged dispute to the Centre. Therefore, by such date, no impediment existed for Bolivia to withdraw its consent. On the contrary, according to the Convention, Bolivia had full right to withdraw its consent at any time before the [T.N.:unclear prose] expressed its consent to submit this dispute to the Centre explicitly and in writing, which did not occur until the Request for Arbitration was filed on October 12th.

The Executive Directors of the Centre stated in the Report about the Convention that "Consent by the parties is the cornerstone on which the Centre jurisdiction rests" [par. 23] and added that, for the Centre to have jurisdiction on a dispute, "consent must exist at the time when the request is submitted to the Centre". [par. 24]. It is important to highlight that, in order to support the latter phrase, the Executive Directors quoted articles 28(3) and 36(3) of the Convention, the same articles stating that a Request for Arbitration must not be registered if the dispute is "manifestly outside the jurisdiction of the Centre". In other words, if consent by both parties does not exist at the time when the Request is submitted, the dispute is necessarily outside the jurisdiction of the Centre. Thus concludes Dr. Amerisinghe, who quotes Articles 28 and 36 to say: "consent by both parties must exist at the time of the submittal of a request for conciliation and arbitration to the Secretary General. If the request fails to show that both parties have given their consent, the Secretary General must reject it" [(a)][6].

*C. The Request Submitted on October 12th of 2007 Did Not Perfect Consent*

It is manifest that the first explicit expression of the required consent by the claimant is the Request for Arbitration dated October 12th of 2007, which was submitted more than five months after the denunciation and the withdrawal of consent by Bolivia. Schreuer's words are worth highlighting [*par. about the obligations of the Contracting State during the six months after the denunciation of the Convention*]: "*An investor's attempt to accept a standing offer of consent by the host State that may exist under legislation or a treaty during this period will not succeed. In order to be preserved by Art. 72, consent must have been perfected before the notice of denunciation or exclusion was received.*" [*p. 1286, (a)*][7].

For this reason, precisely, the alleged dispute submitted by the Company in its Request for Arbitration cannot be registered. According to the information contained in the Request itself, no consent by both parties existed at the time when the Request was submitted, on October 12th of 2007. Since Bolivia had denounced the Convention on May 2nd of 2007 and, therefore, the withdrawal of its consent on the same date, more than five months before the Request for

---

[6] Amerishinghe, C.F., "The International Centre for Settlement of Investment Disputes and Development through the Multinational Corporation, 9 Vanderbilt J. of Transitional Law, 793, 810 (1979)

[7] [T.N.: in the original, this footnote contains the quotation in English, which is translated into Spanish in the body of the text]



EMBAJADA DE BOLIVIA

Arbitration was submitted, it can be asserted that, by October 12th, only ETI had expressed its consent. The required perfection of consent did not exist then and it does not exist at present.

This is why the company desperately advances the previously discussed theory that it gave its consent to submit the dispute to the Centre on April 30th of 2007, that is, two days before the denunciation by Bolivia. This effort by the Company to argue that the date of its consent was April 30th clearly implies its recognition that, no consent having been perfected by that date, that is, before May 2nd, the possibility to perfect such consent no longer exists. Given the foregoing, it has been clearly demonstrated that the letter dated April 30th is not, and cannot be, an instance of consent to submit the dispute to the Centre. And, after May 2nd, it is impossible to perfect the consent required for the Centre to have the power to exercise its jurisdiction.

It is indisputable that no consent by the company existed before the denunciation by Bolivia on May 2nd of 2007. Any expression of consent by the company after that date was necessarily untimely and insufficient to perfect the consent required for the Centre to register the Request. As a result, the information contained in the Request clearly establishes that the consent required for the Centre to exercise its jurisdiction does not exist and that, therefore, the dispute is manifestly out of its jurisdiction and cannot be registered.

## II. The Lack of a Real Dispute

It is clear, by reading the Request for Arbitration, that this is a dispute contrived by the Company, not based on the real measures taken by the Government of Bolivia. In fact, the Bolivian State did not take any measure against the investment by ETI Euro Telecom International, N.V., nor did it fail to comply with its international commitments.

*A. No Expropriation Occurred*

According to the Company, Supreme Decree No. 29087, dated March 28th of 2007, was part of a process of expropriation of its interests; however, it is evident that this allegation is false and that, from the information contained in the request itself, the requirement necessary to submit to the Centre a legal dispute about an investment is not met.

As part of a new State policy, reflected in a successful process of renegotiation of oil contracts that had also been subscribed in the capitalization process, the Bolivian government ordered, by Supreme Decree N° 29087, dated March 28th of 2007, the creation of an Ad Hoc Committee in charge of the negotiations with the Euro Telecom International N.V. (ETI) corporation, in order to recover the Empresa Nacional de Telecomunicaciones Sociedad Anónima –ENTEL S.A.– for the State, in a legitimate action which is absolutely normal in business, especially because these negotiations were carried out "(...) with the sole purpose of defining the conditions to recover the Company". It should be remembered that the Bolivian government successfully recognized 44 oil contracts, exercising its legitimate right as a partner and without violating any international agreements and commitments. It is absolutely unjustified for the Company to consider this legitimate administrative and commercial act as a threat to its investment.



