Robert L. Sills (RS 8896)
Steven J. Fink (SF 3497)
Ryan S. Lester (RL 5603)
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**E.T.I. EURO TELECOM INTERNATIONAL N.V.,**

        Plaintiff,

        -against-

**REPUBLIC OF BOLIVIA** and
**EMPRESA NACIONAL DE
TELECOMUNICACIONES ENTEL S.A.,**

        Defendants.

CIVIL ACTION NO. 08-CV-4247 (LTS)

---

## MEMORANDUM IN SUPPORT OF ETI EURO TELECOM INTERNATIONAL N.V.'S MOTION TO CONFIRM ORDER OF ATTACHMENT

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ................................................................................... 3

    A.  THE PRIVATIZATION OF ENTEL ....................................................... 3

    B.  THE BILATERAL INVESTMENT TREATY BETWEEN BOLIVIA
        AND THE NETHERLANDS ................................................................. 5

    C.  BOLIVIA'S ACTIONS AGAINST ETI AND ENTEL ................................. 6

    D.  THE ICSID PROCEEDING .................................................................. 9

    E.  RECENT EVENTS LEADING UP TO THIS APPLICATION .................. 10

    F.  ENTEL BANK ACCOUNTS IN NEW YORK ........................................ 12

    G.  THE *EX PARTE* ORDER OF ATTACHMENT ................................... 13

    H.  THE ENGLISH ORDER ..................................................................... 14

ARGUMENT ................................................................................................... 14

    A.  SUBJECT MATTER JURISDICTION ................................................... 14

    B.  MOTIONS FOR ATTACHMENT ......................................................... 15

I.     ETI IS ENTITLED TO AN ORDER OF ATTACHMENT UNDER
      CPLR §§ 7502 AND 6212, AS INCORPORATED BY FED. R. C.V.P. 64 ...... 17

    A.  ETI'S ICSID ARBITRATION IS A CAUSE OF ACTION FOR
        PURPOSES OF CPLR §§ 7502(C) AND 6212(A) ..................................... 17

    B.  ETI HAS SHOWN A PROBABILITY OF SUCCESS ON THE
        MERITS ......................................................................................... 18

    C.  THE AMOUNT DEMANDED FROM BOLIVIA EXCEEDS ALL
        JUST COUNTERCLAIMS KNOWN TO ETI .......................................... 21

    D.  ABSENT ATTACHMENT, ANY AWARD TO ETI MAY BE
        RENDERED INEFFECTUAL; THEREFORE A NEED FOR
        CONTINUING THE LEVY EXISTS ..................................................... 21

II.    THE ENTEL BANK ACCOUNTS IN NEW YORK ARE SUBJECT TO
      ATTACHMENT ................................................................................ 22

CONCLUSION ................................................................................................ 24

## PRELIMINARY STATEMENT

Plaintiff E.T.I. Euro Telecom International N.V. ("ETI"), a Dutch corporation, moves for an order confirming the *Ex Parte* Order of Attachment signed by this Court on May 5, 2008. That Order, issued on ETI's application pursuant to Rule 64 of the Federal Rules of Civil Procedure and Articles 62 and 75 of the New York Civil Practice Law and Rules ("CPLR"), attached approximately $36 million in assets of Defendant Empresa Nacional de Telecomunicaciones Entel S.A. ("Entel") maintained on deposit with the New York branches of JP Morgan Chase Bank N.A. ("JP Morgan"), Unicredito Italiano S.p.A. d/b/a Unicredit S.p.A. ("Unicredit") and Intesa Sanpaolo S.p.A. d/b/a Banca Intesa ("Intesa," and collectively with JP Morgan and Unicredit the "Garnishees").[1] The *Ex Parte* Order of Attachment also required ETI to move, by today's date, for an order confirming the attachment.[2]

In 1995, ETI entered into a series of agreements with Defendant the Republic of Bolivia and Defendant Entel, a Bolivian telecommunications company, pursuant to which Entel was privatized. As a result of that transaction, ETI obtained ownership of 50% of Entel's shares, and also obtained management control of Entel. In return, ETI agreed to, and did, invest hundreds of millions of dollars in Bolivia's telecommunications sector, among other commitments. Now, more than a decade later, Bolivia is pursuing a program of re-nationalization through which it seeks to expropriate ETI's substantial interest in Entel without compensation. Bolivia's

---

[1]    ETI has sought, and obtained, similar relief from the English courts. As discussed below, on May 7, the High Court of Justice, Queen's Bench Division, Commercial Court, issued an order, upon ETI's application, freezing approximately $49 million in Entel's funds held at the London branch of Deutsche Bank AG. (Declaration of Robert L. Sills, executed on May 12, 2008 ¶ 6 and Exh. G.)

[2]    Pursuant to CPLR § 6212, the Court's Order also required ETI to deposit with the Clerk of the Court a standby Letter of Credit in the amount of $250,000. ETI has made that deposit. (Declaration of Robert L. Sills, executed on May 12, 2008 ¶ 4 and Exh. C.)

expropriation began with a months-long campaign by which the Bolivian government sought to deprive ETI of the benefits of its investment in Entel.  Then, on May 1, 2008, the President of Bolivia signed and then publicly proclaimed a "Supreme Decree" immediately nationalizing ETI's shares in Entel.  At the same time, through its official actions and statements, Bolivia has made it clear that it intends to pay little or nothing for ETI's interest in Entel.  Indeed, internal government documents explicitly admit that Bolivia does not plan to pay anything at all.  These actions violate the express terms of a bilateral investment treaty between Bolivia and the Netherlands (the "BIT").

