Michael Krinsky (MK4503)
Eric M. Lieberman (EL 4822)
RABINOWITZ, BOUDIN, STANDARD,
   KRINSKY & LIEBERMAN, P.C.
111 Broadway, 11th Floor
New York, New York 10006
Telephone:  (212) 254-1111
Facsimile:  (212) 674-4614

Terry Gross (TG 3249)
GROSS BELSKY ALONSO LLP
180 Montgomery Street, # 2200
San Francisco, California 94104
Telephone:  (415) 514-0200
Facsimile:  (415) 544-0201

*Attorneys for Empresa Nacional de Telecomunicaciones Entel S.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| E.T.I. EURO TELECOM INTERNATIONAL, N.V., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. 08-cv-4247 (LTS) |
| v. | : | |
| | : | |
| REPUBLIC OF BOLIVIA, and EMPRESA NACIONAL DE TELECOMUNICACIONES ENTEL, S.A., | : | **ORAL ARGUMENT REQUESTED** |
| | : | |
| Defendants. | : | |

**EMPRESA NACIONAL de TELECOMUNICACIONES ENTEL S.A.'s
MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO CONFIRM
*EX PARTE* ORDER OF PREJUDGMENT ATTACHMENT**

Of Counsel:
Jules Lobel
3900 Forbes Avenue
Pittsburgh, PA  15260

Adam Belsky
Gross Belsky Alonso LLP

# TABLE OF CONTENTS

<u>Page</u>

ARGUMENT ................................................................................. 3

I.  THE FOREIGN SOVEREIGN IMMUNITIES ACT BARS THE
    PREJUDGMENT ATTACHMENT OF ENTEL'S PROPERTY .................... 3

    A.  The Bolivian State's FSIA Immunities Apply to ENTEL
    Because Plaintiff Seeks to Hold ENTEL Liable on an Award
    Against the Republic of Bolivia ................................................ 3

    B.  The FSIA Applies to ENTEL Because It Is an "Agency or
    Instrumentality" of the Republic of Bolivia ............................... 4

        (1) ENTEL Is an "Agency or Instrumentality" Because
    the Bolivian State Owns a Majority of ENTEL's Shares .................... 5

        (2) ENTEL Is an "Agency or Instrumentality" Because the
    Bolivian State Owns a Majority of ENTEL's "Other Ownership
    Interest" ................................................................................ 5

        (3) ENTEL Is an "Agency or Instrumentality" Because It Is an
    Organ of the Bolivian State ....................................................... 7

    C.  The FSIA Bars the Attachments Because There Has Been No Explicit
    Waiver of the FSIA's Prohibition of Prejudgment Attachment .................. 8

    D.  The FSIA Bars the Attachment Because ENTEL's New York Accounts
    Are Not Being "Used For a Commercial Activity in the United States".. 13

II.  THE ICSID CONVENTION BARS THE PRE-ARBITRAL AWARD
    ATTACHMENT OF ENTEL'S PROPERTY ..................................... 17

III. ENTEL'S PROPERTY MAY NOT BE HELD TO SATISFY AN
    ARBITRAL AWARD AGAINST THE REPUBLIC OF BOLIVIA ............ 20

IV. THE COURT LACKS SUBJECT MATTER JURISDICTION UNDER
    FSIA SECTIONS 1604 AND 1605 ................................................ 24

    A.  The Arbitration Exception Is Inapplicable ................................ 29

    B.  The Waiver Exception Is Inapplicable ..................................... 30

    C.  The Nationalization Exception Is Inapplicable ......................... 32

i

V.  THE FSIA BARS THE ATTACHMENTS BECAUSE THE ATTACHED PROPERTY WOULD BE IMMUNE FROM POST-JUDGMENT EXECUTION ................................................................................. 35

VI. THE COURT LACKS *IN PERSONAM* JURISDICTION OVER ENTEL .... 35

VII. PLAINTIFF HAS NOT MADE THE SHOWING REQUIRED BY CPLR § 7502 ................................................................................. 37

VIII. ENTEL IS ENTITLED TO DAMAGES, ATTORNEYS' FEES AND COSTS ................................................................................. 40

CONCLUSION ................................................................................. 40

## TABLE OF AUTHORITIES

**Page**

<u>Cases</u>

*Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080
   (5th Cir. 2007) ................................................................. 5, 17, 18

*Af-Cap, Inc. v. Republic of Congo*, 383 F.3d 361 (5th Cir. 2004) ........................ 19

*Argentine Republic v. Amerada Hess Shipping*, 488 U.S. 428 (1989)............ 16, 29

*Atlantic Tele-Network, Inc. v. Inter-American Development Bank*,
   251 F. Supp. 2d 126 (D.D.C. 2003) ................................................. 31

*Balentine v. Union Mortgage Co.*, 795 F. Supp. 266 (N.D. Ill. 1992)............... 7, 8

*Banco Nacional de Cuba v. First Nat'l City Bank*, 431 F.2d 394 (2d Cir. 1970),
   *rev'd. on other grounds*, 406 U.S. 759 (1972) ................................................. 34

*Bandes v. Harlow & Jones*, 852 F.2d 661 (2d Cir. 1988)..................................... 29

*Cabiri v. Government of Republic of Ghana*, 165 F.3d 193 (2d Cir. 1999) ......... 14

*Canadian Overseas Ores Ltd. v. Compania de Acero*, 528 F. Supp. 1337
   (S.D.N.Y. 1982), *aff'd*, 727 F.2d 274 (2d Cir. 1984)............................... 33, 34

*Capital Ventures Int'l. v. Republic of Argentina*, 443 F.32d 214
   (2d. Cir. 2006) ................................................................................. 26

*Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012 (2d Cir. 1993) .............. 30

*Compagnie Noga D'Importation et D'Exportation, S.A. v. Russian Federation*,
   361 F.3d 676 (2d Cir. 2004)........................................................................ 7

*Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240
   (5th Cir. 2002) ................................................................................. 17, 18

*Cooper v. Ateliers de la Motobecane, S.A.*, 57 N.Y.2d 408, 456 N.Y.S.2d
   728 (NY 1982) ................................................................................. 15

*De Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir. 1984).....................*passim*

*De Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385 (5th Cir. 1985)....... 34

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003) .................................... 9, 27, 28

*Drexel Burnham Lambert Group Inc. v. Committee of Receivers for Galadari,*
    12 F.3d 317 (2d Cir. 1993).................................................................................. 27

*EIE Guam Corp. v. Long Term Credit Bank of Japan*, 322 F.3d 635
    (9th Cir. 2003) ....................................................................................... *passim*

*El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155 (1999) .................... 21

*EM Ltd. v. Republic of Argentina*, 473 F.3d 463 (2d Cir. 2007)................... *passim*

*Erber v. Catalyst Trading, LLC*, 303 A.D.2d 165 (1st Dep't 2003) ..................... 37

*Filler v. Hanvit Bank*, 378 F.3d 213 (2d Cir. 2004)..................................... 8, 9, 10

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,*
    462 U.S. 611 (1983) .............................................................................. *passim*

*Founders Ins. Co. v. Everest Nat'l Ins. Co.*, 41 A.D.3d 350 (1st Dept. 2007) ..... 37

*French v. Banco Nacional de Cuba*, 23 N.Y.2d 46, 295 N.Y.S.2d 433 (1968).... 34

*Frontera Resources Azerbaijan v. State Oil Co. of the Azerbaijan Republic,*
    479 F. Supp. 2d 376 (S.D.N.Y. 2007)....................................................... 35, 36

*Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006)..................................... 7

*Gates v. Victor Fine Foods*, 54 F.3d 1457 (9th Cir. 1995) .............................. 9, 10

*Greenpeace, Inc. (USA) v. State of France*, 946 F. Supp.
    773 (C.D. Cal. 1996) .................................................................................. 33

*Grove Valve & Regulator Co., Inc. v. Iranian Oil Serv. Ltd.*, 87 F.R.D. 93
    (S.D.N.Y. 1980) ......................................................................................... 36

*Gulf Resources America v. Republic of Congo*, 276 F. Supp. 2d 20
    (D.D.C. 2003), *rev'd on other grounds*, 370 F.3d 65 (D.C. Cir. 2004) .... 31, 32

*Gutch v. Federal Republic of Germany*, 444 F. Supp. 2d 1 (D.D.C. 2006).......... 16

*Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408 (1984) ........... 36

*Hercaire Int'l. Inc. v. Argentina*, 821 F.2d 559 (11th Cir. 1987)........................... 27

*Hirsh v. State of Israel*, 962 F. Supp. 377 (S.D.N.Y. 1997) ................................ 33

*In re Aircrash Disaster Near Monroe, Michigan on January 9, 1997*,
    987 F. Supp. 975 (E.D. Mich. 1997) ............................................................. 7

*In re Bennett Funding Group, Inc.*, 146 F.3d 136 (2d Cir. 1988) ........................ 34

*In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539
    (S.D.N.Y. 2005) ...................................................................................... 9

*Intercontinental Dictionary Series v. De Gruyter*, 822 F. Supp. 662
    (C.D. Cal. 1993) ...................................................................................... 34

*International Ins. Co. v. Caja Nacional De Ahorro Y Seguro*, 293 F. 3rd 392
    (7th Cir. 2002) ........................................................................................ 15

*James v. City of New York*, 95 Dist. LEXIS 14526 (S.D.N.Y. 2003) ................... 23

*Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F. 3d 841 (5th Cir. 2000) ...... *passim*

*L'Europeenne de Banque v. La Republica de Venezuela*, 700 F. Supp.
    114 (S.D.N.Y. 1988) ................................................................................ 27

*Libancell S.A.L. v. Rep. of Lebanon*, 2006 WL 1321328 (S.D.N.Y.
    May 16, 2006) .................................................................................... 15, 17

*Liberian Eastern Timber Corp. v. Republic of Liberia*, 659 F. Supp.
    606 (D.D.C. 1987) ................................................................................... 19

*LNC Investments, Inc. v. Republic of Nicaragua*, 115 F. Supp. 2d 358
    (S.D.N.Y. 2000) ...................................................................................... 27

*Lord Day & Lord v. Socialist Republic of Vietnam*, 134 F. Supp.
    2d 549 (S.D.N.Y. 2001) ........................................................................... 33

*Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298 (D.D.C. 2005) ................. 33

*Maritime Int'l Nominees Estab. v. Republic of Guinea*, 693 F.2d 1094
    (D.C. Cir. 1982) ................................................................................. 20, 31

*McCarthy v. S.E.C.*, 406 F.3d 179 (2d Cir. 2005) ........................................... 8

*Medellin v. Texas*, __ U.S. __, 128 S.Ct. 1346 (2008) ..................................... 21

*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560
    (2d Cir. 1996) ......................................................................................... 35

*Millicom Int'l Cellular, S.A. v. Republic of Costa Rica*, 995 F. Supp.
14 (D.D.C. 1998).................................................................................... 33

*Ministry of Defense v. Cubic Defense Sys., Inc.*, 495 F.3d 1024
(9th Cir. 2007) .................................................................................... 18

*Moore v. National Dist. & Chem. Corp.*, 143 F.R.D. 526 (S.D.N.Y. 1992)......... 14

*Murphy v. Korea Asset Mgmt. Corp.*, 421 F. Supp. 2d 627 (S.D.N.Y. 2005) ........ 8

*Murray v. Union Mortgage Co.*, 1992 WL 247409 (S.D. Ala. Jan. 14, 1992) ....... 8

*National American Corp. v. Federal Republic of Nigeria*, 425 F. Supp.
1365 (S.D.N.Y. 1977) ......................................................................... 36

*Nemariam v. Federal Democratic Republic of Ethiopia*, 491 F.3d 470
(D.C. Cir. 2007) .................................................................................. 34

*New England Merchants Bank v. Iran Power Generation & Trans. Co.*,
502 F. Supp. 120 (S.D.N.Y. 1981).................................................... 14

*O'Connell Mach. Co. v. MV Americana*, 734 F.2d. 115 (2d Cir. 1984) .............. 14

*O'Keefe v. Noble Drilling Corp.*, 2007 WL 2220502 (S.D. Tex.
July 30, 2007)........................................................................................ 7

*Powerex Corp. v. Reliant Energy Serv., Inc.*, ____ U.S. ___, 127 S.Ct.
2411 (2007) .............................................................................. 8, 9, 10

*Reading & Bates Corp. v. National Iranian Oil Co.*, 478 F. Supp. at 728 ........... 14

*Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140 (S.D.N.Y. 2004) .............. 35, 36

*Reino de Espana v. American Bureau of Shipping*, 2006 U.S. Dist.
LEXIS 49545 (S.D.N.Y. 2006) ........................................................ 14

*Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334
(S.D.N.Y. 2005) .................................................................................. 30

*S & S Machinery Co. v. Masinexportimport*, 706 F.2d. 411 (2d Cir. 1983) ......... 13

*Saudia Arabia v. Nelson*, 507 U.S. 349 (1993).................................................... 29

*Security Pacific Nat'l Bank v. Iran*, 513 F. Supp. 864 (C.D. Cal. 1981).............. 14

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co.,*
 *Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d
 572 (2d Cir. 1993) ........................................................................... 31

*Shaffer v. Heitner*, 433 U.S. 186 (1977) ............................................. 37

*Shapiro v. Republic of Bolivia*, 930 F.2d 1013 (2d Cir. 1991) ............... 31

*Skandia American Reinsurance Corp. v. Caja Nacional de Ahorra y Seguro*,
 1997 WL 278054 (S.D.N.Y. May 23, 1997)......................................... 15

*Stephens v. National Distillers & Chem. Corp.*, 69 F.3d 1226 (2d Cir. 1995) ..... 29

*Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176 (1982)...................... 21

*Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d
 300 (2d Cir. 1981)........................................................................... 35

*Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148 (D.C. Cir. 1994)....... 7

*Transmerica Leasing, Inc. v. La Republica De Venezuela*, 200 F.3d
 843 (D.C. Cir. 2000) ........................................................................ 25

*Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Co.*, 204 F.3d
 384 (2d Cir. 2000) .................................................................. 16, 30, 31

*Trans Commodities, Inc. v. Kazakhstan Trading House, S.A.*,
 1997 WL 811474 (S.D.N.Y. May 28, 1997)......................................... 19

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d
 135 (2d Cir. 2001) ........................................................................... 35

*United States v. Atkins*, 869 F.2d 135 (2d Cir. 1989).............................. 8

*United States v. Ingredient Tech. Corp.*, 698 F.2d 88 (2d Cir. 1983).................... 8

*United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000)................................. 8

*United States v. Schmidt*, 935 F.2d 1440 (4th Cir. 1991)........................ 8

*United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991) ........................ 28

*USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190 (3rd Cir. 2003) .................... 8, 9, 10

*Venus Lines Agency v. CVG Industria Venezolana De Aluminio, C.A.*,
 210 F.3d 1309 (11th Cir. 2000)........................................................ 17

v

*Walker Int'l Holdings Ltd v. Republic of Congo*, 395 F.3d 229
  (5th Cir. 2004)................................................................. 5, 18
*Weinberger v. Rossi*, 456 U.S. 25 (1982)............................... 23

*Weston Compagnie de Finance et D'Investissement, S.A. v. Republic
  of Ecuador*, 823 F. Supp. 1106 (S.D.N.Y. 1993) ........................ 19

*Wilk v. Creditanstalt Bankverein Int'l*, 1993 WL 97259
  (S.D.N.Y. Mar. 31, 1993)................................................... 7

*Witham v. VFinance Investments, Inc.*, 2007 WL 4244698
  (Sup. Ct. N.Y. Cty. Nov. 21, 2007)................................... 37

**Statutes**

CPLR § 6202.................................................................. 35
CPLR § 6212(e) ............................................................. 40
CPLR § 7502.............................................................. 37, 38
22 U.S.C. § 1650a......................................................... 20, 24
22 U.S.C. § 2370(e)(2)................................................... 34
Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ..................... 24
Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* ...... *passim*

**Legislative History**

H. Rep. No. 91-1181, 1970 U.S. Cong. & Admin. News 3601, 3602 ................ 24
S. Rep. No. 1374; 1966 U.S. Code Cong. & Admin. News 2617, 2619.............. 24

**Treaties**

Agreement on Encouragement and Reciprocal Protection of
  Investments Between the Kingdom of the Netherlands and
  the Republic of Bolivia ......................................................... *passim*

Convention on the Recognition and Enforcement of Foreign
  Arbitral Awards, 21 U.S.T. 2517, 330 U.N.T.S. 3................................... *passim*

Convention on the Settlement of Investment Disputes Between
  States and Nationals of Other States, 17 U.S.T. 1270,
  575 U.N.T.S. 15 ................................................................ *passim*

**Rules**

International Centre for the Settlement of Investment Disputes,
  Arbitration Rules, Rule 39, www.worldbank.org/icsid.......................... 21, 22

United Nations Commission on International Trade Law (UNCITRAL),
UNCITRAL Arbitration Rules, G.A. Res. 31/98, www.uncitral.org .............. 17

**Other Authorities**

1 ICSID Reports 157 ........................................................................................... 21

Brief for the United States as Intervener, *Maritime Int'l Nominees
Estab. v. Republic of Guinea*, 693 F.2d 1094 (D.C. Cir. 1982),
20 ILM 1436 (1981) ................................................................. 20, 23

Brower, Charles N. & Goodman, Ronald E.M., *Provisional Measures
and the Protection of ICSID Jurisdictional Exclusivity Against
Municipal Proceedings*, 6 ICSID 431 (1991) ............................................. 22

Delaume, Georges R., *ICSID Arbitration and the Courts*, 77 Am. J. of
Int'l Law 784 (1983) ............................................................. 21, 23

Delaume, Georges R., *Judicial Decisions Related to Sovereign Immunity
and Transnational Arbitration*, 2 ICSID Rev. 403 (1987) .............................. 21

O'Neill, Jr., Philip D., *American Legal Developments in Commercial
Arbitration Involving Foreign States and State Enterprises*,
6 J. Int. Arb. 117 (1989) ..................................................... 21, 22

Parra, A.R., *Revised Regulations and Rules*, News From ICSID, Vol. 2/I
p.4 (1985) ........................................................................ 21

Schreuer, Christoph H., *The ICSID Convention: A Commentary* (2001) ....... 20, 23

Shihata, Ibrahim F.I. & Parra, Antonio R., *The Experience of the
International Centre for Settlement of Investment Disputes*,
14 ICSID Rev. 299 (1999) ................................................... 22

Defendant Empresa Nacional de Telecomunicaciones Entel, S.A. ("ENTEL") respect-fully submits this memorandum of law in opposition to plaintiff's motion to confirm the *ex parte* order of prejudgment attachment issued on May 5 and served on May 19, 2008.

ENTEL is Bolivia's state-owned, principal telephone and telecommunications company. Contrary to express statutory and treaty prohibitions never brought to either the Part I judge or this Court's attention, plaintiff has attached ENTEL's New York bank accounts, in the sum of approximately $36 million. With the parallel *ex parte* restraint in London, plaintiff has suc-ceeded in freezing almost all of ENTEL's hard currency and liquid assets.

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1609, 1610(d), categori-cally prohibits prejudgment attachments unless a plaintiff can demonstrate that an "agency or instrumentality of a foreign state" has "explicitly waived" the immunity that protects its property *prior* to judgment. The Republic of Bolivia owns over 97% of the shares of ENTEL, as plaintiff effectively concedes in its papers and as is demonstrated here in any event. For that reason, as well as others, ENTEL is "an agency and instrumentality of a foreign state," since a "majority" of its shares are owned by the foreign state. *See* 28 U.S.C. § 1603(b) (definition of "agency or instrumentality of foreign state"). ENTEL's property is therefore immune from the instant pre-judgment attachment, unless plaintiff can meet its burden of showing an explicit waiver of im-munity. Plaintiff has not even alleged an explicit waiver, and there is none.

Moreover, under the settled law of this circuit, the FSIA's prohibition against prejudg-ment attachments applies because plaintiff is seeking to hold ENTEL's property liable on the award of damages that plaintiff seeks against the *Republic of Bolivia*, in an arbitration proceed-

1

ing that it has brought *exclusively* against the *Republic of Bolivia*.[1]

To the same effect, since plaintiff invoked the Convention On the Settlement of Investment Disputes Between States and Nationals of Other States ("ICSID Convention"), 17 U.S.T. 1270, 575 U.N.T.S. 15, by commencing an ICSID arbitration, plaintiff is precluded from invoking the jurisdiction of this court until completion of the ICSID proceedings. The Convention affirmatively precludes a United States or any national court from ordering pre-arbitral award attachments unless the foreign state expressly consented to such attachments of its own or its agency or instrumentality's property in connection with ICSID proceedings – which is not the case here. The United States has emphatically underscored the imperative of United States courts adhering rigorously to the Convention's prohibition against pre-award attachments.

There are still additional infirmities, each fatal, in plaintiff's effort to obtain prejudgment attachments, as set forth in the sections below.

It is both remarkable and telling that plaintiff, in its *ex parte* application, made no reference to the FSIA at all, or to the ICSID Convention's prohibitions against pre-arbitral award attachments, and that plaintiff makes no such references in its motion to confirm, despite their manifest application.[2] With the burden of showing that the FSIA and Convention's prohibitions are inapplicable because of an explicit waiver, plaintiff's pleadings on their face are insufficient, its motion must be denied, the attachments vacated, and damages and attorneys fees and costs

---

[1] Styled "Complaint For Order of Attachment In Aid of International Arbitration," the action here does not seek any relief other than pre-arbitral award, prejudgment attachments, and does not ask the Court to adjudicate any claim that plaintiff might have against either the Republic of Bolivia or ENTEL.

[2] Indeed, plaintiff in its application for an *ex parte* order of attachment even buried the fact that the Republic of Bolivia is the majority owner of ENTEL's stock, making the FSIA applicable. In its application to the Part I judge, plaintiff prominently emphasized that the Republic of Bolivia had nationalized *50%* of ENTEL's stock but left to a single-sentence footnote on page 6 of the Bertone affidavit the critical fact that Bolivia had previously acquired 47.5% of ENTEL's stock. The Part I judge crossed out the portion of plaintiff's proposed order providing for an attachment against the Republic of Bolivia, presumably because of the FSIA, but ordered the attachment against ENTEL, also protected by the FSIA because of the Republic's *majority* ownership that plaintiff obscured. Plaintiff did not submit a memorandum of law.

awarded to ENTEL. Even putting the plaintiff's burden aside, the result is the same.

By improperly failing to direct the Court's attention to the FSIA and ICSID Convention's provisions in its *ex parte* papers, plaintiff already has achieved the pernicious result that the United States, in adopting the FSIA and ratifying and implementing the ICSID Convention, determined should not be countenanced, *i.e.*, restraint by a United States court on a foreign agency or instrumentality's use of its property prior to an arbitral award and prior to a judicial judgment of liability. It is respectfully submitted that this unfortunate situation requires prompt remedial action by the Court.

## ARGUMENT

### I.    THE FOREIGN SOVEREIGN IMMUNITIES ACT BARS THE PRE-JUDGMENT ATTACHMENT OF ENTEL'S PROPERTY

Section 1609 of the FSIA confers immunity on the property of a foreign state's "agency or instrumentality" as defined by the FSIA, unless one of the exceptions to that immunity established by section 1610 (or section 1611, concerning central bank or military property) applies. Section 1609 provides:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

Section 1610(b) concerns *post*-judgment exceptions to the immunity conferred by § 1609. Section 1610(d) carves out an exceedingly narrow *pre*judgment exception, providing that the property of a "foreign state, as defined in § 1603(a)," "shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States" if, and only if, "the foreign state has *explicitly* waived its immunity from attachment prior to judgment," and the property to be attached is "used for commercial activity in the United States." (emphasis added).

3

In defining a "foreign state," and hence the reach of sections 1609 and 1610(d)'s prohibition against prejudgment attachments, FSIA §1603(a) expressly "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)." Section (b), in turn, defines an "agency or instrumentality of a foreign state" as any entity, not a citizen of the United States or of a third country:

> (1) which is a separate legal person, corporate or otherwise, and

> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof . . . .

### A.    The Bolivian State's FSIA Immunities Apply to ENTEL Because Plaintiff Seeks to Hold ENTEL Liable on an Award Against the Republic of Bolivia

Plaintiff seeks attachment of ENTEL's property to secure the award of "money damages against Bolivia" that it demands in the ICSID arbitral proceedings. Pl. Mem. at 9. Since plaintiff is seeking to hold ENTEL and its property responsible for the *Republic's* debt, the *Republic of Bolivia*'s FSIA immunities apply to ENTEL and its property.

