Michael Krinsky (MK4503)
Eric M. Lieberman (EL 4822)
RABINOWITZ, BOUDIN, STANDARD,
   KRINSKY & LIEBERMAN, P.C.
111 Broadway, 11th Floor
New York, New York 10006
Telephone: (212) 254-1111
Facsimile: (212) 674-4614

Terry Gross (TG 3249)
GROSS, BELSKY & ALONSO LLP
180 Montgomery Street, # 2200
San Francisco, California 94104
Telephone: (415) 514-0200
Facsimile: (415) 544-0201

*Attorneys for Empresa Nacional de Telecomunicaciones Entel S.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E.T.I. EURO TELECOM INTERNATIONAL, N.V., <br><br> Plaintiff, <br><br> v. <br><br> REPUBLIC OF BOLIVIA, and EMPRESA NACIONAL DE TELECOMUNICACIONES ENTEL, S.A., <br><br> Defendants. | Case No. 08-cv-4247 (LTS) |

**DECLARATION OF JOEL FLORES CARPIO IN SUPPORT
OF DEFENDANT EMPRESA NACIONAL DE
TELECOMUNICACIONES ENTEL, S.A.'S OPPOSITION
TO MOTION TO CONFIRM *EX PARTE* ORDER OF
PREJUDGMENT ATTACHMENT**

Michael Krinsky (MK4503)
Eric M. Lieberman (EL 4822)
RABINOWITZ, BOUDIN, STANDARD,
    KRINSKY & LIEBERMAN, P.C.
111 Broadway, 11th Floor
New York, New York 10006
Telephone: (212) 254-1111
Facsimile:  (212) 674-4614
Attorneys for Empresa Nacional de
Telecomunicaciones Entel, S.A.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

E.T.I. EURO TELECOM
INTERNATIONAL, N.V.,

    Plaintiff,

  v.

REPUBLIC OF BOLIVIA, and
EMPRESA NACIONAL DE
TELECOMUNICACIONES ENTEL, S.A.,

    Defendants.

Case No. 08-cv-4247 (LTS)

---

### DECLARATION OF JOEL FLORES CARPIO

  JOEL FLORES CARPIO declares under penalty of perjury under the laws of the United States that the following is true and correct:

  1. I reside in La Paz, Bolivia. I make this declaration in support of the opposition to the motion of the plaintiff to confirm the ex parte order of attachment issued by this Court on May 5, 2008.



2. On May 1, the Superintendent of Telecommunications issued Regulatory Administrative Resolution No. 2008/1056, in which the Supertintendent appointed me as Interventor for 90 days of Empresa Nacional de Telecomunicaciones Entel, S.A. (hereafter, "Entel"), one of the defendants in this action, "so that pertinent actions are taken to guarantee the provision of all telecommunication services provided by this company." As intervenor, I am authorized to make corporate decisions and exercise the authority of the corporation in order to carry out this mission.

3. I graduated from Negocia Business School in Paris with a degree in International Business. I have worked in the fields of telecommunications, information technology and entertainment for my entire professional career. For 10 of those years, I worked with several private telecommunications companies in Europe and Asia.

4. Plaintiff's ex parte attachment of Entel's bank accounts in New York and its parallel ex parte restraint on Entel's bank account in London succeeded in freezing virtually all of the accumulated hard currency funds of Entel, and, as of May 2, more than 92% its total bank accounts. These attachments and restraints have already seriously injured Entel, and, if confirmed, will cause serious and irreparable injury to Entel. The attachments' injury to Entel and their threat to Entel's continued ability to provide telecommunications services seriously affects the public and jeopardizes telecommunications in Bolivia generally.

5. In this Declaration, I more fully describe the injuries caused by the attachments. I also address several other matters.

6. Entel is the largest and most important of the several telephone and telecommunications companies operating in Bolivia. It has approximately 1400 employees.



7.      In addition, Entel provides the "backbone" for all inter-regional telecommunications in the country – that is, Entel is the main provider of service that connects the different cities and regions of the country, and connects all the country to international telecommunications. Although there are other carriers that compete in this market segment, none has the capacity to carry the traffic that ENTEL deals with. In addition, the Entel backbone is used both by Entel and the other service providers to connect their customers in one area of the country to parties in another part of the country and internationally.

