Ronald E.M. Goodman (RG 6698)
Paul S. Reichler
Janis H. Brennan
FOLEY HOAG LLP
1875 K Street NW
Washington, D.C.  20006
Telephone:  202-223-1200
Facsimile:  202-785-6687
*Counsel for the Republic of Bolivia*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————

| | |
|---|---|
| E.T.I. Euro Telecom International, N.V., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | 08 CV 4247 (LTS/FM) |
| Republic of Bolivia and Empresa Nacional de ) | |
| Telecomunicaciones Entel S.A., ) | **ORAL ARGUMENT REQUESTED** |
| ) | |
| Defendants. ) | |

———————————————————————————

**OPPOSITION OF DEFENDANT THE REPUBLIC OF BOLIVIA
TO PLAINTIFF'S MOTION TO CONFIRM *EX PARTE* ORDER OF ATTACHMENT**

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  ARGUMENT .................................................................................................... 2

    A.  BOLIVIA'S AND ENTEL'S ASSETS ARE IMMUNE FROM
        PREJUDGMENT ATTACHMENT UNDER THE FOREIGN SOVEREIGN
        IMMUNITIES ACT BECAUSE NEITHER DEFENDANT HAS EVER
        EXPLICITLY WAIVED ITS IMMUNITY FROM PREJUDGMENT
        ATTACHMENT. ....................................................................................... 6

    B.  THE PROPERTY OF ENTEL MAY NOT BE ATTACHED TO SECURE A
        POSSIBLE ARBITRAL AWARD AGAINST BOLIVIA, SINCE ENTEL IS
        NOT A PARTY TO THE ARBITRATION AND NO CLAIMS HAVE
        BEEN MADE AGAINST IT. .................................................................... 14

    C.  NEITHER THE ICSID CONVENTION NOR THE NEW YORK
        CONVENTION PROVIDES FOR PREJUDGMENT ATTACHMENT
        PRIOR TO THE ISSUANCE OF A FINAL ARBITRAL AWARD ................... 18

        (1)  The ICSID Convention .............................................................. 19

        (2)  The New York Convention ........................................................ 24

    D.  BOLIVIA IS ENTITLED TO ALL COSTS AND DAMAGES INCLUDING
        ATTORNEY'S FEES UNDER CPLR §6212(E) .................................... 27

III.  CONCLUSION ............................................................................................... 28

## I.    <u>INTRODUCTION</u>

The *Ex Parte* Order of Attachment *may not be confirmed* by this Court, because the assets of both Defendants in this case – the Republic of Bolivia and Empresa Nacional de Telecomunicaciones Entel, S.A. – are *immune from prejudgment attachment* under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§1609 and 1610(d).

Section 1609 provides that the property of foreign sovereigns and their agencies and instrumentalities is immune from prejudgment attachment by the courts of the United States, unless the specific exception to immunity from attachment prior to judgment in §1610(d) is applicable.  Section 1610(d) provides that the property of sovereign states and their agencies and instrumentalities may be attached prior to judgment *only* where there has been *an explicit waiver of immunity from prejudgment attachment* by the foreign sovereign or its agency or instrumentality.

Plaintiff has not even alleged, let alone offered proof, that the Republic of Bolivia (Bolivia) or Empresa Nacional de Telecomunicaciones Entel, S.A. (Entel) has explicitly waived its sovereign immunity from prejudgment attachment.  In fact, neither Defendant has ever done so.  On this basis alone, the FSIA precludes prejudgment attachment of their property, and requires the Court to reject Plaintiff's motion to confirm the *Ex Parte* Order of Attachment that was entered on May 5.

It is not disputed that Bolivia is a foreign state, and that it owns Entel.  Plaintiff acknowledges in its Complaint that "Defendant Bolivia is a sovereign nation."  Complaint, ¶6.  And Plaintiff further acknowledges that, by virtue of Bolivia's nationalization of Plaintiff's shares in Entel on May 1, 2008, Bolivia now owns 97% of the shares of that company.  Complaint, ¶¶10, 26; Plaintiff's Memorandum, pp. 2, 8 n.6, 10, 18, 19.  Under §§1603(a) and (b) of the FSIA, a "foreign state" includes both the sovereign and its agencies and instrumentalities;

and an agency or instrumentality is defined as a legal entity whose majority owner is the sovereign. Accordingly, it is beyond dispute that both Bolivia and Entel are "foreign states" under the FSIA, and that they are entitled to immunity from prejudgment attachment of their property under §1609 – absent an explicit waiver of that immunity.

Although Plaintiff has admitted the sovereign status of Bolivia and Bolivia's majority ownership of Entel, it has failed to explain, anywhere in its pleadings, how the *Ex Parte* Order of Attachment, or the motion to confirm that order, can be squared with the immunity provisions of the FSIA cited above (and further discussed below). Indeed, Plaintiff has failed even to *mention* the FSIA anywhere in its pleadings. The Court will look in vain for a reference by Plaintiff to the very statute that fully controls these proceedings.

This cannot have been an oversight on Plaintiff's part. It can only reflect a deliberate attempt to hide, or at least evade, the law that renders impossible the extraordinary relief that Plaintiff seeks from this Court. For this and other reasons explained below, the Court should not only refuse to confirm the *Ex Parte* Order of Attachment that was issued on May 5; it should also order Plaintiff to pay all costs and attorneys fees incurred in opposing the present motion.

## II.    ARGUMENT

There are at least three compelling reasons why the Court may not confirm the *Ex Parte* Order of Attachment that was entered on May 5:

First, as already indicated, the assets of Bolivia and Entel are immune from prejudgment attachment under the FSIA, which permits prejudgment attachment of the assets of foreign sovereigns and their agencies or instrumentalities *only* when the sovereign defendants have *explicitly waived their immunity from prejudgment attachment*. Bolivia and Entel did not do so here. Accordingly, their assets are immune from prejudgment attachment in the United States.

- 2 -

Second, Plaintiff cannot attach *Entel's* assets to secure a possible future arbitral award against *Bolivia*.  Plaintiff acknowledges that the arbitration it commenced at the International Centre for the Settlement of Investment Disputes (ICSID) is against Bolivia and no other entity. Entel is not a party to the arbitration.  Any arbitral award that might conceivably be entered, therefore, could only be against Bolivia.  It could not be against Entel.  Although Entel is an agency or instrumentality of Bolivia, it is, by Plaintiff's own acknowledgement, a separate corporate and legal entity, duly established under the commercial laws of Bolivia, and it has its own separate legal personality, including the ability to sue and be sued in its own name.  As such, it is not and cannot be liable for Bolivia's debts, or for judgments or arbitral awards against Bolivia.  In these circumstances, it is axiomatic that Entel's assets may not lawfully be attached to secure a potential arbitral award against Bolivia.

Third, neither of the two bases invoked by Plaintiff for the Court's exercise of jurisdiction in this matter -- the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (ICSID Convention), and the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (sometimes referred to as the "New York Convention") -- confers jurisdiction or authority on this (or any other U.S.) court to order the prejudgment attachment of sovereign assets that are immune from attachment under the FSIA.  In fact, the ICSID Convention expressly prohibits all proceedings in national courts, including this one, once an arbitration claim has been presented to ICSID, with the sole exception of a suit to enforce a final arbitral award after the arbitration has been concluded.  The New York Convention, likewise, makes no provision whatsoever for attachment of assets prior to the issuance of a final arbitral award.  Thus, neither Convention can support an attachment of the sovereign property at issue here, let alone override the express provisions of the FSIA.

These points will be discussed separately, and in greater detail, below.

However, before addressing these controlling legal issues, Bolivia believes it is important to set the record straight on the context in which this case arises.

To begin with, Plaintiff's claim that Bolivia unlawfully expropriated its shares in Entel by nationalizing those shares without payment of compensation is wholly unsupported and untrue. It is belied by the very documents that Plaintiff attached to its pleadings, particularly the nationalization decree of May 1, 2008, Article 3 of which (entitled "Payment for the Value of the Shares") provides:

> The Bolivian State shall pay ETI EUROTELECOM INTERNATIONAL NV the value of the nationalized stock to the capitalizing company; for this purpose, a valuation shall be carried out within a term of not more than 60 days from the date of entry into force of this Supreme Decree.

Bolivia Exhibit ("B. Ex.") 1 (Supreme Decree No. 29544).

The decree is fully consistent with international law, which recognizes the right of a sovereign state to nationalize foreign-owned property, subject to the condition that the state provide the former owner with appropriate compensation. *Banco Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d 875, 891-93 (2d Cir. 1981). There is no obligation that compensation be instantaneous. That would be an impossibility, in any event, because time is required to assess and determine the value of the nationalized property, and therefore the amount of compensation that is appropriate. Thus, the Restatement on Foreign Relations Law of the United States provides, for example, that compensation should be paid "within a reasonable time" after a nationalization of foreign-owned property.[1]   And the Bilateral Investment Treaty between the Kingdom of the Netherlands (of which Plaintiff is a national) and Bolivia provides, in the case of

---

[1]     Restatement (Third) of Foreign Relations Law of the United States, § 712.

