Robert L. Sills (RS 8896)
Steven J. Fink (SF 3497)
Ryan S. Lester (RL 5603)
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000
Facsimile:  (212) 506-5151
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

**E.T.I. EURO TELECOM INTERNATIONAL N.V.,**

          Plaintiff,

          -against-

**REPUBLIC OF BOLIVIA** and
**EMPRESA NACIONAL DE**
**TELECOMUNICACIONES ENTEL S.A.,**

          Defendants.

------------------------------------------------

08-CV-4247 (LTS)

**ORAL ARGUMENT AND**
**EVIDENTIARY HEARING**
**REQUESTED**

**REPLY MEMORANDUM OF E.T.I. EURO TELECOM INTERNATIONAL N.V.**
**IN SUPPORT OF ITS MOTION TO CONFIRM ORDER OF ATTACHMENT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT ....................................................................................................... 7

I.   THE FSIA DOES NOT APPLY IN THIS PROCEEDING ............................. 7

   A.   Entel Is Not an "Agency or Instrumentality of a Foreign State" as Defined By Section 1603(b) of the FSIA ............................................... 7

      1.   Bolivia Does Not Own a Majority of Entel's Shares.................. 8

         a.   Corporate Formalities Must Be Observed in Determining Share Ownership for FSIA Purposes ................................. 8

         b.   ETI's Shares in Entel Have Not Been Transferred to Bolivia............................................................................... 9

         c.   The Shares Were Not Transferred by Operation of the Nationalization Decree..................................................... 11

      2.   Bolivia Does Not Own a Majority of Any "Other Ownership Interest" in Entel ...................................................................... 11

      3.   Entel Is Not an "Organ" of Bolivia........................................... 12

   B.   Bolivia's Immunity Does Not Extend to Entel's Assets....................... 15

      1.   De Letelier and the Additional Cases Cited by Entel Do Not Apply Here............................................................................... 16

      2.   There Is No Immunity from Attachment because Entel's Assets Are Not Assets of a Foreign State............................................ 18

II.   THE COURT HAS SUBJECT MATTER JURISDICTION.......................... 20

III.  THE EQUITABLE DOCTRINES OF WAIVER AND ESTOPPEL PRECLUDE BOLIVIA AND ENTEL FROM INVOKING THE ICSID EXCLUSIVITY PROVISIONS ....................................................................... 24

   A.   Bolivia and Entel Are Estopped from Raising the ICSID Exclusivity Provisions............................................................................................. 24

   B.   Bolivia Has Waived Its, and Entel's, Right to Invoke the ICSID Exclusivity Provisions ........................................................................ 27

   C.   Confirming the Attachment Will Not Run Afoul of International Public Law .......................................................................................... 28

IV.   ENTEL'S OBJECTION ON PERSONAL JURISDICTION GROUNDS IS BASELESS .............................................................................................. 29

**TABLE OF CONTENTS**
**(continued)**

Page

V.     ETI HAS MADE THE SHOWING REQUIRED BY C.P.L.R. § 7502 ........................... 32

VI.    ENTEL AND BOLIVIA LACK STANDING TO OBJECT TO
       CONFIRMATION AS TO 50% OF THE ATTACHED FUNDS.................................. 33

CONCLUSION.................................................................................................................. 35

# TABLE OF AUTHORITIES

## CASE LAW

Af-Cap Inc. v. Chevron Overseas (Congo) Ltd.,
    475 F.3d 1080 (5th Cir. 2007) ............................................................................17

Allen v. Russian Fed'n,
    522 F.Supp. 2d 167 (D.D.C. 2007) ...................................................................12

Alvenus Shipping Co. v. Delta Petroleum (U.S.A.),
    876 F.Supp. 482 (S.D.N.Y. 1994) .............................................................21, 22

Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation,
    605 F.2d 648 (2d Cir. 1979).............................................................................31

Bandes v. Harlow & Jones, Inc.,
    826 F.Supp. 700 (S.D.N.Y. 1993) ...................................................................10

Bandes v. Harlow & Jones, Inc.,
    852 F.2d 661 (2d Cir. 1988).........................................................................34, 33

Borden, Inc. v. Meiji Milk Prods. Co.,
    919 F.2d 822 (2d Cir. 1990)....................................................................21, 22, 23

CME Media Enter. B.V. v. Zelezny,
    01-Civ-1773 (DC), 2001 U.S. Dist. LEXIS 13888 (S.D.N.Y. Sept. 10, 2001) .....................30

Compagnie Noga d'Importation et d'Exportation S.A. v. Russian Fed'n,
    361 F.3d 676 (2d Cir. 2004)..............................................................................9

County Natwest Sec. Corp. v. Jesup, Josephthal & Co., Inc.,
    579 N.Y.D.2d 376, (1st Dep't 1992) ..................................................................32

Daye Nonferrous Metals Co. v. Trafigura Beheer B.V.,
    96-Civ-9740 (RWS), 1997 U.S. Dist. LEXIS 9661 (S.D.N.Y. July 17, 1997) ......................32

De Letelier v. Republic of Chile,
    748 F.2d 790 (2d Cir. 1984)..........................................................................16, 17

Doctor's Assocs. v. Stuart,
    85 F.3d 975 (2d Cir. 1996)...............................................................................27

Dole Food Co. v. Patrickson,
    538 U.S. 468 (2003)..........................................................................8, 9, 10, 12

Drexel Burnham Lambert, Inc. v. Ruebsamen,
    531 N.Y.S.2d 547 (1st Dep't 1988)........................................................................32

Excel Shipping Corp. v. Seatrain Int'l S.A.,
    584 F.Supp. 734 (E.D.N.Y. 1984) .......................................................................31

Feder v. Turkish Airlines,
    441 F.Supp. 1273 (S.D.N.Y. 1977) .....................................................................31

Filler v. Hanvit Bank,
    378 F.3d 213 (2d Cir. 2004)..........................................................................12, 13

First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,
    462 U.S. 611 (1983)..........................................................................10, 16, 17

Frontera Resources Azerbaijan Corp. v. State Oil Co.,
    479 F.Supp. 2d 376 (S.D.N.Y. 2007)...................................................................30

Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,
    284 F.3d 1114 (9th Cir. 2002) ...........................................................................30

Glus v. Brooklyn Eastern Dist. Terminal,
    359 U.S. 231 (1959)..................................................................................24, 26

Grove Valve & Regulator Co., Inc. v. Iranian Oil Svcs., Ltd.,
    87 F.R.D. 93 (S.D.N.Y. 1980) ..........................................................................31

H.I.G. Capital Mgmt. v. Ligator,
    650 N.Y.S.2d 124 (1st Dep't 1996).....................................................................32

Habitations Ltd., Inc. v. BKL Realty Sales Corp.,
    554 N.Y.S.2d 117 (1st Dep't 1990).....................................................................32

Hemphill v. New York,
    380 F.3d 680 (2d Cir. 2004)...............................................................................26

Imperator Realty Co. v. Tull,
    228 N.Y. 447 (N.Y. 1920) .................................................................................25

Int'l Ins. Co. v. Caja Nacional De Ahorro Y Seguro,
    293 F.3d 392 (7th Cir. 2002) .............................................................................27

J.G. v. Board of Educ.,
    830 F.2d 444 (2d Cir. 1987)...............................................................................27

Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,
      313 F.3d 70 (2d Cir. 2002)..................................................................................................19, 22

Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,
      M-18-302 (TPG), 2004 U.S. Dist. LEXIS 23870 (S.D.N.Y. Oct. 6, 2004), aff'd, 2006
      U.S. App. LEXIS 5932, (2d Cir., Mar. 9, 2006).......................................................................19

Knaust v. City of Kingston,
      193 F.Supp.2d 536 (N.D.N.Y. 2002)......................................................................................34

LNC Investments, Inc. v. Republic of Nicaragua,
      No-96-CV-6360 (JFK), 2000 U.S. Dist. LEXIS 7814 (S.D.N.Y. June 8, 2000).....................19

Lane, Ltd. v. Larus & Brother Co.,
      243 F.2d 364 (2d Cir. 1957)...................................................................................................27

Lapidus v. Hiltzik,
      553 N.Y.S.2d 458 (2d Dep't 1990) ........................................................................................10

Liberian Eastern Timber Corp. v. Republic of Liberia,
      650 F.Supp. 73 (S.D.N.Y. 1986), aff'd without opinion, 854 F.2d 1314 (2d Cir. 1987).........19

Lujan v. Defenders of Wildlife,
      504 U.S. 555 (1992)................................................................................................................34

Maritime Int'l Nominees Establishment v. Republic of Guinea,
      693 F.2d 1094 (D.C. Cir. 1982) ..............................................................................................28

Matthysse v. Sec. Processing Services, Inc.,
      444 F.Supp. 1009 (S.D.N.Y. 1977) ........................................................................................10

Nassau Trust Co. v. Montrose Concrete Prods. Corp.,
      56 N.Y.2d 175 (N.Y. 1982) ....................................................................................................24

Nat'l American Corp. v. Federal Republic of Nigeria,
      425 F.Supp. 1365 (S.D.N.Y. 1977) ........................................................................................31

Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd.,
      476 F.3d 140 (2d Cir. 2007)....................................................................................................13

Reers v. Deutsche Bahn AG,
      320 F.Supp.2d 140 (S.D.N.Y. 2004)......................................................................................31

Robinson v. Pan American World Airways, Inc.,
      650 F.Supp. 125 (S.D.N.Y. 1986) ....................................................................................25, 26

Scheidemann v. Qatar Football Ass'n,
    No. 04-CV-3432(LAP), 2008 WL 144846 (S.D.N.Y. Jan. 15, 2008) ...................................13

Shaffer v. Heitner,
    433 U.S. 186 (1977)..................................................................................................29, 30

SiVault Sys., Inc. v. Wondernet, Ltd.,
    05-Civ.-0890 (RWS), 2005 U.S. Dist. LEXIS 4635 (S.D.N.Y. March 28, 2005).................32

Smith v. Universal Serv. Motors Co.,
    17 Del. Ch. 58 (1929) ...............................................................................................10

