Robert L. Sills (RS 8896)
Steven J. Fink (SF 3497)
Ryan S. Lester (RL 5603)
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**E.T.I. EURO TELECOM INTERNATIONAL N.V.,**

Plaintiff,

-against-

**REPUBLIC OF BOLIVIA** and
**EMPRESA NACIONAL DE
TELECOMUNICACIONES ENTEL S.A.,**

Defendants.

---

08 CV 4247 (LTS)

**REPLY DECLARATION
OF ROBERT L. SILLS**

ROBERT L. SILLS declares the following to be true:

1.      I am a member of the bar of this Court and of Orrick, Herrington & Sutcliffe LLP,

attorneys for plaintiff E.T.I. Euro Telecom International N.V. ("ETI") in the above-entitled

action.  I make this Reply Declaration in further support of ETI's motion for an order of

attachment.

**A.      The ICSID Arbitration Request**

2.      On October 12, 2007, ETI filed its Request for Arbitration (the "Request") with

the International Center for Settlement of Investment Disputes ("ICSID").

3.      Since that time, Bolivia repeatedly has stated that it will not participate in the

ICSID proceeding.

4.      First, the website elEconomista reported on October 23, 2007 that Bolivian

Governmental Coordination Vice-Minister Héctor Arce stated at a press briefing that day that

"due to its decision to withdraw from ICSID, the Bolivian State 'will not consent to the conduct

of any kind of arbitration, and this is a sovereign decision that has been made by the

administration of President Evo Morales.'" A copy of the elEconomista report is attached as

Exhibit 1.

5.      Then, on October 29, 2007, Gustavo Guzmán, Bolivia's Ambassador to the

United States, sent a nine page letter to ICSID, arguing that ICSID had no jurisdiction to proceed

on ETI's claim because Bolivia had denounced the Convention on the Settlement of International

Disputes Between States and Nationals of other States (the "ICSID Convention"), with an

effective date for that denunciation of November 2, 2007. A copy of Ambassador Guzmán's

letter is attached as Exhibit 2. In his letter, Ambassador Guzmán stated, among other things:

>       (a) "[A] sovereign state cannot be forced to submit a dispute to arbitration without its
>       consent . . . . " (Id. at p. 3); and
>
>       (b) "In denouncing the Convention, exercising nothing more than its sovereign rights,
>       Bolivia does not waive the arbitration, but chooses to exit a system that, according
>       to its experience and deeply considered point of view, suffers of serious defects
>       . . . . " (Id. at p. 7).

6.      By letter from ICSID's Secretary General dated October 31, 2007, ICSID rejected

Bolivia's argument and registered the Request, therefore beginning the arbitration process. A

copy of that letter is attached as Exhibit 3.

7.      Then, Red Erbol, a "Digital Newspaper," reported on December 3, 2007 that

Bolivian Vice Minister Arce "remarked that the State renounced to the jurisdiction of the ICSID;

in other words, the Bolivian Government decided to no longer give its consent to any form of arbitration. For an arbitration process to take place, an agreement by both parties must exist, and in this case Bolivia does not agree with the court of the World Bank." Vice Minister Arce reportedly also stated that ICSID "illegally and irregularly accepted" ETI's Request for Arbitration against Bolivia. A copy of the Red Erbol article is attached as Exhibit 4.

8.      Indeed, as recently as May 17, 2008, the Bolivian newspaper "La Prensa" reported that Bolivian Minister of Public Works, Óscar Coca "repeated that the complaint filed against ETI, as well as any similar proceedings that the State may file against other foreign companies, will be dealt with in Bolivia, not in international courts." A copy of the La Prensa article is attached as Exhibit 5.

9.      Consistent with these public statements, Bolivia has failed to appear or participate in the ICSID proceeding.

10.      On November 2, 2007, my partner Steven Fink wrote to Ambassador Guzmán and other representatives of the Bolivian Government proposing, in accordance with ICSID's arbitration rules, a method for selecting the arbitrators to hear the ICSID arbitration. A copy of Mr. Fink's letter is attached as Exhibit 6.

11.      Pursuant to ICSID Arbitration Rule 2(1)(b), Bolivia was required to respond to this proposal within 20 days after its receipt of the proposal. Bolivia, however, never responded. A copy of the ICSID Convention, Regulations and Rules is attached as Exhibit 7.

12.      The ICSID Arbitration Rules provide that if the parties have not agreed on arbitrator selection procedures within 60 days after registration of a request for arbitration, then either party may write to ICSID requesting that default procedures set forth in the ICSID Convention and Arbitration Rules be used to select the arbitrators. ICSID Arbitration Rule 2(3).

The next step is for ICSID to formally notify the parties that the default procedures are to be used. Id. In light of Bolivia's failure to respond to Mr. Fink's November 2 letter, on January 2, 2008 – the first business day after the 60 day period contemplated by the ICSID Rules expired – I wrote to ICSID's Secretary-General, notifying ICSID that ETI selected ICSID's default procedure for arbitrator selection, and requesting that ICSID promptly inform respondent Republic of Bolivia that the Tribunal is to be so constituted.

13.    ICSID did not issue a letter confirming that the default procedures for arbitrator selection were to be used until April 25, 2008, despite our repeated requests in writing that it do so.  Copies of those letters are attached as Exhibits 8 and 9.

14.    Four business days later, on Thursday, May 1, 2008, Bolivian President Morales issued Supreme Decree No. 29544, nationalizing ETI's interest in Entel.  We brought this proceeding for an attachment the following Monday, May 5.

15.    On May 19, Mr. Fink advised me that he had received a telephone call from Michael Krinsky of Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C. and Janis Brennan of Foley Hoag, who had told to him that they represent Entel and Bolivia, respectively, and that they were seeking a substantial extension – to June 27 – of their time to reply to ETI's motion to confirm the attachment of Entel's assets.

16.    The next day, May 20, Mr. Fink and I together spoke by telephone with Mr. Krinsky and Ms. Brennan.  Mr. Krinsky and Ms. Brennan confirmed that Entel and Bolivia were seeking an extension to June 27.  We advised them that we were willing to grant this extension, but that due to our schedules, including a long planned vacation, followed by a business trip, that Mr. Fink has scheduled in late June and early July, respectively, we would need approximately three weeks to respond.  Mr. Krinsky and Ms. Brennan stated that this was not acceptable to their

respective clients, and we subsequently agreed on a different, and somewhat more abbreviated, schedule.

17.    We have repeatedly inquired of Ms. Brennan, and her colleague Paul Reichler, whether Bolivia will appear in the ICSID proceeding, and whether Foley Hoag represents Bolivia in that proceeding. They have never answered these questions, other than to tell us that they do not now represent Bolivia in the ICSID proceeding, and have not been retained to do so.

**B.    Bolivia's Refusal to Provide "Just Compensation"**

18.    On May 16, 2008, Reuters reported: "The government of President Evo Morales has declared that it owes Telecom Italia nothing, maintaining that Telecom Italia has not fulfilled its obligations towards investors and that it owes the government $645 million as fines and taxes." A copy of the Reuters article is attached as Exhibit 10.

19.    As reported in the Bolivian press, the Bolivian government announced immediately after issuing Supreme Decree No. 29544 (the "Nationalization Decree") that it will pay ETI no more than $75 to $100 million – the purported "book value" of the stock – and then further reduce the payment to take into account amounts that the government claims are due it from Entel. See, "Government will pay up to US $100 Millions for Entel," El Deber.com, May 3, 2008, p. 2 (reporting statement of Minister of the Presidency Juan Ramon Quintana that "we will pay, not a market price, but the book price, which is the real cost of this stock."); id. at p. 3; see also "The State Recovers Entel," BolPress.com, May 1, 2008 ("The financial, tax, labor, commercial and regulatory liabilities will be deducted . . . ."). Copies of the El Deber and BolPress articles are attached as Exhibits 11 and 12, respectively.

20.    Bolivia claims that Entel owes it $60 million in taxes, penalties and interest in connection with a capital reduction made by Entel in 2005. (Third Declaration of Lorena Molina executed on June 1, 2008, ¶ 12). After being taken over by the Bolivian government on May 1,

the company apparently conceded this obligation. <u>See</u> "Restraining Order on Entel Accounts

Lifted," El Diario, May 29, 2008, (reporting that restraining order on Entel assets imposed by the

Bolivian government to secure payment of the $60 million in taxes, penalties and interest had

been suspended "after the current authorities of the company provided a payment commitment,

in addition to a prepayment amounting to approximately [60 million Bolivianos, or

approximately $8 million at current exchange rates]."). A copy of the El Diario article is

attached as Exhibit 13.

    21.    In a public statement, Bolivia's Minister of Public Works, Óscar Coca, said that

"the $US 90 million attached in ENTEL accounts overseas will 'easily be recovered' since the

company is 'highly profitable and its financial flow will immediately go back to normal'; the

return rate is 44 percent." "The Government Asserts that Euro Telecom Has Accepted the New

Rules," La Prensa.com, May 16, 2008. A copy of the La Prensa article is attached as Exhibit 14.


    I declare under penalty of perjury that the foregoing is true and correct. Executed

on June 23, 2008 at New York, New York.


Robert L. Sills

# EXHIBIT 1

elEconomista.es
October 23,2007 – 7.22 pm

**Telecom files Complaint with ICSID against Bolivian State for Attempting to Nationalize Subsidiary**

Related Links
The Bolivian Peso keeps its Value vis-à-vis the US Dollar (10/22)
Bolivian Government seeks Solution to determine New Administration for Santa Cruz Airport (10/20)
Normal Flight Activity at Bolivian Airport taken over by Air Force (10/18)

Related Listings
TELECOM 1.38▲ + 2.37%

La Paz, October 23 (EFECOM). Italy-based telephone company Telecom filed a complaint before the International Center for Settlement of Investment Disputes (ICSID) against the Bolivian Government for its attempt to nationalize its Entel subsidiary, as reported by an official source today.

Governmental Coordination Vice-Minister Héctor Arce said today at a press briefing that the complaint was filed on October 12 with the abovementioned agency, which reports to the World Bank, in spite of the fact that Bolivia officially withdrew from it in May.

Telecom owns 50% of Entel, while the Bolivian state controls 47% of the company. The remaining 3% is in the hands of small private investors.

According to the Vice-Minister, due to its decision to withdraw from ICSID, the Bolivian State "will not consent to the conduct of any kind of arbitration, and this is a sovereign decision that has been made by the administration of President Evo Morales."

Arce added that this decision makes Telecom's "deeply unjustified attempt" to bring the Entel case before ICSID unviable.

Last May, however, after Bolivia notified it was pulling out of ICSID, the government itself said that the companies were still entitled to file a complaint against the State for an additional six months, i.e. until November 2, 2007.

Negotiations between Telecom and the Morales administration deadlocked several months ago, though the president intended to accomplish the nationalization of Entel by last April.

In 2006, Morales "nationalized" the oil industry -though its detractors say that measure was just a tax reform-, and last February it expropriated a foundry of Swiss multinational Glencore. EFECOM

[END OF ARTICLE]
http://www.eleconomista.es/empresas-finanzas/noticias/301245/10/07/Telecom-demanda-a... 5/2/2008

**Eco**

Líder de audiencia de la prensa económica

eco

**Eco**

VISITADAS:
[Editar favoritos]

## Telecom demanda a Estado boliviano ante CIADI por querer nacionalizar filial



### El boliviano mantiene su valor respecto al dólar (22/10)

### El Gobierno boliviano busca una solución para determinar la nueva administración del aeropuerto de Santa Cruz (20/10)

### Vuelos normales en el aeropuerto boliviano tomado por la Fuerza Aérea (18/10)

**TELECOM**      ▲=2.37%

La Paz, 23 oct (EFECOM).- La empresa telefónica italiana Telecom denunció al Estado boliviano ante el Centro Internacional de Arreglo de Diferencias de Inversiones (CIADI) por pretender nacionalizar su filial Entel, informó hoy una fuente oficial.

El viceministro de Coordinación Gubernamental, Héctor Arce, dijo hoy en rueda de prensa que la demanda fue presentada el pasado 12 de octubre ante ese organismo, dependiente del Banco Mundial, pese a que Bolivia se retiró oficialmente del mismo en mayo.

Telecom posee el 50 por ciento de Entel, mientras que el Estado boliviano controla un 47 por ciento y el restante 3 por ciento está en manos de pequeños inversores privados.

El viceministro indicó que, por su decisión de retiro del CIADI, el Estado boliviano "no dará su consentimiento para que se lleve adelante ninguna forma de arbitraje y ésta es una determinación

soberana que ha sido tomada por el gobierno encabezado por el presidente Evo Morales".

Arce agregó que esa decisión hace inviable la "pretensión, profundamente injustificada", de Telecom de plantear un juicio ante el CIADI por el caso Entel.

No obstante, en mayo pasado, luego de que Bolivia notificó su salida del CIADI, el mismo gobierno informó de que las empresas tenían todavía derecho a presentar demandas contra el Estado por seis meses más, hasta el 2 de noviembre de este año.

Las negociaciones entre Telecom y el gobierno de Morales se estancaron hace varios meses, pese a que el presidente pretendía concretar la nacionalización de Entel hasta fines de abril pasado.

Morales "nacionalizó" en 2006 la industria petrolera, aunque sus críticos dicen que esa medida fue solo una reforma tributaria, y en febrero pasado expropió una fundidora de la multinacional suiza Glencore. EFECOM

ja/mb/jlm



<u>**Ahora en portada de elEconomista.es**</u>

# El Dow Jones sube y el Nasdaq baja en una jornada muy volátil en la bolsa de Wall Street

La Bolsa de Nueva York ha cerrado hoy con un incremento del 0,37% en el Dow Jones de Industriales y una caída del 0,15% en el Nasdaq, tras una sesión muy volátil y a pesar de que los datos de empleo fueron mejores de lo esperado por Wall Street.

# El Ibex 35 cierra por encima de los 14.000 puntos por primera vez desde enero

# La Fed y el BCE amplían su línea de crédito para combatir la crisis de liquidez

# EEUU destruye menos empleo del previsto en abril y la tasa de paro cae al 5%

# Las espadas en todo lo alto: ¿Opa hostil de Microsoft o alianza Yahoo!-Google?

# Los promotores proponen al Gobierno una vivienda concertada con un tipo de interés fijo en cinco años

## La inestabilidad bursátil no amedrenta a Repsol: lanzará la opv de YPF en junio

## La compraventa de viviendas se reduce en todas las CCAA con Cataluña y País Vasco a la cabeza



El Eco del Mercado es la nueva herramienta con la que podrá consultar las cotizaciones de sus valores favoritos, así como las últimas noticias de elEconomista.es y de otros medios. Además, le permitirá comunicarse con sus contactos de Yahoo!, Hotmail y GMail o disfrutar con alguno de los veinte juegos que ofrecemos. Descárgatelo gratis

Recibe las noticias más importantes de elEconomista en tu correo electrónico. ¡Suscríbete aquí!

+ vistos
interesa
no interesa

ABENGOA (+46 puestos)
CINTRA (+50 puestos)
PRISA (+33 puestos)
MAPFRE (+30 puestos)
JAZZTEL (+16 puestos)

© Ecoprensa S.A. - Todos los derechos reservados - Nota Legal - Quiénes somos - Suscripciones - Publicidad - Newsletters - RSS - Archivo

## <u>DECLARATION OF ACCURACY</u>

I, Silvia Gil De Cwilich, hereby declare as follows:

      I am fluent in Spanish and English and the following is, to the best of my knowledge and belief, a true and accurate translation from Spanish to English of the article titled "Telecom demanda a Estado boliviano ante CIADI por querer nacionalizar filial," from the website of the newspaper <u>El Economista</u>,

http://www.eleconomista.es/empresas-finanzas/noticias/301245/10/07/Telecom-demanda-a-Estado-boliviano-ante-CIADI-por-querer-nacionalizar-filial.html, dated October 23, 2007 (last visited May 2, 2008).

      I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on May 4th, 2008.

                                              Silvia Gil De Cwilich

# EXHIBIT 2



EMBAJADA DE BOLIVIA

Washington DC, October 29<sup>th</sup> of 2007

Ms.
Dr. Ana Palacio
Secretary General
International Centre for Settlement
of Investment Disputes (CIADI – ICSID)
1818 H Street N.W.
MSN U3-301
Washington, D.C. 20433
U.S.A.

Phone No. (202) 458-1534
Fax No.   (202) 522-2615

Re: *Request for Arbitration filed by ETI Euro Telecom International, N.V.*

C.c. Robert B. Zoellick
President of the World Bank
Washington, DC 20433 USA
Phone No  (202) 473-1000
fax: (202) 47-6391

Dear Ms. Secretary General,

I am writing to express the position of my government with regard to the Request for Arbitration (the "Request") filed with the International Centre for Settlement of Investment Disputes (ICSID or the "Center") by the company ETI Euro Telecom International, N.V. (the "Company") and sent by you on the past October 15th, which we consider to be manifestly outside the jurisdiction of the Centre and which, therefore, should not be registered.

**I. Manifest Lack of Consent**

The Request should not be registered because it is manifestly clear, from the content of the Request itself, that the consent needed to submit the alleged dispute to the Centre was never perfected.

*A. The Letter Sent by the Company on April 30th of 2007*

The lack of consent is evident and recognized by the Company itself, which thus presents two untenable theories about the date when it supposedly gave its consent for submitting the case to



EMBAJADA DE BOLIVIA

the Centre. First, the Company claims that it gave its consent on April 30th of 2007, in a letter bearing that date, attached to the Request as Annex C. However, this letter, which is an integral part of the Request, says absolutely nothing about the Centre, about the arbitration or about the consent to submit this or any other dispute to the Centre; this conclusion can be confirmed by simply reading the letter. At no point does the Company explicitly express its consent to submit the dispute to the Centre. According to Professor Schreuer, in order to be valid, consent must be in writing and explicit: "Consent in writing must be explicit and not merely construed"[1] [*p. 94. par. 248; (a)*].

The mere existence of a provision in a treaty about the resolution of controversies, which includes the possibility to submit disputes to the Centre, does not suffice to establish the investor's consent. According to Professor Schreuer: "The treaty provision cannot replace the need for consent by the foreign investor"[2] [*p. 218, par. 302, (a)*]. Although the letter dated April 30th mentions the Bilateral Investment Treaty between Bolivia and the Netherlands, it makes no reference to the Centre, or to the arbitration, or to the treaty provision about the Centre.

Consequently, it is manifestly clear, from the Request itself, that the letter dated April 30th of 2007 does not constitute any expression of the consent required to submit this dispute to the Centre. And, it should be repeated, this is so recognized by the claimant.

This is why the Company presents a second theory about the date of consent, which is its true argument: that it gave its consent to submit the dispute to the Centre on October 12th of 2007, the date when the Request for Arbitration was filed. It is clear that the Request for Arbitration dated October 12th is the first written and explicit expression of the consent by the Company to submit its claims against Bolivia to the Centre.

*B. The Denunciation of the Convention made on May 2nd*

By October 12th of 2007, the Company was the only party to give its consent to submit the dispute to the Centre, since, by that date, consent on the part of Bolivia no longer existed, it being manifestly clear, from the information contained in the Request, that Bolivia withdrew its consent to submit disputes of any kind to the Centre on May 2nd of 2007. As admitted by the Company: "On May 2, 2007, the World Bank, the depositary of the Convention, received the Respondent's notice of denunciation of the Convention".[3] [*p. 2, par. 7, (a)*]. The denunciation was communicated to the President of the World Bank through a letter sent by the Honorable Minister of Foreign Affairs and Cult, who said: "I am writing in order to inform you that, under article 71 of the Convention on Settlement of Investment Disputes between States and Nationals

---

[1] [T.N.: in the original, this footnote contains the quotation in English, which is translated into Spanish in the body of the text.]

[2] [T.N.: in the original, this footnote contains the quotation in English, which is translated into Spanish in the body of the text.]

[3] [T.N.: in the original, this footnote contains the quotation in English, which is translated into Spanish in the body of the text.]



EMBAJADA DE BOLIVIA

of Other States, the Republic of Bolivia denounces this Convention, which it joined on May 3rd of 1991 and that came into force for Bolivia on July 23rd of 1995".

While the text of Article 71 states that "The denunciation shall take effect six months after receipt of such notice" and, therefore, the denouncing State remains a party of the convention and bound to its obligations for a term of six months after the receipt of its denunciation, in no way does this text imply that consent by the denouncing State to submit disputes to the Centre remains in force after its denunciation.

This is confirmed by Professor Schreuer in his masterly work about the Convention, where, in his comments to Article 72[4], he points out:

> 4.     In order to benefit from the continued validity under Art. 72, **consent must have been given before the denunciation of the Convention** or exclusion of a territory. Consent is only perfected after it has been accepted by both parties. Therefore, a unilateral offer of consent by the host State through legislation or a treaty under Arts. 70 or 71 would not suffice. **The effect of the continued validity of consent under Art. 72 would only arise if the offer was accepted in writing by the investor before the notice of denunciation or exclusion.**

> 5.     The provision in Art. 71 that the denunciation of the Convention by a State party will take effect only six months after notice has been give, **does not afford an opportunity to perfect consent before the expiry of this time limit. In particular, an investor's attempt to accept a standing offer of consent by the host State that may exist under legislation or a treaty during this period will not succeed.** In order to be preserved by Art. 72 consent must have been perfected **before the notice of denunciation or exclusion was received.**" (p. 1286, (a))[5]

Professor Schreuer's conclusions are evidently logic and correct, since they are based on the recognition of two indisputable points: that a sovereign state cannot be forced to submit a dispute to arbitration without its consent, and that a denunciation of the convention is necessarily [T.N.: prose unclear] and is, for that reason, a withdrawal of its consent to submit disputes to the Centre. It would not be reasonable to adopt a position to the contrary, since it is undeniable that the State has a right, not only to denounce the Convention, [T.N.: prose unclear], pursuant to Article 25, "notify the Centre of the class or classes of disputes which it would or would not consider submitting to the jurisdiction of the Centre", with immediate effect, once it has ratified the Convention, "at any time thereafter".

---

[4] "Notice by a Contracting State pursuant to Articles 70 or 71 shall not affect the rights or obligations under this Convention of that State or of any of its constituent subdivisions or agencies or of any national of that State arising out of consent to the jurisdiction of the Centre given by one of them before such notice was received by the depositary."

[5] 4. [T.N.: in the original, this footnote contains the quotation in English, which is translated into Spanish in the body of the text.]



EMBAJADA DE BOLIVIA

Of course, Article 25 states that "When the parties have given their consent, no party may withdraw its consent unilaterally", that is, once consent has been perfected, neither of the parties can withdraw it unilaterally. However, as we have seen, by May 2nd of 2007, consent had not been perfected because the Company had not consented explicitly to submit the alleged dispute to the Centre. Therefore, by such date, no impediment existed for Bolivia to withdraw its consent. On the contrary, according to the Convention, Bolivia had full right to withdraw its consent at any time before the [T.N.:unclear prose] expressed its consent to submit this dispute to the Centre explicitly and in writing, which did not occur until the Request for Arbitration was filed on October 12th.

The Executive Directors of the Centre stated in the Report about the Convention that "Consent by the parties is the cornerstone on which the Centre jurisdiction rests" [par. 23] and added that, for the Centre to have jurisdiction on a dispute, "consent must exist at the time when the request is submitted to the Centre". [par. 24]. It is important to highlight that, in order to support the latter phrase, the Executive Directors quoted articles 28(3) and 36(3) of the Convention, the same articles stating that a Request for Arbitration must not be registered if the dispute is "manifestly outside the jurisdiction of the Centre". In other words, if consent by both parties does not exist at the time when the Request is submitted, the dispute is necessarily outside the jurisdiction of the Centre. Thus concludes Dr. Amerisinghe, who quotes Articles 28 and 36 to say: "consent by both parties must exist at the time of the submittal of a request for conciliation and arbitration to the Secretary General. If the request fails to show that both parties have given their consent, the Secretary General must reject it" [(a)][6].

*C. The Request Submitted on October 12th of 2007 Did Not Perfect Consent*

It is manifest that the first explicit expression of the required consent by the claimant is the Request for Arbitration dated October 12th of 2007, which was submitted more than five months after the denunciation and the withdrawal of consent by Bolivia. Schreuer's words are worth highlighting [*par. about the obligations of the Contracting State during the six months after the denunciation of the Convention*]: "*An investor's attempt to accept a standing offer of consent by the host State that may exist under legislation or a treaty during this period will not succeed. In order to be preserved by Art. 72, consent must have been perfected before the notice of denunciation or exclusion was received.*" [*p. 1286, (a)*][7].

For this reason, precisely, the alleged dispute submitted by the Company in its Request for Arbitration cannot be registered. According to the information contained in the Request itself, no consent by both parties existed at the time when the Request was submitted, on October 12th of 2007. Since Bolivia had denounced the Convention on May 2nd of 2007 and, therefore, the withdrawal of its consent on the same date, more than five months before the Request for

---

[6] Amerishinghe, C.F., "The International Centre for Settlement of Investment Disputes and Development through the Multinational Corporation, 9 Vanderbilt J. of Transitional Law, 793, 810 (1979)

[7] [T.N.: in the original, this footnote contains the quotation in English, which is translated into Spanish in the body of the text]



EMBAJADA DE BOLIVIA

Arbitration was submitted, it can be asserted that, by October 12th, only ETI had expressed its consent. The required perfection of consent did not exist then and it does not exist at present.

This is why the company desperately advances the previously discussed theory that it gave its consent to submit the dispute to the Centre on April 30th of 2007, that is, two days before the denunciation by Bolivia. This effort by the Company to argue that the date of its consent was April 30th clearly implies its recognition that, no consent having been perfected by that date, that is, before May 2nd, the possibility to perfect such consent no longer exists. Given the foregoing, it has been clearly demonstrated that the letter dated April 30th is not, and cannot be, an instance of consent to submit the dispute to the Centre. And, after May 2nd, it is impossible to perfect the consent required for the Centre to have the power to exercise its jurisdiction.

It is indisputable that no consent by the company existed before the denunciation by Bolivia on May 2nd of 2007. Any expression of consent by the company after that date was necessarily untimely and insufficient to perfect the consent required for the Centre to register the Request. As a result, the information contained in the Request clearly establishes that the consent required for the Centre to exercise its jurisdiction does not exist and that, therefore, the dispute is manifestly out of its jurisdiction and cannot be registered.

## II. The Lack of a Real Dispute

It is clear, by reading the Request for Arbitration, that this is a dispute contrived by the Company, not based on the real measures taken by the Government of Bolivia. In fact, the Bolivian State did not take any measure against the investment by ETI Euro Telecom International, N.V., nor did it fail to comply with its international commitments.

### A. No Expropriation Occurred

According to the Company, Supreme Decree No. 29087, dated March 28th of 2007, was part of a process of expropriation of its interests; however, it is evident that this allegation is false and that, from the information contained in the request itself, the requirement necessary to submit to the Centre a legal dispute about an investment is not met.

As part of a new State policy, reflected in a successful process of renegotiation of oil contracts that had also been subscribed in the capitalization process, the Bolivian government ordered, by Supreme Decree N° 29087, dated March 28th of 2007, the creation of an Ad Hoc Committee in charge of the negotiations with the Euro Telecom International N.V. (ETI) corporation, in order to recover the Empresa Nacional de Telecomunicaciones Sociedad Anónima –ENTEL S.A.– for the State, in a legitimate action which is absolutely normal in business, especially because these negotiations were carried out "(...) with the sole purpose of defining the conditions to recover the Company". It should be remembered that the Bolivian government successfully recognized 44 oil contracts, exercising its legitimate right as a partner and without violating any international agreements and commitments. It is absolutely unjustified for the Company to consider this legitimate administrative and commercial act as a threat to its investment.



EMBAJADA DE BOLIVIA

This assertion is recognized by the Company, since, in section 36 of the note it submitted to the ICSID, it acknowledges that the Bolivian government "published a national development plan that provided the renationalization of several formerly state-owned companies that had been privatized under the capitalization program under Act No 1544, enacted on March 2nd of 1994" [(a)] and that this plan "(…) provided that the renationalization would be carried out through administrative actions through the return to the State, where applicable, of the shares managed by the pension fund administration companies on behalf of the elderly citizens, and through the purchase of the additional shares necessary to give the State at least 51% of the shares in each company" [(a)].

The order to start negotiations cannot be interpreted as an expropriation. It is exactly the opposite. It is evidently an indication of the policy of the State to acquire the interests only through an agreement with the owner, that is, with the consent by the partner. Negotiating an agreement cannot be mistakenly equated with an expropriation. If this was so, the oil companies would have announced actions aimed at filing for arbitration and this did not happen and is not happening at present, so we consider that there exists extreme susceptibility on the part of the company, which should not move it to file a request before an international arbitration body.

Regarding Supreme Decree N°29101, whose main aim is "to transfer to the Bolivian State, for no consideration, the shares of stock of the Bolivian citizens", this only affects the stock that always belonged and belong to the Bolivian people, not affecting, either directly or indirectly, the shares of stock held by ETI partners; therefore, there are no grounds for the assertion by the Company, in section 49, that this Supreme Decree "is directly detrimental to the security of the investments of the Complainant in Bolivia" [(a)]. It must be clarified that the Bolivian Government is not interested in the depreciation of the shares of stock of a company in which, together with its Bolivian citizens, has a 50% stake.

*B. The Failure to Attach the Supreme Decrees which Allegedly Affected the Investment*

It is objectionable that the Company should not attach the Supreme Decrees or any of the documents it mentions in the grounds presented regarding the alleged "measures against the investment", a fact which results in a request for the registration of a defective arbitration demand, given that the lack of such documents, according to Rule 2, subsection 1(e), which states that "it is mandatory (…) to attach information about the matters which constitute the object of the dispute, indicating that the parties have dispute of a legal nature directly arising from an investment", allows the company to depict unreal situations of unfair treatment based on the distortion of measures of an internal administrative kind which do not imply any legal consequences against it. As a result of all this, the failure by the Company to attach to its request the Supreme Decrees and other documents which supposedly constitute the base for their claims is one more reason why the Centre should reject the Request.



EMBAJADA DE BOLIVIA

*C. The Lack of Damage to the Rights of the Investor*

Regarding the abovementioned Supreme Decree N°29100, which implies the abrogation of Supreme Decree N°28172, dated May 19th of 2005, and the Ministerial Decision N°194, dated August 12th of 2005, and any other decision based on the abrogated Decree, the Company makes the false assertion that the Bolivian government "intends to declare Supreme Decree 29172 unconstitutional and illegal" [*(a)*], since the Bolivian government does not have the power or the jurisdiction to do so. Besides, the Bolivian State intention to signal some facts as "punishable in accordance with the national order, as a result of which they must be processed through the appropriate procedure" [*(a)*] indicates a legitimate interest to investigate facts which were unclear in the administration of the state, and the investigation of irregularities committed by previous government administrations is a state obligation in the framework of the struggle against corruption, and should not be a matter for arbitration between the Bolivian State and any of its investors.

Regarding the tax inspections that the National Revenue Service is reportedly performing in ENTEL S.A., it should be pointed out that these are applied to both national and foreign companies and do not constitute discriminatory treatment; in addition, the Company, like any other company, has the unimpeded possibility to defend itself with all its argument, as it is doing at present. In no way can legitimate tax inspection actions started against national and foreign companies in the entire territory of Bolivia be construed as being "in order to coerce the Complainant into waiving its actions without compensation of any kind" [*(a)*] as the Company states.

These actions of internal administrative nature related to the stake of the Bolivian State in its capitalized companies cannot be considered as an expropriation or as unfair or discriminatory treatment, since they have in no way modified its ability to operate, administer, maintain, use, enjoy or dispose of the Empresa Nacional de Telecomunicaciones (ENTEL S.A.).

**III. Conclusions**

In brief, there is no doubt that the request by the company is manifestly outside the jurisdiction of ICSID. As we indicated above, in the first part of this letter, there is no consent. As we indicated in the second part, no real dispute exists. The alleged dispute does not exist; it has been totally invented because there was no expropriation or any other measure taken by the Bolivian government that could have affected the rights of the investor.

In denouncing the Convention, exercising nothing more than its sovereign rights, Bolivia does not waive the arbitration, but chooses to exit a system that, according to its experience and deeply considered point of view, suffers of serious defects. It is no secret that Contracting States, eminent legal authorities and even arbiters are expressing observations about and questioning the equity, consistence and economy of the Centre arbitration procedures. Bolivia offers and will offer arbitral remedies to the Company and to all investors, in the framework of its national regulations and of international regulations.



EMBAJADA DE BOLIVIA

As we stated above, the cornerstone of arbitration is consent by the parties. For a system based in consent by the parties to be fair, consistent and effective, it is essential that such consent be consolidated free of perceived or actual coercion. If consent is defective, it can only contribute to an increasing delegitimation.

Given the evident lack of jurisdiction, the Secretary General should not hesitate to reject the request for registration of arbitration submitted by ETI.

Very respectfully yours,


Gustavo Guzmán
Ambassador of Bolivia in the United States

---

(a) *Translator's Note: here, in the original in Spanish, the author states that he has translated the quotation into Spanish himself.*

10-29-07   03:32pm   From-EMBASSY OF BOLIVIA          +2023283712        T-501   P.01   F-420



E M B A J A D A   D E   B O L I V I A

Washington DC, 29 de Octubre de 2007


Señora
Dra. Ana Palacio
Secretaria General
Centro Internacional sobre Arreglo de Diferencias
Relativas a Inversiones (CIADI - ICSID)
1818 H Street, N.W.
MSN U3-301
Washington, D.C. 20433
U.S.A.

Phone No. (202) 458-1534
Fax No.   (202) 522-2615

Ref.: *Solicitud de Arbitraje presentada por ETI Euro Telecom Internacional, N.V.*

C.c. Robert B. Zoellick
Presidente del Banco Mundial
1818 H Street, NW
Washington, DC 20433 USA
tel: (202) 473-1000
fax: (202) 477-6391


Estimada Sra. Secretario-General:

Le escribo para expresarle la posición de mi Gobierno, con referencia a la Solicitud de
Arbitraje (la "Solicitud") presentada al Centro Internacional de Arreglo de Diferencias
Relativas a Inversiones (CIADI o el "Centro") por la empresa ETI Euro Telecom
Internacional, N.V. (la "Empresa"), y remitida por ustedes el 15 de octubre pasado, la
misma que consideramos como manifiestamente fuera de la jurisdicción del Centro y
que, por lo tanto, no debe ser registrada.


I. La manifiesta falta de consentimiento

La Solicitud no debe ser registrada porque es manifiestamente claro, de la información
contenida en la Solicitud misma, que nunca fue perfeccionado el consentimiento
necesario para someter la pretendida diferencia al Centro.

---



## EMBAJADA DE BOLIVIA

### A. La carta de la Empresa del 30 de abril de 2007

La falta de consentimiento se hace evidente y es reconocida por la Empresa misma, es así que nos ofrece dos teorías insostenibles acerca de la fecha de su consentimiento para someter el caso al Centro. Primero, la Empresa señala que dio su consentimiento el 30 de abril de 2007, en una carta de esa fecha anexada a la Solicitud como Anexo C. Sin embargo, la carta, que forma parte integral de la Solicitud, no dice absolutamente nada sobre el Centro, sobre el arbitraje, o sobre el consentimiento en someter ésta o cualquier otra disputa al Centro; solamente hay que leer la carta para confirmar esta conclusión. No hay ninguna expresión explícita del consentimiento de la Empresa para someter la diferencia al Centro. Según el Profesor Schreuer, para ser válido el consentimiento tiene que ser escrito y explícito: "El consentimiento escrito debe ser explícito y no sólo inferido"[1] [p. 94, par. 248; traducción propia].

La mera existencia de una cláusula en un tratado sobre la resolución de controversias, que incluye la posibilidad de someter las diferencias al Centro, no es suficiente para establecer el consentimiento del inversionista. Según el Profesor Schreuer: "La cláusula del tratado no puede sustituir a la necesidad del consentimiento por el inversionista extranjero"[2] [p. 218, par. 302; traducción propia]. Aunque la carta del 30 de abril menciona el Tratado Bilateral de Inversiones entre Bolivia y Países Bajos, no hace ninguna referencia al Centro, al arbitraje o a la cláusula del tratado sobre el Centro.

