Ronald E.M. Goodman (RG 6698)
Paul S. Reichler
Janis H. Brennan
FOLEY HOAG LLP
1875 K Street, NW
Suite 800
Washington, DC  20006-1238
202.223.1200
*Counsel for Defendant the Republic of Bolivia*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

————————————————————————
)
E.T.I. Euro Telecom International, N.V.,   )
)
)
            Plaintiff,    )
)
)
      v.    )
)
Republic of Bolivia and    )
Empresa Nacional de Telecomunicaciones    )
ENTEL S.A.,    )
)
)
            Defendants.    )
————————————————————————

CIVIL ACTION NO.
08-cv-4247 (LTS/FM)

**ORAL ARGUMENT REQUESTED**

**SUR-REPLY MEMORANDUM OF THE REPUBLIC OF BOLIVIA IN OPPOSITION
TO PLAINTIFF'S MOTION TO CONFIRM *EX-PARTE* ORDER OF ATTACHMENT**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   ARGUMENT ......................................................................................................2

      A.   BOLIVIA AND ENTEL ARE BOTH ENTITLED TO SOVEREIGN IMMUNITY. ...2

           1.   BOLIVIA ITSELF IS UNDENIABLY ENTITLED TO SOVEREIGN
                IMMUNITY ............................................................................................3

           2.   ENTEL IS ALSO ENTITLED TO SOVEREIGN IMMUNITY............................3

      B.   EVEN IF ENTEL DOES NOT HAVE SOVEREIGN IMMUNITY, ITS ASSETS
           MAY NOT BE ATTACHED..............................................................................10

      C.   HAVING CHOSEN TO PROCEED AT ICSID, PLAINTIFF CANNOT ESCAPE
           THAT FORUM'S EXCLUSIVITY. ....................................................................12

III.  CONCLUSION ................................................................................................15

## I.    __INTRODUCTION__

Plaintiff ETI's Reply brief does not revive its moribund case.  The assets concerning
which ETI improperly secured an *ex parte* attachment from Judge Chin are sovereign property
immune from attachment under the FSIA.  Nothing contained in Plaintiff's Reply can or does
change this basic fact.  ETI's Motion to Confirm should therefore be denied, and the attachment
of Defendant Entel's bank accounts dissolved forthwith.

Plaintiff's Reply brief is stunning in its inconsistency with its prior pleadings.  Both
ETI's Complaint and its opening memorandum in support of its Motion to Confirm are
predicated on the fact that Bolivia fully expropriated its equity interest in Entel.  Plaintiff's
opening memorandum, for example, directly states: "[T]hrough its recent issuance of the
nationalization Decree [Bolivia] has done more than impair ETI's lawful operation and
management of Entel - it has expropriated ETI's property altogether."  (Br. at 18.)  Yet,
confronted now with Defendants' showing that the very nationalization about which ETI
complains renders Entel an "agency and instrumentality" of Bolivia, ETI reverses course and
argues that it retains its equity interest in Entel.  Why?  Because ETI still has its share certificate.

The Court should not permit such transparent gamesmanship.  ETI can and must be held
to its prior judicial admissions (which are factually and legally correct).  Even setting its
admissions aside, ETI's possession of its share certificate is irrelevant.  Whether considered
under U.S. or Bolivian law, Bolivia is now the majority shareholder of Entel.  That being so,
Entel is an agency or instrumentality of Bolivia entitled to sovereign immunity.

Quite apart from the fact that Entel is an agency and instrumentality of Bolivia, ETI's
Motion to Confirm can and must be denied for the alternative reason that the attached Entel bank
accounts do not belong to Bolivia, the lone respondent in the International Centre for Settlement
of Investment Disputes ("ICSID") arbitration in aid of which ETI purports to be acting.  In its

Reply, ETI tries to circumvent this inconvenient truth by arguing -- for the first time -- that under CPLR § 6214(a) it may still attach Entel's accounts because the company owes Bolivia a tax debt. Unfortunately for ETI, however, this new argument founders on the fact that Bolivia's interest in the Entel accounts is a sovereign interest. It is no more subject to prejudgment attachment than an account held in Bolivia's name directly.

