Michael Krinsky (MK 4503)
Eric M. Lieberman (EL 4822)
RABINOWITZ, BOUDIN, STANDARD,
    KRINSKY & LIEBERMAN, P.C.
111 Broadway, 11th Floor
New York, New York 10006
Telephone:  (212) 254-1111
Facsimile:  (212) 674-4614

Terry Gross (TG 3249)
GROSS BELSKY ALONSO LLP
180 Montgomery Street, # 2200
San Francisco, California 94104
Telephone:  (415) 514-0200
Facsimile:  (415) 544-0201

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

E.T.I. EURO TELECOM
INTERNATIONAL, N.V.,

        Plaintiff,

        v.

REPUBLIC OF BOLIVIA, and
EMPRESA NACIONAL DE
TELECOMUNICACIONES ENTEL, S.A.,

        Defendants.

Case No. 08-cv-4247 (LTS/FM)

---

**EMPRESA NACIONAL de TELECOMUNICACIONES ENTEL S.A.'s**
**SUR-REPLY IN OPPOSITION TO MOTION TO CONFIRM**
***EX PARTE* ORDER OF PREJUDGMENT ATTACHMENT**

Of Counsel:
Jules Lobel
3900 Forbes Avenue
Pittsburgh, PA  15260

Adam Belsky
Gross Belsky Alonso LLP

## TABLE OF CONTENTS

**Page**

I.   PLAINTIFF HAS ABANDONED ITS ORIGINAL PREMISE FOR THE ATTACHMENT; JUDGE CHIN'S ORDER AND THE FSIA BAR ITS ATTEMPT TO ATTACH "ENTEL'S DEBT OWED TO BOLIVIA"..................................................................1

II.  THE FSIA BARS THE ATTACHMENT BECAUSE ENTEL IS AN INSTRUMENTALITY OF THE BOLIVIAN STATE.........................5

   A.  The Bolivian State Owns a Majority of ENTEL's Shares...........................6

   B.  The Bolivian State Owns a Majority of ENTEL's "Other Ownership Interest"....................................................................9

   C.  ENTEL is an Organ of the Bolivian State ....................................................9

III. PLAINTIFF CANNOT AVOID THE ICSID CONVENTION'S BAN ON NATIONAL COURTS ORDERING PRE-AWARD ATTACHMENTS.......11

IV.  THE COURT LACKS SUBJECT MATTER JURISDICTION.....................14

V.   PLAINTIFF HAS FAILED TO SATISFY THE JURISDICTIONAL AND OTHER REQUIREMENTS OF THE CPLR.........................................15

VI.  PLAINTIFF'S "STANDING" ARGUMENT IS IRRELEVANT AND WRONG...........................................................................................19

CONCLUSION....................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

*ABKCO Inds., Inc. v. Apple Films, Ltd.*, 39 N.Y.2d 670 (1976) ..........................15

*AF-CAP Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F. 3d 1080
    (9th Cir. 2007)................................................................................................3, 5

*AF-CAP Inc. v. Rep. of Congo*, 383 F. 3d 361 (5th Cir. 2004)................................3

*Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*, 183 F.3d
    1277 (11th Cir. 1999)......................................................................................3

*Alfred Dunhill of London, Inc. v. Rep. of Cuba*, 425 U.S. 682 (1976) .................20

*Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*,
    190 F.3d 16 (2d Cir. 1999)........................................................................15, 18

*Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*,
    605 F.2d 648 (2d Cir. 1979).............................................................................16

*Balentine v. Union Mortg. Co.*, 795 F. Supp. 266 (N.D. Ill. 1992) ........................9

*Banco de Espana v. Federal Reserve Bank*, 114 F.2d 438 (2d Cir. 1940) .............7

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ................................7

*Bernstein v. Van Heyghen Freres Societe Anonyme*,
    163 F.2d 246 (2d Cir. 1947).............................................................................8

*Bevinetto v. Plotnick*, 857 N.Y.S.2d 694 (2d Dept. 2008).....................................11

*Breezevale Ltd. v. Dickinson*, 693 N.Y.S.2d 532 (1st Dep't 1999) ................15, 18

*City of Philadelphia v. Cohen*, 11 N.Y.2d 401 (1962) .........................................18

*Compagnie Noga d'Importation et d'Exportation S.A. v. Russian Fed'n.*,
    361 F.3d 676 (2d Cir. 2004)..........................................................................8

*Conn. Bank of Commerce v. Rep. of Congo*, 309 F.3d 240 (5th Cir. 2002) ...........5

*Corporacion Mexicana de Servicios Maritimas, S.A.*, 89 F.3d 650
    (9th Cir. 1996)..................................................................................................10

*De Letelier v. Rep. of Chile*, 748 F.2d 790 (2d Cir. 1984)......................................1

*Delaware v. New York,* 507 U.S. 490 (1993)............................................................2

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003).................................................9

*EM Ltd. v. Rep. of Argentina*, 473 F.3d 463 (2d Cir. 2007) ..................................5

*European Community v. RJR Nabisco, Inc.*, 424 F.3d 175 (2d Cir. 2005)............18

*Excel Shipping Corp. v. Seatrain Int'l S.A.*, 584 F. Supp. 734 (E.D.N.Y. 1984) ..16

*Feder v. Turkish Airlines*, 441 F. Supp. 1273 (S.D.N.Y. 1977) ...........................16

*Filler v. Hanvit Bank*, 378 F.3d 213 (2d Cir. 2004)..........................................9, 10

*French v. Banco Nacional de Cuba*, 23 N.Y.2d 46 (1968) ....................................8

*Galu v. Swissair*, 873 F.2d 650 (2d. Cir. 1989) ....................................................8

*Gates v. Victor Fine Foods*, 54 F.3d 1457 (9th Cir. 1995) ....................................10

*Harris v. Balk*, 198 U.S. 215 (1905) .....................................................................18

*Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408 (1984) ...........16

*In re Aircrash Disaster Near Monroe, Michigan on January 9, 1997*, 987
    F. Supp. 975 (E.D. Mich. 1997).........................................................................9

*Jones v. Palermo*, N.Y.S.2d 288 (N.Y. Sup. Ct. 1980) ........................................15

*Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas
    Bumi Negara*, 313 F.3d 70 (2d Cir. 2002) ..................................................4, 20

*Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas
    Bumi Negara*, 2004 WL 2712556 (S.D.N.Y. 2004) .........................................4

*Kazazas v. Walt Disney World*, 704 F.2d 1527 (11th Cir. 1983).........................11

*Kelly v. Syria Shell Pet. Dev. B.V.*, 213 F.3d 841 (5th Cir. 2000) ........................10

*Knaust v. City of Kingston*, 193 F.Supp.2d 536 (N.D.N.Y. 2002).........................20

*Koehler v. Bank of Bermuda Ltd.*, 2002 WL 1766444
    (S.D.N.Y. 2002) ................................................................................................15

*Lee v. Burkhart*, 991 F.2d 1004 (2d Cir. 1993)......................................................11

*Liberian Eastern Timber Corp. v. Govt. of Liberia,* 650 F. Supp. 73
    (S.D.N.Y. 1986).............................................................................3, 5

