Robert L. Sills (RS 8896)
Steven J. Fink (SF 3497)
Ryan S. Lester (RL 5603)
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000
Facsimile:  (212) 506-5151
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

E.T.I. EURO TELECOM INTERNATIONAL N.V.,

               Plaintiff,

        -against-

REPUBLIC OF BOLIVIA and
EMPRESA NACIONAL DE
TELECOMUNICACIONES ENTEL S.A.,

               Defendants.

------------------------------------------------

08 CV 4247 (LTS)

**SECOND DECLARATION
OF RAMIRO GUEVARA**

**RAMIRO GUEVARA** declares the following to be true:

1.     I am a member of the bar of La Paz in the Republic of Bolivia and a founding partner of Guevara & Gutierrez S.C., a law firm with offices in La Paz and Santa Cruz, and one of the largest firms in Bolivia.  A copy of my curriculum vitae was attached as Exhibit A to my first declaration in the above-titled Action, executed on June 23, 2008 (the "June 23 Declaration").  I make this declaration in further support of the motion of plaintiff E.T.I. Euro Telecom International N.V. ("ETI") to confirm an order attaching certain funds of Empresa Nacional de Telecomunicaciones Entel S.A. ("Entel") and in response to Dra. Maria Cecilia Rocabado's declaration dated July 4, 2008 (the "Rocabado Declaration").

2.     As set forth below, the Rocabado Declaration is materially inaccurate on the points of Bolivian law that it discusses.

## ETI'S SHARES IN ENTEL HAVE NOT BEEN TRANSFERRED TO
## THE REPUBLIC OF BOLIVIA IN ACCORDANCE WITH BOLIVIAN LAW

3.     Dra. Rocabado argues that ETI's Shares in Entel (the "ETI Shares") have

been transferred to the Republic of Bolivia under the Bolivian Commercial Law.  She bases

this incorrect statement on the following reasoning:

i)     Article 520 of the Bolivian Commercial Code provides that ownership of securities issued "to the order of" may be transferred by a process, different from the process described in my June 23 Declaration, that does not involve an endorsement thereof.

ii)     Article 519 of the Bolivian Commercial Code provides, according to Dra. Rocabado, that the Code provisions related to certificates "to the order of" are applicable to nominative certificates.  (The translation of Article 519 provided by Dra. Rocabado in Paragraph 17 of her declaration is not accurate, as explained below).

iii)     Therefore, and since nominative shares can be considered a species of nominative certificates, Dra. Rocabado opines that nominative shares may be transferred by means other than endorsement.

iv)     According to Dra. Rocabado, Supreme Decree No. 29544 effected a valid transfer of the ETI Shares to the Republic of Bolivia under Article 520.

v)     Therefore, Dra. Rocabado concludes, Bolivia has acquired the ETI Shares under Bolivian Commercial Law.

4.     Dra. Rocabado's reasoning is flawed.  Specifically, her explanation of the

relevant provisions of the Bolivian Commercial Code is inaccurate because:

i)     Article 520 of the Bolivian Commercial Code, which allows for securities to be transmitted by a process other than endorsement, applies by its own terms to securities "to the order of".  The ETI Shares are nominative shares and therefore are not "to the order of".

ii)     Dra. Rocabado's argument that Article 519 of the Bolivian Commercial Code makes the statutory provisions governing the transfer of "to the order of" securities applicable to nominative securities is incorrect.  Article 519 of the Bolivian Commercial Code states that: Regulations relative to "to the order of" securities shall apply – to the extent appropriate - to nominative securities.  The Spanish expression "en lo conducente", which appears in Article 519, was not translated correctly in the Rocabado Declaration.  This expression in Article 519 means that only some – but not all – provisions governing "to the order of" securities may be applied to nominative securities, and only if doing so is consistent with the overall statutory scheme.

iii)     Reading the provisions of the Commercial Code in context, it is apparent that Article 520 does not apply to nominative shares.  One of the distinguishing characteristics of nominative securities is that they may only be transferred by endorsement plus registration of that endorsement in the relevant company's share registry, as discussed

below and in my June 23 Declaration. Read in the context of this statutory scheme, Dra. Rocabado's conclusion is plainly wrong.

      iv)     According to Civil Law principles, whenever two norms of the same hierarchy are deemed to regulate the same matter, the more specific norm shall be applied with preference to the more general norm. This principle is reflected in Article 5 of the Bolivian Judiciary Organization Law (Law No. 1455 dated February 18, 1993), which states that:

> "Magistrates and judges, in the knowledge and determination of the causes, will apply the Constitution in preference to state laws and these in preference to any other provisions. <u>The specific shall be applied with preference to the general law.</u>"(emphasis added)

      v)     Articles 519 and 520 contain general provisions on nominative and "to the order of" securities. The word used in the Spanish version to describe securities is "Título", which translates as "title" or "certificate" in the English language.

      vi)     "Shares", and in this case "nominative shares", are just one of many kinds of "Títulos". "To the order of" securities are a different kind of "Títulos". The transfer of "Nominative Shares" is regulated by specific provisions of the Bolivian Commercial Code. The primary provisions appear in Articles 251 and 254 of said Code. Article 251 provides that: "the company considers as the owner of the nominative shares, the person appearing as such in the share certificate and in the share registry". Article 254 of the Bolivian Commercial Code provides that: "the transfer of nominative shares is perfected by the endorsement and is effective vis a vis the company and third parties as of its registration in the share registry".

      vii)     Articles 519 and 520 of the Bolivian Commercial Code set the general terms to be applied to all "Títulos", but Articles 251 and 254 of the Bolivian Commercial Code set the specific terms to be applied to "Nominative Shares". Following the principle contained in Article 5 of the Bolivian Judiciary Organization Law that specific provisions take precedence over more general provisions, Articles 519 and 520 of the Bolivian Commercial Code might be deemed to apply to the transfer of nominative shares if and only if no other specific provision existed that regulated the transfer of nominative shares.

      viii)     In fact, Articles 251 and 254 set the specific requirements that need to be complied with in order to transfer of nominative shares. While Article 520 applies to other instruments described as "Títulos" under Bolivian Law (such as promissory notes, letters of credit, etc.), it does not apply to nominative shares because the transfer of nominative shares has been specifically regulated by Articles 251 and 254 of the Bolivian Commercial Code. These specific provisions shall be followed with preference to any general provision.

      5.     Dra. Rocabado asserts that the endorsement of shares under Article 254 only perfects a transfer, and is not required to effectuate a transfer. She does not dispute, however, that Article 251 says that "the company considers as the owner of the nominative shares, the person appearing as such in the share certificate and in the share registry". Therefore, even

accepting Dra. Rocadbado's interpretation of Article 254 for the sake of argument,

endorsement and registration of that endorsement nonetheless is a requirement of the

Bolivian Commercial Code in order to transfer ownership of nominative shares.

6.    Bolivian Law provides several legal mechanisms that the Government could

have used to take the ETI Shares from ETI without ETI endorsing the share certificate.  The

Government could, for instance, have applied to a court for an order effectuating the transfer.

The Government has chosen not to follow any of these procedures, however, and, as a matter

of Bolivian law, ownership of the ETI shares has not been transferred.

**THE BOLIVIAN CONSTITUTION DOES NOT
RECOGNIZE ANY DISTINCTION BETWEEN
"NATIONALIZATION" AND "EXPROPRIATION"**

7.    Dra. Rocabado also attempts to draw a distinction between expropriation and

"nationalization" that does not exist under Bolivian law.  Thus, in paragraph 12 of her

Declaration, Dra. Rocabado concludes:

> "[U]nder Bolivian law and practice, the Constitutional provision
> concerning "expropriation" does not apply to nationalizations done by
> Supreme Decree, and prior payment of compensation is not required for
> title in the nationalized properties to pass to the State. With
> nationalizations, compensation can be determined and paid at some time
> after the nationalization and transfer of title."

Dra. Rocabado's conclusion again is simply wrong.

8.    The following provisions of the Bolivian Constitution are relevant:

i)    Article 228.- The Constitution is the supreme law of the national legal
system. The courts, judges and authorities must apply it with preference to the laws and these
[the laws] with preference to any other resolution.

ii)    ARTICLE 7.- Every person has the following fundamental rights, in
accordance with the laws that regulate their exercise:

-    To private property, individually or collectively, as long as it
fulfills a social use.

iii)    ARTICLE 32.- No one shall be obligated to do anything that the
Constitution or the laws do not mandate, nor to be deprived of what they do not prohibit.

iv)    ARTICLE 59.- The Legislative Branch has the following powers:

4

- Dictate, abrogate, derogate, modify and interpret laws.

v)    ARTICLE 96.- The President of the Republic has the following powers:

- Execute and cause the laws to be complied with, issuing the necessary decrees and orders, without defining rights, altering those defined by law or contradict their provisions, respecting the restrictions set forth in this Constitution.

vi)    ARTICLE 30.- Public powers cannot delegate the powers invested to them by this Constitution, nor grant the Executive Branch other powers than those expressly granted to it by the Constitution.

vii)    ARTICLE 31.- All acts performed assuming powers that are not vested on them, as well as acts that purport to exercise jurisdiction or legal authority that do not originate from the law are null.

viii)    ARTICLE 69.- In no case may Congress delegate the powers invested to it by this Constitution to one or more of the members of Congress or to another Branch of government.

A copy of all articles above cited is attached hereto as Exhibit A .

