Michael Krinsky (MK 4503)
Eric M. Lieberman (EL 4822)
RABINOWITZ, BOUDIN, STANDARD,
    KRINSKY & LIEBERMAN, P.C.
111 Broadway, 11th Floor
New York, New York 10006
Telephone:  (212) 254-1111
Facsimile:  (212) 674-4614

Terry Gross (TG 3249)
GROSS BELSKY ALONSO LLP
180 Montgomery Street, # 2200
San Francisco, California 94104
Telephone:  (415) 514-0200
Facsimile:  (415) 544-0201

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E.T.I. EURO TELECOM INTERNATIONAL, N.V., | : |
| Plaintiff, | : |
| v. | : Case No. 08-cv-4247 (LTS/FM) |
| REPUBLIC OF BOLIVIA, and EMPRESA NACIONAL DE TELECOMUNICACIONES ENTEL, S.A., | : |
| Defendants. | : |

**EMPRESA NACIONAL de TELECOMUNICACIONES ENTEL S.A.'s
NOTICE AND SUBMISSION OF HIGH COURT OF JUSTICE'S JUDGMENT
IN PARALLEL ENGLISH ACTION,**

**(A) IN FURTHER OPPOSITION TO MOTION TO CONFIRM *EX PARTE* ORDER
OF PREJUDGMENT ATTACHMENT and**

**(B) IN FURTHER SUPPORT OF MOTION TO DISMISS**

Defendant Empresa Nacional De Telecomunicaciones Entel, S.A. ("ENTEL") respectfully provides notice of and submits for this Court's consideration the attached Judgment of the High Court of Justice, Queen's Bench Division, Commercial Court, in the action brought by plaintiff against the Republic of Bolivia and ENTEL.  The High Court's Judgment was rendered in London on July 11, 2008 and released in official form on July 16, 2008.

The High Court's Judgment fully supports ENTEL's opposition here to plaintiff's motion to confirm the *ex parte* order of prejudgment attachment and ENTEL's motion to dismiss plaintiff's "Complaint for an Order of Attachment In Aid of International Arbitration."

In the attached Judgment, the High Court (Mr. Justice Andrew Smith) discharged with prejudice the *ex parte* restraint it had previously issued at plaintiff's request on any deposits of the Republic of Bolivia and ENTEL in England and Wales, including, specifically, ENTEL's account at Deutsche Bank in London.  The High Court held, *inter alia*, that the freezing order must be vacated "in view of the rules governing ICSID arbitrations."  Judgment ¶26.  The same judge who had issued the *ex parte* order issued the judgment discharging it.

Days after commencing the instant action in New York on May 5, 2008, plaintiff commenced an action in the High Court.  On plaintiff's application, made without notice and *ex parte*, Mr. Justice Andrew Smith issued an order on May 9, 2008 providing that the Republic of Bolivia and ENTEL "must not remove or cause to be removed from England and Wales, or in any way dispose of, or deal with or diminish the value of any deposit, including without limitation time deposits, located at Deutsche Bank AG London…in the name of Empresa Nacional de Telecomunicaciones Entel S.A."  Any person having notice of the order, such as Deutsche Bank, was bound not to assist in its breach.

On June 12 and 30, 2008, respectively, ENTEL and the Republic of Bolivia applied to dis-

charge the order. Upon Bolivia and ENTEL's request, Mr. Justice Andrew Smith agreed to hold

an expedited hearing on July 10 as to why the order should be discharged "on the basis of limited

grounds" - namely, "questions of, or closely related to, their points about jurisdiction" - without

waiting "for the more extended hearing" scheduled for July 29 and 30. Judgment, ¶ 3. The par-

ties submitted "Skeleton Arguments," and ETI and ENTEL submitted Witness Statements exhib-

iting many of the declarations submitted in the instant New York action. ETI submitted the Re-

ply Memorandum it had filed here on June 23, 2008 in support of its motion to confirm the *ex*

*parte* order of prejudgment attachment, as well as all the Reply Declarations it had filed in this

Court on the same date.

On July 10, the High Court heard extended oral argument. The High Court did not hear any

witnesses.

On July 11, the High Court announced its Judgment discharging the freeze order and re-

straint, and issued the attached, approved transcript of its Judgment on July 16. The Court of

Appeal will hear ETI's appeal against the discharge on an expedited basis on July 22, 2008. In

the meantime, the discharge order is stayed.

The Court's attention is drawn in particular to the High Court's ruling that restraint of EN-

TEL or Bolivia's accounts is improper because of the ICSID Convention. Judgment, ¶¶ 5-9 and

26-33. This is so "because the ICSID Convention, Regulations and Rules provide that, unless

otherwise stated, consent of the parties to an ICSID arbitration is deemed to be consent to the

arbitration to the exhaustion of any other remedy (see Article 26 of the Convention)," Judgment

¶ 26, and the "ICSID Convention Rules . . . contemplate that there shall be no provisional meas-

ures in respect of an arbitration otherwise than by agreement or in accordance with the machin-

ery under the Rules." Judgment, ¶ 32.

In the High Court, ETI advanced the very arguments that it relies upon here as to why the ICSID Convention's bar should not be applied. The High Court unequivocally rejected those arguments, Judgment ¶ 29:

> Mr. Moss [on behalf of ETI] put forward two arguments in reply to this submission. He said that it is not open to Bolivia to rely upon the arbitration regime when there is no constituted tribunal that can recommend protective measures as contemplated by Rule 39, and when this came about through Bolivia's own failure to comply with the arbitration regime. There seem to me three answers to this. First, as I have said, Rule 39, on its face, lays down a regime that applies before as well as after the tribunal has been constituted. Secondly, E.T.I. could have had the tribunal fully constituted long before now and before these proceedings were brought, had it availed itself of procedures available to it under the ICSID machinery [as explained in paragraph 9 of the Judgment[1]]. Thirdly, and most fundamentally, it is E.T.I. who seek to rely upon the ICSID arbitration in support of these proceedings. It does not seem to me that it can rely upon, without accepting the limitation of the proceedings under the ICSID machinery, including the restriction on when provisional measures may be sought. That is not a limitation deriving from any breach of the ICSID Convention or Rules on the part of Bolivia, but a limitation inherent in the regime that E.T.I. invoke, and need to invoke, in order to argue that the court has jurisdiction to make the order in its favour.

The High Court concluded, Judgment ¶ 31:

> In view of the arguments put forward about the nature and limitations of the ICSID regime, I cannot accept that it is right to maintain the order on the grounds that it should be made in relation to the ICSID arbitration.