EMBAJADA DE BOLIVIA

This assertion is recognized by the Company, since, in section 36 of the note it submitted to the ICSID, it acknowledges that the Bolivian government "published a national development plan that provided the renationalization of several formerly state-owned companies that had been privatized under the capitalization program under Act No 1544, enacted on March 2nd of 1994" [(a)] and that this plan "(...) provided that the renationalization would be carried out through administrative actions through the return to the State, where applicable, of the shares managed by the pension fund administration companies on behalf of the elderly citizens, and through the purchase of the additional shares necessary to give the State at least 51% of the shares in each company" [(a)].

The order to start negotiations cannot be interpreted as an expropriation. It is exactly the opposite. It is evidently an indication of the policy of the State to acquire the interests only through an agreement with the owner, that is, with the consent by the partner. Negotiating an agreement cannot be mistakenly equated with an expropriation. If this was so, the oil companies would have announced actions aimed at filing for arbitration and this did not happen and is not happening at present, so we consider that there exists extreme susceptibility on the part of the company, which should not move it to file a request before an international arbitration body.

Regarding Supreme Decree N°29101, whose main aim is "to transfer to the Bolivian State, for no consideration, the shares of stock of the Bolivian citizens", this only affects the stock that always belonged and belong to the Bolivian people, not affecting, either directly or indirectly, the shares of stock held by ETI partners; therefore, there are no grounds for the assertion by the Company, in section 49, that this Supreme Decree "is directly detrimental to the security of the investments of the Complainant in Bolivia" [(a)]. It must be clarified that the Bolivian Government is not interested in the depreciation of the shares of stock of a company in which, together with its Bolivian citizens, has a 50% stake.

*B. The Failure to Attach the Supreme Decrees which Allegedly Affected the Investment*

It is objectionable that the Company should not attach the Supreme Decrees or any of the documents it mentions in the grounds presented regarding the alleged "measures against the investment", a fact which results in a request for the registration of a defective arbitration demand, given that the lack of such documents, according to Rule 2, subsection 1(e), which states that "it is mandatory (...) to attach information about the matters which constitute the object of the dispute, indicating that the parties have dispute of a legal nature directly arising from an investment", allows the company to depict unreal situations of unfair treatment based on the distortion of measures of an internal administrative kind which do not imply any legal consequences against it. As a result of all this, the failure by the Company to attach to its request the Supreme Decrees and other documents which supposedly constitute the base for their claims is one more reason why the Centre should reject the Request.



EMBAJADA DE BOLIVIA

## C. *The Lack of Damage to the Rights of the Investor*

Regarding the abovementioned Supreme Decree N°29100, which implies the abrogation of Supreme Decree N°28172, dated May 19th of 2005, and the Ministerial Decision N°194, dated August 12th of 2005, and any other decision based on the abrogated Decree, the Company makes the false assertion that the Bolivian government "intends to declare Supreme Decree 29172 unconstitutional and illegal" [*(a)*], since the Bolivian government does not have the power or the jurisdiction to do so. Besides, the Bolivian State intention to signal some facts as "punishable in accordance with the national order, as a result of which they must be processed through the appropriate procedure" [*(a)*] indicates a legitimate interest to investigate facts which were unclear in the administration of the state, and the investigation of irregularities committed by previous government administrations is a state obligation in the framework of the struggle against corruption, and should not be a matter for arbitration between the Bolivian State and any of its investors.

Regarding the tax inspections that the National Revenue Service is reportedly performing in ENTEL S.A., it should be pointed out that these are applied to both national and foreign companies and do not constitute discriminatory treatment; in addition, the Company, like any other company, has the unimpeded possibility to defend itself with all its argument, as it is doing at present. In no way can legitimate tax inspection actions started against national and foreign companies in the entire territory of Bolivia be construed as being "in order to coerce the Complainant into waiving its actions without compensation of any kind" [*(a)*] as the Company states.

These actions of internal administrative nature related to the stake of the Bolivian State in its capitalized companies cannot be considered as an expropriation or as unfair or discriminatory treatment, since they have in no way modified its ability to operate, administer, maintain, use, enjoy or dispose of the Empresa Nacional de Telecomunicaciones (ENTEL S.A.).

## III. Conclusions

In brief, there is no doubt that the request by the company is manifestly outside the jurisdiction of ICSID. As we indicated above, in the first part of this letter, there is no consent. As we indicated in the second part, no real dispute exists. The alleged dispute does not exist; it has been totally invented because there was no expropriation or any other measure taken by the Bolivian government that could have affected the rights of the investor.

In denouncing the Convention, exercising nothing more than its sovereign rights, Bolivia does not waive the arbitration, but chooses to exit a system that, according to its experience and deeply considered point of view, suffers of serious defects. It is no secret that Contracting States, eminent legal authorities and even arbiters are expressing observations about and questioning the equity, consistence and economy of the Centre arbitration procedures. Bolivia offers and will offer arbitral remedies to the Company and to all investors, in the framework of its national regulations and of international regulations.



EMBAJADA DE BOLIVIA

As we stated above, the cornerstone of arbitration is consent by the parties. For a system based in consent by the parties to be fair, consistent and effective, it is essential that such consent be consolidated free of perceived or actual coercion. If consent is defective, it can only contribute to an increasing delegitimation.

Given the evident lack of jurisdiction, the Secretary General should not hesitate to reject the request for registration of arbitration submitted by ETI.