In October 2007, in accordance with the BIT, ETI brought an arbitration against Bolivia under the auspices of the International Centre for Settlement of Investment Disputes ("ICSID") in Washington, D.C., to recover compensation for Bolivia's expropriation – then implied, now explicit – of ETI's interest in Entel.  In the ICSID arbitration, ETI seeks damages arising out of the expropriation of its property in Bolivia.

Through this motion, ETI seeks an order confirming the attachment of the approximately $36 million in funds maintained by Entel at accounts with the Garnishees within the Southern District of New York.  As set forth below, without that relief, ETI has no reasonable prospect of enforcing an ICSID award, should it prevail in the arbitration, and it appears that Bolivia is attempting to move those assets beyond this court's jurisdiction.[3]

---

[3]    As set forth below at page 20, ETI as a matter of federal law, has the direct right to half of those funds.

**STATEMENT OF FACTS**

A.     **The Privatization of Entel**

ETI obtained its equity interest in Entel in 1995 through a privatization transaction in which it subscribed and paid in a capital increase of Entel.  (Declaration of Franco Bertone executed on May 4, 2008 (the "Bertone Dec.") ¶ 4).  By virtue of its 50% shareholding, ETI also has, under Bolivian law, the right to appoint a majority of Board Members.  (Bertone Dec. ¶ 4).

The privatization of Entel was structured by the Bolivian Government as a payment by ETI to Entel of $610 million to subscribe to 50% of Entel's shares and Board control.  (Bertone Dec. ¶ 5).  The remaining shares were held by two Bolivian pension funds (about 47.5% of the share capital) and by local shareholders and employees of Entel (about 2.5% of the share capital). (Id.).

Entel made substantial investments in Bolivia's telecommunications infrastructure in the years that followed the privatization.  By December 2007, Entel had made investments in infrastructure and technology, on a consolidated basis, in an amount exceeding $741 million and employed 1,500 Bolivians.  (Id. ¶ 6).  This comprised the largest infrastructure investment program in the history of Bolivian telecommunications, and Entel became a leading telecommunications company in the region, providing greatly improved and expanded service to all regions of Bolivia.  (Id.).  From 1996 to 2007, the fixed and mobile telecommunications services penetration in Bolivia grew from 5% to 45% of the population, and the mobile telecommunications services penetration in Bolivia grew from less than 1% to over 38%.  (Id.).

In May 2005, the Bolivian government issued Supreme Decree No. 28172, providing the Ministry of Economic Development with power to determine if Entel had fulfilled its investment obligations undertaken as part of the privatization.  (Id. ¶ 7).  In accordance with that grant, in August 2005, the Ministry of Economic Development confirmed, in its Ministerial Resolution

3

No. 194, that Entel had met all of its commitments in connection with the privatization. (Id.).

Four members of the Bolivian Senate then filed a proceeding before the Constitutional Tribunal

– Bolivia's court of last resort – requesting that Supreme Decree 28172 and Ministerial

Resolution 194 be declared unconstitutional. (Bertone Dec. ¶ 7). On January 18, 2006, the

Constitutional Court ruled that Supreme Decree 28172 was valid, and that the Court lacked

jurisdiction to review the Ministerial Resolution. (Id.). Those instruments, issued by the

Bolivian government and having the force of law, stand as Bolivia's legal certification that Entel

met its obligations under the privatization program.

    In reliance on Bolivia's official actions, the shareholders of Entel (including the Bolivian

pension funds and Entel's employee shareholders), voted to carry out a reduction of the

company's capital in September 2005. (Id. ¶ 8). Corresponding amounts of capital were

thereafter distributed to Entel's shareholders, with approximately $200 million distributed to the

Bolivian shareholders, and the $200 million balance distributed to ETI. (Id.). The Bolivian

government imposed no taxes on the distribution at the time it was made, and two prominent

international accounting firms provided their opinions that the transaction was not a distribution

of dividends, but was a non-taxable distribution of capital. (Id.).

    Under ETI's ownership, Entel has continued to flourish. In May 2007, ABN AMRO

Bank N.V ("ABN AMRO"), a leading international bank, was engaged to value ETI's stake in

Entel. (Id. ¶ 9). That analysis, which was based on conservative assumptions, concluded that

Entel's business had an equity value, as of that date, between $587 million and $650 million, so

that ETI's interest was worth between $294 million and $325 million. (Bertone Dec. ¶ 9 and

Exh. 1). The current US Dollar value of the company is now significantly greater than the ABN

AMRO valuation due to an improved cash position, the fact that the company's performance

exceeded the business plan upon which the valuation was based, and the recent devaluation of the US dollar.  (Bertone Dec. ¶ 9).

**B.      The Bilateral Investment Treaty Between Bolivia and the Netherlands**

The Agreement on Encouragement and Reciprocal Protection of Investments between the Kingdom of the Netherlands and the Republic of Bolivia (the "Bilateral Investment Treaty," or "BIT") was signed on March 10, 1992 and entered into force on November 1, 1994.  A copy of the BIT is attached to the Declaration of Robert L. Sills dated May 5, 2008 (the "Sills Dec.") as Exhibit B.  The BIT remains in force today.