The Second Circuit's decision in *De Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir. 1984) dictates this result. The plaintiffs there attempted to execute a judgment they had obtained against the Republic of Chile against assets owned in New York by LAN Chile, the government-owned airline, arguing that LAN was liable for the Republic's obligation. The court of appeals held that the plaintiffs had not yet carried their burden of overcoming the presumption that LAN, established as a separate corporation, was not responsible for the debts or obligations of the Republic, but stated that "[o]rdinarily we would remand for further evidentiary hearings on the separateness issue." 748 F.2d at 799. It declined to do so, however, holding that, even if the plaintiffs successfully overcame the presumption that LAN could not be held liable for the judgment against the Republic, LAN would then be entitled to invoke the *Republic's* FSIA immunity

4

from execution, which the plaintiffs could not overcome. *Id* at 795-98. The Fifth Circuit also has held that a foreign state's FSIA immunity must be applied to any entity found liable for the state's acts. *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1095 (5th Cir. 2007); *Walker Int'l Holdings Ltd. v. Rep. of Congo*, 395 F.3d 229, 237 (5th Cir. 2004).

Thus, if plaintiff were to show that ENTEL is liable for the ICSID award plaintiff seeks against the Republic - as plaintiff must (and cannot) prove in order to justify attaching ENTEL's assets – then ENTEL is entitled to the same immunity from prejudgment attachment as would be accorded to the Republic.

**B.      The FSIA Applies to ENTEL Because It Is an "Agency or Instrumentality" of the Republic of Bolivia**

By acknowledging that Bolivia nationalized 50% of ENTEL's shares, formerly held by plaintiff, on May 1, 2008, and that another 47.5% of ENTEL's shares were transferred to the Bolivian government in April 2007 – indeed, by alleging that "Entel, as of May 1, 2008 was nationalized by the Bolivia pursuant to the terms of Supreme Decree No. 25944," P. Mem. at 23 – plaintiff has established the FSIA's applicability. In any event, ENTEL shows here that it is an "agency or instrumentality of a foreign state" because it is a separate legal person organized and existing under the laws of Bolivia with its principal place of business in Bolivia, Complaint, ¶ 5, and *each* of the *independently sufficient* grounds for FSIA "agency or instrumentality" status under §1603(b) is met: the Republic owns a "majority" of ENTEL's "shares;" the Republic owns a majority of ENTEL's "ownership interest;" and ENTEL is an "organ" of the Republic.

**(1)      ENTEL Is an "Agency or Instrumentality" Because the Bolivian State Owns a Majority of ENTEL's Shares**

When this action was commenced, the Republic of Bolivia owned more than 97% of ENTEL's shares, as it does now.

First, plaintiff has conceded that, on April 23, 2007, "Supreme Decree 29100 transferred the 47.5% interest of Entel held by two Bolivian pension funds to the Bolivian Government." Bertone Dec. ¶ 17 n.1; P. Mem. at 8 n.6. *See also* Supreme Decree 29100, Ex. A, Castro Dec.; and Ex. M, Salinas Second Dec. (registration of shares).[3]

Second, on May 1, 2008, Supreme Decree No 29544 nationalized the shares held by plaintiff, consisting of 50% of ENTEL's shares. Ex. B, Castro Dec. ("Article 2 – Nationalization. The totality of the stock package held by ETI ... in ENTEL SA is nationalized"). The Decree further stated that "all the shares of [plaintiff (ETI)] shall be transmitted to the Bolivian State under the temporary ownership of the Ministry of Public Works, Services and Housing." *Id.* As plaintiff acknowledges, Supreme Decree 29544 had "immediate effect" (Bertone Dec. ¶ 19; P. Mem. at 10). The next day, May 2, the shares were registered to the Ministry of Public Works, Services and Housing on ENTEL's Share Registry Book. Castro Dec. ¶¶ 4-7, Exs. C-F.

As plaintiff has conceded, the fact that the nationalized shares of ENTEL are held in the name of the Ministry of Public Works, Services, and Housing is of no moment. The 47.5% of the company's shares transferred in April 2007 were likewise transferred to the Ministry of Public Works, Services and Housing, and were so recorded, yet plaintiff properly acknowledges that these were transfers of ENTEL's shares "to the Bolivian Government." Bertone Dec. ¶ 17 n.1; P. Mem. at 8 n.6.[4] Indeed, under settled law, the Ministry is the same as the Bolivian State for FSIA purposes.[5]

---

[3] All references to Declarations are to those submitted by ENTEL in its opposition, except for the Bertone and Sills Declarations, submitted by plaintiff.

[4] Under Bolivia's Constitution, Ex. A, Salinas First Dec., the "Executive Power is exercised by the President of the Republic jointly with the Ministers of State," (Art. 85), who include the Minister of Public Works, Service and Housing (Law 3551 of February 21, 2006, Art. 2, *id.*, Ex. B.) The ministers are "responsible for the acts of administration in their respective branches"(Art. 101). Decrees of the President must be signed by the relevant Minister to be valid (Art. 102). The ministers are authorized to issue Su-

Thus, the Republic of Bolivia owns a majority of ENTEL's shares, and ENTEL is an "agency or instrumentality of a foreign state" entitled to the FSIA's protection.

### (2)    ENTEL Is an "Agency or Instrumentality" Because the Bolivian State Owns a Majority of ENTEL's "Other Ownership Interest"

An entity also is as an "instrumentality of a foreign state" if the state owns a majority of its "other ownership interest." FSIA § 1603(b). As the court explained in *In re Aircrash Disaster Near Monroe, Michigan on January 9, 1997*, 987 F. Supp. 975, 978 (E.D. Mich. 1997), involving an entity in which Brazil owned 33% of the total shares but controlled the company:

> The phrase "other ownership interest" suggests that "ownership" should be used in its normal legal sense where the § 1603 owner of a company enjoys the bundle of rights and powers which an "owner" would be expected to have. Brazil's control over Embraer includes such matters as the ability to appoint Embraer's officers, to set Embraer's corporate policy, and to decide how Embraer should manage its assets. Plaintiffs concede that Brazil controls Embraer. . . . I therefore conclude that Brazil has a § 1603 "other ownership interest" in Embraer. [6]

In *Balentine v. Union Mortgage Co.*, 795 F. Supp. 266, 269 (N.D. Ill. 1992), the court

---

preme Decrees within the scope of their responsibilities (Law 3551, Art. 3). The Ministry of Public Works, Services and Housing's core functions are, *inter alia*, to formulate national strategies of development; promote and negotiate international treaties in cooperation with the Foreign Ministry; design specific norms that permit equitable access to public services; and formulate, execute and evaluate policies of telecommunications, energy and transportation. The Ministry has no separate juridical existence, and does not hold property separately from the Bolivian State. *See Salinas First Dec.*

[5] *See, e.g., Garb v. Republic of Poland*, 440 F.3d 579, 594-97 (2d Cir. 2006) (Ministry of the Treasury is the foreign state because it is "an integral part of Poland's political structure" and its core function is "indisputably governmental"); *Compagnie Noga D'Importation et D'Exportation, S.A. v. Russian Federation*, 361 F.3d 676, 688 (2d Cir. 2004) (reviewing cases, holding "no meaningful legal distinction can be drawn between a sovereign and one of its political organs"); *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994) (Bolivian air force "so closely bound up with the structure of the state" that must "be considered as the 'foreign state' itself"). The Second Circuit noted in *Garb* that no court has ever held that a Ministry does *not* qualify as a "foreign state or political subdivision thereof." 440 F.3d at 597.

[6] *See also, e.g., Wilk v. Creditanstalt Bankverein Int'l*, 1993 WL 97259, at *1-2 (S.D.N.Y. Mar. 31, 1993) (finding majority "other ownership interest" where Austria held 49% of common stock but 71% of voting stock); *O'Keefe v. Noble Drilling Corp.*, 2007 WL 2220502 at *1-2 (S.D. Tex. July 30, 2007).

applied the "ownership interest" prong of FSIA § 1603(b) to find the defendant an "agency or instrumentality" at the time the action was commenced because Finland, the foreign state, "essentially took control" of the corporation prior to commencement of the action, and "began a series of steps that would formalize the nationalization" of the entity, even though "the steps necessary for the acquisition of a majority" of the entity's shares were not completed until later. The court in *Murray v. Union Mortgage Co.*, 1992 WL 247409 (S.D. Ala. Jan. 14, 1992), as discussed in *Balentine*, 795 F. Supp. at 269, reached the same result on the same facts.[7]

These cases control here. As of May 1, the Republic unquestionably "essentially took control" of ENTEL and enjoyed the "bundle of rights and powers which an 'owner' would be expected to have," (*Balentine*, at 269). *See* Castro Dec. ¶ 14 & Ex. H, showing that a shareholders meeting was soon held at which the Ministry (*i.e.,* the Republic) elected an entirely new board of directors. As of May 1, then, ENTEL was an "agency or instrumentality" for that, as well as other, reasons.

### (3)    ENTEL Is an "Agency or Instrumentality" Because It Is an Organ of the Bolivian State

Several federal courts of appeals, including the Second Circuit, have construed the "organ" prong of FSIA § 1603(b).[8] The Third Circuit, which has undertaken the most thorough

---

[7] United States securities and corporate law also recognizes that someone other than the nominal owner of a security is often considered the actual owner. *See, e.g., United States v. Schmidt,* 935 F.2d 1440, 1448 (4th Cir. 1991) ("control over property, rather than documentary title" marks the real owner for tax purposes) (collecting cases); *United States v. Atkins,* 869 F.2d 135, 140 (2d Cir. 1989); *United States v. Ingredient Tech. Corp.,* 698 F.2d 88, 95 (2d Cir. 1983); *United States v. Pirro,* 212 F.3d 86, 94-95 (2d Cir. 2000) ("'Ownership interest'" is a generic term that does not descend to particulars" and cannot be reduced to nominal shareholder ownership); *McCarthy v. S.E.C.,* 406 F.3d 179, 185 (2d Cir. 2005) (entitlement to share profits and losses constituted "ownership interest" in account held in another's name).

[8] *See Filler v. Hanvit Bank,* 378 F.3d 213, 217 (2d Cir. 2004) (*dicta*); *USX Corp. v. Adriatic Ins. Co.,* 345 F.3d 190 (3rd Cir. 2003); *EIE Guam Corp. v. Long Term Credit Bank of Japan,* 322 F.3d 635 (9th Cir. 2003) (also citing earlier Ninth Circuit cases); *Kelly v. Syria Shell Petroleum Dev. B.V.,* 213 F. 3d 841 (5th Cir. 2000). *See also Powerex Corp. v. Reliant Energy Serv., Inc.,* ____ U.S. ___, 127 S.Ct. 2411, 2421 (2007) (Breyer, J., dissenting on other grounds); *Murphy v. Korea Asset Mgmt. Corp.,* 421 F. Supp. 2d

analysis, held that the essence of the definition of "organ" is *control*, in contradistinction to

majority ownership.  Contrasting the Supreme Court's decision concerning majority ownership

of stock in *Dole Food Co. v. Patrickson,* 538 U.S. 468 (2003), the Third Circuit stated in *USX*

345 F.3d at 211:

> The [Supreme] Court rejected a control test under the majority
> ownership prong because the statutory language of the majority
> ownership prong of section 1603(b)(2) makes clear that ownership,
> not control, is required.  On the other hand, the organ prong does
> not speak of ownership.  We find that, although Congress favored
> ownership over control in the majority [stock] ownership prong, its
> use of the word "organ" suggests an emphasis on control under the
> organ prong.

Control, however, does not require congruence or an alter ego relationship.  "An entity

may be an organ of a foreign state even if it has some autonomy from the foreign government."

*EIE Guam Corp.*, 322 F.3d at 640.  Likewise, that an entity is not owned by the government or

engages in commercial activity is not inconsistent with its being an "organ" of the State.  *Id.* at

641; *Gates v. Victor Fine Foods,* 54 F.3d 1457, 1460 (9th Cir. 1995).

Rather, the relevant factors identified by the courts of appeals are:

1.       "The circumstances surrounding the entity's creation [and] the purpose of its ac-

tivities."  *USX,* 345 F.3d at 209.  The courts have inquired whether the foreign state created (or

acquired) the entity to perform a "public function."[9]

2.       The degree of supervision.  *Filler,* 378 F.3d at 217.  Overall supervision, consulta-

---

627, 641 (S.D.N.Y. 2005); *In re Terrorist Attacks on September 11, 2001,* 392 F. Supp. 2d 539, 552-53
(S.D.N.Y. 2005).
[9] *See Filler,* 378 F.3d at 217 ("created the entity for a national purpose"); *EIE Guam Corp.,* 322 F.3d at
640 ("... to carry out Japanese national policy related to revitalization of the financial system ..."); *Kelly,*
213 F.3d at 846, 848 ("for a national purpose:  The development and exploration of Syria's mineral re-
sources . . ."); *USX Corp.,* 345 F.3d at 210, 211 ("an important government interest, namely protecting the
Irish insurance and banking industries from financial disaster and maintaining stability in the Irish econ-
omy"); *Powerex,* 127 S.Ct. at 2425 (Breyer, J.) ( Powerex created "to carry out the specialized tasks of
exporting hydro-generated electric power and of importing power, which it is then to distribute to British
Columbia residents").

tion, power of appointment of some of the governing board or officers, or power to direct actions indirectly support a finding of "organ." *See USX,* 345 F. 3d at 212; *Kelly,* 213 F.3d at 846, 848; *Gates,* 54 F. 3d at 1460-61.