8.      Further, Entel provides internet service in the country and, while there are other providers, none has the capacity to carry all of the services ENTEL deals with. In addition to Entel itself offering Internet service directly to users, other companies that offer Internet services to users mainly purchase from Entel wholesale access to Entel's internet service and then sell it retail to users. As a result, most individuals and businesses in Bolivia, as well as the Bolivian government, are dependent in large part upon Entel for Internet access.

9.      Since assuming my responsibilities under the Intervention resolution on May 1, 2008, I have carefully studied Entel's status and operations, and its ability to service the public.

10.     Until May 1, 2008, the management of Entel was exclusively under the control of plaintiff. Although it owned 50% of the shares, plaintiff had, by various legal stipulations, the right of managerial control, appointed five of the seven directors of the corporation, and appointed the officers of the corporation. Under plaintiff's management control, Entel, as of April 2008, had placed more than 92% of its liquid assets outside of Bolivia: the approximately $36 million in Entel's now-attached bank accounts in New York and the approximately $49 million in Entel's now frozen bank account in London. Entel was left with only the equivalent of roughly $6.7 million in its bank accounts in Bolivia, almost all of which was in local currency.



11.     Entel's need to make substantial investments in its infrastructure is urgent and acute, and delay in its doing so will cause irreparable injury. Entel is currently unable to service its customers adequately and, without the needed investment, the situation will deteriorate further. The urgent need for investment is shown by the fact that, instead of Entel's customer base increasing by 40,000 in May as part of a general trend in the market, as plaintiff had projected for 2008, Entel actually lost 20,000 customers in May. Given the inadequacy of Entel's service, this trend will continue unless investments are rapidly made. In this regard, it should be noted that Entel is the oldest of the telephone companies in Bolivia and thus has the most aged and deteriorated infrastructure, much of it 10 to 20 years old.

12.     To reverse this downward spiral it is necessary for Entel to invest substantial sums as soon as possible. Entel will be unable to do that without the frozen funds in New York and London.

13.     It is highly unlikely or impossible for Entel to obtain the necessary funds elsewhere. Entel has no existing lines of credit or credit history with foreign banks, and as a result international financing for investment in Entel's infrastrucutre is extremely difficult to obtain. Moreover, even if Entel could identify a willing international lender, the time it would take to arrange such financing, and the expense of it, would leave Entel further and further behind in providing essential services to the Bolivian public.

14.     Moreover, it is extremely unlikely that foreign institutions would be willing to provide financing to Entel, at least on acceptable terms, given the attachments. First, plaintiff has asserted that Entel is responsible for an arbitral award that it seeks against Bolivia in the hundreds of millions of dollars. If the attachments are confirmed by the Court, plaintiff's assertion will carry the Court's imprimatur. Potential lenders will classify plaintiff's claim as a

massive contingent liability for Entel, which would cut Entel off from any ability to raise monies on reasonable terms. Second, because of the attachments, financial institutions are highly likely to evaluate Entel as a company without any significant reserves or liquid assets.

15. Similiarly, Entel's suppliers are likely for the same reasons to be unwilling or more reluctant to offer normal financing terms for Entel's purchase of equipment and services. Prior to the attachments, even Entel's smaller suppliers were willing to provide goods and services on 30 day or 60 day payment terms. Now, many have refused to do so. I expect to encounter even more serious difficulties in obtaining normal financing from the suppliers of expensive goods or services, including foreign suppliers.

16. As noted above, Entel not only provides services to its customers, but owns and maintains the main backbone for inter-regional service and for the Internet. The difficulties resulting from the attachments will profoundly affect Entel's ability to maintain those backbones properly, and hence threaten the viability of telephone and telecommunications in Bolivia generally.