Bolivia's nationalization of property owned by Dutch nationals, for payment of "just" compensation "without undue delay."[2]  Yet Plaintiff filed this suit alleging Bolivia's unlawful expropriation of its property, and moved *ex parte* for an order of attachment, a mere *four days* after the decree was issued.

Claiming the clairvoyance to discern Bolivia's "secret" intentions, Plaintiff alleges that Bolivia has secretly decided not to compensate it for its shares of Entel, in spite of the clear language of the nationalization decree quoted above.  Plaintiff repeats this allegation various times, in its Complaint and its Memorandum seeking confirmation of the *ex parte* attachment, as if repetition could substitute for a lack of evidence.  *See, e.g.*, Complaint ("Compl."), ¶¶29,31; Plaintiff's Memorandum ("Pl. Mem."), pp. 2,11,18,19,22.   To demonstrate Bolivia's alleged malevolence, Plaintiff musters only (i) a self-serving affidavit from one if its own officers stating that he believes, based on his (unidentified) "sources" that Bolivia does not intend to compensate Plaintiff; and (ii) an unsigned, undated document of unknown provenance purportedly received by Plaintiff's officer in April 2008 suggesting that Bolivia not pay compensation to Plaintiff.  Pl. Ex. D, ¶¶22-25 and Ex. 7 thereto.  Neither constitutes admissible evidence, and both are contradicted by the express language of the subsequently-issued nationalization decree that Plaintiff itself has furnished to the Court.

For the record, Bolivia fully intends to comply with all the provisions of its own nationalization decree and with its international legal obligations.  Plaintiff has failed to properly allege, let alone demonstrate, any illegal conduct on Bolivia's part.

---

[2]     Pl. Mem., Ex. F and Ex. B thereto, Agreement on encouragement and reciprocal protection of Investments between the Kingdom of the Netherlands and the Republic of Bolivia, Article 6.

Continuing its misguided effort to portray Bolivia as an international scofflaw, Plaintiff proclaims that Bolivia has refused to participate in the ICSID arbitration that Plaintiff filed against it.  Plaintiff has submitted no evidence to support this allegation. Under the ICSID Arbitration Rules, Bolivia is not required to take any action before Plaintiff has named one of the three arbitrators who will hear and decide the case.  *See* ICSID Arbitration Rule 3(1)(b). Although Plaintiff filed its claim with ICSID in October 2007 -- more than seven months ago -- it still has not named an arbitrator.  Bolivia, therefore, has not failed to meet any of its legal obligations.  It is Plaintiff, not Bolivia, which has shown contempt for the law, by recurring to this Court for the purpose of imposing, *ex parte*, an entirely illegal prejudgment attachment of Entel's assets to secure a possible ICSID award against Bolivia in an arbitration Plaintiff has been reluctant to prosecute.

As set forth below, the FSIA does not allow Plaintiff to get away with this.  It fully immunizes Bolivia's and Entel's assets from prejudgment attachment by this Court.

### A.    BOLIVIA'S AND ENTEL'S ASSETS ARE IMMUNE FROM PREJUDGMENT ATTACHMENT UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT BECAUSE NEITHER DEFENDANT HAS EVER EXPLICITLY WAIVED ITS IMMUNITY FROM PREJUDGMENT ATTACHMENT.

The FSIA sets forth the sole and exclusive standards to be used in resolving questions concerning the sovereign immunity of foreign states before the federal and state courts in the United States.  *Stephens v. National Distillers and Chemical Corp.*, 69 F.3d 1226, 1227 (2d Cir. 1995) (*citing* H.R.Rep. No. 94-1487, 94th Cong., 2d Sess. (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6610 ("FSIA Legislative History")).  The Supreme Court and the Second Circuit have recognized "the FSIA as a 'comprehensive set of legal standards'…preempting other laws purporting to set forth rules for suits against foreign sovereigns."  *Id*. (*citing Verlinden*

*B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488 (1983) and *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 437-38 (1989)).

Under the FSIA, a foreign state and its agencies and instrumentalities are immune from the jurisdiction of the federal and state courts of the United States unless one of the specific exceptions to immunity enumerated in §§1605 to 1607 of the FSIA applies.  If none of the listed exceptions applies, there is no subject matter jurisdiction in a case against a foreign state.  28 U.S.C. §§1330(a), 1604; *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-39 (1989); *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *Reino de Espana v. American Bureau of Shipping, Inc.*, 328 F.Supp.2d 489, 492 (S.D.N.Y. 2004) (LTS).  It is always the plaintiff's burden to identify an applicable exception to the immunity of a sovereign defendant. *Reino de Espana v. American Bureau of Shipping*, 2006 U.S. Dist. LEXIS 49545 (LTS) at *5-6 (S.D.N.Y. 2006) (*quoting Cabiri v. Govt. of the Republic of Ghana*, 300 F.3d. 230, 241 (2d Cir. 2002) ("'the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted'"); *Hirsh v. State of Israel*, 962 F.Supp. 377, 379-80 (S.D.N.Y. 1997) (citing *Drexel Burnham Lambert Group, Inc. v. Committee of Receivers for Galadari*, 12 F.3d 317, 325 (2d Cir. 1993) (same).   In this case, Plaintiff has failed to identify any exception that would strip Bolivia or Entel of their immunity under the FSIA. Tellingly, Plaintiff has not even mentioned the FSIA anywhere in its pleadings.

On this basis alone, this Court is without jurisdiction to hear this case, let alone to attach the assets of Entel to satisfy a potential arbitral award against Bolivia.  Moreover, even if *subject matter* jurisdiction over Bolivia and Entel were to exist under one of the exceptions to immunity set forth in the FSIA, there would still be no basis for the *prejudgment attachment* of Entel's assets, since prejudgment attachment is governed exclusively by §§1609 through 1611 of the

FSIA.  *Letelier v. Republic of Chile*, 748 F.2d 790, 798-99 (2d Cir. 1984) (it was not Congress's purpose to lift execution immunity wholly and completely, even where subject matter jurisdiction over the foreign state exists; an exception to immunity of the foreign state's property must exist under §1610 before an execution may be properly issued); *Liberian Eastern Timber Corp. v. Government of Republic of Liberia*, 650 F.Supp. 73, 76-78 (S.D.N.Y. 1986) (separately analyzing whether the Court had jurisdiction under §1605(a) of the FSIA to recognize and enforce an ICSID award rendered against Liberia and whether it had jurisdiction under §§1609 and 1610 to issue executions based upon a judgment recognizing the award; although jurisdiction existed under §1605(a)(6), a motion to vacate the executions was granted because there was no exception to immunity under §1610 of the FSIA); *LNC Invs. Inc. v. Republic of Nicaragua*, 115 F.Supp.2d 358, 361-363 (S.D.N.Y. 2000), *aff'd sub nom. LNC Invs. Inc. v. Banco Central de Nicaragua*, 228 F.3d 423 (2d Cir. 2000) (Nicaragua's subject matter jurisdictional waiver in loan agreement did not operate as a waiver of the immunity of its central bank's property from execution under §§1609 and 1611).

As these cases demonstrate, §1609 of the FSIA governs the attachment of property belonging to a foreign state, including its agencies and instrumentalities.  It sets forth the fundamental rule that the property of foreign states and their agencies and instrumentalities is immune from attachment, except as otherwise specifically provided in §§1610 and 1611 of the FSIA, or in existing international agreements to which the United States is a party.  Specifically, §1609 provides:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

*See also Em Ltd. v. Republic of Argentina*, 473 F.3d 463, 472 (2d Cir. 2007) ("The FSIA protects foreign states' property from attachment and execution, subject to existing international obligations, except under the conditions set forth in two other provisions of the FSIA, 28 U.S.C. §§1610 and 1611").

Sections 1610 and 1611 establish the conditions in which the property of a foreign state, and its agencies and instrumentalities, may be attached.  For present purposes, the relevant section is §1610, not §1611, since the latter sets forth the special rules that are applicable only to the property of a foreign state's central bank, monetary authority or armed forces, and none of these institutions is involved in the present case.  Section 1610 applies to all other property of a foreign state and its agencies and instrumentalities.  Sections 1610(a) through (c) apply to post-judgment attachment, that is, attachment of property *after* a final judgment or arbitral award has been issued.  Section 1610(d) is the only provision in the FSIA that addresses prejudgment attachment, setting forth the conditions in which the immunity from attachment prior to judgment provided by §1609 is not available.  Section 1610(d) provides:

> The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if –
>
> > (1)   *the foreign state has explicitly waived its immunity from attachment prior to judgment*, notwithstanding any withdrawal of the waiver the foreign sovereign may purport to effect except in accordance with the terms of the waiver, and
> >
> > (2)   the purpose of the attachment is to secure satisfaction of judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

Section 1610(d) thus establishes that the property of a foreign state may be attached prior to judgment, as an exception to the immunity provided in §1609, but only when the state has

"explicitly waived its immunity from attachment prior to judgment."  The Second Circuit has

repeatedly upheld this principle, ruling that the assets of a foreign state may not be subjected to

prejudgment attachment absent the State's explicit waiver of its immunity from attachment prior

to judgment.  Numerous cases can be cited for this proposition. A leading one is *S&S Machinery*

*Co. v. Masinexportimport*, 706 F.2d 411 (2d Cir. 1983), *cert. denied*, 464 U.S. 850 (1983) ("*S&S*

*Machinery*"), where the Court of Appeals vacated the prejudgment attachment of assets

belonging to a Romanian state bank and a Romanian state-owned trading company because:

"The Foreign Sovereign Immunities Act immunizes a 'foreign state' from prejudgment

attachment of its assets in the United States, unless that state explicitly waives its immunity."