Valley Forge Christian College v. Americans United for Separation of Church & State,
    Inc.,
    454 U.S. 464 (1982)...................................................................................................34

Venconsul N.V. v. Tim Int'l N.V.,
    No. 03 Civ. 5387 (LTS), 2003 WL 21804833......................................................21, 22, 23

Walker Int'l Holdings Ltd. v. Rep. of Congo,
    395 F.3d 229 (5th Cir. 2004) .....................................................................................17

World-Wide Volkswagen Corp. v. Woodson,
    444 U.S. 286 (U.S. 1980)...........................................................................................29

## STATUTES

C.P.L.R. § 5201(a) ...........................................................................................................3, 20

C.P.L.R. § 5201(b) .................................................................................................................20

C.P.L.R. § 6202...................................................................................................................3, 20

C.P.L.R. § 6214(a) .........................................................................................................3, 16, 20

C.P.L.R. § 7502 (c) ................................................................................................................32

Fed. R. Civ. P. 64.............................................................................................................3, 16

N.Y.C.P.L.R. § 301.................................................................................................................31

U.C.C. §8-301 (1977) .............................................................................................................10

9 U.S.C. § 201 .........................................................................................................................20

9 U.S.C. § 203 ................................................................................20, 21, 22, 23

22 U.S.C. §1650a ...................................................................................................20

28 U.S.C. § 1331 ...................................................................................................20

28 U.S.C. § 1603(a) .................................................................................................7

28 U.S.C. § 1603(b) .............................................................................................7, 8

28 U.S.C. § 1603(b)(1) ...........................................................................................9

28 U.S.C. § 1603(b)(2) ..........................................................................8, 9, 12, 13

28 U.S.C. § 1604....................................................................................................7

28 U.S.C. § 1609.................................................................................................7, 18

28 U.S.C. § 1650a..............................................................................................22, 23

## ADDITIONAL AUTHORITIES

Fletcher, Cyclopedia of the Law of Private Corporations § 5481 ................................10

Fletcher, Cyclopedia of the Law of Private Corporations § 5481.50 ....................10, 11

Paul D. Friedland, Provisional Measures and ICSID Arbitration, 2 Arb. Int'l 335, 356
     (1986).................................................................................................................24

ICSID Article 64 ....................................................................................................28

ICSID Article 72 ....................................................................................................25

ICSID Arbitration Rule 3(1)(b) ..............................................................................26

ICSID Arbitration Rule 4(4) ...................................................................................26

ICSID Arbitration Rule 39 ......................................................................................26

ICSID Arbitration Rule 39(5) .................................................................................26

Plaintiff E.T.I. Euro Telecom International N.V. ("ETI") respectfully submits this reply memorandum in support of its motion to confirm the order of attachment entered by the Court on May 5, 2008 (the "May 5 Order") attaching certain assets of Empresa Nacional de Telecomunicaciones Entel S.A. ("Entel") found within the Southern District of New York.

## PRELIMINARY STATEMENT

The record is clear that, by decree, the Republic of Bolivia ("Bolivia") has formally expropriated ETI's interest in Entel, worth in excess of $300 million, and that it has done so without any compensation at all, let alone just compensation. Among the uncontested facts before the Court are the following:

- Bolivia does not deny that in a meeting conducted in La Paz, Bolivia in April 2008, "[t]he Bolivian Commissioners expressly stated that Bolivia would not pay anything to compensate ETI for the expropriation of its equity stake in Entel in light of the supposed 'irregularities.'" (Declaration of Franco Bertone, executed on May 4, 2008 (the "May 4 Bertone Decl.") ¶ 16).

- Bolivia does not offer the Declaration of any government representative – or any other evidence – to dispute the authenticity of the internal government planning document titled "Executive Summary, Recovery of Entel" that identifies the government's strategy as "[r]ecovering the ownership of the company for the State," and "[c]ompensation 0 due to the irregularities found . . . ." (May 4 Bertone Decl., Exh. 7, p. 2). Defendants' only response is Bolivia's half-hearted, technical argument that this unequivocal admission is not admissible because ETI has not yet had an opportunity to authenticate it. (Opposition Memorandum of The Republic of Bolivia, executed on June 11, 2008 ("Bolivia Memo.") at p. 5).

- On May 16, 2008, Reuters reported: "The government of President Evo Morales has declared that it owes Telecom Italia nothing, maintaining that Telecom Italia has not fulfilled its obligations towards investors and that it owes the government $645 million as fines and taxes." (Reply Declaration of Robert L. Sills, executed on June 23, 2008 ("Sills Decl."), Exh. 10).

- Bolivia's claim, "[f]or the record," that it "fully intends to comply with all the provisions of its own nationalization decree and with its international legal obligations" is mere rhetoric. (Bolivia Memo. at p. 5). As reported in the Bolivian press, the government announced immediately after issuing Supreme Decree No. 29544 (the "Nationalization Decree") that it will pay ETI no more than $75 to $100 million – the purported "book value" of the stock – and then will further reduce the payment to take

into account amounts that the government claims are due it from Entel. (See, Sills Decl., Exh. 11 ("Government will pay up to US $100 Millions for Entel," El Deber.com, May 3, 2008, p. 2) (reporting statement of Minister of the Presidency Juan Ramon Quintana that "we will pay, not a market price, but the book price, which is the real cost of this stock."); id. at p. 3; see also Sills. Decl., Exh. 12 ("The State Recovers Entel," BolPress.com, May 1, 2008) ("The financial, tax, labor, commercial and regulatory liabilities will be deducted . . . .")).[1]

Instead of focusing on these or other critical issues, the voluminous submissions made by Defendants deal in large measure with issues that are not before the Court. Defendants spill much ink on questions of sovereign immunity, despite the fact that the May 5 Order does not attach any assets of Bolivia. Instead, it attaches assets of Entel which, as Defendants go to great lengths to point out, is a corporation whose assets do not belong to Bolivia. Defendants' contention that Bolivia's sovereign immunity nonetheless shields Entel's assets from attachment is wrong for the simple reason that Bolivia does not own a majority interest in Entel – it does not own ETI's 50% of the shares of Entel stock, as a matter of either federal common law, international law or Bolivian law. Nor has Entel otherwise made the requisite showing that Entel is an "agency or instrumentality" of Bolivia, as would be required for the Foreign Sovereign Immunities Act ("FSIA") to apply in this proceeding.

Defendants also devote much of their papers to arguing that there is no basis to pierce Entel's corporate veil and treat Entel's assets as Bolivia's assets. They do so in an effort to show that Entel's assets are not available to satisfy a judgment against Bolivia. Even assuming that

---

[1] At the same April 2007 meeting when Bolivian government representatives told ETI that the government would not pay anything for ETI's stock, the representatives also claimed that Entel owed the government approximately $120 million in trumped-up taxes, penalties, interest, fines and surcharges. (May 4 Bertone Decl. ¶ 15, and Exh. 3, slide 16). It appears that the Bolivian government may subtract half of this amount from the $75-$100 million "book value" that the government has somehow assigned to ETI's 50% shareholding, then offer ETI, at most, between $15 and $40 million for its interest in Entel – a company that has been conservatively valued, by ABN Amro in 2007, at more than $300 million. (May 4 Bertone Decl. ¶ 9 and Exh. 1, p. 63).

2

they are correct, however, New York law (which applies, by operation of Rule 64 of the Federal Rules of Civil Procedure, to determine the availability of an attachment in this proceeding) explicitly provides that an order of attachment may be levied upon any interest of the defendant in personal property or "any debt owed to the defendant," i.e., Bolivia. See C.P.L.R. § 6214(a); see also, e.g., C.P.L.R. §§5201(a), 6202. Here, Bolivia claims that Entel owes it $60 million in taxes, penalties and interest in connection with a capital reduction made by Entel in 2005. (Third Declaration of Lorena Molina, executed on June 1, 2008 (the "Third Molina Decl.") ¶ 12). After being taken over by the Bolivian government on May 1, the company apparently conceded this obligation. (Sills Decl., Exh. 13 ("Restraining Order on Entel Accounts Lifted," El Diario, May 29, 2008) (reporting that restraining order on Entel assets imposed by the Bolivian government to secure payment of the $60 million in taxes, penalties and interest had been suspended "after the current authorities of the company provided a payment commitment, in addition to a prepayment amounting to approximately [60 million Bolivianos, or approximately $8 million at current exchange rates].")).[2]  Thus, ETI is entitled to attach Entel's funds because Entel has an admitted indebtedness to the Bolivian government, and there is no need to examine the question whether grounds exist to pierce Entel's corporate veil.

---

[2] At the meeting conducted in La Paz in April 2007, the Bolivian government asserted that Entel owed the government: (1) a total of $82.2 million in taxes and penalties, largely owing from the capital reduction that took place, with the approval of the Bolivian government, in 2005; (2) $21.5 million in claimed surcharges on purchases greater than $500,000; and (3) $16.7 million in fines and penalties for purported failure to meet investment and other goals. (May 4 Bertone Decl. ¶ 15, and Exh. 3 slide 16). Entel's assertion that the Bolivian government "unquestionably 'essentially took control' of ENTEL" when it issued the Nationalization Decree on May 1, 2008, suggests that Entel likely will concede all of these claimed obligations to the Bolivian government. (Opposition Memorandum of Entel, executed on June 11, 2008 ("Entel Memo.") at p. 8). Nowhere in Entel's opposition papers does it contest any of the Bolivian government's claims.