Consecuentemente, queda manifiestamente claro, de la Solicitud misma, que la carta del 30 de abril de 2007 no constituye ninguna expresión del requerido consentimiento para someter esta diferencia al Centro. Y, es bueno reiterarlo, la parte reclamante así lo reconoce.

Por eso presenta una segunda teoría sobre la fecha del consentimiento, que es su posición real: que dio su consentimiento para someter la diferencia al Centro el 12 de octubre de 2007, fecha de la presentación de la Solicitud de Arbitraje. Queda claro que la Solicitud de Arbitraje del 12 de octubre es la primera expresión escrita y explícita del consentimiento de la Empresa en someter sus reclamos contra Bolivia al Centro.

### B. La denuncia del Convenio del 2 de mayo

Para el 12 de octubre de 2007, la Empresa fue la única parte en dar su consentimiento para someter la disputa al Centro, ya que para esa fecha ya no existía consentimiento de parte de Bolivia, quedando manifiestamente claro, en base de la información contenida en la Solicitud, que Bolivia retiró su consentimiento para someter disputas de cualquier clase

---

[1] "Consent in writing must be explicit and not merely construed."
[2] "The treaty provision cannot replace the need for consent by the foreign investor."



E M B A J A D A   D E   B O L I V I A

al Centro el 2 de mayo de 2007. Según admite la Empresa: "El 2 de mayo, el Banco Mundial, depositario del Convenio, recibió de Bolivia una notificación de su denuncia del convenio"[3] [p. 2, par. 7; traducción propia].    La denuncia fue comunicada al Sr. Presidente del Banco Mundial a través de una carta del Honorable Ministro de Relaciones Exteriores y Cultos, que dijo: "Me dirijo a usted a fin de poner en conocimiento suyo que al amparo del artículo 71 del Convenio sobre Arreglo de Diferencias Relativas a Inversiones entre Estados y Nacionales de Otros Estados, la República de Bolivia denuncia el citado Convenio al cual se adhirió en fecha 3 de mayo de 1991 y que entró en vigor para Bolivia el 23 de julio de 1995".

Si bien el texto del citado Artículo 71 señala que "La denuncia producirá efecto seis meses después del recibo de dicha notificación", y por lo tanto, el Estado denunciante queda parte del Convenio y sujeto a sus obligaciones por un plazo de seis meses después del recibo de su denuncia, de ninguna manera este texto implica que el consentimiento del Estado denunciante para someter las disputas al Centro sigue en vigor después de su denuncia.

Así lo confirma el Profesor Schreuer en su obra magistral sobre el Convenio, donde en sus comentarios sobre el Artículo 72[4] destaca:

4.  Para poder beneficiarse de la validez continua bajo el Art 72, *el consentimiento tendría que haberse dado antes de la denuncia del Convenio* o la exclusión del territorio.  Consentimiento sólo es perfeccionado luego de que sea aceptado por ambas partes.  Por esto, una oferta unilateral de consentimiento por el Estado receptor por medio de legislación o por medio de un tratado antes de una notificación bajo los artículos 70 y 71 no serían suficientes.  *El efecto de la validez continua del consentimiento bajo el Art. 72 sólo surgiría si la oferta fuera aceptada por escrito por el inversionista antes de la notificación de denuncia o exclusión.*

5.  La provisión en el Art. 71 que la denuncia del Convenio por un Estado parte sólo toma efecto luego de los seis meses desde la fecha de que se haya dado la notificación *no otorga la oportunidad de perfeccionar consentimiento antes del vencimiento de este límite de tiempo. En particular, un intento de un inversionista de aceptar una oferta de consentimiento por un Estado receptor que pueda existir bajo la legislación o un tratado durante este periodo no prosperará.*  Para que sea preservado por el Art. 72, el consentimiento tendría que haberse perfeccionado *antes de la recepción de notificación de la denuncia* o exclusión." (p. 1286, traducción propia)[5].

[3] "On May 2, 2007, the World Bank, the depository of the Convention, received the Respondent's notice of denunciation of the Convention."
[4] "Las notificaciones de un Estado Contratante hechas al amparo de los Artículos 70 y 71 no afectarán a los derechos y obligaciones, conforme a este Convenio, de dicho Estado, sus subdivisiones políticas u organismos públicos, o de los nacionales de dicho Estado nacidos del consentimiento a la jurisdicción del Centro dado por alguno de ellos con anterioridad al recibo de dicha notificación por el depositario."
[5] 4. "In order to benefit from the continued validity under Art. 72, consent must have been given before the denunciation of the Convention or exclusion of a territory. Consent is only perfected after it has been accepted by both parties. Therefore, a unilateral offer



EMBAJADA DE BOLIVIA

Las conclusiones del Profesor Schreuer son evidentemente lógicas y correctas, porque se basan en el reconocimiento de dos puntos indiscutibles: que un Estado soberano no puede ser obligado a someter una diferencia al arbitraje sin su consentimiento, y que una denuncia del Convenio es necesariamente una manifestación de la decisión soberana del Estado contratante de dejar de someterse a la jurisdicción arbitral del Centro, y por eso es efectivamente un retiro de su consentimiento en someter las diferencias al Centro. No sería razonable adoptar una posición contraria, ya que es incuestionable el derecho que tiene el Estado, para, no solamente, denunciar el Convenio según el Artículo 71, sino también para, según el Artículo 25, "notificar al Centro la clase o clases de diferencias que aceptarían someter, o no, a su jurisdicción" con efecto inmediato "en cualquier momento ulterior" a su ratificación del Convenio.

Por supuesto, el Artículo 25 establece que "el consentimiento dado por las partes no podrá ser unilateralmente retirado", es decir, una vez que el consentimiento sea perfeccionado, ninguna de las partes podría retirarlo unilateralmente. Pero, como hemos visto, para el 2 de mayo de 2007 el consentimiento no se había perfeccionado porque la empresa no había consentido expresamente en someter la pretendida diferencia al Centro. Por eso, para esa fecha no había ningún impedimento al retiro del consentimiento por parte de Bolivia. Al contrario, según el Convenio, Bolivia tenía el pleno derecho de retirar su consentimiento en cualquier momento antes de la expresión escrita y explícita del consentimiento de la empresa para someter esta diferencia al Centro, cosa que no sucedió hasta la presentación de la Solicitud de Arbitraje el 12 de octubre.

Los Directores Ejecutivos del Centro afirmaron en su Informe acerca del Convenio que "El consentimiento de las partes es la piedra angular en que descansa la jurisdicción del Centro," [par. 23] y agregaron que para que el Centro tenga la jurisdicción sobre una diferencia, "el consentimiento debe existir en el momento que se presenta la solicitud al Centro." [par. 24]. Es importante destacar que para soportar esta última frase, los Directores Ejecutivos citaron los artículos 28(3) y 36(3) del Convenio, los mismos artículos que establecen que una Solicitud de Arbitraje no debe ser registrada si la diferencia "se halla manifiestamente fuera de la jurisdicción del Centro". En otras palabras, si el consentimiento de ambas partes no existe en el momento que se presenta la Solicitud, la diferencia necesariamente se halla manifiestamente fuera de la jurisdicción del Centro. Así concluye el Dr. Amerisinghe, que cita los Artículos 28 y 36 para decir:

---

of consent by the host State through legislation or a treaty before a notice under Arts. 70 or 71 would not suffice. The effect of the continued validity of consent under Art. 72 would only arise if the offer was accepted in writing by the investor before the notice of denunciation or exclusion.

5. "The provision in Art. 71 that the denunciation of the Convention by a State party will take effect only six months after notice has been given, does not afford an opportunity to perfect consent before the expiry of this time limit In particular, an investor's attempt to accept a standing offer of consent by the host State that may exist under legislation or a treaty during this period will not succeed. In order to be preserved by Art. 72, consent must have been perfected before the notice of denunciation or exclusion was received."

Case 1:08-cv-04247-LTS     Document 41-2     Filed 06/23/2008     Page 23 of 51

E M B A J A D A  DE  B O L I V I A

"El consentimiento de ambas partes debe existir en el momento de la presentación al Secretario General, de una solicitud de conciliación y arbitraje. Si la solicitud falla de demostrar que ambas partes hayan consentido, el Secretario General debe rechazarla" (traducción propia)[6].

### C. La solicitud del 12 de octubre de 2007 no perfeccionó el consentimiento

Queda de manifiesto que la primera expresión explícita del requerido consentimiento por la parte reclamante es la Solicitud de Arbitraje del 12 de octubre de 2007, que fue presentada más de cinco meses después de la denuncia, y del retiro del consentimiento, de Bolivia. Vale la pena enfatizar lo que dice Schreuer [par. sobre las obligaciones del Estado contratante durante los seis después de su denuncia del Convenio]: "Un intento de un inversionista de aceptar una oferta de consentimiento por un Estado receptor que pueda existir bajo la legislación o un tratado durante este período no prosperará. Para que sea preservado por el Art. 72, el consentimiento tendría que haberse perfeccionado antes de la recepción de notificación de la denuncia o exclusión." [p. 1286; traducción propia][7].

Precisamente por esta razón, la supuesta diferencia presentada por la Empresa en su Solicitud de Arbitraje no puede ser registrada. Según la información contenida en la Solicitud misma, no hubo consentimiento de ambas partes en el momento que se presentó la Solicitud, el 12 de octubre de 2007. Al haber presentado Bolivia su denuncia del Convenio el 2 de mayo de 2007 y, por lo tanto, el retiro de su consentimiento en la misma fecha, más de cinco meses antes de la presentación de la Solicitud de Arbitraje, podemos afirmar que, para el 12 de octubre, solamente ETI había expresado su consentimiento. El requerido perfeccionamiento del consentimiento no existía entonces ni ahora.

Por eso la empresa avanza desesperadamente la teoría, discutida anteriormente, que su consentimiento en someter la diferencia al Centro fue dado el 30 de abril de 2007, es decir, dos días antes de la denuncia hecha por Bolivia. Este esfuerzo de la Empresa de argumentar que la fecha de su consentimiento fue el 30 de abril, constituye un claro reconocimiento de que al no perfeccionarse el consentimiento para esa fecha, es decir antes del 2 de mayo, ya no existe la posibilidad de perfeccionar dicho consentimiento. Por lo expuesto, queda plenamente demostrado, que la carta del 30 de abril no es ni puede ser un consentimiento para someter la diferencia al Centro. Y después del 2 de mayo, es

---

[6] Amerisinghe, C.F., "The International Centre for Settlement of Investment Disputes and Development through the Multinational Corporation, 9 Vanderbilt J. of Transnational Law. 793, 810 (1979)

[7] "an investor's attempt to accept a standing offer of consent by the host State that may exist under legislation or a treaty during this period will not succeed. In order to be preserved by Art. 72, consent must have been perfected before the notice of denunciation or exclusion was received."



E M B A J A D A   D E   B O L I V I A

imposible el perfeccionamiento del consentimiento requerido para que el Centro esté facultado de ejercer su jurisdicción.

Es indiscutible que no hubo consentimiento de parte de la empresa antes de la denuncia de Bolivia del 2 de mayo de 2007. Cualquier manifestación de su consentimiento después de esa fecha fue necesariamente extemporánea e insuficiente para perfeccionar el consentimiento necesario para que el Centro registre la Solicitud. Consecuentemente, la información contenida en la Solicitud de Arbitraje establece claramente que el consentimiento requerido para el ejercicio de la jurisdicción de parte del Centro no existe, y que por eso la diferencia está manifiestamente fuera de su jurisdicción y no puede ser registrada.

## II. La falta de una verdadera diferencia

Queda claro de una lectura de la solicitud de arbitraje que ésta es una diferencia inventada por la Empresa que no se basa en las verdaderas medidas tomadas por el Gobierno de Bolivia. De hecho, el Estado boliviano no tomó ninguna medida en contra de la inversión de ETI Euro Telecom Internacional, N.V. ni incumplió con sus compromisos internacionales.

### A. No hubo expropiación

Según la Empresa, el Decreto Supremo No. 29087 del 28 de marzo de 2007 fue parte de un proceso de expropiación de sus intereses, sin embargo, es evidente que este alegato es falso y que, de la información contenida en la solicitud misma, no satisface de ninguna manera el requisito necesario para presentar al Centro una diferencia jurídica sobre una inversión.

En el marco de una nueva política de Estado, reflejada en un exitoso proceso de renegociación de contratos petroleros que habían sido suscritos también en el proceso de capitalización, el Gobierno boliviano instruye, mediante Decreto Supremo No. 29087 de 28 de marzo de 2007, la conformación de una Comisión Ad Hoc encargada de las negociaciones con la sociedad Euro Telecom International N.V. (ETI), a fin de recuperar la Empresa Nacional de Telecomunicaciones Sociedad Anónima –ENTEL S.A.– a favor del Estado, en una acción legítima y por demás normal en materia de negocios, sobre todo porque estas negociaciones se llevan a cabo "(...) con el único fin de definir las condiciones para recuperar la Empresa".   Recuérdese que el Gobierno boliviano renegoció exitosamente 44 contratos petroleros ejerciendo su legítimo derecho de socio y sin haber violentado acuerdos y compromisos internacionales. Es totalmente injustificado



E M B A J A D A   D E   B O L I V I A

que la Empresa considere este acto administrativo y comercial legítimo como una amenaza contra su inversión.

Esta afirmación, es reconocida por la Empresa, ya que en el acápite 36 de su nota presentada al CIADI reconoce que el Gobierno boliviano "publicó un plan nacional de desarrollo que contemplaba la re-nacionalización de varias ex empresas de propiedad del Estado que había sido privatizadas bajo el programa de capitalización de acuerdo con la Ley No. 1544, promulgada el 21 de marzo de 1994" [*traducción propia*] y que este plan "(...) contempló la re-nacionalización se llevaría a cabo a través de acciones administrativas mediante la reversión al Estado, donde sea aplicable, de las acciones administradas por las administradoras de fondos de pensiones a nombre de la población de la tercera edad y a través de la compra de acciones adicionales necesarias para darle al Estado cuando menos el 51% de las acciones en cada compañía" [*traducción propia*].

El mandato de iniciar negociaciones no puede ser interpretado como una expropiación. Es todo lo contrario. Es evidentemente una indicación de la política del Estado de adquirir los intereses solamente a través de un acuerdo con el propietario, es decir, con el consentimiento del socio. Negociar un acuerdo no se puede confundir con expropiar. Si así fuera, las empresas petroleras habrían anunciado acciones tendientes a demanda arbitral y esto no se dio ni se está dando, por lo que consideramos una excesiva susceptibilidad de parte de la Empresa que no debería llevarle a pretender una demanda ante una instancia de arbitraje internacional.

Con referencia al Decreto Supremo No. 29101 que tiene como principal objetivo "transferir a favor del Estado boliviano, a título gratuito, las acciones de los ciudadanos bolivianos", éste afecta sólo las acciones que siempre pertenecieron y pertenecen a los bolivianos, no afectando ni directa ni indirectamente a las acciones del socio ETI, por lo que no tiene fundamento lo afirmado por la Empresa en el acápite 49 donde menciona que este Decreto Supremo "lesiona directamente la seguridad de las inversiones del Demandante en Bolivia" [*traducción propia*]. Se debe precisar que el Gobierno boliviano no está interesado en la desvalorización de las acciones de una empresa de la cual es, junto a sus ciudadanos bolivianos, propietaria del 50% de las acciones.

*B. La falta de anexar los Decretos Supremos que supuestamente afectaron la inversión*

Es observable que la Empresa no acompañe los Decretos Supremos ni ninguno de los documentos que mencionan en su fundamentación de supuestas "medidas contra la inversión", hecho que nos pone ante una solicitud de registro de demanda arbitral defectuosa, en vista de que la ausencia de estos documentos, conforme a la Regla 2 inciso 1 (e) que dice que "se deberá (...) acompañar informaciones sobre las cuestiones objeto de la diferencia, señalando que las partes tienen una diferencia de naturaleza jurídica que surge directamente de una inversión", le permite a la Empresa presentar situaciones



E M B A J A D A  D E  B O L I V I A

ficticias de trato injusto basadas en distorsión de medidas de índole administrativo interno que no implican consecuencias jurídicas en su contra. Por todo esto, la falta de la Empresa de anexar a su solicitud los Decretos Supremos y otros documentos que supuestamente forman las bases de sus reclamos, constituye una razón más para que el Centro rechace la Solicitud.

*C. La no afectación de los derechos del inversionista*

Respecto al citado Decreto Supremo No. 29100 que supone la abrogación del Decreto Supremo No. 28172, de 19 de mayo de 2005 y la Resolución Ministerial No. 194 del 12 de agosto de 2005 y toda otra resolución basada en ese Decreto abrogado, no es cierta la afirmación de la Empresa de que el Gobierno boliviano "pretende declarar el Decreto Supremo 28172 como inconstitucional e ilegal" [*traducción propia*], ya que el Gobierno boliviano no tiene la atribución ni competencia de hacerlo. Por otro lado, la intención de que el Estado boliviano señale algunos actos como "punibles conforme al ordenamiento nacional, por lo que deben procesarse en la vía correspondiente" [*traducción propia*], refiere un interés legítimo de investigar hechos poco claros en la administración estatal y

la investigación de hechos irregulares cometidos por anteriores administraciones gubernamentales es una obligación estatal enmarcada en la lucha contra la corrupción y no tendría por qué ser materia de arbitraje entre el Estado boliviano con ninguno de sus inversionistas.

Sobre fiscalizaciones tributarias que el Servicio Nacional de Impuestos estaría llevando a cabo en ENTEL S.A., es bueno señalar que éstas son aplicadas tanto a empresas nacionales como extranjeras y no constituyen un trato discriminatorio, además que la Empresa, como cualquier otra empresa, tiene acceso pleno a defenderse con todos sus argumentos y es así que en la actualidad lo está haciendo en la instancia administrativa correspondiente en el marco de la normativa boliviana. De ninguna manera las acciones de fiscalización tributaria legítimas que se inician contra empresas nacionales y extranjeras en todo el territorio boliviano pueden pretender enmarcarse como en un "orden de coaccionar al Demandante a renunciar a sus acciones sin ningún tipo de compensación" [*traducción propia*] como señala la Empresa.

Estas acciones de carácter administrativo interno de la participación accionaria del Estado boliviano en sus empresas capitalizadas no pueden ser consideradas una expropiación ni un trato injusto o discriminatorio, ya que no han modificado en manera alguna sus capacidades de operación, administración, mantención, uso, gozo, o disposición de la Empresa Nacional de Telecomunicaciones (ENTEL S.A.).

EMBAJADA DE BOLIVIA

### III. Conclusiones

En síntesis, no cabe duda que la solicitud de la Empresa está manifiestamente fuera de la jurisdicción del CIADI. Como indicamos arriba, en la primera parte de esta carta, no existe consentimiento. Como indicamos en la segunda parte, no hay disputa verdadera. La supuesta disputa no existe, es totalmente inventada porque no hubo expropiación u otra medida tomada por parte del Gobierno de Bolivia que afectó los derechos del inversionista.

Al denunciar el Convenio en estricto ejercicio de sus derechos soberanos, Bolivia no renuncia al arbitraje sino opta por salir de un sistema que, desde su experiencia y estudiado punto de vista, sufre de falencias serias. No es secreto que Estados Contratantes, autoridades legales eminentes, y hasta árbitros están vertiendo observaciones y cuestionamientos sobre la equidad, consistencia y economía de los procesos de arbitraje en el Centro. Bolivia ofrece y ofrecerá remedios arbitrales a la Empresa y a todos los inversionistas, en el marco de sus normas nacionales y las normas internacionales.

Como indicamos líneas arriba, la piedra angular del arbitraje es el consentimiento de las partes. Para que un sistema basado en el consentimiento de las partes sea justo, consistente y eficaz, es imprescindible que se consolide dicho consentimiento libre de coerciones percibidas o fácticas. Viciado, el consentimiento sólo puede contribuir a una creciente deslegitimación.

Ante la evidente ausencia de jurisdicción, la Secretaría General no debe dudar en rechazar la solicitud de registro de arbitraje presentado por ETI.

Atenta y respetuosamente,

Gustavo Guzmán
Embajador de Bolivia en Estados Unidos

# DECLARATION OF ACCURACY

I, Silvia Gil De Cwilich, hereby declare as follows:

I am fluent in Spanish and English and the following is, to the best of my knowledge and belief, a true and accurate translation from Spanish to English of the letter from Gustavo Guzman, Ambassador of Bolivia to the United States, to Dr. Ana Palacio, the Secretary General of the International Centre for Settlement of Investment Disputes, dated October 29, 2007.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.  Executed on May 19, 2008.


_____
Silvia Gil De Cwilich

# EXHIBIT 3

**International Centre for Settlement of Investment Disputes**
1818 H Street, N.W., Washington, D.C. 20433, U.S.A.
Telephone: (202) 458-1534    Faxes: (202) 522-2615/2027
Website: www.worldbank.org/icsid

October 31, 2007

E.T.I. Euro Telecom International N.V.
c/o Messrs. Robert L. Sills and
Steven J. Fink
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, NY 10103

Republic of Bolivia
c/o H.E. Evo Morales Ayma
Presidente Constitucional de la República
Palacio de Gobierno
La Paz, Bolivia

H.E. David Choquehuanca Céspedes
Ministero de Relaciones Exteriores y Culto
Plaza Murillo- c. Ingavi esq. c. Junín
La Paz, Bolivia

H.E. Ambassador Mario Gustavo Guzmán Saldaña
Embassy of the Republic of Bolivia
3014 Massachusetts Ave. N.W.
Washington D.C. 20008

<u>Notice of Registration</u>

Pursuant to Article 36(3) of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the Convention) and Rules 6(1)(a) and 7(a) of the Centre's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings (the Institution Rules), I hereby notify you that I have on this date, which is also the date of the dispatch of this Notice, registered in the Arbitration Register the request for arbitration of E.T.I. Euro Telecom International N.V., dated October 12, 2007, as supplemented by its letter to the Centre of October 19, 2007.

Pursuant to Rule 7(b) of the Institution Rules, I also notify you that all communications and notices in connection with the proceeding will be sent, unless otherwise indicated, to the above addresses that have been notified to the Centre.

In accordance with Rule 7(c) of the Institution Rules, the parties are invited to communicate to us any provisions agreed by them regarding the number of arbitrators and the method of their appointment. In accordance with Rule 7(d) of the Institution Rules, the parties are invited to proceed, as soon as possible, to the constitution of an Arbitral Tribunal in accordance with Articles 37 to 40 of the Convention.

In accordance with Rule 7(e) of the Institution Rules, the parties are reminded that the registration of the request is without prejudice to the powers and functions of the Arbitral Tribunal with regard to jurisdiction, competence and the merits.

Pursuant to Rule 7(f) of the Institution Rules, this Notice is accompanied by a list of the members of the Panels of Conciliators and of Arbitrators of the Centre.

Ana Palacio
Secretary-General

# EXHIBIT 4

Red Erbol – Digital Newspaper, Bolivia – December 3, 2007

# Government Starts Actions in Washington to Annul Eurotelecom's Complaint

Washington, December 3rd – Today, the Bolivian Government started taking actions in the United States of America in order to annul the complaint filed with the International Centre for Settlement of Investment Disputes (ICSID) by the Italian Eurotelecom International NV (ETI), Entel S.A.'s majority shareholder, for alleged damages to its investments.

The Vice minister of Governmental Coordination, Héctor Arce, stated that a policy of defense of the Bolivian State is being pursued before the ICSID (an organization dependant upon the World Bank), which "illegally and irregularly accepted a complaint against Bolivia by Eurotelecom, which holds the highest stake in Entel."

In a telephone conversation held with Erbol Network from Washington, the Vice Minister explained the line of defense, which argues that the international firm's complaint should not have been received by the International Center because Bolivia withdrew from this organization on May 2nd this year.

"This is why a number of procedures are being carried out before the ICSID itself, as well as before different authorities that make up this body, so that Bolivia's firm decision of not submitting itself to the authority of the ICSID may be respected" he asserted.

Mr. Arce said that he is in Washington on a two-day trip with an agenda that includes holding meetings with several World Bank directors so that the Bolivian State's decision of no longer belonging to the ICSID may be respected, and so that, given such decision, companies may not be given the possibility to file complaints against Bolivia before that court.

On April 30th this year, the Italian firm sent a letter to the Government of Evo Morales, stating that it had notified the ICSID about the existence of a dispute with the Bolivian State over alleged damages.

On October 12th, the Italian firm Eurotelecom made the complaint before the ICSID official, arguing that the Executive had passed a Supreme Decree nationalizing the shares of the Empresa Nacional de Telecomunicaciones which were previously controlled by the Pension Funds Administration Companies (AFP).

### Bolivia at the ICSID

The complaint filed by Eurotelecom before the ICSID is not the first one against Bolivia. On February 25th 2002, after the so called "Water War", Bechtel Corporation, a company which was expelled, filed a complaint against the State (case N. ARB/02/3) alleging "loss of profit" and demanding compensation for between US $25 and $100 million, although, in practice, its investments did not reach even half a million dollars during its seven months of operation. Activists throughout the world harassed the firm about the illegitimacy of its complaint, and, under this pressure, the firm had to sell its stake to the Bolivian State at the nominal price of 30 dollar cents per share on January 19th 2006.

The company Quiborax, supposedly a shareholder of the Bolivian enterprise Non Metallic Minerals S.A., sued the country before the ICSID for the annulment of its concession to exploit ulexite and other non-metallic minerals at the Salt Flat of Uyuni. Social organizations denounced the overexploitation of reserves by Non Metallic and its potential damage to the region's environment, as well as numerous irregularities in the concession. Non Metallic argued that the Bolivian Government hindered the free management, maintenance, use, usufruct, extension, transfer, sale and liquidation of its US \$3 million investment through unjustified and discriminatory measures, violating in this way the terms of the Bilateral Investment Treaty between Chile and Bolivia signed on February 6th 2006. On April 26th 2006, the Bolivian Government created the National Council for the Legal Defense of the Bolivian State [Translator's Note: in Spanish, *"Consejo Nacional de Defensa Legal del Estado Boliviano"*], which is responsible for monitoring the Non Metallic case, which is in the stage of election of arbitrators.

So far, the complaints by Eurotelecom and Quiborax have been the only ones filed against Bolivia before the ICSID, although another one could be filed at any moment. It should be remembered that the mining company Gleencore stated that it would sue Bolivia, although no complaint has been brought yet.

## Background of ICSID

Bolivia signed the ICSID Agreement on May 3rd 1991 and ratified it by Act N° 1593 on August 12th 1994. The agreement came into force on July 23rd 1995 and the government of Evo Morales denounced it on April 29th 2007.

President Evo Morales presented four reasons to justify his decision: 1. The ICSID is a totally unbalanced court, biased in favor of international firms; 2. it is antidemocratic, since it deliberates secretly without being accountable to anybody; 3. it is extremely expensive for poor countries and constitutes a mechanism to impoverish states; and above all, 4. it violates the Bolivian Constitution. Bolivia was the first country to denounce the ICSID Convention (Venezuela and Nicaragua will follow, according to the agreement signed at the Fifth Conference of ALBA [Translator's Note: *Alternativa Bolivariana para las Américas* or Bolivarian Alternative for the Americas]).

The Bolivian Government denounced the Convention on a suggestion by the Constitutional Court, which declared itself incompetent to decide whether Bilateral Investment Treaties violate the Constitution or not.

The whole ICSID system is designed so that international firms can sue the States, but not the other way around. Among the 232 cases it has heard so far, 230 were complaints brought by the international firms. In these courts, the best outcome a State can hope for is being allowed not to pay, or being allowed to pay less; companies are never made to pay compensation to a State.

This is a kind of "divine justice" of a quite twisted sort because it lacks appeal mechanisms and its rulings are final, according to Pablo Solón, plenipotentiary ambassador of the Bolivian Government for Trade and Integration Issues.

## Next Steps

Mr. Arce informed that a commission will be created, with representatives from the Ministry of the Presidency and of the Foreign Affairs Department [Translator's Note: in Spanish, *"Ministerio de la Presidencia y de la Cancillería"*] in order to defend the country in this new case. "We shall make use

of all the legal resources and mechanisms available to make law prevail and prevent bad investors from taking advantage of the good faith of the State", he stated.

The Vice Minister remarked that the State renounced to the jurisdiction of the ICSID; in other words, the Bolivian Government decided to no longer give its consent to any form of arbitration. For an arbitration process to take place, an agreement by both parties must exist, and in this case Bolivia does not agree with the court of the World Bank.




| La hora en Bolivia 1:16 pm | | Martes 10 de junio de 2008 |
| --- | --- | --- |

Noticias ▼  Buscar

noticia leída 118 veces    volver

Erbol > Economía



escucha
radio
**erbol**

en vivo
transmitiendo

**Noticias**

: Sánchez Berzaín logra
asilo político en EEUU
acusando a Evo de apoyar
al narcotráfico ver más>>

: Chóferes se reúnen en
Sucre para definir posibles
medidas ver más>>

: Mineros y chóferes
cumplen paro parcial en
Potosí ver más>>

: Gobierno entrega Bs24.8
millones a pequeños
productores ver más>>

: Garantizan financiamiento
para planta procesadora de
quinua en Oruro ver
más>>

: Gobierno: Habrá parada
policial el 24 de junio en
defensa de la
institucionalidad ver
más>>

: El Gobierno firmará 69
convenios de alianzas
rurales este martes ver
más>>

: Ministro Rada advierte
sobre un terrorismo político
alentado por los operadores
de justicia ver más>>

## Gobierno inicia gestiones en Washington para anular la demanda de Eurotelecom

Washington., 3 Dic (Erbol).- El Gobierno boliviano inició hoy gestiones en Estados Unidos para anular la demanda que presentó en el Centro Internacional de Arreglo de Diferencias Relativas a Inversiones (CIADI) la italiana Eurotelecom International NV (ETI), accionista mayoritaria de Entel S.A., por supuestos perjuicios a sus inversiones.

El viceministro de Coordinación Gubernamental, Héctor Arce, dijo que están siguiendo la política de defensa del Estado boliviano ante el CIADI, dependiente del Banco Mundial, "que de manera ilegal e irregular admitió una demanda en contra de Bolivia de la empresa Eurotelecom que tiene un paquete accionario mayoritario en Entel".

La autoridad, en un contacto telefónico con la Red Erbol desde Washington, aclaró que la línea de defensa es que la demanda de la transnacional no debía haber sido recepcionada en el Centro Internacional porque Bolivia se retiró de ese organismo el 2 de mayo de este año.

"En función a ello se está haciendo una serie de gestiones, ante el mismo CIADI y ante diferentes autoridades que componen esta institución, con el objetivo de que se respete la determinación boliviana de no someterse al CIADI", afirmó.

Arce dijo que está en Washington en una visita de dos días con una agenda que contempla encuentros con varios directores de Banco Mundial a fin de hacer respetar la decisión del Estado boliviano de ya no pertenecer al CIADI y que a partir de esa determinación ninguna empresa pueda presentar demandas ante ese tribunal contra el país.

El 30 de abril de este año la empresa italiana envió una carta al Gobierno de Evo Morales anunciando que había notificado al CIADI la existencia de una controversia con el Estado boliviano por presuntos perjuicios.

El 12 de octubre, la telefónica italiana oficializó la demanda ante el CIADI. Eurotelecom bajo el argumento de que el Poder Ejecutivo aprobó un Decreto Supremo que nacionaliza las acciones de Empresa Nacional de Telecomunicaciones que eran controladas por las Administradoras de Fondos de Pensiones (AFP).

Bolivia en el CIADI

La demanda de Eurotelecom en el CIADI no es la primera para Bolivia. El 25 de febrero de 2002, la expulsada Bechtel Corporation, tras la denominada "Guerra del Agua", presentó una demanda contra el Estado (caso N. ARB/02/3) por "lucro cesante" exigiendo una compensación de entre 25 y 100 millones de dólares, aunque en la práctica no llegó a invertir ni medio millón de dólares en los siete meses de operación. Activistas de todo el mundo acosaron a la transnacional por la ilegitimidad de su demanda, y la empresa, presionada, tuvo que vender sus acciones al Estado boliviano en el precio nominal de 30 centavos de dólar el 19 de enero de 2006.

La empresa Quiborax, supuesta accionista de la empresa boliviana Non Metallic Minerals SA, demandó al país en el CIADI por la anulación de su concesión para la explotación de ulexita y otros minerales no metálicos en el Salar de Uyuni. Non Metallic fue denunciada por las organizaciones sociales por sobreexplotar las reservas, atentando contra el medioambiente de la zona, y por las múltiples irregularidades de la concesión. Non Metallic argumentó que el gobierno boliviano obstaculizó la libre administración, mantenimiento, uso, usufructo, extensión, transferencia, venta y liquidación de su inversión de tres millones de dólares a través de medidas injustificadas y discriminatorias, violando las cláusulas del TBI entre Bolivia y Chile suscrito el 6 de febrero de 2006. El 26 de abril de 2006, el gobierno boliviano creó el Consejo de Nacional de Defensa Legal del Estado Boliviano que tienen bajo su responsabilidad hacer seguimiento del caso Non Metallic, que se encuentra en la etapa de elección de árbitros.

Policía: Posesionan a nuevos directores y comandantes ver más>>

Evo amenaza con bloquear negociaciones comerciales entre la CAN y UE ver más>>

Cámara Baja tratará proyecto de ley para designar Consejeros de la Judicatura ver más>>

Por ahora, las demandas de Eurotelecom y de Quiborax serían las únicas contra Bolivia en el CIADI, aunque el rato menos pensado puede aparecer otro. No hay que olvidar que la minera Gleencore anunció que enjuiciaría a Bolivia, pero aún no ha presentado ninguna demanda.

Antecedentes del CIADI

Bolivia firmó el Convenio del CIADI el 3 de mayo de 1991 y lo ratificó a través de la Ley N 1593 el 12 de agosto de 1994. El Convenio entró en vigencia el 23 de julio de 1995, y el gobierno de Evo Morales lo denunció el 29 de abril de 2007.

El Presidente Evo Morales expuso cuatro razones para justificar su decisión: 1. El CIADI es un tribunal absolutamente desequilibrado y parcializado con las transnacionales; 2. es antidemocrático porque delibera en secreto y sin rendir cuentas a nadie; 3. es extremadamente caro para los países pobres y un mecanismo para esquilmar a los Estados; y, sobre todo, 4. viola la Constitución. Bolivia fue el primer país que denunció la Convención del CIADI (le seguirán Venezuela y Nicaragua, de acuerdo a lo suscrito en la V Conferencia del ALBA).

El gobierno boliviano denunció la Convención por sugerencia del Tribunal Constitucional, órgano que se declaró incompetente para definir si los TBIs violan la Constitución o no.

Todo el sistema del CAIDI está diseñado para que las transnacionales demanden a los Estados y no a la inversa. De los 232 casos que atendió hasta la fecha, 230 fueron demandas planteadas por las transnacionales. En estas cortes, lo mejor que le puede pasar a un Estado es que no pague o que pague menos; nunca se da el caso de que una empresa indemnice al Estado.

Se trata de una especie de "justicia divina" bastante chueca porque carece de mecanismos de apelación y sus fallos son definitivos, según Pablo Solón, embajador plenipotenciario para Asuntos de Integración y Comercio del gobierno boliviano.

Los pasos a seguir

Arce informó que se conformará una comisión con representantes del Ministerio de la Presidencia y de la Cancillería para defender al país en este nuevo caso. "Vamos a utilizar todos los mecanismos y los recursos legales que tenemos en nuestro alcance para hacer prevalecer el derecho y evitar que malos inversionistas sorprendan la buena la fe del Estado", dijo.

El Viceministro recordó que el Estado renunció a la jurisdicción del CIADI, es decir que el gobierno boliviano decidió no dar su consentimiento para ninguna forma de arbitraje. Para que se de algún proceso arbitral tiene que haber un acuerdo de ambas partes, y en este caso Bolivia no está de acuerdo con el tribunal del Banco Mundial.