Finally, above and beyond the two reasons just stated, there is yet a third reason Plaintiff's Motion to Confirm should be denied: Plaintiff's choice of forum, ICSID, expressly precludes parallel proceedings in national courts. The overwrought estoppel and waiver arguments based on Bolivia's putative rejection of ICSID Plaintiff presents in its Reply are both factually incorrect and legally irrelevant. Bolivia here affirms that it has not refused to appear in the ICSID arbitration, and that it has no intention of abandoning those proceedings, through which it is entitled to present its jurisdictional and other defenses to the arbitrators. But even without that, Plaintiff's argument would still fail. Plaintiff's own depiction of events demonstrates that ETI selected the ICSID forum with full knowledge of Bolivia's stated intent to withdraw from the Convention. Even so, it moved forward with arbitration in that forum. Having sought the benefits of ICSID arbitration, it may not now shirk its voluntarily assumed obligations incident to that choice.

## II.  ARGUMENT

### A.  BOLIVIA AND ENTEL ARE BOTH ENTITLED TO SOVEREIGN IMMUNITY.

Among the more notable features of Plaintiff's opening memorandum was its wholesale disregard for the FSIA. Neither in its Complaint nor in its opening memorandum does ETI even mention the Act, much less analyze its application to this case. Plaintiff's omission is particularly glaring given that the FSIA constitutes the sole basis for establishing subject matter

jurisdiction over foreign states in United States courts.  *Saudia Arabia v. Nelson*, 507 U.S. 349, 355 (1993).

In its Reply, Plaintiff attempts to rectify its oversight and argues that the attachment it seeks to confirm is consistent with sovereign immunity principles.  Before delving further into the relative merits of that argument, however, it is important to note what ETI does *not* argue.  In particular, it does not argue that any statutory exception to sovereign immunity applies in this case.  Instead, its argument turns entirely on the (erroneous) contention that Entel is not an "agency or instrumentality" of Bolivia entitled to sovereign immunity.  Accordingly, if Plaintiff is wrong about this threshold fact (which it is), the case is over.  No further inquiry or analysis is required to deny ETI's motion and dissolve the attachment.

    *1.   Bolivia Itself Is Undeniably Entitled to Sovereign Immunity.*

Plaintiff's Reply sensibly makes no argument that the Republic of Bolivia is not entitled to sovereign immunity because, of course, it is.[1]  As ETI's Complaint states:  "Defendant Bolivia is a sovereign nation."  (Compl. ¶ 6.)  Bolivia's sovereign immunity has important consequences.  Under Section 1610(d) of the FSIA, prejudgment attachment of a foreign state's assets is not permitted unless "the foreign state has explicitly waived its immunity from attachment prior to judgment ...."  28 U.S.C. § 1610(d)(1).  ETI makes no argument that Bolivia has waived its immunity from attachment here; Bolivia's assets therefore retain their full immunity.

    *2.   Entel Is Also Entitled to Sovereign Immunity.*

The sole aim of Plaintiff's sovereign immunity argument is to show that Entel is not an agency or instrumentality of Bolivia, and therefore not a "foreign state" within the meaning of

---

[1] In addition to lacking subject matter jurisdiction, the Court also lacks personal jurisdiction over Bolivia under the FSIA, the United States Constitution and New York Law for the reasons stated in Entel's Sur-reply.

the FSIA. The Parties agree that to be an agency or instrumentality, the entity must (1) be a separate legal person; (2) be majority-owned by a foreign state, and (3) not be a citizen of the United States. 28 U.S.C. § 1603(b). The only one of these requirements in dispute is the second; that is, whether Entel is majority-owned by Bolivia. As Bolivia will demonstrate below, it is.