*LNC Investments, Inc. v. Rep. of Nicaragua,* 2000 WL 745550
    (S.D.N.Y. 2000)..............................................................................3, 5

*LNC Investments LLC v. Rep. of Nicaragua,* 396 F. 3d 342 (3d Cir. 2005)............3

*Menendez v. Saks & Co.,* 485 F. 2d 1355 (2d Cir. 1973)......................................20

*Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560
    (2d Cir. 1996)....................................................................................16

*Miller v. Kaliwerke Aaschersleben Aktien-Gesellschaft,* 283 F. 746
    (2d Cir. 1922).......................................................................................8

*O'Connor v. Lee-Hy Paving Corp.,* 579 F.2d 194 (2d Cir. 1978) ........................16

*O'Keefe v. Noble Drilling Corp.,* 2007 WL 2220502 (S.D. Tex. 2007)................9

*Oliner v. Canadian Pacific Railway Co.,* N.Y.S.2d 429 (1st Dept. 1970) ..............8

*Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd,* 476
    F.3d 140, 143 (2d Cir. 2007)............................................................10

*Perez v. Chase Manhattan Bank, N.A.,* 61 N.Y.2d 460 (1984) ...........................18

*Reino de Espana v. American Bureau of Shipping,* 2006 WL 2034632
    (S.D.N.Y. 2006) ..................................................................................1

*Rep. of Philippines v. Marcos,* 806 F. 2d. 344 (2d Cir. 1986)..............................8

*Ricaud v. American Metal Co.,* 246 U.S. 304 (1918) ...........................................8

*Shaffer v. Heitner,* 433 U.S. 186 (1977) .......................................................16, 17

*Spear v. Heiner,* 34 F.2d 795 (W.D. Pa. 1929).....................................................18

*Texas v. New Jersey,* 379 U.S. 674 (1965) .........................................................2, 4

*United Bank Limited v. Cosmic International, Inc.* 542 F. 2d 868
    (2d Cir. 1976).....................................................................................20

*U.S. v. Craft,* 535 U.S. 274 (2002)........................................................................9

*U.S. v. Pirro*, 212 F.3d 86 (2d Cir. 2000) ................................................................9

*U.S. v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ..........................................................15

*USX Corporation v. Adriatic Insurance Co.*, 345 F.3d 190 (3rd Cir. 2003) ..........10

*Veltri v. Bldg. Service 32 B-J Pension Fund*, 393 F.3d 318 (2d Cir 2004) ...........11

*Walker Int'l Holdings Ltd. v. Rep. of Congo,* 395 F.3d 229 (5th Cir. 2004) ...........3

*Warth v. Seldin*, 422 U.S. 490 (1975) ...................................................................19

*Wilk v. Creditanstalt Bankverein Int'l*, 1993 WL 97259
    (S.D.N.Y. 1993) ....................................................................................................9

*W.S. Kirkpatrick & Co. v. Environmental Tectonics Corporation, Int'l.*,
    493 U.S. 400 (1990) .............................................................................................8

*Zampano v. Quinin*, 6 N.Y.3d 666 (2006) .............................................................11

## Statutes

CPLR § 5201...............................................................................................18
CPLR § 6214...........................................................................................4, 19
CPLR § 6219.................................................................................................19
CPLR § 7502....................................................................................15, 16, 17
22 U.S.C. § 1650a........................................................................................14
Federal Arbitration Act, 28 U.S.C. Title 9 ..................................................14
Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602, *et. seq.* ................. *passim*

## Treaties

Convention of the Settlement of Investment Disputes Between States
    and Nationals of Other States, 17 U.S.T. 1270, 575 U.N.T.S. 15 ..... *passim*

The Convention on the Recognition and Enforcement of Foreign
    Arbitral Awards, 21 U.S.T. 2517, 330 U.N.T.S. 3 .........................................14

Vienna Convention on the Law of Treaties, 1155 U.N.T.S. 331,
    *reprinted at* 8 ILM 679 (1969)...................................................................15

**Rules**

International Centre for the Settlement of Investment Disputes,
    Arbitration Rules.............................................................. 13-14

**Other Authorities**

Brief for the United States as Intervener, *MINE v. Rep. of Guinea*,
    20 ILM 1436 (1981)..............................................................13, 14

ICSID, *Suggested Changes to the ICSID Rules and Regulations, Working Paper
    of the ICSID Secretariat*, May 12, 2005. .......................................13

Reed, Lucy, Paulsson, Jan & Blackaby, Nigel, *Guide to ICSID Arbitration*
    (2004)..........................................................................12

Schreuer, Christoph H., *The ICSID Convention: A Commentary* (2001)..............13

Siegel, David. D., *N.Y. Practice* § 104 (4th ed. 2008).............................17

Siegel, David. D., *N.Y. Practice* § 323 (4th ed. 2008).............................18

Siegel, David. D., *N.Y. Practice* § 487 (4th ed. 2008)........................15, 18

Siegel, David. D., *N.Y. Practice* § 488 (4th ed. 2008).............................18

11 Weinstein, Korn & Miller, *N.Y. Civil Practice* ¶ 5201.01 (2008) ..................2

12 Weinstein, Korn & Miller, *N.Y. Civil Practice* ¶ 6201.08 (2008) ..................16

12 Weinstein, Korn & Miller, *N.Y. Civil Practice* ¶ 6202.14 (2008) ..................15

13 Weinstein, Korn & Miller, *N.Y. Civil Practice* ¶ 7502.20 (2008) ..................17

4A Wright, Charles & Miller, Arthur, *Federal Practice & Procedure* § 1072
    (3d ed. 2008) ..................................................................16

Defendant Empresa Nacional de Telecomunicaciones Entel, S.A. respectfully submits this sur-reply brief.

## I.    PLAINTIFF HAS ABANDONED ITS ORIGINAL PREMISE FOR THE ATTACHMENT; JUDGE CHIN'S ORDER AND THE FSIA BAR ITS ATTEMPT TO ATTACH "ENTEL'S DEBT OWED TO BOLIVIA"

Plaintiff announced for the first time in its Reply that what it is seeking to do is attach ENTEL's asserted "[tax] debt owed to Bolivia." Reply at 16. In its opening brief, plaintiff took an entirely different position, which it has now abandoned, Reply at 3, 15-17: that it was entitled to attachment of ENTEL's bank accounts, even though ENTEL is not a respondent in the ICSID arbitration, because ENTEL is the Republic's *alter ego* and so, by virtue of those accounts, the New York garnishee banks "owe a debt to Entel, and hence to Bolivia," the arbitration respondent. P. Br. at 23.

In its opposition, ENTEL showed that (a) treating ENTEL as the Republic's *alter ego* or otherwise piercing the corporate veil *ipso facto* would make the FSIA applicable, since the Republic's immunities then would be attributable to ENTEL and its property under *De Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir. 1984), *see* Opp. at 4-5; and (b) the FSIA then would bar the attachment, as there has been no explicit waiver of FSIA immunity from prejudgment attachment, *see* Opp. at 13-17. In its Reply, plaintiff did not assert there has been an explicit waiver, and therefore has conceded the point.[1] The result is that the FSIA prohibits attachment on plaintiff's original, now abandoned, theory.[2]

---

[1]  Not only did plaintiff fail to join issue with defendants' showing that there has been no waiver, but it has the "burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." *Reino de Espana v. American Bureau of Shipping*, 2006 WL 2034632, at \*2 (S.D.N.Y. 2006). Plaintiff therefore must be deemed to have conceded that no such waiver exists.