9.    In accordance with the above-cited constitutional provisions:

i)    The Right to Property can only be regulated by Law and in accordance with the Constitution.

ii)    Only Congress is entitled to issue Laws.

iii)    The Executive Branch is only entitled to issue Supreme Decrees that are not considered as Laws, but are only regulations.

iv)    Such Decrees cannot define rights, alter those defined by Law nor contradict their provisions and shall maintain the restrictions set forth in the Constitution.

v)    Any Decree which purports to have the effects of a law (i.e., defining rights) is null.

10.    Our research of the Bolivian Constitution has not uncovered any reference to the concept of "nationalization" as a means for the State to assume the ownership of private property.  Furthermore, our research has failed to reveal any reference to nationalization made in Bolivian law at all[1].  I note in this regard that Dra. Rocabado does not provide a

---

[1] As stated above, note that under Bolivian Law, a Supreme Decree and a Law are different legal instruments. Only a Law can define rights.

single quote or specific reference to Constitutional provisions making reference to the

concept of "nationalization" or to laws describing procedures for "nationalization" under

Bolivian law.  Thus, since no provision found in the Bolivian Constitution or in Bolivian Law

even references the concept of "nationalization", the assertion of the Rocabado Declaration

cited in paragraph 7 above is unequivocally wrong.

     11.    Nor is there any "consistent practice of nationalization in Bolivia" as Dra.

Rocabado states in Paragraph 5 of her Declaration.  The supposed examples that Dra.

Rocabado provides of "nationalizations" are misleading.  Specifically:

     i)    The first erroneously called "nationalization" described in the
Rocabado Declaration supposedly was accomplished by means of a Decree issued on March
13, 1937.  That Decree does not even mention the term "nationalization," and is actually a
termination of the oil concession and the transfer of property of the Standard Oil Company of
Bolivia to the State as a remedy for a breach of the concession contract entered into with the
Bolivian government.  The breach was established by a judicial determination that Standard
Oil had engaged in tax fraud.  A copy of the Decree issued on March 13, 1937 is attached
hereto as Exhibit B. In this "nationalization", the property was taken by a de facto
administration established by means of coup d'etat.  The rule of law was, at best, of dubious
application during that government since Congress was banned and the enforcement of the
Constitution was, de facto, suppressed.

     ii)    In the second "nationalization" described in the Rocabado Declaration
the property was also taken by a de facto administration established by means of coup d'etat.
The rule of law was again, at best, of dubious application during that government since
Congress was banned and the enforcement of the Constitution was, de facto, suppressed.

     iii)    The third "nationalization" mentioned in the Rocabado Declaration (in
fact the first forced transfer of property which mentions the term "nationalization") was
executed by means of Supreme Decree No.  3223 on October 31, 1952 (and not in 1956 as
stated in the Rocabado Declaration).  This Decree, too, was issued by a de facto
administration.  The Decree provided a mechanism to effectuate compensation at the time of
the nationalization by means of payment orders, as contemplated by an earlier Decree issued
on April 4, 1879.  That earlier Decree (declared as Law by means of a Law issued on
December 30, 1884) regulates expropriations in the public interest and is commonly referred
to as the "Law of Expropriation".  Thus, this example directly contradicts Dra. Rocabado's
statement in paragraph 5 of her Declaration that "[t]he construction that the Law of
Expropriation does not apply to nationalization has been confirmed by the consistent practice
of nationalization in Bolivia".  Copies of Supreme Decree No.  3223, the Decree issued on
April 4, 1879 and the December 30, 1884 Law are attached hereto as Exhibit C.

     iv)    The final "nationalization" discussed in the Rocabado Declaration was
carried out by the current administration of President Evo Morales.  It took Bolivian
nationals' property (shares) administered by a trust under the management of two Bolivian

Pension Fund management companies, again without following the legal steps required by the Bolivian Constitution. The fact that the taking of assets by the Government of Bolivia has not contested by the parties being expropriated does not mean that said taking was legal. In fact, it is currently impossible to file any appeal against it because the Bolivian Constitutional Court does not have the necessary number of magistrates to issue any type of ruling. All but one of the five magistrates that constituted that Court resigned after a criminal action was filed against them due to a ruling issued by the Court which was deemed to be contrary to the Morales administration's actions.

12.    In summary, there is no such a thing as a "consistent practice of nationalization" in Bolivia, nor is there any legal basis for a "nationalization" that fails to comply with the requirements for expropriation under the Bolivian Constitution, including advance payment of just compensation. Bolivia's effort to take the ETI Shares from ETI plainly falls within the meaning of an expropriation as that term is used in the Bolivian Constitution. Accordingly, the share transfer can only be completed once the Bolivian constitutional requirements for an expropriation, including just compensation, are met.

### RESOLUTIONS OF THE U.N. GENERAL ASSEMBLY AND THE U.N. CHARTER OF ECONOMIC RIGHTS AND DUTIES OF STATES ARE NOT SOURCES OF BOLIVIAN LAW

13.    Paragraphs 8 to 10 of the Rocabado Declaration discuss resolutions 1803 and 3171 issued by the United Nations General Assembly and the United Nations Charter of Economic Rights and Duties of States (the "Resolutions and Charter") in an effort to establish that there is a distinction between expropriation and "nationalization" for purposes of Bolivian law. These are not, however, sources of Bolivian law.

14.    Paragraph 11 of the Rocabado Declaration goes on to cite Articles 136 and 133 of the Bolivian Constitution, apparently in an attempt to link the sovereignty concepts of the Resolutions and Charter with the terms contained in those constitutional provisions. Dra. Rocabado appears to contend that these constitutional provisions somehow effectuate the U.N. Resolutions and Charter, and thereby demonstrate the existence of constitutional grounds for "nationalization".

7

15.    In this regard, the Charter expressly recognizes that "nationalization" and expropriation are to be performed "in accordance with the rules in force in the State taking such measures", that "compensation should be paid by the State adopting such measures, taking into account its relevant laws and regulations and all circumstances the State considers pertinent..." and that "any disputes that may arise should be settled in accordance with the national legislation of each State carrying out such measures". Therefore, by their own terms, the Resolutions and Charter are necessarily subject to the provisions set forth in the Bolivian Constitution and Bolivian Law that, as explained above, do not contain nor contemplate the possibility of a "nationalization".

16.    Furthermore, Articles 136 and 133 of the Bolivian Constitution do not imply that the Bolivian State or its executive branch are permitted to "nationalize" telecommunication companies simply by virtue of the fact that they are using the electromagnetic spectrum. Dra. Rocabado again is unable to cite to any authority to support this interpretation. Even if those Articles could be read to permit the "nationalization" of rights to use the electromagnetic spectrum, moreover, they have no bearing on the government's right to expropriate shares of stock in a telecommunications company.

17.    Thus, for all the reasons explained in this declaration, I conclude that:

i)    The ETI Shares have not been transferred as a matter of Bolivian Law under the Bolivian Commercial Code;

ii)    There is no basis in Bolivian law for a "nationalization" of property, as a procedure distinct from expropriation;

iii)    There is no "consistent practice of nationalization in Bolivia," as a procedure distinct from expropriation; and

iv)    The fact that Entel is a telecommunications company using the electromagnetic spectrum does not change this result.

8

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 14, 2008

Ramiro Guevara

# EXHIBIT A

## G A C E T A   O F I C I A L   D E   B O L I V I A

**ARTICULO 223°.**

I. Los partidos políticos, las agrupaciones ciudadanas y los pueblos indígenas que concurran a la formación de la voluntad popular son personas jurídicas de Derecho Público.

II. Su programa, organización y funcionamiento deberán ser democráticos y ajustarse a los principios, derechos y garantías reconocidos por esta Constitución.

III. Se registrarán y harán reconocer su personería ante la Corte Nacional Electoral.

IV. Rendirán cuenta pública de los recursos financieros que reciban del Estado y estarán sujetos al control fiscal.

**ARTICULO 224°.** Los partidos políticos y/o las agrupaciones ciudadanas y/o pueblos indígenas, podrán postular directamente candidatos a Presidente, Vicepresidente, Senadores y Diputados, Constituyentes, Concejales, Alcaldes y Agentes Municipales, en igualdad de condiciones ante la Ley, cumpliendo los requisitos establecidos por ella.

### CAPITULO III
### LOS ORGANOS ELECTORALES

ARTICULO 225°. Los órganos electorales son:

1°. La Corte Nacional Electoral;
2°. Las Cortes Departamentales;
3°. Los Juzgados Electorales;
4°. Los Jurados de las Mesas de Sufragios;
5°. Los Notarios Electorales y otros funcionarios que la Ley respectiva instituya.

**ARTICULO 226°.** Se establece y garantiza la autonomía, independencia e imparcialidad de los órganos electorales.

**ARTICULO 227°.** La composición así como la jurisdicción y competencia de los órganos electorales será establecidas por Ley.

### PARTE CUARTA
### PRIMACIA Y REFORMA DE LA CONSTITUCION

### TITULO PRIMERO
### PRIMACIA DE LA CONSTITUCION

**ARTICULO 228°.** La Constitución Política del Estado es la Ley Suprema del ordenamiento jurídico nacional. Los tribunales, jueces y autoridades la aplicarán con preferencia a las leyes, y éstas con preferencia a cualesquiera otras resoluciones.