## CONCLUSION

For the foregoing reasons, and for those previously stated, as well as those set forth by the Republic of Bolivia, plaintiff's motion to confirm the *ex parte* order of prejudgment attachment should be denied and ENTEL's motion to dismiss this action should be granted.

---

[1] The ICSID machinery referenced by the High Court is also set out in ENTEL's Sur-Reply In Opposition to Motion to Confirm *Ex Parte* Order of Prejudgment Attachment, filed July 3, 2008, at 12-13.

Dated:    July 21, 2008

Respectfully submitted,

Michael Krinsky (MK 4503)
Eric M. Lieberman (EL 4822)
RABINOWITZ, BOUDIN, STANDARD,
   KRINSKY & LIEBERMAN, P.C.

Of Counsel:

Jules Lobel

Adam Belsky
GROSS BELSKY ALONSO LLP

Terry Gross (TG 3249)
GROSS BELSKY ALONSO LLP

*Counsel for Empresa Nacional de Telecomuni-*
*caciones Entel S.A.*

**ATTACHMENT**

IN THE HIGH COURT OF JUSTICE                                   No. 468 and 469 of 2008

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

**[2008] EWHC 1689 (COMM)**


Royal Courts of Justice

Friday, 11th July 2008


Before:

MR. JUSTICE ANDREW SMITH


B E T W E E N :

E.T.I. EURO TELECOM INTERNATIONAL NV          Claimant

- and -

(1) REPUBLIC OF BOLIVIA
(2) EMPRESA NACIONALE DE TELECOMUNICACIONES ENTEL SA   Defendants

_____

*Transcribed by BEVERLEY F. NUNNERY & CO*
*Official Shorthand Writers and Tape Transcribers*
*Quality House, Quality Court, Chancery Lane, London WC2A 1HP*
*Tel: 020 7831 5627   Fax: 020 7831 7737*

_____

MR. G. MOSS QC  and  MR. HAYWOOD (instructed by Orrick, Herrington & Sutcliffe) appeared
on behalf of the Claimant.

MR. P. McGRATH (instructed by Stephenson Harwood) appeared on behalf of the First Defendant.

LORD D. BRENNAN QC (instructed by Reed Smith) appeared on behalf of the Second Defendant.

_____

**J U D G M E N T**

(As approved by the Judge)

BEVERLEY F NUNNERY & CO
OFFICIAL SHORTHAND WRITERS

1  MR. JUSTICE ANDREW SMITH:

2  1.  On 9 May 2008 the claimants (whom I shall call "E.T.I.") applied to me
3      without notice for an order against the Republic of Bolivia and against the 2nd
4      defendant (whom I call "Entel") to prevent some deposits at Deutsche Bank,
5      London being removed from England and Wales or being dealt with or
6      diminished in value.  I made the order and on 16 May 2008 Mr. Justice Flaux
7      extended it.  On 12 June 2008 Entel applied to have the order discharged.  On
8      30 June 2008 the Republic of Bolivia made a similar application.  The order
9      was challenged on various bases, including that the court has no jurisdiction to
10     make the order; that there was material non-disclosure, and that there was not
11     sufficient evidence of a risk of dissipation.  Those applications are listed for
12     hearing over two days on 29 and 30 July.

14  2.  On 1 July 2008 Stephenson Harwood, solicitors for the Republic of Bolivia,
15     wrote a letter to the court and Reed Smith, solicitors for Entel (or who claim to
16     be instructed for Entel) countersigned it to record their agreement with its
17     contents.  In the letter Stephenson Harwood wrote:

19         "... We have set out what we consider to be various jurisdictional
20         barriers to the injunctive relief obtained on 9 May 2008.  We consider
21         those points to be both clear and unanswerable.  We have given the
22         claimant an opportunity to consider these points so that, consistent with
23         their continuing duty for full and frank disclosure, they could
24         themselves apply to the court for the immediate discharge of the relief
25         wrongly obtained.  Unfortunately they have not provided their
26         substantive response to the points we have raised.  Given the force of
27         the points and the fact that we are dealing with one of the court's most
28         draconian forms of relief, we respectfully submit that this matter
29         cannot and should not be expected to await a two day hearing now
30         listed for the end of July.  If, as we say, the points fatally undermine
31         the entitlement to the relief granted then the injunctive relief should be
32         immediately discharged".

34  3.  Orrick, Herrington & Sutcliffe, E.T.I.'s solicitors, required until 7 July 2008 to
35     respond to the points raised by the defendants.  The matter was listed for
36     directions on 9 July and I offered the defendants today's hearing, on 10 July
37     2008, to present an argument that the order should be discharged on the basis
38     of limited grounds without waiting for the more extended hearing on 29 and 30
39     July.  The defendants wishes to make such an application, confining their
40     arguments on 10 July 2008 to questions of, or closely related to, their points
41     about jurisdiction.

4.   In view of the nature of the challenge to the order advanced before me, there is no need for a detailed explanation of the facts but I shall set out something of the background. I do so on the basis of E.T.I.'s assertion of the position. It might be that the defendants take issue with some of these matters but, to my mind, E.T.I.'s evidence sufficiently establishes them for present purposes.

5.   In 1995 E.T.I. entered into agreement with the Republic of Bolivia and Entel, the Bolivian communications company, whereby Entel was privatised and E.T.I. became owners of half the shares in Entel and, it says, took managerial control. E.T.I. paid something over US$600m and thereafter made substantial investments in Entel and, in 2005, there was a capital distribution.

6.   In 2007 ABN Amro Bank NV was engaged to place a value on E.T.I.'s stake in Entel and considered that it was worth between US$294m and US$325m. E.T.I. says that its value increased thereafter. In January 2006 President Evo Morales took office in Bolivia, advocating significant State intervention in the economy. It is E.T.I.'s contention that the Government began to take measures that adversely affected the value of its investment in Entel, and were designed to expropriate its interest without paying fair compensation.

7.   On 12 October 2007 E.T.I. submitted a request for arbitration to ICSID, the International Centre for the Settlement of Investment Disputes, part of the World Bank based in Washington D.C. established to hear disputes between investors and States under bi-lateral treaties. It sought to recover damages against Bolivia to compensate it for injuries from the Government's actions. The request was based on its rights under a bi-lateral investment treaty between the Kingdom of the Netherlands and the Republic of Bolivia signed on 10 March 1992. E.T.I. is a Netherlands company.

8.   The treaty is concerned with the legal relationship between Bolivia and Dutch nationals who made investments in Bolivia, and provides for various protections for Dutch nationals who do so. It includes a dispute resolution machinery for arbitration of disputes between either the Dutch or the Bolivian Government and an investor from the other State. The treaty provides that if both States have acceded to the Convention on the Settlement of Investment Disputes between States and nationals of other States of 18 March 1965 (and the Netherlands and Bolivia have) then any disputes that may arise between one of the contracting States and a national of another shall be submitted for conciliation or arbitration to ICSID in accordance with the Convention.