Very respectfully yours,


Gustavo Guzmán
Ambassador of Bolivia in the United States

---

(a) *Translator's Note: here, in the original in Spanish, the author states that he has translated the quotation into Spanish himself.*

10-29-07   03:32pm   From-EMBASSY OF BOLIVIA                +2023283712        T-501   P.01   F-420



E M B A J A D A   D E   B O L I V I A

Washington DC, 29 de Octubre de 2007

Señora
Dra. Ana Palacio
Secretaria General
Centro Internacional sobre Arreglo de Diferencias
Relativas a Inversiones (CIADI - ICSID)
1818 H Street, N.W.
MSN U3-301
Washington, D.C. 20433
U.S.A.

Phone No. (202) 458-1534
Fax No.    (202) 522-2615

Ref.: *Solicitud de Arbitraje presentada por ETI Euro Telecom Internacional, N.V.*

C.c. Robert B. Zoellick
Presidente del Banco Mundial
1818 H Street, NW
Washington, DC 20433 USA
tel: (202) 473-1000
fax: (202) 477-6391

Estimada Sra. Secretario-General:

Le escribo para expresarle la posición de mi Gobierno, con referencia a la Solicitud de Arbitraje (la "Solicitud") presentada al Centro Internacional de Arreglo de Diferencias Relativas a Inversiones (CIADI o el "Centro") por la empresa ETI Euro Telecom Internacional, N.V. (la "Empresa"), y remitida por ustedes el 15 de octubre pasado, la misma que consideramos como manifiestamente fuera de la jurisdicción del Centro y que, por lo tanto, no debe ser registrada.

## I. La manifiesta falta de consentimiento

La Solicitud no debe ser registrada porque es manifiestamente claro, de la información contenida en la Solicitud misma, que nunca fue perfeccionado el consentimiento necesario para someter la pretendida diferencia al Centro.

---



E M B A J A D A  D E  B O L I V I A

*A. La carta de la Empresa del 30 de abril de 2007*

La falta de consentimiento se hace evidente y es reconocida por la Empresa misma, es así que nos ofrece dos teorías insostenibles acerca de la fecha de su consentimiento para someter el caso al Centro. Primero, la Empresa señala que dio su consentimiento el 30 de abril de 2007, en una carta de esa fecha anexada a la Solicitud como Anexo C. Sin embargo, la carta, que forma parte integral de la Solicitud, no dice absolutamente nada sobre el Centro, sobre el arbitraje, o sobre el consentimiento en someter ésta o cualquier otra disputa al Centro; solamente hay que leer la carta para confirmar esta conclusión. No hay ninguna expresión explícita del consentimiento de la Empresa para someter la diferencia al Centro. Según el Profesor Schreuer, para ser válido el consentimiento tiene que ser escrito y explícito: "El consentimiento escrito debe ser explícito y no sólo inferido"[1] [*p. 94, par. 248; traducción propia*].

La mera existencia de una cláusula en un tratado sobre la resolución de controversias, que incluye la posibilidad de someter las diferencias al Centro, no es suficiente para establecer el consentimiento del inversionista. Según el Profesor Schreuer: "La cláusula del tratado no puede sustituir a la necesidad del consentimiento por el inversionista extranjero"[2] [*p. 218, par. 302; traducción propia*]. Aunque la carta del 30 de abril menciona el Tratado Bilateral de Inversiones entre Bolivia y Países Bajos, no hace ninguna referencia al Centro, al arbitraje o a la cláusula del tratado sobre el Centro.

Consecuentemente, queda manifiestamente claro, de la Solicitud misma, que la carta del 30 de abril de 2007 no constituye ninguna expresión del requerido consentimiento para someter esta diferencia al Centro. Y, es bueno reiterarlo, la parte reclamante así lo reconoce.

Por eso presenta una segunda teoría sobre la fecha del consentimiento, que es su posición real: que dio su consentimiento para someter la diferencia al Centro el 12 de octubre de 2007, fecha de la presentación de la Solicitud de Arbitraje. Queda claro que la Solicitud de Arbitraje del 12 de octubre es la primera expresión escrita y explícita del consentimiento de la Empresa en someter sus reclamos contra Bolivia al Centro.

*B. La denuncia del Convenio del 2 de mayo*

Para el 12 de octubre de 2007, la Empresa fue la única parte en dar su consentimiento para someter la disputa al Centro, ya que para esa fecha ya no existía consentimiento de parte de Bolivia, quedando manifiestamente claro, en base de la información contenida en la Solicitud, que Bolivia retiró su consentimiento para someter disputas de cualquier clase

---

[1] "Consent in writing must be explicit and not merely construed."
[2] "The treaty provision cannot replace the need for consent by the foreign investor."



E M B A J A D A   D E   B O L I V I A

al Centro el 2 de mayo de 2007. Según admite la Empresa: "El 2 de mayo, el Banco Mundial, depositario del Convenio, recibió de Bolivia una notificación de su denuncia del convenio"[3] [p. 2, par. 7; *traducción propia*].   La denuncia fue comunicada al Sr. Presidente del Banco Mundial a través de una carta del Honorable Ministro de Relaciones Exteriores y Cultos, que dijo: "Me dirijo a usted a fin de poner en conocimiento suyo que al amparo del artículo 71 del Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados, la República de Bolivia denuncia el citado Convenio al cual se adhirió en fecha 3 de mayo de 1991 y que entró en vigor para Bolivia el 23 de julio de 1995".