The BIT governs the legal relationships between Bolivia and Dutch nationals who make investments in Bolivia, and includes various protections for Dutch nationals investing in Bolivia.  These protections include that:

- Bolivia shall "ensure fair and equitable treatment to the investments of nationals of [the Netherlands] and shall not impair, by unreasonable or discriminatory measures, the operation, management, maintenance, use, enjoyment or disposal thereof by those nationals." (BIT Article 3, ¶ 1);

- Bolivia shall "accord to such investments full security and protection which in any case shall not be less than that accorded either to investments of its own nationals or to investments of nationals of any third State, whichever is more favorable to the investor."  (BIT Article 3, ¶ 2); and

- Bolivia shall not "take any measures depriving, directly or indirectly, nationals of [the Netherlands] of their investments unless . . . the measures are accompanied by provision for the payment of just compensation."  (BIT Article 6).

The BIT also includes a dispute resolution mechanism.  The dispute resolution mechanism provides for arbitration to resolve any disputes between either Bolivia or the Netherlands, on the one hand, and an investor from the other state, arising out of an expropriation.  The BIT goes on to provide that:

> If both Contracting Parties have acceded to the Convention on the Settlement of Investment Disputes between States and Nationals of

5

other States of 18 March 1965, any disputes that may arise from investment between one of the Contracting Parties and a national of the other Contracting Party shall, in accordance with the provisions of that convention, be submitted for conciliation or arbitration to the International Center for Settlement of Investment Disputes.

(BIT, Article 9, ¶ 6).[4]

Pursuant to the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States (the "ICSID Convention"), ICSID was established to hear disputes between investors and states under bilateral investment treaties. ICSID is a part of the World Bank, and has its seat in Washington, D.C. The pending ICSID proceeding between ETI and Bolivia is described below at pages 9 through 10.

## C.    Bolivia's Actions Against ETI and Entel

In January 2006, President Evo Morales, the leader of the "Movement Towards Socialism," took office in Bolivia on a platform advocating significant state intervention in the Bolivian economy. (Bertone Dec. ¶ 10). In June of that same year, Bolivia published a national development plan that contemplated the re-nationalization of various formerly state-owned enterprises that had been privatized in the 1990s. (Id.). The Bolivian government began to execute this National Development Plan by nationalizing Bolivia's oil and gas reserves shortly after President Morales took office. (Id.).

In July 2006, the Bolivian government began to take measures that adversely affected the value of ETI's investment in Entel, and were intended to expropriate that interest without paying fair compensation. (Id. ¶ 11). These measures included:

---

[4]    In addition to the BIT, Bolivia and the Netherlands are both signatories to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), as is the United States. Bolivia is also a signatory to the Inter-American Convention on International Commercial Arbitration, reprinted following 9 U.S.C. § 301 (the "Panama Convention").

(a)    On July 7, 2006, Bolivian authorities notified Entel that Bolivia was imposing on Entel approximately $26 million in purported withholding taxes for the capital distribution made in September 2005.  Although no prior notice had been given, Bolivia nevertheless additionally sought approximately $30 million in penalties and interest.  Entel challenged the imposition of these taxes, penalties and interest.  (Id. ¶ 11).

(b)    On March 28, 2007, Bolivia issued Supreme Decree No. 29087, which established an ad hoc commission (the "Commission") mandated to negotiate the "recovery" of Entel for the Bolivian State within 30 days.  The Commission was comprised of three ministerial and two vice-ministerial members of the Bolivian government.  The Decree also referred to a supposed investigation of Entel which purportedly revealed "irregularities in [its] management and operations . . . ."  Entel first learned of that supposed investigation after the fact, upon the promulgation of Supreme Decree No. 29087.  (Bertone Dec. ¶ 12 and Exh. 2).

(c)    On April 4, 2007, the Commission invited ETI to meet in La Paz on April 11, 2007 for negotiations.  The Bolivian Commission did not offer at the April 2007 meeting to pay anything for ETI's controlling stake in Entel, nor has it done so since.  Instead, the Commission used the meeting as an opportunity to level baseless accusations against ETI and the incumbent management of Entel.[5]  In particular, the Commission made a PowerPoint presentation claiming that various

---

[5]    At the same time, the Commission made a series of incendiary and abusive statements to the Bolivian press, despite the parties' agreement on confidentiality entered into at Bolivia's request.  (Bertone Dec. ¶ 14).

"irregularities" required adjustments to the reported value of Entel of at least $645 million, which was close to the equity value for the company as determined by ABN AMRO.  The Commission members expressly stated that Bolivia would not pay anything to compensate ETI for the expropriation of its equity stake in Entel in light of the supposed "irregularities."   Not surprisingly, the meetings concluded without any agreement between the two sides.  (Bertone Dec. ¶¶ 13-16).

(d)    ETI then accepted a second invitation from the Commission to engage in discussions regarding Entel.  The meeting was to be held on April 23, 2007.  Only hours before that meeting was to begin, the Bolivian government issued two new Decrees directly impacting ETI's interests in Entel:

(i)    Supreme Decree No. 29100, which purports to abrogate Supreme Decree No. 28172 and Ministerial Resolution No. 194.  Supreme Decree No. 28172 and Ministerial Resolution No. 194, as discussed above, collectively certified that Entel had fully performed its obligations in connection with the privatization.  Bolivia issued that Decree despite the fact that, as set forth above, a challenge to the constitutionality of Supreme Decree No. 28172 and Ministerial Resolution No. 194 had been rejected by Bolivia's highest court.[6]  (Bertone Dec. ¶ 17).