3.    Whether the entity holds exclusive rights to some powers or rights. *Filler,* 378 F.3d at 217: *Kelly,* 213 F.3d at 848; *EIE Guam Corp.,* 322 F. 3d at 640, 641.

4.    "The ownership structure of the entity." *USX,* 345 F. 3d at 209, 213 (Even indirect control over the shares of the entity is highly relevant: "Ireland has complete control over all shares of ICAROM, albeit through a tiered arrangement involving civil servants who hold their interests in trust for the Minister"). *See also Powerex,* 127 S.Ct. at 2426 (Breyer, J.) ("The British Columbian Government . . . has sole beneficial ownership of Powerex").

5.    The level of government financial support. *USX,* 345 F. 3d at 209, 212 ; *EIE Guam Corp.,* 322 F.3d at 640. In *Filler* and *Kelly,* however, the Second and Fifth Circuits did not consider this factor to be relevant. *See Powerex,* 127 S.Ct. at 2426 (Breyer, J.) ("a well-run nationalized firm *should* make a reasonable profit, nor should it have to borrow from the government itself") (emphasis in original).

6.    Whether the foreign state requires the hiring of public employees and pays their salaries. *USX,* 345 F.3d at 209; *Kelly,* 213 F.3d at 846; *Filler* 378 F.3d at 217.

It bears emphasis that at least several of these factors, while relevant, are not necessary, and were not present in every case in which a court found that the entity involved was an "organ" of the foreign state. Thus, in both *USX* and *EIE,* the government did not pay the employees, who were not civil servants. *USX,* 345 F.3d at 212-13; *EIE* 322 F.3d at 641. In *USX* and *Kelly,* the entity had no special obligations or privileges under Irish law. *USX,* 345 F.3d at 213; *Kelly,* 213 F.3d 849. In *EIE,* twenty-nine other Japanese companies were engaged in the same business.

*EIE,* 322 F.3d at 641. Under the case law, the most important factors are control, including as a stockholder, and the foreign state's creation and maintenance of the entity to further an overall national purpose or interest, whether or not it engages in commercial activities.

There can be no doubt that ENTEL qualifies as an "organ" under the FSIA. In December 1965, the Republic created ENTEL by Supreme Decree 07441 to exploit and expand telecommunications services in Bolivia, "so that they may contribute effectively, positively and constantly to the economic and social development of the Nation." (Ex. C, Salinas Second Dec., First Whereas Clause). The country's telecommunications had "ceased to be adequate and sufficient to meet the ever greater demands of public and private activity." *Id.*, Second Whereas Clause. As set forth in the Decree, ENTEL's responsibilities included providing inter-regional and international public telecom service and service in certain urban areas, promoting and directing the modernization and expansion of public telecom services, and advising and cooperating with the state and state agencies on telecommunications. *Id.*, Article 4. *See also* Supreme Decree 29101 (Ex. A, Castro Dec.) ("ENTEL [was] created on December 22, 1965, with the purpose of developing telecommunications in the national territory"). The President of the Republic appointed the Chair of ENTEL's Board of Directors, and government ministers appointed four other directors; five were appointed by other stockholders. Supreme Decree 07441, Article 9. The "public sector" contributed at least 51% of the capitalization. *Id.*, Articles 13, 14.

In October, 1968, the Republic determined that ENTEL would install and operate *all* National Telecommunications Services. Supreme Decree 08527 (Ex. D, Salinas Second Dec.) In June 1970, Supreme Decree 09250 converted ENTEL into an entirely state-owned enterprise. Ex. E, Salinas Second Dec. ENTEL built, and still owns and operates, the "backbone" upon which the country's inter-regional and international telecommunications systems are based. Flo-

res Carpio Dec. ¶¶ 7 and 8.

In 1995, Supreme Decree 24025 (June 7, 1995) transformed ENTEL into a "mixed econ-omy society" in accordance with the Capitalization Act, Law No. 1544 (March 1994). Salinas Second Dec., ¶ 9 & Exs. G, H, and I. Fifty percent of the shares of ENTEL were transferred to plaintiff, along with the power to appoint a majority of the Board and to manage the company. (The State gave a 47.4671%, interest in ENTEL to pension funds for senior citizens.) Salinas Second Dec. ¶ 24. Law 1600 of the Sectorial Regulation System ("SIRESE"), created a Superin-tendent to regulate telecommunications, as well as Superintendents over the other sectors consid-ered critical to the national and public interest: hydrocarbons, transport, water and electricity. SIRESE provided that the Superintendents had the power of "intervention of companies under his regulatory jurisdiction and to appoint the state interventors according to sectional legisla-tion." Salinas Second Dec. ¶ 29 and Ex. N. Law 1632 of Telecommunications provided for in-tervention by the Superintendent of Telecommunications "when the continuity of the provision of Telecommunications Service to the people is at risk." *Id.* ¶ 31 and Ex. L.

By Supreme Decree No. 29101, of April 23, 2007, and Supreme Decree No. 29544, of May 1, 2008, Bolivia took back ownership of more than 97% of ENTEL's shares. The Decrees cite "national independence and the development of the country." Exs. A and B, Salinas Second Dec. Supreme Decree No. 29544 requires that the State's dividends from the 50% nationalized stock be re-invested in ENTEL and allocated to foster the technological development and growth of the company "*in accordance with the National Development Plan.*" Ex. B, Salinas Second Dec. (emphasis added). The balance of the State's dividends must be allocated to pensions for Bolivia's senior citizens. *Id.* As 97% shareholder, the State elects the Board of Directors. Castro Dec. ¶ 14 and Ex. H.

It thus is beyond peradventure that ENTEL is a FSIA "organ" of the Republic. It was created to perform a critical national public function, to establish and maintain a viable telecommunications system for the country. It has continued to perform that function. As a stockholder, the Republic exercises control through election of the Board of Directors. By virtue of the initial capitalization and the mandatory reinvestment of dividends, there is significant governmental financial support. For a long period of time, ENTEL, by law, was alone authorized to install and operate national telecommunications services, and it still provides the "backbone" for inter-regional and international service, as well as being the largest provider.

### C.    The FSIA Bars the Attachments Because There Has Been No Explicit Waiver of the FSIA's Prohibition of Prejudgment Attachment

As Section 1610(d) plainly states, the FSIA's prohibition against prejudgment attachment is inapplicable only when there has been an *explicit* waiver of that immunity. In *S & S Machinery Co. v. Masinexportimport*, 706 F.2d. 411, 416 (2d Cir. 1983), the Second Circuit emphasized that:

> [A] waiver of immunity from prejudgment attachment must be explicit in the common sense meaning of that term: the asserted waiver must demonstrate unambiguously the foreign state's intention to waive its immunity from prejudgment attachment in this country. We do not take lightly the congressional demand for explicitness. It would be improper for a court to subvert this directive by substituting a judicially reconstituted gloss on a facially unclear document for an unequivocal waiver by the foreign state.

Thus, in *S & S Machinery Co.,* the Circuit held that a "Business Facilitation" Clause in the United States-Romania trade agreement providing that state enterprises "shall not claim or enjoy immunities from suit or execution of judgment or other liability in the Territory of the other Party with respect to commercial or financial transactions" did *not* constitute an explicit waiver of immunity from prejudgment attachment. *Id.* at 417. Similarly, the Second Circuit, this

13

court, and other courts unanimously have held that provisions in bilateral Treaties of Amity or

Friendship, such as exist between the United States and numerous other foreign states, that con-

tain waivers of "immunity from suit, execution or judgment, or any other liability," are not ex-

plicit waivers of immunity from prejudgment attachment.[10]

A waiver of immunity for an "agency or instrumentality of a foreign state" (hereafter

sometimes "instrumentality" for convenience) may be effected either by the instrumentality it-

self, or by the government of the foreign state on behalf of its instrumentalities. In the latter con-

text, however, the state's waiver of the immunities of the instrumentality must be clear and spe-

cific, and with respect to a waiver of attachment, must be explicit. Thus, in *EM Ltd. v. Republic*

*of Argentina,* 473 F.3d 463 (2d Cir. 2007), the Circuit held that the Republic's explicit waiver of

its immunities, including explicitly its immunity from prejudgment attachment, *id.* at 468, did

not extend to its instrumentalities *(id.* at 485, emphasis added) :

> [A]lthough the Republic's waiver of immunity from attachment is
> worded broadly, it does not appear to *clearly and unambiguously*
> waive BCRA's immunity from attachment, as it must do in order
> to be effective.

Plaintiff has not even attempted to show that Bolivia or ENTEL has "explicitly waived,"

FSIA § 1610(d), ENTEL's immunity from prejudgment attachment. As this Court has recog-

nized, "the plaintiff has the burden of going forward with evidence showing that, under excep-

tions to the FSIA, immunity should not be granted." *Reino de Espana v. American Bureau of*

*Shipping,* 2006 U.S. Dist. LEXIS 49545 at 3 (S.D.N.Y. 2006), *quoting Cabiri v. Government of*

---

[10] *O'Connell Mach. Co., Inc. v. MV Americana,* 734 F.2d. 115 (2d Cir. 1984); *Security Pacific Nat'l Bank v. Iran,* 513 F. Supp. 864, 879-80 (C.D. Cal. 1981); *New England Merchants Bank v. Iran Power Generation & Trans. Co.,* 502 F. Supp. 120, 126-27 (S.D.N.Y. 1981); *Reading & Bates Corp. v. National Iranian Oil Co.,* 478 F. Supp. 724 (S.D.N.Y. 1979). To similar effect, *see Moore v. National Dist. & Chem. Corp.,* 143 F.R.D. 526, 535 n.9 (S.D.N.Y. 1992) (holding no explicit waiver of immunity from prejudgment attachment in agreement to "submit to the jurisdiction of any Court of competent jurisdiction within the United States and [to] comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court").

*Republic of Ghana*, 165 F.3d 193, 196 (2d Cir. 1999). The plaintiff having failed to meet its burden, the attachments must be vacated forthwith. The plaintiff should not be permitted to hide in the weeds by not even acknowledging the FSIA and its burdens under it, only to attempt to ambush the defendants with new arguments on reply.

In any event, such an ambush would be to no avail, as there is no explicit waiver. The Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, 330 U.N.T.S. 3 (the "New York Convention") is inapplicable to ICSID arbitrations, as shown in Point II below. In any event, as Judge Baer held in *Libancell S.A.L. v. Rep. of Lebanon*, 2006 WL 1321328 (S.D.N.Y. May 16, 2006), a State, by becoming party to the New York Convention, does not "explicitly waive" FSIA immunity from prejudgment attachment and FSIA immunity from prejudgment attachment therefore remains intact despite adherence to the New York Convention. On its face, the Convention's Article VI merely provides that *if an arbitrator has made an award* and the losing party applies to a court of competent jurisdiction to set the award aside, that court may order that party to give suitable security before proceeding to the merits. *Id.* at *4. Article VI does not explicitly provide for prejudgment attachment of a party's assets *prior* to issuance of an arbitral award. *Id.* [11] In *Skandia American Reinsurance Corp. v. Caja Nacional de Ahorra y Seguro*, 1997 WL 278054, at *5, n.10 (S.D.N.Y. May 23, 1997), now Chief Judge Wood expressed the view that the Convention does not constitute an explicit waiver of immunity.[12]

---

[11] *See also Cooper v. Ateliers de la Motobecane, S.A.*, 57 N.Y.2d 408, 456 N.Y.S.2d 728, 731, 732 (NY 1982) (dissent and majority agree "that the UN Convention speaks only in terms of post-award security" and "does not specifically address the subject of pre-award attachment").

[12] The only cases to apply Article VI to foreign sovereigns or their instrumentalities involve efforts to require a defendant to post security in a judicial proceeding brought to confirm an arbitration award already made. *Skandia, supra; International Ins. Co. v. Caja Nacional De Ahorro Y Seguro*, 293 F. 3rd 392 (7th

No court has applied Article VI to a foreign sovereign, its agency or instrumentality, in the absence of an extant arbitral award or order.  This Circuit has recognized the distinction between a state's waiver in the NY Convention to the enforcement of *an extant arbitral award* and claims that the Convention waives other FSIA immunities.  *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 391 (2d Cir. 2000).