17. By a Supreme Decree, the Republic of Bolivia is required to utilize all the dividends it receives from Entel for (a) funding the Bolivia's old-age pensions to senior citizens and (b) reinvestment in Entel's infrastructure. The restraints on Entel's funds in New York and London preclude dividends, particularly as Entel cannot meet the legal reserve requirements mandated by Bolivian law so long as those funds are frozen. Thus, the attachments deprive Entel of desparately needed funds for maintaining and upgrading its infrastructure in this way as well.

18. I have been advised that the attachments, if confirmed, may well remain in place for a substantial period of time, inasmuch as, as I understand it, ICSID arbitration proceedings normally take some number of years to conclude. Thus, the adverse impact of the attachments



on Entel described here will be compounded manifold, as the attachments will remain in place until the ICSID proceedings are concluded. Infrastructure will continue to deteriorate and become more and more antiquated. It will become more and more expensive and time consuming to make needed repairs and upgrades. Erosion of Entel's customer base will accelerate ever more rapidly as customers increasingly leave Entel out of dissatisfaction. As a result, Entel's ability to provide essential services will erode at an even faster rate, depriving Entel of the revenue needed for even minimal maintenance and upgrading.

19.     It has become apparent to me that plaintiff, when in control of the company, was not committting the resources needed simply to maintain current level of services, apparently in an effort to maximize the amount of liquid assets it could keep abroad and also to extract the maximum amount of money from the company in the form of return of capital or dividends. Its attachment of Entel's funds now jeopordizes Entel's ability to take even the most minimal necessary corrective actions.

20.     Entel, under plaintiff's management, had budgeted $38 million for investments to be made in 2008 in maintaining and upgrading Entel's infrastructure. I quickly determined that that amount is not sufficient even over the next few months, and I have projected an additional $20 million. Without access to the blocked funds in New York and London, Entel may be unable to make even these investments. While ENTEL had planned to obtain the $38 million for investment from current cash flow, the company's budget was based on projections of an increase in its customer base. As noted, it now appears that these projections were not accurate and, instead of gaining customers, Entel is losing customers. Even more importantly, $58 million in investment in infrastructure for 2008, even if made, would be woefully inadequate to remedy Entel's neglect of its infrastructure for the last several years.



21.     With regard to the bank accounts in New York, I have no legal authority, let alone intention, to transfer Entel's assets to the Republic of Bolivia. The Republic of Bolivia's only financial claim upon Entel is any dividends that may be properly declared to it as a shareholder. As noted, any dividends so declared must be used by the government exclusively to help fund the country's payments to senior citizens and to reinvest in Entel.

22.     On May 2, 2008, I wrote letters to the four banks in other countries in which ENTEL maintains deposits of funds. These banks are: Intesa San Paola SpA, New York branch; J.P. Morgan Bank, New York Branch; Unicredito, New York branch; and Deutsche Bank, London Branch. In these letters, I stated that on May 1, 2008 there was "a resolution appointing the undersigned as Inspector with all the legal representative power for a period of 90 days," and that "the current authorized signatures appearing in your records are no longer valid. Starting on May 1st onwards for a period of 90 days, only the undersigned is entitled and has the legal signature for this account. Please send to my office all documents to be amended as soon as possible."

23.     My letters were a natural and essential step and precaution to take, given that persons associated with plaintiff's management of the company likely had been authorized to control these accounts, which represented such a large part of Entel's assets and almost 92% of its liquid assets, and given my responsibility to preserve and protect the company's assets and to ensure that they be utilized properly.

24.     I requested that ENTEL's Finance Manager, Lorena Molina, send these letters to the banks, and that she communicate with them to ensure that the signatory documents were amended to reflect that I was the only authorized signatory. I authorized only Sra. Molina to communicate with these banks. I had no other communications with any of the four banks about



the authorized signatory on the accounts, nor about the funds in these accounts, nor did I communicate instructions to anyone at any of the banks to move the funds from any of these banks to another bank. Moreover, no one else at ENTEL who would have had any communication with any of these banks indicating that ENTEL was moving the funds from these banks, nor did anyone at ENTEL have the authority to do so.

_____
JOEL FLORES CARPIO

Executed this 10th day of
June, 2008 in La Paz, Bolivia