*S&S Machinery*, 706 F.2d at 413.

The Court of Appeals has explained that, to be *explicit* under §1610(d), the waiver must

state in unambiguous, plain and unmistakable language that immunity from prejudgment

attachment is waived.  *S&S Machinery*, 706 F.2d at 416.  Thus, no language short of an *explicit*

waiver of immunity from *attachment prior to judgment* will suffice.  In *S&S Machinery* the

Second Circuit considered whether Romania had waived the immunity from *prejudgment*

attachment of its agencies and instrumentalities by virtue of its acceptance of the following

language in a Trade Agreement with the United States:

> They shall not claim or enjoy immunities from suit or execution of judgment or
> other liability in the territory of the other Party with respect to commercial or
> financial transactions, except as may be provided in other bilateral agreements.

*S&S Machinery*, 706 F.2d at 416-417.  The Court of Appeals ruled that the waiver of immunity

"from suit or execution of judgment or other liability" did not explicitly waive immunity from

prejudgment attachment, as required by §1610(d), and thereby vacated the order of prejudgment

attachment that had been issued by the District Court.  *S&S Machinery*, 706 F.2d at 418.

To the same effect is *O'Connell Machinery Co. v. M.V. Americana*, 734 F.2d 115 (2d Cir. 1984), *cert. denied* 469 U.S. 1086 (1984).  In *O'Connell* the Second Circuit held that Italy had not waived immunity from prejudgment attachment despite language in the Italian-U.S. Treaty of Friendship, Commerce and Navigation, in which Italy expressly waived immunity "from execution of judgment, or from any other liability." *O'Connell*, 734 F.2d at 117. The Court of Appeals ruled that the language *did not* waive Italy's immunity from prejudgment attachment, because it did not explicitly state that immunity from *prejudgment* attachment was waived: "Prejudgment attachment is permitted only where the foreign state explicitly has waived its immunity and the purpose of the attachment is not to obtain jurisdiction." *Id.*  Neither an implicit waiver, nor a general waiver of immunity from suit, nor even a waiver of immunity from execution of a judgment, will satisfy §1610(d).  What must be waived, both explicitly and unambiguously, is immunity from *prejudgment* attachment.

Section 1610(d) contrasts sharply with §1610(a), which applies to post-judgment attachments.  Unlike §1610(d), §1610(a) recognizes an *implicit* waiver of immunity in the case of *post-judgment* attachments.  According to the Second Circuit: "the requirement that the waiver of immunity from prejudgment attachment be *explicitly* made is underscored both by the plain language of §1610(d) and by the contrast between §1610(d) and §1610(a)." *S&S Machinery Co.,* 706 F.2d at 416.  Under §1610(a), a foreign state can waive immunity from attachment in execution of a judgment "implicitly as well as explicitly, while the immunity from *prejudgment attachment* can be waived only by unmistakable and plain language." *Id.* at 416 (emphasis in original).  In holding that Romania's waiver of immunity "from suit or execution of judgment or other liability" did not constitute the explicit waiver of *prejudgment* attachment required by §1610(d), the Court of Appeals found it "obvious" that "waivers of immunity from suit or from

- 11 -

execution of judgment have no bearing upon the question of immunity from prejudgment attachment." *Id*. at 417. The Appellate Court further explained that: "it would be improper for a court to subvert [§1610(d)] by substituting a judicially reconstituted gloss on a facially unclear document for an unequivocal waiver by the foreign state." *Id.* at 416. To the same effect is *Reading & Bates Corp. v. Nat'l Iranian Oil Co.*, 478 F.Supp. 724, 728-29 (S.D.N.Y. 1979), in which the District Court emphasized the contrast between a waiver of immunity from post-judgment attachment under §1610(b), which may be made "either explicitly or implicitly," and a waiver of immunity from prejudgment attachment under §1610(d), which can only be made "explicitly." *See also Banque Compafina v. Banco de Guatemala*, 583 F.Supp. 320, 325 (S.D.N.Y. 1984) (holding that Guatemala's waiver of "any right or immunity barring claims" cannot constitute waiver of immunity from prejudgment attachment under §1610(d)(1) of the FSIA).

In the present case, neither Bolivia nor Entel has waived its immunity from prejudgment attachment explicitly, or even implicitly. There has been no waiver of immunity from prejudgment attachment of any kind, let alone one that has been expressed in the kind of "unmistakable and plain language" that the Court of Appeals has said is required by §1610(d). *S&S Machinery Co.,* 706 F.2d at 416. Plaintiff's pleadings are entirely devoid of any reference to a waiver by Bolivia or Entel of their immunity from prejudgment attachment. Plaintiff has not even alleged an explicit waiver by either Defendant. Indeed, as indicated above, Plaintiff has preferred to ignore the issue completely. It chose not even to mention the FSIA in its Complaint, its motion papers, or its 23-page legal memorandum supporting a confirmation of the *Ex Parte* Order of Attachment. The Court will undoubtedly draw its own conclusions from Plaintiff's failure to do so.

There can be no dispute that, absent the explicit waiver described in §1610(d), and in light of the decisions of the Second Circuit interpreting that section, the assets of Bolivia and Entel are immune from prejudgment attachment.  Plaintiff admits that Bolivia is a foreign state. Compl., ¶6 ("Defendant Bolivia is a sovereign nation").  There is also no dispute – nor can there be – that Entel is an agency or instrumentality of Bolivia and, as such, is entitled to the same protections under §§1609 and 1610(d) as Bolivia itself.  Section 1610(d) makes clear that, for purposes of that section, "foreign state" includes both the foreign state itself and agencies and instrumentalities of the foreign state; in fact, §1610(d) specifically incorporates the definition of "foreign state" that is set forth in §1603(a), which defines "foreign state" to include an agency or instrumentality of a foreign state.  An "agency or instrumentality," as defined in §1603(b), is an entity that is (1) a separate legal person, corporate or otherwise; (2) majority-owned by, or an organ of, a foreign state; and (3) not a citizen of the United States.

Entel plainly meets this three-part test.  First, it is a corporation duly incorporated under the laws of Bolivia, with its own legal personality.  Compl., ¶5.  Second, it is majority-owned (97%) by the Republic of Bolivia, which previously owned 47% of Entel's shares but acquired majority ownership of the corporation on May 1, 2008, by means of the nationalization decree which immediately brought into its possession the 50% that belonged to Plaintiff.  Compl., ¶¶10, 26; Pl. Mem., pp. 2, 8 n.6, 10, 18, 19; Pl. Ex. D, ¶¶ 19, 20, 33.  Third, it is plainly not a citizen of the United States.  Accordingly, Entel is an agency or instrumentality of Bolivia under §1603(b), which makes it a "foreign state" under §1603(a).  As such, §1610(d) – which expressly applies to the property of "foreign states" under §1603(a) – renders Entel's property immune from prejudgment attachment absent an explicit waiver of immunity from attachment prior to judgment. The Second Circuit has repeatedly held that an agency or instrumentality of a foreign

state, like Entel, is to be treated as a foreign state for the purposes of §1610(d).  *See, e.g., S&S Machinery*, 706 F.2d at 413; *O'Connell*, 734 F.2d at 116-117; *Em Ltd.*, 473 F.3d at 472.

Simply put, Bolivia and Entel are both indisputably "foreign states" under the FSIA, and both are entitled to immunity from prejudgment attachment of their property absent their explicit waiver of immunity from attachment prior to judgment.  Since there has been no such waiver, their immunity under §1609 prevails, and the prejudgment attachment of their property is precluded by the FSIA.  As a consequence, the *Ex Parte* Order of Attachment may not be confirmed, and the order entered on May 5, 2008 must be vacated.

### B. THE PROPERTY OF ENTEL MAY NOT BE ATTACHED TO SECURE A POSSIBLE ARBITRAL AWARD AGAINST BOLIVIA, SINCE ENTEL IS NOT A PARTY TO THE ARBITRATION AND NO CLAIMS HAVE BEEN MADE AGAINST IT.

Independent from the fact that neither Bolivia nor Entel has explicitly waived the immunity of its property from prejudgment attachment, *Entel's* property cannot be attached for the purpose of securing satisfaction of a possible arbitral award *against Bolivia*, which – Plaintiff acknowledges – is the only party to the ICSID proceeding upon which it relies for an order of prejudgment attachment in this proceeding.  Compl., ¶¶2, 23; Pl. Mem., pp. 2, 9.  As a separate legal entity, Entel is not and cannot be liable for an arbitral award, or a judgment on an arbitral award, rendered against Bolivia, and its assets cannot be attached to secure payment of a future ICSID award against Bolivia.