The other arguments raised by Defendants also lack merit. Entel's contention that it will suffer irreparable injury if the attached funds are not immediately released rings hollow in light of the public statement by Bolivia's Minister of Public Works, Óscar Coca, that "the $US 90 million attached in ENTEL accounts overseas will 'easily be recovered' since the company is 'highly profitable and its financial flow will immediately go back to normal'; the return rate is 44 percent." (Sills Decl., Exh. 14 ("The Government Asserts that Euro Telecom Has Accepted the New Rules," La Prensa.com, May 16, 2008)).[3] Indeed, Entel's claim that it is in desperate need of cash to make capital improvements without which Bolivia's telecommunications industry will collapse is groundless. As the Declaration of Franco Bertone – Entel's CEO until the Bolivian government sent in its national police force to take over the company – demonstrates:

- In 2006 and 2007, Entel generated between $40 and $50 million per year in excess cash after the payment of operating expenses, technical and capital investments, dividends and taxes. (June 23 Declaration of Franco Bertone, executed on June 23, 2008 ("June 23 Bertone Decl.") ¶¶ 5, 16). Thus, even if the company elects to make the $20 million in capital investments proposed by the government-installed "Intervenor," in addition to the $38 million in capital expenditures planned for 2008 under ETI management, the company, under any reasonable set of assumptions, will generate more than adequate current cash to pay for these investments by the time payment comes due 12-18 months from now. (Id. ¶¶ 19-20). Even the Intervenor goes no further than to speculate that Entel "may be" unable to pay for the investments that he proposes. (Declaration of Joel Flores Carpio, executed on June 10, 2008, ¶20). This is hardly a compelling showing of irreparable injury.

- Entel's infrastructure is state of the art and is more than adequate to meet the growth planned for 2008. (June 23 Bertone Decl. ¶¶ 10, 13).

- While Entel never needed to resort to either domestic or international financial institutions for credit under ETI's management in light of its strong cash flow, it has credit lines with local Bolivian banks that remain available in the unlikely event that it truly has short term cash needs. (Id. ¶¶ 33-34).

- Entel had already paid its dividends for 2007, in February 2008, and its income taxes, on April 30, 2008, before the May 5 Order was issued. (Id. ¶ 29). Dividends and

---

[3] Entel's claim of urgency is also belied by the fact that Entel and Bolivia both initially requested a month-long extension of their time to brief this motion. (Sills Decl. ¶ 15).

income taxes are typically the only payments funded by Entel out of the Banca Intesa and Unicredito accounts, where the vast majority of the attached assets were maintained. (Id. ¶ 28).

Remarkably, Defendants go so far as to invoke the exclusivity provisions of the International Centre for Settlement of Investment Disputes ("ICSID") Convention and Rules as a basis to escape attachment, despite Bolivia's persistent refusal to comply with its own obligations under the ICSID Convention and Rules and its evident intent to frustrate the ICSID proceeding in which it is obligated to participate by treaty. The Court will search the record in vain for any statement by Bolivia that it will ever appear in the ICSID proceeding, let alone satisfy any ICSID award that is entered against it. Moreover:

- The website elEconomista reported on October 23, 2007 that Bolivian Governmental Coordination Vice-Minister Héctor Arce stated at a press briefing that day that "due to its decision to withdraw from ICSID, the Bolivian State 'will not consent to the conduct of any kind of arbitration, and this is a sovereign decision that has been made by the administration of President Evo Morales.'" (Sills Decl., Exh. 1).

- On October 29, 2007, Gustavo Guzmán, Bolivia's Ambassador to the United States, sent a nine page letter to ICSID, arguing that ICSID had no jurisdiction to proceed on ETI's claim because Bolivia had denounced the Convention on the Settlement of International Disputes Between States and Nationals of other States (the "ICSID Convention"), with an effective date for that denunciation of November 2, 2007. In his letter, Ambassador Guzmán stated, among other things:

    (a) "[A] sovereign state cannot be forced to submit a dispute to arbitration without its consent . . . . " (Id. at Exh. 2, p. 3); and

    (b) "In denouncing the Convention, exercising nothing more than its sovereign rights, Bolivia does not waive the arbitration, but chooses to exit a system that, according to its experience and deeply considered point of view, suffers of serious defects. . . ." (Id. at p. 7).

- By letter from ICSID's Secretary General dated October 31, 2007, ICSID rejected Bolivia's argument and registered the Request, therefore beginning the arbitration process. (Id. at Exh. 3).

- Then, Digital Newspaper Red Erbol reported on December 3 that Bolivian Vice Minister Arce "remarked that the State renounced . . . the jurisdiction of the ICSID; in

other words, the Bolivian Government decided to no longer give its consent to any form of arbitration. For an arbitration process to take place, an agreement by both parties must exist, and in this case Bolivia does not agree with the court of the World Bank." Vice Minister Arce also stated that ICSID "illegally and irregularly accepted" ETI's Request for Arbitration against Bolivia. (Id. at Exh. 4).

- As recently as May 17, 2008, Bolivian newspaper La Prensa reported that Bolivian Minister of Public Works, Óscar Coca, "repeated that the complaint filed against ETI, as well as any similar proceedings that the state may file against other foreign companies, will be dealt with in Bolivia, not in international courts." (Id. at Exh. 5).

- Consistent with these public statements, Bolivia has failed to appear or participate in the ICSID arbitration in any way. (Id. ¶ 9). In particular, it failed to comply with its obligation under ICSID's arbitration rules to participate in establishing a process for arbitrator selection. The result was a delay of several months in establishing the arbitrator selection process. ICSID only confirmed the procedure to be used on April 25, 2008 – four business days before the Bolivian government issued the Nationalization Decree. (Id. ¶¶ 10-14).

Having thus frustrated ETI's efforts to establish an ICSID tribunal, Bolivia – and Entel, now under Bolivia's control – are estopped from invoking ICSID's exclusivity provisions. Under ICSID procedures, ETI would have been entitled to seek provisional relief from the arbitral tribunal, but such relief is available only after the tribunal is formed. Having precluded ETI from exercising its right to seek relief in the ICSID proceeding, Bolivia should not now be heard to argue that ICSID's rules prevent ETI from seeking such relief before this Court.

ETI believes that this record demonstrates conclusively that its motion to confirm should be granted. If, however, the Court determines that the record is insufficient to resolve any of the issues presented by the motion, ETI would respectfully request the opportunity to present evidence, including live witnesses, at a hearing to address these factual matters.

6

**ARGUMENT**

I.    **THE FSIA DOES NOT APPLY IN THIS PROCEEDING**

The FSIA does not apply for the simple reason that ETI has not attached any of Bolivia's assets. Indeed, Judge Chin, sitting as the Part I Judge, struck the reference to attachment of Bolivia's assets in ETI's proposed order before issuing the May 5 Order.

Entel distorts both the facts and the law in its effort to demonstrate, under four alternative theories, that Bolivia's sovereign immunity can somehow be stretched to encompass Entel's assets. These efforts fail: Bolivia does not own a majority of Entel's stock, Bolivia does not own a majority of any "other ownership interest" in Entel, Entel is not an "organ" of Bolivia, and ETI does not seek to hold Entel liable on an award against Bolivia. As a result, the Court need not consider Bolivia's or Entel's arguments that the FSIA deprives the Court of subject matter jurisdiction over this action by operation of 28 U.S.C. § 1604 or precludes the Court from granting pre-judgment attachment by operation of 28 U.S.C. § 1609. (Entel Memo. §§ I.C., I.D., IV, V; Bolivia Memo. § II.A).

A.    **Entel Is Not an "Agency or Instrumentality of a Foreign State" as Defined By Section 1603(b) of the FSIA**

The lynchpin of Defendants' argument that the FSIA applies in this action is their contention that Entel is an "agency or instrumentality" of Bolivia, and therefore entitled to the FSIA's protections. (Entel Memo. at pp. 3-20, Bolivia Memo. at pp. 6-14). That contention is wrong.

28 U.S.C. § 1603(a) defines a "foreign state" for purposes of the FSIA to "include[] . . . an agency or instrumentality of a foreign state as defined in subsection (b)." Section 1603(b), in turn, defines "agency or instrumentality of a foreign state" to mean:

[A]ny entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b). According to Defendants, the above definition applies to Entel because it is simultaneously (i) a corporation, a majority of whose shares are owned by Bolivia, (ii) a corporation a majority of whose "other ownership interest" is owned by Bolivia, and (iii) an "organ" of Bolivia. (Entel Brief at pp. 3-13.) They are wrong on all counts.

### 1.    Bolivia Does Not Own a Majority of Entel's Shares

ETI, not Bolivia, has possession of the share certificate evidencing its ownership of 50% of the shares of Entel's stock. (See Declaration of Francesco S. Lobianco, executed on June 20, 2008 ("Lobianco Decl.") ¶ 2). ETI has not endorsed that share certificate over to Bolivia. (Id. ¶ 3). Accordingly, ETI, not Bolivia, owns the stock.

### a.    Corporate Formalities Must Be Observed in Determining Share Ownership for FSIA Purposes

The rule is "that only direct ownership of a majority of shares by the foreign state satisfies the statutory requirement." Dole Food Co. v. Patrickson, 538 U.S. 468, 474 (2003). In determining share ownership, moreover, corporate formalities must be observed. As the Supreme Court explained in Dole:

Section 1603(b)(2) speaks of ownership. The Dead Sea Companies urge us to ignore corporate formalities and use the colloquial sense of that term. They ask whether, in common parlance, Israel would be said to own the Dead Sea Companies. We reject this analysis. In issues of corporate law structure often matters. It is evident from the Act's text that Congress was aware of settled principles of corporate law and legislated within that context. The language of

§ 1603(b)(2) refers to ownership of "shares," showing that Congress intended statutory coverage to turn on formal corporate ownership. Likewise, § 1603(b)(1), another component of the definition of instrumentality, refers to a "separate legal person, corporate or otherwise." In light of these indicia that Congress had corporate formalities in mind, we assess whether Israel owned shares in the Dead Sea Companies as a matter of corporate law, irrespective of whether Israel could be said to have owned the Dead Sea Companies in everyday parlance.

Id.

### b.    ETI's Shares in Entel Have Not Been Transferred to Bolivia

Bolivia does not own ETI's shares in Entel because ETI's share certificate has not been endorsed to Bolivia. In Compagnie Noga d'Importation et d'Exportation S.A. v. Russian Fed'n, 361 F.3d 676 (2d Cir. 2004), the Second Circuit declined to "cut the Gordian choice-of-law knot" presented by the question of what law – local law, federal common law or international public law – governs a determination whether an entity constitutes an "instrumentality" for purposes of the FSIA "because we conclude that the answer to this question is the same regardless which of the bodies of law advocated by the parties is applied here." Id. at 685. The same analysis applies here because, under both Bolivian law and federal common law, ownership of a certificated share of stock is not transferred until the certificate is endorsed to the transferee, and we are not aware of any international public law guidance on this question.