Imprimir    Enviar a

Periódico Digital ERBOL - Calle Ballivián Nº 1323, Edif. Smith. 4to. piso.
Teléfonos: 2204011 - 2203650. Fax: 2203888
Website http://www.erbol.com.bo - E-mail: erbol@erbol.com.bo
© ERBOL COMUNICACIONES 2007. Todos los derechos reservados.
La Paz – Bolivia

## DECLARATION OF ACCURACY

I, Silvia Gil De Cwilich, hereby declare as follows:

I am fluent in Spanish and English and the following is, to the best of my

knowledge and belief, a true and accurate translation from Spanish to English of the article

titled "Gobierno inicia gestiones en Washington para anular la demanda de Eurotelecom,"

from the newspaper Red Erbol, dated December 3, 2007.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing

is true and correct.  Executed on June 13, 2008.

Silvia Gil De Cwilich

# EXHIBIT 5

La Prensa – La Paz, Bolivia – Saturday, May 17th, 2008

## The Government Says that ETI Accepts the Transfer of Entel

Last Friday, the Government announced that Euro Telecom Italia (ETI) accepted the nationalization of the Empresa Nacional deTelecomunicaciones (Entel) and that the European multinational company is only considering a negotiation plan in order to obtain the best price for its shareholding stake.

This information was provided by the minister of Public Works, Óscar Coca, who stated: "The good news is that no debate exists any longer about the management of Entel. At present, the only goal of the company is to set the price of its shares".

Minister Coca added: "This means that ETI, which used to be the majority stockholder, accepts the new state of affairs, and now the only thing that remains for the company to do is, obviously, to obtain the highest possible amount for its stake. That is all we are going to negotiate".

He denied that the Executive had "offered money" for the stock held by ETI in Entel and pointed out that, in a few days, a new meeting of the stockholders of the nationalized company will be called, after which "the Government will design its negotiation strategy. There is no definite price at present".

Entel was nationalized by the administration of President Evo Morales on May 1st this year. Since then, a state administrator has been working to make a report on the value of the company. This information will be used by the Executive to negotiate the purchase of the shares held by ETI.

### Frozen money

As regards the U$S 90 million owned by the telecommunications company, which were deposited in foreign banks by the former executives of Entel and frozen by ETI, Coca said that they will not be used to buy the stockholding stake of the European company but, once they have been recovered, they will be invested in expanding the telecommunications networks in rural areas and improving the quality of the service.

The Minister repeated that the complaint filed against ETI, as well as any similar proceedings that the State may file against other foreign companies, will be dealt with in Bolivia, not in international courts.

According to the newspaper *Erbol,* the Government set a two-month term to evaluate the situation of Entel and to determine the sum it will pay to the Italian company for its shares; the company was capitalized on November 27th of 1995, during the first presidential term of Gonzalo Sánchez de Lozada (1993-1997).

The president of the Finance Committee of the Chamber of Representatives [Translator's Note: in Spanish, "*Comisión de Hacienda de Diputados*"], Gabriel Herbas, said to Prensa Latina that, at present, 12 years after having been privatized by the Italian company Euro Telecom, the company owes 210 million bolivianos (U$S 26.5 million) to the National Taxation Service.

Furthermore, overcharges for purchases made were detected, in an amount exceeding U$S 500.000. In 2005, the company reduced its operation capital and failed to fulfill its

commitment to extend coverage to 1,110 towns of more than 350 inhabitants, at the same time as it entered the market holding the monopoly over long distance telecommunications.

## The Details

The Executive Branch nationalized Entel by decree on May 1st, 2008.

The administration of Gonzalo Sánchez de Lozada (1993-1997) had capitalized (privatized) the company on November 24th, 1995. As winner of the tender, ETI promised to inject into Entel US $610 million.

At that moment, the appraised value of Entel was U$S 1,200 million.

This week, the European Union questioned the way in which the government transferred the telecommunications company to the State. It also highlighted the importance of resorting to dialogue, so that the sum to be paid for the company's stock can be amicably settled.



Dólar: 7.3-
Euro : 11.181i
12 °C
UFV: 1.348i

La Paz - Bolivia, Sábado, 17 de may de 2008

El Ejecutivo reitera que el proceso judicial debe ser en el país

# El Gobierno dice que ETI acepta traspaso de Entel

Anuncios Google    v  v

Attorney Search Network
California State Bar Certified Lawyer Referral Service

Abogados de Bancarrota
Bancarrota puede ser tu mejor opción. Solicita una evaluación.

Vuelos y Hoteles Baratos
Compare the Best Deals. ¡Ahorra Tiempo y Dinero!

Abogados en Nevada
¿Fue Lesionado? Contáctenos Hoy Reciba su Primera Consulta Gratis

v  v    Anuncios Google

Anuncios Google    v  v

Accidente Abogado
El Abogado Personal de Herida Para Todas Sus Necesidades. 866-806-7398
www.prolaw1.com

Fotos y Videos
Relájate y mira un Video! Y mucho más. Sin registro
100links.com/video

TU Abogado
Hablamos tu idioma Llamenos para una consulta gratis
www.TuAbogadoDelPueblo.com

Envía dinero a Bolivia
Envía $100 por sólo $6.49. Pago en ventanilla o pago a cuenta.
www.xoom.com/bolivia

Abogados de Inmigracion
Casos de Inmigracion y Deportacion Oficinas en la frontera de Texas
www.lawyers.com/pesquivel/espan

El Gobierno anunció este viernes que Euro Telecom Italia (ETI) aceptó la nacionalización de la Empresa Nacional de Telecomunicaciones (Entel) y que la transnacional del viejo continente sólo estudia un plan de negociación para conseguir el mejor precio de su parte accionaria.

La información fue proporcionada por el ministro de Obras Públicas, Óscar Coca, quien dijo que "la buena noticia es que ya no hay discusión sobre la gestión de Entel. Ellos ahora sólo están en un afán de establecer un determinado valor sobre sus acciones".

La autoridad añadió que "eso quiere decir que el accionista mayoritario que era (ETI) hasta entonces, acepta la nueva realidad, y lo que les queda a ellos es, obviamente, sacar el mayor valor posible de sus acciones. Es todo lo que vamos a negociar".

Negó que el Ejecutivo hubiera "ofrecido dinero" por los valores de ETI en Entel y puntualizó que en los siguientes días se convocará a una nueva junta de accionistas de la empresa nacionalizada, luego de lo cual "el Gobierno va a plantear su estrategia de negociación. No hay un precio en este momento".

Entel fue nacionalizada por la administración del presidente Evo Morales el 1 de mayo de este año. Desde entonces un interventor levanta un informe del valor de la compañía. Esa información será usada por el Ejecutivo para negociar la compra de las acciones de ETI.

Dinero congelado

Respecto de los 90 millones de dólares propiedad de la telefónica, depositados por los anteriores ejecutivos de Entel en bancos del exterior y congelados por ETI, Coca dijo que no serán utilizados para comprar el paquete accionario de esa empresa europea, sino, una vez recuperados, para invertir en la expansión de las redes de telecomunicaciones en el área rural y mejorar la calidad del servicio.

La autoridad reiteró que la demanda contra ETI y otros procesos similares que el Estado emprenda contra otras empresas extranjeras serán ventilados en Bolivia y no en tribunales internacionales.

Al ..o
Mitin contra la discriminación a los gays y lesbianas
Cumbre de Lima fija agenda para luchar contra la pobreza
Umopar destruye 12 fábricas de cocaína en Yapacaní
Una obra de Ocampo en un muro de El Prado
El Gobierno dice que ETI acepta traspaso de Entel
El volumen de gas vendido a Argentina baja a 2,12 MMCD
Ex Delegada Presidencial será la Gerente General de BOA
Editorial
La salud y el ejercicio ilegal de la profesión
Llegó el gran día
Opinión
El parámetro-Mateo Garau S. J. *
OEA: El principio de no intervención-Agustín Saavedra Weise *

De acuerdo con Erbol, el Gobierno fijó un plazo de dos meses para evaluar la situación de Entel y determinar cuánto le pagará a la empresa italiana por su participación desde que fue capitalizada el 27 de noviembre de 1995, durante el primer Gobierno de Gonzalo Sánchez de Lozada (1993-1997).

El presidente de la Comisión de Hacienda de Diputados, Gabriel Herbas, dijo a Prensa Latina que tras 12 años de ser privatizada por la italiana Euro Telecom, la firma debe al Servicio de Impuestos Nacionales 210 millones de bolivianos (26,5 millones de dólares).

También se registraron sobreprecios en compras mayores a 500 mil dólares. En 2005, la compañía redujo su capital de operaciones e incumplió el acuerdo de ampliar la cobertura a 1.110 poblaciones de más de 350 habitantes, al tiempo que entró en el mercado teniendo el monopolio de la telefonía de larga distancia.

## Los detalles

El Poder Ejecutivo nacionalizó Entel por decreto el 1 de mayo de 2008.

La administración de Gonzalo Sánchez de Lozada (1993-1997) capitalizó (privatizó) la empresa el 24 de noviembre de 1995. Como ganadora de la adjudicación, ETI se comprometió a inyectar 610 millones de dólares en Entel.

Por entonces, Entel estaba valorada en 1.200 millones de dólares.

La Unión Europea cuestionó esta semana el modo en que el Gobierno transfirió esa telefónica al Estado. Pidió que se recurra al diálogo para resolver de manera amigable el pago por las acciones.

| Regiones | Ciudad | Negocios | Deportes |
|---|---|---|---|
| ¡ Heroínas dañadas | ¡ El Gran Poder quiere ser Patrimonio de la Humanidad | ¡ Las aceiteras tienen vía libre para exportar por tres meses | ¡ La tercera, para un colombiano |
| ¡ FFAA dispone servicio de inteligencia para depósitos de armas | | ¡ Las verduras y fideo siguen al alza | ¡ Rugen los motores en la Vuelta a los Yungas |

| Mundo | Negocios | Seguridad |
|---|---|---|
| ¡ Una réplica sísmica sepulta varios vehículos en China | ¡ Las aceiteras tienen vía libre para exportar por tres meses | ¡ La Policía forma grupos para decomisar armas |
| ¡ Lluvias torrenciales azotan a las zonas afectadas por ciclón Nargis | ¡ Las verduras y fideo siguen al alza | ¡ La Fiscalía imputa al chofer que hirió a la niña Vanessa |

| Al Filo | Sociedad | Opinión |
|---|---|---|
| ¡ Mitin contra la discriminación a los gays y lesbianas | ¡ Tras los 40, ellas y ellos van de cacería | ¡ El parámetro-Mateo Garau S. J. * |
| ¡ Cumbre de Lima fija agenda para luchar contra la pobreza | | ¡ OEA: El principio de no intervención-Agustín Saavedra Weise * |

© 2007 - LA PRENSA - EDITORES ASOCIADOS S.A.
Derechos Reservados ®

## <u>DECLARATION OF ACCURACY</u>

I, Silvia Gil De Cwilich, hereby declare as follows:

I am fluent in Spanish and English and the following is, to the best of my knowledge and belief, a true and accurate translation from Spanish to English of the article titled "El Gobierno dice que ETI acepta traspaso de Entel," from the newspaper <u>La Prensa</u>, dated May 17, 2008.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.  Executed on June 13, 2008.


Silvia Gil De Cwilich

# EXHIBIT 6



ORRICK

November 2, 2007

Steven J. Fink
(212) 506-3756
sfink@orrick.com

**BY OVERNIGHT COURIER**

Republic of Bolivia
c/o H.E. Evo Morales Ayma
Presidente Constitucional de la Republica
Palacio de Gobierno
La Paz, Bolivia

**BY FAX AND OVERNIGHT COURIER**

H.E. David Choquehuanca Céspedes
Ministerio de Relaciones Exteriores y Culto
Plaza Murillo - c. Ingavi esq. c. Junin
La Paz, Bolivia

**BY FAX AND OVERNIGHT COURIER**

H.E. Ambassador Mario Gustavo Guzmán Saldaña
Embassy of the Republic of Bolivia
3014 Massachusetts Ave. N.W.
Washington, D.C. 20008

<u>Arbitration between E.T.I. Euro Telecom International N.V. and Republic of Bolivia,
ICSID Case No. ARB/07/28</u>

Dear Sirs:

On behalf of our client, E.T.I. Euro Telecom International N.V. ("ETI"), we write to confirm the proposal made in ETI's Request for Arbitration, dated October 12, 2007, in accordance with ICSID Arbitration Rule 2(1)(a), that "the requesting party shall, within 10 days after the registration of the request, propose to the other party the appointment of a sole arbitrator or of a specified uneven number of arbitrators and specify the method proposed for their appointment."

In the Request for Arbitration, ETI proposed the following with respect to the constitution of the Tribunal:

In accordance with Arbitration Rule 2(1)(a), the Claimant hereby proposes to the Respondent that the Arbitral Tribunal be composed of three arbitrators, one arbitrator to be appointed by each of the Parties and the third arbitrator, who shall be President of the Tribunal, to be appointed by agreement of the party-nominated arbitrators. In the case of Claimant, the nominated arbitrator shall not be a national or resident of the Netherlands, and in the case of Respondent, the nominated arbitrator shall not be a national or resident of Bolivia. Each party shall nominate its



ORRICK

Republic of Bolivia
H.E. David Choquehuanca Cespedes
H.E. Ambassador Mario Gustavo Guzman Saldana
November 2, 2007
Page 2

arbitrator within 30 days of the registration of this request. If the parties' two party-nominated arbitrators are not able to agree on the President of the Tribunal within 60 days after registration of this request, then the President of the Tribunal, who shall not be a national or resident of either the Netherlands or Bolivia, shall be appointed by the Chairman of the Administrative Counsel of ICSID. Except as expressly set forth herein, the provisions of Arbitration Rule 4 shall apply.

Request for Arbitration, ¶ 70.

In accordance with Arbitration Rule 2(1)(b), and paragraph 71 of the Request for Arbitration, ETI requests that Bolivia respond to this proposal within 20 days of its receipt of the Notice of Registration.

Sincerely yours,

Steven J. Fink

# EXHIBIT 7

# ICSID CONVENTION, REGULATIONS AND RULES

**International Centre for
Settlement of Investment Disputes**
1818 H Street, N.W.
Washington, D.C. 20433, U.S.A.

**ICSID/15**
**April 2006**

· Not for resale ·

# Summary Table of Contents

*Page*

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

Convention on the Settlement of Investment Disputes between
States and Nationals of Other States . . . . . . . . . . . . . . . . . . . . . . . .    7

Report of the Executive Directors of the International Bank for
Reconstruction and Development on the Convention on the
Settlement of Investment Disputes between States and Nationals
of Other States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

Administrative and Financial Regulations . . . . . . . . . . . . . . . . . . . .   51

Rules of Procedure for the Institution of Conciliation and
Arbitration Proceedings (Institution Rules) . . . . . . . . . . . . . . . . . .   73

Rules of Procedure for Conciliation Proceedings
(Conciliation Rules) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   81

Rules of Procedure for Arbitration Proceedings
(Arbitration Rules) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   99

# Introduction

The International Centre for Settlement of Investment Disputes (ICSID or the Centre) is established by the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the ICSID Convention or the Convention). The Convention was formulated by the Executive Directors of the International Bank for Reconstruction and Development (the World Bank). On March 18, 1965, the Executive Directors submitted the Convention, with an accompanying Report, to member governments of the World Bank for their consideration of the Convention with a view to its signature and ratification. The Convention entered into force on October 14, 1966, when it had been ratified by 20 countries. As at April 10, 2006, 143 countries have ratified the Convention to become Contracting States.

In accordance with the provisions of the Convention, ICSID provides facilities for conciliation and arbitration of investment disputes between Contracting States and nationals of other Contracting States. The provisions of the ICSID Convention are complemented by Regulations and Rules adopted by the Administrative Council of the Centre pursuant to Article 6(1)(a)–(c) of the Convention (the ICSID Regulations and Rules).

The ICSID Regulations and Rules comprise Administrative and Financial Regulations; Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings (Institution Rules); Rules of Procedure for Conciliation Proceedings (Conciliation Rules); and Rules of Procedure for Arbitration Proceedings (Arbitration Rules). The latest amendments of the ICSID Regulations and Rules adopted by the Administrative Council of the Centre came into effect on April 10, 2006.

Reprinted in this booklet are the ICSID Convention, the Report of the Executive Directors of the World Bank on the Convention, and the ICSID Regulations and Rules as amended effective April 10, 2006.

Convention

# CONVENTION ON THE SETTLEMENT OF INVESTMENT DISPUTES BETWEEN STATES AND NATIONALS OF OTHER STATES

# CONVENTION ON THE SETTLEMENT OF INVESTMENT DISPUTES BETWEEN STATES AND NATIONALS OF OTHER STATES

## Table of Contents

| Chapter | Section | | Articles | Page |
|---------|---------|---|----------|------|
| | | Preamble | | **11** |
| **I** | | **International Centre for Settlement of Investment Disputes** | **1-24** | **12** |
| | 1 | Establishment and Organization | 1-3 | 12 |
| | 2 | The Administrative Council | 4-8 | 12 |
| | 3 | The Secretariat | 9-11 | 14 |
| | 4 | The Panels | 12-16 | 15 |
| | 5 | Financing the Centre | 17 | 16 |
| | 6 | Status, Immunities and Privileges | 18-24 | 16 |
| **II** | | **Jurisdiction of the Centre** | **25-27** | **18** |
| **III** | | **Conciliation** | **28-35** | **19** |
| | 1 | Request for Conciliation | 28 | 19 |
| | 2 | Constitution of the Conciliation Commission | 29-31 | 20 |
| | 3 | Conciliation Proceedings | 32-35 | 20 |
| **IV** | | **Arbitration** | **36-55** | **22** |
| | 1 | Request for Arbitration | 36 | 22 |
| | 2 | Constitution of the Tribunal | 37-40 | 22 |
| | 3 | Powers and Functions of the Tribunal | 41-47 | 23 |
| | 4 | The Award | 48-49 | 25 |
| | 5 | Interpretation, Revision and Annulment of the Award | 50-52 | 25 |
| | 6 | Recognition and Enforcement of the Award | 53-55 | 27 |
| **V** | | **Replacement and Disqualification of Conciliators and Arbitrators** | **56-58** | **28** |
| **VI** | | **Cost of Proceedings** | **59-61** | **29** |
| **VII** | | **Place of Proceedings** | **62-63** | **30** |

Convention

| | | | | |
|---|---|---|---|---|
| VIII | Disputes Between Contracting States | 64 | 30 |
| IX | Amendment | 65-66 | 30 |
| X | Final Provisions | 67-75 | 31 |
| | Signature Clause | | 33 |

Convention

10

# CONVENTION ON THE SETTLEMENT OF INVESTMENT DISPUTES BETWEEN STATES AND NATIONALS OF OTHER STATES

## Preamble

The Contracting States

**Considering** the need for international cooperation for economic development, and the role of private international investment therein;

**Bearing in mind** the possibility that from time to time disputes may arise in connection with such investment between Contracting States and nationals of other Contracting States;

**Recognizing** that while such disputes would usually be subject to national legal processes, international methods of settlement may be appropriate in certain cases;

**Attaching particular importance** to the availability of facilities for international conciliation or arbitration to which Contracting States and nationals of other Contracting States may submit such disputes if they so desire;

**Desiring** to establish such facilities under the auspices of the International Bank for Reconstruction and Development;

**Recognizing** that mutual consent by the parties to submit such disputes to conciliation or to arbitration through such facilities constitutes a binding agreement which requires in particular that due consideration be given to any recommendation of conciliators, and that any arbitral award be complied with; and

**Declaring** that no Contracting State shall by the mere fact of its ratification, acceptance or approval of this Convention and without its consent be deemed to be under any obligation to submit any particular dispute to conciliation or arbitration,

**Have agreed** as follows:

# Chapter I
# International Centre for
# Settlement of Investment Disputes

## Section 1
## Establishment and Organization

### Article 1

(1) There is hereby established the International Centre for Settlement of Investment Disputes (hereinafter called the Centre).

(2) The purpose of the Centre shall be to provide facilities for conciliation and arbitration of investment disputes between Contracting States and nationals of other Contracting States in accordance with the provisions of this Convention.

### Article 2

The seat of the Centre shall be at the principal office of the International Bank for Reconstruction and Development (hereinafter called the Bank). The seat may be moved to another place by decision of the Administrative Council adopted by a majority of two-thirds of its members.

### Article 3

The Centre shall have an Administrative Council and a Secretariat and shall maintain a Panel of Conciliators and a Panel of Arbitrators.

## Section 2
## The Administrative Council

### Article 4

(1) The Administrative Council shall be composed of one representative of each Contracting State. An alternate may act as representative in case of his principal's absence from a meeting or inability to act.

(2) In the absence of a contrary designation, each governor and alternate governor of the Bank appointed by a Contracting State shall be *ex officio* its representative and its alternate respectively.

### Article 5

The President of the Bank shall be *ex officio* Chairman of the Administrative Council (hereinafter called the Chairman) but shall

12

have no vote. During his absence or inability to act and during any vacancy in the office of President of the Bank, the person for the time being acting as President shall act as Chairman of the Administrative Council.

## Article 6

(1) Without prejudice to the powers and functions vested in it by other provisions of this Convention, the Administrative Council shall:

(a) adopt the administrative and financial regulations of the Centre;

(b) adopt the rules of procedure for the institution of conciliation and arbitration proceedings;

(c) adopt the rules of procedure for conciliation and arbitration proceedings (hereinafter called the Conciliation Rules and the Arbitration Rules);

(d) approve arrangements with the Bank for the use of the Bank's administrative facilities and services;

(e) determine the conditions of service of the Secretary-General and of any Deputy Secretary-General;

(f) adopt the annual budget of revenues and expenditures of the Centre;

(g) approve the annual report on the operation of the Centre.

The decisions referred to in sub-paragraphs (a), (b), (c) and (f) above shall be adopted by a majority of two-thirds of the members of the Administrative Council.

(2) The Administrative Council may appoint such committees as it considers necessary.

(3) The Administrative Council shall also exercise such other powers and perform such other functions as it shall determine to be necessary for the implementation of the provisions of this Convention.

## Article 7

(1) The Administrative Council shall hold an annual meeting and such other meetings as may be determined by the Council, or convened by the Chairman, or convened by the Secretary-General at the request of not less than five members of the Council.

(2) Each member of the Administrative Council shall have one vote and, except as otherwise herein provided, all matters before the Council shall be decided by a majority of the votes cast.

(3) A quorum for any meeting of the Administrative Council shall be a majority of its members.

**Convention**

13

Convention

(4) The Administrative Council may establish, by a majority of two-thirds of its members, a procedure whereby the Chairman may seek a vote of the Council without convening a meeting of the Council. The vote shall be considered valid only if the majority of the members of the Council cast their votes within the time limit fixed by the said procedure.

## Article 8

Members of the Administrative Council and the Chairman shall serve without remuneration from the Centre.

## Section 3
## The Secretariat

## Article 9

The Secretariat shall consist of a Secretary-General, one or more Deputy Secretaries-General and staff.

## Article 10

(1) The Secretary-General and any Deputy Secretary-General shall be elected by the Administrative Council by a majority of two-thirds of its members upon the nomination of the Chairman for a term of service not exceeding six years and shall be eligible for re-election. After consulting the members of the Administrative Council, the Chairman shall propose one or more candidates for each such office.

(2) The offices of Secretary-General and Deputy Secretary-General shall be incompatible with the exercise of any political function. Neither the Secretary-General nor any Deputy Secretary-General may hold any other employment or engage in any other occupation except with the approval of the Administrative Council.

(3) During the Secretary-General's absence or inability to act, and during any vacancy of the office of Secretary-General, the Deputy Secretary-General shall act as Secretary-General. If there shall be more than one Deputy Secretary-General, the Administrative Council shall determine in advance the order in which they shall act as Secretary-General.

## Article 11

The Secretary-General shall be the legal representative and the principal officer of the Centre and shall be responsible for its administration, including the appointment of staff, in accordance with the provisions of this Convention and the rules adopted by the Administrative

Council. He shall perform the function of registrar and shall have the power to authenticate arbitral awards rendered pursuant to this Convention, and to certify copies thereof.

## Section 4
## The Panels

### Article 12

The Panel of Conciliators and the Panel of Arbitrators shall each consist of qualified persons, designated as hereinafter provided, who are willing to serve thereon.

### Article 13

(1) Each Contracting State may designate to each Panel four persons who may but need not be its nationals.

(2) The Chairman may designate ten persons to each Panel. The persons so designated to a Panel shall each have a different nationality.

### Article 14

(1) Persons designated to serve on the Panels shall be persons of high moral character and recognized competence in the fields of law, commerce, industry or finance, who may be relied upon to exercise independent judgment. Competence in the field of law shall be of particular importance in the case of persons on the Panel of Arbitrators.

(2) The Chairman, in designating persons to serve on the Panels, shall in addition pay due regard to the importance of assuring representation on the Panels of the principal legal systems of the world and of the main forms of economic activity.

### Article 15

(1) Panel members shall serve for renewable periods of six years.

(2) In case of death or resignation of a member of a Panel, the authority which designated the member shall have the right to designate another person to serve for the remainder of that member's term.

(3) Panel members shall continue in office until their successors have been designated.

### Article 16

(1) A person may serve on both Panels.

15

(2) If a person shall have been designated to serve on the same Panel by more than one Contracting State, or by one or more Contracting States and the Chairman, he shall be deemed to have been designated by the authority which first designated him or, if one such authority is the State of which he is a national, by that State.

(3) All designations shall be notified to the Secretary-General and shall take effect from the date on which the notification is received.

## Section 5
## Financing the Centre

### Article 17

If the expenditure of the Centre cannot be met out of charges for the use of its facilities, or out of other receipts, the excess shall be borne by Contracting States which are members of the Bank in proportion to their respective subscriptions to the capital stock of the Bank, and by Contracting States which are not members of the Bank in accordance with rules adopted by the Administrative Council.

## Section 6
## Status, Immunities and Privileges

### Article 18

The Centre shall have full international legal personality. The legal capacity of the Centre shall include the capacity:

(a) to contract;

(b) to acquire and dispose of movable and immovable property;

(c) to institute legal proceedings.

### Article 19

To enable the Centre to fulfil its functions, it shall enjoy in the territories of each Contracting State the immunities and privileges set forth in this Section.

### Article 20

The Centre, its property and assets shall enjoy immunity from all legal process, except when the Centre waives this immunity.

16

## Article 21

The Chairman, the members of the Administrative Council, persons acting as conciliators or arbitrators or members of a Committee appointed pursuant to paragraph (3) of Article 52, and the officers and employees of the Secretariat

(a) shall enjoy immunity from legal process with respect to acts performed by them in the exercise of their functions, except when the Centre waives this immunity;

(b) not being local nationals, shall enjoy the same immunities from immigration restrictions, alien registration requirements and national service obligations, the same facilities as regards exchange restrictions and the same treatment in respect of travelling facilities as are accorded by Contracting States to the representatives, officials and employees of comparable rank of other Contracting States.

## Article 22

The provisions of Article 21 shall apply to persons appearing in proceedings under this Convention as parties, agents, counsel, advocates, witnesses or experts; provided, however, that sub-paragraph (b) thereof shall apply only in connection with their travel to and from, and their stay at, the place where the proceedings are held.

## Article 23

(1) The archives of the Centre shall be inviolable, wherever they may be.

(2) With regard to its official communications, the Centre shall be accorded by each Contracting State treatment not less favourable than that accorded to other international organizations.

## Article 24

(1) The Centre, its assets, property and income, and its operations and transactions authorized by this Convention shall be exempt from all taxation and customs duties. The Centre shall also be exempt from liability for the collection or payment of any taxes or customs duties.

(2) Except in the case of local nationals, no tax shall be levied on or in respect of expense allowances paid by the Centre to the Chairman or members of the Administrative Council, or on or in respect of salaries, expense allowances or other emoluments paid by the Centre to officials or employees of the Secretariat.

(3) No tax shall be levied on or in respect of fees or expense allowances received by persons acting as conciliators, or arbitrators, or

17

members of a Committee appointed pursuant to paragraph (3) of Article 52, in proceedings under this Convention, if the sole jurisdictional basis for such tax is the location of the Centre or the place where such proceedings are conducted or the place where such fees or allowances are paid.

# Chapter II
# Jurisdiction of the Centre

**Article 25**

(1) The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally.

(2) "National of another Contracting State" means:

(a) any natural person who had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration as well as on the date on which the request was registered pursuant to paragraph (3) of Article 28 or paragraph (3) of Article 36, but does not include any person who on either date also had the nationality of the Contracting State party to the dispute; and

(b) any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration and any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention.

(3) Consent by a constituent subdivision or agency of a Contracting State shall require the approval of that State unless that State notifies the Centre that no such approval is required.

(4) Any Contracting State may, at the time of ratification, acceptance or approval of this Convention or at any time thereafter, notify the Centre of the class or classes of disputes which it would or would not consider submitting to the jurisdiction of the Centre. The Secretary-General shall forthwith transmit such notification to all Contracting

18

States. Such notification shall not constitute the consent required by paragraph (1).

**Article 26**

Consent of the parties to arbitration under this Convention shall, unless otherwise stated, be deemed consent to such arbitration to the exclusion of any other remedy. A Contracting State may require the exhaustion of local administrative or judicial remedies as a condition of its consent to arbitration under this Convention.

**Article 27**

(1) No Contracting State shall give diplomatic protection, or bring an international claim, in respect of a dispute which one of its nationals and another Contracting State shall have consented to submit or shall have submitted to arbitration under this Convention, unless such other Contracting State shall have failed to abide by and comply with the award rendered in such dispute.

(2) Diplomatic protection, for the purposes of paragraph (1), shall not include informal diplomatic exchanges for the sole purpose of facilitating a settlement of the dispute.

# Chapter III
# Conciliation

## Section 1
## Request for Conciliation

**Article 28**

(1) Any Contracting State or any national of a Contracting State wishing to institute conciliation proceedings shall address a request to that effect in writing to the Secretary-General who shall send a copy of the request to the other party.

(2) The request shall contain information concerning the issues in dispute, the identity of the parties and their consent to conciliation in accordance with the rules of procedure for the institution of conciliation and arbitration proceedings.

(3) The Secretary-General shall register the request unless he finds, on the basis of the information contained in the request, that the dispute is manifestly outside the jurisdiction of the Centre. He shall forthwith notify the parties of registration or refusal to register.

## Section 2
## Constitution of the Conciliation Commission

### Article 29

(1) The Conciliation Commission (hereinafter called the Commission) shall be constituted as soon as possible after registration of a request pursuant to Article 28.

    (2) (a) The Commission shall consist of a sole conciliator or any uneven number of conciliators appointed as the parties shall agree.

        (b) Where the parties do not agree upon the number of conciliators and the method of their appointment, the Commission shall consist of three conciliators, one conciliator appointed by each party and the third, who shall be the president of the Commission, appointed by agreement of the parties.

### Article 30

If the Commission shall not have been constituted within 90 days after notice of registration of the request has been dispatched by the Secretary-General in accordance with paragraph (3) of Article 28, or such other period as the parties may agree, the Chairman shall, at the request of either party and after consulting both parties as far as possible, appoint the conciliator or conciliators not yet appointed.

### Article 31

(1) Conciliators may be appointed from outside the Panel of Conciliators, except in the case of appointments by the Chairman pursuant to Article 30.

(2) Conciliators appointed from outside the Panel of Conciliators shall possess the qualities stated in paragraph (1) of Article 14.

## Section 3
## Conciliation Proceedings

### Article 32

(1) The Commission shall be the judge of its own competence.

(2) Any objection by a party to the dispute that that dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Commission, shall be considered by the Com-

20

mission which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute.

## Article 33

Any conciliation proceeding shall be conducted in accordance with the provisions of this Section and, except as the parties otherwise agree, in accordance with the Conciliation Rules in effect on the date on which the parties consented to conciliation. If any question of procedure arises which is not covered by this Section or the Conciliation Rules or any rules agreed by the parties, the Commission shall decide the question.

## Article 34

(1) It shall be the duty of the Commission to clarify the issues in dispute between the parties and to endeavour to bring about agreement between them upon mutually acceptable terms. To that end, the Commission may at any stage of the proceedings and from time to time recommend terms of settlement to the parties. The parties shall cooperate in good faith with the Commission in order to enable the Commission to carry out its functions, and shall give their most serious consideration to its recommendations.

(2) If the parties reach agreement, the Commission shall draw up a report noting the issues in dispute and recording that the parties have reached agreement. If, at any stage of the proceedings, it appears to the Commission that there is no likelihood of agreement between the parties, it shall close the proceedings and shall draw up a report noting the submission of the dispute and recording the failure of the parties to reach agreement. If one party fails to appear or participate in the proceedings, the Commission shall close the proceedings and shall draw up a report noting that party's failure to appear or participate.

## Article 35

Except as the parties to the dispute shall otherwise agree, neither party to a conciliation proceeding shall be entitled in any other proceeding, whether before arbitrators or in a court of law or otherwise, to invoke or rely on any views expressed or statements or admissions or offers of settlement made by the other party in the conciliation proceedings, or the report or any recommendations made by the Commission.

Convention

# Chapter IV
# Arbitration

## Section 1
## Request for Arbitration

### Article 36

(1) Any Contracting State or any national of a Contracting State wishing to institute arbitration proceedings shall address a request to that effect in writing to the Secretary-General who shall send a copy of the request to the other party.

(2) The request shall contain information concerning the issues in dispute, the identity of the parties and their consent to arbitration in accordance with the rules of procedure for the institution of conciliation and arbitration proceedings.

(3) The Secretary-General shall register the request unless he finds, on the basis of the information contained in the request, that the dispute is manifestly outside the jurisdiction of the Centre. He shall forthwith notify the parties of registration or refusal to register.

## Section 2
## Constitution of the Tribunal

### Article 37

(1) The Arbitral Tribunal (hereinafter called the Tribunal) shall be constituted as soon as possible after registration of a request pursuant to Article 36.

(2) (a) The Tribunal shall consist of a sole arbitrator or any uneven number of arbitrators appointed as the parties shall agree.

(b) Where the parties do not agree upon the number of arbitrators and the method of their appointment, the Tribunal shall consist of three arbitrators, one arbitrator appointed by each party and the third, who shall be the president of the Tribunal, appointed by agreement of the parties.

### Article 38

If the Tribunal shall not have been constituted within 90 days after notice of registration of the request has been dispatched by the Secretary-General in accordance with paragraph (3) of Article 36, or such other period as the parties may agree, the Chairman shall, at the request of either party and after consulting both parties as far as possible,

appoint the arbitrator or arbitrators not yet appointed. Arbitrators appointed by the Chairman pursuant to this Article shall not be nationals of the Contracting State party to the dispute or of the Contracting State whose national is a party to the dispute.

### Article 39

The majority of the arbitrators shall be nationals of States other than the Contracting State party to the dispute and the Contracting State whose national is a party to the dispute; provided, however, that the foregoing provisions of this Article shall not apply if the sole arbitrator or each individual member of the Tribunal has been appointed by agreement of the parties.

### Article 40

(1) Arbitrators may be appointed from outside the Panel of Arbitrators, except in the case of appointments by the Chairman pursuant to Article 38.

(2) Arbitrators appointed from outside the Panel of Arbitrators shall possess the qualities stated in paragraph (1) of Article 14.

## Section 3
## Powers and Functions of the Tribunal

### Article 41

(1) The Tribunal shall be the judge of its own competence.

(2) Any objection by a party to the dispute that that dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Tribunal, shall be considered by the Tribunal which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute.

### Article 42

(1) The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable.

(2) The Tribunal may not bring in a finding of *non liquet* on the ground of silence or obscurity of the law.

(3) The provisions of paragraphs (1) and (2) shall not prejudice the power of the Tribunal to decide a dispute *ex aequo et bono* if the parties so agree.

23

## Article 43

Except as the parties otherwise agree, the Tribunal may, if it deems it necessary at any stage of the proceedings,

(a) call upon the parties to produce documents or other evidence, and

(b) visit the scene connected with the dispute, and conduct such inquiries there as it may deem appropriate.

## Article 44

Any arbitration proceeding shall be conducted in accordance with the provisions of this Section and, except as the parties otherwise agree, in accordance with the Arbitration Rules in effect on the date on which the parties consented to arbitration. If any question of procedure arises which is not covered by this Section or the Arbitration Rules or any rules agreed by the parties, the Tribunal shall decide the question.

## Article 45

(1) Failure of a party to appear or to present his case shall not be deemed an admission of the other party's assertions.