ETI attempts to refute the fact that Bolivia now holds a majority interest in Entel by claiming that it still "has possession of the share certificate evidencing its ownership" of 50% of Entel. (Reply at 8.) According to Plaintiff, this means that "ETI, not Bolivia, owns the stock" (*id.*) because "Bolivian law dictates that ownership of a share certificate is transferred only when … (1) the certificate is endorsed to the transferee; and (2) the endorsement is recorded in the registry of the relevant corporation." (*Id.* at 9.) This argument fails for several reasons, not the least of which is that it flatly contradicts ETI's repeated judicial admissions.

Both Plaintiff's Complaint and its opening memorandum are squarely premised on the fact that Bolivia fully expropriated (past tense) ETI's equity interest in Entel. The Complaint, for example, contains the following statements of fact:

- "This is an action for an order of attachment in aid of arbitration with respect to assets expropriated without compensation by the Republic of Bolivia." (Compl. ¶ 1);
- "Bolivia has expropriated ETI's equity interest in Entel …." (*Id.*);
- "The Bolivian government has not paid anything to ETI for this valuable asset, which it has now taken by force." (*Id.*);
- "This appears to be nothing more than a predicate for paying nothing for the expropriated shares." (*Id.* ¶ 29);
- "… Bolivia has breached the express terms of its BIT with the Netherlands by expropriating ETI's interest in Entel without compensation …." (*Id.* ¶ 35); and
- "… Bolivia has repeatedly stated that no compensation will be paid to ETI for the expropriated Entel shares …." (*Id.* ¶ 36).

ETI's opening memorandum contains many similar statements, including, for instance:

- "[O]n May 1, 2008, the President of Bolivia signed and then publicly proclaimed a 'Supreme Decree' immediately nationalizing ETI's shares in Entel." (Br. at 2);

- 4 -

- "[T]hrough its recent issuance of the Nationalization Decree [Bolivia] has done more than impair ETI's lawful operation and management of Entel - it has expropriated ETI's property altogether." (*Id.* at 18);

- "Given that the nationalization Decree, in President Morales's words of May 1, takes over Entel 'from this moment on,' there is no doubt, if there ever was, that ETI has suffered an expropriation of its investment in Entel." (*Id.* at 19); and

- "ETI's arbitration claim against Bolivia seeks redress for that country's expropriation of a company valued in the hundreds of millions of dollars." (*Id.* at 21).

ETI's revised position that it retains its interest in Entel cannot be reconciled with these prior statements of fact, all of which constitute judicial admissions. *See Allianz Ins. Co. of Canada v. Structure Tone (UK), Inc.*, 2005 WL 2006701, *5 (SDNY 2005) ("The allegations in the complaint are judicial admissions by [Plaintiff], and [it] is bound by them.") Having admitted that Bolivia "has expropriated ETI's property altogether" (Br. at 18), Plaintiff does not get to contradict itself now. Judicial admissions, of course, are binding concessions that take the issue away from the fact-finder. *United States v. A Motion Picture Film Entitled 'I am Curious-Yellow,'* 285 F. Supp. 465, 470 (SDNY 1968) (judicial admissions are "formal intentional admissions of facts made in pleadings or in court [which] are not evidence but rather they obviate the need for the production of evidence on the particular point admitted"). The important policy purpose of holding parties to their judicial admissions is obvious: "judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible." *Soo Line R.R. Co. v. St. Louis Southwestern Ry. Co.*, 125 F.3d 481, 483 (7th Cir.1997). Since Plaintiff previously admitted that "Bolivia has expropriated ETI's equity interest in Entel," its current argument that it, "not Bolivia, owns the stock" can and must be rejected without further inquiry. Accordingly, there can be no dispute either that Entel is entitled to sovereign immunity as an "agency or instrumentality" of Bolivia.