[2]  Additionally, the FSIA prohibition applies because ENTEL's accounts are not being "used for a commercial activity in the United States," as required by FSIA § 1610(d). *See* Opp. at 17-20.

Additionally, ENTEL showed, Opp. at 24-29, that plaintiff could not overcome the strong presumption of separate status established by *Bancec* and its progeny; plaintiff, in its Reply, has expressly eschewed any claim to the contrary. Reply at 15-17. For that reason as well, plaintiff could not prevail on its original, abandoned theory.

It is no wonder that plaintiff has abandoned its original, ill-conceived justification for the *ex parte* attachment, but its new justification – that it is seeking to attach ENTEL's alleged tax debt to Bolivia -- is no more tenable.[3] Plaintiff's proposed *ex parte* order, presented to Judge Chin in Part I, provided for attachment of Bolivia's property, as well as ENTEL's, but Judge Chin denied any authorization to attach Bolivia's property, crossing out "Republic of Bolivia" before signing the order. Yet, astonishingly, plaintiff now attempts to confirm the attachment by seeking to attach precisely what Judge Chin prohibited it from attaching: the Republic's property, a debt assertedly owed to it by ENTEL. *See, e.g., Texas v. New Jersey,* 379 U.S. 674, 680 (1965) ("a debt is property of the creditor, not of the debtor"); *Delaware v. New York,* 507 U.S. 490, 498, 503 (1993) (same); 11 Weinstein, Korn & Miller ("WKM"), *N.Y. Civil Practice* ¶ 5201.01 (debt owed to judgment debtor is property of judgment debtor).

Attachment of ENTEL's asserted tax debt to the Republic is precluded by the *Republic's* immunity under the FSIA. Every case addressing this issue has treated a debt owed to a foreign

---

[3]   Contrary to plaintiff's assertion, based entirely on a false and inadmissible newspaper story, Reply at 3, ENTEL has *not* conceded this tax debt. *See* Salinas Third Dec. On October 2, 2006, the Bolivian National Tax Service issued an Administrative Resolution that ENTEL owed 226,748,761 Bolivianos in taxes and 207,723,981 Bolivianos in penalties and interest (approximately US$26,000,000 in taxes and US$30,000,000 in penalties and interest at the then-current exchange rate). ENTEL has challenged the validity of the Administrative Resolution in its entirety, and its challenge is now pending in Bolivia's Supreme Court. Far from withdrawing its Supreme Court action subsequent to the May 1 nationalization and appointment of an Intervenor, ENTEL continues to deny the validity of the assessment of taxes, interest and penalties. Salinas Third Dec. ¶ 11, and *passim.*

The amount attached by plaintiff in New York and London substantially *exceeds* this putative tax liability. P. Mem. at 14; Opp. at 1. Plaintiff attempts to cover up this embarrassment to its newly-minted justification for the attachments by suggesting that ENTEL's tax liability may be even greater, but there is no other tax assessment against ENTEL. *See* Salinas Third Dec. ¶ 13.

state as the foreign state's property and therefore governed by the foreign state's FSIA immunities. The two leading cases in this District are *Liberian Eastern Timber Corp. v. Govt. of Liberia,* 650 F. Supp. 73 (S.D.N.Y. 1986) (Weinfeld, J.), and *LNC Investments, Inc. v. Rep. of Nicaragua,* 2000 WL 745550 (S.D.N.Y. 2000) (Keenan, J.). In *Liberia*, the plaintiff sought to enforce a judgment against the government by serving writs of execution "on shipowners located in the United States and agents of Liberia appointed to collect from such shipowners tonnage fees, registration fees and other taxes due the government." 650 F. Supp. at 77. Judge Weinfeld held that such debts "are tax revenues for the benefit of the Government of Liberia," and that Liberia's FSIA immunity from post-judgment execution prohibited execution. In *Nicaragua,* Judge Keenan, explicitly relying on Judge Weinfeld's opinion, vacated orders restraining Continental and American Airlines from paying taxes owed to the Republic of Nicaragua because they "are non-commercial in nature and immune from attachment and execution under the FSIA." 2000 WL 745550 at *5.

Plaintiff recognizes that these two decisions defeat its claim, but argues, without explanation, that "they are simply wrong." Reply at 19, n. 7. While an argument without reasons that Judges Weinfeld and Keenan were "simply wrong" is curious at best, it is further refuted by the uniform body of cases in accord with their decisions.[4] There is not a single case to the contrary.

---

[4] For example, in *AF-CAP Inc. v. Chevron Overseas (Congo) Limited,* 475 F.3d 1080 (9th Cir. 2007), the court applied the Congo's FSIA immunity from execution to obligations owed by Chevron-Texaco to the Congo for taxes and royalties, and upheld the claims of immunity from execution. *See also AF-CAP Inc. v. Rep. of Congo,* 383 F.3d 361 (5th Cir. 2004) (applying Congo's FSIA immunity from execution to royalty and tax obligations owed by Texas oil companies to the Congo); *Walker Int'l Holdings Ltd. v. Rep. of Congo,* 395 F.3d 229, 232 (5th Cir. 2004) (treating debts owed by garnishee to the Congo as subject to the Congo's FSIA immunity, and rejecting argument that because the garnishee's property "is not the property of the [Congo]. . . the FSIA is inapplicable"); *LNC Investments LLC v. Rep. of Nicaragua,* 396 F.3d 342 (3d Cir. 2005) (dismissing appeal as premature, but recognizing applicability of FSIA immunity from execution to debts of telephone company to Nicaragua, and favorably citing opinion of Judge Keenan in *LNC* case); *Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.,* 183 F.3d 1277 (11th Cir. 1999) (applying FSIA immunity to debts of U.S. telephone carriers to Cuban state instrumentality).

Plaintiff's reliance on Judge Griesa's oral comments, upon remand, in *Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 2004 WL 2712556, at *2 (S.D.N.Y. 2004), is inapposite and misleading.   *Karaha* did not involve the issue raised here and in the *Liberian Eastern-LNC Investments* line of cases, *i.e.*, an attempt by an actual or putative judgment creditor of a foreign state to attach or garnish debts owed to that foreign state by another entity.   Rather, the issue was whether a judgment against a state owned commercial company that had waived immunity could be executed against assets held by it in its own name where the non-waiving State claimed that the assets actually belonged to it.

The key opinion in the case is *Karaha Bodas Co., LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70 (2d Cir. 2002), holding that 95% of the assets belonged to the government and were immune from attachment, while the remaining five per cent were controlled by the instrumentality, and thus were subject to execution. The court of appeals rejected the instrumentality's argument that, because it owed taxes and dividends to the government, its assets were not really its own but were the government's, and thus were immune from execution since the government had not waived its own immunity.   The court held that "'if any part of the money is within the present or future control of the defendant,'" the defendant has a sufficient "interest" in the funds to subject them to attachment or execution to satisfy a judgment against *the instrumentality* under New York law.   313 F.3d at 92.