### G A C E T A    O F I C I A L    D E    B O L I V I A

II. Toda fuerza armada o reunión de personas que se atribuya la soberanía del pueblo comete delito de sedición.

## PARTE PRIMERA
## LA PERSONA COMO MIEMBRO DEL ESTADO

## TITULO PRIMERO
## DERECHOS Y DEBERES FUNDAMENTALES DE LA PERSONA

**ARTICULO 5°.** No se reconoce ningún género de servidumbre y nadie podrá ser obligado a prestar trabajos personales sin su pleno consentimiento y justa retribución. Los servicios personales sólo podrán ser exigibles cuando así lo establezcan las leyes.

**ARTICULO 6°.**

I. Todo ser humano tiene personalidad y capacidad jurídica, con arreglo a las leyes. Goza de los derechos, libertades y garantías reconocidos por esta Constitución, sin distinción de raza, sexo, idioma, religión, opinión política o de otra índole, origen, condición económica o social, u otra cualquiera.

II. La dignidad y la libertad de la persona son inviolables. Respetarlas y protegerlas es deber primordial del Estado.

**ARTICULO 7°.** Toda persona tiene los siguientes derechos fundamentales, conforme a las leyes que reglamenten su ejercicio:

a) A la vida, la salud y la seguridad;
b) A emitir libremente sus ideas y opiniones por cualquier medio de difusión;
c) A reunirse y asociarse para fines lícitos;
d) A trabajar y dedicarse al comercio, la industria o a cualquier actividad lícita, en condiciones que no perjudiquen al bien colectivo;
e) A recibir instrucción y adquirir cultura;
f) A enseñar bajo la vigilancia del Estado;
g) A ingresar, permanecer, transitar y salir del territorio nacional;
h) A formular peticiones individual y colectivamente;
i) A la propiedad privada, individual y colectivamente, siempre que cumpla una función social;
j) A una remuneración justa por su trabajo que le asegure para sí y su familia una existencia digna del ser humano;
k) A la seguridad social, en la forma determinada por esta Constitución y las leyes.

**ARTICULO 8°.** Toda persona tiene los siguientes deberes fundamentales:

a) De acatar y cumplir la Constitución y las leyes de la República;
b) De trabajar, según su capacidad y posibilidades, en actividades socialmente útiles;

4

<u>G A C E T A   O F I C I A L   D E   B O L I V I A</u>

**ARTICULO 31°.** Son nulos los actos de los que usurpen funciones que no les competen, así como los actos de los que ejerzan jurisdicción o potestad que no emane de la Ley.

**ARTICULO 32°.** Nadie será obligado a hacer lo que la Constitución y las leyes no manden, ni privarse de lo que ellas no prohíban.

**ARTICULO 33°.** La Ley sólo dispone para lo venidero y no tiene efecto retroactivo, excepto en materia social cuando lo determine expresamente, y en materia penal cuando beneficie al delincuente.

**ARTICULO 34°.** Los que vulneren derechos y garantías constitucionales quedan sujetos a la jurisdicción ordinaria.

**ARTICULO 35°.** Las declaraciones, derechos y garantías que proclama esta Constitución no serán entendidos como negación de otros derechos y garantías no enunciados que nacen de la soberanía del pueblo y de la forma republicana de gobierno.

## TITULO TERCERO

## NACIONALIDAD Y CIUDADANIA

### CAPITULO I
### NACIONALIDAD

**ARTICULO 36°.** Son bolivianos de origen:

1°. Los nacidos en el territorio de la República, con excepción de los hijos de extranjeros que se encuentren en Bolivia al servicio de su gobierno.
2°. Los nacidos en el extranjero de padre o madre bolivianos por el solo hecho de avecindarse en el territorio nacional o de inscribirse en los consulados.

**ARTICULO 37°.** Son bolivianos por naturalización:

1°. Los españoles y latinoamericanos que adquieran la nacionalidad boliviana sin hacer renuncia de la de su origen, cuando existan, a título de reciprocidad, convenios de nacionalidad plural con sus gobiernos respectivos.
2°. Los extranjeros que habiendo residido dos años en la República declaren su voluntad de adquirir la nacionalidad boliviana y obtengan carta de naturalización conforme a Ley.
   El tiempo de permanencia se reducirá a un año tratándose de extranjeros que se encuentren en los casos siguientes:

   a) Que tenga cónyuge o hijos bolivianos;
   b) Que se dediquen regularmente al trabajo agrícola o industrial;

**10**

G A C E T A     O F I C I A L     D E     B O L I V I A

**ARTICULO 57°.** Los Senadores y Diputados pueden ser reelectos y sus mandatos son renunciables.

**ARTICULO 58°.** Las sesiones del Congreso y de ambas Cámaras serán públicas, y sólo podrán hacerse secretas cuando dos tercios de sus miembros así lo determinen.

**ARTICULO 59°.** Son atribuciones del Poder Legislativo:

1ª. Dictar leyes, abrogarlas, derogarlas, modificarlas e interpretarlas.

2ª. A iniciativa del Poder Ejecutivo, imponer contribuciones de cualquier clase o naturaleza, suprimir las existentes y determinar su carácter nacional, departamental o universitario, así como decretar los gastos fiscales.

Sin embargo, el Poder Legislativo, a pedido de uno de sus miembros, podrá requerir del Ejecutivo la presentación de proyectos sobre aquellas materias. Si el Ejecutivo, en el término de veinte días, no presentase el proyecto solicitado, el representante que lo requirió u otro parlamentario podrá presentar el suyo para su consideración y aprobación. Las contribuciones se decretarán por tiempo indefinido, salvo que las leyes respectivas señalen un plazo determinado para su vigencia.

3ª. Fijar, para cada gestión financiera, los gastos de la Administración Pública, previa presentación del proyecto de presupuesto por el Poder Ejecutivo.

4ª. Considerar los planes de desarrollo que el Poder Ejecutivo pase a su conocimiento.

5ª. Autorizar y aprobar la contratación de empréstitos que comprometan las rentas generales del Estado, así como los contratos relativos a la explotación de las riquezas nacionales.

6ª. Conceder subvenciones o garantías de interés para la realización e incremento de obras públicas y de necesidad social.

7ª. Autorizar la enajenación de bienes nacionales, departamentales, municipales, universitarios y de todos los que sean de dominio público.

8ª. Autorizar al Ejecutivo la adquisición de bienes inmuebles.

9ª. Autorizar a las universidades la contratación de empréstitos.

10ª. Establecer el sistema monetario y el de pesas y medidas.

11ª. Aprobar anualmente la cuenta de gastos e inversiones que debe presentar el Ejecutivo en la primera sesión de cada legislatura.

12ª. Aprobar los tratados, concordatos y convenios internacionales.

13ª. Ejercitar influencia diplomática sobre actos no consumados o compromisos internacionales del Poder Ejecutivo.

14ª. Aprobar, en cada legislatura, la fuerza militar que ha de mantenerse en tiempo de paz.

15ª. Permitir el tránsito de tropas extranjeras por el territorio de la República, determinando el tiempo de su permanencia.

16ª. Autorizar la salida de tropas nacionales del territorio de la República, determinando el tiempo de su ausencia.

14

# G A C E T A   O F I C I A L   D E   B O L I V I A

**ARTICULO 93º.**

I.  En caso de impedimento o ausencia temporal del Presidente de la República, antes o después de su proclamación, lo reemplazará el Vicepresidente y, a falta de éste y en forma sucesiva, el Presidente del Senado, el de la Cámara de Diputados o el de la Corte Suprema de Justicia.

II.  El Vicepresidente asumirá la Presidencia de la República si ésta quedare vacante antes o después de la proclamación del Presidente Electo, y la ejercerá hasta la finalización del período constitucional.

III.  A falta del Vicepresidente hará sus veces el Presidente del Senado y en su defecto, el Presidente de la Cámara de Diputados y el de la Corte Suprema de Justicia, en estricta prelación. En este último caso, si aún no hubieran transcurrido tres años del período presidencial, se procederá a una nueva elección del Presidente y Vicepresidente, sólo para completar dicho período.

**ARTICULO 94º.** Mientras el Vicepresidente no ejerza el Poder Ejecutivo, desempeñará el cargo de Presidente del Senado, sin perjuicio de que esta Cámara elija su Presidente para que haga las veces de aquel en su ausencia.

**ARTICULO 95º.** El Presidente de la República no podrá ausentarse del territorio nacional, por más de cinco días, sin permiso del Congreso. A su retorno rendirá informe al Congreso.

**ARTICULO 96º.** Son atribuciones del Presidente de la República:

1ª. Ejecutar y hacer cumplir las leyes, expidiendo los decretos y órdenes convenientes, sin definir privativamente derechos, alterar los definidos por Ley ni contrariar sus disposiciones, guardando las restricciones consignadas en esta Constitución.

2ª. Negociar y concluir tratados con naciones extranjeras; canjearlos, previa ratificación del Congreso.

3ª. Conducir las relaciones exteriores, nombrar funcionarios diplomáticos y consulares, admitir a los funcionarios extranjeros en general.

4ª. Concurrir a la formación de códigos y leyes mediante mensajes especiales.

5ª. Convocar al Congreso a sesiones extraordinarias.

6ª. Administrar las rentas nacionales y decretar su inversión por intermedio del respectivo Ministerio, con arreglo a las leyes y con estricta sujeción al presupuesto.

7ª. Presentar al Legislativo, dentro de las treinta primeras sesiones ordinarias, los presupuestos nacional y departamentales para la siguiente gestión financiera y proponer, durante su vigencia, las modificaciones que estime necesarias. La cuenta de los gastos públicos conforme al presupuesto se presentará anualmente.