9.   On 2 May 2007 Bolivia formally denounced the ICSID Convention, but it is E.T.I.'s contention that that denunciation did not take effect before 2 November 2007. On 29 October 2007 Bolivia submitted a letter to ICSID

1    objecting to its jurisdiction over the reference submitted by E.T.I.
2    Nevertheless, on 31 October 2007 ICSID registered E.T.I.'s request for
3    arbitration.  Bolivia has not participated in the ICSID reference.  The tribunal
4    is not yet constituted.  E.T.I. says that this is the result of Bolivia not
5    complying with the ICSID rules.  In view of the state of the evidence before
6    me, I proceed on the basis that Bolivia has indeed not complied with the
7    ICSID rules for constituting a tribunal, although it is right to point out that the
8    ICSID Convention also contains provisions (in particular Articles 37-40) for
9    machinery for the constitution of a tribunal notwithstanding one party to the
10    dispute is not co-operating, and had that machinery been used by E.T.I. a
11    tribunal could by now have been constituted.

10.  On 1 May 2008, at a May Day rally, President Morales announced that Bolivia
    was nationalising E.T.I.'s interest in Entel and pronounced a Supreme Decree
    to that effect.  On the same day police took control of Entel's main offices in
    Bolivia.

11.  Entel, according to E.T.I., maintains cash reserves in London, including some
    renewable time deposits at Deutsche Bank.  There is a dispute, which I cannot
    resolve in this judgment, as to whether they are or have been used for day-to-
    day operating expenses.

12.  On 5 May 2008 E.T.I. obtained ex parte an order of attachment in the courts of
    the South District of New York.  It provided for the Marshal to levy upon,
    amongst other property, deposits held by Entel in J.P. Morgan Chase Bank
    NA.  E.T.I.'s complaint is headed: "Complaint for order of attachment in aid
    of international arbitration".  The complaint itself makes it clear that the order
    is sought "in aid of" the ICSID arbitration.  Proceedings are continuing in the
    New York court.  E.T.I. seeks to have the order confirmed and the Republic
    and Entel (or those purporting to act for Entel) oppose that motion.

13.  On 9 May 2008 E.T.I. sought its order from me, relying upon s.44 of the
    Arbitration Act 1996, and s.25 of the Civil Jurisdiction and Judgments Act
    1982, the latter contention being on the basis that there are "proceedings"
    before the New York court.  It is said that I should discharge the order because
    the court had no jurisdiction to make it or that the court's jurisdiction provides
    no proper basis for making it.  These arguments were advanced by Mr. Paul
    McGrath, representing the Republic of Bolivia:

        (1)  That the court had no jurisdiction under either s.44 of the
        Arbitration Act 1996 or s.25 of the Civil Jurisdiction and Judgments
        Act 1982 to grant an interim injunction in support of the New York

attachment proceedings and/or an ICSID arbitration by the claimant ("E.T.I.") against Bolivia.

(2) If s.25 of the CJJA applies it is not expedient to grant an interim relief in aid of the ICSID arbitration; see Articles 26 and 47 of the ICSID Convention and Rule 39.6 of the ICSID arbitration rules.

(3) The court had no jurisdiction because of s.30(2)(a) of the State Immunity Act 1978 to grant an interim injunction against Bolivia.

These arguments were supported by Lord Brennan QC. He was instructed by Messrs. Reed Smith to represent Entel. I should record that E.T.I. dispute whether Reed Smith are properly authorised to act and give instructions on behalf of Entel, but I cannot, and need not, go into that question.

14. In response to Bolivia's arguments, E.T.I. no longer maintains that the court has jurisdiction under the 1996 Act to make the order. The 1996 Act has only limited application to ICSID arbitrations. ICSID arbitrations are subject to the Arbitration (International Investment Disputes) Act 1966. There is power in s.3(1) of that Act for the Lord Chancellor to issue an Order in Council to extend parts of the 1996 Act, including s.44, to cover ICSID arbitrations, but this has not been done (see *Republic of Ecuador v Occidental Exploration and Production Company* [2006] QB 432 at para.38).

15. E.T.I.'s contention now is that the court has jurisdiction to make its order under the 1982 Act, and this contention has been expanded since the hearing on 9 May, in that it is said that s.25 of the 1982 applies both on the basis of the New York court proceedings but also on the basis of the ICSID arbitration reference. Although the second limb of that contention was not previously advanced by E.T.I., Mr. McGrath and Lord Brennan have not argued that on that account it is not open to E.T.I. now to advance it or that the order should be discharged on that account. Their contention is that the new argument does not assist E.T.I.

16. The background to s.25 of the 1982 Act was the decision of the House of Lords in *The Siskina* [1979] AC 210, that the English court did not have jurisdiction to grant interim relief by way of Mareva injunction (as it was then called) unless it had jurisdiction over the merits of the substantive claim and the provisions of Article 24 of the Convention on Jurisdiction Enforcement of Judgments in Civil and Commercial matters (now Article 31 of the counter-regulation EC No. 44/2001). That provides:

1          "Application may be made to the courts of Contracting State for such
2          provisional, including protective, measures as may be available under
3          the law of that State, even if, under this Convention, the courts of
4          another Contracting State have jurisdiction as to the substance of the
5          matter".

6

7  17.  Section 25, as originally enacted, read (in part) as follows:

8

9          "(1)  The High Court in England and Wales or Northern Ireland should
10         have power to grant interim relief where -
11         (a) proceedings have been or are to be commenced in a Contracting
12         State other than the United Kingdom or in a part of the United
13         Kingdom other than that in which the High Court in question exercises
14         jurisdiction; and
15         (b) there are or will be proceedings whose subject matter is within
16         scope of the 1968 Convention as determined by Article 1 (whether or
17         not the Convention has effect in relation to the proceedings).

18

19         (2)  On an application for any interim relief under sub-section (1) the
20         court may refuse to grant that relief if, in the opinion of the court, the
21         fact that the court has no jurisdiction apart from this section in relation
22         to the subject matter of the proceedings in question makes it
23         inexpedient for the court to grant it.

24

25         (3)  Her Majesty may by Order in Council extend the power to grant
26         interim relief inferred by sub-section (1) so as to make it exercisable in
27         relation to proceedings of any of the following descriptions, namely:
28         (a) proceedings commenced, or to be commenced, otherwise than in a
29         Contracting State;
30         (b)  proceedings whose subject matter is not within the scope of the
31         1968 Convention as determined by Article 1;
32         (c)  arbitration proceedings".