Si bien el texto del citado Artículo 71 señala que "La denuncia producirá efecto seis meses después del recibo de dicha notificación", y por lo tanto, el Estado denunciante queda parte del Convenio y sujeto a sus obligaciones por un plazo de seis meses después del recibo de su denuncia, de ninguna manera este texto implica que el consentimiento del Estado denunciante para someter las disputas al Centro sigue en vigor después de su denuncia.

Así lo confirma el Profesor Schreuer en su obra magistral sobre el Convenio, donde en sus comentarios sobre el Artículo 72[4] destaca:

4. Para poder beneficiarse de la validez continua bajo el Art 72, *el consentimiento tendría que haberse dado antes de la denuncia del Convenio* o la exclusión del territorio.  Consentimiento sólo es perfeccionado luego de que sea aceptado por ambas partes.  Por esto, una oferta unilateral de consentimiento por el Estado receptor por medio de legislación o por medio de un tratado antes de una notificación bajo los artículos 70 y 71 no serían suficientes.  *El efecto de la validez continua del consentimiento bajo el Art. 72 sólo surgiría si la oferta fuera aceptada por escrito por el inversionista antes de la notificación de denuncia o exclusión.*

5. La provisión en el Art. 71 que la denuncia del Convenio por un Estado parte sólo toma efecto luego de los seis meses desde la fecha de que se haya dado la notificación *no otorga la oportunidad de perfeccionar consentimiento antes del vencimiento de este límite de tiempo. En particular, un intento de un inversionista de aceptar una oferta de consentimiento por un Estado receptor que pueda existir bajo la legislación o un tratado durante este período no prosperará.*  Para que sea preservado por el Art. 72, el consentimiento tendría que haberse perfeccionado *antes de la recepción de notificación de la denuncia* o exclusión." (p. 1286, traducción propia)[5].

---

[3] "On May 2, 2007, the World Bank, the depository of the Convention, received the Respondent's notice of denunciation of the Convention."
[4] "Las notificaciones de un Estado Contratante hechas al amparo de los Artículos 70 y 71 no afectarán a los derechos y obligaciones, conforme a este Convenio, de dicho Estado, sus subdivisiones políticas u organismos públicos, o de los nacionales de dicho Estado nacidos del consentimiento a la jurisdicción del Centro dado por alguno de ellos con anterioridad al recibo de dicha notificación por el depositario."
[5] 4. "In order to benefit from the continued validity under Art. 72, consent must have been given before the denunciation of the Convention or exclusion of a territory. Consent is only perfected after it has been accepted by both parties. Therefore, a unilateral offer



E M B A J A D A  D E  B O L I V I A

Las conclusiones del Profesor Schreuer son evidentemente lógicas y correctas, porque se basan en el reconocimiento de dos puntos indiscutibles: que un Estado soberano no puede ser obligado a someter una diferencia al arbitraje sin su consentimiento, y que una denuncia del Convenio es necesariamente una manifestación de la decisión soberana del Estado contratante de dejar de someterse a la jurisdicción arbitral del Centro, y por eso es efectivamente un retiro de su consentimiento en someter las diferencias al Centro. No sería razonable adoptar una posición contraria, ya que es incuestionable el derecho que tiene el Estado, para, no solamente, denunciar el Convenio según el Artículo 71, sino también para, según el Artículo 25, "notificar al Centro la clase o clases de diferencias que aceptarían someter, o no, a su jurisdicción" con efecto inmediato "en cualquier momento ulterior" a su ratificación del Convenio.

Por supuesto, el Artículo 25 establece que "el consentimiento dado por las partes no podrá ser unilateralmente retirado", es decir, una vez que el consentimiento sea perfeccionado, ninguna de las partes podría retirarlo unilateralmente. Pero, como hemos visto, para el 2 de mayo de 2007 el consentimiento no se había perfeccionado porque la empresa no había consentido expresamente en someter la pretendida diferencia al Centro. Por eso, para esa fecha no había ningún impedimento al retiro del consentimiento por parte de Bolivia. Al contrario, según el Convenio, Bolivia tenía el pleno derecho de retirar su consentimiento en cualquier momento antes de la expresión escrita y explícita del consentimiento de la empresa para someter esta diferencia al Centro, cosa que no sucedió hasta la presentación de la Solicitud de Arbitraje el 12 de octubre.

Los Directores Ejecutivos del Centro afirmaron en su Informe acerca del Convenio que "El consentimiento de las partes es la piedra angular en que descansa la jurisdicción del Centro," [par. 23] y agregaron que para que el Centro tenga la jurisdicción sobre una diferencia, "el consentimiento debe existir en el momento que se presenta la solicitud al Centro." [par. 24]. Es importante destacar que para soportar esta última frase, los Directores Ejecutivos citaron los artículos 28(3) y 36(3) del Convenio, los mismos artículos que establecen que una Solicitud de Arbitraje no debe ser registrada si la diferencia "se halla manifiestamente fuera de la jurisdicción del Centro". En otras palabras, si el consentimiento de ambas partes no existe en el momento que se presenta la Solicitud, la diferencia necesariamente se halla manifiestamente fuera de la jurisdicción del Centro. Así concluye el Dr. Amerisinghe, que cita los Artículos 28 y 36 para decir:

---

of consent by the host State through legislation or a treaty before a notice under Arts. 70 or 71 would not suffice. The effect of the continued validity of consent under Art. 72 would only arise if the offer was accepted in writing by the investor before the notice of denunciation or exclusion.