---

[6]    Supreme Decree No. 29100 also transferred the 47.5% interest in Entel held by two Bolivian pension funds to the Bolivian government.

8

      (ii)      <u>Supreme Decree No. 29101</u>, which purports to abrogate several earlier

Decrees that authorized Entel's privatization. (<u>Id</u>.)

In light of these events, the proposed meeting did not go forward.  (<u>Id</u>.).

**D.**    **The ICSID Proceeding**

On May 2, 2007, Bolivia submitted to ICSID its formal denunciation of the ICSID

Convention.  Pursuant to the ICSID Convention, that denunciation took effect six months after it

was received by ICSID, on November 2, 2007.

On October 12, 2007, ETI submitted to ICSID a Request for Arbitration against Bolivia.

Asserting its rights under the BIT, ETI sought to recover money damages against Bolivia to

compensate it for its injuries arising from Bolivia's conduct summarized above.  A copy of ETI's

Request for Arbitration is attached to the Sills Dec. as Exhibit A.

On October 29, 2007, Bolivia submitted to ICSID a nine page letter objecting to ICSID

jurisdiction over the arbitration commenced by ETI.  In that letter, Bolivia took the position that:

> In denouncing the Convention in full exercise of its sovereign
> rights, Bolivia does not surrender to arbitration but chooses to
> leave a system that, from its experience and studied standpoint,
> suffers from serious flaws.  It is no secret that Contracting States,
> eminent legal authorities, and even referees are pouring comments
> and questions about fairness, consistency and economies of the
> arbitration proceedings at the Centre.  Bolivia offers arbitration and
> offers remedies to the Company and all investors, within their
> national laws and international standards.

A copy of Bolivia's letter is attached to the Sills Declaration as Exhibit C.

On October 31, 2007, ICSID registered ETI's Request for Arbitration, thereby initiating

the ICSID arbitration proceeding, over Bolivia's objection.  (<u>See</u> Sills Dec. Exh. D).  Since then,

Bolivia has refused to participate in the ICSID proceeding, taking the position that its

denunciation of the ICSID Convention left ICSID without jurisdiction to hear the dispute.  (Sills

Dec. ¶ 4). Bolivia never responded to ETI's efforts to reach agreement on a procedure for constituting the arbitral tribunal, as required by the ICSID rules, and the arbitral tribunal has not yet been constituted. Indeed, other than its rejected jurisdictional argument, Bolivia has not filed any papers in the ICSID proceeding. (Sills Dec. ¶ 6).

**E.      Recent Events Leading up to This Application**

On May 1, 2008, Bolivian President Morales publicly announced, at a May Day rally in La Paz carried on Bolivian television, that Bolivia was nationalizing ETI's interest in Entel. (Bertone Dec. ¶ 19). As part of that announcement, he publicly proclaimed the text of Supreme Decree No. 29544 (the "Nationalization Decree," a copy of which is attached to the Bertone Dec. as Exh. 6). The Decree, which became immediately effective by virtue of this public pronouncement, provides among other things, that:

- "The stock of the capitalizing company ETI EUROTELECOM INTERNATIONAL NV is hereby nationalized in its entirety and said company is transformed into Entel SAM; all the shares of this capitalizing company shall be transferred to the Bolivian state, being temporarily held by the Ministry of Public Works, Utilities and Housing. . . ." (Nationalization Decree, Article 2); and

- "Any individual that, in any way, may interrupt or disturb the normal business of the company, or engage in acts that cause detriment or prejudice to its corporate assets must be denounced before the Public Ministry under the offense of 'Attempt against the security of public services', 'Anti-Economic Behavior', 'Aggravated Damage' and other offences typified in the Criminal Code." (Nationalization Decree, Article 7, paragraph II).

Also on May 1, the Bolivian police took control of Entel's main offices, blocking access to, or exit from, the building. (Bertone Dec. ¶ 26). In addition, again on May 1, SITTEL, the Bolivian telecommunications regulator, issued Administrative Regulatory Resolution No. 2008/1056 and served it on Entel. (Bertone Dec. ¶ 27 and Exh. 8). The resolution provides, on the authority of the Nationalization Decree, that an agent for SITTEL would immediately assume the management of Entel for a period of ninety days. (Id.).

Although Article 3 of the Nationalization Decree states that compensation for ETI's shares will be paid within 60 days based on an "evaluation," it does not provide any mechanism for fixing that payment, nor does it provide ETI with an opportunity to be heard. (Bertone Dec. Exh. 6). However, ETI has obtained a copy of a Bolivian government document entitled "Executive Summary – Recovery of Entel S.A.", which states that the governmental "work group" proposed that ETI would receive "[c]ompensation 0, due to the irregularities found." (Bertone Dec. ¶¶ 23-24 and Exh. 7).

That statement, that the Bolivian government's strategy is to seize ETI's Entel shares without compensation, is consistent with the position taken by the government representatives in the course of "negotiations" in April 2007, described above at pages 7 and 8. Moreover, Article 4 of the Nationalization Decree includes a proviso, that "[t]he financial, tax, labor, commercial and regulatory liabilities" of Entel, "both payable and contingent, shall be deducted at the time of effecting the final liquidation for the payment to be made to [ETI]. . . ." This appears to be nothing more than the predicate for paying nothing for the expropriated shares. Indeed, only a few days before the Nationalization Decree was issued, the Bolivian tax authorities ordered payment within three days of approximately $60 million for the purported withholding taxes, penalties and interest retroactively assessed for the September 2005 capital reduction and

11

distribution, as discussed above. (Bertone Dec. ¶ 25). The Bolivian government presumably will use that purported obligation, as well as the portions of the $645 million in purported "irregularities" identified during the April 2007 meetings, to further reduce its valuation of the company. (Id.).