Nor did Bolivia explicitly waive immunity from prejudgment attachment by adhering to The Agreement on Encouragement and Reciprocal Protection of Investments Between the Kingdom of the Netherlands and the Republic of Bolivia  (known as a Bilateral Investment Treaty, or "BIT") (*see* Ex. B, Sills Dec. In Support of Pl.'s Motion), including its reference to arbitration before ICSID, or Bolivia's previous adherence to the ICSID Convention (subsequently renounced).  The BIT is silent on immunities and, as we show in Point II, the ICSID Convention, far from expressly allowing pre-award attachments, *precludes* plaintiff from seeking relief in another forum prior to an ICSID award.  ICSID Convention, Article 26 unequivocally provides:

> Consent of the Parties to arbitration under this Convention shall, unless otherwise stated, be deemed consent to such arbitration *to the exclusion of any other remedy*." [emphasis supplied]

Article 47 of the ICSID Convention provides further confirmation of this point:

> Except as the parties otherwise agree, the Tribunal may, if it considers that the circumstances so require, recommend any provisional measures which should be taken to preserve the respective rights of either party.

---

Cir. 2002).  Those cases, and Article VI of the Convention, are inapplicable to this case, where no arbitration award has been rendered.

For the same reason, plaintiff could not argue that the FSIA's exception for international agreements to which the United States was a party at the time of its enactment (1976) applies to this case.  That exception only applies "when international agreements 'expressly conflict' with the immunity provisions of the FSIA. . . ."  *Argentine Republic v. Amerada Hess Shipping,* 488 U.S. 428, 442 (1989) (quoting H.R. Rep. at 17; S. Rep. at 17); *Gutch v. Federal Republic of Germany,* 444 F. Supp. 2d 1, 13 (D.D.C. 2006) ("for the plaintiff to successfully assert the existing agreement exception, a direct conflict must exist between a pre-existing international agreement and the immunity provisions of the FSIA").  In this case, Article VI, on its face, is simply inapplicable and nothing in the New York Convention "*expressly* conflicts" with the FSIA's mandate that ENTEL be accorded immunity from prejudgment attachment.

16

Article 47 permits *an ICSID Tribunal* to provide for security to preserve the rights of either party. In *Libancell,* the plaintiff argued that a broader provision in the UNCITRAL arbitration rules constituted an explicit waiver of immunity from a *court-ordered* prejudgment attachment.[13] Judge Baer rejected the argument, because there, as here, "no such order was issued by any arbitrator," *Libancell*, 2006 WL 1321328, at *5, and the UNCITRAL rule was not an explicit waiver of immunity from prejudgment judicial attachment.

There has been no explicit waiver of immunity from prejudgment attachment. The attachments must be vacated.

### D.     The FSIA Bars the Attachment Because ENTEL's New York Accounts Are Not Being "Used For a Commercial Activity in the United States"

While the explicit waiver requirement is dispositive, there also can be no prejudgment attachment here because the accounts are not being used for a commercial activity in the United States. Even when there is a waiver, FSIA §1610(d) applies only when the property to be attached is "used for a commercial activity in the United States." *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 472-73, 484 (2d Cir. 2007).

Mere presence of the property in the United States is not enough to satisfy this condition. *Venus Lines Agency v. CVG Industria Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1311, 1313 (11th Cir. 2000). Rather, the property must be *used* for a commercial activity within U.S. borders. *Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 251 (5th Cir. 2002) (what matters under the statute is not how the sovereign made its money, but where and how it

---

[13] The UNCITRAL rules, Art. 26 (U.N.G.A. Res. 31/98, www.uncitral.org), provide that:
   1) At the request of either party, the arbitral tribunal may take any interim measures it deems necessary in respect of the subject-matter of the dispute...
   2) Such interim measures may be established in the form of an interim award...
   3) A request for interim measures addressed by any party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate, or as a waiver of that agreement.

spends it). *See also id.* at 254. Thus, in *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd*, 475 F.3d 1080, 1095 (9th Cir. 2007), the court concluded that payment obligations owed by United States companies to the Congo were not used for a commercial activity within the United States because there was no evidence that the Congo was putting the obligations or payments in the service of a commercial activity in the United States, but rather was sending the payments to the Congo. *See also Ministry of Defense v. Cubic Defense Sys., Inc.*, 495 F.3d 1024, 1036-37 (9th Cir. 2007) (Iran intended to send proceeds of arbitration award back to Iran for assimilation into its ministry's general budget); *Walker Int'l Holdings Ltd. v. Republic of Congo*, 395 F.3d 229, 236 (5th Cir. 2004) (no evidence showing how the payments at issue are actually used).[14]

Plaintiff has not met its burden of establishing that the "used for a commercial activity in the United States" requirement is met. Indeed, plaintiff has pled that the funds at issue are "excess cash [and] . . . are not the general operating funds of the company." Bertone Dec. ¶ 36. This admission by itself is sufficient to demonstrate that none of these funds are being used for commercial activity in the United States. This is confirmed by the First Declaration of Lorena Molina that the funds at two of the New York accounts, at Banco Intesa and Banco Unicredito, are repatriated to Bolivia. The funds at the third, one of ENTEL's two JP Morgan accounts (the 757 account), are not used to make payments at all, but are repatriated, transferred to the Intesa or Unicredito or foreign accounts, or transferred to the other JP Morgan account. *Id.* Thus, there is no possible argument that any of the funds in these accounts are used for a commercial activity in the United States.

---

[14] *CBC, AF-Cap, MOD,* and *Walker* address post-judgment attachment under 28 U.S.C. § 1610(a), rather than prejudgment attachment under 28 U.S.C. § 1610(d), but the requirement that the property sought to be attached is being "used for a commercial activity in the United States" applies to both sections. *See EM Ltd.*, 473 F.3d at 472-73 ("[u]nder subsections 1610(a) and (d), assets of a foreign state can be attached only *if the assets sought to be attached* are 'used for a commercial activity the United States'").

Only the second JP Morgan account (the 752 account) arguably has been used to support commercial activities *in the U.S.*, and then only in small part:  in 2008, of $4,423,697 in total funds in the account, $1,400,000 was paid from that account to suppliers in the U.S.  Molina First Dec.  Moreover, the funds paid to U.S. suppliers have already been expended; inasmuch as the remaining funds in the JP Morgan 752 account are not being used for commercial activity in the U.S., no basis exists for any claim that they come within the ambit of FSIA § 1610(d).[15]

That the funds at issue are held in interest-bearing accounts does not alter their immunity from attachment. Otherwise, all foreign sovereign bank deposits in the United States would be subject to attachment irrespective of how and where the funds are being used, an interpretation that would have dire consequences for the U.S. economy and the global financial system.  That, however, is not the law, as the Second Circuit held in *EM Ltd.*  There, plaintiffs had sought pre- and post-judgment attachment of bank accounts held by the central bank of Argentina at the Federal Reserve Bank of New York and various commercial New York banks.  *EM Ltd.*, 473 F.3d at 465 & n.1.  Despite this, the court held that these deposits were not being used for a commercial activity in the United States, based on its analysis of how the funds were being *used*.  *Id.* at 480-85.  The fact that the funds were being held in interest bearing accounts in the United States had no bearing on the Circuit's analysis.  Similarly, in *Trans Commodities, Inc. v. Kazakhstan Trading House, S.A.*, 1997 WL 811474, at *2 (S.D.N.Y. May 28, 1997), this district held that the pro-

---

[15] Even if a portion of this account could be viewed as being used for commercial activity in the United States, that does not mean that the entire account loses its immunity; rather, only those funds actually used for a commercial activity lose their immunity while the remainder of the account retains its immunity. *Weston Compagnie de Finance et D'Investissement, S.A. v. Republic of Ecuador*, 823 F. Supp. 1106, 1114 (S.D.N.Y. 1993); *see also Af-Cap, Inc. v. Republic of Congo*, 383 F.3d 361, 370 & n.9 (5th Cir. 2004); *Liberian Eastern Timber Corp. v. Republic of Liberia*, 659 F. Supp. 606, 610 (D.D.C. 1987). Thus, since in 2008 only 31.6% of the funds in the JP Morgan 752 account were used to pay U.S. suppliers, only 31.6% of that account at most satisfies the "used for commercial activity in the United States" requirement of section 1610(d).  Even those funds cannot be attached, however, because there has been no explicit waiver of immunity, as required by section 1610(d).

ceeds of a $200 million bond offering by the Republic of Kazakhstan held by a New York bank

acting as an underwriter for the bond were not being used for a commercial activity in the United

States under Section 1610(a) because the proceeds were to be returned to Kazakhstan.

## II.    THE ICSID CONVENTION BARS PRE-ARBITRAL AWARD ATTACHMENT OF ENTEL'S PROPERTY

The attachments also must be vacated because they are precluded under the ICSID Con-

vention.  The ICSID Convention is a multinational treaty that creates an autonomous arbitration

process designed to operate to the exclusion of domestic courts.  Christoph H. Schreuer, *The IC-

SID Convention: A Commentary* 347 (2001) ("Schreuer").  The United States has ratified the

Convention and enacted implementing legislation, 22 U.S.C. § 1650a, to give full effect to its

provisions, including judicial recognition and enforcement of ICSID awards.  The United States'

longstanding position is that "the ICSID process is *a distinct, international method* of dispute

resolution" which "provides a role for the domestic legal process *only* in the enforcement of IC-

SID awards."  Brief for the United States as Intervener, *Maritime Int'l Nominees Estab. v. Re-

public of Guinea*, 693 F.2d 1094 (D.C. Cir. 1982), 20 ILM 1436, 1483, 1484 (1981) (emphasis

added) ("U.S. Brief").

Plaintiff has initiated ICSID arbitration against Bolivia pursuant to the Bolivia – Nether-

lands BIT, which provides for the referral of investment disputes to ICSID for arbitration ("if

both parties have acceded to" the ICSID Convention).  The ICSID arbitration is therefore quite

different from an ordinary commercial arbitration between private parties.  Critically, Article 26

of the ICSID Convention provides that the "consent of the parties to arbitration under this con-

vention, shall, unless otherwise stated, be deemed consent to such arbitration to *the exclusion of

any other remedy*." (emphasis supplied.)

The United States has long maintained that "national remedies (are) unavailable" once an

investor has initiated an ICSID arbitration. U.S. Brief at 1476. Courts must give that United States interpretation "great weight."[16] There is simply "no role for domestic courts in ICSID arbitration prior to an award;" the "sole role of domestic courts relates to the recognition and enforcement of awards." Philip D. O'Neill, Jr., *American Legal Developments in Commercial Arbitration Involving Foreign States and State Enterprises*, 6 J. of Int'l Arb. 116, 117 (1989); Georges R. Delaume, *ICSID Arbitration and the Courts*, 77 Am. J. of Int'l Law 784, 785 (1983).

The ICSID Convention's prohibition against resort to domestic courts except to enforce an award (Article 26) applies specifically to prejudgment attachments. Article 47 of the Convention and ICSID Rule 39 (www.worldbank.org/icsid) implementing that Article permit parties to seek provisional remedies *from an ICSID Arbitral Tribunal*, but preclude parties, absent prior consent, from seeking such remedies *in domestic courts*. Pursuant to Article 47, Rule 39(1) provides that "at any time during the proceeding a party may request that provisional measures for the preservation of its rights be recommended by the Tribunal." In 1984, Rule 39(6) was added to provide:

> Nothing in this Rule shall prevent the parties, *provided that they have so stipulated in the agreement recording their consent*, from requesting any judicial or other authority to order provisional measures, prior to the institution of the proceeding, or during the proceeding, for the preservation of their respective rights and interests. (emphasis supplied)

When ICSID's Administrative Council unanimously amended ICSID's rules in 1984 to add Rule 39(6), it did so expressly to clarify that a domestic court could only order provisional remedies if the parties have expressly agreed to them in their consent to arbitration.[17] ICSID

---

[16] It is "well settled that the United States' interpretation of a treaty 'is entitled to great weight'." *Medellin v. Texas,__ U.S. __*, 128 S.Ct. 1346, 1361 (2008), *citing Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982); *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 168 (1999).

[17] 1 ICSID Reports 157, 171; A.R. Parra, Revised Regulations and Rules, News From ICSID, Vol. 2/1 p. 4, 6 (1985); P.D. O'Neill, *American Legal Developments in Commercial Arbitration Involving Foreign*

explained that the

> new provision has been introduced to further clarify that consent to ICSID
> is exclusive of any other remedy (including provisional or conservatory
> measures sought from municipal courts) and that the only case in which
> the parties may request from a judicial or other authority provisional
> measures is that in which the parties would have stipulated in the agree-
> ment recording their consent.