Plaintiff concedes that the four attached bank accounts are Entel's assets, titled in Entel's name and maintained by it "for several years, in the regular course of its business."  Compl. ¶¶3, 30, 31, 36; Pl. Mem., pp. 1, 2, 12, 22-23.  It is well-established that "the party who possesses property is presumed to be the party who owns it."  *See, e.g., Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 86 (2d Cir. 2002)

(*citing Pollock v. Rapid Indus. Plastics Co.*, 113 A.D.2d 520, 525, 497 N.Y.S.2d 45, 49 (2d Dep't 1985). Entel, thus, is presumed to be the owner of bank accounts and any other property titled in its name. *Karaha Bodas*, 313 F.3d at 86 (*citing Kolodziejczyk v. Wing*, 261 A.D.2d 927, 928, 689 N.Y.2d 825 (4th Dep't 1999) and *Perkins v. Guaranty Trust Co. of New York*, 274 N.Y. 260, 261, 8 N.E.2d 849, 853 (1937)).

In fact, the four bank accounts that were attached pursuant to the *Ex Parte* Order of May 5th belong to Entel, not to Bolivia. *See, e.g.*, Entel's Opposition Memorandum, Second Declaration of Alejandro Salinas Vilela, ¶¶14, 16; First Declaration of Lorena Molina, ¶¶3-8. Bolivia's interest in terminating these attachments is based not on any ownership of the accounts, but on (i) its majority ownership of Entel and (ii) its interest in having Entel's separate legal status respected. It is beyond dispute that Entel is a separate legal entity under Bolivian law and that it controls its own assets. *See, e.g.*, Entel's Opposition Memorandum, Second Declaration of Alejandro Salinas Vilela, ¶¶3-5, 11-22, 26-27.

Plaintiff fails to offer any evidence to link Bolivia to the four Entel bank accounts, except as owner of a majority of Entel's shares. There are no documents or other proof evidencing Bolivia's ownership of the attached bank accounts, or any of Entel's other property. The only document in which Bolivia transferred to itself anything pertaining to Entel is the May 1, 2008 decree in which Bolivia transferred Plaintiff's shares in Entel from Plaintiff to the Bolivian State and agreed to compensate Plaintiff for its loss of those shares. B. Ex. 1 (Supreme Decree No. 29544), p. 2, Arts. 2-3. The decree's transfer of Plaintiff's shares in Entel to the Bolivian State and Bolivia's resulting position as a shareholder in Entel, however, have no impact on Entel's ownership of the bank accounts (or any of its other assets). *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 475-476 (2003) (holding that the FSIA did not affect underlying corporate law

principles, and stating that "[a] corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary"); *see also United States v. Wallach*, 935 F.2d 445, 462 (2d Cir. 1991) ("[S]hareholders do not hold legal title to any of the corporation's assets.  Instead, the corporation -- the entity itself -- is vested with the title" (citations omitted)).

The law is well-established that Entel's status as a separate juridical entity from Bolivia, in which Bolivia is the majority shareholder, creates a strong presumption that Entel's assets may not be utilized to satisfy the obligations of its state parent.  As the Supreme Court ruled in *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 626-27 (1983) (widely known as the *Bancec* case): "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such."  The Supreme Court explained:

> [f]reely ignoring the separate status of government instrumentalities would result in substantial uncertainty over whether an instrumentality's assets would be diverted to satisfy a claim against the sovereign, and might thereby cause third parties to hesitate before extending credit to a government instrumentality without the government's guarantee.  As a result, the efforts of sovereign nations to structure their governmental activities in a manner deemed necessary to promote economic development and efficient administration would surely be frustrated.

*Bancec*, 462 U.S. at 626 (footnotes omitted); *see also id.* at 627-628 (quoting FSIA Legislative History at 29-30, *as reprinted in* 1976 U.S.C.C.A.N. at 6628-29); *see also Letelier v. Republic of Chile*, 748 F.2d 790, 793-795 (2d Cir. 1984) (adopting and applying the presumption of separate corporate status of government instrumentalities to reverse the district court's grant of execution against the Chilean government-owned airline, LAN, to satisfy a U.S. judgment against Chile).  For the same reasons, Entel's assets may not be conflated with those of Bolivia.  Any other conclusion would unjustifiably allow the creditors of a foreign state to attach all of the assets of

its agencies and instrumentalities any time the foreign state issues directives that affect an agency's or instrumentality's assets. *Em Ltd. v. Republic of Argentina*, 473 F.3d 463, 475-476 (2d Cir. 2007) (*citing Bancec*, 462 U.S. at 628-33 (1983)).

The case law makes clear that the strong presumption of Entel's separate corporate existence from Bolivia, and the unavailability of its assets to satisfy a future judgment or arbitral award against Bolivia, can only be overcome by Plaintiff's demonstration that Entel has become the alter ego of Bolivia through Bolivia's abuse of the corporate form, such that recognizing Entel's status as a separate legal juridical status would "work fraud or injustice." *Em Ltd.*, 473 F.3d at 477 (*citing* and *quoting Bancec*, 462 U.S. at 628-629). Plaintiff bears the burden of proof on this issue. *Id.* at 477; *Letelier*, 748 F.2d at 795.

Far from carrying its burden of proof, Plaintiff has submitted *no* evidence that Bolivia has abused Entel's corporate form, or that there is any possibility of "fraud or injustice" if this Court were to follow the dictates of *Bancec*, *Letelier*, and *Em Ltd.* as to the separateness of Entel's corporate existence and the unavailability of its assets to secure a judgment against its state parent. In similar circumstances, the Second Circuit has had no difficulty concluding that the plaintiff had failed to carry its burden to show why the separate juridical status of a state-owned entity should be ignored. *Em Ltd.*, 473 F.3d at 479-80 (plaintiff presented no evidence or argument that central bank is the alter ego of Argentina, and Argentina's hypothetical ability to order the central bank's disposition of its assets was insufficient to overcome the presumption of central bank's separate juridical status from Argentina; district court's order vacating the restraint of the central bank's accounts affirmed); *Letelier*, 748 F.2d at 794-795 (Chile's control of the assets and facilities of LAN, its national airline, and use of LAN personnel and facilities in connection with explosives and conspirators involved in the assassination of Chilean diplomat

- 17 -

did not constitute an abuse of LAN's corporate form; orders granting execution against LAN's assets to satisfy judgment against Chile dismissed); *see also LNC Invs. Inc. v. Republic of Nicaragua*, 115 F.Supp.2d 358, 363-366 (S.D.N.Y. 2000), *aff'd sub nom. LNC Invs. Inc. v. Banco Central de Nicaragua*, 228  F.3d 423 (2d Cir. 2000) (LNC failed to prove that Nicaragua abused the central bank's corporate form or that respecting the central bank's separate juridical status would work a fraud or injustice; restraining notices against central bank's funds in New York vacated and quashed).

Accordingly, in addition to the fact that its property is immune from prejudgment attachment under the FSIA, Entel's property may not be attached to secure a possible future arbitral award or judgment against Bolivia, because it is a separate corporate and legal entity that is not responsible for the satisfaction of Bolivia's obligations.  For this independent reason, Plaintiff's Motion to Confirm the *Ex Parte* Order of Attachment must be denied.

### C.    NEITHER THE ICSID CONVENTION NOR THE NEW YORK CONVENTION PROVIDES FOR PREJUDGMENT ATTACHMENT PRIOR TO THE ISSUANCE OF A FINAL ARBITRAL AWARD

Plaintiff does not invoke the FSIA as a basis for the jurisdiction of this Court, even though the Supreme Court and the Second Circuit have made it abundantly clear that the FSIA is the *exclusive* basis for the exercise of jurisdiction over a foreign state by a federal or state court in the United States.  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (*citing Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 433 (1989)); *Stephens v. National Distillers and Chemical Corp.*, 69 F.3d 1226, 1227 (2d Cir. 1995) (*citing Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488 (1983) and *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 437-38 (1989)).

Ignoring the law, Plaintiff purports to base the Court's jurisdiction on the ICSID Convention and the New York Convention.  Compl., ¶7; Pl. Mem., p. 13.  Plaintiff does not

explain how either of these Conventions provides the Court with jurisdiction over the foreign

states that are Defendants in this action.  Nor does Plaintiff explain how the ICSID Convention

or the New York Convention could possibly serve as a basis for subjecting either Defendant's

property to prejudgment attachment in contradiction of §§1609 and 1610(d) of the FSIA.  To be

sure, Bolivia was once a party to the ICSID Convention (Plaintiff admits Bolivia withdrew from

that Convention as of November 2007) and is currently a party to the New York Convention, but

there is nothing in either of these Conventions that could conceivably operate as an explicit

waiver by Bolivia or Entel of the immunity of their property from prejudgment attachment under

§§1609 and 1610(d) of the FSIA.