First, Bolivian law dictates that ownership of a share certificate is transferred only when both of the following conditions are satisfied: (1) the certificate is endorsed to the transferee; and (2) the endorsement is recorded in the registry of the relevant corporation. (Declaration of Ramiro Guevara, executed on June 23, 2008 ("Guevara Decl.") ¶¶ 5-6). Here, neither condition is satisfied. ETI possesses the share certificate evidencing its ownership of 50% of Entel's stock, and it has not endorsed that certificate to Bolivia. (Lobianco Decl. ¶¶ 2-3). Thus, no such endorsement is recorded in Entel's share registry. Indeed, the page of Entel's share registry that

purportedly reflects the transfer to Bolivia specifically notes that "the title owner of the shares did not present share certificate No. 0000001 . . . ." (Declaration of Javier Castro, executed on June 6, 2008 (the "Castro Decl."), Exh. E, p.1). Accordingly, no transfer has occurred for purposes of Bolivian law. (Guevara Decl. ¶ 10).

Second, federal common law similarly requires that a share certificate be endorsed to the new owner to establish a transfer of the ownership of certificated shares. In Dole, the principal authority cited by the Supreme Court in determining federal common law on corporate formalities in the FSIA context was Fletcher, Cyclopedia of the Law of Private Corporations ("Fletcher"). See 538 U.S. at 475; see also First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 629 (1983) ("Bancec").

Fletcher confirms the common sense proposition that "the mere transfer of a certificated security on the books of the corporation without a delivery of the certificates is not sufficient for delivery." 1 Fletcher, § 5481.50. In turn, "delivery is required to implement [a] transfer." Id. § 5481; see also, e.g., Smith v. Universal Serv. Motors Co., 17 Del. Ch. 58, 60 (1929) ("[A] certificate of stock . . . is a valuable paper, the possession of which evidences in permanent form the stockholder's ownership with its incidents of rights. . . ."); U.C.C. §8-301 (1977). Indeed, "[p]ossession of a certificated security, endorsed, is persuasive evidence of ownership and a sufficient basis for summary judgment in favor of the possessor." Bandes v. Harlow & Jones, Inc., 826 F.Supp. 700, 708 (S.D.N.Y. 1993) (applying New York law); see also Matthysse v. Sec. Processing Services, Inc., 444 F.Supp. 1009, 1017 (S.D.N.Y. 1977); Lapidus v. Hiltzik, 553 N.Y.S.2d 458, 459-60 (2d Dep't 1990).

Accordingly, it is clear as a matter of both Bolivian law and federal common law that Bolivia does not own ETI's 50% shareholding in Entel. Entel, therefore, is not a company "a

majority of whose shares . . . is owned by a foreign state." 28 U.S.C. § 1603(b). Instead, Bolivia owns only the 47.5% of Entel shares formerly held by Bolivian pension plans that it seized in 2007.

c.    **The Shares Were Not Transferred by
Operation of the Nationalization Decree**

Bolivia contends that share ownership passed to it on May 1, 2008 by operation of the Nationalization Decree. (Bolivia Memo. at p.13). Bolivia's claim that it "acquired majority ownership of the corporation on May 1, 2008, by means of the nationalization decree which immediately brought into its possession the 50% that belonged to Plaintiff," however, is belied by the plain language of the Decree itself. (Id. at p.13). The Nationalization Decree states:

> Stock held by [ETI] shall be transferred to the Bolivian State, [and placed] under the temporary ownership of the Ministry of Public Works, Services and Housing until the legal transformation of ENTEL S.A. into ENTEL SAM is completed.

(Nationalization Decree, Bolivia Memo., Exh. 1, Article 2 (emphasis added)). Accordingly, the Decree, by its own terms, is not self-executing. Instead, it recognizes that further steps must be taken to effectuate the change in ownership. As demonstrated above, however, Bolivia has not taken the steps necessary to transfer share ownership under either Bolivian law or federal common law. Indeed, the Decree is invalid under Bolivian law for the additional reason that under the Bolivian Constitution, an expropriation is effective only after the payment of just compensation. (Guevara Decl. ¶ 22). Accordingly, the transfer was not completed, and ETI retains its share ownership. (Id. ¶ 13; 1 Fletcher, § 5481.50).

2.    **Bolivia Does Not Own a Majority of Any
"Other Ownership Interest" in Entel**

Implicitly conceding that its "majority share ownership" argument does not work, Entel resorts to the strained alternative argument that Bolivia owns a "majority of . . . other ownership

11

interest" in Entel because it has now assumed control of Entel. (Entel Memo. at pp. 5-8). In doing so, it simply ignores the Supreme Court's directly applicable holding in <u>Dole</u>, that "[c]ontrol and ownership . . . are distinct concepts. The terms of § 1603(b)(2) are explicit and straightforward. Majority ownership by a foreign state, not control, is the benchmark of instrumentality status." 538 U.S. at 477 (internal citations omitted). This is dispositive of plaintiff's argument.

Entel's sole reliance on two pre-<u>Dole</u>, out-of-circuit district court opinions in support of its "control equals ownership" argument is "nothing more than a frontal assault on the Supreme Court's decision in <u>Dole</u>," as another Court put it when confronted with the same argument in <u>Allen v. Russian Fed'n</u>, 522 F.Supp 2d 167, 184 (D.D.C. 2007). The Court should, of course, reject Entel's effort to revive an argument that the Supreme Court has already dispositively rejected.

### 3.   Entel Is Not an "Organ" of Bolivia

Once again disregarding controlling law, Entel argues that it is an "organ," and thus an "agency or instrumentality," of Bolivia for purposes of 28 U.S.C. § 1603(b)(2). The Second Circuit has articulated five factors that courts are to consider in determining whether an entity is an "organ." The Second Declaration of Alejandro Salinas Vilela, executed on June 6, 2008 (the "Second Vilela Decl."), submitted by Entel, conclusively demonstrates that Entel is not an "organ" as measured against the Second Circuit's yardstick. Apparently recognizing this, Entel blithely states that the Third Circuit has "undertaken the most thorough analysis" and proceeds to create its own standards out of whole cloth, based primarily on Third Circuit and other out-of-circuit authorities. (Entel Memo. at pp. 8-10). Entel's repeated efforts to re-make the law speak volumes about the strength of its arguments.

In <u>Filler v. Hanvit Bank</u>, 378 F.3d 213, 217 (2d Cir. 2004), the Second Circuit observed that "there is no specific test for 'organ' status under the FSIA," but recognized that five factors are relevant for purposes of determining whether an entity should be deemed an "organ" for purposes of 28 U.S.C. § 1603(b)(2). <u>Id.</u> Those factors include:

> (1) whether the foreign state created the entity for a national purpose;
>
> (2) whether the foreign state actively supervises the entity;
>
> (3) whether the foreign state requires the hiring of public employees and pays their salaries;
>
> (4) whether the entity holds exclusive rights to some right in the [foreign] country; and
>
> (5) how the entity is treated under foreign state law.

<u>Id.</u> (bracketed text in original) (citations omitted).  Whether or not the portion of the <u>Filler</u> opinion that articulated these factors was <u>dicta</u>, as Entel claims, is irrelevant because the Second Circuit again adopted them in <u>Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd.</u>, 476 F.3d 140, 143-44 (2d Cir. 2007). <u>See also</u> <u>Scheidemann v. Qatar Football Ass'n</u>, No. 04-CV-3432 (LAP), 2008 WL 144846, at *3-*6 (S.D.N.Y. Jan. 15, 2008). Applying the <u>Filler</u> factors here, Entel utterly fails to meet the definition of an "organ" of Bolivia.

<u>First</u>, Entel was not created for a national purpose. As Mr. Vilela recites in his Second Declaration, a predecessor entity was created in 1965 as a "mixed economy company based on the principle of combining public and private interests . . . ." (Second Vilela Decl. ¶ 6). In 1968, that "mixed economy company" was given "exclusive telecommunication concessions," and two years later, in 1970, it was "converted . . . to an entirely state-owned enterprise." (<u>Id.</u> ¶¶ 7-8). All of that changed in 1995, however, when the Bolivian government decided to privatize Entel. The company was first transformed back into a "mixed economy company," and then, "[o]n

November 27, 1995, ENTEL's Extraordinary Shareholders meeting approved the transformation

of ENTEL from a mixed economic society (SAM) to a PLC (a Sociedad Anonima, or 'SA').

ENTEL SA was registered in the General Commerce and Share Based Companies Registry

Office on January 16, 1996 . . . ." (Id. ¶¶ 9-10). Although the Nationalization Decree calls for

ENTEL to be "transformed" back into a "mixed economy company," this has not yet happened.[4]

Thus, in its current incarnation, Entel is a purely private entity that was formed for the express

purpose of privatizing Bolivia's telecommunications sector. (Second Vilela Decl. ¶ 30).[5]  As Mr.

Vilela's Declaration makes clear, "ENTEL SA" was formed for a private purpose, not a national

purpose.

     Second, Bolivia does not actively supervise Entel's operations.  Indeed, Entel submitted a

corrected version of Mr. Vilela's Second Declaration for the sole purpose of correcting it in this

respect to make clear that "[t]he Republic of Bolivia does not control the day to day operations

of ENTEL." (Corrected Second Declaration of Alejandro Salinas Vilela, executed on June 13,

2008, (the "Corrected Second Vilela Decl.) ¶ 20).  As Mr. Vilela goes on to state:

- "Neither the Republic nor the Ministry give orders to the Intervenor.  The Intervenor does not need ministerial approval to take actions.  In fact, an Intervenor is to act independently and does not need the prior approval of the appointing Superintendent in order to take actions." (Id. ¶ 41).

- "Since the beginning of the intervention, the Republic has not attempted to direct the Intervenor in his actions . . . ." (Id. ¶ 42).