(2) If a party fails to appear or to present his case at any stage of the proceedings the other party may request the Tribunal to deal with the questions submitted to it and to render an award. Before rendering an award, the Tribunal shall notify, and grant a period of grace to, the party failing to appear or to present its case, unless it is satisfied that that party does not intend to do so.

## Article 46

Except as the parties otherwise agree, the Tribunal shall, if requested by a party, determine any incidental or additional claims or counterclaims arising directly out of the subject-matter of the dispute provided that they are within the scope of the consent of the parties and are otherwise within the jurisdiction of the Centre.

## Article 47

Except as the parties otherwise agree, the Tribunal may, if it considers that the circumstances so require, recommend any provisional measures which should be taken to preserve the respective rights of either party.

## Section 4
## The Award

### Article 48

(1) The Tribunal shall decide questions by a majority of the votes of all its members.

(2) The award of the Tribunal shall be in writing and shall be signed by the members of the Tribunal who voted for it.

(3) The award shall deal with every question submitted to the Tribunal, and shall state the reasons upon which it is based.

(4) Any member of the Tribunal may attach his individual opinion to the award, whether he dissents from the majority or not, or a statement of his dissent.

(5) The Centre shall not publish the award without the consent of the parties.

### Article 49

(1) The Secretary-General shall promptly dispatch certified copies of the award to the parties. The award shall be deemed to have been rendered on the date on which the certified copies were dispatched.

(2) The Tribunal upon the request of a party made within 45 days after the date on which the award was rendered may after notice to the other party decide any question which it had omitted to decide in the award, and shall rectify any clerical, arithmetical or similar error in the award. Its decision shall become part of the award and shall be notified to the parties in the same manner as the award. The periods of time provided for under paragraph (2) of Article 51 and paragraph (2) of Article 52 shall run from the date on which the decision was rendered.

## Section 5
## Interpretation, Revision and
## Annulment of the Award

### Article 50

(1) If any dispute shall arise between the parties as to the meaning or scope of an award, either party may request interpretation of the award by an application in writing addressed to the Secretary-General.

(2) The request shall, if possible, be submitted to the Tribunal which rendered the award. If this shall not be possible, a new Tribunal shall be constituted in accordance with Section 2 of this Chapter. The

Convention

Tribunal may, if it considers that the circumstances so require, stay enforcement of the award pending its decision.

**Article 51**

Convention

(1) Either party may request revision of the award by an application in writing addressed to the Secretary-General on the ground of discovery of some fact of such a nature as decisively to affect the award, provided that when the award was rendered that fact was unknown to the Tribunal and to the applicant and that the applicant's ignorance of that fact was not due to negligence.

(2) The application shall be made within 90 days after the discovery of such fact and in any event within three years after the date on which the award was rendered.

(3) The request shall, if possible, be submitted to the Tribunal which rendered the award. If this shall not be possible, a new Tribunal shall be constituted in accordance with Section 2 of this Chapter.

(4) The Tribunal may, if it considers that the circumstances so require, stay enforcement of the award pending its decision. If the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Tribunal rules on such request.

**Article 52**

(1) Either party may request annulment of the award by an application in writing addressed to the Secretary-General on one or more of the following grounds:

(a) that the Tribunal was not properly constituted;

(b) that the Tribunal has manifestly exceeded its powers;

(c) that there was corruption on the part of a member of the Tribunal;

(d) that there has been a serious departure from a fundamental rule of procedure; or

(e) that the award has failed to state the reasons on which it is based.

(2) The application shall be made within 120 days after the date on which the award was rendered except that when annulment is requested on the ground of corruption such application shall be made within 120 days after discovery of the corruption and in any event within three years after the date on which the award was rendered.

(3) On receipt of the request the Chairman shall forthwith appoint from the Panel of Arbitrators an *ad hoc* Committee of three persons. None of the members of the Committee shall have been a member of

the Tribunal which rendered the award, shall be of the same nationality as any such member, shall be a national of the State party to the dispute or of the State whose national is a party to the dispute, shall have been designated to the Panel of Arbitrators by either of those States, or shall have acted as a conciliator in the same dispute. The Committee shall have the authority to annul the award or any part thereof on any of the grounds set forth in paragraph (1).

(4) The provisions of Articles 41-45, 48, 49, 53 and 54, and of Chapters VI and VII shall apply *mutatis mutandis* to proceedings before the Committee.

(5) The Committee may, if it considers that the circumstances so require, stay enforcement of the award pending its decision. If the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Committee rules on such request.

(6) If the award is annulled the dispute shall, at the request of either party, be submitted to a new Tribunal constituted in accordance with Section 2 of this Chapter.

<div style="text-align:right"><strong>Convention</strong></div>

## Section 6
## Recognition and Enforcement
## of the Award

### Article 53

(1) The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention.

(2) For the purposes of this Section, "award" shall include any decision interpreting, revising or annulling such award pursuant to Articles 50, 51 or 52.

### Article 54

(1) Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.

(2) A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General. Each Contracting State shall notify the Secretary-General of the designation of the competent court or other authority for this purpose and of any subsequent change in such designation.

(3) Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought.

### Article 55

Nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution.

# Chapter V
# Replacement and Disqualification of Conciliators and Arbitrators

### Article 56

(1) After a Commission or a Tribunal has been constituted and proceedings have begun, its composition shall remain unchanged; provided, however, that if a conciliator or an arbitrator should die, become incapacitated, or resign, the resulting vacancy shall be filled in accordance with the provisions of Section 2 of Chapter III or Section 2 of Chapter IV.

(2) A member of a Commission or Tribunal shall continue to serve in that capacity notwithstanding that he shall have ceased to be a member of the Panel.

(3) If a conciliator or arbitrator appointed by a party shall have resigned without the consent of the Commission or Tribunal of which he was a member, the Chairman shall appoint a person from the appropriate Panel to fill the resulting vacancy.

### Article 57

A party may propose to a Commission or Tribunal the disqualification of any of its members on account of any fact indicating a manifest lack of the qualities required by paragraph (1) of Article 14. A party to arbitration proceedings may, in addition, propose the disqualification

of an arbitrator on the ground that he was ineligible for appointment to the Tribunal under Section 2 of Chapter IV.

**Article 58**

The decision on any proposal to disqualify a conciliator or arbitrator shall be taken by the other members of the Commission or Tribunal as the case may be, provided that where those members are equally divided, or in the case of a proposal to disqualify a sole conciliator or arbitrator, or a majority of the conciliators or arbitrators, the Chairman shall take that decision. If it is decided that the proposal is well-founded the conciliator or arbitrator to whom the decision relates shall be replaced in accordance with the provisions of Section 2 of Chapter III or Section 2 of Chapter IV.

# Chapter VI
# Cost of Proceedings

**Article 59**

The charges payable by the parties for the use of the facilities of the Centre shall be determined by the Secretary-General in accordance with the regulations adopted by the Administrative Council.

**Article 60**

(1) Each Commission and each Tribunal shall determine the fees and expenses of its members within limits established from time to time by the Administrative Council and after consultation with the Secretary-General.

(2) Nothing in paragraph (1) of this Article shall preclude the parties from agreeing in advance with the Commission or Tribunal concerned upon the fees and expenses of its members.

**Article 61**

(1) In the case of conciliation proceedings the fees and expenses of members of the Commission as well as the charges for the use of the facilities of the Centre, shall be borne equally by the parties. Each party shall bear any other expenses it incurs in connection with the proceedings.

(2) In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tri-

Convention

bunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.

# Chapter VII
# Place of Proceedings

**Article 62**

Conciliation and arbitration proceedings shall be held at the seat of the Centre except as hereinafter provided.

**Article 63**

Conciliation and arbitration proceedings may be held, if the parties so agree,

(a) at the seat of the Permanent Court of Arbitration or of any other appropriate institution, whether private or public, with which the Centre may make arrangements for that purpose; or

(b) at any other place approved by the Commission or Tribunal after consultation with the Secretary-General.

# Chapter VIII
# Disputes Between Contracting States

**Article 64**

Any dispute arising between Contracting States concerning the interpretation or application of this Convention which is not settled by negotiation shall be referred to the International Court of Justice by the application of any party to such dispute, unless the States concerned agree to another method of settlement.

# Chapter IX
# Amendment

**Article 65**

Any Contracting State may propose amendment of this Convention. The text of a proposed amendment shall be communicated to the Secretary-General not less than 90 days prior to the meeting of the Administrative Council at which such amendment is to be considered

30

and shall forthwith be transmitted by him to all the members of the Administrative Council.

**Article 66**

(1) If the Administrative Council shall so decide by a majority of two-thirds of its members, the proposed amendment shall be circulated to all Contracting States for ratification, acceptance or approval. Each amendment shall enter into force 30 days after dispatch by the depositary of this Convention of a notification to Contracting States that all Contracting States have ratified, accepted or approved the amendment.

(2) No amendment shall affect the rights and obligations under this Convention of any Contracting State or of any of its constituent subdivisions or agencies, or of any national of such State arising out of consent to the jurisdiction of the Centre given before the date of entry into force of the amendment.

# Chapter X
# Final Provisions

**Article 67**

This Convention shall be open for signature on behalf of States members of the Bank. It shall also be open for signature on behalf of any other State which is a party to the Statute of the International Court of Justice and which the Administrative Council, by a vote of two-thirds of its members, shall have invited to sign the Convention.

**Article 68**

(1) This Convention shall be subject to ratification, acceptance or approval by the signatory States in accordance with their respective constitutional procedures.

(2) This Convention shall enter into force 30 days after the date of deposit of the twentieth instrument of ratification, acceptance or approval. It shall enter into force for each State which subsequently deposits its instrument of ratification, acceptance or approval 30 days after the date of such deposit.

**Article 69**

Each Contracting State shall take such legislative or other measures as may be necessary for making the provisions of this Convention effective in its territories.

31

## Article 70

This Convention shall apply to all territories for whose international relations a Contracting State is responsible, except those which are excluded by such State by written notice to the depositary of this Convention either at the time of ratification, acceptance or approval or subsequently.

## Article 71

Any Contracting State may denounce this Convention by written notice to the depositary of this Convention. The denunciation shall take effect six months after receipt of such notice.

## Article 72

Notice by a Contracting State pursuant to Articles 70 or 71 shall not affect the rights or obligations under this Convention of that State or of any of its constituent subdivisions or agencies or of any national of that State arising out of consent to the jurisdiction of the Centre given by one of them before such notice was received by the depositary.

## Article 73

Instruments of ratification, acceptance or approval of this Convention and of amendments thereto shall be deposited with the Bank which shall act as the depositary of this Convention. The depositary shall transmit certified copies of this Convention to States members of the Bank and to any other State invited to sign the Convention.

## Article 74

The depositary shall register this Convention with the Secretariat of the United Nations in accordance with Article 102 of the Charter of the United Nations and the Regulations thereunder adopted by the General Assembly.

## Article 75

The depositary shall notify all signatory States of the following:

    (a) signatures in accordance with Article 67;

    (b) deposits of instruments of ratification, acceptance and approval in accordance with Article 73;

    (c) the date on which this Convention enters into force in accordance with Article 68;

    (d) exclusions from territorial application pursuant to Article 70;

(e) the date on which any amendment of this Convention enters into force in accordance with Article 66; and

(f) denunciations in accordance with Article 71.

DONE at Washington, in the English, French and Spanish languages, all three texts being equally authentic, in a single copy which shall remain deposited in the archives of the International Bank for Reconstruction and Development, which has indicated by its signature below its agreement to fulfil the functions with which it is charged under this Convention.

**Convention**

33

# REPORT OF THE EXECUTIVE DIRECTORS ON THE CONVENTION ON THE SETTLEMENT OF INVESTMENT DISPUTES BETWEEN STATES AND NATIONALS OF OTHER STATES

Report of the Executive Directors on the Convention

International Bank for Reconstruction and Development

March 18, 1965

# REPORT OF THE EXECUTIVE DIRECTORS
## ON THE CONVENTION

## Table of Contents

| Section | Paragraph | | Page |
|---|---|---|---|
| I–III | 1-14 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 38 |
| IV | | The International Centre for Settlement of Investment Disputes | |
| | 15-18 | General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 41 |
| | 19 | Functions of the Administrative Council . . . . . | 42 |
| | 20 | Functions of the Secretary-General . . . . . . . . . | 42 |
| | 21 | The Panels . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 43 |
| V | | Jurisdiction of the Centre | |
| | 22 | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 43 |
| | 23-25 | Consent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 43 |
| | 26-27 | Nature of the Dispute . . . . . . . . . . . . . . . . . . . . | 44 |
| | 28-30 | Parties to the Dispute . . . . . . . . . . . . . . . . . . . . | 44 |
| | 31 | Notifications by Contracting States . . . . . . . . . | 44 |
| | 32 | Arbitration as Exclusive Remedy . . . . . . . . . . . | 45 |
| | 33 | Claims by the Investor's State . . . . . . . . . . . . . . | 45 |
| VI | | Proceedings under the Convention | |
| | 34 | Institution of Proceedings . . . . . . . . . . . . . . . . | 45 |
| | 35-36 | Constitution of Conciliation Commissions and Arbitral Tribunals . . . . . . . . . . . . . . . . . . . . | 46 |
| | 37-40 | Conciliation Proceedings; Powers and Functions of Arbitral Tribunals . . . . . . . . . | 46 |
| | 41-43 | Recognition and Enforcement of Arbitral Awards . . . . . . . . . . . . . . . . . . . . . . . . | 47 |
| VII | 44 | Place of Proceedings . . . . . . . . . . . . . . . . . . . . . . | 48 |
| VIII | 45 | Disputes Between Contracting States . . . . . . . | 48 |
| IX | 46 | Entry into Force . . . . . . . . . . . . . . . . . . . . . . . . . | 48 |

Report of the Executive Directors on the Convention

37

# Report of the Executive Directors on the Convention on the Settlement of Investment Disputes between States and Nationals of Other States

## I

1. Resolution No. 214, adopted by the Board of Governors of the International Bank for Reconstruction and Development on September 10, 1964, provides as follows:

"RESOLVED:

(a) The report of the Executive Directors on "Settlement of Investment Disputes," dated August 6, 1964, is hereby approved.

(b) The Executive Directors are requested to formulate a convention establishing facilities and procedures which would be available on a voluntary basis for the settlement of investment disputes between contracting States and Nationals of other contracting States through conciliation and arbitration.

(c) In formulating such a convention, the Executive Directors shall take into account the views of member governments and shall keep in mind the desirability of arriving at a text which could be accepted by the largest possible number of governments.

(d) The Executive Directors shall submit the text of such a convention to member governments with such recommendations as they shall deem appropriate."

2. The Executive Directors of the Bank, acting pursuant to the foregoing Resolution, have formulated a Convention on the Settlement of Investment Disputes between States and Nationals of Other States and, on March 18, 1965, approved the submission of the text of the Convention, as attached hereto, to member governments of the Bank. This action by the Executive Directors does not, of course, imply that the governments represented by the individual Executive Directors are committed to take action on the Convention.

3. The action by the Executive Directors was preceded by extensive preparatory work, details of which are given in paragraphs 6-8 below. The Executive Directors are satisfied that the Convention in the form attached hereto represents a broad consensus of the views of those governments which accept the principle of establishing by inter-gov-

38

ernmental agreement facilities and procedures for the settlement of investment disputes which States and foreign investors wish to submit to conciliation or arbitration. They are also satisfied that the Convention constitutes a suitable framework for such facilities and procedures. Accordingly, the text of the Convention is submitted to member governments for consideration with a view to signature and ratification, acceptance or approval.

4.    The Executive Directors invite attention to the provision of Article 68(2) pursuant to which the Convention will enter into force as between the Contracting States 30 days after deposit with the Bank, the depositary of the Convention, of the twentieth instrument of ratification, acceptance or approval.

5.    The attached text of the Convention in the English, French and Spanish languages has been deposited in the archives of the Bank, as depositary, and is open for signature.

# II

6.    The question of the desirability and practicability of establishing institutional facilities, sponsored by the Bank, for the settlement through conciliation and arbitration of investment disputes between States and foreign investors was first placed before the Board of Governors of the Bank at its Seventeenth Annual Meeting, held in Washington, D.C. in September 1962. At that Meeting the Board of Governors, by Resolution No. 174, adopted on September 18, 1962, requested the Executive Directors to study the question.

7.    After a series of informal discussions on the basis of working papers prepared by the staff of the Bank, the Executive Directors decided that the Bank should convene consultative meetings of legal experts designated by member governments to consider the subject in greater detail. The consultative meetings were held on a regional basis in Addis Ababa (December 16-20, 1963), Santiago de Chile (February 3-7, 1964), Geneva (February 17-21, 1964) and Bangkok (April 27-May 1, 1964), with the administrative assistance of the United Nations Economic Commissions and the European Office of the United Nations, and took as the basis for discussion a Preliminary Draft of a Convention on Settlement of Investment Disputes between States and Nationals of Other States prepared by the staff of the Bank in the light of the discussions of the Executive Directors and the views of governments. The meetings were attended by legal experts from 86 countries.

8.    In the light of the preparatory work and of the views expressed at the consultative meetings, the Executive Directors reported to the Board of Governors at its Nineteenth Annual Meeting in Tokyo, in September 1964, that it would be desirable to establish the institutional facilities envisaged, and to do so within the framework of an inter-gov-

Report of the Executive Directors
on the Convention

39

ernmental agreement. The Board of Governors adopted the Resolution set forth in paragraph 1 of this Report, whereupon the Executive Directors undertook the formulation of the present Convention. With a view to arriving at a text which could be accepted by the largest possible number of governments, the Bank invited its members to designate representatives to a Legal Committee which would assist the Executive Directors in their task. This Committee met in Washington from November 23 through December 11, 1964, and the Executive Directors gratefully acknowledge the valuable advice they received from the representatives of the 61 member countries who served on the Committee.

## III

9.  In submitting the attached Convention to governments, the Executive Directors are prompted by the desire to strengthen the partnership between countries in the cause of economic development. The creation of an institution designed to facilitate the settlement of disputes between States and foreign investors can be a major step toward promoting an atmosphere of mutual confidence and thus stimulating a larger flow of private international capital into those countries which wish to attract it.

10. The Executive Directors recognize that investment disputes are as a rule settled through administrative, judicial or arbitral procedures available under the laws of the country in which the investment concerned is made. However, experience shows that disputes may arise which the parties wish to settle by other methods; and investment agreements entered into in recent years show that both States and investors frequently consider that it is in their mutual interest to agree to resort to international methods of settlement.

11. The present Convention would offer international methods of settlement designed to take account of the special characteristics of the disputes covered, as well as of the parties to whom it would apply. It would provide facilities for conciliation and arbitration by specially qualified persons of independent judgment carried out according to rules known and accepted in advance by the parties concerned. In particular, it would ensure that once a government or investor had given consent to conciliation or arbitration under the auspices of the Centre, such consent could not be unilaterally withdrawn.

12. The Executive Directors believe that private capital will continue to flow to countries offering a favorable climate for attractive and sound investments, even if such countries did not become parties to the Convention or, having joined, did not make use of the facilities of the Centre. On the other hand, adherence to the Convention by a country would provide additional inducement and stimulate a larger flow of private international investment into its territories, which is the primary purpose of the Convention.

13. While the broad objective of the Convention is to encourage a larger flow of private international investment, the provisions of the Convention maintain a careful balance between the interests of investors and those of host States. Moreover, the Convention permits the institution of proceedings by host States as well as by investors and the Executive Directors have constantly had in mind that the provisions of the Convention should be equally adapted to the requirements of both cases.

14. The provisions of the attached Convention are for the most part self-explanatory. Brief comment on a few principal features may, however, be useful to member governments in their consideration of the Convention.

## IV
## The International Centre for Settlement of Investment Disputes

**General**

15. The Convention establishes the International Centre for Settlement of Investment Disputes as an autonomous international institution (Articles 18-24). The purpose of the Centre is "to provide facilities for conciliation and arbitration of investment disputes * * *" (Article 1(2)). The Centre will not itself engage in conciliation or arbitration activities. This will be the task of Conciliation Commissions and Arbitral Tribunals constituted in accordance with the provisions of the Convention.

16. As sponsor of the establishment of the institution the Bank will provide the Centre with premises for its seat (Article 2) and, pursuant to arrangements between the two institutions, with other administrative facilities and services (Article 6(d)).

17. With respect to the financing of the Centre (Article 17), the Executive Directors have decided that the Bank should be prepared to provide the Centre with office accommodation free of charge as long as the Centre has its seat at the Bank's headquarters and to underwrite, within reasonable limits, the basic overhead expenditure of the Centre for a period of years to be determined after the Centre is established.

18. Simplicity and economy consistent with the efficient discharge of the functions of the Centre characterize its structure. The organs of the Centre are the Administrative Council (Articles 4-8) and the Secretariat (Article 9-11). The Administrative Council will be composed of one representative of each Contracting State, serving without remuneration from the Centre. Each member of the Council casts one vote and matters before the Council are decided by a majority of the votes cast unless a different majority is required by the Convention. The President

41

of the Bank will serve *ex officio* as the Council's Chairman but will have no vote. The Secretariat will consist of a Secretary-General, one or more Deputy Secretaries-General and staff. In the interest of flexibility the Convention provides for the possibility of there being more than one Deputy Secretary-General, but the Executive Directors do not now foresee a need for more than one or two full time high officials of the Centre. Article 10, which requires that the Secretary-General and any Deputy Secretary-General be elected by the Administrative Council by a majority of two-thirds of its members, on the nomination of the Chairman, limits their terms of office to a period not exceeding six years and permits their re-election. The Executive Directors believe that the initial election, which will take place shortly after the Convention will have come into force, should be for a short term so as not to deprive the States which ratify the Convention after its entry into force of the possibility of participating in the selection of the high officials of the Centre. Article 10 also limits the extent to which these officials may engage in activities other than their official functions.

### Functions of the Administrative Council

19. The principal functions of the Administrative Council are the election of the Secretary-General and any Deputy Secretary-General, the adoption of the budget of the Centre and the adoption of administrative and financial regulations, rules governing the institution of proceedings and rules of procedure for conciliation and arbitration proceedings. Action on all these matters requires a majority of two-thirds of the members of the Council.

### Functions of the Secretary-General

20. The Convention requires the Secretary-General to perform a variety of administrative functions as legal representative, registrar and principal officer of the Centre (Articles 7(1), 11, 16(3), 25(4), 28, 36, 49(1), 50(1), 51(1), 52(1), 54(2), 59, 60(1), 63(b) and 65). In addition, the Secretary-General is given the power to refuse registration of a request for conciliation proceedings or arbitration proceedings, and thereby to prevent the institution of such proceedings, if on the basis of the information furnished by the applicant he finds that the dispute is *manifestly* outside the jurisdiction of the Centre (Article 28(3) and 36(3)). The Secretary-General is given this limited power to "screen" requests for conciliation or arbitration proceedings with a view to avoiding the embarrassment to a party (particularly a State) which might result from the institution of proceedings against it in a dispute which it had not consented to submit to the Centre, as well as the possibility that the machinery of the Centre would be set in motion in cases which for other reasons were obviously outside the jurisdiction of the

Centre e.g., because either the applicant or the other party was not eligible to be a party in proceedings under the Convention.

**The Panels**

21. Article 3 requires the Centre to maintain a Panel of Conciliators and a Panel of Arbitrators, while Articles 12-16 outline the manner and terms of designation of Panel members. In particular, Article 14(1) seeks to ensure that Panel members will possess a high degree of competence and be capable of exercising independent judgment. In keeping with the essentially flexible character of the proceedings, the Convention permits the parties to appoint conciliators and arbitrators from outside the Panels but requires (Articles 31(2) and 40(2)) that such appointees possess the qualities stated in Article 14(1). The Chairman, when called upon to appoint a conciliator or arbitrator pursuant to Article 30 or 38, is restricted in his choice to Panel members.

# V
## Jurisdiction of the Centre

22. The term "jurisdiction of the Centre" is used in the Convention as a convenient expression to mean the limits within which the provisions of the Convention will apply and the facilities of the Centre will be available for conciliation and arbitration proceedings. The jurisdiction of the Centre is dealt with in Chapter II of the Convention (Articles 25-27).

**Consent**

23. Consent of the parties is the cornerstone of the jurisdiction of the Centre. Consent to jurisdiction must be in writing and once given cannot be withdrawn unilaterally (Article 25(1)).

24. Consent of the parties must exist when the Centre is seized (Articles 28(3) and 36(3)) but the Convention does not otherwise specify the time at which consent should be given. Consent may be given, for example, in a clause included in an investment agreement, providing for the submission to the Centre of future disputes arising out of that agreement, or in a *compromis* regarding a dispute which has already arisen. Nor does the Convention require that the consent of both parties be expressed in a single instrument. Thus, a host State might in its investment promotion legislation offer to submit disputes arising out of certain classes of investments to the jurisdiction of the Centre, and the investor might give his consent by accepting the offer in writing.

25. While consent of the parties is an essential prerequisite for the jurisdiction of the Centre, consent alone will not suffice to bring a dispute within its jurisdiction. In keeping with the purpose of the Con-

vention, the jurisdiction of the Centre is further limited by reference to the nature of the dispute and the parties thereto.

### Nature of the Dispute

26. Article 25(1) requires that the dispute must be a "legal dispute arising directly out of an investment." The expression "legal dispute" has been used to make clear that while conflicts of rights are within the jurisdiction of the Centre, mere conflicts of interests are not. The dispute must concern the existence or scope of a legal right or obligation, or the nature or extent of the reparation to be made for breach of a legal obligation.

27. No attempt was made to define the term "investment" given the essential requirement of consent by the parties, and the mechanism through which Contracting States can make known in advance, if they so desire, the classes of disputes which they would or would not consider submitting to the Centre (Article 25(4)).

### Parties to the Dispute

28. For a dispute to be within the jurisdiction of the Centre one of the parties must be a Contracting State (or a constituent subdivision or agency of a Contracting State) and the other party must be a "national of another Contracting State." The latter term as defined in paragraph (2) of Article 25 covers both natural persons and juridical persons.

29. It should be noted that under clause (a) of Article 25(2) a natural person who was a national of the State party to the dispute would not be eligible to be a party in proceedings under the auspices of the Centre, even if at the same time he had the nationality of another State. This ineligibility is absolute and cannot be cured even if the State party to the dispute had given its consent.

30. Clause (b) of Article 25(2), which deals with juridical persons, is more flexible. A juridical person which had the nationality of the State party to the dispute would be eligible to be a party to proceedings under the auspices of the Centre if that State had agreed to treat it as a national of another Contracting State because of foreign control.

### Notifications by Contracting States

31. While no conciliation or arbitration proceedings could be brought against a Contracting State without its consent and while no Contracting State is under any obligation to give its consent to such proceedings, it was nevertheless felt that adherence to the Convention might be interpreted as holding out an expectation that Contracting States would give favorable consideration to requests by investors for the submission of a dispute to the Centre. It was pointed out in that connection that there might be classes of investment disputes which

Report of the Executive Directors on the Convention

44

governments would consider unsuitable for submission to the Centre or which, under their own law, they were not permitted to submit to the Centre. In order to avoid any risk of misunderstanding on this score, Article 25(4) expressly permits Contracting States to make known to the Centre in advance, if they so desire, the classes of disputes which they would or would not consider submitting to the Centre. The provision makes clear that a statement by a Contracting State that it would consider submitting a certain class of dispute to the Centre would serve for purposes of information only and would not constitute the consent required to give the Centre jurisdiction. Of course, a statement excluding certain classes of disputes from consideration would not constitute a reservation to the Convention.

### Arbitration as Exclusive Remedy

32. It may be presumed that when a State and an investor agree to have recourse to arbitration, and do not reserve the right to have recourse to other remedies or require the prior exhaustion of other remedies, the intention of the parties is to have recourse to arbitration to the exclusion of any other remedy. This rule of interpretation is embodied in the first sentence of Article 26. In order to make clear that it was not intended thereby to modify the rules of international law regarding the exhaustion of local remedies, the second sentence explicitly recognizes the right of a State to require the prior exhaustion of local remedies.

### Claims by the Investor's State

33. When a host State consents to the submission of a dispute with an investor to the Centre, thereby giving the investor direct access to an international jurisdiction, the investor should not be in a position to ask his State to espouse his case and that State should not be permitted to do so. Accordingly, Article 27 expressly prohibits a Contracting State from giving diplomatic protection, or bringing an international claim, in respect of a dispute which one of its nationals and another Contracting State have consented to submit, or have submitted, to arbitration under the Convention, unless the State party to the dispute fails to honor the award rendered in that dispute.

## VI
## Proceedings under the Convention

### Institution of Proceedings

34. Proceedings are instituted by means of a request addressed to the Secretary-General (Articles 28 and 36). After registration of the request the Conciliation Commission or Arbitral Tribunal, as the case

Report of the Executive Directors on the Convention

may be, will be constituted. Reference is made to paragraph 20 above on the power of the Secretary-General to refuse registration.

### Constitution of Conciliation Commissions and Arbitral Tribunals

35. Although the Convention leaves the parties a large measure of freedom as regards the constitution of Commissions and Tribunals, it assures that a lack of agreement between the parties on these matters or the unwillingness of a party to cooperate will not frustrate proceedings (Articles 29-30 and 37-38, respectively).

36. Mention has already been made of the fact that the parties are free to appoint conciliators and arbitrators from outside the Panels (see paragraph 21 above). While the Convention does not restrict the appointment of conciliators with reference to nationality, Article 39 lays down the rule that the majority of the members of an Arbitral Tribunal should not be nationals of the State party to the dispute or of the State whose national is a party to the dispute. This rule is likely to have the effect of excluding persons having these nationalities from serving on a Tribunal composed of not more than three members. However, the rule will not apply where each and every arbitrator on the Tribunal has been appointed by agreement of the parties.

### Conciliation Proceedings; Powers and Functions of Arbitral Tribunals

37. In general, the provisions of Articles 32-35 dealing with conciliation proceedings and of Articles 41-49, dealing with the powers and functions of Arbitral Tribunals and awards rendered by such Tribunals, are self-explanatory. The differences between the two sets of provisions reflect the basic distinction between the process of conciliation which seeks to bring the parties to agreement and that of arbitration which aims at a binding determination of the dispute by the Tribunal.

38. Article 41 reiterates the well-established principle that international tribunals are to be the judges of their own competence and Article 32 applies the same principle to Conciliation Commissions. It is to be noted in this connection that the power of the Secretary-General to refuse registration of a request for conciliation or arbitration (see paragraph 20 above) is so narrowly defined as not to encroach on the prerogative of Commissions and Tribunals to determine their own competence and, on the other hand, that registration of a request by the Secretary-General does not, of course, preclude a Commission or Tribunal from finding that the dispute is outside the jurisdiction of the Centre.

39. In keeping with the consensual character of proceedings under the Convention, the parties to conciliation or arbitration proceedings

Report of the Executive Directors on the Convention

may agree on the rules of procedure which will apply in those proceedings. However, if or to the extent that they have not so agreed the Conciliation Rules and Arbitration Rules adopted by the Administrative Council will apply (Articles 33 and 44).

40. Under the Convention an Arbitral Tribunal is required to apply the law agreed by the parties. Failing such agreement, the Tribunal must apply the law of the State party to the dispute (unless that law calls for the application of some other law), as well as such rules of international law as may be applicable. The term "international law" as used in this context should be understood in the sense given to it by Article 38(1) of the Statute of the International Court of Justice, allowance being made for the fact that Article 38 was designed to apply to inter-State disputes.[1]

### Recognition and Enforcement of Arbitral Awards

41. Article 53 declares that the parties are bound by the award and that it shall not be subject to appeal or to any other remedy except those provided for in the Convention. The remedies provided for are revision (Article 51) and annulment (Article 52). In addition, a party may ask a Tribunal which omitted to decide any question submitted to it, to supplement its award (Article 49(2)) and may request interpretation of the award (Article 50).

42. Subject to any stay of enforcement in connection with any of the above proceedings in accordance with the provisions of the Convention, the parties are obliged to abide by and comply with the award and Article 54 requires every Contracting State to recognize the award as binding and to enforce the pecuniary obligations imposed by the award as if it were a final decision of a domestic court. Because of the different legal techniques followed in common law and civil law jurisdictions and the different judicial systems found in unitary and federal or other non-unitary States, Article 54 does not prescribe any particular method to be followed in its domestic implementation, but requires each Contracting State to meet the requirements of the Article in accordance with its own legal system.

43. The doctrine of sovereign immunity may prevent the forced execution in a State of judgments obtained against foreign States or

---

[1] Article 38(1) of the Statute of the International Court of Justice reads as follows:
"1.  The Court, whose function it is to decide in accordance with international law such disputes as are submitted to it, shall apply:
   a. international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;
   b. international custom, as evidence of a general practice accepted as law;
   c. the general principles of law recognized by civilized nations;
   d. subject to the provisions of Article 59, judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of rules of law."

Report of the Executive Directors on the Convention

against the State in which execution is sought. Article 54 requires Contracting States to equate an award rendered pursuant to the Convention with a final judgment of its own courts. It does not require them to go beyond that and to undertake forced execution of awards rendered pursuant to the Convention in cases in which final judgments could not be executed. In order to leave no doubt on this point Article 55 provides that nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution.

## VII
## Place of Proceedings

44. In dealing with proceedings away from the Centre, Article 63 provides that proceedings may be held, if the parties so agree, at the seat of the Permanent Court of Arbitration or of any other appropriate institution with which the Centre may enter into arrangements for that purpose. These arrangements are likely to vary with the type of institution and to range from merely making premises available for the proceedings to the provision of complete secretariat services.

## VIII
## Disputes Between Contracting States

45. Article 64 confers on the International Court of Justice jurisdiction over disputes between Contracting States regarding the interpretation or application of the Convention which are not settled by negotiation and which the parties do not agree to settle by other methods. While the provision is couched in general terms, it must be read in the context of the Convention as a whole. Specifically, the provision does not confer jurisdiction on the Court to review the decision of a Conciliation Commission or Arbitral Tribunal as to its competence with respect to any dispute before it. Nor does it empower a State to institute proceedings before the Court in respect of a dispute which one of its nationals and another Contracting State have consented to submit or have submitted to arbitration, since such proceedings would contravene the provisions of Article 27, unless the other Contracting State had failed to abide by and comply with the award rendered in that dispute.

## IX
## Entry into Force

46. The Convention is open for signature on behalf of States members of the Bank. It will also be open for signature on behalf of any other State which is a party to the Statute of the International Court of Justice and which the Administrative Council, by a vote of two-thirds of its

members, shall have invited to sign. No time limit has been prescribed for signature. Signature is required both of States joining before the Convention enters into force and those joining thereafter (Article 67). The Convention is subject to ratification, acceptance or approval by the signatory States in accordance with their constitutional procedures (Article 68). As already stated, the Convention will enter into force upon the deposit of the twentieth instrument of ratification, acceptance or approval.