Even if ETI were permitted to escape the consequences of its prior representations to the Court, the result would be no different whether the issue were considered under what ETI calls

"federal common law" or Bolivian law.  In all cases, ETI's mere retention of its share certificate would be insufficient to establish its actual ownership of the Entel shares.[2]

Turning first to so-called "federal common law," ETI devotes a significant amount of energy to arguing that the Supreme Court actually decided this very issue in *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003).  According to ETI, *Dole* stands for the proposition "that only direct ownership of a majority of shares by the foreign state satisfies the statutory requirement." (Reply at 8 (citing *Dole* at 474).)  Although Plaintiff's quotation from *Dole* is accurate, it is taken entirely out of context.  Placed in context, it is clear that the Court's words are irrelevant to this case.  The issue in *Dole* was whether a wholly owned subsidiary of a corporation that was itself majority owned by a foreign state could be deemed an agency or instrumentality of that state. The Supreme Court held that it could not; only corporations *directly held* by the foreign state itself are agencies or instrumentalities.  This, of course, has no bearing on the question here; that is, whether the mere possession of a share certificate is determinative of actual ownership.

In fact, the prevailing rule at common law (whether federal or state) is that actual ownership is not determined by the mere fortuity of who happens to have the stock certificate. At best, possession of a stock certificate constitutes *evidence* of ownership, but it is not determinative of the issue.  One of Plaintiff's own cases makes the point clearly.  In *Smith v. Universal Services Motors*, 147 A. 247, 248 (Del. 1929), the Delaware Court of Chancery stated: "The status of stockholder in a corporation is not dependent on the issuance to him of a certificate of stock.  The certificate is only an evidence of ownership -- a muniment of title."  *See also Peets v. Manhasset Civil Eng'rs, Inc.*, 68 N.Y.S.2d 338, 344 (Sup. Ct. 1946) ("The

---

[2] The consequences of ETI's argument bear noting.  If Plaintiff is correct, a company could prevent a sovereign nation from consummating its nationalization of an enterprise through the simple expedient of refusing to turn over its share certificate.  The absurdity of that position speaks for itself.

certificate of the corporation for the shares, or the stock certificate, is not necessary to the

existence of the shares or their ownership.  It is merely the written evidence of those facts").

        Not surprisingly, actual ownership is determined by the underlying reality.  In *Davis v.*

*Commissioner of Internal Rev.*, 32 B.T.A. 943 (1935), for example, the Board of Tax Appeals

addressed the question of whether, for federal tax purposes, the date of distribution of certain

stock was the date of a state probate court decree ordering the distribution or the date the stock

certificates were actually delivered.  The court readily concluded it was the former, holding:  "A

certificate of stock merely evidence ownership, it is not the stock itself.  If certificates

representing the shares of stock distributed to these petitioners had never been delivered to them

by the executors, they would nevertheless have been the owners of interests in the respective

corporations from [the date of the decree]."  32 B.T.A. at 946.  Similarly, in *United States v.*

*Merchants Nat'l Trust & Savs. Bank*, 101 F.2d 399 (9th Cir. 1939), the 9th Circuit held that a

statutory transfer of stock occurs at the instant the law dictates without regard to the endorsement

and/or surrender of the physical stock certificates.  101 F.2d at 403.

        Here, the underlying reality is clear.  Pursuant to Supreme Decree No. 29544 dated May

1, 2008, Bolivia immediately acquired title to Entel by operation of law when it nationalized its

stock.  Moreover, pursuant to the nationalization decree, Bolivia took physical possession of

Entel's premises and its assets on May 1, 2008, replaced Entel's management and immediately

began operating the company.  (Compl. ¶¶ 27, 31.)  As of that date, it owned Entel.  In its Reply,

Plaintiff argues that the nationalization decree did not become effective immediately.  (Reply at

11.)  This is yet another example of ETI contradicting its prior judicial admissions.  In both its

Complaint and its opening memorandum, ETI expressly stated that the nationalization decree

"became immediately effective."  (Compl. ¶26; Br. at 10.)  This admission may not be retracted

- 7 -

now. At any rate, the terms of the decree are clear on their face: "The stock of the capitalizing

company ETI Eurotelecom International NV *is hereby nationalized* in its entirety ...."

(Emphasis added.)