The comments of Judge Griesa quoted by plaintiff were made on remand on other issues, and merely constituted Judge Griesa's informal summation of the prior proceedings in the case. Nothing in Judge Griesa's comments can be construed as contradicting the well accepted doctrine, reflected in CPLR § 6214(a) (*see also, e.g., Texas v. New Jersey*, 379 U.S. at 680), that a debt due a creditor is the intangible property of the creditor and subject to execution by one hold-

4

ing a judgment against the creditor.

Here, plaintiff seeks to attach ENTEL's bank accounts not because, as in *Karaha,* of a claim or judgment against ENTEL, but rather to collect ENTEL's tax debt to the Republic because of plaintiff's claim against the Republic. But because ENTEL's debt is the property of the Republic, the Republic's unwaived immunity precludes the attachment. Additionally, the FSIA completely immunizes taxes owed the Republic by ENTEL because they are not "used for a commercial activity in the United States," as the FSIA exceptions to prejudgment attachment and execution immunities alike require.[5]

Finally, the court of appeals' opinion (and Judge Griesa's summary of it) not only offers plaintiff no support but requires vacatur of the attachment. Either plaintiff seeks to attach ENTEL's tax debt to Bolivia (as it now asserts), in which case Bolivia's immunity bars the attachment, or it seeks to attach ENTEL's assets, which it cannot do except in pursuit of a claim against ENTEL, not Bolivia, whether or not (as *Karaha Bodas* makes clear) ENTEL owes taxes to the Republic. Since plaintiff has abandoned any claim that ENTEL is responsible for the arbitration award it seeks against the Republic, plaintiff has no basis to continue the attachment on ENTEL's accounts on the latter basis any more than on the former.

## II.    THE FSIA BARS THE ATTACHMENT BECAUSE ENTEL IS AN INSTRUMENTALITY OF THE BOLIVIAN STATE

Even though it now states that it seeks to attach ENTEL's alleged tax debt to the Republic, plaintiff maintains that the Court should nonetheless look to *ENTEL's status* to determine whether the FSIA bars prejudgment attachment. This, as shown above, is contrary to unanimous

---

[5] *See* Opp. at 17-18, and, specifically as to taxes owed the foreign state, *see, e.g., Liberian Eastern Timber Corp. v. Govt. of Liberia,* 650 F. Supp. at 77 (Weinfeld, J.); *LNC Investments, Inc. v. Rep. of Nicaragua,* 2000 WL 745550, at *5 (Keenan, J.); *EM Ltd. v. Rep. of Argentina,* 473 F.3d 463, 481, n.19 (2d Cir. 2007) (citing *LNC* with approval); *Conn. Bank of Commerce v. Rep. of Congo,* 309 F.3d 240, 260-61 (5th Cir. 2002); *AF-CAP Inc. v. Chevron Overseas (Congo) Ltd.,* 475 F. 3d at 1084.

case authority, since the debt plaintiff seeks to attach is the property of Bolivia. Even if, however, the Court were to do as plaintiff suggests, the result would be the same: ENTEL itself comes within the FSIA's protection. Since, as we have shown and plaintiff has not controverted, there has been no explicit waiver, the FSIA's prohibition against prejudgment attachments applies.[6]

## A.  The Bolivian State Owns a Majority of ENTEL's Shares

Second Circuit and Supreme Court precedent require recognition of the Republic as owner of the shares formerly held by plaintiff, whatever the merits of plaintiff's argument (advanced for the first time in its Reply) that the Republic's decree and ministerial directive transferring ownership violated, or were ineffectual under, Bolivian law.  Together with the 50% of ENTEL's shares formerly held by plaintiff, the Republic owns a majority of ENTEL's shares, as the Republic already owned (as ETI concedes) 47.46% of ENTEL's shares. Opp. at 6.  ENTEL is therefore an "agency or instrumentality" of a foreign state, FSIA §1603(b), fully protected by the FSIA's prohibition against prejudgment attachments.

On May 1, 2008, Bolivia's President, together with the Republic's fifteen Ministers of State, issued Supreme Decree No. 29544 (Ex. B, Castro Dec.): "it is the purpose of this Supreme Decree to nationalize the stock package held by" ETI in ENTEL. Art. 1. In Article 2, the Supreme Decree provided that ETI's stock package "is nationalized."  The Supreme Decree provided that the nationalized stock "shall be transferred to the Bolivian State, [and placed] under the temporary ownership of the Ministry of Public Works, Services and Housing," Art. 2, and that the "Ministers of the State in their respective Offices shall be responsible for the execution and enforcement of this Supreme Decree." Art. 10.  Acting expressly pursuant to the Supreme

---

[6]  Additionally, the FSIA prohibition applies because the attached property is not used for a commercial activity in the United States. *See* Opp. at 17-20.

Decree, the Minister of Public Works, Services and Housing (a Minister of State, *see* Salinas

First Dec.), issued a directive the next day to the Interventor of ENTEL, appointed by the Super-

intendent of Telecommunications to manage ENTEL for 90 days, requiring the Interventor to

"instruct" the "Office of the Secretary of the Board of Directors to record the above-mentioned

stock in the Book of Stockholders under the name of the Ministry in my care." (Ex. D, Castro

Dec.). As instructed, ENTEL's Secretary recorded the Ministry as the owner of the stock in EN-

TEL's Book of Shareholders on May 2. (Castro Dec., ¶¶ 8 –11 and Exs. E and F).

These governmental acts are controlling on the question of ownership. In *Banco de Es-*

*pana v. Federal Reserve Bank*, 114 F.2d 438, 443-44 (2d Cir. 1940), the Second Circuit recog-

nized the Spanish government's purported acquisition of title, holding, in terms dispositive here:

> The validity under Spanish law of the [Executive's] decree, or of any other step in
> the purported acquisition of title to the silver by the Spanish government, is not
> open to examination by us. If these acts took place, they took place within Spain.
> It has been squarely held that the courts of this country will not examine the acts
> of a foreign sovereign within its own borders, in order to determine whether or
> not those acts were legal under the municipal law of the foreign state....
>
> Nor are we persuaded that the doctrine there set forth should be limited to situa-
> tions in which the foreign acts is committed in a manner "colorably valid" under
> foreign law. It should make no difference whether the foreign act is, under local
> law, partially or wholly, technically or fundamentally, illegal.... So long as the act
> is the act of the foreign sovereign, it matters not how grossly the sovereign has
> transgressed its own laws....
>
> By a "governmental act" is meant no more than a step physically taken by persons
> capable of exercising the sovereign authority of the foreign nation. ... If they
> purported to act in their official capacity, that physical fact precludes us from ex-
> amining the validity of their acts under local law.

In *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 415 & n. 17 (1964), the Court, citing

*Banco de Espana* with approval, held that U.S. courts will not entertain challenges to a foreign

sovereign's purported acquisition of title on the ground that it has violated its own laws.[7]

Plaintiff wholly ignores the dispositive line of authority. *Compagnie Noga d'Importation et d'Exportation, S.A. v. Russian Fed'n.*, 361 F.3d 676 (2d Cir. 2004), cited by plaintiff, did not even present the relevant issue, let alone represent a break *sub silentio* in more than a century of Supreme Court and Second Circuit precedent. There was no claim there that sovereign acts were at variance with Russian law, and so the Circuit interpreted Russian law to determine the relationship of the Russian Federation and the Russian Government.