8ª. Presentar al Legislativo los planes de desarrollo que sobrepasen los presupuestos ordinarios en materia o en tiempo de gestión.

23

## G A C E T A   O F I C I A L   D E   B O L I V I A

III. La decisión que se pronuncie se elevará en revisión, de oficio ante el Tribunal Constitucional, en el plazo de veinticuatro horas, sin que por ello se suspenda la ejecución del fallo.

IV. El recurso de "Habeas Data" no procederá para levantar el secreto en materia de prensa.

V. El recurso de "Habeas Data" se tramitará conforme al procedimiento establecido para el Recurso de Amparo Constitucional previsto en el Artículo 19° de esta Constitución.

ARTICULO 24°. Las empresas y súbditos extranjeros están sometidos a las leyes bolivianas, sin que en ningún caso puedan invocar situación excepcional ni apelar a reclamaciones diplomáticas.

ARTICULO 25°. Dentro de cincuenta kilómetros de las fronteras, los extranjeros no pueden adquirir ni poseer, por ningún título, suelo ni subsuelo, directa o indirectamente, individualmente o en sociedad, bajo pena de perder, en beneficio del Estado, la propiedad adquirida, excepto el caso de necesidad nacional declarada por Ley expresa.

ARTICULO 26°. Ningún impuesto es obligatorio sino cuando ha sido establecido conforme a las prescripciones de la Constitución. Los perjudicados pueden interponer recursos ante el Tribunal Constitucional contra los impuestos ilegales. Los impuestos municipales son obligatorios cuando en su creación han sido observados los requisitos constitucionales.

ARTICULO 27°. Los impuestos y demás cargas públicas obligan igualmente a todos. Su creación, distribución y supresión tendrán carácter general, debiendo determinarse en relación a un sacrificio igual de los contribuyentes, en forma proporcional o progresiva, según los casos.

ARTICULO 28°. Los bienes de la Iglesia, de las órdenes y congregaciones religiosas y de las instituciones que ejercen labor educativa, de asistencia y de beneficencia, gozan de los mismos derechos y garantías que los pertenecientes a los particulares.

ARTICULO 29°. Sólo el Poder Legislativo tiene facultad para alterar y modificar los Códigos, así como para dictar reglamentos y disposiciones sobre procedimientos judiciales.

ARTICULO 30°. Los poderes públicos no podrán delegar las facultades que les confiere esta Constitución, ni atribuir al Poder Ejecutivo otras que las que expresamente les están acordadas por ella.

9

## G A C E T A    O F I C I A L    D E    B O L I V I A

4ª. Separar temporal o definitivamente, con el acuerdo de dos tercios de votos, a cualesquiera de sus miembros por graves faltas cometidas en el ejercicio de sus funciones.

5ª. Fijar las dietas que percibirán los legisladores; ordenar el pago de sus presupuestos; nombrar y remover su personal administrativo y atender todo lo relativo a su economía y régimen interior.

6ª. Realizar las investigaciones que fueren necesarias para su función constitucional, pudiendo designar comisiones entre sus miembros para que faciliten esa tarea.

7ª. Aplicar sanciones a quienes cometan faltas contra la Cámara o sus miembros, en la forma que establezcan sus reglamentos, debiendo asegurarse en éstos, el derecho de defensa.

**ARTICULO 68º.** Las Cámaras se reunirán en Congreso para los siguientes fines:

1º. Inaugurar y clausurar sus sesiones.

2º. Verificar el escrutinio de las actas de elecciones de Presidente y Vicepresidente de la República, o designarlos cuando no hubieran reunido la pluralidad absoluta de votos, conforme a las disposiciones de esta Constitución.

3º. Recibir el juramento de los dignatarios mencionados en el párrafo anterior.

4º. Admitir o negar la renuncia de los mismos.

5º. Ejercitar las atribuciones a que se refieren los incisos 11º y 13º del artículo 59º.

6º. Considerar las leyes vetadas por el Ejecutivo.

7º. Resolver la declaratoria de guerra a petición del Ejecutivo.

8º. Determinar el número de efectivos de las Fuerzas Armadas de la Nación.

9º. Considerar los proyectos de Ley que, aprobados en la Cámara de origen, no lo fueren por la Cámara revisora.

10º. Ejercitar las facultades que les corresponden conforme a los artículos 111º, 112º, 113º y 114º de esta Constitución.

11º. Autorizar el enjuiciamiento del Presidente y el Vicepresidente de la República, Ministros de Estado y Prefectos de Departamento con arreglo a la atribución 5ª del artículo 118º de esta Constitución.

12º. Designar a los Ministros de la Corte Suprema de Justicia, a los Magistrados del Tribunal Constitucional, a los Consejeros de la Judicatura, al Fiscal General de la República y al Defensor del Pueblo, de acuerdo a lo previsto en los artículos 117º, 119º, 122º, 126º y 128º de esta Constitución.

**ARTICULO 69º.** En ningún caso podrá delegar el Congreso a uno o más de sus miembros, ni a otro Poder, las atribuciones que tiene por esta Constitución.

**ARTICULO 70º.**

1. A iniciativa de cualquier parlamentario, las Cámaras pueden pedir a los Ministros de Estado informes verbales o escritos con fines legislativos, de

18

# EXHIBIT B

MARZO

...contrado, en la inspección ocular prac-
del Distrito, que el alambique estaba
de funcionar poco antes de la dili-
xistencia de 300 litros de aguardien-

...sión de Impuestos Internos, al decla-
bia y condenado al denunciado Solari
s de aguardiente y a la multa de Bs.
os datos del proceso y a lo prescrito,
creto Reglamentario de 23 de enero...

...rdo con lo dictaminado por el señor
Confírmase, en apelación, el auto de
ministración de Impuestos Internos,
1936, en la denuncia formulada por
ario Solari, por elaboración clandes-
reparación de fermentos con materia
ciéndose en favor del denunciante a
artículo 91 del Reglamento de 29 de
saber y devuélvase.

R. — Fernando Campero A.

It. Aduana de La Paz en el proce-
dolfo González.

---

MARZO                                                                 519

...ción clandestina de billetes bolivianos en la cantidad de once
mil y seiscientos pesos argentinos; los Informes de la Dirección
General de Aduanas; del Asesor Técnico del mismo ramo y el
dictamen del Fiscal de Gobierno;

CONSIDERANDO: Que el funcionario nombrado, al
practicar las revisiones de su incumbencia requirió la decla-
ración al pasajero J. Adolfo González, que viajaba en el tren
internacional con destino a Buenos Aires, habiendo éste de-
clarado que llevaba consigo la cantidad de Bs. 11.000.— en bi-
lletes del Banco Central y 600.— pesos argentinos y entregado,
además, en la aduana las mencionadas cantidades;

Que si bien el proceso adolece de vicios en su tramita-
ción, por no haber concurrido el acusado sino mediante apo-
derado, el Tribunal de grado tiene facultad de revisión y, tra-
tándose de un caso de hecho, en el que consta la prueba efec-
tiva de no haberse consumado ni intentado la infracción, toda
vez que el pasajero ha declarado ante las autoridades boliva-
nas ser portador de los valores que motivan el juicio;

De acuerdo con las opiniones del Asesor Técnico de Adua-
nas y el dictamen del Fiscal de Gobierno;

SE RESUELVE: Revócase el auto pronunciado por el
Administrador de La Aduana de La Paz, y se declara no exis-
tir la infracción acusada, ordenándose la devolución de los
billetes bolivianos y la entrega de los pesos argentinos al Ban-
co Central por medio del que debe efectuar toda transacción,
con moneda extranjera, al interesado.

Regístrese y remítase a la Dirección General de Adua-
nas, para su cumplimiento.

(Fdo.) — D. Toro R. — Fernando Campero A.

Standard Oil. — Declárase caducas todas sus concesiones en
la República, por defraudación de intereses fisca-
les.

MINISTERIO DE MINAS Y PETRÓLEOS

La Paz, 13 de marzo de 1937

VISTOS: Los obrados del proceso contra The Standard

131.

Oil Co., of Bolivia por defraudación de los intereses fiscales tada por "The Standard Oil Co., of Bolivia, se comprueba que la producción de Petróleo en los pozos Bermejo, 1925 y 1926 y su exportación del territorio de la República, en el año 1928 la citada Compañía, al exigir el pago de patentes petroleras correspondientes a periodos de explotación, manteniéndose en varios escritos no haber habido explotación, y más aún, no estar en posibilidad de producir, de tal que en evidente de este producto desde el campamento de Agua Blanca en la Argentina, Bermejo ...

... a presentar ninguna liquidación;

Que a base de estas falsas afirmaciones eludió el pago de patentes y la entrega de la regalía correspondiente al Estado, defraudando los intereses fiscales en forma manifiesta, ...

... Que el contrato suscrito con esta Compañía en 27 de julio de 1922, no es sino una aclaración del contrato anterior sobre el mismo asunto, firmado en 1920 con Richmond Levering and Co., ya que en 1922 no era posible suscribir nuevamente un contrato en contraposición expresa de la Ley Orgánica de Petróleos de 1921, y que en vista de esto The Standard Oil Co., explotó que no se trataba de un nuevo, sino de la prorrogación del de Richmond Levering and Co., que era anterior a la Ley, sin rescindirlo ni dejarlo sin efecto; ...