33

34      Sub-section (5) of s.25 provided that an order in relation to arbitration
35      proceedings may provide for the repeal of any provision in relation to s.12(6)
36      of the Arbitration Act 1950.

37

38  18.  By the Arbitration Act 1996 the section is amended in that the reference in
39      sub-section 25(3)(c) to arbitration proceedings was repealed, as was sub-
40      section (5).  That amendment to the 1982 Act came into effect on 31 January
41      1997.  On 12 February 1997 there was made the Civil Jurisdiction and
42      Judgments Act 1982 (Interim Relief) Order 1997.  It came into force on 1
43      April 1997.  It provided in paragraph (2) that:

> "The High Court in England and Wales or Northern Ireland shall have power to grant interim relief under s.25(1) of the Civil Jurisdiction and Judgments Act 1982 in relation to proceedings of the following descriptions, namely -
>
> (a) proceedings commenced or to be commenced otherwise than in a Brussels or Lugano Contracting State;
>
> (b) proceedings whose subject matter is not within the scope of the 1968 Convention as determined by Article 1 thereof".

I should perhaps say that Article 1 of the 1968 Brussels Convention, to which s.25 and the Order in Council refer, provided, of course, that the Convention should apply to civil and commercial matters but not extend, for example, to Revenue and Customs or administrative matters and should not apply to arbitration and various other specified matters, such as the status or legal capacity of natural persons and bankruptcy.

19.  In *Credit Suisse Fides Trust SA v Cuoghi* [1998] QB 818 the Court of Appeal considered an order made under s.25 of the 1982 Act after proceedings had been brought by the claimant against the defendant in Switzerland.  After explaining the background to the section and referring to the Order in Council, Lord Justice Millett said, at p.825C:

> "The position has now been reached ... that the High Court have power to grant interim relief in aid of substantive proceedings elsewhere of whatever kind and wherever taking place".

He went on to say this, at p.827D-E:

> "I recognise that an ancillary jurisdiction ought to be exercised with caution, and that care should be taken not to make orders which conflict with those of the court seised of the substantive proceedings. But I do not accept that interim relief should be limited to that which would be available in the court trying the substantive dispute: or that by going further we would be seeking to remedy defects in the laws of other countries".

20.  Thus, Mr. McGrath submits that s.25 is limited to giving the court jurisdiction to assist foreign substantive proceedings.  I accept that, provided the expression "substantive proceedings" is not understood too narrowly.  For example, in *Kensington International Ltd v Republic of the Congo* [2008] a Lloyd's Rep 161, the claimant, having obtained judgment in the English court, brought attachment proceedings in Switzerland and the Court of Appeal

1   recognised that s.25 provided the jurisdiction to make orders in support of
2   those Swiss attachment proceedings.  Mr. McGrath argued that the
3   proceedings in the New York court are not proceedings within the meaning of
4   s.25 of the 1982 Act, or the Order in Council, because they are not substantive
5   proceedings and are themselves ancillary to the ICSID arbitration.  I observe,
6   however, that the word "substantive" is not found in either s.25 or in the Order
7   of Council, and it seems to me, for the purposes of this case and sufficiently
8   for Bolivia's purposes, Mr. McGrath's argument can be recast to trace more
9   closely the statutory language.  If the English court has power to make the
10  order because of the New York proceedings, it is because such power is
11  conferred by the Order in Council.  The Order in Council empowers the court
12  to grant interim relief "in relation to proceedings" commenced in a non-
13  Convention State, and whose subject matter is not within the scope of the 1968
14  Convention as determined by Article 1.
15
16  21.  It does not seem to me that the order in these proceedings is interim relief
17       made in relation to the New York proceedings in any relevant sense.  The New
18       York proceedings are directed to assets said to be within the New York
19       jurisdiction.  These proceedings are directed to different assets, said to be in
20       London.  Both are ancillary to the ICSID arbitration and, in that sense, the New
21       York proceedings and these proceedings might be said to be parallel
22       proceedings.  But these proceedings cannot be said to be ancillary to, or in
23       support of, the New York proceedings, and the New York proceedings have no
24       primacy over these proceedings except in an irrelevant temporal sense.  I do
25       not consider, therefore, that the court has jurisdiction under the Order in
26       Council by virtue of the existence of the New York proceedings.
27
28  22.  I must therefore consider the alternative argument that the court has
29       jurisdiction under the Order in Council because the court order is made in
30       relation to the arbitration proceedings.  Here Mr. McGrath advances two
31       arguments: that the Order in Council is not to be interpreted as empowering
32       the courts to make orders in relation to arbitration proceedings, and that, even
33       if it did, it must be inexpedient to exercise that power because of the ICSID
34       rules which govern the arbitration and to which E.T.I. is to be taken to have
35       subscribed by submitting the request to a ICSID arbitration.
36
37  23.  Mr. McGrath's first argument is that s.25, as originally enacted, was confined
38       to the position where legal as opposed to arbitral proceedings have been, or are
39       to be, commenced and that the Order in Council does not change this.
40       Although the order brings it about that, as Lord Justice Millett put it, there is
41       jurisdiction to "grant interim relief in aid of substantive proceedings elsewhere
42       of whatever kind and wherever taking place", that does not include arbitral
43       proceedings.  This is not, as I understand the argument, because it is said that

1   the word "proceedings" is in itself always inappropriate to refer to arbitrations.
2   Mr. Moss rightly referred to other areas of the law where the word
3   "proceedings" has been understood to refer to arbitrations and this can,
4   depending on the context, undoubtedly be a natural usage of the term.  Mr.
5   McGrath's argument instead is directed to its meaning in the context of the
6   order and, importantly, in the legislative context in which the order is made.
7
8   24.   As I have said, the Order in Council was made shortly after the Arbitration Act
9         1996 was passed, providing a detailed regime in s.44 for the court powers in
10        support of arbitrations.  The specific power conferred by the 1966 Act as
11        amended to extend the regime of the 1996 Act to ICSID arbitrations has not
12        been exercised.  It is not, it is said, to be supposed that instead the Order in
13        Council intended to supplement or otherwise affect the new regime under the
14        1996 Act, and, it is added, it is not to be supposed that the Order, which was
15        directed to private disputes, incidentally conferred power to use s.25 in relation
16        to ICSID arbitrations involving States.  There is no need to interpret the Order
17        as having this surprising effect and it should not be so interpreted.
18
19  25.   I am persuaded by this argument.  Mr. Moss responds that, given the
20        amendment to s.25 made by the 1996 Act, the effect of the order is that there is
21        no statutory restriction on what proceedings can be supported by orders made
22        under the section.  It is simply a question of deciding whether arbitration
23        proceedings are included in the expression "proceedings" and that it is natural
24        so to interpret the expression.  He reinforces this argument by submitting that
25        there is no reason that, where s.44 is available, the court should not have
26        parallel jurisdictions under s.44 of the 1996 Act and s.25 of the 1982 Act, just
27        as, in other circumstances, the court has power and jurisdiction under s.44 and
28        under s.37 of the Supreme Court Act 1981.  However, these arguments do not,
29        as it seems to me, answer the thrust of Mr. McGrath's point, that the regime
30        for arbitrations, as laid down in detail in the 1996 Act, and there is power to
31        extend it by statutory instrument ICSID arbitrations if it was so decided.
32        I cannot accept that in these circumstances the Order in Council is to be
33        interpreted as covering arbitration proceedings.
34
35  26.   I also accept Mr. McGrath's second argument about this part of the case, that if
36        there is jurisdiction to make the order it could not be expedient to make it in
37        view of the rules governing ICSID arbitrations.  This is because the ICSID
38        Convention, Regulations and Rules provide that, unless otherwise stated,
39        consent of the parties to an ICSID arbitration is deemed to be consent to the
40        arbitration to the exhaustion of any other remedy (see Article 26 of the
41        Convention).
42