5. "The provision in Art. 71 that the denunciation of the Convention by a State party will take effect only six months after notice has been given, does not afford an opportunity to perfect consent before the expiry of this time limit In particular, an investor's attempt to accept a standing offer of consent by the host State that may exist under legislation or a treaty during this period will not succeed. In order to be preserved by Art. 72, consent must have been perfected before the notice of denunciation or exclusion was received."

---



EMBAJADA DE BOLIVIA

"El consentimiento de ambas partes debe existir en el momento de la presentación al Secretario General, de una solicitud de conciliación y arbitraje. Si la solicitud falla de demostrar que ambas partes hayan consentido, el Secretario General debe rechazarla" (traducción propia)[6].

*C. La solicitud del 12 de octubre de 2007 no perfeccionó el consentimiento*

Queda de manifiesto que la primera expresión explícita del requerido consentimiento por la parte reclamante es la Solicitud de Arbitraje del 12 de octubre de 2007, que fue presentada más de cinco meses después de la denuncia, y del retiro del consentimiento, de Bolivia. Vale la pena enfatizar lo que dice Schreuer [*par. sobre las obligaciones del Estado contratante durante los seis después de su denuncia del Convenio*]: *"Un intento de un inversionista de aceptar una oferta de consentimiento por un Estado receptor que pueda existir bajo la legislación o un tratado durante este periodo no prosperará. Para que sea preservado por el Art. 72, el consentimiento tendría que haberse perfeccionado antes de la recepción de notificación de la denuncia o exclusión."* [*p. 1286; traducción propia*][7].

Precisamente por esta razón, la supuesta diferencia presentada por la Empresa en su Solicitud de Arbitraje no puede ser registrada. Según la información contenida en la Solicitud misma, no hubo consentimiento de ambas partes en el momento que se presentó la Solicitud, el 12 de octubre de 2007. Al haber presentado Bolivia su denuncia del Convenio el 2 de mayo de 2007 y, por lo tanto, el retiro de su consentimiento en la misma fecha, más de cinco meses antes de la presentación de la Solicitud de Arbitraje, podemos afirmar que, para el 12 de octubre, solamente ETI había expresado su consentimiento. El requerido perfeccionamiento del consentimiento no existía entonces ni ahora.

Por eso la empresa avanza desesperadamente la teoría, discutida anteriormente, que su consentimiento en someter la diferencia al Centro fue dado el 30 de abril de 2007, es decir, dos días antes de la denuncia hecha por Bolivia. Este esfuerzo de la Empresa de argumentar que la fecha de su consentimiento fue el 30 de abril constituye un claro reconocimiento de que al no perfeccionarse el consentimiento para esa fecha, es decir antes del 2 de mayo, ya no existe la posibilidad de perfeccionar dicho consentimiento. Por lo expuesto, queda plenamente demostrado, que la carta del 30 de abril no es ni puede ser un consentimiento para someter la diferencia al Centro. Y después del 2 de mayo, es

---

[6] Amerisinghe, C.F., "The International Centre for Settlement of Investment Disputes and Development through the Multinational Corporation, 9 Vanderbilt J, of Transnational Law. 793, 810 (1979)
[7] "an investor's attempt to accept a standing offer of consent by the host State that may exist under legislation or a treaty during this period will not succeed. In order to be preserved by Art. 72, consent must have been perfected before the notice of denunciation or exclusion was received."



E M B A J A D A  D E  B O L I V I A

imposible el perfeccionamiento del consentimiento requerido para que el Centro esté facultado de ejercer su jurisdicción.

Es indiscutible que no hubo consentimiento de parte de la empresa antes de la denuncia de Bolivia del 2 de mayo de 2007. Cualquier manifestación de su consentimiento después de esa fecha fue necesariamente extemporánea e insuficiente para perfeccionar el consentimiento necesario para que el Centro registre la Solicitud. Consecuentemente, la información contenida en la Solicitud de Arbitraje establece claramente que el consentimiento requerido para el ejercicio de la jurisdicción de parte del Centro no existe, y que por eso la diferencia está manifiestamente fuera de su jurisdicción y no puede ser registrada.

## II. La falta de una verdadera diferencia

Queda claro de una lectura de la solicitud de arbitraje que ésta es una diferencia inventada por la Empresa que no se basa en las verdaderas medidas tomadas por el Gobierno de Bolivia. De hecho, el Estado boliviano no tomó ninguna medida en contra de la inversión de ETI Euro Telecom Internacional, N.V. ni incumplió con sus compromisos internacionales.

### A. No hubo expropiación

Según la Empresa, el Decreto Supremo No. 29087 del 28 de marzo de 2007 fue parte de un proceso de expropiación de sus intereses, sin embargo, es evidente que este alegato es falso y que, de la información contenida en la solicitud misma, no satisface de ninguna manera el requisito necesario para presentar al Centro una diferencia jurídica sobre una inversión.