**F.    Entel Bank Accounts in New York**

For several years, in the regular course of its business, Entel has maintained significant cash reserves on deposit with financial institutions in New York. These funds have not been used for day-to-day operating expenses. (Bertone Dec. ¶ 36). ETI is currently aware of four such accounts. The first account, bearing account number 304-279-757, is maintained at JP Morgan's New York branch located at 4 New York Plaza, Floor 15, New York, New York 10004. (Sills Dec. ¶ 11). The balance is $1,681,000. The second account, bearing account number 3100042572, is maintained at Unicredit's New York branch located at 150 East 42nd Street, New York, New York 10017. The outstanding time deposit with Unicredit amounts to €4,856,596 (principal plus interest); at maturity on May 29, 2008, Unicredit will reimburse principal and pay interest for the total above-mentioned amount to the Euro account number 3100042572 (approximately $7,480,000 at today's exchange rate). (Bertone Dec. ¶ 35). The third account, bearing account number 8601-081-0099, is maintained at Intesa's New York branch located at One William Street, New York, New York, 10004. The outstanding time deposit in Euros with Intesa amounts to €10,075,556 (principal plus interest); at maturity on June 16, 2008, Intesa will reimburse the principal and pay interest for the total above-mentioned amount to the Euro account 8601-081-0099 (approximately $15.5 million at today's exchange rate). (Id.). The fourth account, bearing account number 8601-081-0001, is also maintained at the William Street branch of Intesa. The outstanding time deposit with Intesa amounts to $11,203,102 (principal plus interest); at maturity on May 16, 2008, Intesa will reimburse

principal and pay interest for the total above-mentioned amount to account number 8601-081-0001.  (Id.)  The total amount held in those four New York accounts is approximately $36 million.

Once the Bolivian police physically seized Entel's headquarters in La Paz, the finance director was called in for an individual interview and was pressed for detailed information regarding Entel's foreign accounts, including the names of authorized signatories.  (Bertone Dec. ¶ 31).  Then, on Friday, May 2, Mr. Joel Flores Carpio, the "administrator" appointed by the Bolivian government to manage Entel following the seizure of ETI's shares, wrote to the banks in New York, asserting that he was the sole signatory for each of the relevant accounts, and asking the banks in question to provide him with the necessary documents to formalize his authority.  See Declaration of Fabio Incutti, executed May 5, 2008.  The logical inference to be drawn from these events is that the Bolivian government intends to move the funds in question as quickly as possible, particularly viewed in the context of Bolivia's campaign to seize ETI's stake in Entel without paying for it.

**G.    The *Ex Parte* Order of Attachment**

On May 5, 2008, ETI moved *ex parte* for the entry of the *Ex Parte* Order of Attachment. Judge Chin, sitting as Part I Judge, granted ETI's application.  The order directs ETI to move, within five days after levy, for an order confirming the order of attachment.  The *Ex Parte* Order of Attachment also directs ETI, within five business days after issuance of the Order (*i.e.*, by today's date), to deposit with the Clerk of the Court a standby Letter of Credit or other undertaking in the amount of $250,000.

ETI today deposited with the Clerk of the Court a standby Letter of Credit in the amount of $250,000. (Declaration of Robert L. Sills executed on May 12, 2008 ¶ 4 and Exh. C.). It now timely makes this motion to confirm.

**H.      The English Order**

On May 7, 2008, ETI sought similar relief in the English courts. That same day, the High Court of Justice, Queen's Bench Division, Commercial Court, granted an order, on ETI's application, freezing approximately $49 million in Entel's funds maintained at Deutsche Bank AG's London branch. (Declaration of Robert L. Sills executed on May 12, 2008 ¶ 6 and Exh. G.).

## ARGUMENT

**A.      Subject Matter Jurisdiction**

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 9 U.S.C. § 203 because this action falls under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), reprinted following 9 U.S.C. § 201, and 22 U.S.C. § 1650a and 28 U.S.C. § 1331, and arises under the ICSID Convention, 17 U.S.T. 1270, 575 U.N.T.S 15 (1966). See Borden, Inc. v. Meiji Milk Prods., Co., 919 F.2d 822, 826 (2d Cir. 1990); Venconsul N.V. v. Tim Int'l N.V., No. 03 Civ. 5387 (LTS)(MHD), 2003 WL 21804833, at *3 (S.D.N.Y. Aug. 6, 2003); Alvenus Shipping Co. v.

Delta Petroleum (U.S.A.) Ltd., 876 F. Supp. 482, 487 (S.D.N.Y. 1994).[7]

**B.    Motions For Attachment**

An application to this Court for attachment in aid of arbitration is governed by Fed. R.

Civ. P. 64, and through Rule 64, New York law concerning such applications.  Rule 64 states, in

relevant part, "at the commencement of and throughout an action, every remedy is available that,

under the law of the state where the court is located, provides for seizing a person or property to

secure satisfaction of the potential judgment.  But a federal statute governs to the extent it

applies."  See SiVault Sys., Inc. v. Wondernet, Ltd., No. 05 Civ. 0890 (RWS), 2005 WL 681457,

at *3 (S.D.N.Y. Mar. 25, 2005).