O'Neill, *supra* at 127 (quoting Administrative Council). *See also* Ibrahim F.I. Shihata & Anto-

nio R. Parra, *The Experience of the International Centre for Settlement of Investment Disputes*,

14 ICSID Rev. 299, 324 (1999);  Charles N. Brower & Ronald E.M. Goodman, *Provisional*

*Measures and the Protection of ICSID Jurisdictional Exclusivity Against Municipal Proceed-*

*ings*, 6 ICSID 431, 435-36 (1991) (quoting Administrative Council and adding that Rule 39(6)

reflects a "consensus of national courts and publicists").  The rule is so unambiguous and univer-

sally accepted that counsel has been unable to find any case arising out of an ICSID arbitration

initiated after Rule 39(6)'s adoption in which a party requested prejudgment attachment or other

security before a national court.

There is no stipulation in either the BIT or Bolivia's agreement to join the ICSID Con-

vention waiving Bolivia's immunity from judicially ordered provisional remedies.  No provision

of the BIT, including Article 9 (which provides for arbitration), mentions provisional remedies or

conservatory measures such as pre-award or prejudgment attachments.  ICSID Rule 39(6) there-

fore prohibits plaintiff's attempt to use this Court to attach ENTEL's assets.

Plaintiff elected to invoke ICSID arbitration, "thereby commencing an arbitration pro-

ceeding in that forum." P. Mem. at 17.   Indeed, as plaintiff recognizes, Complaint ¶ 24, Bolivia

offered non-ICSID arbitration to plaintiff as an alternative to an ICSID proceeding, an offer that

was consistent with Bolivia's obligations under the BIT.  Plaintiff chose not to accept that offer,

---

*States and State Enterprises*, 6 J. Int. Arb. 117, 127 (1989); Georges R. Delaume, *Judicial Decisions Re-*
*lated to Sovereign Immunity and Transnational Arbitration*, 2 ICSID Rev. 403, 420 (1987).

but instead initiated an ICSID proceeding. Having chosen to pursue an ICSID remedy, plaintiff is now precluded by the ICSID treaty from pursuing provisional measures in a domestic court. *Cf., James v. City of New York*, 95 Dist. LEXIS 14526 (S.D.N.Y. 2003) (Swain, J.) (plaintiff who elects to file complaint under NYS Human Rights law with Commission on Human Rights is precluded from filing a federal lawsuit under the election of remedies provision of that law).

There is nothing in the ICSID Convention or Rules modifying the exclusive nature of the ICSID remedy when ICSID's jurisdiction to decide a dispute is in doubt, contested, or where one party is uncooperative. As the principal commentary on the Convention notes: "Even in the face of an uncooperative party, ICSID arbitration is designed to proceed independently without the support of domestic courts." Schreuer, *supra*, at 347. ICSID has the power to proceed in the absence of a party to impanel a tribunal that would decide whether jurisdiction exists, to issue enforceable default judgments and to itself decide whether provisional remedies such as pre-award attachment are appropriate. ICSID Convention, Art. 45(2), Art. 47. As the United States has stressed, where ICSID jurisdiction is contested or disputed by one party (as in this case), a domestic court must not take any action until ICSID definitively decides that it does not have jurisdiction over the dispute. U.S. Brief at 1475-79.

As the United States has emphasized, that national courts refuse to issue attachments in aid of an ICSID arbitration is "necessary not only to accord proper deference to ICSID and the multilateral treaty structure establishing it, but also to eliminate any basis for assertion of an international claim against the United States for improper exercise of jurisdiction over a case within ICSID's exclusive jurisdiction," U.S. Brief at 1481. *See also Delaume*, 77 A.J.I.L. at 785 (a court's action contrary to Convention's rule might expose its own state to an international claim before the International Court of Justice). Under settled law, this court should not place

the United States in violation of its international treaty obligations. *See e.g., Weinberger v. Rossi*, 456 U.S. 25, 32 (1982). Only in the event that ICSID determines that it does not have jurisdiction over a dispute can a domestic court arguably take any action without violating the ICSID Convention.

Congress recognized the exclusivity and independence of ICSID arbitration when it enacted 22 U.S.C. § 1650a, implementing the ICSID Convention. Section 1650a expressly provides that the Federal Arbitration Act – Chapter 2 of which implements the New York Convention – "shall not apply to enforcement" of ICSID awards.[18] Congress understood that ICSID is different than and in some ways inconsistent with other arbitration regimes. S. Rep. No. 1374; 1966 U.S. Code Cong. & Admin. News 2617, 2619.

In addition, Article VII of the New York Convention itself provides that its rules do not override or negate provisions of other treaties, such as ICSID: the "provisions of the present Convention shall not affect the validity of multilateral or bilateral agreements concerning the recognition and enforcement of arbitral agreements entered into by the Contracting States."

Plaintiff has elected to proceed pursuant to an ICSID process that, by the ICSID Convention and Rules, explicitly requires that it forego resort to domestic courts until an award is rendered. Having sought the benefits of the ICSID process, plaintiff is bound by ICSID's preclusion of resort to judicial remedies, including pre-award attachment.

### III.  ENTEL'S PROPERTY MAY NOT BE HELD TO SATISFY AN ARBITRAL AWARD AGAINST THE REPUBLIC OF BOLIVIA

In *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611 (1983) (popularly known as the *"Bancec"* case), the Supreme Court held that state-owned for-

---

[18] The legislation implementing the New York Convention in 1970 was "added to the Federal Arbitration Act (Title 9, U.S.C.)." House Rpt. No. 91-1181, Judiciary Comm. (June 11, 1970), 1970 U.S. Cong. & Admin. News 3601, 3602.

eign corporations, established with separate juridical personality, will not be held responsible for the debts and obligations of the foreign state, absent limited, exceptional circumstances. *Id.* at 626-27. The Court established a strong "presumption" in favor of honoring a state-owned corporation's separate juridical status that a plaintiff must overcome. *Id. at* 628; *see also, e.g., De Letelier v. Republic of Chile*, 748 F.2d 790, 795 (2d Cir 1984) ("both *Bancec* and the FSIA legislative history caution against too easily overcoming the presumption of separateness").

*Bancec* is fully applicable when a plaintiff seeks to seize the assets of the state-owned corporation to satisfy a judgment (or, as here, to secure satisfaction of a possible judgment) against the foreign state. In *Letelier,* "[w]e [the Second Circuit] interpreted *Bancec* to establish a presumption that *assets of a foreign government instrumentality could not be executed upon to satisfy a judgment against a parent foreign government.* That presumption could be overcome *only* if the party seeking attachment *carried its burden* of demonstrating that the instrumentality's separate juridical status was not entitled to recognition." *EM*, 473 F.3d at 477 (emphasis added).

Under Bolivian law, ENTEL is a corporation with its own juridical personality and property – including the attached New York bank accounts - and it is not responsible for the debts and obligations of the Republic of Bolivia. Complaint, ¶ 5; Salinas Second Dec., *passim.* Under *Bancec* and its progeny, ENTEL cannot be held responsible on the arbitral award (or any confirming judicial judgment) that plaintiff seeks against the Republic of Bolivia.[19]

Plaintiff has not even tried to meet its burden of overcoming the *Bancec* presumption, and could not do so if it did.

---

[19] *See* Salinas Second Dec. for a description of ENTEL. The foreign State's ownership of all the shares of a corporation and its ability to appoint its directors, the corporation's dedication by law to a public service, and the corporation's operation under the supervision of a ministry do not weigh against application of the *Bancec* principle; to the contrary, these and the other features of ENTEL conform to the Supreme Court's description of a "typical governmental instrumentality" within the *Bancec* rule's protection. *Bancec*, 462 U.S. at 624; *see also Transmerica Leasing, Inc. v. La Republica De Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000); *EM*, 473 F.3d at 479 n.15; *Letelier,* 748 F.2d at 794.

Plaintiff betrays both its recognition of the obstacles posed by *Bancec* and its utter inability to overcome them by its preposterous citation to *Capital Ventures Int'l. v. Republic of Argentina*, 443 F.3d 214 (2d. Cir. 2006), as its sole authority for holding ENTEL liable on plaintiff's claims against the Republic. In *Capital*, no question of separate entity was even presented; only the Republic of Argentina was involved. Plaintiff sought to attach United States and German bonds *owned by the Republic* that were placed by the Republic with a New York bank as collateral to secure the Republic's own issue of bonds. Under the security agreement, the Republic had the right to reversion of its bonds in certain circumstances, and the Court of Appeals held that the plaintiff could attach the Republic's reversionary interest. Nothing in *Capital Ventures* supports plaintiff's efforts to attach ENTEL's assets here.

The appointment of a temporary Intervenor on May 1, 2008, Complaint ¶ 27; Salinas Second Dec., ¶37 and Ex. C, does nothing to alter the application of *Bancec*. Bolivia created the current regulatory authority, including Intervention authority, over the telecommunications sector at the same time it privatized ENTEL, then a state-owned company, in 1995. By Supreme Decree No. 24132, Ex. O, Salinas Second Dec., the then-President created the Office of Superintendent of Telecommunications ("Superintendent") "to regulate activities in the telecommunications sector throughout the entire national territory." Art. 1. The 1995 Decree granted the Superintendent the authority to order "preventive intervention" of any telecommunications company through the Superintendent's appointment of an Intervenor, to protect the public and national interest in the event of a risk to the continuity of service. The Intervenor is authorized to "supervise, administer, or operate the licensee company, as necessary," for a period of up to 90 days. Title V; and Law 1632, July 5, 1995, Art. 17; Ex. L. Salinas Second Dec.). The Intervention power belongs to the regulatory authority, and not to the Ministry of Public Works, Services

and Housing, which holds the Republic's ENTEL shares.

Pursuant to this long-standing authority, the Superintendent ordered the appointment for 90 days of an Intervenor of ENTEL on May 1, 2008, in consideration of "the risk to the continuity or regularity of delivery of public services, a situation that would constitute an emergency," including the risk to service arising from the May 1 change in ENTEL's ownership and management and also the possibility of interruption of service by persons affected by the nationalization. Administrative Resolution No. 2008/1056, Ex. C, Castro Dec.

A temporary intervention by government regulators does not pierce the corporate veil between a corporate entity and the regulatory agency. *See Dole*, 538 U.S. at 474-76 (describing *Bancec* as implementing doctrine of piercing the corporate veil); *Drexel Burnham Lambert Group Inc. v. Committee of Receivers for Galadari*, 12 F.3d 317, 330 (2d Cir. 1993) (receivership committee created by Dubai to wind-up affairs of troubled private entity not amenable to suit under FSIA, despite fact it controlled all of entity's finances and activities).

Further, the narrow, limited exceptions recognized in *Bancec* and its progeny concern "abuse of the corporate form" and use of the corporate form to perpetrate a fraud on third-parties. *Letelier* 748 F.2d at 794 (party seeking attachment must show "abuse of corporate form"); *Hercaire Int'l. Inc. v. Argentina*, 821 F.2d 559, 564 (11th Cir. 1987) (*Bancec* "presumption may be overcome only upon a showing that there has been some abuse of the corporate form"); *LNC Investments, Inc. v. Republic of Nicaragua,* 115 F. Supp. 2d 358, 363 (S.D.N.Y. 2000). Intervention is not an abuse of the corporate form, or a fraud on third-parties,[20] and plaintiff has not otherwise shown abuse of the corporate form or fraud.

---

[20] Indeed, "intervention" is a legal institution well-established in Latin America as well as elsewhere, and is similar to a court or government-appointed receiver or trustee to manage the affairs of a company experiencing difficulties or irregularities that threaten the company's shareholders, creditors or the public. *See, e.g., L'Europeenne de Banque v. La Republica de Venezuela*, 700 F. Supp 114, 117 & n.3 (S.D.N.Y.

27

Since it has not overcome *Bancec*, plaintiff cannot proceed against the New York bank accounts on the ICSID arbitration award it seeks. The Republic of Bolivia as stockholder does not have any interest in ENTEL's New York bank accounts that could render them subject to attachment based on a claim against the Republic. *See, e.g., EM Ltd.,* 473 F.3d at 476 (New York bank accounts of subsidiary not subject to attachment in relation to debts of foreign sovereign owner); *Dole,* 538 U.S. at 475-76 (parent has no legal interest in assets of subsidiary that would make them subject to attachment); *United States v. Wallach,* 935 F.2d 445, 462 (2d Cir. 1991) ("[S]hareholders do not hold legal title to any of the corporation's assets. Instead, the corporation-the entity itself-is vested with the title.")