>    **(1)    The ICSID Convention**

Plaintiff states that the arbitration that it has elected to pursue against Bolivia, and the

arbitration in aid of which it seeks the prejudgment attachment, is the ICSID arbitration that

Plaintiff filed against Bolivia on October 12, 2007, under Article 9(6) of the Agreement on

Encouragement and Reciprocal Protection of Investments between the Kingdom of the

Netherlands and the Republic of Bolivia (the "Netherlands/Bolivia BIT").  Compl., ¶¶2, 16-19,

23, 33-35; Pl. Mem., pp. 2, 5-6, 9, 17, 22.   Plaintiff acknowledges that its action for a

prejudgment attachment "arises under" the ICSID Convention.  Compl., ¶7; Pl. Mem., p. 13.

This, it turns out, is still another fatal blow to Plaintiff's effort to attach Bolivia's and

Entel's assets -- which is already dead on arrival under the FSIA.  Under the terms of the ICSID

Convention, once Plaintiff filed its Request for Arbitration on October 12, 2007, it was

*precluded* from seeking prejudgment attachment or any other type of provisional or conservatory

measure through the courts of any country (including the U.S. courts).  The ICSID Convention is

clear on this point.  Article 26 of the Convention provides:

> Consent of the parties to arbitration under this Convention shall, unless otherwise stated, be deemed consent to such arbitration to the exclusion of any other remedy.  A Contracting State may require the exhaustion of local administrative or judicial remedies as a condition of its consent to arbitration under this Convention.

Article 26 of the Convention has been consistently and authoritatively interpreted as providing "no role for domestic courts in ICSID arbitration prior to an award," with the "sole role of domestic courts" being limited to the recognition and enforcement of ICSID awards. Philip D. O'Neill, Jr., *American Legal Developments in Commercial Arbitration Involving Foreign States and State Enterprises*, 6 J. Int'l Arb. 116, 117 (1989); George Delaume, *ICSID Arbitration and the Courts*, 77 Am.J.Int'l. Law, 784, 784-785 (1983); *see also* Paul Friedland, *Commentary: ICSID Tribunals and Injunctions by State Courts,* 18 Arb. Int'l 323, 323 (2002) ("ICSID arbitration should be exclusive and not subject to injunctions by national courts whether or not the national courts were acting in conformity with national law").

Regarding Article 26, it has been the long-standing position of the U.S. Government, as a party to the ICSID Convention, that "….[t]he ICSID process is a distinct, international method of dispute resolution [and] ICSID's mandate to determine its own jurisdiction, and its ability to proceed ex parte if necessary eliminates any need to resort to domestic legal process."  Brief for the United States of America as Intervenor and Suggestion of Interest ("U.S. Brief"), *Maritime International Nominees Establishment v. Guinea* (693 F.2d 1094 (D.C.Cir. 1982)), 20 I.L.M. 1436, 1483 (1981).  As the U.S. Government explained:

> …the exclusive nature of the ICSID remedy, absent contrary agreement by the parties, demonstrates the independence that is desired for ICSID from domestic legal proceedings.  Indeed, a primary purpose of the Convention is to "protect[] Contracting States against other forms of foreign or international litigation." [citation omitted]  The Convention therefore provides a role for domestic legal process only in the enforcement of ICSID awards, and even then, the power of review in domestic court is sharply limited. [citation omitted]

U.S. Brief, 20 I.L.M. at 1483-1484.

The prohibition on national courts' involvement in connection with an ICSID proceeding, except for the enforcement of final ICSID awards after they have been issued, is based upon the necessity of according "proper deference to ICSID and the multilateral treaty structure establishing it, but also to eliminate any basis for the assertion of an international claim against the United States for the improper exercise of jurisdiction over a case within ICSID's exclusive jurisdiction." U.S. Brief, 20 I.L.M. at 1481. Under Article 64 of the ICSID Convention, a national court's assertion of jurisdiction over a Contracting State party to a case pending before ICSID exposes the United States to suit by the Contracting State before the International Court of Justice.[3] *See* Delaume, *ICSID Arbitration and the Courts*, 77 Am.J.Int'l. Law 784, 785 (1983) (the failure of a domestic court to honor a rule of abstention might expose its own State to an international claim before the International Court of Justice).

Plaintiff alleges that 22 U.S.C. § 1650a provides this Court with jurisdiction to attach Entel's assets to secure an ICSID arbitral award against Bolivia. Compl., ¶7; Pl. Mem., p. 4. However, a reading of that section shows that it does no such thing. In 22 U.S.C. §1650a, the U.S. Congress codified the requirements of Article 54 of the ICSID Convention, which requires Parties to the Convention to recognize and enforce ICSID arbitral awards. Section 1650a provides:

> (a)    **Treaty rights; enforcement; full faith and credit; nonapplication of Federal Arbitration Act**. *An award of an arbitral tribunal rendered pursuant to chapter IV of the convention* shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such

---

[3]    Article 64 of the ICSID Convention states: "Any dispute arising between Contracting States concerning the interpretation or application of this Convention which is not settled by negotiation shall be referred to the International Court of Justice by the application of any party to such dispute, unless the States concerned agree to another method of settlement."

> an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States. The Federal Arbitration Act (9 U.S.C. 1 et seq.) shall not apply to enforcement of awards rendered pursuant to the convention.
>
> (b)    **Jurisdiction; amount in controversy.** The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have exclusive jurisdiction over actions and proceedings under subsection (a) of this section, regardless of the amount in controversy.

It is clear from the plain language of 22 U.S.C. §1650a that it applies only to the recognition and enforcement of an award of an ICSID arbitral tribunal,[4] and not to a situation where -- as here – no award has been rendered. There is nothing whatsoever in §1650a that speaks to, or authorizes, the jurisdiction of the U.S. courts to attach assets prior to the issuance of the arbitral award, whether to secure execution of the eventual award or for any other purpose. Certainly there is nothing in 22 U.S.C. §1650a that could establish the Court's jurisdiction in the present case, where no arbitral award has been entered, to attach assets of Bolivia or Entel that are, in any event, immune from prejudgment attachment under §§1609 and 1610(d) of the FSIA.

The United States, as a party to the ICSID Convention, has long recognized that a state's consent to ICSID arbitration *does not operate as a waiver of immunity* from the jurisdiction of the U.S. courts, even where the arbitration is to be held at the ICSID headquarters in the United States. The only exception is for the enforcement of an ICSID arbitral award:

> In view of ICSID's international character, the United States does not believe an arbitration agreement contemplating ICSID proceedings can fairly be interpreted as a waiver of sovereign immunity, except for purposes of enforcing the resulting award.

---

[4]    Chapter IV of the ICSID Convention, referenced in 22 U.S.C. §1650a, lays out, among other things, the procedure and rules governing the rendering of ICSID awards; a request for the interpretation, revision or annulment of an ICSID award; and the recognition and enforcement of a final ICSID awards. ICSID Convention, Chapter IV, Sections 5-6.

....

> Proceedings before ICSID, or arbitral panels established pursuant to the ICSID Convention, have an international rather than a national character.  The ICSID Centre, itself, is an international organization which the United States as host is obligated to accord appropriate privileges and immunities.  ICSID Convention, Art. 18-21, 23-24.  See 22 U.S.C. §288-288e; Exec. Order 11966, 42 Fed. Reg. 4331 (1977).  More importantly, individuals appearing in ICSID proceedings, whether at the Centre, or before ICSID arbitral panels established elsewhere, are entitled to similar treatment under the Convention, *including immunity from domestic legal process.*  ICSID Convention, Art. 21-22,…In consequence, we submit that ICSID's location in the United States must be deemed irrelevant for purposes of ascertaining whether a foreign state has consented to U.S. jurisdiction.  An ICSID arbitration does not take place "in the United States," as that phrase is used in the legislative history of the Foreign Sovereign Immunities Act.

U.S. Brief, 20 I.L.M. at pp. 1484-1485.

The only exception to the rule that judicial proceedings may not be invoked in aid of ICSID arbitrations prior to the issuance of the final arbitral award is set forth in Rule 39(6) of the ICSID Arbitration Rules.  But that exception is limited to the sole circumstance in which the parties have expressly agreed, in the instrument constituting their consent to ICSID arbitration, that provisional measures for the preservation of their respective rights during the pendency of the arbitration may be pursued in the courts.  Rule 39 provides:

> Nothing in this Rule shall prevent the parties, *provided that they have so stipulated in the agreement recording their consent*, from requesting any judicial or other authority to order provisional measures, prior to or after the institution of the proceeding, for the preservation of their respective rights and interests.