---

[4] Article 6(I) of the Nationalization Decree provides that "Entel S.A. must be transformed into a Mixed Economy Corporation, pursuant to the provisions of the Code of Commerce.  For that purpose, the Stockholders' Meeting must adapt the incorporation and statutory regulations within the term of 180 calendar days from the date this Supreme Decree comes into effect." (May 4 Bertone Decl., Exh. 6).

[5] Entel's memorandum of law omits Entel's transformation into a privately held company from its lengthy recitation of Entel's corporate history, in an apparent effort to create the incorrect impression that Entel remains a "mixed" economy company. (Entel Memo. at pp. 11-12).  It does so even though the privatization is described in Mr. Vilela's Declaration that Entel's counsel presumably drafted for him.

- While the Government has purported to appoint a new Board of Directors since the Nationalization Decree went into effect, "[a]ll members of ENTEL's [new] board of directors are private individuals, and none are government employees or ministers." (Id. ¶ 27).

Third, Bolivia does not require the hiring of public employees or pay the salaries of Entel's employees. Again, Mr. Vilela's Declaration could not be more clear on this point: "ENTEL hires its own employees, just like any other company, and is not instructed by the Republic as to who to hire." (Id. ¶ 22). Moreover, "Entel is responsible for its own financing. . . ." (Id. ¶ 21).

Fourth, Entel does not hold any exclusive rights in Bolivia. To the contrary, it is one of three Bolivian suppliers of mobile telephone service, one of more than a dozen long distance carriers, one of approximately sixteen local telephone service providers, and one of two or three dozen internet providers. (June 23 Bertone Decl. ¶ 8).

Fifth and finally, Entel is treated under Bolivian law identically to privately held telecommunications companies. "ENTEL is subject to the regulatory supervision of the Republic, just as other fully privately owned entities are," and, in fact, "[s]ince May 1, 2008, when the intervention began, nothing has changed concerning ENTEL . . . except that there is a different shareholder . . . ." (Corrected Second Vilela Decl. ¶¶ 19, 43).

Thus, applying the facts to controlling Second Circuit law, it is readily apparent that Entel is not an "organ" of Bolivia.

## B.    Bolivia's Immunity Does Not Extend to Entel's Assets

Entel further argues that even if it is not an "agency or instrumentality" of Bolivia, it is nonetheless shielded by Bolivia's sovereign immunity on the theory that "plaintiff is seeking to hold ENTEL and its property responsible for the Republic's debt . . . ." (Entel Memo. at p. 4). Essentially the same argument is raised in Part III of Entel's Memorandum and in Part II.B of

15

Bolivia's Memorandum. These arguments are based on the premise that ETI seeks to attach

Entel's assets, and ultimately recover those assets, on the theory that Bolivia owns Entel's assets.

Entel and Bolivia argue that it would be impermissible for ETI to recover against Entel on this

basis under the Supreme Court's decision in <u>Bancec</u>, because Entel is a separate juridical entity

from Bolivia and thus, while Bolivia owns a portion of the shares of Entel stock, it does not own

Entel's assets. (Entel Memo. at pp. 24-29; Bolivia Memo. at pp. 6-14). This entire line of

argumentation is irrelevant, however.

ETI does not seek to attach Entel's assets on the theory that it can pierce Entel's

corporate veil, and thereby treat Entel's assets as Bolivia's assets. Instead, ETI seeks to attach

the $60 million in debt that Entel has now acknowledged it owes to Bolivia, as well as the

additional amounts that Bolivia claims are due from Entel amounting to approximately another

$60 million. (Sills Decl., Exh. 13; May 4 Bertone Decl. ¶ 25). ETI is permitted to do so

pursuant to C.P.L.R. § 6214(a), which applies in this proceeding pursuant to Fed. R. Civ. P. 64.

<u>See</u> N.Y. C.P.L.R. § 6214(a) ("The sheriff shall levy upon any interest of the defendant in

personal property, <u>or upon any debt owed to the defendant</u> . . . .") (emphasis added). Because

ETI seeks to attach Entel's debt owed to Bolivia, and does not claim that Entel's assets belong to

Bolivia, <u>Bancec</u> and its progeny have no application here.

### 1. *De Letelier* **and the Additional Cases Cited by Entel Do Not Apply** **Here**

Entel relies chiefly upon <u>De Letelier v. Republic of Chile</u>, 748 F.2d 790 (2d Cir. 1984) to

support its argument that "the Bolivian State's FSIA immunities apply to Entel," arguing that <u>De</u>

<u>Letelier</u> "dictates this result." (Entel Memo. at pp. 4-5). However, <u>De Letelier</u> is a veil piercing

case, in which "[t]he critical question posed [was] whether the assets of a foreign state's wholly

owned airline are subject to execution to satisfy a default judgment obtained against the foreign

state." 748 F.2d at 791. The Court of Appeals held that "[t]he evidence submitted by the judgment creditors does not reveal abuse of corporate form of the nature or degree that <u>Bancec</u> found sufficient to overcome the presumption of separate existence." <u>Id.</u> at 795. The panel went on, in <u>dicta</u>, to conclude that the FSIA would have precluded enforcement of a judgment against the airline, even if the airline's corporate veil could be pierced, based on the common sense proposition that if the veil was pierced and the airline's assets treated a state assets, then those assets would fall within the scope of Chile's sovereign immunity unless an exception to immunity applied. <u>Id.</u> at 799. <u>De Letelier</u> has no application here because, as noted above ETI does not seek to pierce Entel's corporate veil.

The additional cases cited by Entel are similarly unavailing. Entel incorrectly states that <u>Af-Cap Inc. v. Chevron Overseas (Congo) Ltd.</u>, 475 F.3d 1080, 1095 (9th Cir. 2007)[6] and <u>Walker Int'l Holdings Ltd. v. Rep. of Congo</u>, 395 F.3d 229, 237 (5th Cir. 2004) "held that a foreign state's FSIA immunity must be applied to any entity found liable for the state's acts." (Entel Memo. at p.5). Entel misstates the holdings of those two out-of-circuit cases. In <u>Af-Cap, Inc.</u>, the Ninth Circuit, relying on <u>Bancec</u>, held that an entity found to be an alter ego of a foreign state is not a "separate legal entity," and thus would be entitled to the same FSIA protections as the state itself. 475 F.3d at 1095. Similarly, the Fifth Circuit in <u>Walker</u>, without citing <u>Bancec</u>, held that an entity found to be an alter ego of the Republic of Congo "would have to undergo the same immunity analysis as the [Republic of Congo]." 395 F.3d at 237. Because ETI does not advance a veil piercing or alter ego theory here, those cases are irrelevant, and Entel's reliance on them is misplaced.

---

[6] Entel incorrectly describes <u>Af-Cap, Inc.</u> as decided by the Fifth Circuit (Entel Memo. at p. 5); it was decided by the Ninth Circuit.

2.    **There Is No Immunity from Attachment because
Entel's Assets Are Not Assets of a Foreign State**

The FSIA immunity from attachment extends only to property of a foreign state.  28

U.S.C. § 1609 provides:

> Subject to existing international agreements to which the United
> States is a party at the time of enactment of this Act the property in
> the United States of a foreign state shall be immune from
> attachment arrest and execution except as provided in sections
> 1610 and 1611 of this chapter.

(emphasis added).  The plain language of the statute makes clear that it does not immunize from

attachment assets that are not property of a foreign state.

As demonstrated above, Entel is not an "agency or instrumentality" of Bolivia, and thus

falls outside the FSIA's definition of a "foreign state."  Moreover, as Entel and Bolivia argue at

great length, Entel's separate juridical status precludes the Court from looking through Entel's

corporate form and treating Entel's assets as Bolivia's assets.  (See e.g., Entel Memo. at p. 25

("ENTEL is a corporation with its own juridical personality and property . . . ."); id. at p. 28

("The Republic of Bolivia as stockholder does not have any interest in ENTEL's New York bank

accounts . . . ."); Bolivia Memo. at p. 15 ("In fact, the four bank accounts that were attached

pursuant to the Ex Parte Order of May 5th belong to Entel, not to Bolivia.")).

Accordingly, because ETI seeks to attach only Entel's assets, and not Bolivia's, the FSIA

is not applicable.  See Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas

Bumi Negara, M-18-302 (TPG), 2004 U.S. Dist. LEXIS 23870, *1 (S.D.N.Y. Oct. 6, 2004)

("Pertamina"), aff'd, 2006 U.S. App. LEXIS 5932, 2006 WL 565694 (2d Cir. Mar. 9, 2006).  In

Pertamina, the Court held that the claimant was permitted to enforce an arbitral award by

executing against the assets of the defendant, an Indonesian state owned company, where the

company had waived its sovereign immunity as an "agency or instrumentality," but Indonesia

itself had not so waived.  See generally Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan

Minyak Dan Gas Bumi Negara, 313 F.3d 70, 82-85 (2d Cir. 2002).  In a later proceeding, Judge

Griesa held that this did not run afoul of the FSIA, notwithstanding the fact that a portion of the

funds were due to Indonesia for taxes and dividends.  He reasoned:

> It is of some interest now to note that under Indonesian law,
> after Pertamina received the retention fee, or was credited with the
> retention fee, Pertamina was required to pay a tax out of that
> retention fee and to pay a dividend to the Republic of Indonesia.
> Both the tax and the dividend were to be paid to the Republic of
> Indonesia.  Despite the fact that Indonesian law required the
> payment of the tax and the dividend, the District Court and the
> Court of Appeals did not hold that the tax and the dividend were
> the property of the government.  These courts did not hold that the
> tax and the dividend were part of the government's share of the
> moneys in question.  What was held in substance was that the
> obligation to pay the tax and the obligation to pay the dividend
> meant that Pertamina had to pay those amounts out of the retention
> fee, but that did not mean that the full retention fee was not the
> property of Pertamina.  Those amounts were not property of the
> government until they were paid.
>
> This is not an astonishing proposition.  If a taxpayer earns a
> salary, the salary belongs to the taxpayer.  It doesn't instantly
> belong to the government, although the taxpayer may ultimately
> owe the government a tax.  If a corporation becomes obligated by a
> corporate resolution to pay a dividend, the revenues coming into
> the corporation are not the property of the shareholders the minute
> they come in.  They become shareholders when the corporation
> pays the dividend.