**Report of the Executive Directors on the Convention**

# ADMINISTRATIVE
# AND FINANCIAL
# REGULATIONS

**Administrative and
Financial Regulations**

# ADMINISTRATIVE AND
# FINANCIAL REGULATIONS

## Table of Contents

| Chapter | Regulation | | Page |
|---|---|---|---|
| **I** | | **Procedures of the Administrative Council** | |
| | 1 | Date and Place of the Annual Meeting | 55 |
| | 2 | Notice of Meetings | 55 |
| | 3 | Agenda for Meetings | 56 |
| | 4 | Presiding Officer | 56 |
| | 5 | Secretary of the Council | 56 |
| | 6 | Attendance at Meetings | 57 |
| | 7 | Voting | 57 |
| **II** | | **The Secretariat** | |
| | 8 | Election of the Secretary-General and His Deputies | 58 |
| | 9 | Acting Secretary-General | 58 |
| | 10 | Appointment of Staff Members | 59 |
| | 11 | Conditions of Employment | 59 |
| | 12 | Authority of the Secretary-General | 59 |
| | 13 | Incompatibility of Functions | 59 |
| **III** | | **Financial Provisions** | |
| | 14 | Direct Costs of Individual Proceedings | 60 |
| | 15 | Special Services to Parties | 62 |
| | 16 | Fee for Lodging Requests | 62 |
| | 17 | The Budget | 63 |
| | 18 | Assessment of Contributions | 63 |
| | 19 | Audits | 64 |
| **IV** | | **General Functions of the Secretariat** | |
| | 20 | List of Contracting States | 64 |
| | 21 | Establishment of Panels | 65 |
| | 22 | Publication | 66 |
| **V** | | **Functions with Respect to Individual Proceedings** | |
| | 23 | The Registers | 66 |
| | 24 | Means of Communication | 67 |
| | 25 | Secretary | 67 |
| | 26 | Place of Proceedings | 68 |

Administrative and
Financial Regulations

|   | 27 | Other Assistance ......................... | 68 |
|   | 28 | Depositary Functions ...................... | 68 |
| **VI** |   | **Special Provisions Relating to Proceedings** |   |
|   | 29 | Time Limits ............................. | 69 |
|   | 30 | Supporting Documentation ................ | 69 |
| **VII** |   | **Immunities and Privileges** |   |
|   | 31 | Certificate of Official Travel ................ | 70 |
|   | 32 | Waiver of Immunities ...................... | 70 |
| **VIII** |   | **Miscellaneous** |   |
|   | 33 | Communications with Contracting States .... | 71 |
|   | 34 | Official Languages ........................ | 71 |

**Administrative and Financial Regulations**

54

*The Administrative and Financial Regulations of ICSID were adopted by the Administrative Council of the Centre pursuant to Article 6(1)(a) of the ICSID Convention.*

*The Regulations of particular interest to parties to proceedings under the Convention are: 14-16, 22-31 and 34(1). They are intended to be complementary both to the Convention and to the Institution, Conciliation and Arbitration Rules adopted pursuant to Article 6(1)(b) and (c) of the Convention.*

# Administrative and Financial Regulations

## Chapter I
## Procedures of the Administrative Council

### Regulation 1
### Date and Place of the Annual Meeting

(1) The Annual Meeting of the Administrative Council shall take place in conjunction with the Annual Meeting of the Board of Governors of the International Bank for Reconstruction and Development (hereinafter referred to as the "Bank"), unless the Council specifies otherwise.

(2) The Secretary-General shall coordinate the arrangements for the Annual Meeting of the Administrative Council with the appropriate officers of the Bank.

### Regulation 2
### Notice of Meetings

(1) The Secretary-General shall, by any rapid means of communication, give each member notice of the time and place of each meeting of the Administrative Council, which notice shall be dispatched not less than 42 days prior to the date set for such meeting, except that in urgent cases such notice shall be sufficient if dispatched by telegram or cable not less than 10 days prior to the date set for such meeting.

(2) Any meeting of the Administrative Council at which no quorum is present may be adjourned from time to time by a majority of the members present and notice of the adjourned meeting need not be given.

### Regulation 3
### Agenda for Meetings

(1) Under the direction of the Chairman, the Secretary-General shall prepare a brief agenda for each meeting of the Administrative Council and shall transmit such agenda to each member with the notice of such meeting.

(2) Additional subjects may be placed on the agenda for any meeting of the Administrative Council by any member provided that he shall give notice thereof to the Secretary-General not less than seven days prior to the date set for such meeting. In special circumstances the Chairman, or the Secretary-General after consulting the Chairman, may at any time place additional subjects on the agenda for any meeting of the Council. The Secretary-General shall as promptly as possible give each member notice of the addition of any subject to the agenda for any meeting.

(3) The Administrative Council may at any time authorize any subject to be placed on the agenda for any meeting even though the notice required by this Regulation shall not have been given.

### Regulation 4
### Presiding Officer

(1) The Chairman shall be the Presiding Officer at meetings of the Administrative Council.

(2) If the Chairman is unable to preside over all or part of a meeting of the Council, one of the members of the Administrative Council shall act as temporary Presiding Officer. This member shall be the Representative, Alternate Representative or temporary Alternate Representative of that Contracting State represented at the meeting that stands highest on a list of Contracting States arranged chronologically according to the date of the deposit of instruments of ratification, acceptance or approval of the Convention, starting with the State following the one that had on the last previous occasion provided a temporary Presiding Officer. A temporary Presiding Officer may cast the vote of the State he represents, or he may assign another member of his delegation to do so.

### Regulation 5
### Secretary of the Council

(1) The Secretary-General shall serve as Secretary of the Administrative Council.

(2) Except as otherwise specifically directed by the Administrative Council, the Secretary-General, in consultation with the Chairman,

shall have charge of all arrangements for the holding of meetings of the Council.

(3) The Secretary-General shall keep a summary record of the proceedings of the Administrative Council, copies of which shall be provided to all members.

(4) The Secretary-General shall present to each Annual Meeting of the Administrative Council, for its approval pursuant to Article 6(1)(g) of the Convention, the annual report on the operation of the Centre.

## Regulation 6
## Attendance at Meetings

(1) The Secretary-General and the Deputy Secretaries-General may attend all meetings of the Administrative Council.

(2) The Secretary-General, in consultation with the Chairman, may invite observers to attend any meeting of the Administrative Council.

## Regulation 7
## Voting

(1) Except as otherwise specifically provided in the Convention, all decisions of the Administrative Council shall be taken by a majority of the votes cast. At any meeting the Presiding Officer may ascertain the sense of the meeting in lieu of a formal vote but he shall require a formal vote upon the request of any member. Whenever a formal vote is required the written text of the motion shall be distributed to the members.

(2) No member of the Administrative Council may vote by proxy or by any other method than in person, but the representative of a Contracting State may designate a temporary alternate to vote for him at any meeting at which the regular alternate is not present.

(3) Whenever, in the judgment of the Chairman, any action must be taken by the Administrative Council which should not be postponed until the next Annual Meeting of the Council and does not warrant the calling of a special meeting, the Secretary-General shall transmit to each member by any rapid means of communication a motion embodying the proposed action with a request for a vote by the members of the Council. Votes shall be cast during a period ending 21 days after such dispatch, unless a longer period is approved by the Chairman. At the expiration of the established period, the Secretary-General shall record the results and notify all members of the Council. If the replies received do not include those of a majority of the members, the motion shall be considered lost.

**Administrative and Financial Regulations**

(4) Whenever at a meeting of the Administrative Council at which all Contracting States are not represented, the votes necessary to adopt a proposed decision by a majority of two-thirds of the members of the Council are not obtained, the Council with the concurrence of the Chairman may decide that the votes of those members of the Council represented at the meeting shall be registered and the votes of the absent members shall be solicited in accordance with paragraph (3) of this Regulation. Votes registered at the meeting may be changed by the member before the expiration of the voting period established pursuant to that paragraph.

# Chapter II
# The Secretariat

## Regulation 8
## Election of the Secretary-General and His Deputies

In proposing to the Administrative Council one or more candidates for the office of Secretary-General or any Deputy Secretary-General, the Chairman shall at the same time make proposals with respect to:

(a) the length of the term of service;

(b) approval for any of the candidates to hold, if elected, any other employment or to engage in any other occupation;

(c) the conditions of service, taking into account any proposals made pursuant to paragraph (b).

## Regulation 9
## Acting Secretary-General

(1) If, on the election of a Deputy Secretary-General, there should at any time be more than one Deputy Secretary-General, the Chairman shall immediately after such election propose to the Administrative Council the order in which these Deputies shall act as Secretary-General pursuant to Article 10(3) of the Convention. In the absence of such a decision the order shall be that of seniority in the post of Deputy.

(2) The Secretary-General shall designate the member of the staff of the Centre who shall act for him during his absence or inability to act, if all Deputy Secretaries-General should also be absent or unable to act or if the office of Deputy should be vacant. If there should be a simultaneous vacancy in the offices of Secretary-General and Deputy Secretary-General, the Chairman shall designate the member of the staff who shall act for the Secretary-General.

## Regulation 10
## Appointment of Staff Members

The Secretary-General shall appoint the members of the staff of the Centre. Appointments may be made directly or by secondment.

## Regulation 11
## Conditions of Employment

(1) The conditions of service of the members of the staff of the Centre shall be the same as those of the staff of the Bank.

(2) The Secretary-General shall make arrangements with the Bank, within the framework of the general administrative arrangements approved by the Administrative Council pursuant to Article 6(1)(d) of the Convention, for the participation of members of the Secretariat in the Staff Retirement Plan of the Bank as well as in other facilities and contractual arrangements established for the benefit of the staff of the Bank.

## Regulation 12
## Authority of the Secretary-General

(1) Deputy Secretaries-General and the members of the staff, whether on direct appointment or on secondment, shall act solely under the direction of the Secretary-General.

(2) The Secretary-General shall have authority to dismiss members of the Secretariat and to impose disciplinary measures. In the case of Deputy Secretaries-General dismissal may only be imposed with the concurrence of the Administrative Council.

## Regulation 13
## Incompatibility of Functions

The Secretary-General, the Deputy Secretaries-General and the members of the staff may not serve on the Panel of Conciliators or of Arbitrators, or as members of any Commission or Tribunal.

**Administrative and Financial Regulations**

59

# Chapter III
# Financial Provisions

## Regulation 14
## Direct Costs of Individual Proceedings

(1) Unless otherwise agreed pursuant to Article 60(2) of the Convention, and in addition to receiving reimbursement for any direct expenses reasonably incurred, each member of a Commission, a Tribunal or an *ad hoc* Committee appointed from the Panel of Arbitrators pursuant to Article 52(3) of the Convention (hereinafter referred to as "Committee") shall receive:

    (a) a fee for each day on which he participates in meetings of the body of which he is a member;

    (b) a fee for the equivalent of each eight-hour day of other work performed in connection with the proceedings;

    (c) in lieu of reimbursement of subsistence expenses when away from his normal place of residence, a *per diem* allowance based on the allowance established from time to time for the Executive Directors of the Bank;

    (d) travel expenses in connection with meetings of the body of which he is a member based on the norms established from time to time for the Executive Directors of the Bank.

The amounts of the fees referred to in paragraphs (a) and (b) above shall be determined from time to time by the Secretary-General, with the approval of the Chairman. Any request for a higher amount shall be made through the Secretary-General.

(2) All payments, including reimbursement of expenses, to the following shall in all cases be made by the Centre and not by or through either party to the proceeding:

    (a) members of Commissions, Tribunals and Committees;

    (b) witnesses and experts summoned at the initiative of a Commission, Tribunal or Committee, and not of one of the parties;

    (c) members of the Secretariat of the Centre, including persons (such as interpreters, translators, reporters or secretaries) especially engaged by the Centre for a particular proceeding;

    (d) the host of any proceeding held away from the seat of the Centre pursuant to Article 63 of the Convention.

Administrative and Financial Regulations

(3) In order to enable the Centre to make the payments provided for in paragraph (2), as well as to incur other direct expenses in connection with a proceeding (other than expenses covered by Regulation 15):

(a) the parties shall make advance payments to the Centre as follows:

  (i) initially as soon as a Commission or Tribunal has been constituted, the Secretary-General shall, after consultation with the President of the body in question and, as far as possible, the parties, estimate the expenses that will be incurred by the Centre during the next three to six months and request the parties to make an advance payment of this amount;

  (ii) if at any time the Secretary-General determines, after consultation with the President of the body in question and as far as possible the parties, that the advances made by the parties will not cover a revised estimate of expenses for the period or any subsequent period, he shall request the parties to make supplementary advance payments.

(b) the Centre shall not be required to provide any service in connection with a proceeding or to pay the fees, allowances or expenses of the members of any Commission, Tribunal or Committee, unless sufficient advance payments shall previously have been made;

(c) if the initial advance payments are insufficient to cover estimated future expenses, prior to requesting the parties to make additional advance payments, the Secretary-General shall ascertain the actual expenses incurred and commitments entered into by the Centre with regard to each proceeding and shall appropriately charge or credit the parties;

(d) in connection with every conciliation proceeding, and in connection with every arbitration proceeding unless a different division is provided for in the Arbitration Rules or is decided by the parties or the Tribunal, each party shall pay one half of each advance or supplemental charge, without prejudice to the final decision on the payment of the cost of an arbitration proceeding to be made by the Tribunal pursuant to Article 61(2) of the Convention. All advances and charges shall be payable, at the place and in the currencies specified by the Secretary-General, as soon as a request for payment is made by him. If the amounts requested are not paid in full within 30 days, then the Secretary-General shall inform both parties of the default and give an opportunity to either of them to make the required payment. At any time 15 days after such information is sent by the Secre-

61

tary-General, he may move that the Commission or Tribunal stay the proceeding, if by the date of such motion any part of the required payment is still outstanding. If any proceeding is stayed for non-payment for a consecutive period in excess of six months, the Secretary-General may, after notice to and as far as possible in consultation with the parties, move that the competent body discontinue the proceeding;

(e) in the event that an application for annulment of an award is registered, the above provisions of this Rule shall apply *mutatis mutandis,* except that the applicant shall be solely responsible for making the advance payments requested by the Secretary-General to cover expenses following the constitution of the Committee, and without prejudice to the right of the Committee in accordance with Article 52(4) of the Convention to decide how and by whom expenses incurred in connection with the annulment proceeding shall be paid.

### Regulation 15
### Special Services to Parties

(1) The Centre shall only perform any special service for a party in connection with a proceeding (for example, the provision of translations or copies) if the party shall in advance have deposited an amount sufficient to cover the charge for such service.

(2) Charges for special services shall normally be based on a schedule of fees to be promulgated from time to time by the Secretary-General and communicated by him to all Contracting States as well as to the parties to all pending proceedings.

### Regulation 16
### Fee for Lodging Requests

The party or parties (if a request is made jointly) wishing to institute a conciliation or arbitration proceeding, requesting a supplementary decision to, or the rectification, interpretation, revision or annulment of an arbitral award, or requesting resubmission of a dispute to a new Tribunal after the annulment of an arbitral award, shall pay to the Centre a non-refundable fee determined from time to time by the Secretary-General.

## Regulation 17
## The Budget

(1) The fiscal year of the Centre shall run from July 1 of each year to June 30 of the following year.

(2) Before the end of each fiscal year the Secretary-General shall prepare and submit, for adoption by the Administrative Council at its next Annual Meeting and in accordance with Article 6(1)(f) of the Convention, a budget for the following fiscal year. This budget is to indicate the expected expenditures of the Centre (excepting those to be incurred on a reimbursable basis) and the expected revenues (excepting reimbursements).

(3) If, during the course of a fiscal year, the Secretary-General determines that the expected expenditures will exceed those authorized in the budget, or if he should wish to incur expenditures not previously authorized, he shall, in consultation with the Chairman, prepare a supplementary budget, which he shall submit to the Administrative Council for adoption, either at the Annual Meeting or at any other meeting, or in accordance with Regulation 7(3).

(4) The adoption of a budget constitutes authority for the Secretary-General to make expenditures and incur obligations for the purposes and within the limits specified in the budget. Unless otherwise provided by the Administrative Council, the Secretary-General may exceed the amount specified for any given budget item, provided that the total amount of the budget is not exceeded.

(5) Pending the adoption of the budget by the Administrative Council, the Secretary-General may incur expenditures for the purposes and within the limits specified in the budget he submitted to the Council, up to one quarter of the amount authorized to be expended in the previous fiscal year but in no event exceeding the amount that the Bank has agreed to make available for the current fiscal year.

## Regulation 18
## Assessment of Contributions

(1) Any excess of expected expenditures over expected revenues shall be assessed on the Contracting States. Each State that is not a member of the Bank shall be assessed a fraction of the total assessment equal to the fraction of the budget of the International Court of Justice that it would have to bear if that budget were divided only among the Contracting States in proportion to the then current scale of contributions applicable to the budget of the Court; the balance of the total assessment shall be divided among the Contracting States that are members of the Bank in proportion to their respective subscription to the capital stock of the Bank. The assessments shall be calculated by the

Administrative and
Financial Regulations

63

Secretary-General immediately after the adoption of the annual budget, on the basis of the then current membership of the Centre, and shall be promptly communicated to all Contracting States. The assessments shall be payable as soon as they are thus communicated.

(2) On the adoption of a supplementary budget, the Secretary-General shall immediately calculate supplementary assessments, which shall be payable as soon as they are communicated to the Contracting States.

(3) A State which is party to the Convention during any part of a fiscal year shall be assessed for the entire fiscal year. If a State becomes a party to the Convention after the assessments for a given fiscal year have been calculated, its assessment shall be calculated by the application of the same appropriate factor as was applied in calculating the original assessments, and no recalculation of the assessments of the other Contracting States shall be made.

(4) If, after the close of a fiscal year, it is determined that there is a cash surplus, such surplus shall, unless the Administrative Council otherwise decides, be credited to the Contracting States in proportion to the assessed contributions they had paid for that fiscal year. These credits shall be made with respect to the assessments for the fiscal year commencing two years after the end of the fiscal year to which the surplus pertains.

### Regulation 19
### Audits

The Secretary-General shall have an audit of the accounts of the Centre made once each year and on the basis of this audit submit a financial statement to the Administrative Council for consideration at the Annual Meeting.

# Chapter IV
# General Functions
# of the Secretariat

### Regulation 20
### List of Contracting States

The Secretary-General shall maintain a list, which he shall transmit from time to time to all Contracting States and on request to any State or person, of the Contracting States (including former Contracting States, showing the date on which their notice of denunciation was received by the depositary), indicating for each:

*Administrative and Financial Regulations*

(a) the date on which the Convention entered into force with respect to it;

(b) any territories excluded pursuant to Article 70 of the Convention and the dates on which the notice of exclusion and any modification of such notice were received by the depositary;

(c) any designation, pursuant to Article 25(1) of the Convention, of constituent subdivisions or agencies to whose investment disputes the jurisdiction of the Centre extends;

(d) any notification, pursuant to Article 25(3) of the Convention, that no approval by the State is required for the consent by a constituent subdivision or agency to the jurisdiction of the Centre;

(e) any notification, pursuant to Article 25(4) of the Convention, of the class or classes of disputes which the State would or would not consider submitting to the jurisdiction of the Centre;

(f) the competent court or other authority for the recognition and enforcement of arbitral awards, designated pursuant to Article 54(2) of the Convention;

(g) any legislative or other measures taken, pursuant to Article 69 of the Convention, for making its provisions effective in the territories of the State and communicated by the State to the Centre.

**Administrative and Financial Regulations**

## Regulation 21
### Establishment of Panels

(1) Whenever a Contracting State has the right to make one or more designations to the Panel of Conciliators or of Arbitrators, the Secretary-General shall invite the State to make such designations.

(2) Each designation made by a Contracting State or by the Chairman shall indicate the name, address and nationality of the designee, and include a statement of his qualifications, with particular reference to his competence in the fields of law, commerce, industry and finance.

(3) As soon as the Secretary-General is notified of a designation, he shall inform the designee thereof, indicating to him the designating authority and the terminal date of the period of designation, and requesting confirmation that the designee is willing to serve.

(4) The Secretary-General shall maintain lists, which he shall transmit from time to time to all Contracting States and on request to any State or person, of the members of the Panels of Conciliators and of Arbitrators, indicating for each member:

(a)  his address;

(b)  his nationality;

(c)  the terminal date of the current designation;

(d)  the designating authority;

(e)  his qualifications.

## Regulation 22
## Publication

(1)  The Secretary-General shall appropriately publish information about the operation of the Centre, including the registration of all requests for conciliation or arbitration and in due course an indication of the date and method of the termination of each proceeding.

(2)  If both parties to a proceeding consent to the publication of:

(a)  reports of Conciliation Commissions;

(b)  arbitral awards; or

(c)  the minutes and other records of proceedings,

the Secretary-General shall arrange for the publication thereof, in an appropriate form with a view to furthering the development of international law in relation to investments.

# Chapter V
# Functions with Respect
# to Individual Proceedings

## Regulation 23
## The Registers

(1)  The Secretary-General shall maintain, in accordance with rules to be promulgated by him, separate Registers for requests for conciliation and requests for arbitration. In these he shall enter all significant data concerning the institution, conduct and disposition of each proceeding, including in particular the method of constitution and the membership of each Commission, Tribunal and Committee. On the Arbitration Register he shall also enter, with respect to each award, all significant data concerning any request for the supplementation, rectification, interpretation, revision or annulment of the award, and any stay of enforcement.

(2)  The Registers shall be open for inspection by any person. The Secretary-General shall promulgate rules concerning access to the Reg-

Administrative and Financial Regulations

isters, and a schedule of charges for the provision of certified and uncertified extracts therefrom.

## Regulation 24
## Means of Communication

(1) During the pendency of any proceeding the Secretary-General shall be the official channel of written communications among the parties, the Commission, Tribunal or Committee, and the Chairman of the Administrative Council, except that:

    (a) the parties may communicate directly with each other unless the communication is one required by the Convention or the Institution, Conciliation or Arbitration Rules (hereinafter referred to as the "Rules");

    (b) the members of any Commission, Tribunal or Committee shall communicate directly with each other.

(2) Instruments and documents shall be introduced into the proceeding by transmitting them to the Secretary-General, who shall retain the original for the files of the Centre and arrange for appropriate distribution of copies. If the instrument or document does not meet the applicable requirements, the Secretary-General:

    (a) shall inform the party submitting it of the deficiency, and of any consequent action the Secretary-General is taking;

    (b) may, if the deficiency is merely a formal one, accept it subject to subsequent correction;

    (c) may, if the deficiency consists merely of an insufficiency in the number of copies or the lack of required translations, provide the necessary copies or translations at the cost of the party concerned.

## Regulation 25
## Secretary

The Secretary-General shall appoint a Secretary for each Commission, Tribunal and Committee. The Secretary may be drawn from among the Secretariat of the Centre, and shall in any case, while serving in that capacity, be considered as a member of its staff. He shall:

    (a) represent the Secretary-General and may perform all functions assigned to the latter by these Regulations or the Rules with regard to individual proceedings or assigned to the latter by the Convention, and delegated by him to the Secretary;

    (b) be the channel through which the parties may request particular services from the Centre;

**Administrative and Financial Regulations**

(c) keep summary minutes of hearings, unless the parties agree with the Commission, Tribunal or Committee on another manner of keeping the record of the hearings; and

(d) perform other functions with respect to the proceeding at the request of the President of the Commission, Tribunal or Committee, or at the direction of the Secretary-General.

## Regulation 26
## Place of Proceedings

(1) The Secretary-General shall make arrangements for the holding of conciliation and arbitration proceedings at the seat of the Centre or shall, at the request of the parties and as provided in Article 63 of the Convention, make or supervise arrangements if proceedings are held elsewhere.

(2) The Secretary-General shall assist a Commission or Tribunal, at its request, in visiting any place connected with a dispute or in conducting inquiries there.

## Regulation 27
## Other Assistance

(1) The Secretary-General shall provide such other assistance as may be required in connection with all meetings of Commissions, Tribunals and Committees, in particular in making translations and interpretations from one official language of the Centre into another.

(2) The Secretary-General may also provide, by use of the staff and equipment of the Centre or of persons employed and equipment acquired on a short-time basis, other services required for the conduct of proceedings, such as the duplication and translation of documents, or interpretations from and to a language other than an official language of the Centre.

## Regulation 28
## Depository Functions

(1) The Secretary-General shall deposit in the archives of the Centre and shall make arrangements for the permanent retention of the original text:

(a) of the request and of all instruments and documents filed or prepared in connection with any proceeding, including the minutes of any hearing;

(b) of any report by a Commission or of any award or decision by a Tribunal or Committee.

Administrative and Financial Regulations

68

(2) Subject to the Rules and to the agreement of the parties to particular proceedings, and upon payment of any charges in accordance with a schedule to be promulgated by the Secretary-General, he shall make available to the parties certified copies of reports and awards (reflecting thereon any supplementary decision, rectification, interpretation, revision or annulment duly made, and any stay of enforcement while it is in effect), as well as of other instruments, documents and minutes.

# Chapter VI
## Special Provisions Relating to Proceedings

### Regulation 29
### Time Limits

(1) All time limits, specified in the Convention or the Rules or fixed by a Commission, Tribunal, Committee or the Secretary-General, shall be computed from the date on which the limit is announced in the presence of the parties or their representatives or on which the Secretary-General dispatches the pertinent notification or instrument (which date shall be marked on it). The day of such announcement or dispatch shall be excluded from the calculation.

(2) A time limit shall be satisfied if a notification or instrument dispatched by a party is delivered at the seat of the Centre, or to the Secretary of the competent Commission, Tribunal or Committee that is meeting away from the seat of the Centre, before the close of business on the indicated date or, if that day is a Saturday, a Sunday, a public holiday observed at the place of delivery or a day on which for any reason regular mail delivery is restricted at the place of delivery, then before the close of business on the next subsequent day on which regular mail service is available.

### Regulation 30
### Supporting Documentation

(1) Documentation filed in support of any request, pleading, application, written observation or other instrument introduced into a proceeding shall consist of one original and of the number of additional copies specified in paragraph (2). The original shall, unless otherwise agreed by the parties or ordered by the competent Commission, Tribunal or Committee, consist of the complete document or of a duly certified copy or extract, except if the party is unable to obtain such document or certified copy or extract (in which case the reason for such inability must be stated).

Administrative and
Financial Regulations

(2) The number of additional copies of any document shall be equal to the number of additional copies required of the instrument to which the documentation relates, except that no such copies are required if the document has been published and is readily available. Each additional copy shall be certified by the party presenting it to be a true and complete copy of the original, except that if the document is lengthy and relevant only in part, it is sufficient if it is certified to be a true and complete extract of the relevant parts, which must be precisely specified.

(3) Each original and additional copy of a document which is not in a language approved for the proceeding in question, shall, unless otherwise ordered by the competent Commission, Tribunal or Committee, be accompanied by a certified translation into such a language. However, if the document is lengthy and relevant only in part, it is sufficient if only the relevant parts, which must be precisely specified, are translated, provided that the competent body may require a fuller or a complete translation.

(4) Whenever an extract of an original document is presented pursuant to paragraph (1) or a partial copy or translation pursuant to paragraph (2) or (3), each such extract, copy and translation shall be accompanied by a statement that the omission of the remainder of the text does not render the portion presented misleading.

# Chapter VII
# Immunities and Privileges

## Regulation 31
## Certificates of Official Travel

The Secretary-General may issue certificates to members of Commissions, Tribunals or Committees, to officers and employees of the Secretariat and to the parties, agents, counsel, advocates, witnesses and experts appearing in proceedings, indicating that they are traveling in connection with a proceeding under the Convention.

## Regulation 32
## Waiver of Immunities

(1) The Secretary-General may waive the immunity of:

    (a) the Centre;

    (b) members of the staff of the Centre.

(2) The Chairman of the Council may waive the immunity of:

    (a) the Secretary-General or any Deputy Secretary-General;

    (b) members of a Commission, Tribunal or Committee;

Administrative and Financial Regulations

(c) the parties, agents, counsel, advocates, witnesses or experts appearing in a proceeding, if a recommendation for such waiver is made by the Commission, Tribunal or Committee concerned.

(3) The Administrative Council may waive the immunity of:

(a) the Chairman and members of the Council;

(b) the parties, agents, counsel, advocates, witnesses or experts appearing in a proceeding, even if no recommendation for such a waiver is made by the Commission, Tribunal or Committee concerned;

(c) the Centre or any person mentioned in paragraph (1) or (2).

# Chapter VIII
# Miscellaneous

### Regulation 33
### Communications with
### Contracting States

Unless another channel of communications is specified by the State concerned, all communications required by the Convention or these Regulations to be sent to Contracting States shall be addressed to the State's representative on the Administrative Council.

### Regulation 34
### Official Languages

(1) The official languages of the Centre shall be English, French and Spanish.

(2) The texts of these Regulations in each official language shall be equally authentic.

Administrative and
Financial Regulations

# RULES OF PROCEDURE FOR THE INSTITUTION OF CONCILIATION AND ARBITRATION PROCEEDINGS (INSTITUTION RULES)

**Institution Rules**

# RULES OF PROCEDURE FOR THE
# INSTITUTION OF CONCILIATION
# AND ARBITRATION PROCEEDINGS
# (INSTITUTION RULES)

## Table of Contents

*Rule*                                                                    *Page*

1      The Request ...................................    76
2      Contents of the Request ..........................    76
3      Optional Information in the Request ................    77
4      Copies of the Request ............................    77
5      Acknowledgement of the Request ...................    78
6      Registration of the Request ........................    78
7      Notice of Registration ............................    78
8      Withdrawal of the Request .........................    79
9      Final Provisions .................................    79

**Institution Rules**

*The Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings (the Institution Rules) of ICSID were adopted by the Administrative Council of the Centre pursuant to Article 6(1)(b) of the ICSID Convention.*

*The Institution Rules are supplemented by the Administrative and Financial Regulations of the Centre, in particular by Regulations 16, 22(1), 23, 24, 30 and 34(1).*

*The Institution Rules are restricted in scope to the period of time from the filing of a request to the dispatch of the notice of registration. All transactions subsequent to that time are to be regulated in accordance with the Conciliation and the Arbitration Rules.*

# Institution Rules

## Rule 1
## The Request

(1) Any Contracting State or any national of a Contracting State wishing to institute conciliation or arbitration proceedings under the Convention shall address a request to that effect in writing to the Secretary-General at the seat of the Centre. The request shall indicate whether it relates to a conciliation or an arbitration proceeding. It shall be drawn up in an official language of the Centre, shall be dated, and shall be signed by the requesting party or its duly authorized representative.

(2) The request may be made jointly by the parties to the dispute.

## Rule 2
## Contents of the Request

(1) The request shall:

(a) designate precisely each party to the dispute and state the address of each;

(b) state, if one of the parties is a constituent subdivision or agency of a Contracting State, that it has been designated to the Centre by that State pursuant to Article 25(1) of the Convention;

(c) indicate the date of consent and the instruments in which it is recorded, including, if one party is a constituent subdivision or agency of a Contracting State, similar data on the approval of such consent by that State unless it had notified the Centre that no such approval is required;

(d) indicate with respect to the party that is a national of a Contracting State:

   (i) its nationality on the date of consent; and

   (ii) if the party is a natural person:

      (A) his nationality on the date of the request; and

      (B) that he did not have the nationality of the Contracting State party to the dispute either on the date of consent or on the date of the request; or

   (iii) if the party is a juridical person which on the date of consent had the nationality of the Contracting State party to the dispute, the agreement of the parties that it should be treated as a national of another Contracting State for the purposes of the Convention;

(e) contain information concerning the issues in dispute indicating that there is, between the parties, a legal dispute arising directly out of an investment; and

(f) state, if the requesting party is a juridical person, that it has taken all necessary internal actions to authorize the request.

(2) The information required by subparagraphs (1)(c), (1)(d)(iii) and (1)(f) shall be supported by documentation.

(3) "Date of consent" means the date on which the parties to the dispute consented in writing to submit it to the Centre; if both parties did not act on the same day, it means the date on which the second party acted.

### Rule 3
### Optional Information
### in the Request

The request may in addition set forth any provisions agreed by the parties regarding the number of conciliators or arbitrators and the method of their appointment, as well as any other provisions agreed concerning the settlement of the dispute.

### Rule 4
### Copies of the Request

(1) The request shall be accompanied by five additional signed copies. The Secretary-General may require such further copies as he may deem necessary.

**Institution Rules**

(2) Any documentation submitted with the request shall conform to the requirements of Administrative and Financial Regulation 30.

## Rule 5
## Acknowledgement of the Request

(1) On receiving a request the Secretary-General shall:

    (a) send an acknowledgement to the requesting party;

    (b) take no other action with respect to the request until he has received payment of the prescribed fee.

(2) As soon as he has received the fee for lodging the request, the Secretary-General shall transmit a copy of the request and of the accompanying documentation to the other party.

## Rule 6
## Registration of the Request

(1) The Secretary-General shall, subject to Rule 5(1)(b), as soon as possible, either:

    (a) register the request in the Conciliation or the Arbitration Register and on the same day notify the parties of the registration; or

    (b) if he finds, on the basis of the information contained in the request, that the dispute is manifestly outside the jurisdiction of the Centre, notify the parties of his refusal to register the request and of the reasons therefor.

(2) A proceeding under the Convention shall be deemed to have been instituted on the date of the registration of the request.

## Rule 7
## Notice of Registration

The notice of registration of a request shall:

    (a) record that the request is registered and indicate the date of the registration and of the dispatch of that notice;

    (b) notify each party that all communications and notices in connection with the proceeding will be sent to the address stated in the request, unless another address is indicated to the Centre;

    (c) unless such information has already been provided, invite the parties to communicate to the Secretary-General any

*Institution Rules*

provisions agreed by them regarding the number and the method of appointment of the conciliators or arbitrators;

(d) invite the parties to proceed, as soon as possible, to constitute a Conciliation Commission in accordance with Articles 29 to 31 of the Convention, or an Arbitral Tribunal in accordance with Articles 37 to 40;

(e) remind the parties that the registration of the request is without prejudice to the powers and functions of the Conciliation Commission or Arbitral Tribunal in regard to jurisdiction, competence and the merits; and

(f) be accompanied by a list of the members of the Panel of Conciliators or of Arbitrators of the Centre.

## Rule 8
## Withdrawal of the Request

The requesting party may, by written notice to the Secretary-General, withdraw the request before it has been registered. The Secretary-General shall promptly notify the other party, unless, pursuant to Rule 5(1)(b), the request had not been transmitted to it.

## Rule 9
## Final Provisions

(1) The texts of these Rules in each official language of the Centre shall be equally authentic.

(2) These Rules may be cited as the "Institution Rules" of the Centre.

**Institution Rules**

# RULES OF PROCEDURE
# FOR CONCILIATION PROCEEDINGS
# (CONCILIATION RULES)

**Conciliation Rules**

# RULES OF PROCEDURE
# FOR CONCILIATION PROCEEDINGS
# (CONCILIATION RULES)

## Table of Contents

| Chapter | Rule | | Page |
|---|---|---|---|
| I | | **Establishment of the Commission** | |
| | 1 | General Obligations ......................... | 85 |
| | 2 | Method of Constituting the Commission in the Absence of Previous Agreement .......... | 85 |
| | 3 | Appointment of Conciliators to a Commission Constituted in Accordance with Convention Article 29(2)(b) .............. | 86 |
| | 4 | Appointment of Conciliators by the Chairman of the Administrative Council ........ | 87 |
| | 5 | Acceptance of Appointments .................. | 87 |
| | 6 | Constitution of the Commission .............. | 88 |
| | 7 | Replacement of Conciliators ................. | 88 |
| | 8 | Incapacity or Resignation of Conciliators ....... | 88 |
| | 9 | Disqualification of Conciliators ............... | 89 |
| | 10 | Procedure during a Vacancy on the Commission . | 89 |
| | 11 | Filling Vacancies on the Commission .......... | 90 |
| | 12 | Resumption of Proceeding after Filling a Vacancy | 90 |
| II | | **Working of the Commission** | |
| | 13 | Sessions of the Commission .................. | 90 |
| | 14 | Sittings of the Commission .................. | 91 |
| | 15 | Deliberations of the Commission ............. | 91 |
| | 16 | Decisions of the Commission ................. | 92 |
| | 17 | Incapacity of the President ................... | 92 |
| | 18 | Representation of the Parties ................. | 92 |
| III | | **General Procedural Provisions** | |
| | 19 | Procedural Orders .......................... | 92 |
| | 20 | Preliminary Procedural Consultation ........... | 93 |
| | 21 | Procedural Languages ....................... | 93 |
| IV | | **Conciliation Procedures** | |
| | 22 | Functions of the Commission ................. | 94 |
| | 23 | Cooperation of the Parties ................... | 94 |
| | 24 | Transmission of the Request ................. | 95 |
| | 25 | Written Statements ......................... | 95 |

**Conciliation Rules**

83

|    | 26 | Supporting Documentation .................... | 95 |
|    | 27 | Hearings .................................. | 95 |
|    | 28 | Witnesses and Experts ...................... | 96 |
| V  |    | **Termination of the Proceeding** | |
|    | 29 | Objections to Jurisdiction ................... | 96 |
|    | 30 | Closure of the Proceeding ................... | 97 |
|    | 31 | Preparation of the Report ................... | 97 |
|    | 32 | The Report ............................... | 97 |
|    | 33 | Communication of the Report ............... | 98 |
| VI |    | **General Provisions** | |
|    | 34 | Final Provisions ........................... | 98 |

**Conciliation Rules**

84

*The Rules of Procedure for Conciliation Proceedings (the Conciliation Rules) of ICSID were adopted by the Administrative Council of the Centre pursuant to Article 6(1)(c) of the ICSID Convention.*

*The Conciliation Rules are supplemented by the Administrative and Financial Regulations of the Centre, in particular by Regulations 14-16, 22-31 and 34(1).*

*The Conciliation Rules cover the period of time from the dispatch of the notice of registration of a request for conciliation until a report is drawn up. The transactions previous to that time are to be regulated in accordance with the Institution Rules.*

# Conciliation Rules

## Chapter I
## Establishment of the Commission

### Rule 1
### General Obligations

(1) Upon notification of the registration of the request for conciliation, the parties shall, with all possible dispatch, proceed to constitute a Commission, with due regard to Section 2 of Chapter III of the Convention.