Turning to Bolivian law, the analysis is somewhat different, but the result is just the

same. Plaintiff's argument that ownership of a share of stock is not transferred until the

certificate is endorsed confuses two distinct concepts under Bolivian law: expropriation and

nationalization. In cases, as here, of nationalization, the transfer of the nationalized asset is

effected pursuant to the terms of the nationalization decree. As stated at paragraph 14 of the

affidavit of Ms. Maria Cecilia Rocabado, submitted with Entel's Sur-reply:

> Clearly, when a nationalization occurs, as opposed to a purchase and sale, or
> even an expropriation, a voluntary act of the prior owner of the nominative
> share is not needed or contemplated, and, therefore, it is not and cannot be a
> legal requirement that the prior owner endorse and deliver the share certificate
> to the State. By the same token, the exercise of national sovereignty through
> nationalization is not and cannot be made dependent on the actions of private
> shareholders endorsing share certificates. Nevertheless, because of the
> immediate legal effect of the Supreme Decree ordering the nationalization, the
> title to the nationalized property transfers immediately to the State.

Moreover, ETI is simply wrong that Bolivian law requires the return of an endorsed share

certificate to effect a transfer of the prior holder's interest. In fact, the Commercial Code

explicitly contemplates the transfer of shares without the return of the prior share certificate. In

particular, Article 521 provides that when a transfer occurs by means other than the endorsement

of the share certificate, the acquiree not only has all rights as a shareholder but also may demand

of the company that it deliver a new certificate to him. As Ms. Rocabado states (at ¶20):

> That is exactly what happened with Supreme Decree No. 29544. Pursuant to
> that Supreme Decree, the transfer of the shares formerly held by E.T.I. were
> nationalized and then transferred to the Ministry by virtue of the authority of the
> Supreme Decree – this is a transfer by means other than endorsement.

Even taking the terms of Article 524, on which Plaintiff, relies on its own terms, it is clear that it does not mean that ETI retains ownership of the Entel shares. As Ms. Rocabado discusses (at ¶ 23), that provision provides that the transfer is "perfected" by the endorsement but is "effective" vis-à-vis the company and third parties as of registration in the share registry.[3] Because, pursuant to the May 1 nationalization decree, the shares were recorded in ENTEL's Share Registry as being owned by the Ministry of Public Works, Services and Housing as of May 2, 2008, the transfer is clearly effective vis-à-vis the company and third parties.[4]

Finally, even if U.S. and Bolivian law were not so clear, and did not lead to exactly the same conclusion, ETI's case would still fail. Under the Act of State doctrine, Bolivia is the sole judge of the validity of its actions. As the Supreme Court stated in *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964): "The act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." In *Banco de España v. Federal Reserve Bank of N.Y.*, 114 F.2d 438 (2d Cir. 1940), for example, the Second Circuit refused to pass upon the validity of the Spanish government's acquisition of title to a large quantity of silver acquired by secret government decree. The Court held that

> the question of the validity under Spanish law of the secret decree, or of any
> other step in the purported acquisition of title to the silver by the Spanish
> government, is not open to question by us. ... It has been squarely held that the
> courts of this country will not examine the acts of a foreign sovereign within its
> own borders, in order to determine whether or not those acts were legal under
> the municipal law of the foreign state.

---

[3] "Perfection" refers to the priority of rights among creditors, not about rights between the prior holder and a new holder. (Rocabado Aff. ¶ 23.)

[4] Bolivia notes that the lone Bolivian law "expert" on whom ETI relies, Mr. Ramiro Guevara, is hardly a neutral or objective witness. He is a well-known opponent of the Bolivian government who frequently works as an advocate on behalf of investors in proceedings against the government. He is, for example, counsel of record for the claimant in *Química Borax v. Bolivia*, ICSID Case No. ARB/06/2, a separate ICSID case registered on February 6, 2006.

114 F.2d at 443. The doctrine applies equally here. The validity of Bolivia's acquisition

of title to ETI's former equity interest in Entel is not open to question before this Court.