Here, Bolivia's governmental acts – even if they were at variance with Bolivian law – are the "official act of a foreign sovereign," and the Second Circuit and Supreme Court precedent require that they, not Bolivian law (if different), provide the "'rule of decision for the courts of this country'" in determining ownership. *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corporation, Int'l*, 493 U.S. 400, 405 (1990), quoting *Ricaud v. American Metal Co.*, 246 U.S. 304, 310 (1918). Applying, as in *Compagnie*, the relevant U.S. law to the relationship thus established, the result is that the FSIA protects ENTEL as an entity coming within the FSIA's definition of "agency or instrumentality."

Lest plaintiff's assertions go unanswered, ENTEL has submitted the declaration of a Bolivian law professor, Maria Cecilia Rocabado, that the State's acquisition of the ENTEL

---

[7] *See also, e.g., Bernstein v. Van Heyghen Freres Societe Anonyme,* 163 F.2d 246, 249 (2d Cir. 1947); *Rep. of Philippines v. Marcos,* 806 F.2d. 344, 358-59 (2d Cir. 1986); *Galu v. Swissair,* 873 F.2d 650, 653, 655 and n. 3 (2d. Cir. 1989); *French v. Banco Nacional de Cuba,* 23 N.Y.2d 46, 52 (1968) (all citing *Banco de Espana*).

As in this line of authority, the property at issue here has its situs in the foreign state: the situs of stock in ENTEL is in Bolivia, where the corporation was organized and is domiciled, not where the share certificates may be located. *See, e.g., Oliner v. Canadian Pacific Railway Co.*, 311 N.Y.S.2d 429 (1st Dept. 1970) (courts may not inquire into validity of Canadian government's taking and vesting ownership of stock of Canadian corporation even though share certificates were in New York and corporation was licensed to do business in New York), citing, *inter alia, Miller v. Kaliwerke Aaschersleben Aktien-Gesellschaft*, 283 F. 746, 755 (2d Cir. 1922) (U.S. governmental seizure of stock ownership in U.S. corporation effective, even though certificates outside the U.S. and not seized)

shares was effective and valid under Bolivian law. We emphasize, however, that the above-noted

precedent makes irrelevant the dispute over Bolivian law proffered by plaintiff, and compels rec-

ognition of the Bolivian State's ownership of a majority of ENTEL's shares.

**B.      The Bolivian State Owns a Majority of ENTEL's "Other Ownership Interest"**

Even if the Court were free to inquire into whether Bolivia's transfer of the shares for-

merly held by plaintiff was complete under Bolivian law, and concluded it was not, ENTEL

would qualify as an FSIA instrumentality because Bolivia would still own a majority of "shares

*or other ownership interest,*" FSIA § 1603(b)(2), in ENTEL (emphasis supplied).  Bolivia has

the ability to vote, and has voted – *directly, in its own name, and with observance of corporate*

*formalities* - the 50% of ENTEL's shares that formerly belonged to ETI, as well as the 47% of

the shares it held previously. *See* Castro Dec.  Courts in and out of this District, before and after

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), relied upon by plaintiff, uniformly have held

that direct voting rights is sufficient to satisfy the "other ownership interest" prong of §

1603(b)(2).[8]

**C.      ENTEL is an Organ of the Bolivian State**

Plaintiff accuses ENTEL of trying to "remake the law" concerning the definition of the

term "organ" under the FSIA because we cited and discussed cases from other circuits in addi-

tion to the Second Circuit's *dicta* in *Filler v. Hanvit Bank,* 378 F.3d 213 (2d Cir. 2004), and sug-

---

[8]  *See Wilk v. Creditanstalt Bankverein Int'l*, 1993 WL 97259, at *1-2 (S.D.N.Y. 1993); *O'Keefe v. Noble Drilling Corp.*, 2007 WL 2220502 at *1-2 (S.D. Tex. 2007); *In re Aircrash Disaster Near Monroe, Michigan on January 9, 1997*, 987 F. Supp. 975, 977-78 (E.D. Mich. 1997); *Balentine v. Union Mortg. Co.*, 795 F. Supp. 266 (N.D. Ill. 1992).

As is often noted, property is like a bundle of sticks – an assortment of individual rights that, when possessed in certain combinations, constitute ownership. *See, e.g., U.S. v. Craft*, 535 U.S. 274, 278 (2002). Even under formal U.S. corporate and securities law, documentary title is not determinative of who has an "ownership interest" in an entity. *See, e.g., U.S. v. Pirro*, 212 F.3d 86 (2d Cir. 2000) (majority and dissent citing cases).

gested that the Third Circuit's lengthy decision in *USX Corporation v. Adriatic Insurance Co.*, 345 F.3d 190 (3rd Cir. 2003) contains the most thorough analysis. But, as is obvious from the opinions, the analysis of the four circuits to have considered the issue cross-reference and borrow from each other freely and are entirely consistent and mutually reinforcing.[9]  As the Second Circuit has emphasized, there is "no definitive test to determine whether an entity is a government 'organ.'"  *Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co., Ltd,* 476 F.3d 140, 143 (2d Cir. 2007).  Whether the mutually overlapping factors considered by the circuits is counted as five, six, seven or some other number, there can be no doubt that the key factors are precisely what we emphasized in our opening brief (Opp. at 8-13): creation and/or maintenance of the entity to further an overall national purpose or interest, and control.

We have shown that ENTEL meets the test, however defined.  In response, plaintiff argues that ENTEL does not further a national purpose, because it was privatized in 1995, asking the Court to ignore the fact that ENTEL was re-nationalized precisely to ensure that it fulfill the national purpose for which it originally was created.  And as plaintiff continues to acknowledge (Reply at 6, 24), the Republic indubitably took over control of ENTEL immediately upon the decree of nationalization, and has appointed a new board of directors.  While the Republic has left the day-to-day administration of the nationalized company to professionals, it continues to assert overall supervisory control, precisely to ensure compliance with the broad national goals that motivated the re-nationalization.  That is all that is required.  *See Filler*, 378 F.3d at 217 ("many of its operations are overseen by the Ministry of Finance and Economy"); *USX,* 345 F. 3d at 212 ("the government has played and continues to play an active role in supervising

---

[9] *See, e.g., Filler*, 378 F.3d at 217, quoting *Kelly v. Syria Shell Pet. Dev. B.V.*, 213 F.3d 841 (5th Cir. 2000) and *Corporacion Mexicana de Servicios Maritimas, S.A.*, 89 F.3d 650 (9th Cir. 1996); and *USX Corp.*, 345 F.3d at 206-207, quoting and discussing, *inter alia, Kelly* and *Gates v. Victor Fine Foods*, 54 F.3d 1457 (9th Cir. 1995).

ICAROM's operations though . . . the government does not control them on a day-to-day basis").