... moral Levering and Co., se estipula que el Gobierno podría declarar su caducidad o rescisión administrativamente, por defraudación de los intereses fiscales; caducidad que importa la pérdida de todos los derechos a los capitalistas; que tuvieran en el país, los que pasan a propiedad exclusiva del Estado;

Que mientras se define la forma en que el Estado administrará los campamentos petroleros, pozos y refinerías, etc., éstos podrán ser manejados por Y. P. F. B.;

SE RESUELVE: Declárase la caducidad de todas las propiedades de "The Standard Oil Co of Bolivia, dentro del territorio de la República, por defraudación comprobada de intereses fiscales.

Todos los bienes de la Compañía mejorada

---

... pallaren en territorio boliviano al tiempo de dictarse la presente Resolución, pasan a propiedad del Estado.

Hasta que el Gobierno lo crea conveniente, quedará encargada de la administración y manejo de todos los bienes de la Compañía, que en virtud de esta caducidad pasan a ser de propiedad del Estado, la entidad oficial "Yacimientos Petrolíferos Fiscales Bolivianos" (Y. P. F. B.)

Regístrese, transcríbase a quien corresponda y archívese.

(K'Jo). — D. Toro R. — A. Ichazo. — Gral. Quillen. — E. Finot. — F. Campero A. — Tonl. Vera G. — O. Moscoso. — J. Paz C. — R. Alfee. — Tabera.

...rías. — Apruébase las de las líneas de The Bolivian Railway Co., para 1937.

MINISTERIO DE OBRAS PUBLICAS

La Paz, 13 de marzo de 1937

VISTOS: Las gestiones realizadas por el ferrocarril de Antofagasta a Bolivia para un nuevo reajuste en las tarifas de sus líneas propias y en las de The Bolivia Railway Co., que maneja y:

CONSIDERANDO: Que subsisten las causales determinantes de la Resolución Suprema de 1o. de agosto de 1934, modificatoria de las tarifas ferroviarias desde entonces vigentes; ...por el contrario con la adopción del tipo de cambio por libra esterlina, la Empresa ha recargado en forma considerable sus erogaciones que darían justificativos para una mayor elevación aún de la acordia en esta Resolución;

Que son uniformes las opiniones de los técnicos en sentido favorable a los petitorios de la Empresa;

SE RESUELVE: Art. 1o. — Apruébase las tarifas de líneas del ferrocarril de Antofagasta a Bolivia y las de The Bolivia Railway Co., para su vigencia durante el presente año

# EXHIBIT C

— 92 —

Dado en el Palacio de Gobierno de la ciudad de La Paz, a los treinta días del mes de octubre de mil novecientos cincuenta y dos años,

(Fdo.) VICTOR PAZ ESTENSSORO.— Cnl. César Aliaga C.

31 de Octubre

### DECRETO SUPREMO Nº 3223.

VICTOR PAZ ESTENSSORO
Presidente Constitucional de la República.

CONSIDERANDO:

Que Bolivia, país esencialmente productor de minerales desde épocas remotas, no pudo incorporar a la economía nacional las riquezas extraídas de su suelo, porque a la explotación colonial de las minas de plata, siguió la explotación semi-colonial de las minas de estaño, malográndose, por ello, las coyunturas favorables que se presentaron en el curso de su historia, para asegurar el bienestar colectivo y el progreso de la Nación;

Que, como consecuencia del alto valor comercial que adquirió el estaño desde fines del siglo pasado, y de la posesión de los mejores yacimientos por Simón I. Patiño, la Compañía Aramayo y Mauricio Hoschschild se produjo una concentración de riqueza en manos de éstos, desproporcionada con el nivel general de la economía del país;

Que el poder económico derivado de esa concentración de riquezas, devino también en poder político, ejerciendo una hegemonía que deformó en su beneficio toda la vida nacional.

CONSIDERANDO:

Que las grandes empresas, sin tener en cuenta los superiores intereses del país, subordinaron el esfuerzo nacional, a la exclusiva explotación de sus minas, impidiendo, de manera sistemática, toda otra actividad, hasta convertir a Bolivia en un simple campamento minero;

— 93 —

Que al no retornar al país, sino en mínima parte, el valor de las exportaciones mineras, de las tres grandes empresas, se produjo un permanente drenaje de la riqueza nacional, tanto más grave cuanto que por ser la industria minera esencialmente extractiva, está sujeta a inevitable agotamiento;

Que esa constante fuga de capitales ha determinado el empobrecimiento progresivo del país y anulado las posibilidades de creación y desarrollo de un mercado interno, con todas sus funestas consecuencias sobre la agricultura, la industria, el comercio y el transporte;

Que la subordinación del país a los intereses de los grandes empresarios mineros, anquilosó el desarrollo agropecuario e industrial de riquísimas zonas de nuestro teritorio, ya que la preferencia en la importación de artículos extranjeros de consumo, privó de todo incentivo a los productores nacionales.

CONSIDERANDO:

Que, en contraste con el desmesurado enriquecimiento de los magnates del estaño, el Estado boliviano se empobreció gradualmente y arrastró déficits presupuestarios cada día mayores, porque la minería, principal fuente de la riqueza nacional, estaba prácticamente eximida de cargas tributarias, al amparo del dominio incontrastable que ejerció sobre los poderes públicos;

Que la deuda externa, originada por la penuria fiscal a que dió lugar el régimen impositivo de privilegio mantenido por la influencia política de las grandes empresas mineras, no pudo ser atendida, porque los recursos fiscales y las disponibilidades en moneda extranjera apenas alcanzaron para cubrir las necesidades más premiosas del país, en tanto que los potentados del estaño continuaban acumulando enormes fortunas en el exterior;

Que, ante las necesidades fiscales cada vez más imperiosas y el despertar de la conciencia obrera, después de la masacre de Uncía en 1923, el gobierno se vió obligado a dictar la primera ley de impuestos sobre utilidades mineras y las medidas iniciales de protección social;

Que, como reacción a tales disposiciones y para asegurar con ayuda extranjera la continuidad de la explotación ilimitada y la opresión del país que les daba su fortuna, las empresas se internacionalizaron, mediante la ficción de distribuir acciones entre ciudadanos de países poderosos, empujando así a Bolivia a la condición de semicolonia controlada por el imperialismo;

— 94 —

Que esas empresas, al organizarse en el extranjero con capitales salidos de Bolivia, y no para traer nuevos capitales al país, no sólo buscaron el amparo y la protección de las grandes potencias, sino que también pretendieron legalizar la fuga de riquezas practicada durante veinticinco años y continuada sin interrupción hasta nuestros días.

CONSIDERANDO:

Que para implantar y sostener, a lo largo de medio siglo, semejante régimen de explotación, los tres empresarios mineros lograron dominar, mediante el soborno, el halago o la intimidación, a los personeros de todos los poderes del Estado, a los dirigentes de los partidos políticos y a los órganos de publicidad encargados de orientar la opinión pública, persiguiendo y eliminando, cuando fué necesario, a quienes se resistieron a obedecerles incondicionalmente;

Que, con tales procedimientos, las Empresas convirtieron al Estado Boliviano en el típico instrumento de opresión semicolonial, que les sirvió para garantizar la más fácil y continuada explotación de los recursos naturales del país y su libre transferencia al extranjero;

Que, si algún gobierno intentó poner límite a esa inescrupulosa intervención de las empresas en la vida pública de la Nación, éstas no trepidaron en organizar revoluciones, golpes de Estado y asonadas, alterando así el normal desarrollo democrático de la República.

CONSIDERANDO:

Que el régimen de trabajo impuesto por las grandes empresas mineras, es de tal manera inhumano y opresivo, que el promedio de vida de los obreros ocupados en el interior de las minas es apenas de 27 años, como lo han comprobado investigadores internacionales del problema social boliviano;

Que las demandas de aumento de salarios, las huelgas y otras manifestaciones colectivas originadas en el hambre y la desesperación de los trabajadores, fueron reprimidas sistemáticamente con la persecución, los despidos en masa, la supresión de los servicios de agua y luz en las viviendas, el trabajo bajo vigilancia armada, las listas negras, y, finalmente, las masacres periódicas indiscriminadas de hombres, mujeres y niños, meticulosamente preparadas por las empresas y ejecutadas por los gobiernos a su servicio.

CONSIDERANDO:

Que las manifestaciones culturales del país sufrieron también las consecuencias de la dominación de esos intereses privilegiados, pues ningún esfuerzo del espíritu que no estuviese a su servicio tenía esperanza de encontrar apoyo ni estímulo;

Que los investigadores, escritores y artistas se vieron forzados, directa o indirectamente, a imitar los sistemas de ideas, las creaciones artísticas y el estilo de vida importados desde el extranjero, para uso de la oligarquía, con sacrificio y preterición de todo intento creador cuyas raíces se hundieran profundamente en la realidad nacional boliviana.

CONSIDERANDO:

Que la victoria nacional de Abril, culminación de un largo proceso revolucionario, al liquidar la dominación política de las grandes empresas mineras, ha hecho posible materializar la decisión irrevocable del pueblo boliviano, como una necesidad vital, de nacionalizar las minas de Patiño, Hochschild y Aramayo;

Que el estudio realizado por la Comisión constituida por Decreto Supremo N° 3059, de 13 de mayo último, ha evidenciado el derecho incontrovertible del Estado boliviano a nacionalizar las minas y, ha proporcionado las bases jurídicas, económicas y técnicas para llevar a cabo tan trascendental medida.