27. Article 47 of the Convention deals with provisional measures to preserve rights. I should read Rule 39 of the Arbitration Rules:

"(1) At any time after the institution of proceeding, a party may request that provisional measures for the preservation of its rights be recommended by the Tribunal. The request shall specify the rights to be preserved, the measures the recommendation of which is requested, and the circumstances that require such measures.

(2) The Tribunal shall give priority to the consideration of a request made pursuant to paragraph (1).

(3) The Tribunal may also recommend provisional measures on its own initiative or recommend measures other than those specified in a request. It may at any time modify or revoke its recommendations.

…

(5) If a party makes a request pursuant to paragraph (1) before the constitution of the Tribunal, the Secretary-General shall, on the application of either party, fix time limits for the parties to present observations on the request, so that the request and observations may be considered by the Tribunal promptly upon its constitution.

(6) Nothing in this Rule shall prevent the parties, provided that they have so stipulated in the agreement recording their consent, their requesting any judicial or other authority to order provisional measures, prior to or after the institution of the proceeding, for the preservation of their respective rights and interests".

It will be observed that Rule 39 lays down a regime that applies before as well as after the tribunal is constituted. Thus Mr. McGrath submits that it must be inexpedient for an order to be made supposedly in aid of the arbitral tribunal if that in itself is inconsistent with the arbitral regime, and contrary to the arrangement for the arbitration which a party accepts when requesting arbitration.

28. In support of this, he again refers to *Credit Suisse* where it is emphasised that it will not be expedient to exercise the jurisdiction under s.25, other than harmoniously with the regime and procedures of the court seised of the substantive proceedings (see especially p.827D per Millett J., which I cited above, and p.831H to 832A per Lord Bingham CJ).

29.  Mr. Moss put forward two arguments in reply to this submission. He said that
it is not open to Bolivia to rely upon the arbitration regime when there is no
constituted tribunal that can recommend protective measures as contemplated
by Rule 39, and when this come about through Bolivia's own failure to comply
with the arbitration regime. There seem to me three answers to this. First, as
I have said, Rule 39, on its face, lays down a regime that applies before as well
as after the tribunal has been constituted. Secondly, E.T.I. could have had the
tribunal fully constituted long before now and before these proceedings were
brought, had it availed itself of procedures available to it under the ICSID
machinery. Thirdly, and most fundamentally, it is E.T.I. who seek to rely
upon the ICSID arbitration in support of these proceedings. It does not seem
to me that it can rely upon, without accepting the limitation of the proceedings
under the ICSID machinery, including the restriction on when provisional
measures may be sought. That is not a limitation deriving from any breach of
the ICSID Convention or Rules on the part of Bolivia, but a limitation inherent
in the regime that E.T.I. invoke, and need to invoke, in order to argue that the
court has jurisdiction to make the order in its favour.

30.  Mr. Moss also argues that since ultimately this point raises a question whether
it is inexpedient that the order stand, it should not be considered on the limited
basis upon which Mr. McGrath urges. It must or should be decided only at the
longer hearing at the end of the month, when all the considerations thereupon
the expediency of my order and the exercise of the court's discretion can be
weighed. Indeed, Mr. Moss argued that, similarly, all the points raised by the
defendants should be deferred for consideration at the end month and
adjudicated upon in the light of the broader considerations about this dispute.

31.  I could see force in this submission if I thought that there was a realistic
prospect that other considerations might affect my decision, either on the
question of expediency or on the other arguments put forward by Mr.
McGrath. But I cannot accept that it would be right to maintain a freezing
order against another State without considering arguments that it was granted
on an erroneous basis, the more so when arguments were put forward when it
was granted which clearly cannot be sustained and the relevant ICSID rules
were not there before the court. To my mind, this is so even assuming that
E.T.I. maintains that the defendants did not move as expeditiously as they
might have done to discharge the order. In view of the arguments put forward
about the nature and limitations of the ICSID regime, I cannot accept that it is
right to maintain the order on the grounds that it should be made in relation to
the ICSID arbitration.

32.  In view of these conclusions, it is not necessary for me to consider the
alternative argument that Mr. McGrath put forward based upon the State

1    Immunity Act 1978, but it is a short point and I shall say something about it.
2    Section 13(2) of the Act provides that "relief shall not be given against a State
3    by way of injunction :..."  However, E.T.I. rely upon s.9 of the Act, which
4    provides as follows:
5
6        "(1)  Where a State has agreed in writing to submit a dispute which has
7        arisen, or may arise, to arbitration, the State is not immune as respects
8        proceedings in the courts of the United Kingdom which relate to the
9        arbitration.
10
11        (2)  This section has effect subject to any contrary provision in the
12        arbitration agreement and does not apply to any arbitration agreement
13        between States".
14
15    The issue between the parties is whether the agreement whereby Bolivia
16    agreed to submit a dispute of this kind to arbitration contains a "contrary
17    provision". Mr. McGrath says that it does, because the agreement was for
18    ICSID arbitration and because of the regime that I have described.  The bi-
19    lateral treaty between the Kingdom of the Netherlands and the Republic of
20    Bolivia provides for ICSID arbitration.  The ICSID Convention Rules, as I
21    have explained contemplate that there shall be no provisional measures in
22    respect of an arbitration otherwise than by agreement or in accordance with the
23    machinery under the Rules.
24
25  33.  In my judgment, therefore, Mr. McGrath is right in his argument that there is a
26      relevant "contrary agreement", under s.9, and Bolivia is entitled to State
27      immunity.  I am therefore satisfied that the orders made on 9 May and 16 May
28      2008 against Bolivia should not have been made, either on the basis of
29      contentions that E.T.I. then put forward in support of them, or on the grounds
30      it now argues.  There is no proper basis for continuing the order until a further
31      lengthier hearing at the end of July, and the order against Bolivia should be
32      discharged.  There is no proper independent basis for maintaining the order
33      against Entel and the order against it too should therefore be discharged.
34
35  MR. McGRATH:  My Lord, I am grateful.  I believe you may have misspoke in the
36      third answer you gave to the argument that Bolivia was not entitled to rely
37      upon the ICSID rules.  I think you said ICSID wishes to rely upon ICSID
38      arbitration.  I think you intended to say E.T.I. relies upon ICSID arbitration.  It
39      was the very word under answer 3.
40
41  MR. JUSTICE ANDREW SMITH:  I miswrote it.  You are quite right.
42