En el marco de una nueva política de Estado, reflejada en un exitoso proceso de renegociación de contratos petroleros que habían sido suscritos también en el proceso de capitalización, el Gobierno boliviano instruye, mediante Decreto Supremo No. 29087 de 28 de marzo de 2007, la conformación de una Comisión Ad Hoc encargada de las negociaciones con la sociedad Euro Telecom International N.V. (ETI), a fin de recuperar la Empresa Nacional de Telecomunicaciones Sociedad Anónima –ENTEL S.A.– a favor del Estado, en una acción legítima y por demás normal en materia de negocios, sobre todo porque estas negociaciones se llevan a cabo "(...) con el único fin de definir las condiciones para recuperar la Empresa".   Recuérdese que el Gobierno boliviano renegoció exitosamente 44 contratos petroleros ejerciendo su legítimo derecho de socio y sin haber violentado acuerdos y compromisos internacionales. Es totalmente injustificado



E M B A J A D A  D E  B O L I V I A

que la Empresa considere este acto administrativo y comercial legítimo como una amenaza contra su inversión.

Esta afirmación, es reconocida por la Empresa, ya que en el acápite 36 de su nota presentada al CIADI reconoce que el Gobierno boliviano "publicó un plan nacional de desarrollo que contemplaba la re-nacionalización de varias ex empresas de propiedad del Estado que había sido privatizadas bajo el programa de capitalización de acuerdo con la Ley No. 1544, promulgada el 21 de marzo de 1994" [*traducción propia*] y que este plan "(...) contempló que la re-nacionalización se llevaría a cabo a través de acciones administrativas mediante la reversión al Estado, donde sea aplicable, de las acciones administradas por las administradoras de fondos de pensiones a nombre de la población de la tercera edad y a través de la compra de acciones adicionales necesarias para darle al Estado cuando menos el 51% de las acciones en cada compañía" [*traducción propia*].

El mandato de iniciar negociaciones no puede ser interpretado como una expropiación. Es todo lo contrario. Es evidentemente una indicación de la política del Estado de adquirir los intereses solamente a través de un acuerdo con el propietario, es decir, con el consentimiento del socio. Negociar un acuerdo no se puede confundir con expropiar. Si así fuera, las empresas petroleras habrían anunciado acciones tendientes a demanda arbitral y esto no se dio ni se está dando, por lo que consideramos una excesiva susceptibilidad de parte de la Empresa que no debería llevarle a pretender una demanda ante una instancia de arbitraje internacional.

Con referencia al Decreto Supremo No. 29101 que tiene como principal objetivo "transferir a favor del Estado boliviano, a título gratuito, las acciones de los ciudadanos bolivianos", éste afecta sólo las acciones que siempre pertenecieron y pertenecen a los bolivianos, no afectando ni directa ni indirectamente a las acciones del socio ETI, por lo que no tiene fundamento lo afirmado por la Empresa en el acápite 49 donde menciona que este Decreto Supremo "lesiona directamente la seguridad de las inversiones del Demandante en Bolivia" [*traducción propia*]. Se debe precisar que el Gobierno boliviano no está interesado en la desvalorización de las acciones de una empresa de la cual es, junto a sus ciudadanos bolivianos, propietaria del 50% de las acciones.

*B. La falta de anexar los Decretos Supremos que supuestamente afectaron la inversión*

Es observable que la Empresa no acompañe los Decretos Supremos ni ninguno de los documentos que mencionan en su fundamentación de supuestas "medidas contra la inversión", hecho que nos pone ante una solicitud de registro de demanda arbitral defectuosa, en vista de que la ausencia de estos documentos, conforme a la Regla 2 inciso 1 (e) que dice que "se deberá (...) acompañar informaciones sobre las cuestiones objeto de la diferencia, señalando que las partes tienen una diferencia de naturaleza jurídica que surge directamente de una inversión", le permite a la Empresa presentar situaciones



E M B A J A D A  D E  B O L I V I A

ficticias de trato injusto basadas en distorsión de medidas de índole administrativo interno que no implican consecuencias jurídicas en su contra. Por todo esto, la falta de la Empresa de anexar a su solicitud los Decretos Supremos y otros documentos que supuestamente forman las bases de sus reclamos, constituye una razón más para que el Centro rechace la Solicitud.

*C. La no afectación de los derechos del inversionista*

Respecto al citado Decreto Supremo No. 29100 que supone la abrogación del Decreto Supremo No. 28172, de 19 de mayo de 2005 y la Resolución Ministerial No. 194 del 12 de agosto de 2005 y toda otra resolución basada en ese Decreto abrogado, no es cierta la afirmación de la Empresa de que el Gobierno boliviano "pretende declarar el Decreto Supremo 28172 como inconstitucional e ilegal" [*traducción propia*], ya que el Gobierno boliviano no tiene la atribución ni competencia de hacerlo. Por otro lado, la intención de que el Estado boliviano señale algunos actos como "punibles conforme al ordenamiento nacional, por lo que deben procesarse en la vía correspondiente" [*traducción propia*], refiere un interés legítimo de investigar hechos poco claros en la administración estatal y

la investigación de hechos irregulares cometidos por anteriores administraciones gubernamentales es una obligación estatal enmarcada en la lucha contra la corrupción y no tendría por qué ser materia de arbitraje entre el Estado boliviano con ninguno de sus inversionistas.