Section 7502(c) of the New York Civil Practice Law and Rules expressly permits parties

to apply to a court for prejudgment attachment in aid of arbitration:

> Provisional remedies.  The supreme court in the county in which
> an arbitration is pending or in a county specified in subdivision (a)
> of this section, may entertain an application for an order of
> attachment or for a preliminary injunction in connection with an
> arbitration that is pending or that is to be commenced inside or
> outside this state, whether or not it is subject to the United Nations
> convention on the recognition and enforcement of foreign arbitral
> awards, but only upon the ground that the award to which the
> applicant may be entitled may be rendered ineffectual without such
> provisional relief.  The provisions of articles 62 and 63 of this

---

[7]    Article II (1) of the New York Convention requires recognition of "an agreement in writing under which the parties undertake to submit to arbitration all or any differences which may have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not. . . ."  As paragraph 4(b) of the BIT between Bolivia and the United States, entitled Treaty Concerning the Encouragement and Reciprocal Protection of Investment, U.S.-Bol., Art. IX, Apr. 17, 1998, Senate Treaty Document 106-26, makes clear, a BIT is an "agreement in writing" for purposes of the New York Convention, and hence Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201, et seq.  Moreover, 22 U.S.C. § 1650(a), which enforces the ICSID Convention in the United States, provides that "[t]he Federal Arbitration Act (9 U.S.C. 1 et seq.) shall not apply to enforcement of awards rendered pursuant to the [ICSID] Convention."  It follows, consistent with the status of the BIT as an "agreement in writing" providing for arbitration, that the FAA is otherwise applicable to a claim within ICSID's jurisdiction.

chapter shall apply to the application, including those relating to undertakings and to the time for commencement of an action (arbitration shall be deemed an action for this purpose), except that the sole ground for the granting of the remedy shall be as stated above. If an arbitration is not commenced within thirty days of the granting of the provisional relief, the order granting such relief shall expire and be null and void and costs, including reasonable attorney's fees, awarded to the respondent. The court may reduce or expand this period of time for good cause shown. The form of the application shall be as provided in subdivision (a) of this section.

CPLR § 7502(c).

Parties seeking an order of attachment must, therefore, satisfy the requirements of Section 7502(c), as well as those of CPLR articles 62 and 63, as modified by Section 7502(c). Courts interpreting the interplay of those provisions have held that the requirements of CPLR § 6212(a) governs an application for an order of attachment under Section 7502(c), except for that portion of Section 6212(a) that refers to CPLR § 6201.[8] See SG Cowen Sec. Corp. v. Messih, 224 F.3d 79, 82 (2d Cir. 2000); In re Thornton & Naumes, LLP, 36 A.D.3d 1119, 1120, 829 N.Y.S.2d 248, 249 (3d Dep't 2007); In re Cullman Ventures, Inc., 252 A.D.2d 222, 230, 682 N.Y.S.2d 391, 396 (1st Dep't 1998).

In particular, Courts have held that CPLR § 6212(a) is modified by CPLR § 7502(c) so that any party seeking an order of attachment must make the following showings, as set forth in those sections: (1) "that there is a cause of action," (2) "that it is probable that the plaintiff will succeed on the merits," (3) "that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff," and (4) that "the award to which the applicant may be

---

[8]       Courts have recognized that CPLR § 6201 is inapplicable to an application for an attachment in aid of arbitration, because its requirements contradict the express terms of Section 7502(c). SiVault Sys., 2005 WL 681457, at *3. See also County Natwest Sec. Corp. USA v. Jesup, Josephthal & Co., 180 A.D.2d 468, 469, 579 N.Y.S.2d 376, 377 (1st Dep't 1992); Drexel Burnham Lambert, Inc. v. Ruebsamen, 139 A.D.2d 323, 531 N.Y.S.2d 547 (1st Dep't 1988).

entitled may be rendered ineffectual without such provisional relief." CPLR § 6212(a); CPLR § 7502(c); see also SiVault Sys., 2005 WL 681457, at *3.

All four of those tests are also applicable on a motion to confirm attachment, as provided by CPLR § 6211(b).[9] ETI meets all four of those tests, as detailed below.

## I.    ETI IS ENTITLED TO AN ORDER CONFIRMING ATTACHMENT UNDER CPLR §§ 7502 AND 6212, AS INCORPORATED BY FED. R. CIV . P. 64

### A.    ETI's ICSID Arbitration Is A Cause Of Action For Purposes Of CPLR §§ 7502(c) And 6212(a)

As a preliminary matter, ETI shows here that it has satisfied the first requirement for an order of attachment: "that there is a cause of action" as defined by the relevant CPLR provisions. Consistent with the terms of the BIT, as well as the ICSID Convention, ETI submitted its Request for Arbitration to ICSID on October 12, 2007, thereby commencing an arbitration proceeding in that forum. See Sills Dec. ¶ 2 and Exh. A. ETI's arbitration with Bolivia is currently pending. Because CPLR § 7502(c) expressly provides for orders of attachment "in connection with an arbitration that is pending . . . inside or outside this state," ETI has met its burden of showing that there exists a cause of action with respect to which this Court can properly grant relief. See SiVault Sys., 2005 WL 681457, at *4; Sierra USA Commc'ns, Inc. v. Int'l Tel. & Satellite, Corp., 824 N.Y.S.2d 560, 561 (Sup. Ct. N.Y. Cty., 2006); see also CPLR § 7502(c) (providing that "arbitration shall be deemed an action" for purposes of applying article 62 and 63 provisions relating to the time for commencement of an action).