Plaintiff suggests that, if it is ultimately determined that ICSID lacks jurisdiction over the arbitration it has commenced, plaintiff would bring a new action in this court to recover fifty percent of ENTEL's New York accounts (corresponding to its nationalized 50% interest in ENTEL stock), on the theory that U.S. courts should not give effect to nationalization decrees with respect to property within the forum at the time of the nationalization when the nationalization decree fails to provide compensation. P. Mem. at 20. As shown above, Point II, and as plaintiff concedes, the ICSID Convention bars plaintiff from bringing such a lawsuit now, since plaintiff is pursuing an ICSID arbitration. There is no support in the ICSID Convention or Rules for the proposition, and it cannot be seriously suggested, that the Convention's prohibition on resort to domestic courts bars plaintiff's hypothetical action at present but allows the instant attachment on the theory that such a suit might be brought someday.[21]

---

1988) (Ministry of Finance declared "intervention" in affairs of Venezuelan Bank, granting "interventor" "all management powers"; authorized under Venezuelan law to protect depositors, creditors or the banking system).

[21] Plaintiff's hypothetical lawsuit cannot be considered for an additional reason. On its face, the nationalization decree is "accompanied by provision for the payment of just compensation ... without undue

The only action before the Court is one solely and exclusively to aid the ICSID arbitration, an arbitration in which plaintiff seeks "to recover money damages against Bolivia to compensate it for injuries." P. Mem. at 9. And, to execute against the assets of ENTEL in the enforcement of that ICSID award, plaintiff must meet its burden of overcoming *Bancec*, which it has not done and cannot do. *Bancec* therefore bars the instant attachment.

## IV.    THE COURT LACKS SUBJECT MATTER JURISDICTION UNDER FSIA SECTIONS 1604 AND 1605

In addition to the FSIA's prohibitions against prejudgment attachment, FSIA sections 1604 and 1605 deprive the court of subject matter jurisdiction and therefore require denial of the motion to confirm and vacatur of the attachments.[22] Section 1604 provides that, "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States ... except as provided in sections 1605 and 1607."

As shown, Points IC, n.12, and II, the "subject to" proviso of section 1604 is inapplicable: neither the ICSID Convention nor the New York Convention provides jurisdiction over a case for prejudgment attachment of an instrumentality's property in aid of an ICSID arbitration.

---

delay," Bolivia-Netherlands BIT, Article 6 (c). Plaintiff could not conceivably bring the action it hypothesizes until after Bolivia has determined the compensation to be paid, and applied offsets, if any, for taxes and so forth.

Citing *Bandes v. Harlow & Jones*, 852 F.2d 661 (2d Cir. 1988), plaintiff suggests that its future, hypothetical lawsuit might also be based on Bolivia's supposed failure to provide it procedural "due process." P. Mem. at 20. If nothing else, the ICSID arbitration process invoked by plaintiff, and the *ad hoc* arbitration authorized by the BIT if ICSID arbitration is not available, and offered by Bolivia, would satisfy even plaintiff's exaggerated reading of *Bandes*. Further, *Bandes* simply concerned the foreign sovereign allegedly subjecting the nationalized company's former owner to criminal jeopardy for contesting the nationalization; there is not, and could not be, any suggestion that such is the case here.

[22] FSIA sections 1604 and 1605 must be satisfied or there can be no proceedings here. The FSIA is the exclusive basis for jurisdiction over a foreign state or instrumentality or their property. *Saudia Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). The FSIA establishes "a 'comprehensive set of legal standards'... preempting other laws purporting to set forth rules for suits against foreign sovereigns." *Stephens v. National Distillers & Chem. Corp.*, 69 F.3d 1226, 1227 (2d Cir. 1995).

Additionally, ICSID is not a pre-enactment (1976) international agreement with Bolivia, which adhered to the ICSID Convention in 1995 (www.worldbank.org/icsid). Similarly, none of the even arguably relevant provisions of FSIA § 1605 apply, as shown below.

### A.    The Arbitration Exception Is Inapplicable

FSIA § 1605(a)(6) provides, in pertinent part, that "a foreign state shall not be immune from the jurisdiction of courts of the United States" where an:

> action is brought, either to enforce an agreement made by the foreign state . . . to submit [a dispute] to arbitration . . ., or to confirm an award made pursuant to such an agreement to arbitrate . . .

Section 1605(a)(6) is "construed narrowly." *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Co.*, 204 F.3d 384, 391 (2d Cir. 2000). By its plain meaning, section 1605(a)(6) does not provide jurisdiction in this case, since this is neither a suit to compel arbitration nor a suit to confirm an arbitral award. *See, e.g., Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1017 (2d Cir. 1993) (§ 1605(a)(6) limited to actions to compel arbitration or enforce awards); *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 364 (S.D.N.Y. 2005) ("By its terms, . . . [(§ 1605(a)(6)] applies only to an action brought to enforce the arbitration agreement or confirm the arbitration award" and does not grant jurisdiction otherwise); *see also Transatlantic,* 204 F.3d at 391.

### B.    The Waiver Exception Is Inapplicable

Unlike FSIA § 1610(d)'s prohibition against prejudgment attachments, which requires an *explicit* waiver, FSIA §§ 1604 and 1605(a)(1) provide that the foreign state shall not be immune from the jurisdiction of the courts in any case "in which the foreign state has waived its immunity either explicitly or by implication." As shown above, there has been no explicit waiver of immunity from prejudgment attachment; since the instant action is simply for a prejudgment at-

tachment and nothing more, this disposes of the explicit waiver provision of FSIA §1605(a).

Nor has there been an implicit waiver.[23]  As previously explained, the New York Convention is inapplicable to ICSID arbitrations; but, in any event, the Second Circuit has been extremely clear that the N.Y. Convention constitutes an implicit waiver *only* in cases where a party is seeking to "enforce an arbitral award," *not* in cases where the parties have agreed to arbitrate but the plaintiff has not yet obtained an arbitral award.  *See Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 391 (2d Cir. 2000); *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 577-78 (2d Cir. 1993) (explaining distinction).  Because this is not an action to enforce an arbitral award, the N.Y. Convention, even if applicable, would not implicitly waive immunity from jurisdiction in this case.

The BIT's ICSID arbitration clause, and the ICSID Convention itself, do not constitute an implied waiver precisely because, as set forth in Point II, *supra,* ICSID jurisdiction precludes resort to domestic courts prior to issuance of an ICSID award, at least in the absence of an explicit consent to pre-award judicial remedies.  *See also Maritime Int'l Nominees Establishment v. Rep. of Guinea*, 693 F.2d 1094, 1103-04 (D.C. Cir. 1982) (agreement to ICSID arbitration did not constitute waiver under § 1605(a)); *Atlantic Tele-Network, Inc. v. Inter-American Development Bank*, 251 F. Supp. 2d 126, 133 (D.D.C. 2003) (Guyana did not waive immunity for § 1605(a) purposes by agreeing to BIT that provided for ICSID arbitration); *Gulf Resources America v. Republic of Congo*, 276 F. Supp. 2d 20, 28 (D.D.C. 2003) (Congo's agreement to BIT that

---

[23] The implied waiver provision of FSIA § 1605(a)(1) must be construed "narrowly." *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d at 577 (2d Cir. 1993) (quoting *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991); instances where courts have found an implicit waiver "involve circumstances in which the waiver was unmistakable, and courts have been reluctant to find an implied waiver where the circumstances were not similarly unambiguous." *Shapiro*, 930 F.2d at 1017.

stipulated ICSID arbitration did not constitute waiver of sovereign immunity), *rev'd on other grounds*, 370 F.3d 65 (D.C. Cir. 2004).

### C.    The Nationalization Exception Is Inapplicable

Section 1605(a)(3) provides, in pertinent part, that a foreign state shall not be immune from jurisdiction in any case

> in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

The nationalization exception is inapplicable on its face for several reasons. First, the "case" before this Court does not put "rights in property" in issue; it only seeks an attachment in aid of the ICSID arbitration. It is the "case" here, not the arbitration, that must come within section 1605(a)(3)'s terms.

Second, even if reference were made to the ICSID arbitration, section 1605(c)(3) would be inapplicable. In the ICSID proceeding, plaintiff does not put in issue "rights in property," but only seeks "damages" for the injuries it suffered because of Bolivia's alleged violation of the Bolivia-Netherlands BIT. P. Mem. at 9. Plaintiff does not claim (nor could it) that it still has "rights" to ENTEL's stock (or indirectly through that stock ownership, to any of ENTEL's property), or that the Republic of Bolivia is not now the owner of that stock. Rather than challenging Bolivia's title – that is, "rights in property" – plaintiff asserts in the ICSID proceeding that Bolivia has an obligation under the BIT to provide compensation for its acquiring title. Compare, for example, the lawsuit that plaintiff asserts it would bring in this court if ICSID, contrary to plaintiff's contention, does not have jurisdiction: a new action alleging that plaintiff, not ENTEL, has the "rights" in the New York bank accounts because of the forum's asserted public policy

against giving extraterritorial effect to nationalizations without compensation. P. Mem. at 20. Whether or not such a lawsuit would fall within FSIA § 1605(a)(3), it would stand, as plaintiff concedes, in contradistinction to the ICSID arbitration that plaintiff has brought and that alone is relevant here.

Moreover, courts have required that before invoking the jurisdiction of United States courts under section 1605(a)(3), a plaintiff must exhaust (or excuse exhaustion of) local remedies because, "as a threshold matter, a claimant cannot complain that a taking or other economic injury has not been fairly compensated, and hence violates international law, unless the claimant has first pursued and exhausted domestic remedies in the foreign state that is alleged to have caused the injury." *Millicom Int'l Cellular, S.A. v. Republic of Costa Rica,* 995 F. Supp. 14, 23 (D.D.C. 1998). *Accord, Greenpeace, Inc. (USA) v. State of France,* 946 F. Supp. 773, 783 (C.D. Cal. 1996); *Malewicz v. City of Amsterdam,* 362 F. Supp. 2d 298, 307 (D.D.C. 2005).

Here, the "local remedy," according to plaintiff, is ICSID arbitration by virtue of the BIT, but plaintiff has not exhausted that remedy, and so cannot yet invoke section 1605(a)(3), if it ever can. Plaintiff's alternative remedy under the BIT is *ad hoc* arbitration, which plaintiff has not pursued, let alone exhausted. Accordingly, the nationalization "exception is inapplicable to confer jurisdiction because a 'taking' in violation of international law has not occurred." *Millicom,* 995 F. Supp. at 23.

Additionally, the courts in this district have construed the term "rights in property" in section 1610(a)(3) to be limited to tangible, physical property, and not intangible property.[24] These and other courts, referencing the legislative history of the FSIA, have found that the term

---

[24] *Lord Day & Lord v. Socialist Republic of Vietnam,* 134 F. Supp. 2d 549, 560 (S.D.N.Y. 2001) ("Property taken within the meaning of the statute means 'physical property' not the right to receive payment"); *Hirsh v. State of Israel,* 962 F. Supp. 377, 383 (S.D.N.Y. 1997)(same); *Canadian Overseas Ores Ltd. v. Compania de Acero,* 528 F. Supp. 1337, 1346 (S.D.N.Y. 1982), *aff'd,* 727 F.2d 274 (2d Cir. 1984).

"rights in property" was intended to have a similar meaning to virtually the same phrase in the

Hickenlooper Amendment, 22 U.S.C. § 2370(e)(2), which provided for narrow exceptions to the

Act of State doctrine, and was held to apply only to lawsuits to recover specific physical prop-

erty that had been nationalized in violation of international law.[25] *De Sanchez v. Banco Central*

*de Nicaragua,* 770 F.2d 1385, 1395 (5th Cir. 1985) ("Several courts have interpreted the Hick-

enlooper Exception not to apply to takings of intangible interests such as the contractual right to

receive payment. . . . This principle has been expanded to the FSIA on the ground that the Hick-

enlooper Exception and Section 1605(a)(3) are congruent").  As Judge Lasker explained:

> The phrase used in the Hickenlooper Amendment, "claim of title
> or other right to property", has been interpreted to apply only to
> takings of tangible property . . . The legislative history of the FSIA
> indicates that . . . § 1605(a)(3) appears to be intended to match the
> exception to the Act of State doctrine created by the Hickenlooper
> Amendment . . .

*Canadian Overseas Ores Ltd.,* 528 F. Supp. at 1346.  *Accord, Intercontinental*

*Dictionary Series v. De Gruyter,* 822 F. Supp. 662, 678 (C.D. Cal. 1993).[26]

This case seeks only prejudgment attachment of bank accounts; no other relief is sought.

Bank accounts are not physical property, but merely represent a bank's debt to the account party.

*In re Bennett Funding Group, Inc.,* 146 F.3d 136, 139 (2d Cir. 1988).  They are intangible prop-

erty and thus not within the scope of the nationalization exception to FSIA immunity.