In their authoritative interpretation of the ICSID Arbitration Rules, Ibrahim F.I. Shihata (the Secretary-General of ICSID) and Antonio R. Parra (the Deputy Secretary-General of ICSID), explained that, under Rule 39: "It is now clear that recourse may not be had to courts for provisional measures unless the parties have stipulated otherwise in their consent to arbitration. In the case of ICSID Convention arbitration proceedings brought under [bilateral investment

treaties] and multilateral treaties dealing with investment, this in practice means that court-ordered provisional measures will be available only if so provided in the BIT or multilateral treaty containing the consent of the State party to the dispute." Ibrahim F.I. Shihata & Antonio R. Parra, *The Experience of the International Centre for Settlement of Investment Disputes*, 14 ICSID Rev.- F.I.L.J. 299, 324 (1999)

According to Plaintiff, the agreement containing Bolivia's consent to ICSID arbitration is the Netherlands/Bolivia BIT.  Compl., ¶¶2, 16-19, 23, 33-35.  It is significant, then, that the BIT contains no provision stipulating to – or even addressing – the ability of the parties to seek prejudgment attachment or other provisional measures in any national courts after the ICSID arbitral proceedings have commenced or while they are in progress. There is no other document in which the Netherlands (on behalf of Netherlands investors, including Plaintiff) and Bolivia, or Plaintiff and Bolivia, stipulated that such actions could be brought while an ICSID arbitration is pending.  As a result, Plaintiff cannot now, in this case, seek -- and this Court may not grant -- a prejudgment attachment that Plaintiff has already waived by submitting to ICSID arbitration. Such an attachment would violate the governing principles of the very ICSID arbitration which Plaintiff invokes as the basis for its requested relief.

Accordingly, neither the ICSID Convention nor 22 U.S.C. §1650a  provides this Court with any jurisdictional basis to order the prejudgment attachment of Bolivia's or Entel's property in the United States, nor does either operate as an explicit waiver of the immunity of the Defendants' property from prejudgment attachment under the FSIA.

### (2)    The New York Convention

The New York Convention is equally unavailing to Plaintiff.  The only provision of that Convention that could possibly apply to an attachment action of any sort is found in its Article VI, which provides:

> If the application for the setting aside or suspension of *the award* has been made to a competent authority referred to in article V(1)(e), the authority before which *the award is sought to be relied upon* may, if it considers it proper, adjourn the decision on the enforcement of the award and may also, on the application of the party claiming *enforcement of the award*, order the other party to give suitable security.[5]

The plain language of Article VI demonstrates that it applies only *after* an arbitral award has been issued. It speaks only to actions to enforce arbitral awards already made. It provides that, in a case in which the losing party in the arbitration has moved before another "competent authority" to set the award aside or suspend it, the court may "adjourn the decision on the enforcement of the award" until the "competent authority" rules. Article VI further provides that, in such circumstances, the court may order the losing party "to give suitable security" to "the party claiming enforcement of the award." Article VI says nothing about, and has no application to, circumstances like those present here, where no arbitral award yet exists and no action to enforce an arbitral award has been (or could be) made. It has no relevance to a case, like this one, where Plaintiff is seeking prejudgment attachment of Defendants' property while an arbitration is ongoing, and long before an award is issued. Plainly, Bolivia's accession to the New York Convention, which says nothing else about attachment of property (pre- or post-arbitral award), other than what is set forth in Article VI, cannot constitute an explicit waiver of immunity from prejudgment attachment of its property under §1610(d) of the FSIA. In the absence of an award in the pending ICSID proceeding, Bolivia's mere accession to the New

---

[5]    In footnote 4 of its Memorandum, Plaintiff asserts that Bolivia "is also a signatory" to the Inter-American Convention on International Commercial Arbitration (the "Inter-American Convention"), Article 6 of which contains a provision similar to Article VI of the New York Convention. However, Article 6 of the Inter-American Convention does not operate as an explicit waiver of the immunity from pre-judgment attachment of Bolivia's or Entel's property in the United States, for the same reasons that Article VI of the New York Convention does not constitute such a waiver.

York Convention cannot be read as the type of unmistakable, plain, and unambiguous waiver required under the FSIA for the prejudgment attachment of its or Entel's property in the United States.

In its Memorandum, Plaintiff cites three cases in support of its assertion that the New York Convention somehow authorizes this Court to order a prejudgment attachment of Defendants' property. None of these cases helps Plaintiff, however. None of them construes Article VI of the New York Convention in any context, much less interprets it as the type of unmistakable, unambiguous and plain language required for a foreign state or its agencies or instrumentalities to explicitly waive immunity from prejudgment attachment under §1610(d). Indeed, two of the cited cases involved strictly private parties, none of which was a foreign state covered by the FSIA. In the third case, one of the parties was a state-owned corporation, but it does not appear to have invoked the FSIA or asserted defenses thereunder.[6]

Plaintiff has cited no case, nor can it cite any, in which a U.S. court has interpreted a foreign state's accession to Article VI or any other provision of the New York Convention as an explicit waiver of immunity from prejudgment attachment for purposes of §1610(d). In fact, there are no cases, because there is nothing in Article VI or elsewhere in the Convention that could possibly operate as such a waiver.[7]

---

[6]    Plaintiff's three cases are: *Venconsul N.V. v. TIM International*, 2003 WL 21804833 (S.D.N.Y Aug. 6, 2003) (LTS) (involving a dispute between two Dutch companies, both principal shareholders of a third privately-owned company of Venezuelan nationality); *Borden, Inc. v. Meiji Milk Products Co.*, 919 F.2d 822 (2d Cir. 1990) (involving private corporations from the United States and Japan); and *Alvenus Shipping Co. v. Delta Petroleum (U.S.A.) Ltd.*, 876 F.Supp. 482 (S.D.N.Y. 1994) (involving private corporations from England and Wales and the United States, a corporate "agency of the Government of Ecuador" that does not appear to have raised FSIA defenses, and the Ecuadorian company's New York law firm).

[7]    In addition to the reasons set forth in Sections II(A), (B), and (C) of this Memorandum, Plaintiff's present motion must fail because Plaintiff has failed to meet the standards for pre-judgment attachment under New York law. N.Y. C.P.L.R. Article 62 and § 7502(c) (McKinney 1980). Bolivia need not address New York law because the FSIA is fully dispositive of the issues presented by Plaintiff's Motion to Confirm the *Ex Parte* Order of Attachment. Bolivia notes, however, that it is in agreement with the argument presented by Entel in Section VII of

## D.    BOLIVIA IS ENTITLED TO ALL COSTS AND DAMAGES INCLUDING ATTORNEY'S FEES UNDER CPLR §6212(e)

As demonstrated, Plaintiff is not entitled to a prejudgment attachment of Entel's or Bolivia's property.  As a result, if its Motion to Confirm the *Ex Parte* Order of Attachment is dismissed, Plaintiff is liable to Bolivia for all costs and damages, including attorney's fees, under CPLR §6212(e).  The statute expressly provides for such costs in cases where the plaintiff was not entitled to an attachment:

> <u>Damages</u>.  The plaintiff shall be liable to the defendant for all costs and damages, including reasonable attorney's fees, which may be sustained by reason of the attachment if the defendant recovers judgment, or if it is finally decided that the plaintiff was not entitled to an attachment of the defendant's property.  Plaintiff's liability shall not be limited by the amount of the undertaking.

N.Y. C.P.L.R. §6212(e) (McKinney 1980).

The purpose of §6212(e) is "to make the attaching plaintiff strictly liable for all damages occasioned by a wrongful attachment….  The plaintiff's statutory liability for wrongful attachment includes 'reasonable attorney's fees' which may be sustained by reason of the attachment."  *Roth v. Pritikin*, 787 F.2d 54, 59 (2d Cir. 1986) (*quoting* the statute and commentary).  The state and federal courts in New York applying New York law regularly enforce a defendant's right to costs and attorney's fees in cases where a plaintiff's complaint for attachment is not sustained.  *See*, *e.g.*, *Roth*, 787 F.2d at 58-59; *Merck & Co., Inc. v. Technoquimicas S.A.*, No. 9 Civ. 5345 (NRB), 2001 WL 963977, at *2 n.5 (S.D.N.Y. Aug. 22, 2001) (noting that "[t]here is clear state and federal authority for the proposition that if a plaintiff

---

its Memorandum, which it incorporates herein by reference, and it reserves its rights to contest Plaintiff's arguments under New York law in the future, in the unlikely event it becomes necessary to do so.

seeks an attachment that is later vacated under §6212(e), the defendant may then seek attorney's fees from that plaintiff").

Based on the foregoing, Bolivia is entitled to compensation for its costs and damages including attorney's fees.  Foreign states, like private parties that have been victims of unlawful attachments, are entitled to such relief under the CPLR.  *See Concord Reinsurance Co., Ltd. v. Caja Nacional De Ahorro y Seguro*, No. 93 Civ. 6606 (JSM), 1994 WL 260779 *2 (S.D.N.Y June 7, 1994) (where the court vacated an attachment pursuant to the FSIA, and held that the sovereign defendants were entitled to costs and damages including attorney's fees under the CPLR).

## III.    CONCLUSION

Based upon each of the foregoing reasons, Plaintiff's Motion to Confirm the *Ex Parte* Order of Attachment should be denied; and the attachments of Entel's four bank accounts in New York should be dissolved; and Plaintiff should be required to pay for the costs and damages, including attorneys fees, incurred in opposing the Motion.  Bolivia respectfully requests oral argument on Plaintiff's Motion and this Opposition.