Pertamina, 2004 U.S. Dist. LEXIS 23870, *4-*6 (emphasis added).[7]

---

[7] While two District Court cases have assumed, without considering the question and without
discussion, that the FSIA extends to property of third parties to be used to satisfy a judgment
against a foreign state, they are simply wrong.  See LNC Investments, Inc. v. Republic of
Nicaragua, No-96-CV-6360 (JFK), 2000 U.S.Dist. LEXIS 7814 (S.D.N.Y. June 8, 2000);
Liberian Eastern Timber Corp. v. Republic of Liberia, 650 F.Supp. 73 (S.D.N.Y. 1986), aff'd
without opinion, 854 F.2d 1314 (2d Cir. 1987).  In those cases, unlike Pertamina, the parties
apparently did not raise, and the courts did not decide, the question whether the FSIA can apply
to funds owned by a debtor of a foreign state, but which have not been paid to the foreign state
and thus do not constitute property of the foreign state.

The same analysis applies here. The fact that the C.P.L.R. permits a judgment creditor to execute a judgment against (and a prospective judgment creditor to attach) a debt owed to the judgment debtor does not convert the debt into property of the judgment debtor. It is elementary that the third party's assets remain his own until they are transferred to the judgment debtor in satisfaction of the third party's debt to the judgment debtor. The C.P.L.R. repeatedly draws this distinction between a judgment debtor's property and a debt owed to the judgment debtor that can be attached and executed against. See, e.g., C.P.L.R. § 6214(a) (attachment may be levied against "any interest of the defendant in personal property, or upon any debt owed to the defendant") (emphasis added); C.P.L.R. § 6202 ("Any debt or property against which a money judgment may be enforced as provided in section 5201 is subject to attachment."); C.P.L.R. § 5201(a) ("A money judgment may be enforced against any debt, which is past due or is yet to become due . . . ."); C.P.L.R. § 5201(b) (regarding enforcement against property of the judgment debtor).

The parties agree that the Entel bank accounts that ETI has attached belong to Entel. They accordingly fall outside the scope of Bolivia's FSIA immunity from attachment because Entel is not an "agency or instrumentality" of Bolivia.

## II.  THE COURT HAS SUBJECT MATTER JURISDICTION

Defendants' contention that the Court lacks subject matter jurisdiction is wrong. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 9 U.S.C. § 203 because this action falls under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), reprinted following 9 U.S.C. § 201, and 22 U.S.C. §1650a, and arises under the ICSID Convention, 17 U.S.T. 1270, 575 U.N.T.S. 15 (1966).

The Court has subject matter jurisdiction over actions arising under the New York Convention pursuant to 9 U.S.C. § 203. That statute provides:

> An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy.

It is undisputed that both Bolivia and the Netherlands, like the United States, are signatories to the New York Convention and that the Bolivia/Netherlands BIT constitutes an "agreement in writing" that provides a basis for the Court to exercise jurisdiction under the New York Convention. (ETI's Memorandum in Support of Motion to Confirm Order of Attachment, dated May 12, 2008, at pp. 5-6).

The Second Circuit has held that 9 U.S.C. § 203's grant of subject matter jurisdiction applies in actions to compel arbitration, to enforce an arbitral award, and for a pre-judgment attachment in aid of arbitration. See Borden, Inc. v. Meiji Milk Prods. Co., 919 F.2d 822, 826 (2d Cir. 1990); Venconsul N.V. v. Tim Int'l N.V., No. 03 Civ. 5387 (LTS)(MHD), 2003 WL 21804833, at *3 (S.D.N.Y. Aug. 6, 2003); Alvenus Shipping Co. v. Delta Petroleum (U.S.A.), 876 F.Supp. 482, 487 (S.D.N.Y. 1994).

In Venconsul, the plaintiff corporation moved before this Court for a preliminary injunction precluding the defendant corporation from taking certain actions during the pendency of the parties' arbitration before the International Chamber of Commerce. See Venconsul, 2003 WL 21804833, at *1-3. The defendant corporation, while not disputing that the arbitration agreement fell within the scope of the New York Convention, nonetheless asserted that the Court lacked subject matter jurisdiction "'because the party invoking [the Convention] did not seek either to compel arbitration or to enforce an arbitral award.'" Id. at *2 (bracketed text in

21

original) (citation omitted). Rejecting the defendant's argument, this Court held that the Second

Circuit's holding in Borden controlled, and stated:

> [T]he Second Circuit [has] rejected the argument that a court's
> jurisdiction under the [New York] Convention is limited to
> compelling arbitration or confirming an arbitration award. The
> court held that "entertaining an application for a preliminary
> injunction in aid of arbitration is consistent with the court's powers
> pursuant to [9 U.S.C.] § 206." Seeking equitable remedies in
> connection with arbitration is consistent with the Convention's
> "provisions and . . . spirit," the court reasoned, because "the desire
> for speedy decisions in arbitration is entirely consistent with a
> desire to make as effective as possible recovery upon awards, after
> they have been made, which is what provisional remedies do."
> Borden has been interpreted as recognizing a court's power to
> entertain requests for provisional remedies in aid of arbitration
> even where the request for remedies does not accompany a motion
> to compel arbitration or to confirm an award.

Id. at *3 (internal citations omitted) (citing Alvenus, 876 F.Supp. at 487).

Defendants raise two arguments in support of their contention that the Court nonetheless

lacks subject matter jurisdiction in this proceeding, claiming that: (1) the FSIA precludes the

Court from exercising jurisdiction; and (2) 9 U.S.C. § 203 does not provide jurisdiction as to an

ICSID proceeding. Both of those arguments are wrong.

First, the FSIA is not applicable to this proceeding for the reasons discussed above.

Bolivia is not required to participate if it prefers to invoke its immunity, but that does not defeat

the Court's jurisdiction over this action to attach Entel's assets. See Karaha Bodas Co., 313 F.3d

at 83 n.12 (2d Cir. 2002) ("Because this is an appeal from an order executing a judgment against

the property of Pertamina – as opposed to the property of the Ministry or the Republic of

Indonesia – the sovereign immunity claims of the Ministry or the Republic of Indonesia are not

before us.").

Second, while it is true that the provisions of 9 U.S.C. § 203 do not provide a federal

court with jurisdiction over a proceeding to enforce an ICSID award, because of the terms of 22

22

U.S.C. § 1650a those statutes confirm that this Court has subject matter jurisdiction over this proceeding.[8]  22 U.S.C. § 1650a provides as follows:

> (a) Treaty rights; enforcement, full faith and credit; non application of Federal Arbitration Act
>
> An award of an arbitral tribunal rendered pursuant to chapter IV of the [ICSID] convention shall create a right arising under a treaty of the United States.  The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States.  The Federal Arbitration Act (9 U.S.C. 1 et seq.) shall not apply to enforcement of awards rendered pursuant to the convention.
>
> (b) Jurisdiction; amount in controversy
>
> The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have exclusive jurisdiction over actions and proceedings under subsection (a) of this section, regardless of the amount in controversy.

22 U.S.C. § 1650a.

It follows that, because 22 U.S.C. § 1650a makes the Federal Arbitration Act (of which 9 U.S.C. § 203 is a part) inapplicable only to "enforcement of [ICSID] awards . . ." all other provisions of the Federal Arbitration Act are applicable.[9]  Read together, 9 U.S.C. § 203 and 28 U.S.C. § 1650a provide district courts with a jurisdictional grant as to ICSID proceedings at least as broad as – if not broader than – the New York Convention's grant of jurisdiction as to non-ICSID arbitrations.  Accordingly, the holdings of <u>Borden</u> and <u>Venconsul</u> apply with at least equal force here, and the Court has subject matter jurisdiction over this proceeding.

---

[8] 22 U.S.C. § 1650a elevates an ICSID award, unlike other arbitral awards, to a status equivalent to a judgment of a state court of general jurisdiction.

[9] The United States–Bolivia BIT expressly provides that the BIT constitutes an "agreement in writing" for purposes of the New York Convention, and hence 9 U.S.C. § 203.  The Netherlands-Bolivia BIT has a "most favored nation" clause, set out in Article 3(2), that expressly incorporates that provision of the United States–Bolivia BIT.

### III.    THE EQUITABLE DOCTRINES OF WAIVER AND ESTOPPEL PRECLUDE BOLIVIA AND ENTEL FROM INVOKING THE ICSID EXCLUSIVITY PROVISIONS

Having denounced the ICSID Convention, refused to participate in, and attempted to derail, the ICSID arbitration commenced by ETI, and stated publicly that it intends to sue ETI in a Bolivian court, Bolivia now blithely invokes the exclusivity provisions of the ICSID Convention and Rules. Bolivia nowhere even hints that it will appear in the ICSID proceeding or satisfy any ICSID award. Nonetheless, it asks the Court to permit it, through Entel, to repatriate the only assets here that are readily available to satisfy, in part, an ICSID award. The Court should not countenance such an unjust and inequitable request. As stated by one commentator, "[w]hen an ICSID party in good faith initiates proceedings before a neutral court to secure emergency relief unavailable from an ICSID Tribunal, the considerations motivating the exclusivity principle are plainly not applicable." Paul D. Friedland, Provisional Measures and ICSID Arbitration, 2 Arb. Int'l 335, 356 (1986).

"To decide the case [the Court] need look no further than the maxim that no man may take advantage of his own wrong." Glus v. Brooklyn Eastern Dist. Terminal, 359 U.S. 231, 232 (1959). The equitable doctrines of waiver and estoppel effectuate this maxim. See Nassau Trust Co. v. Montrose Concrete Prods. Corp., 56 N.Y.2d 175, 184 (N.Y. 1982). Both doctrines operate here, and ban Bolivia from selectively invoking the ICSID Rules.

### A.    Bolivia and Entel Are Estopped from Raising the ICSID Exclusivity Provisions

Bolivia – and thus Entel, which by its own admission, is now controlled by Bolivia – are estopped from raising the exclusivity provisions of the ICSID Convention and Rules.