(2) Unless such information is provided in the request, the parties shall communicate to the Secretary-General as soon as possible any provisions agreed by them regarding the number of conciliators and the method of their appointment.

### Rule 2
### Method of Constituting the Commission in the
### Absence of Previous Agreement

(1) If the parties, at the time of the registration of the request for conciliation, have not agreed upon the number of conciliators and the method of their appointment, they shall, unless they agree otherwise, follow the following procedure:

    (a) the requesting party shall, within 10 days after the registration of the request, propose to the other party the appointment of a sole conciliator or of a specified uneven number of conciliators and specify the method proposed for their appointment;

*Conciliation Rules*

(b) within 20 days after receipt of the proposals made by the requesting party, the other party shall:

    (i) accept such proposals; or

    (ii) make other proposals regarding the number of conciliators and the method of their appointment;

(c) within 20 days after receipt of the reply containing any such other proposals, the requesting party shall notify the other party whether it accepts or rejects such proposals.

(2) The communications provided for in paragraph (1) shall be made or promptly confirmed in writing and shall either be transmitted through the Secretary-General or directly between the parties with a copy to the Secretary-General. The parties shall promptly notify the Secretary-General of the contents of any agreement reached.

(3) At any time 60 days after the registration of the request, if no agreement on another procedure is reached, either party may inform the Secretary-General that it chooses the formula provided for in Article 29(2)(b) of the Convention. The Secretary-General shall thereupon promptly inform the other party that the Commission is to be constituted in accordance with that Article.

### Rule 3
### Appointment of Conciliators
### to a Commission Constituted in Accordance
### with Convention Article 29(2)(b)

(1) If the Commission is to be constituted in accordance with Article 29(2)(b) of the Convention:

(a) either party shall, in a communication to the other party:

    (i) name two persons, identifying one of them as the conciliator appointed by it and the other as the conciliator proposed to be the President of the Commission; and

    (ii) invite the other party to concur in the appointment of the conciliator proposed to be the President of the Commission and to appoint another conciliator;

(b) promptly upon receipt of this communication the other party shall, in its reply:

    (i) name a person as the conciliator appointed by it; and

    (ii) concur in the appointment of the conciliator proposed to be the President of the Commission or name another person as the conciliator proposed to be President;

(c) promptly upon receipt of the reply containing such a pro-
posal, the initiating party shall notify the other party whether
it concurs in the appointment of the conciliator proposed by
that party to be the President of the Commission.

(2) The communications provided for in this Rule shall be made or
promptly confirmed in writing and shall either be transmitted through
the Secretary-General or directly between the parties with a copy to the
Secretary-General.

### Rule 4
### Appointment of Conciliators by the Chairman
### of the Administrative Council

(1) If the Commission is not constituted within 90 days after the
dispatch by the Secretary-General of the notice of registration, or such
other period as the parties may agree, either party may, through the Sec-
retary-General, address to the Chairman of the Administrative Council
a request in writing to appoint the conciliator or conciliators not yet
appointed and to designate a conciliator to be the President of the
Commission.

(2) The provision of paragraph (1) shall apply *mutatis mutandis* in
the event that the parties have agreed that the conciliators shall elect the
President of the Commission and they fail to do so.

(3) The Secretary-General shall forthwith send a copy of the
request to the other party.

(4) The Chairman shall use his best efforts to comply with that
request within 30 days after its receipt. Before he proceeds to make an
appointment or designation, with due regard to Article 31(1) of the
Convention, he shall consult both parties as far as possible.

(5) The Secretary-General shall promptly notify the parties of any
appointment or designation made by the Chairman.

### Rule 5
### Acceptance of Appointments

(1) The party or parties concerned shall notify the Secretary-Gen-
eral of the appointment of each conciliator and indicate the method of
his appointment.

(2) As soon as the Secretary-General has been informed by a party
or the Chairman of the Administrative Council of the appointment of
a conciliator, he shall seek an acceptance from the appointee.

(3) If a conciliator fails to accept his appointment within 15 days,
the Secretary-General shall promptly notify the parties, and if appro-
priate the Chairman, and invite them to proceed to the appointment of

**Conciliation Rules**

another conciliator in accordance with the method followed for the previous appointment.

## Rule 6
## Constitution of the Commission

(1) The Commission shall be deemed to be constituted and the proceeding to have begun on the date the Secretary-General notifies the parties that all the conciliators have accepted their appointment.

(2) Before or at the first session of the Commission, each conciliator shall sign a declaration in the following form:

"To the best of my knowledge there is no reason why I should not serve on the Conciliation Commission constituted by the International Centre for Settlement of Investment Disputes with respect to a dispute between _____ and _____.

"I shall keep confidential all information coming to my knowledge as a result of my participation in this proceeding, as well as the contents of any report drawn up by the Commission.

"I shall not accept any instruction or compensation with regard to the proceeding from any source except as provided in the Convention on the Settlement of Investment Disputes between States and Nationals of Other States and in the Regulations and Rules made pursuant thereto.

"A statement of my past and present professional, business and other relationships (if any) with the parties is attached hereto."

Any conciliator failing to sign such a declaration by the end of the first session of the Commission shall be deemed to have resigned.

## Rule 7
## Replacement of Conciliators

At any time before the Commission is constituted, each party may replace any conciliator appointed by it and the parties may by common consent agree to replace any conciliator. The procedure of such replacement shall be in accordance with Rules 1, 5 and 6.

## Rule 8
## Incapacity or Resignation of Conciliators

(1) If a conciliator becomes incapacitated or unable to perform the duties of his office, the procedure in respect of the disqualification of conciliators set forth in Rule 9 shall apply.

(2) A conciliator may resign by submitting his resignation to the other members of the Commission and the Secretary-General. If the

conciliator was appointed by one of the parties, the Commission shall promptly consider the reasons for his resignation and decide whether it consents thereto. The Commission shall promptly notify the Secretary-General of its decision.

### Rule 9
### Disqualification of Conciliators

(1) A party proposing the disqualification of a conciliator pursuant to Article 57 of the Convention shall promptly, and in any event before the Commission first recommends terms of settlement of the dispute to the parties or when the proceeding is closed (whichever occurs earlier), file its proposal with the Secretary-General, stating its reasons therefor.

(2) The Secretary-General shall forthwith:

    (a) transmit the proposal to the members of the Commission and, if it relates to a sole conciliator or to a majority of the members of the Commission, to the Chairman of the Administrative Council; and

    (b) notify the other party of the proposal.

(3) The conciliator to whom the proposal relates may, without delay, furnish explanations to the Commission or the Chairman, as the case may be.

(4) Unless the proposal relates to a majority of the members of the Commission, the other members shall promptly consider and vote on the proposal in the absence of the conciliator concerned. If those members are equally divided, they shall, through the Secretary-General, promptly notify the Chairman of the proposal, of any explanation furnished by the conciliator concerned and of their failure to reach a decision.

(5) Whenever the Chairman has to decide on a proposal to disqualify a conciliator, he shall use his best efforts to take that decision within 30 days after he has received the proposal.

(6) The proceeding shall be suspended until a decision has been taken on the proposal.

### Rule 10
### Procedure during a Vacancy
### on the Commission

(1) The Secretary-General shall forthwith notify the parties and, if necessary, the Chairman of the Administrative Council of the disqualification, death, incapacity or resignation of a conciliator and of the consent, if any, of the Commission to a resignation.

Conciliation Rules

(2) Upon the notification by the Secretary-General of a vacancy on the Commission, the proceeding shall be or remain suspended until the vacancy has been filled.

### Rule 11
### Filling Vacancies
### on the Commission

(1) Except as provided in paragraph (2), a vacancy resulting from the disqualification, death, incapacity or resignation of a conciliator shall be promptly filled by the same method by which his appointment had been made.

(2) In addition to filling vacancies relating to conciliators appointed by him, the Chairman of the Administrative Council shall appoint a person from the Panel of Conciliators:

    (a) to fill a vacancy caused by the resignation, without the consent of the Commission, of a conciliator appointed by a party; or

    (b) at the request of either party, to fill any other vacancy, if no new appointment is made and accepted within 45 days of the notification of the vacancy by the Secretary-General.

(3) The procedure for filling a vacancy shall be in accordance with Rules 1, 4(4), 4(5), 5 and, *mutatis mutandis,* 6(2).

### Rule 12
### Resumption of Proceeding
### after Filling a Vacancy

As soon as a vacancy on the Commission has been filled, the proceeding shall continue from the point it had reached at the time the vacancy occurred. The newly appointed conciliator may, however, require that any hearings be repeated in whole or in part.

## Chapter II
## Working of the Commission

### Rule 13
### Sessions of the Commission

(1) The Commission shall hold its first session within 60 days after its constitution or such other period as the parties may agree. The dates of that session shall be fixed by the President of the Commission after consultation with its members and the Secretary-General. If upon its

90

Conciliation Rules

constitution the Commission has no President because the parties have agreed that the President shall be elected by its members, the Secretary-General shall fix the dates of that session. In both cases, the parties shall be consulted as far as possible.

(2) The dates of subsequent sessions shall be determined by the Commission, after consultation with the Secretary-General and with the parties as far as possible.

(3) The Commission shall meet at the seat of the Centre or at such other place as may have been agreed by the parties in accordance with Article 63 of the Convention. If the parties agree that the proceeding shall be held at a place other than the Centre or an institution with which the Centre has made the necessary arrangements, they shall consult with the Secretary-General and request the approval of the Commission. Failing such approval, the Commission shall meet at the seat of the Centre.

(4) The Secretary-General shall notify the members of the Commission and the parties of the dates and place of the sessions of the Commission in good time.

## Rule 14
## Sittings of the Commission

(1) The President of the Commission shall conduct its hearings and preside at its deliberations.

(2) Except as the parties otherwise agree, the presence of a majority of the members of the Commission shall be required at its sittings.

(3) The President of the Commission shall fix the date and hour of its sittings.

## Rule 15
## Deliberations of
## the Commission

(1) The deliberations of the Commission shall take place in private and remain secret.

(2) Only members of the Commission shall take part in its deliberations. No other person shall be admitted unless the Commission decides otherwise.

**Conciliation Rules**

### Rule 16
### Decisions of
### the Commission

(1) Decisions of the Commission shall be taken by a majority of the votes of all its members. Abstention shall count as a negative vote.

(2) Except as otherwise provided by these Rules or decided by the Commission, it may take any decision by correspondence among its members, provided that all of them are consulted. Decisions so taken shall be certified by the President of the Commission.

### Rule 17
### Incapacity of
### the President

If at any time the President of the Commission should be unable to act, his functions shall be performed by one of the other members of the Commission, acting in the order in which the Secretary-General had received the notice of their acceptance of their appointment to the Commission.

### Rule 18
### Representation of
### the Parties

(1) Each party may be represented or assisted by agents, counsel or advocates whose names and authority shall be notified by that party to the Secretary-General, who shall promptly inform the Commission and the other party.

(2) For the purposes of these Rules, the expression "party" includes, where the context so admits, an agent, counsel or advocate authorized to represent that party.

## Chapter III
## General Procedural Provisions

### Rule 19
### Procedural Orders

The Commission shall make the orders required for the conduct of the proceeding.

### Rule 20
### Preliminary Procedural
### Consultation

(1) As early as possible after the constitution of a Commission, its President shall endeavor to ascertain the views of the parties regarding questions of procedure. For this purpose he may request the parties to meet him. He shall, in particular, seek their views on the following matters:

>   (a) the number of members of the Commission required to constitute a quorum at its sittings;

>   (b) the language or languages to be used in the proceeding;

>   (c) the evidence, oral or written, which each party intends to produce or to request the Commission to call for, and the written statements which each party intends to file, as well as the time limits within which such evidence should be produced and such statements filed;

>   (d) the number of copies desired by each party of instruments filed by the other; and

>   (e) the manner in which the record of the hearings shall be kept.

(2) In the conduct of the proceeding the Commission shall apply any agreement between the parties on procedural matters, except as otherwise provided in the Convention or the Administrative and Financial Regulations.

### Rule 21
### Procedural Languages

(1) The parties may agree on the use of one or two languages to be used in the proceeding, provided that, if they agree on any language that is not an official language of the Centre, the Commission, after consultation with the Secretary-General, gives its approval. If the parties do not agree on any such procedural language, each of them may select one of the official languages (i.e., English, French and Spanish) for this purpose.

(2) If two procedural languages are selected by the parties, any instrument may be filed in either language. Either language may be used at the hearings, subject, if the Commission so requires, to translation and interpretation. The recommendations and the report of the Commission shall be rendered and the record kept in both procedural languages, both versions being equally authentic.

**Conciliation Rules**

# Chapter IV
# Conciliation Procedures

## Rule 22
## Functions of
## the Commission

(1) In order to clarify the issues in dispute between the parties, the Commission shall hear the parties and shall endeavor to obtain any information that might serve this end. The parties shall be associated with its work as closely as possible.

(2) In order to bring about agreement between the parties, the Commission may, from time to time at any stage of the proceeding, make—orally or in writing—recommendations to the parties. It may recommend that the parties accept specific terms of settlement or that they refrain, while it seeks to bring about agreement between them, from specific acts that might aggravate the dispute; it shall point out to the parties the arguments in favor of its recommendations. It may fix time limits within which each party shall inform the Commission of its decision concerning the recommendations made.

(3) The Commission, in order to obtain information that might enable it to discharge its functions, may at any stage of the proceeding:

   (a) request from either party oral explanations, documents and other information;

   (b) request evidence from other persons; and

   (c) with the consent of the party concerned, visit any place connected with the dispute or conduct inquiries there, provided that the parties may participate in any such visits and inquiries.

## Rule 23
## Cooperation of the Parties

(1) The parties shall cooperate in good faith with the Commission and, in particular, at its request furnish all relevant documents, information and explanations as well as use the means at their disposal to enable the Commission to hear witnesses and experts whom it desires to call. The parties shall also facilitate visits to and inquiries at any place connected with the dispute that the Commission desires to undertake.

(2) The parties shall comply with any time limits agreed with or fixed by the Commission.

Conciliation Rules

94

## Rule 24
### Transmission of the Request

As soon as the Commission is constituted, the Secretary-General shall transmit to each member a copy of the request by which the proceeding was initiated, of the supporting documentation, of the notice of registration and of any communication received from either party in response thereto.

## Rule 25
### Written Statements

(1) Upon the constitution of the Commission, its President shall invite each party to file, within 30 days or such longer time limit as he may fix, a written statement of its position. If, upon its constitution, the Commission has no President, such invitation shall be issued and any such longer time limit shall be fixed by the Secretary-General. At any stage of the proceeding, within such time limits as the Commission shall fix, either party may file such other written statements as it deems useful and relevant.

(2) Except as otherwise provided by the Commission after consultation with the parties and the Secretary-General, every written statement or other instrument shall be filed in the form of a signed original accompanied by additional copies whose number shall be two more than the number of members of the Commission.

## Rule 26
### Supporting Documentation

(1) Every written statement or other instrument filed by a party may be accompanied by supporting documentation, in such form and number of copies as required by Administrative and Financial Regulation 30.

(2) Supporting documentation shall ordinarily be filed together with the instrument to which it relates, and in any case within the time limit fixed for the filing of such instrument.

## Rule 27
### Hearings

(1) The hearings of the Commission shall take place in private and, except as the parties otherwise agree, shall remain secret.

(2) The Commission shall decide, with the consent of the parties, which other persons besides the parties, their agents, counsel and advo-

**Conciliation Rules**

cates, witnesses and experts during their testimony, and officers of the Commission may attend the hearings.

## Rule 28
## Witnesses and Experts

(1) Each party may, at any stage of the proceeding, request that the Commission hear the witnesses and experts whose evidence the party considers relevant. The Commission shall fix a time limit within which such hearing shall take place.

(2) Witnesses and experts shall, as a rule, be examined before the Commission by the parties under the control of its President. Questions may also be put to them by any member of the Commission.

(3) If a witness or expert is unable to appear before it, the Commission, in agreement with the parties, may make appropriate arrangements for the evidence to be given in a written deposition or to be taken by examination elsewhere. The parties may participate in any such examination.

# Chapter V
# Termination of the Proceeding

## Rule 29
## Objections to Jurisdiction

(1) Any objection that the dispute is not within the jurisdiction of the Centre or, for other reasons, is not within the competence of the Commission shall be made as early as possible. A party shall file the objection with the Secretary-General no later than in its first written statement or at the first hearing if that occurs earlier, unless the facts on which the objection is based are unknown to the party at that time.

(2) The Commission may on its own initiative consider, at any stage of the proceeding, whether the dispute before it is within the jurisdiction of the Centre and within its own competence.

(3) Upon the formal raising of an objection, the proceeding on the merits shall be suspended. The Commission shall obtain the views of the parties on the objection.

(4) The Commission may deal with the objection as a preliminary question or join it to the merits of the dispute. If the Commission overrules the objection or joins it to the merits, it shall resume consideration of the latter without delay.

(5) If the Commission decides that the dispute is not within the jurisdiction of the Centre or not within its own competence, it shall

close the proceeding and draw up a report to that effect, in which it shall state its reasons.

## Rule 30
## Closure of the Proceeding

(1) If the parties reach agreement on the issues in dispute, the Commission shall close the proceeding and draw up its report noting the issues in dispute and recording that the parties have reached agreement. At the request of the parties, the report shall record the detailed terms and conditions of their agreement.

(2) If at any stage of the proceeding it appears to the Commission that there is no likelihood of agreement between the parties, the Commission shall, after notice to the parties, close the proceeding and draw up its report noting the submission of the dispute to conciliation and recording the failure of the parties to reach agreement.

(3) If one party fails to appear or participate in the proceeding, the Commission shall, after notice to the parties, close the proceeding and draw up its report noting the submission of the dispute to conciliation and recording the failure of that party to appear or participate.

## Rule 31
## Preparation of the Report

The report of the Commission shall be drawn up and signed within 60 days after the closure of the proceeding.

## Rule 32
## The Report

(1) The report shall be in writing and shall contain, in addition to the material specified in paragraph (2) and in Rule 30:

   (a) a precise designation of each party;

   (b) a statement that the Commission was established under the Convention, and a description of the method of its constitution;

   (c) the names of the members of the Commission, and an identification of the appointing authority of each;

   (d) the names of the agents, counsel and advocates of the parties;

   (e) the dates and place of the sittings of the Commission; and

   (f) a summary of the proceeding.

Conciliation Rules

(2) The report shall also record any agreement of the parties, pursuant to Article 35 of the Convention, concerning the use in other proceedings of the views expressed or statements or admissions or offers of settlement made in the proceeding before the Commission or of the report or any recommendation made by the Commission.

(3) The report shall be signed by the members of the Commission; the date of each signature shall be indicated. The fact that a member refuses to sign the report shall be recorded therein.

### Rule 33
### Communication
### of the Report

(1) Upon signature by the last conciliator to sign, the Secretary-General shall promptly:

    (a) authenticate the original text of the report and deposit it in the archives of the Centre; and

    (b) dispatch a certified copy to each party, indicating the date of dispatch on the original text and on all copies.

(2) The Secretary-General shall, upon request, make available to a party additional certified copies of the report.

(3) The Centre shall not publish the report without the consent of the parties.

## Chapter VI
## General Provisions

### Rule 34
### Final Provisions

(1) The texts of these Rules in each official language of the Centre shall be equally authentic.

(2) These Rules may be cited as the "Conciliation Rules" of the Centre.

# RULES OF PROCEDURE
# FOR ARBITRATION
# PROCEEDINGS
# (ARBITRATION RULES)

**Arbitration Rules**

# RULES OF PROCEDURE FOR ARBITRATION PROCEEDINGS (ARBITRATION RULES)

## Table of Contents

| Chapter | Rule | | Page |
|---------|------|---|------|
| I | | **Establishment of the Tribunal** | |
| | 1 | General Obligations | 103 |
| | 2 | Method of Constituting the Tribunal in the Absence of Previous Agreement | 104 |
| | 3 | Appointment of Arbitrators to a Tribunal Constituted in Accordance with Convention Article 37(2)(b) | 104 |
| | 4 | Appointment of Arbitrators by the Chairman of the Administrative Council | 105 |
| | 5 | Acceptance of Appointments | 106 |
| | 6 | Constitution of the Tribunal | 106 |
| | 7 | Replacement of Arbitrators | 107 |
| | 8 | Incapacity or Resignation of Arbitrators | 107 |
| | 9 | Disqualification of Arbitrators | 107 |
| | 10 | Procedure during a Vacancy on the Tribunal | 108 |
| | 11 | Filling Vacancies on the Tribunal | 108 |
| | 12 | Resumption of Proceeding after Filling a Vacancy | 109 |
| II | | **Working of the Tribunal** | |
| | 13 | Sessions of the Tribunal | 109 |
| | 14 | Sittings of the Tribunal | 110 |
| | 15 | Deliberations of the Tribunal | 110 |
| | 16 | Decisions of the Tribunal | 110 |
| | 17 | Incapacity of the President | 110 |
| | 18 | Representation of the Parties | 110 |
| III | | **General Procedural Provisions** | |
| | 19 | Procedural Orders | 111 |
| | 20 | Preliminary Procedural Consultation | 111 |
| | 21 | Pre-Hearing Conference | 111 |
| | 22 | Procedural Languages | 112 |
| | 23 | Copies of Instruments | 112 |
| | 24 | Supporting Documentation | 112 |
| | 25 | Correction of Errors | 113 |
| | 26 | Time Limits | 113 |

**Arbitration Rules**

|    | 27  | Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 113 |
|    | 28  | Cost of Proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . | 113 |

**IV** — **Written and Oral Procedures**

|    | 29  | Normal Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . | 114 |
|    | 30  | Transmission of the Request . . . . . . . . . . . . . . . . . | 114 |
|    | 31  | The Written Procedure . . . . . . . . . . . . . . . . . . . . . . . | 114 |
|    | 32  | The Oral Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . | 115 |
|    | 33  | Marshalling of Evidence . . . . . . . . . . . . . . . . . . . . . | 115 |
|    | 34  | Evidence: General Principles . . . . . . . . . . . . . . . . . | 115 |
|    | 35  | Examination of Witnesses and Experts . . . . . . . . . | 116 |
|    | 36  | Witnesses and Experts: Special Rules . . . . . . . . . . | 116 |
|    | 37  | Visits and Inquiries; Submissions of Non-disputing Parties . . . . . . . . . . . . . . . . . . . . . . . . | 117 |
|    | 38  | Closure of the Proceeding . . . . . . . . . . . . . . . . . . . . | 117 |

**V** — **Particular Procedures**

|    | 39  | Provisional Measures . . . . . . . . . . . . . . . . . . . . . . . . | 118 |
|    | 40  | Ancillary Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 118 |
|    | 41  | Preliminary Objections . . . . . . . . . . . . . . . . . . . . . . | 119 |
|    | 42  | Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 120 |
|    | 43  | Settlement and Discontinuance . . . . . . . . . . . . . . . | 120 |
|    | 44  | Discontinuance at Request of a Party . . . . . . . . . . | 121 |
|    | 45  | Discontinuance for Failure of Parties to Act . . . . . | 121 |

**VI** — **The Award**

|    | 46  | Preparation of the Award . . . . . . . . . . . . . . . . . . . . . | 121 |
|    | 47  | The Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 121 |
|    | 48  | Rendering of the Award . . . . . . . . . . . . . . . . . . . . . . | 122 |
|    | 49  | Supplementary Decisions and Rectification . . . . . . | 123 |

**VII** — **Interpretation, Revision and Annulment of the Award**

|    | 50  | The Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 124 |
|    | 51  | Interpretation or Revision: Further Procedures . . . | 125 |
|    | 52  | Annulment: Further Procedures . . . . . . . . . . . . . . . | 126 |
|    | 53  | Rules of Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . | 126 |
|    | 54  | Stay of Enforcement of the Award . . . . . . . . . . . . . | 126 |
|    | 55  | Resubmission of Dispute after an Annulment . . . . | 127 |

**VIII** — **General Provisions**

|    | 56  | Final Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 128 |

Arbitration Rules

*The Rules of Procedure for Arbitration Proceedings (the Arbitration Rules) of ICSID were adopted by the Administrative Council of the Centre pursuant to Article 6(1)(c) of the ICSID Convention.*

*The Arbitration Rules are supplemented by the Administrative and Financial Regulations of the Centre, in particular by Regulations 14-16, 22-31 and 34(1).*

*The Arbitration Rules cover the period of time from the dispatch of the notice of registration of a request for arbitration until an award is rendered and all challenges possible to it under the Convention have been exhausted. The transactions previous to that time are to be regulated in accordance with the Institution Rules.*

# Arbitration Rules

## Chapter I
## Establishment of the Tribunal

### Rule 1
### General Obligations

(1) Upon notification of the registration of the request for arbitration, the parties shall, with all possible dispatch, proceed to constitute a Tribunal, with due regard to Section 2 of Chapter IV of the Convention.

(2) Unless such information is provided in the request, the parties shall communicate to the Secretary-General as soon as possible any provisions agreed by them regarding the number of arbitrators and the method of their appointment.

(3) The majority of the arbitrators shall be nationals of States other than the State party to the dispute and of the State whose national is a party to the dispute, unless the sole arbitrator or each individual member of the Tribunal is appointed by agreement of the parties. Where the Tribunal is to consist of three members, a national of either of these States may not be appointed as an arbitrator by a party without the agreement of the other party to the dispute. Where the Tribunal is to consist of five or more members, nationals of either of these States may not be appointed as arbitrators by a party if appointment by the other party of the same number of arbitrators of either of these nationalities would result in a majority of arbitrators of these nationalities.

(4) No person who had previously acted as a conciliator or arbitrator in any proceeding for the settlement of the dispute may be appointed as a member of the Tribunal.

**Arbitration Rules**

103

### Rule 2
### Method of Constituting
### the Tribunal in the Absence
### of Previous Agreement

(1) If the parties, at the time of the registration of the request for arbitration, have not agreed upon the number of arbitrators and the method of their appointment, they shall, unless they agree otherwise, follow the following procedure:

    (a) the requesting party shall, within 10 days after the registration of the request, propose to the other party the appointment of a sole arbitrator or of a specified uneven number of arbitrators and specify the method proposed for their appointment;

    (b) within 20 days after receipt of the proposals made by the requesting party, the other party shall:

        (i) accept such proposals; or

        (ii) make other proposals regarding the number of arbitrators and the method of their appointment;

    (c) within 20 days after receipt of the reply containing any such other proposals, the requesting party shall notify the other party whether it accepts or rejects such proposals.

(2) The communications provided for in paragraph (1) shall be made or promptly confirmed in writing and shall either be transmitted through the Secretary-General or directly between the parties with a copy to the Secretary-General. The parties shall promptly notify the Secretary-General of the contents of any agreement reached.

(3) At any time 60 days after the registration of the request, if no agreement on another procedure is reached, either party may inform the Secretary-General that it chooses the formula provided for in Article 37(2)(b) of the Convention. The Secretary-General shall thereupon promptly inform the other party that the Tribunal is to be constituted in accordance with that Article.

### Rule 3
### Appointment of Arbitrators
### to a Tribunal Constituted in Accordance
### with Convention Article 37(2)(b)

(1) If the Tribunal is to be constituted in accordance with Article 37(2)(b) of the Convention:

    (a) either party shall in a communication to the other party:

Arbitration Rules

(i) name two persons, identifying one of them, who shall not have the same nationality as nor be a national of either party, as the arbitrator appointed by it, and the other as the arbitrator proposed to be the President of the Tribunal; and

(ii) invite the other party to concur in the appointment of the arbitrator proposed to be the President of the Tribunal and to appoint another arbitrator;

(b) promptly upon receipt of this communication the other party shall, in its reply:

(i) name a person as the arbitrator appointed by it, who shall not have the same nationality as nor be a national of either party; and

(ii) concur in the appointment of the arbitrator proposed to be the President of the Tribunal or name another person as the arbitrator proposed to be President;

(c) promptly upon receipt of the reply containing such a proposal, the initiating party shall notify the other party whether it concurs in the appointment of the arbitrator proposed by that party to be the President of the Tribunal.

(2) The communications provided for in this Rule shall be made or promptly confirmed in writing and shall either be transmitted through the Secretary-General or directly between the parties with a copy to the Secretary-General.

### Rule 4
### Appointment of Arbitrators
### by the Chairman of
### the Administrative Council

(1) If the Tribunal is not constituted within 90 days after the dispatch by the Secretary-General of the notice of registration, or such other period as the parties may agree, either party may, through the Secretary-General, address to the Chairman of the Administrative Council a request in writing to appoint the arbitrator or arbitrators not yet appointed and to designate an arbitrator to be the President of the Tribunal.

(2) The provision of paragraph (1) shall apply *mutatis mutandis* in the event that the parties have agreed that the arbitrators shall elect the President of the Tribunal and they fail to do so.

(3) The Secretary-General shall forthwith send a copy of the request to the other party.

**Arbitration Rules**

(4) The Chairman shall use his best efforts to comply with that request within 30 days after its receipt. Before he proceeds to make an appointment or designation, with due regard to Articles 38 and 40(1) of the Convention, he shall consult both parties as far as possible.

(5) The Secretary-General shall promptly notify the parties of any appointment or designation made by the Chairman.

## Rule 5
## Acceptance of Appointments

(1) The party or parties concerned shall notify the Secretary-General of the appointment of each arbitrator and indicate the method of his appointment.

(2) As soon as the Secretary-General has been informed by a party or the Chairman of the Administrative Council of the appointment of an arbitrator, he shall seek an acceptance from the appointee.

(3) If an arbitrator fails to accept his appointment within 15 days, the Secretary-General shall promptly notify the parties, and if appropriate the Chairman, and invite them to proceed to the appointment of another arbitrator in accordance with the method followed for the previous appointment.

## Rule 6
## Constitution of the Tribunal

(1) The Tribunal shall be deemed to be constituted and the proceeding to have begun on the date the Secretary-General notifies the parties that all the arbitrators have accepted their appointment.

(2) Before or at the first session of the Tribunal, each arbitrator shall sign a declaration in the following form:

"To the best of my knowledge there is no reason why I should not serve on the Arbitral Tribunal constituted by the International Centre for Settlement of Investment Disputes with respect to a dispute between _____ and _____.

"I shall keep confidential all information coming to my knowledge as a result of my participation in this proceeding, as well as the contents of any award made by the Tribunal.

"I shall judge fairly as between the parties, according to the applicable law, and shall not accept any instruction or compensation with regard to the proceeding from any source except as provided in the Convention on the Settlement of Investment Disputes between States and Nationals of Other States and in the Regulations and Rules made pursuant thereto.

**Arbitration Rules**

"Attached is a statement of (a) my past and present professional, business and other relationships (if any) with the parties and (b) any other circumstance that might cause my reliability for independent judgment to be questioned by a party. I acknowledge that by signing this declaration, I assume a continuing obligation promptly to notify the Secretary-General of the Centre of any such relationship or circumstance that subsequently arises during this proceeding."

Any arbitrator failing to sign a declaration by the end of the first session of the Tribunal shall be deemed to have resigned.

## Rule 7
## Replacement of Arbitrators

At any time before the Tribunal is constituted, each party may replace any arbitrator appointed by it and the parties may by common consent agree to replace any arbitrator. The procedure of such replacement shall be in accordance with Rules 1, 5 and 6.

## Rule 8
## Incapacity or Resignation
## of Arbitrators

(1) If an arbitrator becomes incapacitated or unable to perform the duties of his office, the procedure in respect of the disqualification of arbitrators set forth in Rule 9 shall apply.

(2) An arbitrator may resign by submitting his resignation to the other members of the Tribunal and the Secretary-General. If the arbitrator was appointed by one of the parties, the Tribunal shall promptly consider the reasons for his resignation and decide whether it consents thereto. The Tribunal shall promptly notify the Secretary-General of its decision.

## Rule 9
## Disqualification of Arbitrators

(1) A party proposing the disqualification of an arbitrator pursuant to Article 57 of the Convention shall promptly, and in any event before the proceeding is declared closed, file its proposal with the Secretary-General, stating its reasons therefor.

(2) The Secretary-General shall forthwith:

    (a) transmit the proposal to the members of the Tribunal and, if it relates to a sole arbitrator or to a majority of the members of the Tribunal, to the Chairman of the Administrative Council; and

**Arbitration Rules**

(b) notify the other party of the proposal.

(3) The arbitrator to whom the proposal relates may, without delay, furnish explanations to the Tribunal or the Chairman, as the case may be.

(4) Unless the proposal relates to a majority of the members of the Tribunal, the other members shall promptly consider and vote on the proposal in the absence of the arbitrator concerned. If those members are equally divided, they shall, through the Secretary-General, promptly notify the Chairman of the proposal, of any explanation furnished by the arbitrator concerned and of their failure to reach a decision.

(5) Whenever the Chairman has to decide on a proposal to disqualify an arbitrator, he shall use his best efforts to take that decision within 30 days after he has received the proposal.

(6) The proceeding shall be suspended until a decision has been taken on the proposal.

## Rule 10
### Procedure during a Vacancy
### on the Tribunal

(1) The Secretary-General shall forthwith notify the parties and, if necessary, the Chairman of the Administrative Council of the disqualification, death, incapacity or resignation of an arbitrator and of the consent, if any, of the Tribunal to a resignation.

(2) Upon the notification by the Secretary-General of a vacancy on the Tribunal, the proceeding shall be or remain suspended until the vacancy has been filled.

## Rule 11
### Filling Vacancies
### on the Tribunal

(1) Except as provided in paragraph (2), a vacancy resulting from the disqualification, death, incapacity or resignation of an arbitrator shall be promptly filled by the same method by which his appointment had been made.

(2) In addition to filling vacancies relating to arbitrators appointed by him, the Chairman of the Administrative Council shall appoint a person from the Panel of Arbitrators:

    (a) to fill a vacancy caused by the resignation, without the consent of the Tribunal, of an arbitrator appointed by a party; or

*Arbitration Rules*

(b) at the request of either party, to fill any other vacancy, if no new appointment is made and accepted within 45 days of the notification of the vacancy by the Secretary-General.

(3) The procedure for filling a vacancy shall be in accordance with Rules 1, 4(4), 4(5), 5 and, *mutatis mutandis*, 6(2).

### Rule 12
### Resumption of Proceeding after Filling a Vacancy

As soon as a vacancy on the Tribunal has been filled, the proceeding shall continue from the point it had reached at the time the vacancy occurred. The newly appointed arbitrator may, however, require that the oral procedure be recommenced, if this had already been started.

# Chapter II
# Working of the Tribunal

### Rule 13
### Sessions of the Tribunal

(1) The Tribunal shall hold its first session within 60 days after its constitution or such other period as the parties may agree. The dates of that session shall be fixed by the President of the Tribunal after consultation with its members and the Secretary-General. If upon its constitution the Tribunal has no President because the parties have agreed that the President shall be elected by its members, the Secretary-General shall fix the dates of that session. In both cases, the parties shall be consulted as far as possible.

(2) The dates of subsequent sessions shall be determined by the Tribunal, after consultation with the Secretary-General and with the parties as far as possible.

(3) The Tribunal shall meet at the seat of the Centre or at such other place as may have been agreed by the parties in accordance with Article 63 of the Convention. If the parties agree that the proceeding shall be held at a place other than the Centre or an institution with which the Centre has made the necessary arrangements, they shall consult with the Secretary-General and request the approval of the Tribunal. Failing such approval, the Tribunal shall meet at the seat of the Centre.

(4) The Secretary-General shall notify the members of the Tribunal and the parties of the dates and place of the sessions of the Tribunal in good time.

**Arbitration Rules**

### Rule 14
### Sittings of the Tribunal

(1) The President of the Tribunal shall conduct its hearings and preside at its deliberations.