By Supreme Decree No. 29544 dated May 1, 2008, Bolivia acquired title to Entel by

nationalizing its stock. When it did so, Entel immediately became an agency or

instrumentality of the Republic of Bolivia entitled to sovereign immunity.

### B.    EVEN IF ENTEL DOES NOT HAVE SOVEREIGN IMMUNITY, ITS ASSETS MAY NOT BE ATTACHED.

In its Opposition to ETI's Motion to Confirm, Bolivia showed that Entel's accounts may

not be attached to secure a potential arbitration award against Bolivia even if one assumes away

Entel's sovereign immunity. Entel is not a party to the underlying ICSID arbitration and no

claims have been made against it. (Opp. at 14-18.) Plaintiff's Reply understandably chooses not

to attack this point frontally. Indeed, it expressly disclaims any veil-piercing theory as a basis for

attaching Entel's property to secure claims against Bolivia. (Reply at 16.) What Plaintiff

chooses to argue instead is something it did not argue before: it can attach Entel's assets under

CPLR § 6214(a) because Entel owes a tax debt to Bolvia. Unfortunately for ETI, this novel

argument does not work either; Bolivia's interest in the Entel accounts has sovereign immunity.

Plaintiff's argument that it may attach Bolivia's money in Entel's accounts relies

exclusively on the decision in *Karaha Bodas Co., LLC v. Perusaham Pertambangan Minyak*,

2004 U.S. Dist LEXIS 23870, *4-6 (S.D.N.Y 2004). According to Plaintiff, *Karaha* stands for

the proposition that a court may attach Bolivia's sovereign assets in Entel's hands. (Reply at 19.)

In truth, however, *Karaha* stands for no such thing; that case could scarcely be less analogous to

this one. *Karaha* was not only a post-judgment attachment case, the judgment at issue was

against the state-owned company (which had waived sovereign immunity), not against Indonesia

itself. The question was thus whether Indonesia could use its sovereign interests in the judgment debtor's accounts to shield those accounts from execution. The Court found it could not.

The contrast with this case is obvious. Here, the prospective judgment debtor is not the state-owned company but rather the state itself. There has been no waiver of sovereign immunity, either by the state-owned ompany or the state. The question is thus whether the prospective judgment debtor, Bolivia, can block the attachment of third-party accounts when the only alleged basis for the attachment is the sovereign's interest in those accounts. The two cases from this District to answer analogous questions, *Liberian Eastern Timber Corp. v. Liberia,* 650 F. Supp. 73 (SDNY 1986) and *LNC Invests., Inc. v. Nicaragua,* 2000 WL 745550 (SDNY 2000), came to exactly the same answer: the sovereign assets were immune from attachment.

In the *Liberia* case, the plaintiff sought to enforce a judgment against Liberia by serving writs of execution on ship-owners located in the United States, as well as Liberian agents appointed to collect tonnage fees, registration fees and other taxes from the ship-owners. 650 F. Supp. at 77. Judge Weinfeld held that such debts "are tax revenues for the benefit of the Government of Liberia," and that Liberia's sovereign immunity from post-judgment attachment prohibited such execution. *Id.* In the *Nicaragua* case, Judge Keenan vacated orders restraining two U.S. airlines from paying taxes owed to Nicaragua because they were "immune from attachment and execution under the FSIA." 2000 WL 745550 at *5. Decisions from outside this Circuit have uniformly reached identical results. *See, e.g., AF-CAP v. Chevron Overseas (Congo) Limited,* 475 F. 3d 1080 (9th Cir. 2007) (relying on the Republic of Congo's immunity to block execution against tax obligations of Chevron-Texaco to that government); *Walker Intl Holdings Ltd v. Republic of Congo,* 395 F.3d 229, 232 (5th Cir. 2004) (rejecting the argument that because the garnishee's property "is not the property of the ROC ... the FSIA is

inapplicable"); *LNC Investments LLC v. Republic of Nicaragua,* 396 F. 3d 342 (3d Cir. 2005) (shielding debts of telephone company to Nicaragua from execution).