Plaintiff's argument that ENTEL is but one of numerous telephone carriers in Bolivia and that it is treated under Bolivian law in the same manner as them is demonstrably untrue. ENTEL not only is the principal provider, but built and still owns and operates the "backbone" upon which the country's inter-regional and international telecommunications systems are based. Flores Carpio Dec. ¶¶ 7-8. Perhaps most importantly, Supreme Decree No. 29544 requires that the State's dividends from the 50% nationalized stock be re-invested in ENTEL and allocated to foster the technological development and growth of the company "*in accordance with the National Development Plan.*" Ex. B (Art. 5), Castro Dec. (emphasis added). No other telephone carrier in Bolivia serves these essential public functions, is governed by such legal requirements or is subject to comparable control.

### III.    PLAINTIFF CANNOT AVOID THE ICSID CONVENTION'S BAN ON NATIONAL COURTS ORDERING PRE-AWARD ATTACHMENTS

Plaintiff does not dispute that by invoking ICSID, a party is barred from seeking provisional remedies in a national court, Opp. 20-24, but claims that equitable estoppel precludes Bolivia and ENTEL from raising ICSID's exclusivity provisions. Reply at 24-26. Plaintiff's argument ignores an essential element of equitable estoppel – material misrepresentation – which is utterly lacking here. *Veltri v. Bldg. Service 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004) ("The three elements defendants must establish to invoke equitable estoppel are (1) a misrepresentation by the plaintiff, (2) reasonable reliance by the defendant and (3) prejudice"); *Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir. 1993) (same).[10]

Plaintiff nowhere claims that Bolivia misrepresented anything or misled it, and there is

---

[10] *See also Kazanzas v. Walt Disney World Co.*, 704 F.2d 1527 (11th Cir. 1983); *Zampano v. Quinin*, 6 N.Y.3d 666, 674 (2006); *Bevinetto v. Plotnick*, 857 N.Y.S.2d 694 (2d Dept. 2008).

therefore no basis for applying equitable estoppel here. To the contrary, plaintiff's complaint is that Bolivia openly and publicly denounced the ICSID Convention. [11] With full knowledge of that denunciation, plaintiff nonetheless elected to pursue ICSID arbitration – which precludes it from seeking provisional remedies in a national court - rather than accept the ad-hoc arbitration that Bolivia offered. Plaintiff cannot escape the consequences of its choice: it cannot obtain the advantages ICSID offers to investors and yet avoid the carefully balanced protections ICSID affords States.

Plaintiff's conclusory allegation that Bolivia "deprived ETI of the opportunity to pursue conservatory measures" before ICSID (Reply at 26) is incorrect. Plaintiff itself is responsible for delaying the appointment of an arbitral panel, in that it chose not to invoke ICSID's procedure to appoint arbitrators where a party does not participate. Plaintiff's request for arbitration was registered by ICSID on October 31, 2007 (Complaint, ¶ 25). ICSID Convention, Article 38, provides that if for any reason a Tribunal is not constituted within 90 days after the arbitration request has been registered, either party may request that the chair of ICSID's Administrative Council appoint the arbitrator or arbitrators. Under ICSID Arbitration Rule 4, the chair must use his or her best efforts to appoint the arbitrators within 30 days of the receipt of the request. Article 38 "ensures that an uncooperative party cannot prevent the constitution of the tribunal and thereby frustrate the arbitration process." Lucy Reed, Jan Paulsson, Nigel Blackaby, *Guide to ICSID Arbitration* 79 (2004). As the principal commentary on the Convention points out, the "combined time limits of Art. 38 and of Arbitration Rule 4(4) have the effect of enabling a determined party that presses the speedy constitution of a tribunal to insist on the appointment of all arbitrators within little more than 120 days from the registration of the request for arbitra-

---

[11] The ICSID Convention ("ICSID"), 17 UST 1270, 575 UNTS 15, and ICSID's Arbitration Rules may be found at www.worldbank.org/icsid.

tion." Christoph H. Schreuer, *The ICSID Convention: A Commentary* 493 (2001). Had plaintiff invoked Article 38, an arbitration panel should have been constituted by March 1, 2008, two months *prior* to the May 1 nationalization.

Moreover, ICSID Rule 39(5) permits an expedited request for provisional measures even before a Tribunal is constituted, to ensure that the request will be ready for consideration as soon as the Tribunal is constituted.[12]  Plaintiff nonetheless has never requested expedited provisional measures from ICSID pursuant to Rule 39(5).  Had it invoked both Article 38 and Rule 39(5), an arbitration panel could have already heard its request for provisional measures.

Plaintiff's real objection is to the careful balance that ICSID strikes in providing investors with certain advantages but precluding pre-award national court remedies against sovereign states. United States Brief in *MINE v. Rep. of Guinea*, 20 ILM 1436, 1476,1483 (1981) (purpose of Article 26's exclusivity provision is to protect foreign states from other forms of foreign or international litigation).  Those exclusivity provisions are designed to apply even where the foreign state defaults or refuses to participate in the arbitration. *Id.* at 1477, 1483[13]  Plaintiff chose to invoke ICSID arbitration but eschew its mechanism for quickly selecting a tribunal and requesting expedited provisional measures. It cannot invoke ICSID, yet end run around ICSID's rules and seek attachments in domestic courts that those rules preclude.

---

[12] Rule 39(5) was added in April 2006 to "introduce a procedure for the expedited filing of requests for provisional measures, and of all the observations of the parties on such a request, prior to the constitution of a tribunal.  Such a procedure would reduce delay and ensure that the tribunal is able to consider the request once it is constituted, especially where the measures are urgently required."  ICSID, Suggested Changes to the ICSID Rules and Regulations, Working Paper of the ICSID Secretariat, May 12, 2005, Note p. 6.

[13] Plaintiff unaccountably claims that the United States' position in *MINE v. Rep. of Guinea* actually supports its argument despite the government's clear position that U.S. courts should take no action in cases which arguably come within ICSID's jurisdiction until "ICSID finds that it lacks jurisdiction."  U.S. Br. at 1478.  While plaintiff dismisses Bolivia's potential invocation of the International Court of Justice, the U.S. government warned that U.S. court abstention is necessary to eliminate a potential international claim against the U.S. for the improper exercise of jurisdiction, whether that claim is raised through diplomatic channels or before the ICJ.  U.S. Br. at 1481.

Plaintiff argues that by denouncing the ICSID Convention, Bolivia waived ICSID's protections. The cases plaintiff cites only stand for the proposition that Bolivia's denunciation waived its right to initiate an ICSID arbitration. Bolivia's denunciation did not, however, implicitly or explicitly waive its right to ICSID protections where an investor initiates an ICSID arbitration *against* Bolivia. In that situation, Bolivia is entitled to invoke all the rules and protections of ICSID, including its exclusivity provision, until the arbitration panel rules that it is without jurisdiction to hear ETI's claim. U.S. Brief, at 1478 (court cannot take any action until ICSID rules that it has no jurisdiction).