CONSIDERANDO:

Que, por imperio de la Constitución y las leyes de minería, todas las substancias del reino mineral son del dominio del Estado, el cual, sin desprenderse de su derecho, las adjudica a los particulares, en el concepto de que su explotación reviste carácter de utilidad pública y beneficio colectivo;

Que las minas explotadas por los grupos Patiño, Hochschild y Aramayo, en lugar de ser fuente de beneficio colectivo, sólo aprovecharon a sus adjudicatarios y se convirtieron, en manos de ellos, en peligrosos instrumentos de dominio y opresión del pueblo boliviano;

Que, habiendo desaparecido así el motivo fundamental de la adjudicación de las concesiones mineras en favor de aquellos particulares, el Estado tiene el derecho y el deber de revertirlas a su dominio, para hacer que, en el futuro, las riquezas extraídas del subsuelo sean de beneficio nacional y sirvan los intereses de la colectividad;

Que, de acuerdo a nuestra legislación y a la jurisprudencia nacional y extranjera, al revertir los yacimientos los adjudicatarios, cuyo derecho no comprende más que la tenencia y pose-

— 96 —

sión, no pueden capitalizarlos contra el Estado, que no se ha desprendido en ningún momento del dominio sobre aquellos;

Que la reversión de las concesiones mineras al dominio del Estado, impone la expropiación de todas las instalaciones y demás bienes pertenecientes a las empresas que forman los grupos Patiño, Hoschchild y Aramayo, necesarios a la producción de minerales, ya que la actividad minera es vital para el país y debe mantenerse sin interrupción, por exigirlo así, con carácter imperioso, la seguridad y necesidad públicas a que se refiere el artículo 109 de la Constitución;

Que, de acuerdo a la legislación civil y mercantil vigente, los libros de los comerciantes e industriales tienen valor probatorio, por lo que, para los efectos de la avaluación de los bienes a expropiarse, se toma como base los valores contables de las empresas;

Que, de conformidad al estudio practicado por la Comisión de Nacionalización de Minas, se ha determinado, provisionalmente, los montos indemnizables en favor de las empresas, tomando como base el valor contable de sus balances al 31 de diciembre de 1951, hechas las deducciones que son procedentes;

Que, así como el Gobierno pagará el justo valor de los bienes expropiados, también tiene el derecho inobjetable de cobrar todos los impuestos y otras obligaciones fiscales determinadas por leyes y decretos preexistentes, que adeudan al Estado las empresas que forman los grupos Patiño, Hochschild y Aramayo y que éstas dejaron de pagar prevalidas de la impunidad que les aseguraba su dominio sobre los gobiernos y funcionarios encargados de velar por los intereses del Estado.

CONSIDERANDO:

Que el sacrificio, heroísmo y perseverancia de los trabajadores mineros en la lucha contra la oligarquía, han sido elementos decisivos para el triunfo de la Revolución Nacional;

Que, como factor principal en el proceso de la producción, el esfuerzo de los trabajadores en la explotación de las minas que pasan a poder del Estado debe merecer especial reconocimiento;

Que, así como se ha establecido la participación de los trabajadores en el manejo superior de la Corporación Minera de Bolivia, es de justicia otorgar la intervención y control de obreros en la administración local de las minas nacionalizadas.

— 97 —

**DECRETA:**

**Artículo 1°**—Se nacionaliza, por causa de utilidad nacional, las minas y bienes de las empresas que forman los grupos Patiño, Hochschild y Aramayo.

**Artículo 2°**—La nacionalización dispuesta en el artículo anterior comprende:

a) La reversión al dominio del Estado, en toda su plenitud, de las concesiones mineras poseídas actualmente, a cualquier título, por todas y cada una de las empresas nombradas en el inciso siguiente, que son las que integran los grupos Patiño, Hochschild y Aramayo;

b) La expropiación en favor del Estado, por causa de utilidad pública, de todas las maquinarias, instalaciones, edificios, ingenios, plantas de experimentación, laboratorios, vías y medios de comunicación, equipos y materiales de transporte, centrales eléctricas, campamentos, materiales de explotación y de pulpería, productos minerales acumulados, estudios, informes técnicos, planos, cartas de curso, libros de contabilidad, documentos, archivos y de todos los muebles e inmuebles de propiedad de las empresas Patiño Mines & Enterprises Consolidated Inc.; Bolivian Tin & Tungsten Mines Corporation, con su subsidiaria Sociedad de Estaño de Araca; Compañía Minera y Agrícola Oploca de Bolivia; Compañía Huanchaca de Bolivia; Compañía Minera Unificada del Cerro de Potosí; Compañía Minera de Oruro, con sus subsidiarias Compañía Estañífera de Vinto y Sociedad Estañífera de Morococala; Empresa Minera Matilde; Minas Pampa Grande; Empresa Minera Bolsa Negra; Grupo Minero Venus y Compagnie Aramayo de Mines en Bolivie S. A.; las instalaciones industriales pertenecientes a Mauricio Hochschild S.A.M.I. destinadas a la explotación minera, así como todo lo que, perteneciendo a las nombradas empresas, se juzgue necesario para el descubrimiento, exploración, explotación, beneficio, transporte y distribución de los productos de la industria minera.

**Artículo 3°** — Se establece como apreciación provisional de los montos indemnizables en favor de las empresas, las siguientes cantidades:

Patiño Mines & Ent. Cons. Inc. por B$ 218.876.797.51 y $us. 2.707.707.74;

Bolivian Tin & Tungsten Mines Corp. por B$ 41.378.536.91 y $us 211, 213.77;

— 98 —

Cia. Minera Agricola Oploca de Bolivia por £ 87.657.11.2;

Cia. Minera Unificada del Cerro de Potosí por B$.———
18.328.600.89 y Sus. 1.847.385.17;

Cia Minera de Oruro por B$ 15.817.060.67 y Sus.———
2.088.908.43;

Cia. Huanchaca de Bolivia, por Sus. 1.179.134.89;

Empresa Minera Matilde, por B$ 4.153.310.80 y Sus.———
1.724.847.78;

Empresa Minera Bolsa Negra por B$ 5.989.981.36 y Sus.
831.250.60;

Minas Pampa Grande, por $us. 2.210.65;

Grupo Minero Venus, por $us. 6.555.64;

Compagnie Aramayo de Mines en Bolivia S. A. por Sus.
4.976.324.82;

Mauricio Hochschild S.A.M.I., por sus instalaciones re-
lacionadas con la explotación minera, por Sus. 361.985.64:  can-
tidades resultantes del valor contable de los bienes expropiados
según los balances de las empresas al 31 de diciembre de 1951.
deducción hecha de los siguientes conceptos:

    a) Las inversiones recíprocas de las empresas;
    b) Las inversiones radicadas en el exterior;
    c) Los efectivos y valores realizables situados en el ex-
       tranjero:
    d) Las reservas para atención de obligaciones sociales;
    e) Otros conceptos por los cuales el Estado asume res-
       ponsabilidad.

Artículo 4°— Entre tanto se determine el monto indemni-
zable definitivo, de acuerdo al procedimiento señalado en los ar-
tículos 8° y 9° de este mismo Decreto y, en calidad de pago pro-
visional por la expropiación dispuesta en el inciso b), del artícu-
lo 2°, el Contralor General de la República y el Tesorero General
de la Nación, a nombre y en representación del Estado, emitirán y
entregarán con vencimiento al 31 de diciembre de 1953, los li-
bramientos a que se refiere el Decreto Reglamentario del 4 de
abril de 1879, a los personeros de las empresas, por las cantida-
des y en la moneda que se detalla en el artículo anterior.

Artículo 5°— Los libramientos a que se refiere el artícu-
lo precedente serán nominativos y el Estado no reconocerá, has-
ta tanto concluyan las diligencias mencionadas en el artículo 8°

— 99 —

del presente Decreto, transferencias, negociaciones, embargos ni acto alguno que importe limitación o mutación de dominio sobre los mismos.

**Artículo 6°—** De acuerdo a lo dispuesto por el artículo 2° del Decreto Supremo 3196 de 2 del presente mes, se encomienda a la Corporación Minera de Bolivia la administración y operación de las minas nacionalizadas.

**Artículo 7°—** La Corporación Minera de Bolivia procederá a la inmediata ocupación de las concesiones revertidas al dominio del Estado, en virtud de lo dispuesto por el inciso a), del artículo 2° del presente Decreto.

Asímismo, para mantener ininterrumpida la producción, por requerirlo con carácter imperioso la seguridad y necesidad públicas, procederá a la ocupación inmediata y uso de los bienes expropiados, hasta la liquidación definitiva, en ejercicio de las facultades de ocupación temporal y aprovechamiento de materiales que autoriza la sección segunda del Decreto Reglamentario de 4 de abril de 1879, con fuerza de Ley por imperio de la de 30 de diciembre de 1884.

**Artículo 8°—** La Corporación Minera de Bolivia, tomando como base los balances de las empresas al 31 de diciembre de 1951 y el subsiguiente movimiento de cuentas, determinará a la fecha de la ocupación de las minas, los valores de los bienes expropiados y las obligaciones de las empresas por las cuales el Estado asumiera responsabilidad de pago.

De acuerdo con esa comprobación se establecerá los montos indemnizables.

**Artículo 9°—** De los montos indemnizables establecidos de acuerdo a lo dispuesto por el artículo anterior, se descontará las sumas que resultaren adeudar las empresas al Estado, verificados que hayan sido los cargos pendientes contra ellas.