1    MR. McGRATH:  My Lord, I obviously ask for my costs and ask for my costs on
2        the indemnity basis, the reason being they obtained one of the draconian orders
3        and that has been summarily dismissed.  It was obtained on 9th May and
4        maintained until 7th July on the basis of s.44 of the 1996 Act, and that was only
5        abandoned when we appeared in front of ... on 7th July before seeking a
6        hearing before a court.  Your Lordship did not call on me to reply in respect of
7        the New York proceedings, which was the only other argument that was ... in
8        front of your Lordship and Mr. Justice Flaux.

10    MR. JUSTICE ANDREW SMITH:  Many times have I not called upon a party and
11      given costs on the standard basis.

13    MR. McGRATH:  My Lord, what was said here is, of course, that you are dealing
14      with draconian orders and, whilst one might ----

16    MR. JUSTICE ANDREW SMITH:  Yes.  The last point was not your best.

18    MR. McGRATH:  Very well.  It was sought to be maintained on an entirely new
19      basis which, as a matter of statute construction, we say was clearly erroneous.
20      These are draconian orders.  We understand that one can rush the court quickly
21      and fail to pinpoint certain arguments, but, of course, we were not there at the
22      hearing in front of Mr. Justice Flaux and so one retains the usual duties, which
23      continue throughout a Mareva's life.

25    MR. JUSTICE ANDREW SMITH:  Were you aware of the order by the 16th?

27    MR. McGRATH:  Yes, we were, my Lord.  Yes, in the letter to your Lordship and
28      the court started this particular summary process, we indicated, I believe - I
29      might be wrong - that we were aware by the 14th or 13th May but could not get
30      ourselves sorted until 16th May.  But be that as it may, by 16th May they had
31      had an extra week to consider the point that they had raised.

33    MR. JUSTICE ANDREW SMITH:  When you say that you could not get yourself
34      sorted - I am criticising your phraseology - but what exactly do you mean?  Do
35      you mean that you could not oppose a substantive application or you could not
36      even write to the court to say, "We are interested.  If you are going to extend it
37      at all, do so for a short period"?

39    MR. McGRATH:  My understanding is that we simply did not have English
40      lawyers on board at that stage to deal with the point.  The notice had, in a
41      roundabout way, obviously ----

43    MR. JUSTICE ANDREW SMITH:  Did you have New York lawyers?

1
2   MR. McGRATH:  We had New York lawyers who were dealing with the matters
3       relating to the arbitration and then the attachment proceedings that had gone on
4       there.  That is why most of the material you have seen, my Lord, has been very
5       New York orientated and generated.  But we say that when you apply for one
6       of these orders you really must do your research. With respect to the very last
7       point your Lordship made, which was the State Immunity point, when one
8       deals with a State in open up, **Gee**, **Halsburys**, standard books that I referred
9       to in my submissions, they all go straight to 13(2)(a).
10
11  MR. JUSTICE ANDREW SMITH:  I am bound to say I cannot remember whether
12      Mr. Moss got there, but I got to s.9 mentally.  I do not think, in a sense,
13      I certainly was not blind to s.13.
14
15  MR. McGRATH:  It was not mentioned.
16
17  MR. JUSTICE ANDREW SMITH:  Maybe, but I can only say what I remember
18      was in my mind.
19
20  MR. McGRATH:  They are the reasons why we say that the costs should be on an
21      indemnity basis.  There was no grounds upon which the order should have
22      been granted against my client, a State, and your Lordship has shown that in
23      the summary basis.
24
25  LORD BRENNAN:  My Lord, I adopt those arguments about costs.  As to an
26      undertaking for damages, which figures against us rather the Republic, I would
27      invite your Lordship to give us 14 days in which to indicate to the court and
28      E.T.I. whether we wish to proceed in relation to any loss arising.  We have to
29      take instructions from Bolivia.
30
31  MR. JUSTICE ANDREW SMITH:  Yes.  I do not see any objection.  In a sense,
32      that is a self-limiting suggestion but it is helpful for case management
33      purposes.
34
35  MR. MOSS:  My Lord, we respectfully oppose indemnity costs.
36
37  MR. JUSTICE ANDREW SMITH:  You cannot oppose costs.
38
39  MR. MOSS:  No, but we do oppose indemnity costs.
40
41  MR. JUSTICE ANDREW SMITH:  Lord Brennan's second point is sensible?
42

1    MR. MOSS: That seems a sensible way of dealing with it. I cannot think of any
2         proper reason to oppose that. We do not ourselves think though there can be
3         any ----
4
5    MR. JUSTICE ANDREW SMITH: There may be, but I mean ----
6
7    MR. MOSS: If they want 14 days to think about that is seems fair enough.
8
9    MR. JUSTICE ANDREW SMITH: Yes.
10
11    MR. MOSS: My Lord, in our respectful submission, there is absolutely no basis for
12         indemnity costs in this case. It took them six weeks to find and write about
13         these points, which they now claim are obvious, but they are plainly not
14         obvious. They are actually very complex, difficult and arguable points of law.
15         They accept - they do not, I think, in their first letter accept - but in the
16         subsequent correspondence when pressed they did accept they knew about the
17         order by the time we came before Mr. Justice Flaux and yet they did not even
18         write to the court to tell the court that they were aware of the order and, your
19         Lordship may recall, we were going through a very elaborate process of trying
20         to serve Bolivia and Entel which, under Bolivian law, is a major undertaking.
21         In relation to Bolivia we have to go through the Foreign & Commonwealth
22         Office and so on. Once they became aware they could simply have got in
23         touch with us; they could have got in touch with the court. Their American
24         lawyers must have correspondents here they use, and they could have asked
25         for it to be adjourned and the matter could have come back interpartes, say,
26         within a few days thereafter. So the matter has only been outstanding because
27         they did not tell the court they were involved; they did not tell us they were
28         involved; they did not, for six weeks, take any prompt action to apply or to
29         prompt us to try and apply. They then sent us a letter and demanded a
30         reaction, having waited for six weeks, within 48 hours, I think it was, from us.
31         We took a week to look at this carefully and in detail and wrote back with our
32         position in relation to the various arguments.
33
34         In our respectful submission, there is absolutely no basis for indemnity costs
35         here. Our recollection, like your Lordship's, is that the question of sovereign
36         immunity was mentioned in passing, but clearly we thought at the time this
37         was a commercial matter; it related to arbitration, and there were proper
38         grounds for sovereign immunity not applying. Obviously the matter was dealt
39         with in a rush at the time. So, in our respectful submission, my Lord, there is
40         simply none of the normal bases on which people can make out a case for
41         indemnity costs. There was been no sort of misconduct alleged or
42         demonstrated or impropriety or anything of that sort. All that has happened is
43         that your Lordship has held that our arguments, the substantive arguments of