Sobre fiscalizaciones tributarias que el Servicio Nacional de Impuestos estaría llevando a cabo en ENTEL S.A., es bueno señalar que éstas son aplicadas tanto a empresas nacionales como extranjeras y no constituyen un  trato discriminatorio, además que la Empresa, como cualquier otra empresa, tiene acceso pleno a defenderse con todos sus argumentos y es así que en la actualidad lo está haciendo en la instancia administrativa correspondiente en el marco de la normativa boliviana. De ninguna manera las acciones de fiscalización tributaria legítimas que se inician contra empresas nacionales y extranjeras en todo el territorio boliviano pueden pretender enmarcarse como en un "orden de coaccionar al Demandante a renunciar a sus acciones sin ningún tipo de compensación" [*traducción propia*] como señala la Empresa.

Estas acciones de carácter administrativo interno de la participación accionaria del Estado boliviano en sus empresas capitalizadas no pueden ser consideradas una expropiación ni un trato injusto o discriminatorio, ya que no han modificado en manera alguna sus capacidades de operación, administración, mantención, uso, gozo, o disposición de la Empresa Nacional de Telecomunicaciones (ENTEL S.A.).



### EMBAJADA DE BOLIVIA

## III. Conclusiones

En síntesis, no cabe duda que la solicitud de la Empresa está manifiestamente fuera de la jurisdicción del CIADI. Como indicamos arriba, en la primera parte de esta carta, no existe consentimiento. Como indicamos en la segunda parte, no hay disputa verdadera. La supuesta disputa no existe, es totalmente inventada porque no hubo expropiación u otra medida tomada por parte del Gobierno de Bolivia que afectó los derechos del inversionista.

Al denunciar el Convenio en estricto ejercicio de sus derechos soberanos, Bolivia no renuncia al arbitraje sino opta por salir de un sistema que, desde su experiencia y estudiado punto de vista, sufre de falencias serias. No es secreto que Estados Contratantes, autoridades legales eminentes, y hasta árbitros están vertiendo observaciones y cuestionamientos sobre la equidad, consistencia y economía de los procesos de arbitraje en el Centro. Bolivia ofrece y ofrecerá remedios arbitrales a la Empresa y a todos los inversionistas, en el marco de sus normas nacionales y las normas internacionales.

Como indicamos líneas arriba, la piedra angular del arbitraje es el consentimiento de las partes. Para que un sistema basado en el consentimiento de las partes sea justo, consistente y eficaz, es imprescindible que se consolide dicho consentimiento libre de coerciones percibidas o fácticas. Viciado, el consentimiento sólo puede contribuir a una creciente deslegitimación.

Ante la evidente ausencia de jurisdicción, la Secretaria General no debe dudar en rechazar la solicitud de registro de arbitraje presentado por ETI.

Atenta y respetuosamente,

Gustavo Guzmán
Embajador de Bolivia en Estados Unidos

## DECLARATION OF ACCURACY

I, Silvia Gil De Cwilich, hereby declare as follows:

I am fluent in Spanish and English and the following is, to the best of my knowledge and belief, a true and accurate translation from Spanish to English of the letter from Gustavo Guzman, Ambassador of Bolivia to the United States, to Dr. Ana Palacio, the Secretary General of the International Centre for Settlement of Investment Disputes, dated October 29, 2007.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on May 13, 2008.

_____
Silvia Gil De Cwilich

# EXHIBIT D

## International Centre for Settlement of Investment Disputes

1818 H Street, N.W., Washington, D.C. 20433, U.S.A.
Telephone: (202) 458-1534    Faxes: (202) 522-2615/2027
Website: www.worldbank.org/icsid

October 31, 2007

E.T.I. Euro Telecom International N.V.
c/o Messrs. Robert L. Sills and
Steven J. Fink
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, NY 10103

Republic of Bolivia
c/o H.E. Evo Morales Ayma
Presidente Constitucional de la República
Palacio de Gobierno
La Paz, Bolivia

H.E. David Choquehuanca Céspedes
Ministero de Relaciones Exteriores y Culto
Plaza Murillo- c. Ingavi esq. c. Junín
La Paz, Bolivia

H.E. Ambassador Mario Gustavo Guzmán Saldaña
Embassy of the Republic of Bolivia
3014 Massachusetts Ave. N.W.
Washington D.C. 20008

### Notice of Registration

Pursuant to Article 36(3) of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the Convention) and Rules 6(1)(a) and 7(a) of the Centre's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings (the Institution Rules), I hereby notify you that I have on this date, which is also the date of the dispatch of this Notice, registered in the Arbitration Register the request for arbitration of E.T.I. Euro Telecom International N.V., dated October 12, 2007, as supplemented by its letter to the Centre of October 19, 2007.

Pursuant to Rule 7(b) of the Institution Rules, I also notify you that all communications and notices in connection with the proceeding will be sent, unless otherwise indicated, to the above addresses that have been notified to the Centre.

In accordance with Rule 7(c) of the Institution Rules, the parties are invited to communicate to us any provisions agreed by them regarding the number of arbitrators and the method of their appointment. In accordance with Rule 7(d) of the Institution Rules, the parties are invited to proceed, as soon as possible, to the constitution of an Arbitral Tribunal in accordance with Articles 37 to 40 of the Convention.

In accordance with Rule 7(e) of the Institution Rules, the parties are reminded that the registration of the request is without prejudice to the powers and functions of the Arbitral Tribunal with regard to jurisdiction, competence and the merits.

Pursuant to Rule 7(f) of the Institution Rules, this Notice is accompanied by a list of the members of the Panels of Conciliators and of Arbitrators of the Centre.