---

[9]    CPLR § 6211(b), which governs motions to confirm attachments, provides that "[u]pon the motion to confirm, the provisions of subdivision (b) of section 6223 shall apply." CPLR § 6223(b) in turn provides that "[u]pon a motion to vacate or modify an order of attachment the plaintiff shall have the burden of establishing the grounds for the attachment, the need for continuing the levy and the probability that he will succeed on the merits."

**B.    ETI Has Shown a Probability of Success On The Merits**

ETI has shown that it is probable that ETI will succeed on the merits in its arbitration claim against Bolivia.

Bolivia repeatedly has violated the express terms of the BIT.  For example, Article 3, paragraph 1 of the BIT provides that "[e]ach Contracting Party shall ensure fair and equitable treatment to the investments of nationals of the other Contracting Party and shall not impair, by unreasonable or discriminatory measures, the operation, management, maintenance, use enjoyment or disposal thereof by those nationals." Sills Dec. Exh. B, Article 3 (emphasis added).  Bolivia has engaged in a months-long campaign of treating ETI unfairly and inequitably, and through its recent issuance of the Nationalization Decree has done more than impair ETI's lawful operation and management of Entel – it has expropriated ETI's property altogether.  As set forth above, it evidently does not intend to pay for the assets it has seized.

Bolivia's actions also violate subsections (a), (b) and (c) of Article 6 of the BIT.  That Article provides:

> Neither Contracting Party shall take any measures depriving, directly or indirectly, nationals of the other Contracting Party of their investments unless the following conditions are complied with:
>
> the measures are taken in the public interest and under due process of law;
>
> the measures are not discriminatory or contrary to any undertaking which the former Contracting Party may have given;
>
> the measures are accompanied by provision for the payment of just compensation.  Such compensation shall represent the genuine value of the investments affected and shall, in order to be effective for the claimants, be paid and made transferable, without undue delay, to the country designated by the claimants concerned and in the currency of the country of which the claimants are nationals or in any freely convertible currency accepted by the claimants.

BIT, Sills Dec. Exh. B, Article 6. (emphasis added).

Given that the Nationalization Decree, in President Morales's words of May 1, takes over Entel "from this moment on," there is no doubt, if there ever was, that ETI has suffered an expropriation of its investment in Entel. Therefore, the only issue to be decided by the ICSID tribunal – to whose jurisdiction Bolivia submitted itself by treaty – is the valuation of ETI's shares. As set out above, these shares are worth hundreds of millions of dollars.

Bolivia, however, has refused to participate in the ICSID proceeding. Instead, the Nationalization Decree announced that Bolivia would pay an amount to be determined in its sole discretion, and without any participation by ETI. The Nationalization Decree goes on to provide that Bolivia will deduct all "financial, tax-based, labor-based commercial and regulatory liabilities" of Entel. Those apparently include, according to the Bolivian government, the $645 million in "irregularities" that Bolivia identified at the April 2007 meetings, including the claim for $60 million in taxes and penalties Bolivia claims in its recent attempt to reverse its own former administrative and judicial approval of Entel's reduction in capital.

Most telling, in a memorandum entitled "Executive Summary – Recuperation of Entel S.A.", the Bolivian government states that its goal is "compensation 0, because of the irregularities found."

ETI's clear right to proceed before ICSID, Bolivia's blatant acts of expropriation, and its evident intention to pay nothing for the shares it has seized are a more than adequate showing of a likelihood of success on the merits. However, even were there merit to Bolivia's apparent claim that ICSID lacks jurisdiction, that would not affect the outcome of this factor. The BIT provides for binding *ad hoc* arbitration should ICSID not be available. Accordingly, were there any infirmity in the ICSID proceeding, ETI would simply pursue an identical claim in arbitration

before an *ad hoc* tribunal.  Because CPLR § 7502(c) allows an order of attachment "in

connection with an arbitration that is pending or that is to be commenced inside or outside this

state," such a proceeding "to be commenced" would constitute a more than sufficient basis for

the relief sought.

Moreover, as a matter of federal law, Bolivia's acts of expropriation are ineffective with

respect to property in the United States.  The rule is that:

> [T]he effect of a foreign act of state affecting property within the
> United States is a question of federal law and that a confiscation
> decree will be given consideration only if the decree is consistent
> with our policy and laws. . . .  We then held that the decree in
> question was not consistent with our law.

> [W]e held that confiscation of the assets of an individual is
> shocking to our sense of justice "even if he wears a crown," and
> pointed out that our Constitution sets itself against such
> confiscations not only by virtue of guarantees of due process and
> the Fifth and Fourteenth Amendments, . . .

Republic of Philippines v. Marcos, 806 F.2d 344, 360 (2d Cir. 1986).

Under that rule, the shareholders of corporations seized in violation of international law

and the norms of due process have been able to recover funds from those corporations' New

York bank accounts.  See, e.g., Bandes v. Harlow & Jones, 852 F.2d 661, 666-67 (2d Cir. 1988).

Accordingly, even if ETI were unable to pursue its claims against Bolivia in arbitration at all, it

would still have a valid claim to the funds on deposit in New York, given the gross violations of

law by Bolivia, and an order of attachment to protect that right would be appropriate.

This showing easily satisfies the second requirement for the issuance of an attachment

under applicable law, See CPLR § 6212(a); See also SG Cowen Sec. Corp., 224 F.3d at 84;

SiVault Sys., 2005 WL 681457, at *4.