Finally, the Republic's immunity applies to the New York bank accounts because plain-

tiff attributes the Republic's liability to ENTEL.  *See* Point IA.  Therefore, FSIA §1605(a)(3) is

only applicable if the N.Y. accounts are being used "in connection with a commercial activity

---

[25] *Banco Nacional de Cuba v. First Nat'l City Bank,* 431 F.2d 394, 402-03 (2d Cir. 1970), *rev'd. on other grounds,* 406 U.S. 759 (1972); *French v. Banco Nacional de Cuba,* 23 N.Y.2d 46, 57-58, 295 N.Y.S.2d 433, 444 (1968).

[26] Some courts, outside the Second Circuit, have taken a contrary view.  *See, e.g., Nemariam v. Federal Democratic Republic of Ethiopia,* 491 F.3d 470 (D.C. Cir. 2007).

carried on in the United States by the foreign state," which, as shown, Point I D, they are not.

### V.    THE FSIA BARS THE ATTACHMENTS BECAUSE THE ATTACHED PROPERTY WOULD BE IMMUNE FROM POST-JUDGMENT EXECUTION

As plaintiff recognizes, New York law requires that the property attached be subject to execution in satisfaction of an eventual judgment.  P. Mem. at 22; CPLR § 6202.  In addition to the already stated reasons why ENTEL's bank accounts cannot be executed upon to satisfy an arbitral award against the Republic, FSIA §1610(a) precludes execution, and hence attachment.

FSIA §1610(a) allows execution against the property of a foreign state (as distinct from its agency or instrumentality) only when the property is being "used for a commercial activity in the United States."  As shown Point I A, ENTEL's property is cloaked with the Republic's immunity because plaintiff would be seeking to execute upon a judgment against the Republic.  As also shown above, Point I D, the attached property is not "used for a commercial activity in the United States."  Therefore, execution, and hence attachment, are barred.

### VI.    THE COURT LACKS *IN PERSONAM* JURISDICTION OVER ENTEL

The exercise of personal jurisdiction over ENTEL must satisfy the Due Process Clause.[27] Plaintiff bears the burden of establishing constitutional personal jurisdiction.  *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996); *Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140, 149 (S.D.N.Y. 2004).

Plaintiff has not and cannot meet its burden.  Plaintiff makes no attempt to allege or prove the type of "continuous and systematic general business contacts" with the United States

---

[27] This is so whether or not ENTEL is considered an FSIA instrumentality.  *See U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 (2d Cir. 2001); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 308 (2d Cir. 1981), *cert. denied*, 454 U.S. 1148 (1982); *Frontera Resources Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 479 F. Supp. 2d 376, (S.D.N.Y. 2007) ("the holding of *Texas Trading* remains good law within the Second Circuit"). The FSIA "cannot create personal jurisdiction where the Constitution forbids it."  *Texas Trading,* 647 F.2d at 308.

required to support general jurisdiction. *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466

U.S. 408, 416 (1984); *see also Frontera Resources Azerbaijan v. State Oil Co. of the Azerbaijan

Republic*, 479 F. Supp. 2d 376, 386 (S.D.N.Y. 2007) (defendant's contacts must approximate

physical presence to satisfy general jurisdiction test). ENTEL's bank accounts are insufficient to

establish general jurisdiction,[28] and ENTEL's aggregate contacts, see Molina Second Dec., fall

far below what the Supreme Court held *insufficient* in *Helicopteros*, 466 U.S. at 416-18 (in *Heli-

copteros*, purchasing equipment and services for substantial sums, sending personnel for training,

negotiating a contract in the forum); *see also Frontera*, 479 F. Supp. 2d at 386-87.[29]

Plaintiff also cannot establish specific jurisdiction because its claim against Bolivia for

damages in the ICSID arbitration does not arise out of ENTEL's contacts with the United States

but out of the Republic's nationalization of plaintiff's stock in a Bolivian company, which took

place in Bolivia, and other actions in Bolivia. *See Reers*, 320 F. Supp. 2d at 149 (no specific ju-

risdiction because claims do "not arise out of any activity by the nonresident defendants within

the state of New York"); *National American Corp.*, 425 F. Supp. at 1370-72 (same). Plaintiff

seeks an arbitral award of "money damages against Bolivia to compensate it for its injuries to

compensate it for its injuries," P. Mem. at 9, not restitution (or the equivalent) of the New York

accounts or any other property.

That plaintiff is attempting to attach ENTEL's bank accounts within this jurisdiction does

---

[28] *See, e.g., Reers*, 320 F. Supp. 2d at 156 ("bank accounts standing alone cannot create jurisdiction unless they are used for 'substantially all' of [defendant's] business"); *Grove Valve & Regulator Co. v. Iranian Oil Serv. Ltd.*, 87 F.R.D. 93, 95 & n.4 (S.D.N.Y. 1980) (foreign corporation's maintenance of New York bank account insufficient for personal jurisdiction); *National American Corp. v. Federal Republic of Nigeria*, 425 F. Supp. 1365, 1369 (S.D.N.Y. 1977) ("maintaining bank accounts here has been held not to constitute doing business" sufficient to establish general jurisdiction).

[29] ENTEL has no office, representative, sales or purchasing agents and no telephones in the U.S. It has purchased only a small amount of goods from U.S. suppliers ($1.4 million in 2008); and has no property except interconnection equipment in Florida with a value of less than $400,000. It receives payments from U.S. carriers in small amounts, but this is for its service in terminating calls in Bolivia, and the amount is small in any event ($450,000 in 2008). Molina Second Dec. ¶¶ 4-6.

not alter this result. As the Supreme Court made clear in *Shaffer v. Heitner*, 433 U.S. 186, 207-12 (1977), the minimum contacts standard governs not just *in personam* actions, but *quasi in rem* and *in rem* actions as well.

### VII.  PLAINTIFF HAS NOT MADE THE SHOWING REQUIRED BY CPLR § 7502

CPLR § 7502 requires plaintiff to demonstrate "there is a cause of action," P. Mem. at 17; that plaintiff is likely to succeed on the merits of its arbitration claim; that there is a danger of irreparable harm to plaintiff without the attachment and that the arbitration award is likely to be ineffectual without the attachment; and that the balance of equities favor provisional relief.[30] Plaintiff acknowledges that it has the burden in all these respects. P. Mem. at 17.[31]

In its opposition, the Republic of Bolivia shows that, even without extended analysis, it is apparent that plaintiff has not met its burden, particularly given that the nationalization decree of which plaintiff complains expressly provides for compensation for the value of the taking; that the decree on its face is consistent with international law; that the decree provides for the State's valuation of plaintiff's shares within 60 days, a period that has not yet expired; that Bolivia intends to comply with its own nationalization decree; that plaintiff's accusation that Bolivia has refused to participate in the ICSID proceeding is false; and that plaintiff, having commenced the ICSID, still has not taken the elementary step of appointing an arbitrator. ENTEL adopts the Republic of Bolivia's position, and, believing that the FSIA and other issues presented above are fully controlling, respectfully reserves its right (as does the Republic) to address the CPLR §

---

[30] *See, e.g., Founders Ins. Co. v. Everest Nat'l Ins. Co.*, 41 A.D.3d 350, 350 (1st Dept. 2007); *Erber v. Catalyst Trading, LLC*, 303 A.D.2d 165 (1st Dep't 2003); *Witham v. VFinance Investments, Inc.*, 2007 WL 4244698, at *3-4 (Sup. Ct. N.Y. Cty. Nov. 21, 2007) (although historically courts took different positions, current authority requires application of preliminary injunction standard).

[31] In that connection, plaintiff has asserted that ENTEL tried to move its funds out of New York soon after May 1, 2008, P. Mem. at 2, 22, but offers absolutely no support for that contention, and there is none. *See* Flores Carpio Dec. ¶¶ 27-29; Molina Fourth Dec.

7502 requirements further should it become necessary to do so.

Nonetheless, plaintiff's repeated assertions in its papers that the instant attachments are harmless requires a response now, for it is both patently nonsense, and the balance of the equities in fact tip sharply against the attachments.

Plaintiff has attached ENTEL's New York bank accounts, in the sum of approximately $36 million, and, with the parallel *ex parte* restraint in London of $49 million, almost all of EN-TEL's hard currency and liquid assets. The frozen funds together represent more than 92% of ENTEL's total bank accounts, and virtually all of its accumulated hard currency. Molina First Dec. ¶ 4; Flores Carpio Dec. ¶ 10. ENTEL's accounts in Bolivia are 95% in local currency, which cannot be used for international transactions or for some domestic transactions; there are substantial costs and fees in exchanging those funds for hard currency. Molina Third Dec. ¶ 4.

The attached accounts have been used in part to pay dividends, as well as to pay taxes. Molina First Dec. at ¶ 9. Additionally, one of these accounts, contrary to plaintiff's suggestion, is used to pay suppliers in the U.S. and elsewhere. *Id.* at ¶ 8.

Freeze of the New York and London accounts precludes ENTEL from declaring dividends, as, *inter alia*, ENTEL cannot satisfy Bolivian law's reserve requirements with the accounts frozen. Molina Third Dec. ¶ 6. It bears emphasis in that regard that, under Supreme Decree 29544, of May 1, 2008, the dividends received by the State as a shareholder must go, in roughly equal measure, (a) to funding the "Renta Dignidad," the pensions paid to all Bolivian citizens over the age of 60 and (b) to reinvestment in ENTEL to foster technological development and improvement of infrastructure. Molina Third Dec. ¶¶ 10 & 11.

This commitment to the upgrading of ENTEL's infrastructure reflects ENTEL's vital public service and the difficulties that ENTEL faces in meeting the public and the country's

needs. ENTEL is Bolivia's largest and most important telephone and telecommunications provider, with approximately 1400 employees. It is the "backbone" for Bolivia's inter-regional and international telecommunications. Its infrastructure is aged, much of it 10 to 20 years old, deteriorating, and has been neglected. Flores Carpio Dec. ¶¶ 6-8.

ENTEL's need to make substantial investments in its infrastructure is urgent and acute, and delay will cause irreparable damage, both to ENTEL and to the Bolivian public. ENTEL is currently unable to service its customers adequately and, without the needed, rapid investment, the situation will deteriorate. This is shown by the fact that, instead of ENTEL's customer base increasing by 40,000 in May as part of a general industry trend (as plaintiff predicted when in control of the company), ENTEL actually lost 20,000 customers. Flores Carpio Dec. ¶¶ 11 –12.

To reverse this downward spiral, which will increasingly deprive ENTEL of needed revenues for infrastructure improvement, it is necessary for ENTEL to invest substantial sums as soon as possible. It cannot do that without the frozen funds. Flores Carpio Dec., ¶¶ 11 –15.

At the same time, confirmation of the attachments would make it very unlikely and perhaps impossible for ENTEL to obtain financing, at least on acceptable terms. The court would have put its imprimatur on plaintiff's claim that ENTEL is responsible for an arbitration award that plaintiff seeks against the Republic for hundreds of millions of dollars. Potential lenders will classify plaintiff's claim as a massive contingent liability for ENTEL, cutting ENTEL off from financing on reasonable terms. The attachments are also likely to cause financial institutions to evaluate ENTEL as a company without significant reserves or liquid assets. Flores Carpio ¶¶ 13 – 15. Still other consequences of the attachment are set out in the Flores Carpio Dec. and Molina Third Dec.

It is important to note that, if confirmed, the attachments are likely to remain in place for

a substantial period of time.  ICSID arbitration proceedings take, on average, more than two and one-half years, as shown by a review of the information on ICSID's website (www.worldbank. org/icsid).  The damage to ENTEL, and consequently to the public, described above will increase manifold over time.

## VIII.   ENTEL IS ENTITLED TO DAMAGES, ATTORNEYS' FEES AND COSTS

ENTEL requests that the Court, as is required by CPLR § 6212(e), award ENTEL damages, attorneys' fees and costs in the event it denies plaintiff's motion to confirm.

## CONCLUSION

For the foregoing reasons, and those separately stated in the opposition of the Republic of Bolivia, plaintiff's motion to confirm the *ex parte* order of attachment should be denied, the attachment vacated forthwith and ENTEL awarded damages, costs and attorneys fees.

**ENTEL requests oral argument.**

Dated: June 11, 2008

Of Counsel:

Jules Lobel

Adam Belsky
GROSS BELSKY ALONSO LLP

Respectfully submitted,

Michael Krinsky (MK4503)
Eric M. Lieberman (EL 4822)
RABINOWITZ, BOUDIN, STANDARD,
    KRINSKY & LIEBERMAN, P.C.

Terry Gross (TG 3249)
GROSS BELSKY ALONSO LLP

*Attorneys for Empresa Nacional de*
*Telecomunicaciones Entel S.A.*