Respectfully submitted,

FOLEY HOAG LLP

By: *Ronald E. M. Goodman*

Ronald E.M. Goodman (RG 6698)
Paul S. Reichler
Janis H. Brennan
1875 K Street NW
Washington, D.C.  20006
Telephone:  202-223-1200
Facsimile:  202-785-6687
*Counsel to the Republic of Bolivia*

Date:   June 11, 2008

# EXHIBIT 1

**OPPOSITION OF DEFENDANT THE REPUBLIC OF BOLIVIA
TO PLAINTIFF'S MOTION TO CONFIRM *EX PARTE* ORDER OF
ATTACHMENT**

<u>**SUPREME DECREE NO. 29544**</u>

**EVO MORALES AYMA**
<u>**CONSTITUTIONAL PRESIDENT OF THE REPUBLIC**</u>

**WHEREAS**:

Capitalization Law No. 1544 dated March 21, 1994 provided for the capitalization of several public companies, among them, the Empresa Nacional de Telecomunicaciones – ENTEL.

For this purpose, ENTEL was transformed into a Mixed Corporation, converting workers into shareholders up to the amount of their benefits; subsequently it was converted into a corporation through the signing of a capitalization agreement with a strategic partner and a pseudo-transfer of stock to Bolivian citizens of legal age on December 31, 1995. The sole purpose of this action was to divest the State of its share in the capitalized company and release it to private interests.

No shares were ever issued in favor of Bolivian citizens, and consequently they never received dividends nor did they participate or appoint representation to the Board of Directors or to the Shareholders' Meetings of the capitalized company, thus distorting the Corporation's nature claimed by ENTEL S.A., which does not comply with the provisions of Article 137 of the Code of Commerce.

The Stock Subscription Agreement dated November 27, 1995 required the capitalizing company to invest the amount of the stock subscription in the telecommunications sector, for the benefit of ENTEL; the agreement provided for the existence of a reserve fund for issuance premiums. In the end, the amount was distributed among shareholders through a voluntary capital reduction process, agreed upon at the Shareholders' Meeting held from September 16 through September 20, 2005, which caused the decapitalization of the company.

Within the framework mentioned above, the National Government, by means of Supreme Decree No. 29087 of March 28, 2007, provided for the creation of an Ad Hoc Commission to negotiate the recovery of ETI EUROTELECOM INTERNATIONAL NV stock in ENTEL S.A.

In spite of having consented to the negotiation process, officially designated its representatives and participated in three meetings of the Government Commission, the capitalizing company unilaterally interrupted the course of negotiations.

The National Government, through Supreme Decree No. 29101 of April 23, 2007, provided for the transfer in favor of the Bolivian State, at no charge, of the shares of the Bolivian citizens that were part of the Collective Capitalization Fund at ENTEL S.A., managed by the Administrators of Pension Funds "Futuro de Bolivia S.A. AFP" and "BBVA Prevision AFP S.A."

The Political Constitution of the State declares in Article 133 that the use of natural and human resources shall be for the purpose of national independence and the development of the country while protecting the security of the State and in pursuit of the well-being of the Bolivian people.

Pursuant to Articles 24 and 135 of the Political Constitution of the State, all companies established in the country shall be considered national companies and shall be subject to the sovereignty, laws and the authorities of the Republic.

**IN CABINET MEETING,**

**DECREES**:

**ARTICLE 1. - (PURPOSE)**. It is the purpose of this Supreme Decree to nationalize the stock package held by ETI EUROTELECOM INTERNATIONAL NV in Empresa Nacional de Telecomunicaciones Sociedad Anonima – ENTEL S.A.

**ARTICLE 2. - (NATIONALIZATION)**. The totality of the stock package held by ETI EUROTELECOM INTERNATIONAL NV in ENTEL S.A. is nationalized. Stock held by this capitalizing company shall be transferred to the Bolivian State, [and placed] under the temporary ownership of the Ministry of Public Works, Services and Housing until the legal transformation of ENTEL S.A. into ENTEL SAM is completed. By virtue of this measure, every ENTEL S.A. subsidiary in Bolivia and abroad shall also be nationalized proportionally.

**ARTICLE 3. (PAYMENT OF THE VALUE OF THE STOCK)**. The Bolivian State shall pay ETI EUROTELECOM INTERNATIONAL NV the value of the nationalized stock to the capitalizing company; for this purpose, a valuation shall be carried out within a term of not more than 60 days from the date of entry into force of this Supreme Decree.

**ARTICLE 4. (LIABILITIES)**. As the General Treasury of the Nation had assumed all the liabilities of the public company ENTEL before its capitalization, financial, tax, labor, commercial and regulatory liabilities of ENTEL S.A., both receivable and contingent, shall be deducted at the time of final liquidation of the payment to the company ETI EUROTELECOM INTERNATIONAL NV.

**ARTICLE 5. (DIVIDENDS)**. The dividends generated by the nationalized stock shall be destined for reinvestment, technological development and growth of the

company, in accordance with the National Development Plan, the new Bylaws and the new institutional strategic plan while dividends corresponding to stock recovered by the State through Supreme Decree No. 29101 of April 23, 2007 shall continue to be destined for the *Fondo de Renta Dignidad*.

**ARTICLE 6. (ENTEL SAM)**.

I.      ENTEL S.A. shall be transformed into a mixed corporation, pursuant to the provisions of the Code of Commerce; for this purpose, the Shareholders' Meeting shall adapt its bylaws and constituent documents within a term of 180 calendar days starting from the date of entry into force of this Supreme Decree.

II.     The Ministry of Public Works, Services and Housing shall exercise legal protection over ENTEL S.A.M.

**ARTICLE 7. (CONTINUITY OF SERVICES)**.

I.      The continuity of all services rendered by ENTEL is hereby guaranteed; it shall be the responsibility of the entity regulating the telecommunications sector to ensure compliance with the provisions of this paragraph, pursuant to the Law of Telecommunications and its regulatory decrees.

II.     Persons preventing or disrupting in any way the normal development of the company or those whose actions cause damage or loss to its worth shall have charges brought against them before the Public Prosecutor for crimes of "Attempt against the safety of public services", "Anti-economic behavior", "Qualified Damage" and other crimes described in the Criminal Code.

**ARTICLE 8. (EMPLOYMENT)**.

I      Continued employment is guaranteed to ENTEL workers, pursuant to the provisions of Article 11 of Supreme Decree No. 28699 of May 1 2006.

II     Directors and higher-level officials of the capitalizing company are excluded from the provisions of the above paragraph.

**ARTICLE 9. (REGULATORY FRAMEWORK)**. The nationalized company shall be subject to the laws, regulations and authorities governing the telecommunications sector.

**ARTICLE 10 (ADMINISTRATION).**

I.    The Ministry of Public Works, Services and Housing, through the Deputy Minister of Telecommunication, shall adopt the measures necessary to ensure the temporary administration of the company and normal provision of services, until the corporate nature of the company is changed.

II.    Agreements executed by ENTEL S.A. granting the provision of certain services to third parties shall remain in effect. Agreements held with companies related to ETI EUROTELECOM INTERNATIONAL N.V. group shall be analyzed on a case-by-case basis and either ratified or voided, after issuance of technical and legal reports.

III.    Likewise, service agreements or consulting agreements executed with professionals or firms shall remain in effect, provided no legal incompatibility exists.

The Ministers of the State in their respective Offices shall be responsible for the execution and enforcement of this Supreme Decree.

Issued in the Government Palace of the city of La Paz, on the first day of the month of May of the year two thousand eight.

SIGNED/EVO MORALES AYMA, David Coquehuanca Céspedes, Juan Ramón Quintana Taborga, Alfredo Octavio Rada Velez, Walter San Miguel Rodriguez, Celima Torrico Rojas, Graciela Toro Ibañez, Luis Alberto Arce Catacora, Rene Gonzalo Orellana Halkyer, Angel Javier Hurtado Mercado, Oscar Coca Antezana, Susana Rivero Guzmán, Carlos Villegas Quiroga, Luis Alberto Echazu Alvarado, Walter Juvenal Delgadillo Terceros, María Magdalena Cajias de la Vega, Walter Selum Rivero.

**DECRETO SUPREMO N° 29544**
**EVO MORALES AYMA**
**PRESIDENTE CONSTITUCIONAL DE LA REPÚBLICA**

**C O N S I D E R A N D O:**

Que mediante Ley N° 1544 de Capitalización de 21 de marzo de 1994 se dispuso la capitalización de varias empresas públicas, entre ellas de la Empresa Nacional de Telecomunicaciones – ENTEL.

Que a este efecto se dispuso la transformación de ENTEL en sociedad anónima mixta, convirtiendo a los trabajadores en accionistas hasta el monto de sus beneficios sociales, produciéndose posteriormente su conversión en sociedad anónima, a través de la firma de un contrato de capitalización con un socio estratégico y una seudo transferencia de las acciones en favor de los ciudadanos bolivianos mayores de edad al 31 de diciembre de 1995, que tuvo el único propósito de despojar al Estado de su participación en la empresa capitalizada y de dejarla librada a intereses privados.

Que nunca se emitieron acciones en favor de los ciudadanos bolivianos y por consiguiente éstos nunca recibieron dividendos ni participaron o delegaron su participación en el Directorio ni en las Juntas de Accionistas de la empresa capitalizada, desvirtuándose de esta manera la naturaleza de sociedad anónima que ostenta ENTEL S.A. y que no se adecua a lo dispuesto por el Artículo 137 del Código de Comercio.