> The very root of equity is the need to give relief where the strict enforcement of the rules of law would work injustice. As a New York court has explained, "Estoppel is an ethical concept, enforcible when good conscience and honest dealing require it."

> Because of its unique nature as a special tool to do justice in
> individual cases, *equitable* estoppel differs from rules of *law* in
> that, like other equitable remedies, estoppel is not subject to fixed
> and settled rules of universal application: "An equitable estoppel
> rests largely on the facts and circumstances of the particular case;
> consequently any attempted definition usually amounts to no more
> than a declaration of estoppel under those facts and
> circumstances."

Robinson v. Pan American World Airways, Inc., 650 F.Supp. 125, 127 (S.D.N.Y. 1986) (internal

citations omitted).  See Imperator Realty Co. v. Tull, 228 N.Y. 447, 457 (N.Y. 1920).

Here, Bolivia entered into the Bolivia/Netherlands BIT, by which it consented to resolve

disputes with Dutch investors through ICSID arbitration.  While Bolivia denounced the

Convention in May 2007, that denunciation did not take effect until November 2007, after ETI

commenced its ICSID arbitration against Bolivia, and after ICSID registered its claim.  Thus,

under the ICSID Convention, the denunciation was not effective to deprive ICSID of

jurisdiction.  See ICSID Convention Article 72 ("Notice by a Contracting State [of denunciation

of the ICSID Convention] shall not affect the rights or obligations under this Convention of that

State . . . arising out of consent to the jurisdiction of the Centre given by [it] before such notice

was received by the depositary.").

Bolivia has not complied with its treaty obligation to participate in the ICSID proceeding.

Instead of raising its jurisdictional objection with the arbitral tribunal once constituted, it wrote

to ICSID, before ETI's Request for Arbitration was even registered, stating that it has chosen to

"exit" the ICSID system in light of what it claims to be "serious defects." (Sills Decl., Exh. 2, p.

7).  It then boycotted the procedure, required under ICSID's Rules, for establishing a mechanism

to appoint a tribunal.  (Id. ¶ 11).  The result is that ICSID did not even announce the procedures

to be used for establishing a tribunal until April 25, 2008 – four business days before Bolivia

issued the Nationalization Decree and began taking steps to try to gain control over the New

York assets. (Id. ¶¶ 13-14; Declaration of Fabio Incutti, executed on May 5, 2008, ¶ 2). In the interim, Bolivia repeatedly has reaffirmed its refusal to participate in the ICSID arbitration. (Sills Decl. ¶¶ 3-11, Exhs. 1-5).

The ICSID procedures authorize an ICSID tribunal to award conservatory relief. (ICSID Arbitration Rule 39).[10] Thus, by frustrating ETI's efforts to promptly constitute an arbitral tribunal until after it de facto took over Entel's operations, Bolivia wrongfully deprived ETI of the opportunity even to request that the panel grant it the conservatory relief that it seeks.[11] Because Bolivia's actions have deprived ETI of the opportunity to pursue conservatory measures under the procedures that the parties had agreed to, it is estopped from invoking those procedures to block ETI's application to this Court. See, e.g., Glus, 359 U.S. at 234 ("The principle is that where one party has by his representations or his conduct induced the other party to a transaction to give him an advantage which it would be against equity and good conscience for him to assert, he would not in a court of justice be permitted to avail himself of that advantage."); Robinson, 650 F.Supp. at 126-27; see also, e.g., Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004) ("We hold today . . . that, in some circumstances, the behavior of the defendants may render administrative remedies unavailable. To the extent that the plaintiff lacked 'available'

---

[10] While a party is permitted to request such relief before the tribunal is constituted, that request would merely be held until a tribunal was constituted, and then transmitted to the tribunal. Only after the tribunal is constituted could relief be granted. (ICSID Arbitration Rule 39(5)).

[11] There is not even a theoretical possibility that a tribunal could have been constituted during the four-day window after ICSID announced the procedures to be used for selecting a tribunal and before issuance of the Nationalization Decree. Under ICSID's Rules, after ETI appointed its arbitrator and nominated a president, Bolivia would be given an opportunity to respond with its own nominations. (ICSID Arbitration Rule 3(1)(b)). Only if Bolivia failed to do so would ETI have had the opportunity to request that the Chairman of ICSID's Administrative Council appoint an arbitrator on Bolivia's behalf. Similarly, either party can apply to the Chairman to appoint a President of the Tribunal if the parties fail to reach agreement on the President. The Chairman "shall use his best efforts to comply with that request within 30 days after its receipt." (ICSID Arbitration Rule 4(4)). In any event, Bolivia has done nothing to comply with the procedures set by ICSID since then.

administrative remedies, the PLRA's exhaustion requirement is inapplicable."); <u>J.G. v. Board of Educ.</u>, 830 F.2d 444, 447 (2d Cir. 1987) (same).

**B.    Bolivia Has Waived Its, and Entel's, Right to Invoke the ICSID Exclusivity Provisions**

The same conduct that estops Bolivia and Entel from invoking the ICSID exclusivity provisions also constitutes a waiver of their right to do so.  Indeed, Bolivian Minister of Public Works Óscar Coca has made clear that Bolivia has no intention of abiding by ICSID's exclusivity provision, stating that a complaint filed against ETI will be "dealt with in Bolivia, not in international courts."  (Sills Decl., Exh. 5, p. 1).

It is settled that a party, by its conduct, may waive its right to invoke an arbitration clause.  <u>See</u> <u>Doctor's Assocs. v. Stuart</u>, 85 F.3d 975, 981 (2d Cir. 1996) (internal quotations and citations omitted); <u>see also</u>, <u>e.g.</u>, <u>Lane, Ltd. v. Larus & Brother Co.</u>, 243 F.2d 364, 367 (2d Cir. 1957) ("A party cannot raise unjustifiable objections to a valid demand for arbitration, all the while protesting its willingness in principle to arbitrate and then, when the other side has been forced to abandon its demand, seek to defeat a judicial determination by asking for arbitration after suit has been commenced.").  Analagously, while Bolivia remains obligated to participate in the ICSID case, it has waived its right to invoke the exclusivity provisions of the ICSID rules.  <u>See</u> <u>Int'l Ins. Co. v. Caja Nacional De Ahorro Y Seguro</u>, 293 F.3d 392, 401 (7th Cir. 2002) ("[W]e believe that under the limited circumstances of this case, pre-judgment security was appropriate.  Caja repeatedly failed to appear for any part of the arbitration proceeding.  We do not deem it to be an abuse of discretion for a court to require such a party to post security in the full amount of the possible judgment against it given this poor track record.").  Analagously, here, Bolivia has waived its right to invoke ICSID exclusivity.

### C.    Confirming the Attachment Will Not Run Afoul of International Public Law

Bolivia goes so far as to threaten that it might bring a proceeding against the United States in the International Court of Justice in the event that the court confirms the attachment. (Bolivia Memo. at p. 21). The Court should not credit such posturing. Article 64 of the ICSID Convention, which Bolivia cites as the basis for this threat, provides:

> Any dispute arising between Contracting States concerning the interpretation or application of this Convention which is not settled by negotiation shall be referred to the International Court of Justice by the application of any party to such dispute, unless the States concerned agree to another method of settlement.

Even assuming that Bolivia's objection to an order of attachment entered in a federal court constitutes a dispute between contracting states concerning the interpretation or application of the ICSID convention, and not simply a threat to attempt to re-litigate an adverse ruling; that Bolivia would approach the United States government to negotiate over that "dispute," as required by the ICSID Convention; and that, following such negotiations, Bolivia would in fact seek a referral to the International Court of Justice to resolve the alleged matter of "interpretation or application" of the ICSID Convention, Bolivia does not say what relief it would seek in such a proceeding. The far more likely result is that Bolivia or Entel, like any other litigant unhappy with a ruling of this Court, would simply appeal. In any event, it is entirely unclear what arguments Bolivia would present to the International Court of Justice regarding the "interpretation or application" of a treaty to which it stridently contends it is not a contracting party, or what relief it might seek in any such proceeding.

Moreover, the brief and suggestion of interest of the United States concerning the ICSID exclusivity provisions cited by Entel and Bolivia actually supports ETI's position. See Brief for the United States of America as Intervenor and Suggestion of Interest, Maritime Int'l Nominees Establishment v. Republic of Guinea 693 F.2d 1094 (D.C. Cir. 1982), 20 I.L.M. 1436 (1981).

The United States government did not ask the D.C. Circuit to dismiss for fear of a claim being brought in the International Court of Justice. Instead, in the government's Brief, the United States took the position that "a case brought in a United States court which arguably falls within ICSID's exclusive jurisdiction should be stayed to permit ICSID to resolve whether it has jurisdiction . . . ." Id. at 1472-73. This is essentially what ETI seeks – for the status quo to be preserved until an ICSID Tribunal is (1) constituted; and (2) has an opportunity to rule on ETI's request for conservatory relief.

## IV. ENTEL'S OBJECTION ON PERSONAL JURISDICTION GROUNDS IS BASELESS

Entel, but not Bolivia, argues that the Court lacks jurisdiction in personam over it. Not only is such jurisdiction unnecessary in this quasi in rem attachment proceeding, but Entel has sufficient minimum contacts to support an exercise of jurisdiction, even if the Court were to determine that minimum contacts are required. Indeed, Entel voluntarily chose to avail itself of the protections of New York law when it deposited substantial sums of cash in New York bank accounts. (June 23 Bertone Decl. ¶ 23). Thus, the Court should reject this argument too.

The only authority that Entel cites in support of its argument that the Court must conduct a minimum contacts analysis is the Supreme Court's opinion in Shaffer v. Heitner, 433 U.S. 186 (1977). In Shaffer, The Supreme Court held that, in an action on the merits, quasi-in-rem jurisdiction could not be based upon the mere presence in the state of property of a non-resident defendant that was unrelated to the plaintiff's cause of action, and that the Due Process minimum contacts standard set forth in International Shoe must therefore be satisfied. 433 U.S at 212. In a footnote, however, the Court indicated that there is an exception to this rule in enforcement actions – actions in which a plaintiff seeks to apply the property of the defendant to the satisfaction of a judgment obtained against him. Id. at 210 n. 36; see also World-Wide

29

Volkswagen Corp. v. Woodson, 444 U.S. 286, 309 n. 14 (U.S. 1980) (Brennan, J., dissenting) ("The Court has recognized that there are cases where the interests of justice can turn the focus of the jurisdictional inquiry away from the contacts between a defendant and the forum State. For instance, the Court indicated that the requirement of contacts may be greatly relaxed (if indeed any personal contacts would be required) where a plaintiff is suing a nonresident defendant to enforce a judgment procured in another State.").