(2) Except as the parties otherwise agree, the presence of a majority of the members of the Tribunal shall be required at its sittings.

(3) The President of the Tribunal shall fix the date and hour of its sittings.

### Rule 15
### Deliberations of the Tribunal

(1) The deliberations of the Tribunal shall take place in private and remain secret.

(2) Only members of the Tribunal shall take part in its deliberations. No other person shall be admitted unless the Tribunal decides otherwise.

### Rule 16
### Decisions of the Tribunal

(1) Decisions of the Tribunal shall be taken by a majority of the votes of all its members. Abstention shall count as a negative vote.

(2) Except as otherwise provided by these Rules or decided by the Tribunal, it may take any decision by correspondence among its members, provided that all of them are consulted. Decisions so taken shall be certified by the President of the Tribunal.

### Rule 17
### Incapacity of the President

If at any time the President of the Tribunal should be unable to act, his functions shall be performed by one of the other members of the Tribunal, acting in the order in which the Secretary-General had received the notice of their acceptance of their appointment to the Tribunal.

### Rule 18
### Representation of the Parties

(1) Each party may be represented or assisted by agents, counsel or advocates whose names and authority shall be notified by that party to the Secretary-General, who shall promptly inform the Tribunal and the other party.

**Arbitration Rules**

(2) For the purposes of these Rules, the expression "party" includes, where the context so admits, an agent, counsel or advocate authorized to represent that party.

# Chapter III
## General Procedural Provisions

### Rule 19
### Procedural Orders

The Tribunal shall make the orders required for the conduct of the proceeding.

### Rule 20
### Preliminary Procedural Consultation

(1) As early as possible after the constitution of a Tribunal, its President shall endeavor to ascertain the views of the parties regarding questions of procedure. For this purpose he may request the parties to meet him. He shall, in particular, seek their views on the following matters:

    (a) the number of members of the Tribunal required to constitute a quorum at its sittings;

    (b) the language or languages to be used in the proceeding;

    (c) the number and sequence of the pleadings and the time limits within which they are to be filed;

    (d) the number of copies desired by each party of instruments filed by the other;

    (e) dispensing with the written or the oral procedure;

    (f) the manner in which the cost of the proceeding is to be apportioned; and

    (g) the manner in which the record of the hearings shall be kept.

(2) In the conduct of the proceeding the Tribunal shall apply any agreement between the parties on procedural matters, except as otherwise provided in the Convention or the Administrative and Financial Regulations.

### Rule 21
### Pre-Hearing Conference

(1) At the request of the Secretary-General or at the discretion of the President of the Tribunal, a pre-hearing conference between the Tri-

**Arbitration Rules**

111

bunal and the parties may be held to arrange for an exchange of information and the stipulation of uncontested facts in order to expedite the proceeding.

(2) At the request of the parties, a pre-hearing conference between the Tribunal and the parties, duly represented by their authorized representatives, may be held to consider the issues in dispute with a view to reaching an amicable settlement.

## Rule 22
## Procedural Languages

(1) The parties may agree on the use of one or two languages to be used in the proceeding, provided, that, if they agree on any language that is not an official language of the Centre, the Tribunal, after consultation with the Secretary-General, gives its approval. If the parties do not agree on any such procedural language, each of them may select one of the official languages (i.e., English, French and Spanish) for this purpose.

(2) If two procedural languages are selected by the parties, any instrument may be filed in either language. Either language may be used at the hearings, subject, if the Tribunal so requires, to translation and interpretation. The orders and the award of the Tribunal shall be rendered and the record kept in both procedural languages, both versions being equally authentic.

## Rule 23
## Copies of Instruments

Except as otherwise provided by the Tribunal after consultation with the parties and the Secretary-General, every request, pleading, application, written observation, supporting documentation, if any, or other instrument shall be filed in the form of a signed original accompanied by the following number of additional copies:

    (a) before the number of members of the Tribunal has been determined: five;

    (b) after the number of members of the Tribunal has been determined: two more than the number of its members.

## Rule 24
## Supporting Documentation

Supporting documentation shall ordinarily be filed together with the instrument to which it relates, and in any case within the time limit fixed for the filing of such instrument.

## Rule 25
## Correction of Errors

An accidental error in any instrument or supporting document may, with the consent of the other party or by leave of the Tribunal, be corrected at any time before the award is rendered.

## Rule 26
## Time Limits

(1) Where required, time limits shall be fixed by the Tribunal by assigning dates for the completion of the various steps in the proceeding. The Tribunal may delegate this power to its President.

(2) The Tribunal may extend any time limit that it has fixed. If the Tribunal is not in session, this power shall be exercised by its President.

(3) Any step taken after expiration of the applicable time limit shall be disregarded unless the Tribunal, in special circumstances and after giving the other party an opportunity of stating its views, decides otherwise.

## Rule 27
## Waiver

A party which knows or should have known that a provision of the Administrative and Financial Regulations, of these Rules, of any other rules or agreement applicable to the proceeding, or of an order of the Tribunal has not been complied with and which fails to state promptly its objections thereto, shall be deemed—subject to Article 45 of the Convention—to have waived its right to object.

## Rule 28
## Cost of Proceeding

(1) Without prejudice to the final decision on the payment of the cost of the proceeding, the Tribunal may, unless otherwise agreed by the parties, decide:

(a) at any stage of the proceeding, the portion which each party shall pay, pursuant to Administrative and Financial Regulation 14, of the fees and expenses of the Tribunal and the charges for the use of the facilities of the Centre;

(b) with respect to any part of the proceeding, that the related costs (as determined by the Secretary-General) shall be borne entirely or in a particular share by one of the parties.

Arbitration Rules

113

(2) Promptly after the closure of the proceeding, each party shall submit to the Tribunal a statement of costs reasonably incurred or borne by it in the proceeding and the Secretary-General shall submit to the Tribunal an account of all amounts paid by each party to the Centre and of all costs incurred by the Centre for the proceeding. The Tribunal may, before the award has been rendered, request the parties and the Secretary-General to provide additional information concerning the cost of the proceeding.

# Chapter IV
# Written and Oral Procedures

## Rule 29
## Normal Procedures

Except if the parties otherwise agree, the proceeding shall comprise two distinct phases: a written procedure followed by an oral one.

## Rule 30
## Transmission of the Request

As soon as the Tribunal is constituted, the Secretary-General shall transmit to each member a copy of the request by which the proceeding was initiated, of the supporting documentation, of the notice of registration and of any communication received from either party in response thereto.

## Rule 31
## The Written Procedure

(1) In addition to the request for arbitration, the written procedure shall consist of the following pleadings, filed within time limits set by the Tribunal:

    (a) a memorial by the requesting party;

    (b) a counter-memorial by the other party;

and, if the parties so agree or the Tribunal deems it necessary:

    (c) a reply by the requesting party; and

    (d) a rejoinder by the other party.

(2) If the request was made jointly, each party shall, within the same time limit determined by the Tribunal, file its memorial and, if the parties so agree or the Tribunal deems it necessary, its reply; however,

**Arbitration Rules**

114

the parties may instead agree that one of them shall, for the purposes of paragraph (1), be considered as the requesting party.

(3) A memorial shall contain: a statement of the relevant facts; a statement of law; and the submissions. A counter-memorial, reply or rejoinder shall contain an admission or denial of the facts stated in the last previous pleading; any additional facts, if necessary; observations concerning the statement of law in the last previous pleading; a statement of law in answer thereto; and the submissions.

## Rule 32
### The Oral Procedure

(1) The oral procedure shall consist of the hearing by the Tribunal of the parties, their agents, counsel and advocates, and of witnesses and experts.

(2) Unless either party objects, the Tribunal, after consultation with the Secretary-General, may allow other persons, besides the parties, their agents, counsel and advocates, witnesses and experts during their testimony, and officers of the Tribunal, to attend or observe all or part of the hearings, subject to appropriate logistical arrangements. The Tribunal shall for such cases establish procedures for the protection of proprietary or privileged information.

(3) The members of the Tribunal may, during the hearings, put questions to the parties, their agents, counsel and advocates, and ask them for explanations.

## Rule 33
### Marshalling of Evidence

Without prejudice to the rules concerning the production of documents, each party shall, within time limits fixed by the Tribunal, communicate to the Secretary-General, for transmission to the Tribunal and the other party, precise information regarding the evidence which it intends to produce and that which it intends to request the Tribunal to call for, together with an indication of the points to which such evidence will be directed.

## Rule 34
### Evidence: General Principles

(1) The Tribunal shall be the judge of the admissibility of any evidence adduced and of its probative value.

(2) The Tribunal may, if it deems it necessary at any stage of the proceeding:

**Arbitration Rules**

(a) call upon the parties to produce documents, witnesses and experts; and

(b) visit any place connected with the dispute or conduct inquiries there.

(3) The parties shall cooperate with the Tribunal in the production of the evidence and in the other measures provided for in paragraph (2). The Tribunal shall take formal note of the failure of a party to comply with its obligations under this paragraph and of any reasons given for such failure.

(4) Expenses incurred in producing evidence and in taking other measures in accordance with paragraph (2) shall be deemed to constitute part of the expenses incurred by the parties within the meaning of Article 61(2) of the Convention.

## Rule 35
## Examination of Witnesses and Experts

(1) Witnesses and experts shall be examined before the Tribunal by the parties under the control of its President. Questions may also be put to them by any member of the Tribunal.

(2) Each witness shall make the following declaration before giving his evidence:

"I solemnly declare upon my honour and conscience that I shall speak the truth, the whole truth and nothing but the truth."

(3) Each expert shall make the following declaration before making his statement:

"I solemnly declare upon my honour and conscience that my statement will be in accordance with my sincere belief."

## Rule 36
## Witnesses and Experts: Special Rules

Notwithstanding Rule 35 the Tribunal may:

(a) admit evidence given by a witness or expert in a written deposition; and

(b) with the consent of both parties, arrange for the examination of a witness or expert otherwise than before the Tribunal itself. The Tribunal shall define the subject of the examination, the time limit, the procedure to be followed and other particulars. The parties may participate in the examination.

### Rule 37
### Visits and Inquiries;
### Submissions of Non-disputing Parties

(1) If the Tribunal considers it necessary to visit any place connected with the dispute or to conduct an inquiry there, it shall make an order to this effect. The order shall define the scope of the visit or the subject of the inquiry, the time limit, the procedure to be followed and other particulars. The parties may participate in any visit or inquiry.

(2) After consulting both parties, the Tribunal may allow a person or entity that is not a party to the dispute (in this Rule called the "non-disputing party") to file a written submission with the Tribunal regarding a matter within the scope of the dispute. In determining whether to allow such a filing, the Tribunal shall consider, among other things, the extent to which:

    (a) the non-disputing party submission would assist the Tribunal in the determination of a factual or legal issue related to the proceeding by bringing a perspective, particular knowledge or insight that is different from that of the disputing parties;

    (b) the non-disputing party submission would address a matter within the scope of the dispute;

    (c) the non-disputing party has a significant interest in the proceeding.

The Tribunal shall ensure that the non-disputing party submission does not disrupt the proceeding or unduly burden or unfairly prejudice either party, and that both parties are given an opportunity to present their observations on the non-disputing party submission.

### Rule 38
### Closure of the Proceeding

(1) When the presentation of the case by the parties is completed, the proceeding shall be declared closed.

(2) Exceptionally, the Tribunal may, before the award has been rendered, reopen the proceeding on the ground that new evidence is forthcoming of such a nature as to constitute a decisive factor, or that there is a vital need for clarification on certain specific points.

**Arbitration Rules**

117

# Chapter V
# Particular Procedures

## Rule 39
## Provisional Measures

(1) At any time after the institution of the proceeding, a party may request that provisional measures for the preservation of its rights be recommended by the Tribunal. The request shall specify the rights to be preserved, the measures the recommendation of which is requested, and the circumstances that require such measures.

(2) The Tribunal shall give priority to the consideration of a request made pursuant to paragraph (1).

(3) The Tribunal may also recommend provisional measures on its own initiative or recommend measures other than those specified in a request. It may at any time modify or revoke its recommendations.

(4) The Tribunal shall only recommend provisional measures, or modify or revoke its recommendations, after giving each party an opportunity of presenting its observations.

(5) If a party makes a request pursuant to paragraph (1) before the constitution of the Tribunal, the Secretary-General shall, on the application of either party, fix time limits for the parties to present observations on the request, so that the request and observations may be considered by the Tribunal promptly upon its constitution.

(6) Nothing in this Rule shall prevent the parties, provided that they have so stipulated in the agreement recording their consent, from requesting any judicial or other authority to order provisional measures, prior to or after the institution of the proceeding, for the preservation of their respective rights and interests.

## Rule 40
## Ancillary Claims

(1) Except as the parties otherwise agree, a party may present an incidental or additional claim or counter-claim arising directly out of the subject-matter of the dispute, provided that such ancillary claim is within the scope of the consent of the parties and is otherwise within the jurisdiction of the Centre.

(2) An incidental or additional claim shall be presented not later than in the reply and a counter-claim no later than in the counter-memorial, unless the Tribunal, upon justification by the party presenting the ancillary claim and upon considering any objection of the other party, authorizes the presentation of the claim at a later stage in the proceeding.

Arbitration Rules

(3) The Tribunal shall fix a time limit within which the party against which an ancillary claim is presented may file its observations thereon.

## Rule 41
## Preliminary Objections

(1) Any objection that the dispute or any ancillary claim is not within the jurisdiction of the Centre or, for other reasons, is not within the competence of the Tribunal shall be made as early as possible. A party shall file the objection with the Secretary-General no later than the expiration of the time limit fixed for the filing of the counter-memorial, or, if the objection relates to an ancillary claim, for the filing of the rejoinder—unless the facts on which the objection is based are unknown to the party at that time.

(2) The Tribunal may on its own initiative consider, at any stage of the proceeding, whether the dispute or any ancillary claim before it is within the jurisdiction of the Centre and within its own competence.

(3) Upon the formal raising of an objection relating to the dispute, the Tribunal may decide to suspend the proceeding on the merits. The President of the Tribunal, after consultation with its other members, shall fix a time limit within which the parties may file observations on the objection.

(4) The Tribunal shall decide whether or not the further procedures relating to the objection made pursuant to paragraph (1) shall be oral. It may deal with the objection as a preliminary question or join it to the merits of the dispute. If the Tribunal overrules the objection or joins it to the merits, it shall once more fix time limits for the further procedures.

(5) Unless the parties have agreed to another expedited procedure for making preliminary objections, a party may, no later than 30 days after the constitution of the Tribunal, and in any event before the first session of the Tribunal, file an objection that a claim is manifestly without legal merit. The party shall specify as precisely as possible the basis for the objection. The Tribunal, after giving the parties the opportunity to present their observations on the objection, shall, at its first session or promptly thereafter, notify the parties of its decision on the objection. The decision of the Tribunal shall be without prejudice to the right of a party to file an objection pursuant to paragraph (1) or to object, in the course of the proceeding, that a claim lacks legal merit.

(6) If the Tribunal decides that the dispute is not within the jurisdiction of the Centre or not within its own competence, or that all claims are manifestly without legal merit, it shall render an award to that effect.

**Arbitration Rules**

119

## Rule 42
## Default

(1) If a party (in this Rule called the "defaulting party") fails to appear or to present its case at any stage of the proceeding, the other party may, at any time prior to the discontinuance of the proceeding, request the Tribunal to deal with the questions submitted to it and to render an award.

(2) The Tribunal shall promptly notify the defaulting party of such a request. Unless it is satisfied that that party does not intend to appear or to present its case in the proceeding, it shall, at the same time, grant a period of grace and to this end:

   (a) if that party had failed to file a pleading or any other instrument within the time limit fixed therefor, fix a new time limit for its filing; or

   (b) if that party had failed to appear or present its case at a hearing, fix a new date for the hearing.

The period of grace shall not, without the consent of the other party, exceed 60 days.

(3) After the expiration of the period of grace or when, in accordance with paragraph (2), no such period is granted, the Tribunal shall resume the consideration of the dispute. Failure of the defaulting party to appear or to present its case shall not be deemed an admission of the assertions made by the other party.

(4) The Tribunal shall examine the jurisdiction of the Centre and its own competence in the dispute and, if it is satisfied, decide whether the submissions made are well-founded in fact and in law. To this end, it may, at any stage of the proceeding, call on the party appearing to file observations, produce evidence or submit oral explanations.

## Rule 43
## Settlement and Discontinuance

(1) If, before the award is rendered, the parties agree on a settlement of the dispute or otherwise to discontinue the proceeding, the Tribunal, or the Secretary-General if the Tribunal has not yet been constituted, shall, at their written request, in an order take note of the discontinuance of the proceeding.

(2) If the parties file with the Secretary-General the full and signed text of their settlement and in writing request the Tribunal to embody such settlement in an award, the Tribunal may record the settlement in the form of its award.

Arbitration Rules

## Rule 44
## Discontinuance at Request of a Party

If a party requests the discontinuance of the proceeding, the Tribunal, or the Secretary-General if the Tribunal has not yet been constituted, shall in an order fix a time limit within which the other party may state whether it opposes the discontinuance. If no objection is made in writing within the time limit, the other party shall be deemed to have acquiesced in the discontinuance and the Tribunal, or if appropriate the Secretary-General, shall in an order take note of the discontinuance of the proceeding. If objection is made, the proceeding shall continue.

## Rule 45
## Discontinuance for Failure
## of Parties to Act

If the parties fail to take any steps in the proceeding during six consecutive months or such period as they may agree with the approval of the Tribunal, or of the Secretary-General if the Tribunal has not yet been constituted, they shall be deemed to have discontinued the proceeding and the Tribunal, or if appropriate the Secretary-General, shall, after notice to the parties, in an order take note of the discontinuance.

# Chapter VI
# The Award

## Rule 46
## Preparation of the Award

The award (including any individual or dissenting opinion) shall be drawn up and signed within 120 days after closure of the proceeding. The Tribunal may, however, extend this period by a further 60 days if it would otherwise be unable to draw up the award.

## Rule 47
## The Award

(1) The award shall be in writing and shall contain:

    (a) a precise designation of each party;

    (b) a statement that the Tribunal was established under the Convention, and a description of the method of its constitution;

**Arbitration Rules**

    (c)  the name of each member of the Tribunal, and an identification of the appointing authority of each;

    (d)  the names of the agents, counsel and advocates of the parties;

    (e)  the dates and place of the sittings of the Tribunal;

    (f)  a summary of the proceeding;

    (g)  a statement of the facts as found by the Tribunal;

    (h)  the submissions of the parties;

    (i)  the decision of the Tribunal on every question submitted to it, together with the reasons upon which the decision is based; and

    (j)  any decision of the Tribunal regarding the cost of the proceeding.

(2) The award shall be signed by the members of the Tribunal who voted for it; the date of each signature shall be indicated.

(3) Any member of the Tribunal may attach his individual opinion to the award, whether he dissents from the majority or not, or a statement of his dissent.

## Rule 48
## Rendering of the Award

(1) Upon signature by the last arbitrator to sign, the Secretary-General shall promptly:

    (a)  authenticate the original text of the award and deposit it in the archives of the Centre, together with any individual opinions and statements of dissent; and

    (b)  dispatch a certified copy of the award (including individual opinions and statements of dissent) to each party, indicating the date of dispatch on the original text and on all copies.

(2) The award shall be deemed to have been rendered on the date on which the certified copies were dispatched.

(3) The Secretary-General shall, upon request, make available to a party additional certified copies of the award.

(4) The Centre shall not publish the award without the consent of the parties. The Centre shall, however, promptly include in its publications excerpts of the legal reasoning of the Tribunal.

Arbitration Rules

## Rule 49
### Supplementary Decisions and Rectification

(1) Within 45 days after the date on which the award was rendered, either party may request, pursuant to Article 49(2) of the Convention, a supplementary decision on, or the rectification of, the award. Such a request shall be addressed in writing to the Secretary-General. The request shall:

    (a) identify the award to which it relates;

    (b) indicate the date of the request;

    (c) state in detail:

        (i) any question which, in the opinion of the requesting party, the Tribunal omitted to decide in the award; and

        (ii) any error in the award which the requesting party seeks to have rectified; and

    (d) be accompanied by a fee for lodging the request.

(2) Upon receipt of the request and of the lodging fee, the Secretary-General shall forthwith:

    (a) register the request;

    (b) notify the parties of the registration;

    (c) transmit to the other party a copy of the request and of any accompanying documentation; and

    (d) transmit to each member of the Tribunal a copy of the notice of registration, together with a copy of the request and of any accompanying documentation.

(3) The President of the Tribunal shall consult the members on whether it is necessary for the Tribunal to meet in order to consider the request. The Tribunal shall fix a time limit for the parties to file their observations on the request and shall determine the procedure for its consideration.

(4) Rules 46-48 shall apply, *mutatis mutandis,* to any decision of the Tribunal pursuant to this Rule.

(5) If a request is received by the Secretary-General more than 45 days after the award was rendered, he shall refuse to register the request and so inform forthwith the requesting party.

**Arbitration Rules**

# Chapter VII
# Interpretation, Revision and
# Annulment of the Award

## Rule 50
## The Application

(1) An application for the interpretation, revision or annulment of an award shall be addressed in writing to the Secretary-General and shall:

(a) identify the award to which it relates;

(b) indicate the date of the application;

(c) state in detail:

    (i) in an application for interpretation, the precise points in dispute;

    (ii) in an application for revision, pursuant to Article 51(1) of the Convention, the change sought in the award, the discovery of some fact of such a nature as decisively to affect the award, and evidence that when the award was rendered that fact was unknown to the Tribunal and to the applicant, and that the applicant's ignorance of that fact was not due to negligence;

    (iii) in an application for annulment, pursuant to Article 52(1) of the Convention, the grounds on which it is based. These grounds are limited to the following:

        – that the Tribunal was not properly constituted;

        – that the Tribunal has manifestly exceeded its powers;

        – that there was corruption on the part of a member of the Tribunal;

        – that there has been a serious departure from a fundamental rule of procedure;

        – that the award has failed to state the reasons on which it is based;

(d) be accompanied by the payment of a fee for lodging the application.

(2) Without prejudice to the provisions of paragraph (3), upon receiving an application and the lodging fee, the Secretary-General shall forthwith:

(a) register the application;

(b) notify the parties of the registration; and

Arbitration Rules

   (c) transmit to the other party a copy of the application and of any accompanying documentation.

(3) The Secretary-General shall refuse to register an application for:

   (a) revision, if, in accordance with Article 51(2) of the Convention, it is not made within 90 days after the discovery of the new fact and in any event within three years after the date on which the award was rendered (or any subsequent decision or correction);

   (b) annulment, if, in accordance with Article 52(2) of the Convention, it is not made:

      (i) within 120 days after the date on which the award was rendered (or any subsequent decision or correction) if the application is based on any of the following grounds:

         – the Tribunal was not properly constituted;

         – the Tribunal has manifestly exceeded its powers;

         – there has been a serious departure from a fundamental rule of procedure;

         – the award has failed to state the reasons on which it is based;

      (ii) in the case of corruption on the part of a member of the Tribunal, within 120 days after discovery thereof, and in any event within three years after the date on which the award was rendered (or any subsequent decision or correction).

(4) If the Secretary-General refuses to register an application for revision, or annulment, he shall forthwith notify the requesting party of his refusal.

## Rule 51
### Interpretation or Revision:
### Further Procedures

(1) Upon registration of an application for the interpretation or revision of an award, the Secretary-General shall forthwith:

   (a) transmit to each member of the original Tribunal a copy of the notice of registration, together with a copy of the application and of any accompanying documentation; and

   (b) request each member of the Tribunal to inform him within a specified time limit whether that member is willing to take part in the consideration of the application.

**Arbitration Rules**

(2) If all members of the Tribunal express their willingness to take part in the consideration of the application, the Secretary-General shall so notify the members of the Tribunal and the parties. Upon dispatch of these notices the Tribunal shall be deemed to be reconstituted.

(3) If the Tribunal cannot be reconstituted in accordance with paragraph (2), the Secretary-General shall so notify the parties and invite them to proceed, as soon as possible, to constitute a new Tribunal, including the same number of arbitrators, and appointed by the same method, as the original one.

## Rule 52
## Annulment: Further Procedures

(1) Upon registration of an application for the annulment of an award, the Secretary-General shall forthwith request the Chairman of the Administrative Council to appoint an *ad hoc* Committee in accordance with Article 52(3) of the Convention.

(2) The Committee shall be deemed to be constituted on the date the Secretary-General notifies the parties that all members have accepted their appointment. Before or at the first session of the Committee, each member shall sign a declaration conforming to that set forth in Rule 6(2).

## Rule 53
## Rules of Procedure

The provisions of these Rules shall apply *mutatis mutandis* to any procedure relating to the interpretation, revision or annulment of an award and to the decision of the Tribunal or Committee.

## Rule 54
## Stay of Enforcement
## of the Award

(1) The party applying for the interpretation, revision or annulment of an award may in its application, and either party may at any time before the final disposition of the application, request a stay in the enforcement of part or all of the award to which the application relates. The Tribunal or Committee shall give priority to the consideration of such a request.

(2) If an application for the revision or annulment of an award contains a request for a stay of its enforcement, the Secretary-General shall, together with the notice of registration, inform both parties of the provisional stay of the award. As soon as the Tribunal or Committee is constituted it shall, if either party requests, rule within 30 days on

whether such stay should be continued; unless it decides to continue the stay, it shall automatically be terminated.

(3) If a stay of enforcement has been granted pursuant to paragraph (1) or continued pursuant to paragraph (2), the Tribunal or Committee may at any time modify or terminate the stay at the request of either party. All stays shall automatically terminate on the date on which a final decision is rendered on the application, except that a Committee granting the partial annulment of an award may order the temporary stay of enforcement of the unannulled portion in order to give either party an opportunity to request any new Tribunal constituted pursuant to Article 52(6) of the Convention to grant a stay pursuant to Rule 55(3).

(4) A request pursuant to paragraph (1), (2) (second sentence) or (3) shall specify the circumstances that require the stay or its modification or termination. A request shall only be granted after the Tribunal or Committee has given each party an opportunity of presenting its observations.

(5) The Secretary-General shall promptly notify both parties of the stay of enforcement of any award and of the modification or termination of such a stay, which shall become effective on the date on which he dispatches such notification.

## Rule 55
## Resubmission of Dispute
## after an Annulment

(1) If a Committee annuls part or all of an award, either party may request the resubmission of the dispute to a new Tribunal. Such a request shall be addressed in writing to the Secretary-General and shall:

    (a) identify the award to which it relates;

    (b) indicate the date of the request;

    (c) explain in detail what aspect of the dispute is to be submitted to the Tribunal; and

    (d) be accompanied by a fee for lodging the request.

(2) Upon receipt of the request and of the lodging fee, the Secretary-General shall forthwith:

    (a) register it in the Arbitration Register;

    (b) notify both parties of the registration;

    (c) transmit to the other party a copy of the request and of any accompanying documentation; and

    (d) invite the parties to proceed, as soon as possible, to constitute a new Tribunal, including the same number of arbi-

**Arbitration Rules**

trators, and appointed by the same method, as the original one.

(3) If the original award had only been annulled in part, the new Tribunal shall not reconsider any portion of the award not so annulled. It may, however, in accordance with the procedures set forth in Rule 54, stay or continue to stay the enforcement of the unannulled portion of the award until the date its own award is rendered.

(4) Except as otherwise provided in paragraphs (1)–(3), these Rules shall apply to a proceeding on a resubmitted dispute in the same manner as if such dispute had been submitted pursuant to the Institution Rules.

# Chapter VIII
# General Provisions

## Rule 56
## Final Provisions

(1) The texts of these Rules in each official language of the Centre shall be equally authentic.

(2) These Rules may be cited as the "Arbitration Rules" of the Centre.

Arbitration Rules

# EXHIBIT 8



# ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
666 FIFTH AVENUE
NEW YORK, NY 10103-0001
tel +1 212 506 5000
fax +1 212 506 5151
WWW.ORRICK.COM

January 2, 2008

Robert L. Sills
(212) 506-5110
rsills@orrick.com

**BY FEDERAL EXPRESS**

Ms. Ana Palacio
Secretary-General
International Centre for Settlement of Investment Disputes
1818 H Street, N.W.
Washington, DC 20433

      <u>Arbitration between E.T.I. Euro Telecom International N.V. and Republic of Bolivia,</u>
<u>ICSID Case No. ARB/07/28</u>

Dear Secretary-General Palacio:

      On behalf of our client, E.T.I. Euro Telecom International N.V. ("E.T.I."), we write pursuant to Arbitration Rule 2(3) to notify you that sixty days have passed since E.T.I.'s Request for Arbitration in the above-referenced arbitration was registered on October 31, 2007, and that the parties have not reached agreement upon the number of arbitrators or the method of their appointment. In accordance with Arbitration Rule 2(3), E.T.I. chooses the formula for constituting the Tribunal provided for in Article 37(2)(b) of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, and respectfully requests that you promptly inform respondent Republic of Bolivia that the Tribunal is to be so constituted.

                      Respectfully,

                      Robert L. Sills



**ORRICK**

Ms. Ana Palacio
January 2, 2008
Page 2

Copies (By Federal Express) to:

Republic of Bolivia
c/o H.E. Evo Morales Ayma
Presidente Constitucional de la Republica
Palacio de Gobierno
La Paz, Bolivia

H.E. David Choquehuanca Céspedes
Ministerio de Relaciones Exteriores y Culto
Plaza Murillo - c. Ingavi esq. c. Junin
La Paz, Bolivia

H.E. Ambassador Mario Gustavo Guzmán Saldaña
Embassy of the Republic of Bolivia
3014 Massachusetts Ave. N.W.
Washington, D.C. 20008

# EXHIBIT 9

# International Centre for Settlement of Investment Disputes
1818 H Street, N.W., Washington, D.C. 20433, U.S.A.
Telephone: (202) 458-1534   Faxes: (202) 522-2615/2027
Website: www.worldbank.org/icsid

April 25, 2008

By e-mail

E.T.I. Euro Telecom International N.V.
c/o Messrs. Robert L. Sills and
Steven J. Fink
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, NY 10103

Republic of Bolivia
c/o H.E. Evo Morales Ayma
Presidente Constitucional de la República
Palacio de Gobierno
La Paz, Bolivia

H.E. David Choquehuanca Céspedes
Ministro de Relaciones Exteriores y Cultos
Plaza Murillo- c. Ingavi esq. c. Junín
La Paz, Bolivia

H.E. Ambassador Gustavo Guzmán
Embassy of the Republic of Bolivia
3014 Massachusetts Ave. N.W.
Washington D.C. 20008

Ref:    **E.T.I. Euro Telecom International N.V. v. Republic of Bolivia**
        **(ICSID Case No. ARB/07/28)**

Dear Sirs,

This will confirm our receipt of a letter of April 24, 2008 from counsel for the Claimant.

By letter of January 30, 2008, the Claimant informed the Secretary-General that it had elected the formula provided for in Article 37(2)(b) of the ICSID Convention. This choice was confirmed in a letter from the Claimant of April 24, 2008. I understand that copies of these letters were sent by the Claimant to the Respondent. For ease of reference, however, these letters are being transmitted herewith to the Respondent.

Rule 2(3) of the Arbitration Rules of the Centre provides that at any time 60 days after the registration of a request for arbitration, if the parties have not agreed on the number of arbitrators and the method of their appointment, either party may inform the Secretary-General of the Centre that it chooses the formula provided in Article 37(2)(b) of the ICSID Convention. This formula calls for an arbitral tribunal consisting of three

-2-                                                April 25, 2008

arbitrators, one arbitrator appointed by each party and the third, who will be the President of the Tribunal, appointed by agreement of the parties.

More than sixty days having elapsed since the registration of the request for arbitration, I hereby inform you, in accordance with ICSID Arbitration Rule 2(3) and on behalf of the Secretary-General, that the arbitral tribunal in this case is to be constituted in accordance with Article 37(2)(b) of the ICSID Convention.

Sincerely yours,

Eloïse M. Obadia
Senior Counsel

# EXHIBIT 10

Headline: Telecom transfers Entel's funds from Bolivia to foreign accounts.

Dateline: May 16, 2008.

Body:

La Paz, May 16 (Reuters) – The government of Bolivia announced that Telecom had transferred $ 90 millions belonging to its subsidiary Entel to foreign bank accounts. The state of Bolivia has recently nationalized Entel.

The center-left wing Bolivian government has acquired Entel's business, and it is now litigating the issue of post-nationalization indemnification with the Italian telecommunication company.

"We were expecting such move because the shareholder (Telecom Italia) has never kept funds in Bolivia while it was controlling the company", the Bolivian Minister of Public Works Oscar Coca has said.

Coca has not specified when the money transfer had occurred, but he has said that this is a "reprehensible" act that will greatly affect the current negotiations as to the indemnification.

Entel was not available to make comments.

The government of Evo Morales has declared that it owes Telecom Italia nothing, maintaining that Telecom Italia has not fulfilled its obligations towards investors and that it owes the government $ 645 millions as fines and taxes.

The Italian company, instead, alleges to have invested more then it had promised when it bought 50% of the company [Entel] in 1996.

Telecom Italia has requested ICSID (International Center for Settlement of Investment Disputes), the World Bank's dispute resolution body, to intervene.

Over the past two years, Morales has nationalized the energy industrial sector and has extended the government's control over many other sectors of the economy.

Entel holds 80% of the long-distance telephone market and 70% of mobile services.

# REUTERS
Italia

⁝ THOMSON REUTERS

ULTIME NOTIZIE ⁝⁝ CONSIGLIO D'EUROPA IN ITALIA PER CHIARIMENTI SU NORME SICUREZZA

Siete qui:    Home > Ultime Notizie > Articolo

HOME

FINANZA E INVESTIMENTI

ULTIME NOTIZIE

Prima Pagina

Business

Internet e Technologia

Costume e Sport

Euro 2008

Prodotti e servizi
  Support

Informazioni sulla società



# Telecom trasferisce fondi di Entel da Bolivia a conti esteri

venerdì 16 maggio 2008 08:35

Stampa quest'articolo                                             [-] Testo [+]

LA PAZ, 16 maggio (Reuters) - Il governo della Bolivia ha detto che Telecom Italia (TLIT.MI: Quotazione) ha trasferito su conti esteri 90 milioni di dollari della controllata Entel, che la Bolivia ha recentemente nazionalizzato.

Il governo boliviano di centro-sinistra ha rilevato le attività di Entel e adesso è in causa con la compagnia di tlc italiana per trattare l'indenizzo post-nazionalizzazione.

"Ci aspettavamo una mossa del genere perché l'azionista (Telecom Italia) non ha mai tenuto fondi in Bolivia quando era a capo della società", ha detto il ministro dei Lavori pubblici boliviano Oscar Coca.

Coca non ha detto quando è avvenuto il trasferimento di denaro, ma ha detto che è una mossa "biasimevole" che peserà certamente sulle trattative in corso per l'indenizzo.

Entel non è stata disponibile per un commento.

Il governo di Evo Morales ha dichiarato di non dover pagare nulla a Telecom Italia, sostenendo che Telecom Italia non ha mantenuto gli impegni con gli investitori e che deve al governo 645 milioni di dollari di multe e tasse.

La compagnia italiana, invece, sostiene di aver investito più di quanto promesso, quando ha acquistato il 50% della società nel 1996.

Telecom Italia ha chiesto l'intervento del Ciadi (Centro internazionale per la risoluzione delle controversie relatice agli investimenti), l'organo di arbitraggio alla Banca Mondiale.

Negli ultimi due anni Morales ha nazionalizzato l'industria energetica e ha portato il governo a estendere il controllo su molti altri settori dell'economia.

Entel detiene l'80% del mercato telefonico a lunga distanza e il 70% dei servizi di telefonia mobile.

⁄ Thomson Reuters 2008 Tutti i diritti riservati a Reuters.