Plaintiff acknowledges the *Liberia* and *Nicaragua* cases (albeit in a footnote) and boldly dismisses Judges Weinfeld and Keenan as "simply wrong." (Reply at 19 n.7.) Yet, ETI does not ever bother to explain itself. Nor does it even mention the numerous out-of-circuit cases cited just above. Instead, it chooses to put its misplaced trust in *Karaha.* Bolivia is confident the Court will draw its own conclusions from the fact that Plaintiff chooses to rest its argument on one irrelevant case while simultaneously disregarding multiple on-point precedent. Bolivia does note, however, that there is a stark contradiction at the heart of ETI's argument. It is this: from one side of its mouth, Plaintiff argues that the Court may attach Entel's accounts under CPLR § 6214(a) because the money in them really belongs to Bolivia. Yet, from the other side of its mouth, Plaintiff simultaneously argues that the accounts are not shielded by Bolivia's sovereign immunity because the money in them still belongs to Entel. Bolivia lauds the perfect circularity (and the *chutzpah*) of ETI's argument. It does not, however, constitute the basis for a decision in accordance with the law. Bolivia's interest in Entel's accounts is entitled to sovereign immunity.

### C.    HAVING CHOSEN TO PROCEED AT ICSID, PLAINTIFF CANNOT ESCAPE THAT FORUM'S EXCLUSIVITY.

In its Opposition to ETI's Motion to Confirm, Bolivia showed that there is yet a third reason Plaintiff's motion must be denied (again, even if, contrary to the law, Entel were not entitled to sovereign immunity). Under Article 26 of the ICSID Convention, consent to arbitration thereunder is "deemed consent to such arbitration *to the exclusion of any other remedy.*" Plainly, prejudgment attachment in a U.S. court is an excluded "other remedy."

In its Reply, ETI argues: (1) that the Court has authority to order pre-judgment attachment under the New York Convention as codified in the Federal Arbitration Act; and (2)

Bolivia has waived its right to assert or is estopped from asserting ICSID exclusivity. (*See* Reply at 23-27.) Neither argument is availing.

ETI's New York Convention argument goes something like this: since 22 U.S.C. Section 1650a (which codifies Article 54 of the ICSID Convention requiring states parties to recognize and enforce ICSID awards) provides that the Federal Arbitration Act "shall not apply to enforcement of awards rendered pursuant to the convention," 22 U.S.C. § 1650a, that must mean that "all other provisions of the Federal Arbitration Act are applicable" to ICSID arbitrations (Reply at 23). Among the more notable aspects of this creative argument is the fact that Plaintiff cites nothing to support it. No case law, no law review articles, no nothing is offered. The reason is obvious: the argument is untenable. The obvious purpose of stating that the FAA "shall not apply" to actions to enforce ICSID awards under Section 1650a is to eliminate any possible confusion as to whether such actions should proceed under Section 1650a or under the FAA. In addition, reading the statute as Plaintiff suggests would create a very obvious and, from an international perspective, very serious conflict with the terms of the ICSID Convention. As stated, Article 26 of the Convention mandates that ICSIC arbitration be "to the exclusion of any other remedy." As the U.S. Government stated to the D.C. Circuit:

> [A] primary purpose of the Convention is to protect Contracting States against other forms of foreign or international litigation. The Convention therefore provides a role for domestic legal process only in the enforcement of ICSID awards, and even then, the power of review in domestic court is sharply limited.

Brief for the U.S., *Maritime Int'l Nominess Est. v. Guinea* (693 F.2d 1094 (D.C. Cir. 1982)), 20 I.L.M. 1436, 1483 (1981). Permitting simultaneous court actions under the FAA would quite obviously be inconsistent with the scheme of the ICSID Convention.