## IV.    THE COURT LACKS SUBJECT MATTER JURISDICTION

Even though it has sued a foreign state (and instrumentality) and seeks to attach the state's property (the tax debt), ETI does not address the defendants' showing, Opp. at 29-34, that the court lacks subject matter jurisdiction under the FSIA. As the FSIA alone can provide jurisdiction over a foreign state (or instrumentality) and its property, Opp at 29 n.22, this is fatal.

Plaintiff cannot ignore the FSIA, but, even if it could, its efforts to establish jurisdiction would falter. Plaintiff argues that because 22 U.S.C. § 1650a makes the Federal Arbitration Act inapplicable to the "enforcement of ICSID awards," all other provisions of the FAA (and thus the New York Convention) are applicable. Reply at 23. This argument is circular, since, as the United States has long recognized, apart from the enforcement of awards, domestic courts were to have *no* role with respect to ICSID arbitrations. U.S. Br., *supra* at 1484. By providing that the FAA was not applicable to enforcement of an ICSID award, Congress thus precluded the FAA from having *any* role with respect to an ICSID arbitration.

Moreover, the New York Convention, 21 UST 2517, 330 UNTS 3, itself provides (Art. VII) that its "provisions...shall not affect the validity" of any other multilateral agreement con-

14

cerning arbitration agreed to by the parties. It is an authoritative rule of treaty interpretation that "[w]hen a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of *that other* treaty prevail." Vienna Convention on the Law of Treaties, Art. 30(2); 1155 UNTS 331, *reprinted at* 8 ILM 679 (1969) (emphasis added). Therefore, ICSID exclusivity provisions govern this case and not the New York Convention.[14]

## V.    PLAINTIFF HAS FAILED TO SATISFY THE JURISDICTIONAL AND OTHER REQUIREMENTS OF THE CPLR

In order to attach a debt from ENTEL to the Republic in aid of arbitration, pursuant to CPLR § 7502(c), there must be personal jurisdiction over both ENTEL, the putative garnishee, and the Republic, the arbitration respondent. Plaintiff cannot satisfy either requirement.

It is settled that attachment of a debt owed by a third-party to the judgment debtor or putative judgment debtor requires personal jurisdiction over the debtor.[15]   Plaintiff makes no argument, and could not, that specific jurisdiction is applicable here – that the claim for damages it pursues in the ICSID arbitration "aris[es] out of or [is] related to" the debt to Bolivia that plaintiff seeks to attach. Nor, as already shown, Opp. at 35-36, is ENTEL subject to general jurisdiction, which requires plaintiff to prove that the defendant had "'continuous and systematic general

---

[14] Courts look to the Vienna Convention for "guidance" because "the U.S. Department of State long has taken the position that the Convention is . . . the authoritative guide to current treaty law and practice," *U.S. v. Yousef*, 327 F.3d 56, 94 n.28 (2d Cir. 2003)

[15] *See, e.g., Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 190 F.3d 16, 25 (2d Cir. 1999); *Koehler v. Bank of Bermuda Ltd.*, 2002 WL 1766444, *5 (S.D.N.Y. 2002); *Breezevale Ltd. v. Dickinson*, 693 N.Y.S.2d 532, 533 (1st Dept. 1999); *Jones v. Palermo*, 432 N.Y.S.2d 288, 290 (N.Y. Sup. Ct. 1980); 12 WKM ¶ 6202.14.

Without personal jurisdiction over ENTEL, there could not even arguably be jurisdiction here over the debt, which is required. *Alliance Bond Fund*, 190 F.3d 16; *ABKCO Inds., Inc. v. Apple Films, Ltd.*, 39 N.Y.2d 670 (1976); 12 WKM ¶ 6202.14; Siegel, *N.Y. Practice*, § 487. The tax debt is payable in Bolivia to the Bolivian tax authority by a Bolivian corporation with its only offices in Bolivia.

business contacts'" with New York. *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416 (1984)). Plaintiff does not even address *Helicopteros* or its stringent general jurisdiction test. The only case plaintiff cites even relevant to the general jurisdiction issue has been overruled by the Second Circuit.[16]

Instead, plaintiff's posits the astonishing argument that minimum contacts analysis does not apply at all "in this *quasi in rem* attachment proceeding." Reply at 29-30. *Shaffer v. Heitner,* 433 U.S. 186 (1977), explicitly rejects jurisdiction based solely on attachment of property, and clearly establishes the requirement of constitutional minimum contacts, that is, an inquiry into "the relationship among the defendant, the forum, and the litigation" as the requisite for the assertion of jurisdiction. *See Shaffer*, 433 U.S. at 204; *id*. at 212 ("all assertions of state-court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny"); 12 WKM ¶ 6201.08. Further, CPLR §7502(c) expressly permits pre-arbitration award attachment only in aid of *security*, *not* in aid of jurisdiction, so this case is plainly *not* a "*quasi in rem* attachment proceeding" in any jurisdictional sense, and the act of the attachment itself is irrelevant to the issue of personal jurisdiction.

Plaintiff mistakenly relies upon a footnote in *Shaffer* which noted that, where there has

---

[16] In *Feder v. Turkish Airlines*, 441 F. Supp. 1273 (S.D.N.Y. 1977), the court found that a bank account unrelated to the action could establish jurisdiction. This position was rejected by the Second Circuit in *O'Connor v. Lee-Hy Paving Corp.*, 579 F.2d 194, 198 (2d Cir. 1978). *See* 4A C. Wright & A. Miller, *Federal Practice & Procedure* § 1072 & n. 16 (3d ed. 2008) (noting *O'Connor* rejected *Feder* on sufficiency of bank account for general jurisdiction)

Plaintiff's reliance on two other cases is similarly misplaced. *Excel Shipping Corp. v. Seatrain Int'l S.A.*, 584 F. Supp. 734, 739 (E.D.N.Y. 1984), did not even involve a bank account, but rather the continuous and extensive sales of Michelin tires in New York (30% of total exports). In *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*, 605 F.2d 648, 655 (2d Cir. 1979), the court expressly found that "the property attached is related to the matter in controversy," thus requiring the lesser contacts for specific jurisdiction.

already been an adjudication on the merits by a forum that had jurisdiction over the judgment

debtor, *post-judgment* "there would seem to be no unfairness in allowing an action to realize on

that [judgment] debt in a State where the defendant has property, whether or not that State would

have jurisdiction to determine the existence of the debt as an original matter." *Shaffer*, 433 U.S.

at 210, n.36.  Not surprisingly, none of the cases cited by plaintiff (Reply at 30) that applied the

*Shaffer* footnote involved *pre-arbitration award or pre-judgment* proceedings; they all involved

proceedings to confirm arbitration awards. While plaintiff asserts that "[t]he jurisdictional analy-

sis is no different in this proceeding for a pre-judgment attachment" (*id.*), plaintiff is unable to

cite any authority for this proposition, precisely because the proposition is directly contrary to

the core holding of *Shaffer*.