**Artículo 10°—** Efectuada la liquidación final en la forma indicada en los dos artículos que preceden y siempre que resultaren saldos a favor de las empresas, el Contralor General de la República y el Tesorero General de la Nación, canjearán los libramientos provisionales de pago mencionados en el artículo 4° de este Decreto, con documentos de pago definitivos por el importe de dichos saldos. La liquidación y, en su caso, el canje de documentos, podrán efectuarse antes del 31 de diciembre de 1953.

**Artículo 11°—** Desde el momento de la ocupación y mientras se verifique los saldos líquidos indemnizables, el Estado abo-

— 100 —

nará a las empresas un interés anual del 3% sobre las sumas consignadas en el artículo 3º Este interés se liquidará y pagará por semestres vencidos, en la misma moneda en que se hubiere emitido el respectivo libramiento provisional.

Si a tiempo del pago de los intereses, existieran notas de cargo ejecutoriadas contra las empresas, se practicará la compensación respectiva en la proporción que corresponda.

**Artículo 12º** — Para la atención por el Estado de las obligaciones emergentes de la nacionalización, el organismo encargado de la exportación de minerales separará y depositará en el Banco Central de Bolivia, en cuenta especial, el 2% del valor bruto de los minerales procedentes de las minas nacionalizadas.

**Artículo 13º** — Bajo conminatoria de las sanciones establecidas en el Decreto Supremo de 30 de septiembre de 1940 y en el Artículo 40º de la Ley de 21 de Noviembre de 1872, las empresas nombradas en los Artículos 2º, inciso b), y 3º de este Decreto, entregarán al Banco Central, en los plazos fijados por la Contraloría General de la República, la documentación completa, debidamente legalizada, para el descargo de remanentes de divisas a que se refieren los Decretos Supremos de 7 de junio y 7 de julio de 1939 y demás disposiciones legales relativas a la materia. La inobservancia de esta obligación producirá, además, la conversión a términos de moneda nacional, de los montos indemnizables que resultaren de la liquidación definitiva a que se refieren los artículos 8º y 9º de este Decreto.

Dicha conversión se hará a los tipos de cambio vigentes en las épocas en que debieron efectuarse los descargos de remanentes.

**Artículo 14º** — El Estado, de acuerdo a la legislación vigente, reconoce la antigüedad y todos los demás derechos sociales de empleados y obreros, emergentes de servicios prestados a las empresas, imputando a éstas los importes correspondientes de acuerdo a los Artículos 3º inciso e), y 8º de este Decreto.

**Artículo 15º** — Los empleados nacionales y extranjeros, en servicio de las empresas nacionalizadas, gozarán de todas las garantías que les acuerda el ordenamiento legal de la República. Los que deseen retirarse, darán a la Corporación Minera de Bolivia los preavisos de ley, bajo conminatoria de perder sus beneficios sociales y contractuales.

**Artículo 16º** — En ejecución de lo dispuesto en el inciso a), del artículo 2º de este Decreto, la Corporación Minera de Bolivia tramitará inmediatamente los registros correspondientes en

— 101 —

favor del Estado. Asimismo, practicará la inventariación de los bienes expropiados, a la fecha de su ocupación.

Artículo 17° — En las minas nacionalizadas se ejercitará control obrero, con la participación de los trabajadores, mediante delegados, en la administración local de cada una de ellas.

Los señores Ministros de Estado en los Despachos de Minas y Petróleo y Hacienda y Estadística, quedan encargados de la ejecución y cumplimiento del presente Decreto.

Es dado en el Campo de María Barzola, Catavi, a los treinta y un días del mes de octubre de mil novecientos cincuenta y dos años.

(Fdo.) VICTOR PAZ ESTENSSORO.— Juan Lechín O.— F. Gutiérrez Granier.— Wálter Guevara A.— Cnl. César Aliaga C.— Ñuflo Chávez O.— Guillermo Aborta.— Julio Ml. Aramayo.— Tgral. Froilán Calleja.— Adrián Barrenechea.— Germán Butrón.— M. Diez de Medina.— F. Alvarez Plata.— Hugo Roberts B.

———————

3 de Noviembre.

DECRETO SUPREMO N° 3224.

VICTOR PAZ ESTENSSORO
Presidente Constitucional de la República

CONSIDERANDO:

Que es deber del Supremo Gobierno, dotar a la provincia Bautista Saavedra del Departamento de La Paz, de una Casa de Gobierno y Justicia, que permita la adecuada atención de los diferentes asuntos administrativos y judiciales que se tramitan en aquella apartada región;

Que los inmuebles de propiedad de los hermanos Jenaro, Héctor, Rodolfo, Jorge, Liberato y Albina Pastén y Uldarico Tudela, situados en la Plaza de Villa Pérez (Charazani), capital de la indicada Provincia, reunen favorables condiciones por su especial ubicación;

77

Abril.

# DECRETO DE 1.° DE ABRIL.

**Expropiacion por causa de utilidad pública.—Se reglamenta provisionalmente la materia de referencia.**

**HILARIÓN DAZA, PRESIDENTE DE LA REPÚBLICA.**

**Considerando:**

La necesidad de reglamentar la expropiacion por causa de utilidad pública; i teniendo presente que las disposiciones necesarias a este objeto, siendo de carácter simplemente administrativo, no están comprendidas en las atribuciones del artículo 1.° de la Constitucion, referentes a la reforma de las leyes: En tanto se espida una lei especial sobre la materia, he venido en decretar]

Decreto el siguiente reglamento provisional sobre expropiacion por causa de utilidad pública.

## TÍTULO PRIMERO.

### Disposiciones generales.

Artículo 1.° — Siendo inviolable el derecho de propiedad, no se puede obligar a ningun particular, corporacion o establecimiento de cualquier especie, a que ceda o enajene lo que sea de su propiedad, para obras de interés público, sin que precedan los requisitos siguientes: 1.° declaracion solemne de que la obra proyectada es de utilidad pública; 2.° permiso competente para ejecutarla; 3.° declaracion de que es indispensable que se ceda o enajene la propiedad para ejecutar la obra de utilidad pública; i 4.° pago del precio en que se justiprecie la cosa que haya de cederse o enajenarse.

Art. 2.° — Se entiende por obras de utilidad pública, las que interesen por objeto directo proporcionar al Estado en jeneral, a uno o mas departamentos, provincias o cantones, cualesquiera usos o disfrutes de inmediato comun beneficio; i las ejecutadas por cuenta del Estado, de los departamentos, provincias o cantones, o por compañías o empresas particulares autorizadas competentemente.

Art. 3.° — La declaracion de que una obra es de utilidad pública, y el permiso para emprenderla, será objeto de una ley, o de las respectivas ordenanzas municipales, siempre que para ejecutarla haya que imponer una contribucion que grave a una o mas circunscripciones. En los casos además que tengan por objeto un uso i libre ejercicio, debiendo preceder a su espedicion los requisitos siguientes: Primero, publicacion en el periódico oficial, dando a conocer el objeto de la obra, para que los habitantes de las poblaciones interesadas puedan hacer presente a la autoridad política local lo que tuvieren por conveniente. Segundo, que el consejo departamental, oyendo a las juntas municipales...

[columna lateral:]

...consejo de instruccion, conforme a la resolucion de 25 de enero de 1874 i al réjimen de estos funcionarios del consejo del departamento, debiendo funcionan los colejios y facultades instituidos, destinándose a la reflexion i mejora de la educacion primaria, i segun el réjimen científico necesario a los establecimientos.

Se quedan encargados de la ejecucion del ministerio de instruccion...

...de la enseñanza libre será conforme a todos los colejios, terminándose por el consejo de instruccion primaria será indeterminando por el consejo de...

...instruccion primaria será indeterminando por el consejo de...

L.

° DE ABRIL.

...la guardia nacional moviliza...

...sujetos a las leyes militares y reglas.—(Democrática.) No...

E. Diaz.—Julio Méndez.

...i dias del mes de marzo de 1879.

78

...

**TÍTULO SEGUNDO.**

*Disposiciones particulares.*

**Sección 1.ª**

*Formalidades que se han de observar en los casos de expropiación.*

Art. 11. Declarada una obra de utilidad pública, se procederá al reconocimiento...

79

## 80

### ARNIL.

§400, el plazo de la obra en líneas negras, marcando con otras de carmín las partes de cada propiedad que haya necesidad de expropiar, y vistos estos planos se remitirá al prefecto o a la municipalidad, según los casos. La prefectura se dirigirá con informe a la mesa tropezará a la dirección general de caminos públicas, ó á dicha dirección si se hubiere ocupado á las propiedades vulneradas, á fin de que quedase su conformidad se expongan de agravios, en cuyo caso resolverá por la prefectura, ó la municipalidad respectivamente, dando de valor á expropiar de 500 pesos, y remitirá la relación de que consta al informe á la mesa tropezará que funciona cerca del ministerio de industria.

Art. 23. Para el pago de las propiedades sujetas á expropiación, se procederá á la expropiación á ocupación de los terrenos ántes de que conste el pago en dichas indemnizaciones.

Art. 24. La indemnización que se consignará á los interesados á la prefectura, podrá reclamar interrumpido por causa de la entidad que tengan á la presente pública reclamo resarciendo. Promovéndose litispíes entre el dueño de la cosa y el que reclama indemnización por causa de la autoridad, quedando exentos los intereses que tuviesen según reales, se procederá á la liquidación respectiva.