1    law, were wrong. That is a matter that we will propose to take, or certainly
2    attempt to take, further and, of course, it is possible that other judges might
3    take different views.
4
5    MR. JUSTICE ANDREW SMITH: That does not bear upon the costs, does it?
6
7    MR. MOSS: No, no. It is only if it is being suggested that these were unarguable
8    points, but I do not think my learned friend, to be fair to him, actually said that.
9    The fact that it draconian, as he puts it, in our respectful submission, there is
10    nothing draconian about it. It is a perfectly proper provisional conservatory
11    measure. It is a very sensible measure to take.
12
13    MR. JUSTICE ANDREW SMITH: I suppose the nuclear weapons are.
14
15    MR. MOSS: That is sort of colourful.
16
17    MR. JUSTICE ANDREW SMITH: It is almost meiosis to call them draconian.
18    Draco was mild in comparison.
19
20    MR. MOSS: It is more Anton Piller and ... rather than just Mareva.
21
22    MR. JUSTICE ANDREW SMITH: Anyway, we know what you mean.
23
24    MR. MOSS: The fact that we have argued the matter on different bases from the
25    ones we started with, these are all arguable points of law. We are not accused
26    of withholding facts or not setting out the facts fairly, as we saw them and put
27    them in evidence. Those facts have yet to be challenged in terms of evidence.
28    Neither Entel or Bolivia have submitted to the jurisdiction as it happens. That
29    is their privilege. In our respectful submission, we have acted throughout
30    properly and there is no basis for an indemnity costs order.
31
32    MR. JUSTICE ANDREW SMITH: Thank you. Do you want to say anything
33    more?
34
35    MR. McGRATH: No, my Lord.
36
37    MR. JUSTICE ANDREW SMITH: I make the order for the defendants' costs but
38    I do not think it is right that they be on an indemnity basis. Mr. McGrath is
39    right that the sovereign immunity point does mean that the court does have to
40    respond promptly when it is raised, but it is not as though - Mr. Moss
41    confirmed my recollection - the question of sovereign immunity was one that
42    was overlooked and, indeed, it would be a criticism of me if it were. But in the
43    end that depended on the ICSID Rules. I also bear in mind that being aware,

1    or presumably their New York lawyers being aware, the proceedings in May
2    before Mr. Justice Flaux, there was no communication with the court
3    suggesting that the matter be dealt with on a short-term basis so they had time
4    to examine it fully.  So it seems to me that standard basis is right.
5
6  MR. MOSS:  My Lord, the next matter is to ask your Lordship for permission to
7    appeal.  My Lord, obviously it is an invidious situation for any judge who has
8    just given a judgment ----
9
10  MR. JUSTICE ANDREW SMITH:  It often happens.  Do not worry.
11
12  MR. MOSS:  Yes.  It has happened to me too so I know the feeling.  But, in our
13    respectful submission, even if your Lordship at this stage was convinced that
14    your Lordship is right on all the points, they are all clearly arguable - pure
15    points of law, in fact - other than the argument about waiting for the matter to
16    be dealt with which has is not absolutely pure law but is a "lawish" type of
17    point.  In our respectful submission, however certain your Lordship may be of
18    your own views on all of these points, of course it is perfectly feasible that
19    other judges might take a different view.  In our respectful submission, there
20    are reasonable prospects within the test and therefore it would be right for your
21    Lordship to give permission on our undertaking to apply immediately for
22    expedition and get our documents in early next week to make sure that the
23    matter is heard urgently by the Court of Appeal.  I am not sure that it would be
24    useful for me to elaborate the grounds of appeal particularly.  Your Lordship is
25    obviously aware that they essentially consist of saying that your Lordship is
26    wrong.
27
28  MR. JUSTICE ANDREW SMITH:  Yes, of course.
29
30  MR. MOSS:  And that the arguments that we have put forward in some detail
31    before your Lordship, both in writing and orally, are correct and exactly the
32    same argument would be run before the Court of Appeal, in what would be a
33    pretty short hearing - probably a half a day one, I would imagine, with pre-
34    reading - and the matter can be quickly dealt with and decided perhaps before
35    the end of this term.  And, if the worst comes to the worst, there are now
36    sittings of the Court of Appeal in August - not popular with counsel, but that
37    may take place where necessary.
38
39  MR. JUSTICE ANDREW SMITH:  Yes.  I do not propose to give permission to
40    appeal.  I formed a clear view, rightly or wrongly, on whether the New York
41    proceedings were relevant proceedings.  Had my decision turned solely on
42    whether the Order in Council includes arbitration proceedings. I might well
43    have given permission to appeal.  But in view of the alternative argument, to