Ana Palacio
Secretary-General

# EXHIBIT  G

No.        of 2007

IN THE HIGH COURT OF JUSTICE



QUEEN'S BENCH DIVISION

COMMERCIAL COURT

Mr Justice Andrew Smith

7 May 2008

BETWEEN:

E.T.I. EURO TELECOM INTERNATIONAL N.V.

Claimant/Applicant

-and-

(1) REPUBLIC OF BOLIVIA

(2) EMPRESA NACIONAL DE TELECOMUNICACIONES ENTEL S.A.

Defendants/Respondent

---

ORDER

---

UPON HEARING Leading Counsel for the E.T.I. Euro Telecom International N.V. ("the Applicant")

AND UPON reading the undertakings listed in Schedule A

IT IS ORDERED THAT:-

1. Until the return date or further order of the court, the Respondents must not remove or cause to be removed from England and Wales or in any way dispose of,

deal with or diminish the value of any deposit, including without limitation time deposits, located at Deutsche Bank AG London, Winchester House, 1 Great Winchester Street, London EC2N 2DB ("DB London") in the name of Empresa Nacional de Telecomunicaciones Entel S.A. ("Entel"), whether solely or jointly, including without limitation any deposit held at DB London under account number 004411739.

2. This order will cease to have effect if the Respondents provide security by paying the sum of US$49,313,144.49 into court, to be held to the order of the court or make provision for security in that sum by another method agreed with the Applicant's legal representatives.

3. Anyone served with or notified of this order may apply to the court at any time to vary or discharge this order (or so much of it as affects that person), but they must first inform the Applicant's solicitors. If any evidence is to be relied upon in support of the application, the substance of it must be communicated in writing to the Applicant's solicitors in advance.

4. This matter be listed for a further hearing on 16 May 2008 ("the return date").

5. The applicant do have permission to serve the Respondents with a copy of claim form (when issued) out of the jurisdiction in the Republic of Bolivia. The period for filing an acknowledgement of service is 23 days after service of the claim form.

6. The costs of this application are reserved to the judge hearing the application on the return date.

**Effect of this Order on Third Parties**

7. It is a contempt of court for any person notified of this order knowingly to assist in or permit a breach of this order. Any person doing so may be imprisoned, fined or have their assets seized.

8. This injunction does not prevent DB London from exercising any right of set off it may have in respect of any facility which it gave to Entel before it was notified of this order.

All communications to the court about this Order should be sent to Room EB09, Royal Courts of Justice, Strand, London WC2A 2LL. The telephone number is 0207 947 6826. The offices are open between 10 a.m. and 4.30 p.m. Monday to Friday.

The name and address of the Applicant's solicitors is:

ORRICK, HERRINGTON & SUTCLIFFE
TOWER 42, LEVEL 35
25 OLD BROAD STREET
LONDON
EC2N 1HQ

## Schedule A

1. If the court later finds that this order has caused loss to the Respondents and decides that the Respondents should be compensated for that loss, the Applicant will comply with any order the court may make.

2. The Applicant will on or before 14 May 2008 cause a written guarantee, the beneficiaries of which will be both the Respondents, in the sum of £250,000 to be issued from a bank with a place of business within England or Wales, in respect of any order the court may make pursuant to paragraph (1) above and immediately upon issue of the guarantee, cause a copy of it to be served on the Respondents.

3. As soon as reasonably practicable and in any event no later than 14 May 2008, the Applicant will issue a claim form claiming the appropriate relief.

4. As soon as reasonably practicable and in any event by 14 May 2008, the Applicant will cause to be sworn and filed an affidavit of Simon Cockshutt confirming, on information from the authors, the accuracy of the contents of (i) the draft affidavit of Franco Bertone; and (ii) the declarations of Fabio Incutte and Robert Sills dated 5 May 2008.

5. The Applicant will serve upon the Respondents together with this order as soon as practicable copies of the witness statement, affidavit and exhibits containing the evidence relied upon by the Applicant, the claim form, any other documents provided to the court on the making of the application and an application notice for continuation of the order.

6. Anyone notified of this order will be given a copy of it by the Applicant's legal representatives.

7. The Applicant will pay the reasonable costs of anyone other than the Respondents which have been incurred as a result of this order including the costs of finding out whether that person holds any of the Respondents' assets and if the court later finds that this order has caused such person loss, and decides that such person

should be compensated for that loss, the Applicant will comply with any order the court may make.

8. If this order ceases to have effect (for example, if the Respondent provides security) the Applicant will immediately take all reasonable steps to inform in writing anyone to whom he has given notice of this order, or who he has reasonable grounds for supposing may act upon this order, that it has ceased to have effect.

9. The Applicant will not without the permission of the court seek to enforce this order in any country outside England and Wales.

No.          of 2007

IN THE HIGH COURT OF JUSTICE

Queen's Bench Division

Commercial Court

BETWEEN:

E.T.I.        EURO         TELECOM
INTERNATIONAL N.V.

                    Claimant/Applicant

                    -and-

(1) REPUBLIC OF BOLIVIA

(2)    EMPRESA    NACIONAL    DE
TELECOMUNICACIONES ENTEL S.A.

                    Defendants/Respondent

---

## ORDER

---

Orrick, Herrington & Sutcliffe

TOWER 42, LEVEL 35

25 OLD BROAD STREET

LONDON

EC2N 1HQ