C.    **The Amount Demanded From Bolivia
      Exceeds All Just Counterclaims Known To ETI**

To obtain an order of attachment, ETI must also show that the amount demanded from

Bolivia exceeds all counterclaims known to ETI.  See CPLR § 6212(a).  Courts applying this

requirement have recognized that they are only to examine the amount of counterclaims that a

plaintiff concedes are just.  See Bank of Leumi Trust Co. of New York v. Istim, Inc., 892

F.Supp. 478, 482 (S.D.N.Y. 1995).  ETI is not aware of any just counterclaims by Bolivia.  See

Sills Dec. ¶ 12.  ETI's arbitration claim against Bolivia seeks redress for that country's

expropriation of a company valued in the hundreds of millions of dollars.  ETI's claims against

Bolivia therefore far exceed all known counterclaims that Bolivia could assert in good faith

during the arbitration.


D.    **Absent Confirmation Of The Attachment, Any Award To ETI May Be
      Rendered Ineffectual; Therefore A Need For Continuing The Levy Exists**

Courts interpreting CPLR § 7502(c)'s requirement that an applicant for an order of

attachment demonstrate "that the award to which the applicant may be entitled may be rendered

ineffectual without such provisional relief" have considered factors including whether: (1) the

assets subject to attachment are the only viable source of recovery, (2) the defendant's financial

condition makes recovery unlikely, (3) the assets subject to attachment can easily be transferred

outside of the jurisdiction and out of the reach of creditors, and (4) the plaintiff will be unable to

enforce the arbitration award outside of the jurisdiction.  See SiVault Sys., 2005 WL 681457, at

*4; County Natwest, 180 A.D.2d  at 469; Habitations Ltd. v. BKL Realty Sales Corp., 160

A.D.2d 423, 554 N.Y.S.2d 117 (1st Dep't 1990).  It is within the court's discretion to determine

whether, based on the facts submitted, an applicant has made the requisite showing.  Drexel

Burnham, 139 A.D.2d at 326.

ETI satisfies these factors because (1) the Bolivian government has repeatedly stated that no compensation will be paid to ETI for the expropriated Entel shares, and it is unlikely, to say the least, that a Bolivian court would enforce an ICSID award for an amount in excess of the "value" determined by the Bolivian government pursuant to Articles 3 and 4 of Nationalization Decree; (2) the funds on deposit in Entel's New York bank accounts can easily be transferred out of ETI's reach by Bolivia, and Bolivia is taking steps to do so at its first opportunity; and (3) the total pool of assets known to ETI to be available to satisfy an award outside of Bolivia is less than the likely amount of any such award.

Consequently, attachment of Entel's New York bank accounts is of paramount importance to ETI's ability to protect its right to collect even a fraction of any award issued in its favor by ICSID. Without an order attaching those accounts, Bolivia is virtually certain to seek to transfer the funds they contain to Bolivia, or another jurisdiction where they will become impossible for ETI to reach. An order of attachment is therefore appropriate under applicable law.

## II.   THE ENTEL BANK ACCOUNTS IN NEW YORK ARE SUBJECT TO ATTACHMENT

Attachment of Entel's New York bank accounts is permitted by the applicable provisions of CPLR Article 62. That article provides that "[a]ny debt or property against which a money judgment may be enforced as provided in section 5201 is subject to attachment." CPLR § 6202. CPLR § 5201(b), in turn, states that "[a] money judgment may be enforced against any property which could be assigned or transferred. . . ."[10] The bank accounts in question belong to, or

---

[10]     Pursuant to 22 U.S.C. §1650a, an ICSID award "shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States."

constitute a debt owing to, Entel. Entel, as of May 1, 2008, was nationalized by Bolivia pursuant

to the terms of Supreme Decree No. 25944. Entel bank accounts are therefore, properly subject

to attachment in this proceeding. See Capital Ventures Int'l v. Republic of Argentina, 443 F.3d

214, 218-20 (2d Cir. 2006) (holding that a bank account held by a state is property or debt

belonging to that country for purposes of CPLR § 5201). Similarly, because JP Morgan,

Unicredit and Intesa owe a debt to Entel, and hence to Bolivia, for purposes of CPLR § 6214,

those institutions are proper garnishees in the Order of Attachment.[11]

---

[11]    CPLR § 6214 provides that levy may be had "upon any interest of the defendant in
personal property, or upon any debt owed to the defendant . . . ." Accordingly, the banks are
properly named as garnishees in orders of attachment. See Kates v. Marine Midland Bank, N.A.,
541 N.Y.S.2d 925, 927 (Sup. Ct., Monroe Cty., 1989).

## CONCLUSION

For the foregoing reasons, ETI's motion to confirm this Court's May 5, 2008 *Ex Parte* Order of Attachment should be granted in its entirety.


Dated: New York, New York
       May 12, 2008

                                ORRICK, HERRINGTON & SUTCLIFFE LLP

                                By: *[signature]*
                                Robert L. Sills (RS 8896)
                                Steven J. Fink (SF 3497)
                                Ryan S. Lester (RL 5603)
                                ORRICK, HERRINGTON & SUTCLIFFE LLP
                                666 Fifth Avenue
                                New York, New York 101013
                                Telephone: (212) 506-5000
                                Facsimile:  (212) 506-5151

                                Attorneys for Plaintiff E.T.I. Euro Telecom
                                International N.V.