Que el Contrato de Suscripción de Acciones de 27 de noviembre de 1995 exigía que la empresa capitalizadora invierta el monto de la suscripción de acciones en el sector de telecomunicaciones en beneficio de ENTEL, disponiéndose en este contrato la existencia de un fondo de reserva por concepto de prima de emisión, monto que finalmente fue distribuido entre los accionistas a través del proceso de reducción voluntaria de capital, acordada por la Junta de Accionista realizada los días 16 y 20 de septiembre de 2005, provocando la descapitalización de la empresa.

Que en el marco descrito, el Gobierno Nacional, mediante Decreto Supremo N° 29087 de 28 de marzo de 2007 dispuso la creación de una Comisión Ad Hoc de negociación para la recuperación de las acciones de ETI EUROTELECOM INTERNATIONAL NV en ENTEL S.A.

Que no obstante de haber dado su consentimiento al proceso de negociación, acreditado oficialmente a sus representantes y participado en tres reuniones con la Comisión gubernamental, la empresa capitalizadora interrumpió unilateralmente el curso de las negociaciones.

Que el Gobierno Nacional, mediante Decreto Supremo Nº 29101 de 23 de abril de 2007, dispuso la transferencia en favor del Estado boliviano, a título gratuito, de las acciones de los ciudadanos bolivianos que formaban parte del Fondo de Capitalización Colectiva en ENTEL S.A., administradas por las Administradoras de Fondos de Pensiones "Futuro de Bolivia S.A. AFP" y "BBVA Previsión AFP S.A.".

Que la Constitución Política del Estado, en su Artículo 133 señala que el aprovechamiento de los recursos naturales y humanos tendrá como objetivo la independencia nacional y el desarrollo del país en resguardo de la seguridad del Estado y en procura del bienestar del pueblo boliviano.

Que de acuerdo a los Artículos 24 y 135 de la Constitución Política del Estado, todas las empresas establecidas en el país se consideran nacionales y están sometidas a la soberanía, leyes y autoridades de la República.

### EN CONSEJO DE MINISTROS

**DECRETA:**

**ARTÍCULO 1. (OBJETO).** El presente Decreto Supremo tiene por objeto nacionalizar el paquete accionario que tiene la empresa ETI EUROTELECOM INTERNATIONAL NV en la Empresa Nacional de Telecomunicaciones Sociedad Anónima – ENTEL S.A.

**ARTÍCULO 2. (NACIONALIZACIÓN).** Se nacionaliza la totalidad del paquete accionario de la capitalizadora ETI EUROTELECOM INTERNATIONAL NV en ENTEL S.A., debiendo las acciones de esta empresa capitalizadora ser transferidas al Estado boliviano bajo la titularidad transitoria del Ministerio de Obras Públicas, Servicios y Vivienda mientras se realice la transformación de la naturaleza jurídica de ENTEL S.A. a ENTEL SAM. En virtud de esta medida todas las empresas subsidiarias de ENTEL S.A., en Bolivia o en el extranjero, quedan también nacionalizadas en la cuota parte respectiva.

**ARTÍCULO 3. (PAGO POR EL VALOR DE LAS ACCIONES).** El Estado boliviano pagará el valor de las acciones nacionalizadas a la empresa capitalizadora ETI EUROTELECOM INTERNATIONAL NV., debiendo efectuarse a este efecto una valuación en un plazo no mayor a 60 días a partir de la vigencia del presente Decreto Supremo.

**ARTÍCULO 4. (PASIVOS).** Los pasivos financieros, tributarios, laborales, comerciales y regulatorios de ENTEL S.A., tanto exigibles como contingentes, serán deducidos a tiempo de efectuar la liquidación final para el pago a la empresa ETI EURO-

Gaceta Nº 7869

TELECOM INTERNATIONAL NV, toda vez que el Tesoro General de la Nación asumió todos los pasivos de la empresa pública ENTEL antes de la capitalización.

**ARTÍCULO 5. (DIVIDENDOS).** Los dividendos que generen las acciones nacionalizadas serán destinados a la reinversión, el desarrollo tecnológico y el crecimiento de la empresa, de conformidad al Plan Nacional de Desarrollo, los nuevos Estatutos y el nuevo plan estratégico institucional. En tanto que los dividendos que corresponden a las acciones recuperadas por el Estado por Decreto Supremo No. 29101 de 23 de abril de 2007 continuarán siendo destinados al Fondo de Renta Dignidad.

**ARTÍCULO 6. (ENTEL SAM).**

I.    ENTEL S.A. deberá ser transformada a la tipología de Sociedad Anónima Mixta, conforme a las previsiones del Código de Comercio, a cuyo efecto la Junta de Accionistas deberá adecuar sus normas constitutivas y estatutarias en el plazo de 180 días calendario, que será computable a partir de la vigencia del presente Decreto Supremo.

II.   El Ministerio de Obras Públicas, Servicios y Vivienda ejercerá la tuición sobre ENTEL S.A.M.

**ARTÍCULO 7. (CONTINUIDAD DE LOS SERVICIOS).**

I.    Se garantiza la continuidad de todos los servicios que presta ENTEL, siendo responsabilidad del órgano regulador del sector de telecomunicaciones velar por lo dispuesto en el presente parágrafo, de conformidad con la Ley de Telecomunicaciones y sus decretos reglamentarios.

II.   Las personas que de cualquier modo impidan o perturben el normal desenvolvimiento de la empresa o las que incurran en actos que denoten perjuicio o detrimento a su patrimonio, serán denunciadas ante el Ministerio Público por los delitos de "Atentado contra la seguridad de los servicios públicos", "Conducta antieconómica", "Daño calificado" y otras conductas delictivas tipificadas en el Código Penal.

**ARTÍCULO 8. (SITUACIÓN LABORAL).**

I.    Se garantiza la continuidad laboral de los trabajadores de ENTEL, conforme dispone el artículo 11 del Decreto Supremo No.28699 de 1ro de mayo de 2006.

II.   Se exceptúan de lo dispuesto en el parágrafo precedente a los funcionarios jerárquicos y directivos de la empresa capitalizadora.

**ARTÍCULO 9. (MARCO REGULATORIO).** La empresa nacionalizada estará sujeta a las leyes, reglamentos y autoridades que rigen en el sector de telecomunicaciones.

GACETA OFICIAL DE BOLIVIA

**ARTÍCULO 10. (ADMINISTRACIÓN).**

I.   El Ministerio de Obras Públicas, Servicios y Vivienda, a través del Viceministerio de Telecomunicaciones, adoptará las medidas necesarias para garantizar la administración transitoria de la empresa y la normal provisión de los servicios, hasta que sea transformada su naturaleza societaria.

II.  Los contratos suscritos por ENTEL S.A. en virtud de los cuales ciertos servicios son otorgados a terceros continuarán vigentes. Aquellos contratos suscritos con empresas vinculadas al grupo ETI EUROTELECOM INTERNATIONAL N.V. serán analizados caso por caso y en su caso ratificados o dejados sin efecto, previa emisión de informes técnicos y legales.

III. Asimismo continuarán vigentes los contratos de prestación de servicios o de consultoría suscritos con profesionales o firmas, siempre y cuando no existan incompatibilidades legales.

Los Señores Ministros de Estado, en sus respectivos Despachos, quedan encargados de la ejecución y cumplimiento del presente Decreto Supremo.

Es dado en el Palacio de Gobierno de la ciudad de La Paz, al primer día del mes de mayo del año dos mil ocho.

FDO. **EVO MORALES AYMA**, David Choquehuanca Céspedes, Juan Ramón Quintana Taborga, Alfredo Octavio Rada Vélez, Walker San Miguel Rodríguez, Celima Torrico Rojas, Graciela Toro Ibañez, Luis Alberto Arce Catacora, René Gonzalo Orellana Halkyer, Ángel Javier Hurtado Mercado, Oscar Coca Antezana, Susana Rivero Guzmán, Carlos Villegas Quiroga, Luis Alberto Echazú Alvarado, Walter J. Delgadillo Terceros, María Magdalena Cajías de la Vega, Walter Selum Rivero.



PRECIO OFICIAL PARA TODO EL PAIS Bs. 1

Impreso en Talleres de
Gaceta Oficial de Bolivia
Dirección:
Calle MERCADO Nº 1121
Edificio Guerrero Planta Baja

The LanguageWorks, Inc.
1123 Broadway
New York, NY 10010
Tel. 212 447 6060
Fax 212 447 6257

**Language**Works

STATE OF NEW YORK      )
                                          )          ss
COUNTY OF NEW YORK  )

## CERTIFICATION

This is to certify that the accompanying, to the best of my knowledge and belief, is a true and accurate translation into English of a "**Supreme Decree No. 29544**" completed on 6/5/2008, originally written in Spanish.

Gina St. Laurent
Director of Legal Translation Division
The LanguageWorks, Inc.

Sworn to and subscribed before me
This 5th day of June 2008

Notary Public

CHRIS SULLIVAN
Notary Public, State of New York
No. 01SU6146597
Qualified in Kings County
Commission Expires May 22, 2010