Several courts have recognized this distinction and held that a minimum contacts test is not required in enforcement proceedings. See Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co., 284 F.3d 1114, 1127 (9th Cir. 2002) ("[c]onsiderable authority supports [plaintiff's] position that it can enforce the award against [defendant's] property in the forum even if that property has no relationship to the underlying controversy between the parties."); Frontera Resources Azerbaijan Corp. v. State Oil Co., 479 F.Supp. 2d 376, 387-88 (S.D.N.Y. 2007); CME Media Enter. B.V. v. Zelezny, 01-Civ-1733 (DC), 2001 U.S. Dist. LEXIS 13888, *8-*10 (S.D.N.Y. Sept. 10, 2001) (holding that an exception to the Shaffer rule exists "where quasi in rem jurisdiction is used to attach property to collect a debt based on a claim already adjudicated in a forum where there was personal jurisdiction over the defendant" and that "minimal contacts are not required for a court to exercise jurisdiction over assets to permit a party to collect on an arbitration award."). The jurisdictional analysis is no different in this proceeding for a pre-judgment attachment.

In any event, even if the court determines that a minimum contacts analysis is required, this test is easily satisfied here. The maintenance of a bank account in the forum state is sufficient to satisfy minimum contacts due process requirements.

> The voluntary opening by [defendant] of a bank account in New
> York satisfies the "minimum contacts" of International Shoe, as

> well as that requirement of foreseeability imparted by *Shaffer* into
> *quasi in rem* actions: the concept, that is to say, that the
> nonresident owner has undertaken acts with respect to the attached
> property which placed him on notice of the possibility of his
> having to defend such property in the foreign forum.... It is not
> necessary that the property attached be related to the underlying
> cause of action; jurisdiction *quasi in rem*, at least in the second of
> its two manifestations, requires no such showing.

Feder v. Turkish Airlines, 441 F.Supp. 1273, 1278-79 (S.D.N.Y. 1977); see also Amoco Overseas

Oil Co. v. Compagnie Nationale Algerienne de Navigation, 605 F.2d 648, 655 (2d Cir. 1979)

(finding sufficient contacts for quasi in rem jurisdiction where the property attached was related to

the matter in controversy and had been purposefully deposited into New York accounts); Excel

Shipping Corp. v. Seatrain Int'l S.A., 584 F.Supp. 734, 741 (E.D.N.Y. 1984).[12]

Entel voluntarily chose to deposit a substantial portion of its excess cash in New York to

take advantage of the "world's largest, best developed financial markets," which "ensured the

security of this excess cash from both a business and a legal perspective." (June 23 Bertone Decl.

¶ 23). Indeed, Bolivia's obligation to compensate ETI for its expropriation of ETI's interest in

Entel's stock is the subject of the underlying ICSID arbitration. Thus not only does Entel have

minimum contacts sufficient to justify the Court in exercising jurisdiction over it should the Court

determine that a minimum contacts analysis has any relevance to this quasi in rem attachment

proceeding, but those contacts relate directly to the underlying action.

---

[12] The cases that Entel cites in footnote 28 of its brief do not show otherwise. In fact, none of those cases deals with the minimum contacts inquiry at all. Instead those cases turn on the question whether maintaining a bank account in New York is sufficient to constitute "doing business" in New York for purposes of C.P.L.R. § 301's requirement for general in personam jurisdiction. See Reers v. Deutsche Bahn AG, 320 F.Supp. 2d 140, 149-56 (S.D.N.Y. 2004); Grove Valve & Regulator Co., Inc. v. Iranian Oil Svcs., Ltd., 87 F.R.D. 93, 95 (S.D.N.Y. 1980); Nat'l American Corp. v. Federal Republic of Nigeria, 425 F.Supp. 1365, 1369 (S.D.N.Y. 1977). That question is not at issue here.

## V.    ETI HAS MADE THE SHOWING REQUIRED BY C.P.L.R. § 7502

Entel's argument that ETI has failed to meet the C.P.L.R. § 7502 requirements to justify a

provisional remedy are empty rhetoric.

First, nowhere in Entel's or Bolivia's memoranda do they deny the fundamental point

that the ICSID award to which ETI believes that it is entitled "will be rendered ineffectual

without such provisional relief." C.P.L.R. § 7502(c). (Entel's Memorandum in Support of

Motion to Confirm Order of Attachment, Part I.D). This, not irreparable injury, is the applicable

standard for an order of attachment.  See SiVault Sys., Inc. v. Wondernet, Ltd., 05-Civ-0890

(RWS), 2005 U.S. Dist. LEXIS 4635, at *9 (S.D.N.Y. March 28, 2005) ("The sole ground

relevant to an application for an order of attachment brought under section 7502(c) is 'that the

award to which the applicant may be entitled may be rendered ineffectual without such

provisional relief.'"); see also Drexel Burnham Lambert, Inc. v. Ruebsamen, 531 N.Y.S.2d 547,

550 (1st Dep't 1988) (finding that "respondents' possible or likely transfer of assets from New

York to West Germany, along with petitioner's inability to enforce the arbitration award in West

Germany should it ultimately prevail in its claim against respondents, is certainly sufficient to

support an order of attachment."); Habitations Ltd., Inc. v. BKL Realty Sales Corp., 554

N.Y.S.2d 117, 118 (1st Dep't 1990); County Natwest Sec. Corp. v. Jesup, Josephthal & Co., Inc.,

579 N.Y.D.2d 376, 376-77 (1st Dep't 1992).[13]

---

[13] Even if Plaintiff were required to show irreparable harm – which it is not – the evidence set forth
in this case is more than sufficient.  See Daye Nonferrous Metals Co. v. Trafigura Beheer B.V., 96-
Civ-9740 (RWS), 1997 U.S. Dist. LEXIS 9661, *14 (S.D.N.Y. July 17, 1997) ("[A]lthough
injuries compensable by monetary damages ordinarily do not give rise to irreparable harm, . . . 'a
demonstration of intent to frustrate a [monetary] judgment will satisfy the requirement for a
preliminary injunction of a showing of irreparable harm.'"); H.I.G. Capital Mgmt. v. Ligator, 650
N.Y.S.2d 124, 125 (1st Dep't 1996) ("The uncontrolled disposal of respondent's assets, which
might render an award ineffectual, presents the risk of irreparable harm.").

Second, ETI has easily met its burden to show a likelihood of success on the merits. The record overwhelmingly demonstrates that Bolivia intends to pay little or nothing for ETI's interest in Entel. Thus, the only question in the ICSID proceeding is how much is due to ETI for this expropriation in violation of international (and Bolivian) law.

Third, Entel's contention that it will be prejudiced if the attachment is confirmed is amply refuted by the June 23 Declaration of Franco Bertone. Entel generates more than sufficient cash to meet all of its obligations, including all planned capital improvements, and even the additional capital improvements proposed by the Interventor, and then to still pay dividends. (June 23 Bertone Decl. ¶¶ 18-21). It also has credit lines with local Bolivian banks should it truly have short term cash needs, although it has never in the past had occasion to draw down those lines of credit.

## VI.     ENTEL AND BOLIVIA LACK STANDING TO OBJECT TO CONFIRMATION AS TO ONE HALF OF THE ATTACHED FUNDS

The Court should confirm the May 5 Order for the reasons provided above. However, even if the Court were to determine that Entel or Bolivia had advanced a valid reason to deny confirmation, the Court should, at a minimum, confirm the attachment as to 50% of the attached funds.

In Bandes v. Harlow & Jones, Inc., 852 F.2d 661 (2d Cir. 1988), the Second Circuit held that the United States courts will not enforce an expropriation without compensation by a foreign sovereign of assets located in the United States. Id. at 666-67. Thus, it affirmed an equitable apportionment of the fund at issue – cash refunded in respect of a shipment of steel billets – in which the District Court awarded to the former shareholder the percentage of the U.S. assets corresponding to his former shareholding percentage in the expropriated company. Id. at 667-70. Applying Bandes here, ETI is entitled, at a minimum, to 50% of the attached funds because

33

Bolivia's lawless expropriation of Entel conveys no rights in the funds at hand. Accordingly, neither Bolivia nor Entel, even on their theory of case, have standing to challenge the attachment as to the 50% allocated to ETI's ownership interest in Entel.

The doctrine of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992); see also Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982); Knaust v. City of Kingston, 193 F.Supp. 2d 536, 540 (N.D.N.Y. 2002) ("[T]o establish standing in the specific context of a taking claim, the plaintiff must demonstrate the requisite interest in the property at issue and the deprivation thereof. . . .") (internal quotations omitted). "To show this requisite interest, the plaintiff must demonstrate ownership of the property at the time of the taking. If the plaintiff fails to establish this most basic requirement of the personal injury component of the standing analysis, a court need not progress to the other considerations of standing." Knaust, 193 F.Supp. 2d at 540 (internal citations and quotations omitted).

Here, Bolivia and Entel could not have suffered any actual or threatened injury as the result of the attachment of 50% of the funds in Entel's New York accounts for the simple reason that, under the rule set out in Bandes, they have no interest in ETI's share of those funds. Thus, they lack standing to object to the attachment of those funds. See Lujan, 504 U.S. at 559-62; see also Bandes, 852 F.2d at 668-69.

## CONCLUSION

For the above-stated reasons, ETI respectfully requests that the Court grant its motion to confirm the May 5 Order.

Dated: New York, New York
June 23, 2008

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _____
Robert L. Sills (RS 8896)
Steven J. Fink (SF 3497)
Ryan S. Lester (RL 5603)
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151

Attorneys for Plaintiff E.T.I. Euro Telecom
International N.V.

35