**Ads di Google**  Cosa sono?

Call Italy from USA 3c
No Any Fees nationwide local access Sign now Get hundreds minutes free
www.3longdistance.com

Bolivia Paraguay Partido
Vea Bolivia Contra Paraguay Partido Vea Eliminatorias 2010 Por internet
www.Jumptv.com/Copa-Mundial-2010

Bolivia
Vacanze a Bolivia? Confronta prezzi hotel & Rassegne.
www.TripAdvisor.it

Cheap Flights to Bolivia
Free Email Quotes from US Agents Specialized in Bolivia
www.DiscountAirfares.com

**it.reuters.com:**    Help & Info |  Contatti |  Pubblicità su questo sito

**Thomson Reuters Corporate:**    Copyright |  Disclaimer |  Privacy |  Lavorare in Reuters

**International Editions :**    Africa  |  Mondo Arabo  |  Argentina  |  Brasile  |  Canada  |  Cina  |  Francia  |  Germania  |  India  |  Italia  |  Gia
Spagna  |  Regno Unito  |  Stati Uniti

Thomson Reuters is the world's largest international multimedia news agency, providing investing news, world news, business news, technology news
stock market, and mutual funds information available on Reuters.com, video, mobile, and interactive television platforms. Thomson Reuters journalists
and disclosure of relevant interests.

## DECLARATION OF ACCURACY

I, Mariano Granato, hereby declare as follows:

I am fluent in Italian and English and the following is, to the best of my knowledge and belief, a true and accurate translation from Italian to English of the article titled "Telecom trasferisce fondi di Entel da Bolivia a conti esteri," dated May 16, 2008, from the Reuters Italia website, http://it.reuters.com/article/IT_WORLDNEWS/idITL1666224920080516 (last visited 6/19/2008).

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.  Executed on June 19, 2008.

Mariano Granato

# EXHIBIT 11

## Government Will Pay up to US$ 100 Millions for Entel

Nationalization. State administrator Joel Flores assumed control of the telephone company in La Paz. 11 changes in the executive ranks have been announced. The SIN [T.N.: National Taxation Service] froze accounts due to debts for Bs 434 millions. Internal tension.

### M. Chuquimia / J.C. Salinas

Few hours after announcing its nationalization by decree, the Government offered to pay the telephone company Eurotelecom no more than US$ 100 million for 100% of the shares of stock that it holds in the Empresa Nacional de Telecomunicaciones (Entel SA).

"We have created a trust fund to pay for the shares of stock that this firm held in Entel. We will pay, not a market price, but the book price, which is the real cost of this stock", asserted the Minister of the Presidency, Juan Ramón Quintana, who arrived yesterday in Santa Cruz de la Sierra.

He said that, for the Executive Branch, the total price of the Italian firm stock is between US$ 75 and US$ 100 million, but that an objective and true valuation of the cost of this stock will be available only after 60 days.

It should be remembered that, in 2006, the Government had started a negotiation process with Eurotelecom to buy its shares of stock. At that time, the Government was asked to pay US$ 170 million for the stock, but it refused to do so.

In the meantime, from La Paz, the Minister of Public Works and Utilities, Óscar Coca, explained that the first step will be to change 11 top rank executives —it was explained that these are the regional managers— who will ensure that services continue to be provided.

Coca said that the company could have been paralyzed yesterday if a state administrator had not been appointed and if the latter had not, in turn, appointed his most immediate collaborators.

He asserted that the new authorities will remain in office during the term of the intervention, which is 90 days, and then qualified personnel will be selected.

He also said that the job continuity of the workers is guaranteed; in fact, before starting their working day —at 8.00 am— the workers of Entel were summoned to a meeting in which they were informed that no dismissals would take place, but workers still expressed their concern. Coca said that, to prevent any change of staff, Decree 29944 was issued, guaranteeing stability on the job.

Asked about the changes, state administrator Joel Flores said that, for the time being, he will not make any internal changes until he has a new organizational structure.

Entel informed that, until last night, the multinational company Eurotelecom had not issued any official communication.

The workers insecurity was increased by the decision by the National Taxation Service (SIN) to freeze the Entel bank accounts.

The SIN President a.i., Marlene Ardaya, explained that this was requested of the Superintendence of Banks on April 29th as a coercive measure for the default on the payment of Bs 434 millions, considering fines and interest.

She said that the freezing was due, not only to the debt of the company, but also to all of the financial movements.

The debt started to accumulate in 2005, when the SIN established that irregularities existed in the distribution of the profits of the telephone company.

Minister Coca stated that the Government will not cancel this debt and that, in any case, the amount will be incorporated to the negotiations.

## Small Stockholders Talk of Total Uncertainty

Entel minor stockholders, who yesterday went to the offices located in the Ayacucho and Federico Suazo streets, were not able to get in or to gather any information because the police, who were guarding the facilities, forbade their entry; only officials were let in.

Edwin Jiménez, who owns 54 shares of stock, said that he was informed in the reception that he would be notified through "the press" of the call to the stockholders' meeting and that entry to the building was prohibited.

Jiménez expressed his concern that he does not know what will happen with people like him, who hold a small number of shares.

He asserted that the stockholders with an interest in this company are as many as one hundred. According to the Minister of Public Works and Utilities, Óscar Coca, the State had a 47% stake in the company and Eurotelecom had 50% of the stock; the remaining 3% belongs to the minor stockholders; the Minister said that the latter shall be called to be given an explanation of the process, and that nothing can happen, since the State already has the majority of the stock.

It was known off the record that, as from yesterday, once the state administrator assumed control of the telephone company, the communication unit of Entel was forbidden to issue any internal or external information without the authorization of the Superintendence of Telecommunications (Sittel) or of the state administrator.

Besides, the top executives of the company in La Paz unexpectedly found themselves on a collective vacation.

The services of Entel in Bolivia include 68% of long-distance telephone communications, 67% of mobile phone services (1.8 million users) and more than 90% of Internet services.

## Political Parties Podemos and UN Warn about a New Form of Control

The top authority of the Senate, Óscar Ortiz, noted that the issue of the appropriation of Entel is a matter of still deeper concern, since the telephone company can be used as an instrument to exercise political control over communications.

"With the pretext of a nationalization, this company can be used as an instrument of control, both of the media links and of communications between people", he stated.

Also expressing criticism, the head of the political party National Unity (*Unidad Nacional* – UN), Samuel Doria Medina, asserted that the nationalization of Entel will allow the government to control the media and any person by eavesdropping on their communications and even by spying on their e-mail.

**Numbers**
**Debt in Millions of Bs**
200 is the amount registered by the SIN as the debt of Entel. However, after adding interest and fines, the unpaid amount reaches Bs 434 million.

**Eurotelecom Stake**
50% is the stock of Entel held by Eurotelecom, according to the Minister of Public Works, Óscar Coca. 47% belongs to the state and 3%, to private individuals.

# EL DEBER.com.bo

    X

## Gobierno dará hasta $us 100 millones por la firma Entel

Nacionalización. El interventor Joel Flores tomó el mando de la telefónica en La Paz. Se anuncian 11 cambios de ejecutivos. El SIN congeló cuentas por un adeudo de Bs 434 millones. Hay tensión interna

**M. Chuquimia / J.C. Salinas**

A pocas horas de haber anunciado su nacionalización mediante decreto, el Gobierno ofertó pagar a la telefónica Eurotelecom no más de $us 100 millones por el 100% de sus acciones que tiene en la Empresa Nacional de Telecomunicaciones (Entel SA).

"Hemos constituido un fondo de fideicomiso para pagar las acciones que tenía esta firma en Entel. Pagaremos un precio no de mercado, sino el precio de los libros, que es el costo real por estas acciones", sostuvo el ministro de la Presidencia, Juan Ramón Quintana, que ayer llegó a Santa Cruz de la Sierra.

Indicó que para el Ejecutivo, el precio total de las acciones de la firma italiana oscila entre $us 75 y 100 millones. Pero que para tener una valoración objetiva y real del costo de estas acciones se tendrá que esperar 60 días.

Cabe recordar que en 2006, el Gobierno había iniciado una negociación con Eurotelecom para la compra de sus acciones. En ese entonces se pidió $us 170 millones por el paquete accionario, pero el Gobierno lo rechazó.

Por su lado, desde La Paz, el ministro de Servicios y Obras Públicas, Óscar Coca, explicó que el primer paso será cambiar a 11 altos ejecutivos -se explicó que son los gerentes regionales- que velarán por la continuidad de los servicios.

Coca dijo que la empresa podía quedar paralizada si ayer no se designaba a un interventor y éste a su vez no designaba a sus colaboradores más inmediatos.

Afirmó que las nuevas autoridades estarán en funciones mientras dure la intervención, que es de 90 días, y luego se hará la selección de personal calificado.

También dijo que la estabilidad laboral de los trabajadores está garantizada, de hecho, antes de iniciar la jornada -a las 8:00- los trabajadores de Entel fueron convocados a una reunión en la que se les informó de que no habría ninguna remoción de personal, pero los trabajadores no dejaron de expresar su preocupación.

Coca dijo que para descartar cualquier cambio de personal se emitió el Decreto 29944, que garantiza la estabilidad laboral.

Consultado sobre los cambios, el interventor Joel Flores precisó que por el momento no hará ningún movimiento interno en tanto no tenga una nueva estructura organizativa.

Entel hizo conocer que, hasta anoche, la multinacional Eurotelecom no emitió una comunicación oficial.

A la susceptibilidad de los trabajadores se sumó la decisión del Servicio de Impuestos Nacionales (SIN) de congelar las cuentas bancarias que tiene Entel.

La presidenta a.i. del SIN, Marlene Ardaya, explicó que la solicitud a la Superintendencia de Bancos fue realizada el 29 de abril como una medida coercitiva por el incumplimiento del pago de Bs 434 millones con multas e intereses. Dijo que la inmovilización no es sólo por la deuda de la empresa, sino de todo el movimiento financiero.

La deuda se inició en 2005 cuando el SIN estableció la existencia de irregularidades en la distribución de utilidades de la telefónica.

El ministro Coca, afirmó que el Gobierno no se hará cargo de esa deuda y que en todo caso el monto será incorporado a las negociaciones.

## Accionistas chicos hablan de incertidumbre total

Los accionistas menores de Entel, que acudieron ayer a las oficinas de la calle Ayacucho y de la calle Federico Suazo, no pudieron ingresar y tampoco recabar información porque la Policía que resguardaba las instalaciones prohibió el ingreso de los interesados; sólo era permitido el ingreso de los funcionarios.

Edwin Jiménez, quien posee 54 acciones de la empresa, dijo que en la recepción le informaron de que le comunicarían a través de 'la prensa' la citación a junta de accionistas y que era prohibido el ingreso.

Jiménez exteriorizó su preocupación porque no sabe qué pasará con personas como él, que tienen escasas acciones.

Afirmó que son un centenar los accionistas que tienen inversiones en esta empresa.

Según el ministro de Servicios y Obras Públicas, Óscar Coca, el Estado tenía una participación del 47% y Eurotelecom 50%, el 3% restante pertenece a los accionistas menores a quienes, dijo, citarán para explicarles el proceso y que no puede ocurrir nada puesto que el Estado ya tiene la mayoría de las acciones.

Se conoció extraoficialmente que desde ayer, una vez que el interventor Joel Flores tomó el control de la telefónica, se prohibió a la unidad de comunicación de Entel emitir información interna y externa sin el permiso de la Superintendencia de Telecomunicaciones (Sittel) o del interventor.

Además, de manera sorpresiva, los altos ejecutivos de la empresa en La Paz tuvieron vacación colectiva.

Entel presta servicios en Bolivia al 68% de la telefonía de larga distancia, el 67% de la telefonía móvil (1,8 millones de usuarios) y más del 90% de los servicios de Internet.

## Podemos y UN alertan sobre nuevo control

La primera autoridad del Senado, Óscar Ortiz, indicó que el tema de apropiación de Entel es aun más preocupante, ya que la empresa telefónica puede ser utilizada como un instrumento de control político sobre las comunicaciones. "Se puede utilizar con el pretexto de una nacionalización a esta empresa como un instrumento de control, tanto sobre los enlaces de los medios de comunicación, como sobre la comunicaciones entre personas", declaró.

En la misma línea crítica, el jefe de Unidad Nacional (UN), Samuel Doria Medina, afirmó que con la nacionalización de Entel el Gobierno podrá controlar a los medios de comunicación y a cualquier persona interviniendo sus comunicaciones e incluso sus correos electrónicos.



**Deuda en millones de Bs**
200
Es el monto que el SIN tiene registrado como adeudo de Entel. Sin embargo, sumados los intereses y multas la cifra impaga llega a Bs 434 millones.

**Participación de Eurotelecom**
50%
Es el paquete accionario que Eurotelecom, según el ministro de Obras Públicas, Óscar Coca, tiene en Entel. Un 47% es del Estado y un 3% es de privados.

 

## DECLARATION OF ACCURACY

I, Silvia Gil De Cwilich, hereby declare as follows:

I am fluent in Spanish and English and the following is, to the best of my knowledge and belief, a true and accurate translation from Spanish to English of the article titled "Gobierno dará hasta $us 100 milliones por la firma Entel," from the website of the Bolivian newspaper El Deber, http://www.eldeber.com.bo/2008/imprimir.php?id=080502233057, dated May 3, 2008 (last visited May 3, 2008).

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.  Executed on May 9, 2008.

_____
Silvia Gil De Cwilich

# EXHIBIT 12

**Economy. The Government and the Italian company ETI Eurotelecom Internacional NV have a two-month deadline to negotiate the amount of compensation**

# The State Recovers ENTEL

Through decree 29544, issued last Thursday, President Evo Morales forced the Italian company ETI Eurotelecom Internacional NV to transfer to the State all of the shares it held in the Empresa Nacional deTelecomunicaciones (ENTEL). The government ordered that the company should be preventively administered by the State for a three-month term.

The Italian company Stet purchased 50% of the shares of ENTEL in 1996, in the context of the program of capitalization/privatization of state companies launched by the administration of Gonzalo Sánchez de Lozada. Later, Stet transferred its shares to the Italian company ETI.

Supreme Decree 29544, issued during a mass gathering that took place in La Paz for the commemoration of the International Workers' Day, nationalizes the entire stock of ETI, including all the subsidiaries of ENTEL based in Bolivia and abroad.

The stock will be transferred to the State, and will temporarily be owned by the Ministry of Public Works, Services and Housing, until the legal nature of ENTEL is modified.

ENTEL SA must be transformed into a mixed corporation, as defined by the Commerce Code. To such effect, the shareholders' meeting will have to adjust the company's articles of incorporation and by-laws in the term of 180 calendar days as from May 1st of 2008.

The state will pay for the nationalized shares according to an appraisal of the company value to be carried out in no more than 60 days counted as from May 1st 2008. The Minister of Public Works, Oscar Coca, expects that the price negotiations with the company representatives will start next Monday. Investors will be compensated taking into account the investments made.

The financial, tax, labor, commercial and regulatory liabilities will be deducted once the final liquidation of the company has been effected, since the National Treasury took responsibility for all the liabilities of the public company ENTEL before its capitalization. The Superintendence of Telecommunications (SITTEL) issued Regulatory Administrative Decision RAR 2008/1056, which orders the preventive intervention of ENTEL by the State. The appointed state administrator, for a 90-day period, is Joel Flores Carpio.

The state administrator said that after the capitalization of ENTEL, a capitalist view of management prevailed which left almost no room for State participation. Now, the goal is to combine the vision of entrepreneurs, the dynamism of workers and a technological innovation process that may result in the improvement of the services provided.

The Superintendent of Telecommunications, Jorge Antonio Nava Amador, explained yesterday that the administrative and technical intervention by the state will by no means imply the interruption of the service.

The Government issued Supreme Decree N° 29543, which modifies the implementing regulations of the Telecommunications Act so that the interventions ordered by the Superintendence of Telecommunications may be more effective, free from ambiguity and widely applicable.

The dividends produced by the nationalized shares will be used for reinvestments, and for the company's technological development and growth, while the dividends of the shares recovered by the State through Supreme Decree N° 29101, dated April 23rd of 2007 will continue being used to engross the Dignity Fund [Translator's Note: In Spanish, *Fondo de la Renta Dignidad*, welfare benefit payable to all Bolivian senior citizens].

The Decree guarantees the job continuity of the workers of ENTEL. The contracts subscribed with third parties will remain in force, whereas the contracts with companies that have a relationship with ETI EUROTELECOM INTERNATIONAL NV will be analyzed on a case by case basis and will be ratified or annulled. The service provision or consulting services contracts subscribed with professionals or firms will remain in force as long as no legal incompatibilities exist.

### Reasons for the Nationalization

The decree that nationalizes ENTEL states that, in spite of existing legal provisions, ETI EUROTELECOM INTERNATIONAL NV never issued any shares for the Bolivian citizens, as a result of which the latter never received any dividends, nor did they participate or delegate their participation in the Board of Directors of the Shareholders' Meeting.

On the contrary, the company was decapitalized, since the Italian capitalists did not invest the amount they had promised and distributed profits among the shareholders by means of a voluntary capital reduction process.

The representatives of ETI accepted to negotiate the transfer of the shares to the State and held three meetings with government authorities, but then interrupted the negotiation process unilaterally.

President Morales asserted that his government made huge efforts to negotiate with the Italians for two years, but, regrettably, the private company showed no willingness to negotiate.

On April 23rd 2007, the government ordered that the shares belonging to the Bolivian citizens which were part of the ENTEL SA Collective Capitalization Fund [Translator's Note: in Spanish, *Fondo de Capitalización Colectiva*], managed by Futuro de Bolivia S.A. AFP and BBA Previsión AFP S.A, [Translator's Note: *AFPs*: Pension Fund Administration Companies] be transferred to the State for no consideration.

The Italian consortium sued Bolivia before the International Centre for the Settlement of Investment Disputes (ICSID) at the end of April 2007, a few days after the government had ordered two AFPs to transfer 47% of the stock of ENTEL to the State.

The government said it was willing to go to international trial about the nationalization of ENTEL. However, it reiterated that, according to articles 24 and 135 of the Political Constitution of the State, all the companies based in the country are considered to be Bolivian and are subject to the sovereignty, laws and authorities of the Republic.



14:47:08 Partidos políticos: La autonomía ilegal fomenta consultas ilegales y fragmenta a Tarija    14:49:18 Info económica: Pregu

    

www.admline.com

Username [        ]    Password [        ]    **Ingresar**    Nuevo registro | ¿Olvidó su contraseña?    Lunes, 16 de junio de 200

---

  El gobierno y la italiana ETI Eurotelecom Internacional NV tiene un plazo de dos meses para negociar la
  indeminización

# El Estado recupera ENTEL

Mediante el decreto 29544 promulgado este jueves, el
Presidente Evo Morales obligó a la empresa italiana
ETI Eurotelecom Internacional NV a transferir al
Estado todas sus acciones en la Empresa Nacional de
Telecomunicaciones (ENTEL). La compañía fue
intervenida preventivamente por un plazo de tres
meses.

 **5** min.

**Chicas de Bolivia**
Fotos y Perfiles de Chicas Solteras de Bolivia en tu
Bolivia-Dating.com

**Llamar a Bolivia**
Tarjetas telefonicas prepagas, accesos locales en
www.tarjetastelefonicas.com

**Tu Propia Empresa**
En Telecomunicaciones Larga Distancia y Calling
www.tconecto.com

**Chat Bolivia**
Haz Chat con Bolivianos que viven en tu Ciudad de
Hispano-Chats.com

---

### Otros artículos

- 05-06-2008: Papebol, Cartonbol y Lacteosbol comi
  en 2009
- 05-06-2008: Agroindustriales bolivianos aprenden
  biocombustibles
- 05-06-2008: En La Paz hay más empresas que en
- 20-05-2008: Soboce renueva convenio para vende
  precio solidario
- 20-05-2008: Ex ejecutivo de Entel ganaba 70 mil b
- 16-05-2008: Fino, IOL, Gravetal y Crisol autorizada
  aceite
- 02-05-2008: La capitalización del ENTEL: historia c
- 01-05-2008: El Estado recupera ENTEL

La empresa italiana Stet adquirió 50 por ciento de las acciones de ENTEL en 1996, en el marco c
capitalización-privatización de empresas estatales impulsado por el gobierno de Gonzalo Sáncl
Posteriormente, Stet transfirió sus acciones a la italiana a ETI.
El Decreto Supremo 29544, promulgado en una masiva concentración en La Paz al conmemorarse el Día
Trabajo, nacionaliza la totalidad del paquete accionario de ETI, incluyendo a todas las empresas subsidiar
Bolivia o en el extranjero.

El paquete accionario será transferido al Estado bajo la titularidad transitoria del Ministerio de Obras Púb
Vivienda, mientras se transforme la naturaleza jurídica de ENTEL.

ENTEL SA deberá ser transformada a la tipología sociedad anónima mixta, en el marco del Código de C efecto, la Junta de accionistas deberá adecuar sus normas constitutivas y estatutarias en el plazo de 180 días partir del 1 de mayo de 2008.

El Estado pagará por las acciones nacionalizadas en función de una valuación en un plazo no mayor a los del 1 de mayo de 2008. El ministro de Obras Públicas Oscar Coca espera que la negociación del representantes de la empresa comience este lunes. Los inversionistas serán compensados tomando inversiones realizadas.
<!--[if !supportLineBreakNewLine]--> <!--[endif]-->

Los pasivos financieros, tributarios, laborales, comerciales y regulatorios serán deducidos una vez q liquidación final a la empresa, toda vez que el Tesoro General de la Nación asumió todos los pasivos de la ENTEL antes de la capitalización.

La Superintendencia de Telecomunicaciones (SITTEL) emitió la Resolución Administrativa Regulatoria disponiendo la intervención preventiva de ENTEL. Fue posesionado como interventor Joel Flores Carpio de 90 días.

El interventor dijo que luego de la capitalización de ENTEL primó una visión capitalista de admini preponderancia a la participación del Estado. Ahora el objetivo es combinar la visión de emprendedores, los trabajadores y una innovación tecnológica que dé como resultado el mejoramiento de los servicios.

El Superintendente de Telecomunicaciones Jorge Antonio Nava Amador explicó que la interve administrativa en ningún caso significará la interrupción de los servicios.

El gobierno emitió el Decreto Supremo N 29543 que modifica el reglamento de la Ley de Telecomunic permitir que las intervenciones dispuestas por la Superintendencia de Telecomunicaciones sean más efi sujetas a ninguna ambigüedad, y que sean de aplicación general.

Los dividendos que generen las acciones nacionalizadas serán destinados a la reinversión, el desarrollo crecimiento de la empresa, en tanto que los dividendos que corresponden a las acciones recuperadas p Decreto Supremo No. 29101 de 23 de abril de 2007 continuarán siendo destinadas al Fondo de la Renta Di

El Decreto garantiza la continuidad laboral de los trabajadores de ENTEL. Los contratos suscrit continuarán vigentes, mientras que los contratos con empresas vinculadas a ETI EUROTELECOM INTE serán analizados caso por caso para ser ratificados o dejados sin efecto. Los contratos de prestación de consultoría suscritos con profesionales o firmas continuarán vigentes siempre y cuando no existan ind legales.

**Razones de la nacionalización**

El decreto de nacionalización de ENTEL recuerda que pese a la existencia de disposiciones legales, EUROTELECOM INTERNATIONAL NV nunca emitió acciones a favor de los ciudadanos bolivianos, por recibieron dividendos ni participaron o delegaron su presencia en el Directorio de la Junta de Accionistas.

Al contrario, se produjo una descapitalización de la empresa porque los capitalistas italianos no invir prometido y distribuyeron ganancias entre los accionistas a través de un proceso de reducción voluntaria o

Los representantes de ETI aceptaron negociar la transferencia de las acciones al Estado y participaron e con autoridades de gobierno, pero luego interrumpieron unilateralmente las reuniones.

El Presidente Morales aseguró que su gobierno trató de negociar con los italianos durante dos años h esfuerzos, pero lamentablemente no hubo voluntad en la parte privada.
<!--[if !supportLineBreakNewLine]--> <!--[endif]-->

El 23 de abril de 2007, el gobierno dispuso que las acciones de los ciudadanos bolivianos que forman pa Capitalización Colectiva en ENTEL SA, administradas por Futuro de Bolivia S.A. AFP y BBA Previsió transferidas al Estado a título gratuito.

El consorcio italiano demandó a Bolivia ante el Centro Internacional de Arreglo de Diferencias Relativ

(CIADI) a fines de abril de 2007, días después de que el gobierno ordenara a dos AFPS transferir al Esta de las acciones de ENTEL.
<!--[if !supportLineBreakNewLine]--> <!--[endif]-->

El gobierno dijo estar dispuesto a asumir un juicio internacional por la nacionalización de ENTEL. Sin e que de acuerdo a los artículos 24 y 135 de la Constitución Política del Estado, todas las empresas establec: consideran nacionales y están sometidas a la soberanía, leyes y autoridades de la República.

| Tu Propia Empresa | Beautiful Bolivia Girls |
|---|---|
| En Telecomunicaciones Larga Distancia y Calling Cards | Latin Dating And Personals Site. Browse Photo Profiles. Join Free! |

Volver atrás

## <u>DECLARATION OF ACCURACY</u>

I, Silvia Gil De Cwilich, hereby declare as follows:

I am fluent in Spanish and English and the following is, to the best of my knowledge and belief, a true and accurate translation from Spanish to English of the article "El Estado recupera ENTEL" from the newspaper <u>Bol Press</u>, dated May 1, 2008.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on June 19, 2008.


Silvia Gil De Cwilich

# EXHIBIT 13

El Diario
May 29, 2008

**Restraining Order on Entel Accounts Lifted**

(ANF). The restraining order that banned transactions on the bank accounts of Empresa
Nacional de Telecomunicaciones (Entel) was revoked yesterday, according to a report.

The bank accounts of the telecommunications company, which was nationalized on
May 1, had been frozen at the request of the National Revenue Service, due to a tax debt
of Bs 434 million.

It was reported that the suspension of the restraining order was granted after the current
authorities of the company provided a payment commitment, in addition to a
prepayment amounting to approximately Bs 60 million.

When asked about this particular, Interim President of the National Revenue Service
Marlene Ardaya said the restraining order had been lifted, but refrained from any further
comments, based on article 67 of the Tax Code.

Entel's accounts were frozen on Friday May 2, one day after nationalization was
announced and the Interventor took office, pursuant to article 108 of Law 2492 (Tax
Code).

The account freeze request was filed with the Bank and Financial Institution
Superintendence on April 29.

The principal of the tax debt initially amounted to 200 million Bolivian pesos. Plus
costs, penalties and interest, the debt rose to 434 million Bolivian pesos.

**El Diario**

29-MAG-2008

Diffusione: n.d.    Lettori: n.d.    da pag. 1

## Levantan medidas coactivas sobre las cuentas de Entel

(ANF).- Las medidas coactivas que impedían el movimiento económico de las cuentas bancarias de la Empresa Nacional de Telecomunicaciones (Entel) fueron levantadas ayer, según se informó.

Las cuentas bancarias de la empresa de telecomunicaciones, que fue nacionalizada el primero de mayo, fueron congeladas por solicitud del Servicio de Impuestos Nacionales, debido a un adeudo tributario de 434 millones de bolivianos.

Según se conoció, la suspensión fue posible luego de un compromiso de pago, por parte de las actuales autoridades de la entidad, además de un adelanto de aproximadamente 60 millones de bolivianos.

Consultada sobre el tema la presidenta interina del Servicio de Impuestos Nacionales, Marlene Ardaya, respondió que se habían levantando las medidas coactivas, pero evitó ampliar la información, apelando al artículo 67 del Código Tributario.

Las cuentas de Entel fueron congeladas el viernes 2 de mayo, un día después del anuncio de nacionalización y de la posesión del interventor, en cumplimiento del artículo 108 de la Ley 2.492 (Código Tributario).

La solicitud de congelamiento de cuentas, a la Superintendencia de Bancos y Entidades Financieras, se presentó el 29 de abril.

La deuda tributaria inicial era de 200 millones de bolivianos, que con accesorios, multas e intereses subió a 434 millones de bolivianos.


data
stampa

## DECLARATION OF ACCURACY

l, Silvia Gil De Cwilich, hereby declare as follows:

I am fluent in Spanish and English and the following is, to the best of my

knowledge and belief, a true and accurate translation from Spanish to English of the article

titled "Levantan medidas coactivas sobre las cuentas de Entel," from the Bolivian

newspaper El Diario, dated May 29, 2008.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing

is true and correct. Executed on June 9, 2008.


Silvia Gil De Cwilich

# EXHIBIT 14

La Prensa.com - May 16th. 2008

## The Government Asserts That Euro Telecom Has Accepted The New Rules

The Government is certain that Euro Telecom International, former majority shareholder of the Empresa Nacional de Telecomunicaciones (ENTEL) has accepted the "nationalization" and now intends to obtain the highest price for its shares, a value that will have to be negotiated, according to the Minister of Public Works, Oscar Coca.

The official also asserted that the U$S 90 million attached in ENTEL accounts overseas will "easily be recovered" since the company is "highly profitable and its financial flow will immediately go back to normal"; the return rate is 44 percent.

**PRICE NEGOTIATION:** "No debate exists any longer about the management of Entel. At present, the only goal of the company is to set the price of its shares", the official pointed out. "This basically means that the majority shareholder accepts the new state of affairs". As regards the price, the Minister claimed that "there is no definite price at present" and that no offer of U$S 100 million dollars was made, since it will be at the Shareholders' Meeting that the Government will develop its strategy to negotiate with the European company.

"Now, the only thing that remains for the company to do is, obviously, to obtain the highest possible amount for its shares, and this we are going to negotiate".

Regarding a possible complaint by ETI against the Bolivian Government, the Minister stated: "We have not been formally notified yet", but anyway "we will put forward that the complaint process should take place in Bolivia, since ENTEL is a Bolivian company".

**COVERAGE:** Furthermore, regarding the services to be expanded by ENTEL, the Minister of Public Works informed that U$S 30 million will be invested in expanding services to the rural area, since "the countryside lacks enough information coverage," as regards both public telephone booths and cell phones, for "there are places where no signal is available" or where TDMA, an "analogical technology", is "still" used. "ENTEL had the duty to make the investments", but "has not made them," remarked Coca, and stated that "when ENTEL was capitalized, the private company received last generation technology, and now we are recovering the company with a very low technological level".

As regards rates, Coca assured that "this issue has to be considered by the Superintendence and we wish to highlight that telecommunication rates are subject to another procedure; this is regulated; it is standardized".

At the moment, ENTEL is still a business corporation in which the Bolivian Government is the majority shareholder, but it is not within its scope to set the rates; this is an issue to be settled by the Superintendence", he pointed out in concluding his speech.

[Translator's Note: in the original, the opening quotation mark in the last paragraph is missing.]



**LA PRENSA**

ÚLTIMAS NOTICIAS
NEGOCIOS

La Paz - Bolivia, Viernes, 16 de may de 2008

12 ºC

Dolar: 7.3.
Euro : 11.181
UFV: 1.347

## Negocios

18:28 El boliviano
mantiene su valor frente
al dólar

18:28 Precio de cobre
sube un 0,8% pese a leve
alza de reservas en
bolsas del mundo

17:50 Gobierno asegura
que Euro Telecom aceptó
las nuevas reglas

17:45 Gobierno ofrece
rebajar impuesto a
petroleras mientras
dialogan

17:38 Empresas de EE.UU.
y España debaten cómo
aumentar sus inversiones

17:08 CEPAL prevé región
crezca 4,5 por ciento,
pese a informe
discrepante de ONU

15:44 EE.UU. suspende
compras de crudo para su
Reserva Estratégica

15:43 Inversiones mineras
en Argentina disparan
importaciones de equipos

11:06 Wall Street en baja
al continuar alza del
crudo

11:03 Países UE acuerdan
recurrir contra dictamen
OMC favorable Ecuador
por banano

10:47 Piden UE elimine
subvenciones a
biocombustibles para
bajar precios alimentos

10:37 ONU: Economía
mundial al borde de una
grave declinación

10:28 General Electric
dispuesto a vender o
segregar su unidad de
electrodomésticos

09:25 Construcción de
casas en abril registra
mayor subida en dos años
en EE.UU.

## Gobierno asegura que Euro Telecom aceptó las nuevas reglas

16-05-2008 - 17:50 h.

⊕ 1 Luma Gratis Desde USA
A Tu País: Mexico. Perú, Ecuador Guatemala y más
destinos.

Partidos de Fútbol - ViVO
Vea las Eliminatorias Sudamericanas al Mundial Sudáfrica
2010 Online!

10 tonos sin recargo
Canciones de tus artistas favoritos Juanes, Shakira, Don
Omar y más

Mexico Futbol
Todas las noticias sobre deportes y deportistas en Terra.
¡Informate!

Anuncios Google

La Paz | ANF

El gobierno está seguro
que Euro Telecom
International, ex socia
mayoritaria de la Empresa
Nacional de
Telecomunicaciones
(ENTEL) aceptó la
"nacionalización" y ahora
tiene como objetivo
conseguir el mayor precio
por sus acciones, para lo
cual se deberá negociar
ese valor, según indicó el
ministro de Obras
Públicas, Oscar Coca.

La autoridad también aseguró que los 90 millones de dólares congelados en
cuentas de ENTEL fuera del país "van a ser fácilmente restituidos", puesto que la
empresa "es altamente rentable y su flujo financiero inmediatamente se va a
reacomodar", la tasa de rentabilidad es de 44 por ciento.

NEGOCIACIÓN POR PRECIO "Ya no hay discusión sobre la gestión de ENTEL, ellos
ahora sólo están en un afán de establecer un determinado valor sobre sus
acciones", por lo que "en el fondo eso quiere decir que el accionista mayoritario
acepta la nueva realidad", puntualizó la autoridad. Respecto al precio el Ministro
aseguró que "no hay un precio en este momento", tampoco se ofrecieron 100
millones de dólares, puesto que en la Junta de Accionistas el gobierno va a
plantear su estrategia de negociación con los europeos.

Ahora "lo único que les queda a ellos es, obviamente, tratar de sacar el mayor
valor posible de sus acciones y esto lo vamos a negociar", aseguró.

En cuanto a una posible demanda por parte de ETI contra el gobierno boliviano, el
Ministro aseguró: "Todavía no nos ha llegado de manera formal", pero de todas
maneras "nosotros vamos a plantear que se lleve acá en Bolivia, porque ENTEL es
una empresa boliviana".

COBERTURA Por otro lado, respecto a los servicios que ampliará ENTEL, el Ministro
de Obras Públicas informó que se invertirán 30 millones de dólares en la expansión
al área rural, puesto que "el país no tiene la suficiente cobertura de información"
tanto en cabinas públicas como en telefonía móvil, puesto que "hay lugares donde
no entra la señal" o utilizar TDMA que es "tecnología todavía analógica". "ENTEL
tenía la obligación de hacer las inversiones", pero "no las ha hecho", remarcó Coca
al asegurar que "cuando se capitalizó ENTEL la tecnología que se les ha otorgado a
ellos era de última generación y hoy día que las estamos recuperando en
tecnología es tan mínima".

Respecto de las tarifas, Coca aseguró que "es un asunto que tiene que ver la
Superintendencia y queremos señalar que las tarifas de telecomunicación tiene
otro procedimiento, esto está regulado, está normado".

En este momento, ENTEL sigue siendo una sociedad anónima con mayoría del
Estado boliviano, pero no le corresponde fijar las tarifas, éste es un asunto que la
Superintendencia debe fijar", puntualizó al concluir.

**Anuncios Google**

## Noticias
Encuentra todas las
noticias de actualidad en
Terra. Ingresa ahora!
www.Terra.com/noticias

## Negocio Rentable
Gana $6000 usd como
Dueño de una
Distribuidora de
Productos Lideres
www.negocio-redituable.com

## Necaxa Tonos Para
Celular
Carga Necaxa tonos y
melodias para celulares
sin cargo alguno.
TonosParaCelularGratis.net

## Chicas en Autos
Chicas bellas en Autos
alucinantes
www.AutoCity.com

## Lo Viste en la
Televisión
Inglés Sin Barreras® -
Pruébalo ya Para Toda la
Familia - Info Gratis!
InglesSinBarrerasHoy.com

© 2007 - LA PRENSA - EDITORES ASOCIADOS S.A.
Derechos Reservados ®

## DECLARATION OF ACCURACY

I, Silvia Gil De Cwilich, hereby declare as follows:

I am fluent in Spanish and English and the following is, to the best of my knowledge and belief, a true and accurate translation from Spanish to English of the article titled "Gobierno asegura que Euro Telecom aceptó las nuevas reglas," from the newspaper La Prensa, dated May 16, 2008.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on June 13, 2008.


Silvia Gil De Cwilich