ETI's waiver and estoppel arguments are equally unpersuasive. In the first instance, they are based on a false premise; namely, that Bolivia has decided not to defend itself in the ICSID

proceeding. To the contrary, Bolivia hereby affirms for the Court that it has made no such decision. To be sure, Bolivia has objected both to the registration of ETI's arbitration request by the ICSID secretariat and the exercise of jurisdiction by ICSID. However, it is quite common for states appearing before ICSID arbitral tribunals to assert jurisdictional objections, as well as merits objections, which are decided by the arbitrators. Bolivia has taken no action to absent itself from these arbitral proceedings, and has no intention of doing so. Accordingly, the predicate for Plaintiff's arguments is unsound.

Plaintiff's waiver and estoppel arguments also fail even taken on their own terms. With respect to estoppel, it is, of course, axiomatic that a necessary element of any valid estoppel is detrimental reliance. *See, e.g., Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir. 1993). Indeed, the very first case Plaintiff itself cites, the Supreme Court's decision in *Glus v. Brooklyn*, 359 U.S. 231 (1959), makes clear that estoppel requires that the party claiming an estoppel has been induced to do something it would not otherwise have done but for the conduct of the other party. 359 U.S. at 234. Plaintiff has not identified -- because it cannot -- the requisite detrimental reliance here. Indeed, the facts show that ETI filed its Request for Arbitration with ICSID *in spite of*, not because of, Bolivia's withdrawal from the ICSID Convention. The withdrawal notice was issued on May 2, 2007 and, pursuant to the terms of the ICSID Convention, took effect six months later on November 2, 2007. (Compl. ¶ 22.) Against this backdrop, ETI made sure to get its Request for Arbitration on file in October 2007 before the six months expired. Accordingly, Plaintiff has no argument that it has been "snookered" by Bolivia in anyway.

If anything, it is ETI that should be estopped from contesting the exclusivity mandated by Article 26 of the ICSID Convention. Plaintiff is in control of its own case. Knowing that Bolivia had announced its intent to withdraw from the ICSID Convention, ETI nonetheless made

- 14 -

the strategic choice to pursue its remedies before ICSID. Having done so, it must be held to the consequences of that choice. It cannot be allowed simultaneously to seek both to secure the benefits afforded by ICSID and to escape the constraints imposed by its chosen forum.

ETI's waiver argument is similarly baseless. Plaintiff does not argue that Bolivia has expressly waived its rights. Rather, its argument turns on the ever-dubious proposition that an implied waiver can be inferred. As noted, ETI's argument collapses in the face of the fact that Bolivia has not absented itself from the ICSID arbitration. There can therefore be no argument that Bolivia has relinquished its right to insist on all the protections afforded by ICSID.

Plaintiff's waiver argument suffers from a more fundamental infirmity: ICSID exclusivity is not a "right" amenable to unilateral waiver by one of the Parties. Article 26 of the ICSID Convention provides that consent "to arbitration under this Convention shall, *unless otherwise stated*, be deemed consent to such arbitration to the exclusion of any other remedy." (Emphasis added.) And, according to Rule 39(6) of the ICSID Rules, any such statement must be made in the agreement consenting to ICSID arbitration -- in this case, the Netherlands-Bolivia BIT. Since no such consent is expressed in the BIT, ICSID exclusivity operates as much as an obligation on the parties as a right. At any rate, in no case is it susceptible to a unilateral waiver.

### III.    CONCLUSION

For all the foregoing reasons, together with those stated in Bolivia's initial Opposition and in Defendant Entel's submissions, Plaintiff ETI's Motion to Confirm should be denied, and the attachments of Entel's bank accounts dissolved forthwith. In addition, as set forth in Bolvia's Opposition to Plaintiff's Motion to Confirm, Plaintiff should be required to pay the costs and damages, including attorneys' fees, incurred in opposing the Motion.

Respectfully submitted,

FOLEY HOAG LLP

By: _____
Ronald E.M. Goodman (RG 6698)
Paul S. Reichler
Janis H. Brennan
1875 K Street NW
Washington, D.C.  20006
Telephone:  202-223-1200
Facsimile:  202-785-6687

*Counsel for Defendant the Republic of
Bolivia*

Date:  July 3, 2008