      In addition to personal jurisdiction over ENTEL, the garnishee, the court must have per-

sonal jurisdiction over the Republic, the *arbitration respondent*, in order to attach its assets to

secure a possible arbitration award pursuant to CPLR 7502(c), that is, prejudgment.  The 2005

amendment of §7502(c) to permit pre-award attachment of a respondent's assets in New York in

an out-of-state arbitration (permitted only to provide security, not to obtain jurisdiction), was

"not intended to change …the jurisdictional requirements …. [A] court can issue one of these

provisional remedies if … *the court can obtain jurisdiction over the respondent*." 13 WKM ¶

7502.20  n.18 (emphasis added) (citing Joint New York City Bar Report that proposed 2005

amendment).  Any attempt to adjudicate that party's interests in property, including attachment

as security, *without* establishing personal jurisdiction over the arbitration respondent, would run

afoul of constitutional due process, for without pre-award power over the respondent, the court

lacks pre-award power over the respondent's property. *See Shaffer*, 433 U.S. at 207, 210; Siegel,

*N.Y. Practice* § 104 (4th ed.) (attachment of debt for security purposes requires that "jurisdiction

*in personam* exists" over creditor of debt). There is no personal jurisdiction over the Republic, as the record is devoid of any contacts by the Republic with New York (or the United States, for that matter), and there is no basis for specific jurisdiction.

Plaintiff's purported attachment of the debt assertedly due the Republic suffers from still other fatal infirmities. ENTEL's alleged tax obligation to Bolivia does not qualify as a "debt" under CPLR § 5201(a) as it is still subject to unresolved litigation in Bolivia (Salinas Third Dec). *See Breezevale Ltd. v. Dickinson*, 693 N.Y.S.2d 532, 533 (1st Dep't 1999). Bolivia cannot assign or transfer the putative attached property, the taxes due it (Salinas Third Dec., ¶ 16), as required by CPLR § 5201(b), *see Alliance Bond Fund,* 190 F.3d at 24. (In the U.S. as well, "taxes are not assignable as ordinary debts," *Spear v. Heiner*, 34 F.2d 795 (W.D. Pa. 1929)). In attempting to attach the alleged tax debt owed Bolivia, plaintiff, standing as it must in Bolivia's shoes, *see* Siegel, *N.Y. Practice* §§ 323, 488 (4th ed.), would violate the long standing rule prohibiting New York and federal courts from collecting a foreign state's taxes. *See European Community v. RJR Nabisco, Inc.*, 424 F. 3d 175, 179 (2d Cir. 2005); *accord, City of Philadelphia v. Cohen*, 11 N.Y.2d 401, 406 (1962).

Finally, whatever its false hopes of justifying the instant attachment as an attachment of ENTEL's debt to Bolivia, ETI did *not* even succeed in attaching that asserted debt, and therefore cannot confirm what it has never done. A party does not attach a debt simply by attaching property unrelated to the debt that might or might not be used to pay the debt. Siegel, *N.Y. Practice* § 487 (4th ed.) (creditor seizes debt by serving debtor/garnishee with appropriate process).[17] Yet that is all that plaintiff has done. The *ex parte* Order of Attachment did not, as would have been necessary to attach debts owed by ENTEL to Bolivia, permit attachment of Bolivia's property;

---

[17] *See also Perez v. Chase Manhattan Bank, N.A.*, 61 N.Y.2d 460, 469 (N.Y. 1984) (*Harris v. Balk*, 198 U.S. 215 (1905), still good law on obligation to attach debt).

mention any debt ENTEL might owe to Bolivia; or identify or treat ENTEL as the garnishee, required to "serve upon the sheriff a statement specifying all debts of [ENTEL] to the defendant [Bolivia]," CPLR § 6219, and restrained from paying the debt to Bolivia, CPLR § 6214.

## VI.    PLAINTIFF'S "STANDING" ARGUMENT IS IRRELEVANT AND WRONG

In its opening brief, plaintiff alternatively attempted to justify the instant attachment on the theory that, if it is ultimately determined that ICSID lacks jurisdiction over plaintiff's arbitration claim, plaintiff would bring a new action in this court, different than the "Complaint For Order of Attachment in Aid of International Arbitration" that it has filed: that *this Court* (not an arbitration panel) should adjudicate Bolivia's nationalization of plaintiff's 50% interest in ENTEL as being violative of international law, entitling plaintiff to 50% of ENTEL's assets in the U.S. at the time of the nationalization.  P. Mem at 20.  In response, ENTEL argued, *inter alia*, that there is no authority and no justification for attaching assets on the basis of a hypothetical lawsuit that may (or may not) be brought some day in the distant future. *See* Opp. 28-29.  (Nor could such an action be brought now, since, *inter alia*, the ICSID Convention bars ETI from pursuing judicial remedies at this juncture.)

In the face of ENTEL's argument, plaintiff purportedly has abandoned its original position, but only to recast its hypothetical lawsuit as a "standing" argument (Reply at 33):  that ENTEL lacks "standing" to contest the attachment of 50% of its bank accounts because the nationalization decree violated international law.  Plaintiff, of course, simply has confused "standing" with the merits of the substantive claim it would assert in its future lawsuit. *See, e.g., Warth v. Seldin*, 422 U.S. 490, 498 (1975) ("In essence, the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute….").

That plaintiff's "standing" argument is simply the merits of an action plaintiff has not

brought is also shown by the most cursory consideration of standing law. ENTEL is the *defendant* here; it is the account party on the attached accounts, making it the presumptive owner, *see, e.g., Karaha Bodas,* 313 F.3d at 86; plaintiff acknowledges that these funds are part of ENTEL's corporate assets; ENTEL would have free use of the funds but for the attachments. No court has ever doubted that a party in ENTEL's position has standing; indeed, the Second Circuit has always considered it to be a merits question, not one of standing, whether a foreign party will be prevented from recovering assets that were in the U.S at the time of a nationalization decree.[18]

## CONCLUSION

For the foregoing reasons, and those stated in ENTEL's Opposition as well as in Bolivia's submissions, plaintiff's motion to confirm the *ex parte* order of attachment should be denied, the attachment vacated forthwith and ENTEL awarded damages, costs and attorneys fees.

Dated:    July 3, 2008

                                          Respectfully submitted,

                                          *Michael Krinsky*

Of Counsel:                               Michael Krinsky (MK 4503)
                                          Eric M. Lieberman (EL 4822)
Jules Lobel                               RABINOWITZ, BOUDIN, STANDARD,
                                               KRINSKY & LIEBERMAN, P.C.

Adam Belsky
GROSS BELSKY ALONSO LLP                   Terry Gross (TG 3249)
                                          GROSS BELSKY ALONSO LLP

                                          *Counsel for Empresa Nacional de Telecomuni-*
                                          *caciones Entel S.A.*

---

[18] *See, e.g., Menendez v. Saks & Co.,* 485 F. 2d 1355, 1364-65 (2d Cir. 1973*), rev'd. on other grounds, sub nom. Alfred Dunhill of London, Inc. v. Rep. of Cuba,* 425 U.S. 682 (1976); *United Bank Limited v. Cosmic International, Inc.* 542 F.2d 868, 872-73 (2d Cir. 1976). In *Knaust v. City of Kingston,* 193 F.Supp.2d 536 (N.D.N.Y. 2002), cited by plaintiff, there was no ownership issue resembling what ETI seeks to raise here; standing objections were asserted against the plaintiff, not the defendant; there was no taking of property in the party's exclusive possession, use and presumptive title. The other cases cited by plaintiff are no more germane.