### De la ocupación temporal y aprovechamiento de materiales. Sección 2ª

Art. 26. Si la ejecución de las obras públicas exigiere la temporal ocupación, se observarán las reglas siguientes:

Art. 27. El ingeniero comunicará á los dueños de predios y de materiales la necesidad de su ocupación temporal ó de su aprovechamiento, y si la propiedad perteneciere á un municipio, serviendo respectivamente, quienes teniendo los intereses convenientes ó oyendo el consejo departamental, resolverá lo que corresponda.

## 81

### ARNIL.

Si los interesados no se conforman con la resolución, podrán acudir al consejo gobierno competente en materia de industria.

Art. 28. Los edificios sólo podrán ocuparse para habitación de operarios ó servicio de la obra, en la parte que los dueños no los habiten ó aprovechen.

Art. 29. Se entiende por materiales de construcción aprovechables, aquellos no se encuentran destinados ó reservados para el uso particular.

Art. 30. Siempre que sea posible la tasación de los materiales necesarios para la construcción de la obra, se verificará ántes de ocupar la propiedad, y los dueños serán indemnizados, y á su valor, antes del momento, y los dueños serán indemnizados, y su valor depende del mayor ó menor espacio, medida ó pianola, y se va la tasación se verificará la indemnización según los daños que se les produzca, los demás gastos de la obra, liquidando entre ellos el valor de las cosas aprovechadas.

Art. 31. Todas las tasaciones que sea preciso hacer por ocupación temporal de las propiedades, se practicarán en la forma prescrita en los artículos 15, 16, 17, 18 y 19 de este reglamento.

Art. 32. Si por cualquier motivo no fuese posible la prévia tasación, se satisfará al propietario el precio de la tasación verificada al concluir las operaciones para que hecha la ocupación los materiales que sea necesario, se procederá á verificar esta tasación, el derecho que los interesados tuviesen á ser indemnizados.

Art. 33. Las partes tendrán siempre el derecho á verificar esta tasación, y se ha resta ó el la hubiera podido producir su propiedad durante la ocupación.

Art. 34. Si la obra por consiste, ó son proviniera por diferencia durante el ejercicio de la tasación verificada ántes de la plantación pública, se usará de la indemnización.

Art. 35. Si las obras se ejecutan por cuenta, y no se hubiese satisfado el libre aprovechamiento de los materiales que se encuentran en terrenos, cuadras ó bosques del estado, álcuará el contratista el precio de dichos materiales, oliquación ó su administración de la obra por el contratista.

### Expropiación de muebles religiosos. Sección 3ª

Art. 36. Si el inmueble sujeto á desapropio perteneciere al dominio...

11

## 82 ABRIL.

de la iglesia, de convento monasterio o instituto, sujetos a ella, la expropiación será prefiamente acordada con la autoridad diocesana, continuándose de acuerdo con el proceso.

Art. 36. No siendo posible ninguna conciliación, se procederá del modo siguiente:

I. Tratándose de la apertura de calles que corten conventos o monasterios, se iniciará al administrador de ellos para que en un término subsistente, previo traz de la línea de la calle que haya de hacerse en la casa religiosa, se derriben las murallas por cuenta de los fondos de que se trate luego el trayecto, no se violan los preceptos de la clausura monástica.

Art. 57. En la expropiación de otros inmuebles religiosos y sujetos de distinta clase, se seguirán las reglas comunes.

## Sección 4.ª

### De lo contencioso.

Art. 38. Cuando se falte a las presentes disposiciones podrán las partes iniciarlo en su caso...

---

## Abril. 83

el valor que los dueños atribuyan a su propiedad, podrán los mismos reclamar...

## DECRETO DE 5 DE ABRIL.

El ministro de Justicia, Culto e Instrucción Pública queda encargado de la ejecución y cumplimiento del presente decreto.—Bianco Díaz.—Julio Méndez.

## RESOLUCION DE 5 DE ABRIL.

### Tratado secreto de alianza entre Bolivia y el Perú.—Se publicó y celebró en 6 de febrero de 1873.

### PROTOCOLO.

Reunidos en el Ministerio de Relaciones Exteriores los infrascritos Manuel Irideyen, ministro de ese ramo, y Serapio Reyes Ortiz, enviado extraordinario y ministro plenipotenciario de Bolivia, en misión confidencial, convinieron de conformidad con lo dispuesto en el artículo adicional del tratado de alianza defensiva celebrada entre el Perú y Bolivia el 6 de febrero de 1873 y previa la exhibición de sus respectivos plenos poderes, en dar publicidad a dicho tratado.

DICIEMBRE.

## LEI DE 30 DE DICIEMBRE.

**Expropiacion.**—*Se declara lei de Estado el decreto supremo de 4 de abril de 1879 sobre expropiacion por causa de necesidad y utilidad pública.*

EL CONGRESO NACIONAL

Decreta:

Artículo único. Rejirá como lei del Estado el decreto del poder ejecutivo de 4 de abril de 1879, sobre expropiacion por causa de necesidad y utilidad pública, sin perjuicio del procedimiento especial de minería que rije en la materia.

Comuníquese al poder ejecutivo.

Sala de sesiones del congreso nacional en Sucre, noviembre 8 de 1884.

M. BAPTISTA,
T. VILLEGAS.

*Juan Francisco Velarde*, S. secretario.
*Dámaso Sánchez*, D. secretario.
*Domingo Paz*, D. secretario.

Por tanto la promulgo para que se tenga y cumpla como lei de la república.

Palacio de gobierno, en la capital Sucre, a los 30 dias del mes de diciembre de 1884 años.

G. PACHECO.—H. Gutiérrez.

## DECRETO DE 30 DE DICIEMBRE.

**Municipalidades.**—*Se establece una junta municipal en el pueblo de San Lúcas, provincia de Cinti.*

GREGORIO PACHECO, PRESIDENTE CONSTITUCIONAL DE LA REPÚBLICA,

Considerando:

Que la lei electoral de 20 de noviembre de 1888, en el artículo 3.° de los transitorios, ha creado un segundo distrito electoral en la provincia de Cinti, el que debe tener su junta municipal respectiva, conforme a dicha lei;

Decreto:

Art. 1.° Se establece en el pueblo de San Lúcas, una junta municipal, compuesta de cinco miembros, con jurisdiccion en los cantones San Lúcas, Aocilla y Colpa.

Art. 2.° Para su organizacion, se verificará la eleccion de municipes, el 2.° domingo del mes de febrero próximo; el escrutinio y proclamacion el tercer domingo del mismo mes, y la instalacion de la junta el 1.° de marzo siguiente.

Art. 3.° En la eleccion, escrutinio y proclamacion, se observarán las disposiciones de la lei electoral vijente.

Art. 4.° El ministro de gobierno queda encargado de la ejecucion y cumplimiento de este decreto.

Dado en Sucre, a los 30 dias del mes de diciembre de 1884 años.

G. PACHECO.—M. D. Medina.

DICIEMBRE.

## DECRETO DE 31 DE DICIEMBRE.

**Aduanas.**—*Se declara la aduana comun de Arica.*

GREGORIO PACHECO, PRESIDENTE CONSTITUCIONAL DE LA REPÚBLICA,

Considerando:

Que cancelado el pacto de trégua ajustado el 4 de abril, el rendimiento de la aduana de Arica es divisible entre nuestra república y la de Chile.

Considerando:

Que está nombrado el ajente que en representacion de los derechos de Bolivia, debe tomar conocimiento de las operaciones fiscales que se verifiquen en aquel puerto;

Decreto:

Art. 1.° Se declara, desde el 1.° de enero de 1885, aduana comun, la del puerto de Arica. — Su rendimiento se dividirá, segun el artículo 6.° párrafo 8.° del pacto de tégua de 4 de abril y complementario de 8 del mismo mes y año.

Art. 2.° El ajente aduanero nombrado por el gobierno, tomar conocimiento de la contabilidad que se lleve en el puerto de Arica, ejeciendo las demás atribuciones que sean inherentes a su cargo.

El ministro de hacienda e industria queda encargado de la ejecucion y cumplimiento de este decreto.

Dado en Sucre, a los 31 dias del mes de diciembre de 1884 años.

G. PACHECO.—H. Gutiérrez.

## CIRCULAR DE 31 DE DICIEMBRE.

**Telégrafos.**—*Se invita a propuestas para encargarse del trabajo de l... lineas telegráficas de Colquechaca a Oruro, La Paz y Cochabamba.*

Ministerio de hacienda e industria.—Sucre, diciembre 31 de 18...

Circular N.° 81.

Al señor prefecto del departamento de...........

Señor.

El gobierno que cuenta con material conveniente para la construccion de líneas telegráficas—tiesen que las capitales de Oruro, Cochababa y La Paz, se unan por ese vínculo a los centros mineros del sur y comuniquen con el exterior.

Para realizar este propósito invitará U. por medio de la prensa los ciudadanos que quieran encargarse de la obra bajo las bases y condiciones que siguen:

1.ª Las líneas telegráficas, que deben partir de Colquechaca a Oruro, Cochabamba y La Paz serán de doble alambre.

2.ª Aisladores, máquinas y alambre se proporcionarán por el Estado. El salario de obreros y todos los demás gastos y útiles se proverán y pagarán por éste.

3.ª El gobierno incitará a los sub-prefectos para que faciliten brazos necesarios pagándoles el precio corriente por su trabajo.

4.ª Se prestará por el empresario una fianza que garantice la ...