1    which I acceded, and the State Immunity point, it seems to me that Mr. Moss
2    will have to apply to the Lord Justice to see whether I was right or wrong.
3
4    MR. MOSS: My Lord, the only thing, I think, that remains is to ask your Lordship
5        for a stay on your Lordship's order setting aside the present orders until we get
6        a chance to get ourselves, as a matter of urgency, before the Court of Appeal.
7
8    MR. JUSTICE ANDREW SMITH: Yes. What do you say about that,
9        Mr. McGrath?
10
11    MR. McGRATH: We oppose that, my Lord. Your Lordship has found that the
12        court has no jurisdiction to grant these orders against Bolivia. Your Lordship
13        also found that one of the reasons why it has no grounds in jurisdiction is a
14        State Immunity point. It would be wrong to hold over - having made those
15        decision based on effectively the court's jurisdiction and come to a clear
16        conclusion - it would wrong to grant a stay. In particular, my friend will have
17        to point to some prejudice that he says would flow in circumstances where -
18        and I am speaking on behalf of Bolivia here - no assets of Bolivia have been
19        identified ... particularly frozen in the United Kingdom, and we say, having
20        come to those clear conclusions ... there should be no stay pending the appeal.
21        Otherwise we might not have bothered doing this exercise at all in the sense
22        that we get it held over until at least the end of July and the whole purpose of
23        this appeal was that if the jurisdiction point is clear then the court has an
24        opportunity to deal with it exactly as it did now.
25
26    MR. JUSTICE ANDREW SMITH: Well, you decided how you wanted to proceed.
27        Anyway, Lord Brennan?
28
29    LORD BRENNAN: I think this effects Entel more perhaps than the Republic of
30        Bolivia. I explained to you yesterday that the hard currency assets of this
31        entity are held in New York and London, and, my Lord, I need not take you to
32        it, but in the declarations put in in this case by Irena Bolina and Joel Carpio,
33        there are numerous explanations as to what use this money is normally put to -
34        infrastructure commitments, the running of Entel in terms of its external clients
35        and so on. It would be an extremely burdensome result for them to have
36        succeeded and yet face the same economic consequences.
37
38    MR. JUSTICE ANDREW SMITH: Yes. I would not envisage a stay for longer
39        than, say, the end of Tuesday. I do not suppose there is any specific evidence
40        that another five days will make a great deal of difference. Then Mr. Moss
41        will have to persuade the single Lord Justice to protect him.
42

1    LORD BRENNAN: In which event, my Lord, I am going to invite you to say in
2         open court that which is reasonable, that he will keep us informed of when he
3         proposes to put in application for permission to appeal.
4
5    MR. JUSTICE ANDREW SMITH: If I grant a stay only until the end of Tuesday,
6         he will then have to accompany any application for permission with an attempt
7         to get a further stay from the Lord Justice.
8
9    LORD BRENNAN: My Lord, I understand, provided we have notice of the timing
10        of that so we can ----
11
12    MR. JUSTICE ANDREW SMITH: You mean so you can make representations to
13        the Lord Justice? I take your point, yes. I daresay Mr. Moss can give you that
14        comfort and it probably is as well that he says so for the record.
15
16    MR. MOSS: Although I think the procedure is normally ex parte, if the other side
17        say they want to appear then obviously ----
18
19    MR. JUSTICE ANDREW SMITH: I do not think it is a question of wanting to
20        appear. As I understand it, it is a question that if you are going to ask, as well
21        as your permission, for an extension of the stay ----
22
23    MR. MOSS: Absolutely, yes, my Lord.
24
25    MR. JUSTICE ANDREW SMITH: -- that Lord Brennan would wish to at least
26        know sufficient to enable him to put in representation.
27
28    MR. MOSS: Yes, absolutely. Can I just say on prejudice that it is actually the
29        easiest part of this case, because the evidence is unopposed and persuaded the
30        court that in fact it was irrefutable.
31
32    MR. JUSTICE ANDREW SMITH: But does it matter since we are not arguing it?
33
34    MR. MOSS: On Lord Brennan's point, I should just say, and I do not think we
35        need go into in detail, but in opposition to the declarations that they put in both
36        in New York and repeated here, it was that volume I showed your Lordship
37        yesterday which goes to show, from the point of view of our evidence, that in
38        fact their suggestions, that Lord Brennan has just repeated, are not correct.
39        Obviously your Lordship does not want to get into the details of that now, but
40        we do not accept these suggestions of prejudice and the need to use this money
41        at all. But, in our respectful submission, all we can properly ask for, and what
42        we do ask for, is just sufficient time so that we do not have to go to the Court
43        of Appeal this afternoon in a half day fashion. We can go properly as a matter

1    of urgency next week.  Obviously it is a matter of discretion for your Lordship.
2    Tuesday may be a little bit quick and we would ask for a longer time if that is
3    possible.  But obviously if your Lordship says Tuesday, we will have to do our
4    best to do as good a job for the purposes of the Court of Appeal and take …
5    with them to ----
6
7    MR. JUSTICE ANDREW SMITH:  That is what you will have to do, I am afraid.
8    My order will be that you have a stay until 4p.m. on Tuesday.  That is to say,
9    my order shall take effect at 4p.m. next Tuesday.
10
11    LORD BRENNAN:  Thank you, my Lord, for sitting this morning.
12
13    MR. JUSTICE ANDREW SMITH:  Not at all.  I am sorry that you got various
14    messages, but I thought you would prefer to end up in the right place.  You
15    have got a logistic question of getting the material before the Court of Appeal.
16    Would it assist to have my note?
17
18    MR. MOSS:  Very much so.
19
20    MR. JUSTICE ANDREW SMITH:  There should be no question about its status.
21    I have delivered an oral judgment, and the oral judgment holds sway.  You will
22    see two manuscript amendments in it.  There might be others where I have
23    departed from the text.  I have only got one copy but I am sure it can be dealt
24    with fairly.  It strikes me that somehow or other the Lord Justice ought to get
25    hold of what I say.
26
27    MR. MOSS:  Yes, because we are not going to get a transcript from the recording
28    office by Tuesday.
29
30    MR. JUSTICE ANDREW SMITH:  That is what occurred to me.
31
32    MR. McGRATH:  My Lord, can I just clarify one point because obviously this
33    whole exercise started off in part, at least, as an arbitration proceeding, that
34    your Lordship's judgment is at least in open court?  No one is pretending that
35    it should be private?  Perhaps it academic now that my friend is going to take it
36    to the Court of Appeal, but just so that ----
37
38    MR. JUSTICE ANDREW SMITH:  He might not get permission.
39
40    MR. McGRATH:  No, but we shall see.
41
42    MR. JUSTICE ANDREW SMITH:  Does anyone have any objection to the
43    judgment being made publicly available?

```
1
2    MR. MOSS:  My Lord, no.
3
4    MR. JUSTICE ANDREW SMITH:  In that case it can be made publicly available,
5         just so there is no doubt about this, because sometimes one does get asked
6         later. Is there any reason as to whether that should be confined to the judgment
7         or whether the hearing should be deemed to have taken place in public?
8
9    MR. McGRATH:  To be perfectly frank, my Lord, the question of it in private
10        really only arises under Rule 62.10, which is 1966 arbitration claims, and my
11        friend abandoned this evidence ----
12
13   MR. JUSTICE ANDREW SMITH:  Mr. McGrath, does anyone say that I should
14        not simply order that the hearing, as well as the judgment, be treated as having
15        taken place in public?
16
17   MR. MOSS:  We had assumed they had.
18
19   MR. JUSTICE ANDREW SMITH:  Let's make your assumption the case then.
20        Nothing else?  Thank you all for your help.
21
22                              _____
23
```