Michael Krinsky (MK 4503)
Eric M. Lieberman (EL 4822)
RABINOWITZ, BOUDIN, STANDARD,
   KRINSKY & LIEBERMAN, P.C.
111 Broadway, 11th Floor
New York, New York 10006
Telephone: (212) 254-1111
Facsimile: (212) 674-4614

Terry Gross (TG 3249)
GROSS BELSKY ALONSO LLP
180 Montgomery Street, # 2200
San Francisco, California 94104
Telephone: (415) 514-0200
Facsimile: (415) 544-0201

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| E.T.I. EURO TELECOM INTERNATIONAL, N.V., | : | |
| Plaintiff, | : | |
| v. | : | Case No. 08-cv-4247 (LTS/FM) |
| REPUBLIC OF BOLIVIA, and EMPRESA NACIONAL DE TELECOMUNICACIONES ENTEL, S.A., | : | |
| Defendants. | : | |

**EMPRESA NACIONAL de TELECOMUNICACIONES ENTEL S.A.'s
NOTICE AND SUBMISSION OF COURT OF APPEAL'S JUDGMENT
IN PARALLEL ENGLISH ACTION,**

**(A) IN FURTHER OPPOSITION TO MOTION TO CONFIRM *EX PARTE* ORDER
OF PREJUDGMENT ATTACHMENT and**

**(B) IN FURTHER SUPPORT OF MOTION TO DISMISS**

Defendant Empresa Nacional De Telecomunicaciones Entel, S.A. ("ENTEL") respect-fully provides notice of and submits for the Court's consideration the attached unanimous Order and Judgment of the Supreme Court of Judicature, Court of Appeal (Civil Division), rendered on July 28, 2008, in the parallel action brought by plaintiff in London against the Republic of Bo-livia and ENTEL, together with ENTEL's comments on the Court of Appeal's judgment.

The Court of Appeal affirmed the Judgment of the High Court of Justice, Queens Bench Division (Commercial Court) (Mr. Justice Andrew Smith) discharging with prejudice its prior, *ex parte* restraint of ENTEL's account at Deutsche Bank in London (and its restraint of any other bank deposits of the Republic of Bolivia and ENTEL in England and Wales). The Court of Ap-peal refused leave for ETI to appeal to the House of Lords.

The Court of Appeal's Judgment, like the High Court's Judgment, fully supports ENTEL's opposition in this Court to plaintiff's motion to confirm the *ex parte* order of prejudgment attachment of ENTEL's New York bank accounts, and ENTEL's motion to dismiss plaintiff's "Complaint for an Order of Attachment In Aid of International Arbitration." On July 21, 2008, ENTEL submitted the High Court's Judgment, with comments, for the Court's consideration.

The Judgment of the Court of Appeal is set forth in the opinions of Lord Justice Law-rence Collins and Lord Justice Stanley Burnton. Lord Justice Tuckey stated his agreement with both opinions, and Lord Justice Burnton also expressly joined in the opinion of Lord Justice Collins.

The Lord Justices agreed with the High Court that pre-arbitral award restraint of ENTEL's bank account was prohibited both by sovereign immunity and by the ICSID Convention's prohibition against national courts issuing provisional remedies absent explicit

agreement.  Court of Appeal's Judgment ¶¶ 102-117, 124-127; 130.  The Court of Appeal's Judgment likewise supports ENTEL's position here in additional respects.

**1.  Sovereign Immunity Bars Pre-Judgment Restraint of ENTEL's Bank Account**

The Court of Appeal held that Bolivia's immunity from prejudgment and pre-arbitral award restraint precludes holding ENTEL's bank accounts as security for the ICSID arbitration award that ETI seeks against the Republic of Bolivia.

Like the United States' Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1609 and 1610, England's State Immunity Act 1978, § 13, UK ST 1978 c.33, Pt I, s 13, prohibits restraint of a foreign state's property prior to judgment or arbitral award without the "written consent of the State concerned," § 13(2) and (3).  The Court of Appeal found there to have been no such consent by Bolivia.  Court of Appeal's Judgment ¶¶ 110-117 (Lord Justice Collins); 127 (Lord Justice Burnton).

This was dispositive of the London action, just as ENTEL argues that it is dispositive here.  The Court of Appeal observed that "it is by no means clear on what basis the [*ex parte*] order was sought and obtained against Entel," Judgment ¶ 115: as it has in this Court, ETI sometimes asserted in the English proceedings that ENTEL's account could be held as security, even though the ICSID arbitration is not against ENTEL but only Bolivia, because ENTEL is an *alter ego* of Bolivia, and sometimes asserted the account could be held because ENTEL owes a tax debt to Bolivia.  The Court of Appeal ruled that "on this aspect" – that is, on the issue of sovereign immunity – "it does not matter" whether ETI is proceeding on one or the other of these theories (or any other).  This is "because (as the [High Court] judge said) if the order cannot stand against Bolivia because of its immunity, the injunction could not stand against ENTEL. But if the bank account which is the subject of the injunction is said to belong to Bolivia then the

order would be contrary to section 13(2)" of the State Immunity Act. Court of Appeal's Judgment ¶ 115. *See also* High Court's Judgment ¶¶ 32-33.

Expressing his "entire" agreement with Lord Justice Collins, Lord Justice Burnton elaborated on the sovereign immunity issue in an opinion which Lord Justice Tuckey endorsed (along with the opinion of Lord Justice Collins):

> I am also troubled by the Appellant's application for an injunction against Entel, a company that was not a party to any arbitration agreement and against which the Appellant has no cause of action.
> 
> \* \* \*
> 
> [ETI] veered between suggesting that moneys held by Entel were a debt due to Bolivia and that those moneys were or could be controlled by Bolivia through its control over Entel. If the moneys were owed to Bolivia, there is a debt that is the property of Bolivia to which section 13(1)(b) of the State Immunity Act 1978 applies; if the moneys are in the control of Bolivia, section 6(4) applies. *Either way,* Bolivia and *those moneys* are immune from enforcement proceedings, including interim injunctions, against the state. (emphasis supplied)

Court of Appeal's Judgment ¶¶ 124, 127 (emphasis supplied).

Just as the Court of Appeal held that, on ETI's "debt" theory, "there is [restraint of] a debt that is the property of Bolivia," and hence Bolivia's immunity applies, ENTEL has argued here that plaintiff cannot proceed on its "debt" theory because of Bolivia's immunity. *See* ENTEL's Sur-Reply In Opposition to Motion to Confirm *Ex Parte* Order of Prejudgment Attachment at 1-5.[1] Just as the Court of Appeal held that ETI's "control" or *alter ego* theory necessarily extends Bolivia's immunity to ENTEL's property, ENTEL has argued, on the basis of *De Letelier v. Rep. of Chile*, 748 F.2d 790 (2nd Cir. 1984), that ENTEL is cloaked with Bolivia's immunity from prejudgment attachment on that alternative, now abandoned basis for

---

[1] Section 13(2)(b) of the State Immunity Act, referenced by the Court of Appeal, prohibits the prejudgment and pre-arbitral award immunity of the "property of a State."

the attachment here. *See* ENTEL's Memorandum in Opposition at 3-5.[2] Already supported by uniform and, indeed, controlling authority, both of ENTEL's positions are now directly supported as well by the Court of Appeal (as well as the High Court). "Either way," the "monies" in ENTEL's account are immune. Court of Appeal's Judgment, ¶ 127.

Just as it has done here, ETI argued to the Court of Appeal that even if "there was no jurisdiction to make an order against Bolivia by virtue of the provisions of the [State Immunity] 1978 Act, that would not prevent the court from making an order against Entel only." Court of Appeal's Judgment ¶ 61. The Court of Appeal's rejection of this contention is further authority in support of ENTEL's rejoinder to plaintiff's very same suggestion here. *See, in particular,* ENTEL Sur-Reply at 4-5.

Unlike the FSIA, England's State Immunity Act does not provide independent immunity for corporations that are state-owned or act as "organs" of the foreign state. *Compare* FSIA, 28 U.S.C. § 1603(a) & (b), with State Immunity Act, § 14 (2). The High Court and the Court of Appeal thus had no occasion to address the additional, alternative basis for ENTEL's immunity from prejudgment attachment here: that ENTEL is "an agency or instrumentality of a foreign state," FSIA, 28 U.S.C. § 1603(b).

**2. The ICSID Convention Bars Pre-Judgment Restraint of ENTEL's Bank Account**

The High Court held that, in addition to sovereign immunity, restraint of ENTEL's accounts is barred "because the ICSID Convention, Regulations and Rules provide that, unless otherwise stated, consent of the parties to an ICSID arbitration is deemed to be consent to the arbi-

---

[2] Section 6(4) of the State Immunity Act, referenced by the Court of Appeal, provides in statutory form what the Second Circuit held in *De Letelier*. Section 6(4) authorizes a court to entertain proceedings against a person other than a State notwithstanding that the proceedings relate to property (a) "which is in the possession or control of a State" or (b) "in which a State claims an interest," *but only* "if the State would not have been immune had the proceedings been brought against it or, in a case within paragraph (b) above, if the claim is neither admitted nor supported by prima facie evidence."

tration to the exhaustion of any other remedy (see Article 26 of the Convention)," High Court's Judgment ¶ 26, and the "ICSID Convention Rules . . . contemplate that there shall be no provisional measures in respect of an arbitration otherwise than by agreement or in accordance with the machinery under the Rules." *Id.*, ¶ 32.    The Court of Appeal stated in agreement that "the prevailing view" even prior to adoption of ICSID Rule 39(6) "was that the effect of Article 26 was that it was not possible for a private party to obtain an attachment in a national court in aid of an ICSID arbitration," Court of Appeal's Judgment ¶ 106, and that "the effect of [ICSID] Rule 39(6) is that provisional remedies may be sought only from the ICSID tribunal itself, and not from national courts, unless the parties agree otherwise." Court of Appeal's Judgment ¶ 108. "[I]n a case such as this the effect of these provisions taken together is that the parties have agreed not to seek interim measures in a national court." Court of Appeal's Judgment ¶ 109.

The High Court rejected the same arguments, including estoppel and waiver, that ETI has made here as to why the ICSID Convention's bar nonetheless does not apply.  High Court's Judgment ¶¶ 29, 31; *see also* ENTEL Memorandum in Opposition at 22-24; ENTEL Sur-Reply at 11-15.  ETI advanced these arguments in the Court of Appeal, just as it did in the High Court, Court of Appeal's Judgment, ¶¶ 54-59, but likewise to no effect.

Supported by uniform authority – including the United States - ENTEL has argued that the ICSID Convention bars the instant attachment. *See* ENTEL Memorandum in Opposition at 20-24; ENTEL Sur-Reply at 11-15.  The Judgment of the English Court of Appeal, as well as that of the High Court, provides still additional, convincing authority for ENTEL's position.

### 3. General Arbitration Laws Are Inapplicable to ICSID Arbitrations

ENTEL has shown that ETI cannot support the attachment here on the basis of federal or state laws concerning arbitrations generally (including the Federal Arbitration Act and the New

York Convention) because, *inter alia*, they are inapplicable to ICSID arbitrations. *See* ENTEL Memorandum in Opposition at 15-17, 20-24, 30-32; 37; ENTEL Sur-Reply at 14-15. The Court of Appeal held that, even though English law otherwise generally authorizes a court to grant interim relief in support of arbitrations, Court of Appeal's Judgment ¶ 91, England has not extended that authority to ICSID arbitrations "in the light of Article 26 of the ICSID Convention and Rule 39(6) of the Arbitration Rules." Court of Appeal's Judgment ¶ 96. The same respect for the ICSID Convention required the United States to do just what it has done: like England, exclude ICSID arbitrations from whatever authority its general arbitration laws might otherwise confer on courts to attach funds to secure an ultimate arbitration award.

### 4. ENTEL's Property May Not Be Restrained to Secure a Possible Arbitral Award Against Bolivia

The Court of Appeal found that ETI had not advanced a coherent or persuasive basis for restraining ENTEL's accounts to secure an arbitration claim against *Bolivia*, even apart from the bars imposed by sovereign immunity and the ICSID Convention. *See* Court of Appeal's Judgment ¶ 115-117; 124-126. The same observation applies here, as we have shown. ENTEL Memorandum in Opposition at 24-29; ENTEL Sur-Reply at 1-2.

### CONCLUSION

For the foregoing reasons, and for those previously stated, as well as those set forth by the Republic of Bolivia, plaintiff's motion to confirm the *ex parte* order of prejudgment attachment should be denied and ENTEL's motion to dismiss this action should be granted.

Dated:    July 29, 2008

Of Counsel:

Jules Lobel

Adam Belsky
GROSS BELSKY ALONSO LLP

Respectfully submitted,

Michael Krinsky (MK 4503)
Eric M. Lieberman (EL 4822)
RABINOWITZ, BOUDIN, STANDARD,
    KRINSKY & LIEBERMAN, P.C.

Terry Gross (TG 3249)
GROSS BELSKY ALONSO LLP

*Counsel for Empresa Nacional de Telecomunicaciones Entel S.A.*

7

**ORDER AND JUDGMENT OF THE SUPREME COURT OF JUDICATURE,
COURT OF APPEAL (CIVIL DIVISION), ISSUED JULY 28, 2008**

Fax sent by : 902079476751      ASSOCIATE OFFICE      28-07-08 14:14   Pg: 1/1



MONDAY 28TH JULY 2008

## IN THE COURT OF APPEAL                          7986

ON APPEAL FROM THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

468/9 OF 2008

BEFORE      LORD JUSTICE TUCKEY
            LORD JUSTICE LAWRENCE COLLINS
And         LORD JUSTICE STANLEY BURNTON

**B E T W E E N**

COURT 69
Appeal No.

A3/2008/1628

E.T.I. EURO TELECOM INTERNATIONAL N.V.

                                          **APPELLANT/**
                                          **CLAIMANT**

- and -

1)REPUBLIC OF BOLIVIA                      1ST RESPONDENT
                                           1ST DEFENDANT

2)EMPRESA NACIONAL DE TELECOMUNICACIONES ENTEL S.A.

                                           2nd RESPONDENT
                                           2ND DEFENDANT

**ON READING** the Appellant's Notice sealed on the 14th July 2008 filed on

behalf of the Claimant on appeal from the order of Mr Justice Andrew Smith

dated 11th July 2008

**AND ON HEARING** Mr Gabriel Moss QC and Marcus Haywood of Counsel on

behalf of the Appellant/Claimant and  Mr Joe Smouha QC and Mr Paul McGrath

of Counsel for the 1st Respondent/ 1st Defendant and Mr Jeffrey Gruder QC of

Counsel on behalf of the 2nd Respondent/ 2nd Defendant

**IT IS ORDERED** that

1) the appeal be dismissed

2) leave to appeal to the House of Lords be refused

3) the stay be refused

4) the Appellant do pay the Respondents costs on a standard basis

5) payment on account of £40,000 to each of the Respondents, namely an

   aggregate of £80,000

[The Court Sat from 10.30-13.00 and 14.00-16.21 on 22nd July 2008]





Neutral Citation Number: [2008] EWCA Civ 880

Case No: A3/2008/1628

**IN THE SUPREME COURT OF JUDICATURE**
**COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION COMMERCIAL COURT**
**MR JUSTICE ANDREW SMITH**
**Nos 468 of 2008 and 469 of 2008**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 28/07/2008

Before :

**LORD JUSTICE TUCKEY**
**LORD JUSTICE LAWRENCE COLLINS**
and
**LORD JUSTICE STANLEY BURNTON**

- - - - - - - - - - - - - - - - - - - - -

Between :

| | |
|---|---|
| **E.T.I. EURO TELECOM INTERNATIONAL N.V.** | **Appellant/ Claimant** |
| - and - | |
| **(1) REPUBLIC OF BOLIVIA** | **First Respondent /First Defendant** |
| **(2) EMPRESA NACIONAL DE TELECOMUNICACIONES ENTEL S.A.** | **Second Respondent /Second Defendant** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr Gabriel Moss QC and Mr Marcus Haywood** (instructed by **Orrick, Herrington & Sutcliffe**) for the **Appellant/Claimant**
**Mr Joe Smouha QC and Mr Paul McGrath** (instructed by **Stephenson Harwood**) for the **First Respondent/First Defendant**
**Mr Jeffrey Gruder QC** (instructed by Reed Smith) for the **Second Respondent/Second Defendant**

Hearing date : July 22, 2008
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

**Lord Justice Lawrence Collins :**

**I    Introduction**

1.    This is an urgent appeal brought by permission of this court from a decision of
Andrew Smith J given on July 11, 2008, in which he set aside freezing orders granted
in favour of ETI Euro Telecom International NV ("ETI"), the appellant, against the
Republic of Bolivia ("Bolivia") and Empresa Nacional de Telecomunicaciones Entel
SA ("Entel"), the respondents. It concerns an attempt by ETI to use national courts to
secure its position in an international arbitration arising out of the nationalisation of
its interests in Bolivia.

*The World Bank Convention and the Bilateral Investment Treaty*

2.    The Convention on the Settlement of Investment Disputes of 18 March 1965 was
concluded under the auspices of the World Bank, and entered into force in 1966. It
created the International Center for Settlement of Investment Disputes ("ICSID").
ICSID is based in Washington DC, but arbitrations conducted under its auspices are
not subject to any national law. The number of ICSID arbitrations has greatly
expanded in recent years as a result of the widespread use of bilateral investment
treaties ("BITs") under which Contracting States agree in advance that their nationals
will have a right of recourse to ICSID.

3.    One such agreement, the Agreement on Encouragement and Reciprocal Protection of
Investments between Netherlands and Bolivia, was signed on 10 March 1992 and
entered into force on 1 November 1994.

4.    The Netherlands-Bolivia BIT provides: (1) each country shall "ensure fair and
equitable treatment to the investments of nationals of the other Contracting Party and
shall not impair, by unreasonable or discriminatory measures, the operation,
management, maintenance, use, enjoyment or disposal thereof by those nationals"
(Article 3(1)); (2) each country shall "accord to such investments full security and
protection which in any case shall be not less than that accorded either to investments
of its own nationals or to investments of nationals of any third State, whichever is
more favorable to the investor." (Article 3(2)); and (3) neither country "shall take any
measures depriving, directly or indirectly, nationals of the other Contracting Party of
their investments unless  . . .  the measures are accompanied by provision for the
payment of just compensation." (Article 6).

5.    The BIT also includes a dispute resolution mechanism which provides for arbitration
to resolve any disputes which may arise from investments between either Bolivia or
the Netherlands, on the one hand, and an investor from the other state.  The BIT
provides that if both Contracting Parties have acceded to the ICSID Convention "any
disputes that may arise from investment between one of the Contracting Parties and a
national of the other Contracting Party shall, in accordance with the provisions of that
Convention, be submitted for conciliation or arbitration to the International Center for
Settlement of Investment Disputes" (Article 9(6)).

6.    In *Republic of Ecuador v Occidental Exploration and Production Company* [2005]
EWCA Civ 1116, [2006] QB 432 at [32], this court said of a different BIT: "…The
Treaty involves, on any view, a deliberate attempt to ensure for private investors the

Case 1:08-cv-04247-LTS    Document 68    Filed 07/29/2008    Page 13 of 38

Judgment Approved by the court for handing down.                    ETI Euro Telecom International N.V. and (1) Republic of Bolivia
                                                                    (2) Empresa Nacional De Telecomunicaciones Entel S.A.

benefits and protection of consensual arbitration; and this is an aim to which national courts should, in an internationalist spirit and *because* it has been agreed between States at an international level, aspire to give effect …"

*ICSID Convention and Arbitration Rules*

7.    Because of their significance in these proceedings I set out here, without any elaboration, those provisions of the ICSID Convention and the ICSID Arbitration Rules, which are relevant on this appeal.

8.    By Article 26 of the Convention:

> "Consent of the parties to arbitration under this Convention shall, unless otherwise stated, be deemed consent to such arbitration to the exclusion of any other remedy. A Contracting State may require the exhaustion of local administrative or judicial remedies as a condition of its consent to arbitration under this Convention."

9.    Article 47 deals with the power of an ICSID arbitral tribunal to recommend provisional measures:

> "Except as the parties otherwise agree, the tribunal may, if it considers the circumstances so require, recommend any provisional measures which should be taken to preserve the respective rights of either party."

10.   Rule 39 of the ICSID Arbitration Rules (of which what is now Article 39(6) is the most significant on this appeal) provides:

> "(1)    At any time after the institution of the proceeding, a party may request that provisional measures for the preservation of its rights be recommended by the Tribunal. The request shall specify the rights to be preserved, the measures the recommendation of which is requested, and the circumstances that require such measures.
>
> (2)    The Tribunal shall give priority to the consideration of a request made pursuant to paragraph (1).
>
> (3)    The Tribunal may also recommend provisional measures on its own initiative or recommend measures other than those specified in a request. It may at any time modify or revoke its recommendations.
>
> …
>
> (5)    If a party makes a request pursuant to paragraph (1) before the constitution of the Tribunal, the Secretary-General shall, on the application of either party, fix time limits for the parties to present observations on

the request, so that the request and observations may be considered by the Tribunal promptly upon its constitution.

(6)    Nothing in this Rule shall prevent the parties, provided that they have so stipulated in the agreement recording their consent, from requesting any judicial or other authority to order provisional measures, prior to or after the institution of the proceeding, for the preservation of their respective rights and interests."

*The ICSID Convention and United Kingdom law*

11.    The Arbitration (International Investment Disputes) Act 1966 was designed to implement the ICSID Convention. The ICSID Convention was scheduled to the 1966 Act (section 1(1)), but was not made part of United Kingdom law.

12.    The 1966 Act is mainly concerned with enforcement of ICSID awards (sections 1 and 2), but also provides in section 3(1) in its original form that any of the provisions contained in section 12 of the Arbitration Act 1950 (attendance of witnesses, production of documents, etc.) and the Foreign Tribunals Evidence Act 1856 (which relates to the taking of evidence in the United Kingdom for the purposes of proceedings before a foreign tribunal) may be applied by statutory instrument to ICSID arbitration. Subject to that, it was provided in section 3(2) that the Arbitration Act 1950 would not apply to ICSID arbitration, except that section 4(1) of the Arbitration Act 1950 (stay of court proceedings where there was submission to arbitration) would apply.

13.    The Arbitration Act 1996, section 107(1) and schedule 3, replaced section 3 of the 1966 Act with the following:

"3(1)    The Lord Chancellor may by order direct that any of the provisions contained in sections 36 and 38 to 44 of the Arbitration Act 1966 (provisions concerning the conduct of arbitral proceedings, & c.) shall apply to such proceedings pursuant to the Convention as are specified in the order with or without any modifications or exceptions specified in the order.

(2)    Subject to subsection (1), the Arbitration Act 1996 shall not apply to proceedings pursuant to the Convention, but this subsection shall not be taken as affecting section 9 of that Act (stay of legal proceedings in respect of matter subject to arbitration).

(3)    An order made under this section –

(a)    may be varied or revoked by a subsequent order so made, and

(b)    shall be contained in a statutory instrument."

14.    No order was made under the 1966 Act, section 3(1), prior to its amendment and no order has been made under section 3(1) of the 1966 Act as amended. Consequently the only provisions of the Arbitration Act 1996 which apply are (as with the Arbitration Act 1950) those relating to stays of English proceedings brought in breach of an agreement to submit to ICSID arbitration.

**II    ETI's 1995 investment in Entel, and Bolivian 2007 decrees**

15.    In 1995, ETI, a Netherlands company, entered into a series of agreements with the Bolivian Government and Entel, a Bolivian telecommunications company, pursuant to which Entel was privatised. ETI obtained ownership of 50% of Entel's shares, and also was granted management control of Entel.

16.    The privatisation of Entel was structured by the Bolivian Government as a payment by ETI to Entel of US$610 million to subscribe for 50% of Entel's shares and management control. The remaining shares were held by two Bolivian pension funds (about 47.5% of the share capital) and by local shareholders and employees of Entel (about 2.5% of the share capital).

17.    According to ETI, by December 2007, Entel had made investments in infrastructure and technology in an amount exceeding US$741 million and employed 1,500 Bolivians. In May 2007, ABN AMRO Bank N.V ("ABN AMRO") valued Entel's business at between US$587 million and US$650 million, so that ETI's interest was worth between US$294 million and US$325 million.

18.    In June 2006 Bolivia published a national development plan which contemplated the re-nationalisation of various formerly state-owned enterprises that had been privatised in the 1990s.

19.    The Bolivian government began to take measures which, according to ETI, adversely affected the value of ETI's investment in Entel, and which were intended to expropriate its interest in Entel without paying fair compensation.

20.    In July 2006, Bolivian authorities notified Entel that Bolivia was imposing on Entel approximately US$26 million in withholding taxes for a capital distribution made in September 2005, and sought approximately US$30 million in penalties and interest. In March 2007 Bolivia issued a decree which established an ad hoc commission to negotiate the recovery of Entel for the Bolivian State within 30 days, and referred to an investigation of Entel which purportedly revealed "irregularities in [its] management and operations . . . .". In April 2007, the ad hoc commission claimed that various irregularities required adjustments to the reported value of Entel of at least US$645 million, which was close to the equity value of Entel as determined by ABN AMRO.

21.    On 23 April 2007, the Bolivian government issued two decrees. The first decree abrogated a decree and a ministerial regulation which had certified that Entel had fully performed its obligations in connection with the privatization, and transferred the 47.5% interest in Entel held by two Bolivian pension funds to the Bolivian government. The second decree purported to abrogate several earlier decrees that authorised Entel's privatisation.

**III      The ICSID arbitration proceedings and the nationalisation of Entel**

22.    On 12 October 2007, ETI submitted to ICSID a Request for Arbitration against
       Bolivia pursuant to which ETI sought to recover damages against Bolivia to
       compensate it for its injuries arising from Bolivia's conduct.

23.    On 2 May 2007, Bolivia submitted to ICSID a formal denunciation of the ICSID
       Convention. Pursuant to the ICSID Convention, that denunciation took effect six
       months after it was received by ICSID, on November 2, 2007. On 29 October 2007,
       Bolivia submitted to ICSID a letter objecting to ICSID's jurisdiction over the
       arbitration commenced by ETI.

24.    On 31 October 2007, ICSID registered ETI's Request for Arbitration, thereby
       initiating the ICSID arbitration proceeding. In June 2008 ETI nominated the
       distinguished international arbitrator, Professor Francisco Orrego Vicuna, as its
       arbitrator and proposed the Hon Marc Lalonde as President of the Tribunal. Bolivia
       did not respond and ETI has, in accordance with Rule 4 of the Arbitration Rules of
       ICSID, requested the Chairman of the Administrative Council of ICSID to nominate
       two arbitrators and designate one of them as President of the Tribunal. By Rule 6(1)
       the Tribunal is deemed to be constituted, and the proceedings to have begun, on the
       date that the Secretary-General of ICSID notifies the parties that all the arbitrators
       have accepted their appointment.

25.    On 1 May 2008, Bolivian President Morales proclaimed a Nationalisation Decree,
       which provides (Article 2):

              "The stock of the capitalising company ETI EUROTELECOM
              INTERNATIONAL NV is hereby nationalised in its entirety
              and said company is transformed into Entel SAM; all the shares
              of this capitalising company shall be transferred to the Bolivian
              state, being temporarily held by the Ministry of Public Works,
              Utilities and Housing...."

26.    Although Article 3 of the Nationalisation Decree states that compensation for ETI's
       shares will be valued within 60 days based on an evaluation, it does not provide any
       mechanism for fixing that payment. ETI says that it has obtained a copy of a Bolivian
       government document entitled "Executive Summary – Recovery of Entel S.A.",
       which states that the governmental "work group" proposed that ETI would receive
       "[c]ompensation 0, due to the irregularities found." The 60 day period referred to in
       the Nationalisation Decree has passed without any payment being made to ETI or it
       being informed by Bolivia what it thinks the asset is worth.

27.    Article 4 of the Nationalisation Decree includes a proviso, that "[t]he financial, tax,
       labor, commercial and regulatory liabilities" of Entel, "both payable and contingent,
       shall be deducted at the time of effecting the final liquidation for the payment to be
       made to [ETI]. . . ." It is ETI's case that this shows that nothing will be paid for the
       expropriated shares. A few days before the Nationalisation Decree was issued, the
       Bolivian tax authorities ordered payment within three days of approximately US$60
       million for the purported withholding taxes, penalties and interest retroactively
       assessed for the September 2005 capital reduction and distribution, as discussed
       above.

28.    Also on May 1, 2008, the Bolivian police took control of Entel's main offices, and SITTEL, the Bolivian telecommunications regulator, issued an administrative resolution, which provided on the authority of the Nationalisation Decree, that an agent for SITTEL would immediately assume the management of Entel for a period of ninety days.

## IV    Proceedings in New York

29.    On 5 May 2008, ETI obtained an ex parte order of attachment in the United States Federal District Court for the Southern District of New York ("the SDNY"). The order provided that the United States Marshal for the SDNY was to levy within the court's jurisdiction upon such monies and/or interest in the property of Entel as were on deposit, including certain time deposits held by Entel with JP Morgan Chase Bank N.A.

30.    The complaint commencing the proceedings in the SDNY describes the proceedings as "an action for an order of attachment in aid of arbitration" (para 1), namely the ICSID arbitration. The basis for the claim is that "without an order of attachment, the arbitral award will be rendered ineffectual ...." (para 36). Subject-matter jurisdiction is said to arise under the New York Convention on the Recognition and Enforcement of Arbitral Awards and the ICSID Convention (para 7) and New York is said to be the appropriate venue because (among other reasons) "Debt or property belonging to Defendants Entel and/or Bolivia is within the jurisdiction of this Court" and "because all of the property that is the subject of this action is situated within the District." (paras 8 and 9).

31.    An application by ETI has been filed in the SDNY to confirm the order granted on 5 May 2005. Bolivia and Entel are opposing that application. The application remains pending, and it is not anticipated that there will be a ruling in the near future.

## V    The English proceedings and the judge's judgment

32.    About US$50 million is currently being held by Deutsche Bank in London in an account in the name of Entel on renewable time deposits. On 7 May 2008 ETI applied to Andrew Smith J without notice for an order against Bolivia and Entel to prevent the deposits at Deutsche Bank being removed from England and Wales or being dealt with or diminished in value.

33.    The evidence consisted of a short affidavit by ETI's solicitor, to which he exhibited a more detailed affidavit by the former chief executive officer of Entel, Mr Bertone, sworn in the SDNY proceedings. Mr Bertone gave the history of Bolivia's actions and said (para 34): "I anticipate that once the Bolivian government appoints its own designees to the Entel Board, one of the Board's first acts will be to direct a transfer to Bolivia of Entel's assets held outside the country."

34.    The order, according to the skeleton argument for ETI, was sought pursuant to the Arbitration Act 1996, section 44 (which enables injunctions to be sought in aid of arbitrations) and section 25 of the Civil Jurisdiction and Judgments Act 1982 ("the 1982 Act").

35.    As regards section 44, it was said that, notwithstanding the fact that the seat of the arbitration was outside England, the presence of sufficient assets in England, and the fact that if no injunction were granted ETI's ability to enforce any award would be significantly reduced, was sufficient to justify the exercise of the court's jurisdiction. That contention was abandoned shortly before the main hearing of the application to set aside the order. That was because (as will appear below) the Arbitration Act 1996 has only limited application to ICSID arbitrations. There is power in the Arbitration (International Investment Disputes) Act 1966, section 3(1) of that Act (as amended by the Arbitration Act 1996, section 107(1) and schedule 3) for the Lord Chancellor to apply (inter alia) section 44 of the Arbitration Act 1996 to cover ICSID arbitrations, but this has not been done: *Republic of Ecuador v Occidental Exploration and Production Company* [2005] EWCA Civ 1116, [2006] QB 432 at [38].

36.    I set out at this point the current version of section 25 of the 1982 Act, as implemented by Order in Council. Section 25 enables the English court to grant interim relief in connection with certain types of proceedings pending outside England. In its present form, so far as material, it provides:

> **25.— Interim relief in England and Wales and Northern Ireland in the absence of substantive proceedings**
>
> (1) The High Court in England …shall have power to grant interim relief where—
>
> (a) proceedings have been or are to be commenced in a Brussels or Lugano Contracting State or a Regulation State other than the United Kingdom or in a part of the United Kingdom other than that in which the High Court in question exercises jurisdiction; and
>
> (b) they are or will be proceedings whose subject-matter is within the scope of the Regulation as determined by Article 1 of the Regulation (whether or not the Regulation has effect in relation to the proceedings).
>
> (2) On an application for any interim relief under subsection (1) the court may refuse to grant that relief if, in the opinion of the court, the fact that the court has no jurisdiction apart from this section in relation to the subject-matter of the proceedings in question makes it inexpedient for the court to grant it.
>
> (3) Her Majesty may by Order in Council extend the power to grant interim relief conferred by subsection (1) so as to make it exercisable in relation to proceedings of any of the following descriptions, namely—
>
> (a) proceedings commenced or to be commenced otherwise than in a Brussels or Lugano Contracting State or Regulation State;

(b) proceedings whose subject-matter is not within the scope of the Regulation as determined by Article 1 of the Regulation.

4) An Order in Council under subsection (3)—

(a) may confer power to grant only specified descriptions of interim relief;

(b) may make different provision for different classes of proceedings, for proceedings pending in different countries or courts outside the United Kingdom or in different parts of the United Kingdom, and for other different circumstances; and

(c) may impose conditions or restrictions on the exercise of any power conferred by the Order.

...."

37.    The 1997 Order, in its present form, provides, in Article 2:

"The High Court in England and Wales or Northern Ireland shall have power to grant interim relief under section 25(1) of the Civil Jurisdiction and Judgments Act 1982 in relation to proceedings of the following descriptions, namely -

(a)    proceedings commenced or to be commenced otherwise than in a Brussels or Lugano Contracting State or Regulation State;

(b)    proceedings whose subject-matter is not within the scope of the Regulation as determined by Article 1 thereof".

38.    The ICSID proceedings are against Bolivia, and the application justified the proposed order against Entel on the theory (to which I shall revert) that an injunction could be granted against a third party (such as Entel) if the respondent to the arbitration was in a position to affect the value of its holding in a valuable asset such as the shares in Entel by allowing its officers to transfer funds to Bolivia. It was also said that the funds on deposit could easily be transferred out of ETI's reach by Bolivia, and that Bolivia appeared to be taking steps to do so at the first opportunity.

39.    Andrew Smith J made the order on 9 May 2008 and it was extended by Flaux J on 16 May. On 12 June 2008 Entel applied to have the order discharged, and on 30 June 2008 Bolivia made a similar application. The order was challenged on various bases, including these: that the court had no jurisdiction to make the order; that there was material non-disclosure; and that there was not sufficient evidence of a risk of dissipation. The applications were originally listed for hearing on 29 and 30 July 2008.

40.    On 1 July 2008 solicitors for Bolivia and Entel asked for an earlier hearing. ETI's solicitors required until 7 July 2008 to respond to the points raised by Bolivia and Entel. The matter was listed for directions on 9 July and the judge offered Bolivia

and Entel an opportunity (which they accepted) to have the matter dealt with on 10 July 2008, confining their arguments on 10 July 2008 to questions of, or closely related to, the points on jurisdiction. The points were (broadly) (1) whether the court had jurisdiction pursuant to section 25 of the 1982 Act as extended by the Civil Jurisdiction and Judgments Act 1982 (Interim Relief) Order 1997 ("the 1997 Order") to make the freezing order in support of either the proceedings commenced by ETI in the SDNY and/or the ICSID arbitration; (2) whether it was inexpedient within the meaning of section 25(2) of the 1982 Act to make the freezing order given the provisions of ICSID Articles 26 and 47 and ICSID Rule 39(6) (set out above); and (3) whether the State Immunity Act 1978 prevented the court from making the freezing order against Bolivia.

41.     On 11 July 2008, the judge gave judgment, and held: (1) the freezing order was not made in relation to the proceedings in the SDNY in the relevant sense required by section 25 of the 1982 Act as extended by the 1997 Order; (2) section 25 of the 1982 Act as implemented by the 1997 Order did not extend to making an order in support of ICSID arbitrations. That was sufficient to dispose of the order, but he went on to hold that, in any event, (3) the order should not have been made because it was "inexpedient to grant" the relief (section 25(2)), and (4) Bolivia was entitled to state immunity and there was no independent basis for the order against Entel.

42.     The judge refused ETI permission to appeal, but directed that his order was not to come into force until 4pm on Tuesday 15 July 2008 in order to allow an application for permission to appeal to be made. On that day Jacob LJ gave permission to appeal and extended the stay until the disposition of the appeal.

## VI    ETI's appeal

### 1.    Procedural irregularity

43.     The first ground was that it was wrong and unjust for the judge to proceed to hear argument on 10 July 2008 for two reasons. First, it said that it was only two days before the hearing that Bolivia had raised the state immunity issue, and ETI was faced with a large volume of authorities at a very late stage. The second was that it was not right for the judge to deal with the question raised by Bolivia as to whether it was "expedient" to grant relief even if there were jurisdiction to do so, because that question depended on all the circumstances and was not a jurisdictional issue.

44.     The court did not call upon the respondents on this ground. The judge made a sensible case management decision, and he cannot be faulted. I will deal below with the question whether it was right for the judge to consider, in the light solely of the ICSID Convention and ICSID Arbitration Rules, whether it was "inexpedient" to make the order for the purposes of section 25(2) of the 1982 Act.

### 2.    Section 25 of the 1982 Act and the New York proceedings

*Judge's decision*

45.     The judge accepted the submission for Bolivia and Entel that section 25 was limited to giving the court jurisdiction to assist foreign substantive proceedings, provided the expression "substantive proceedings" was not understood too narrowly: *Kensington*

*International Ltd v Republic of the Congo* [2007] EWCA Civ 1128, [2008] 1 Lloyd's Rep 161. The order in these proceedings was not interim relief granted in relation to the New York proceedings in any relevant sense. The New York proceedings were directed to assets in New York. The English proceedings were directed to different assets in London. Both were ancillary to the ICSID arbitration and might be said to be parallel proceedings. But the English proceedings could not be said to be ancillary to, or in support of, the New York proceedings, and the New York proceedings had no primacy except in an irrelevant temporal sense. Consequently the court did not have jurisdiction under the Order in Council by virtue of the existence of the New York proceedings.

*ETI's argument*

46.    The principal points made by Mr Gabriel Moss QC on behalf of ETI were as follows. A proceeding can be "substantive" even if its sole purpose is to assist some other proceeding not concerned with the final merits: *Kensington International Ltd v Republic of Congo, ante.* The proceedings in the SDNY are concerned with the dispute as to whether or not the ICSID arbitration can be made effective by preserving assets to which Bolivia can have recourse to pay a future award pending the making of any arbitration award. In principle, this would involve the SDNY attaching deposits in London as well as New York. The fact that the New York court had (sensibly) not actually tried to exercise its jurisdiction extra-territorially over the accounts in London was irrelevant.

47.    The key question was whether the purpose of the order made in the SDNY would be assisted by the making of the freezing order. The judge's focus upon the assets in respect of which relief was granted in the SDNY was mistaken. The fact that the relief available in the substantive proceedings did not equate precisely to the relief sought in England did not prevent the court from making the order sought: *Crédit Suisse Fides Trust SA v Cuoghi* [1998] QB 818. There was no reason to suppose that the New York court would not have welcomed assistance from the courts of this country: *Crédit Suisse Fides Trust SA v Cuoghi, ante,* at 829; *Motorola Credit Corp v Uzan (No 2)* [2003] EWCA Civ 752, [2004] 1 WLR 113 at 134.

**3.    Section 25 of the 1982 Act and the ICSID arbitration**

*Judge's decision*

48.    The judge accepted the argument for Entel and Bolivia that the 1997 Order should not be regarded as applying to arbitral proceedings, in view of the fact that section 25 had been amended to take account of the new arbitration regime under the Arbitration Act 1996. Even though the specific power conferred in the Arbitration (International Investment Disputes) Act 1966 (as amended by the Arbitration Act 1996) to apply section 44 of the Arbitration Act 1996 to ICSID arbitrations had not been exercised, it was not to be supposed that the 1997 Order was intended to supplement or otherwise affect the new regime under the Arbitration Act 1996, and it was not to be supposed that the 1997 Order, which was directed to private disputes, incidentally conferred power to use section 25 in relation to ICSID arbitrations involving States.

*ETI's appeal*

49.    The argument for ETI is that there is nothing in the 1997 Order which prevents its application to arbitration proceedings. The term "proceedings" has been held or assumed to extend to arbitration proceedings in other statutory contexts: *Bristol Airport plc v Powdrill* [1990] BCLC 585, 600 (Insolvency Act 1986, section 11(3)(d)); Case C-294/02 *Commission v AMI Semiconductor Belgium* [2005] ECR I-2175 (Council Regulation 1346/2000 on Insolvency Proceedings Article 4(2)(f)) and also Virgos and Garcimartin, *The European Insolvency Regulation: Law and Practice*, pp 76, 141-142; Guide to Enactment of the UNCITRAL Model Law on Cross Border Insolvency, para 145 (reference in Article 20 of the Model Law to "actions" includes arbitrations).

50.    If the legislature had intended the term "proceedings" in the 1982 Act as extended by the 1997 Order to be restricted to "court proceedings" it would have specified this. Article 1 of Council Regulation 44/2001 ("the Judgments Regulation") provides (as did the Brussels and Lugano Conventions) that the Judgments Regulation shall not apply to arbitration. The 1997 Order (as amended) extends the application of the 1982 Act to "proceedings whose subject-matter is not within the scope of the Regulation as determined by Article 1 of the Regulation". The logical inference is that this must include arbitrations.

51.    Just as the powers under section 37 of the Supreme Court Act 1981 remain available to the court whether or not section 44 of the 1996 Act is applicable (*Starlight Shipping Co v Tai Ping Insurance Co Limited* [2008] 1 Lloyd's Rep 230; *Russell on Arbitration*, 23rd ed., 2007, at 7-196), relief under section 25 of the 1982 Act may be available whether or not the provisions of section 44 of the 1996 Act are applicable.

52.    In answer to the argument that it made no sense for the Arbitration Act 1996 to make provision for assisting arbitrations, including the amendment to the 1966 Act potentially assisting ICSID arbitrations, if the 1997 Order had the effect suggested, ETI says, inter alia, if the Arbitration Act 1996 can co-exist with the wider powers in Supreme Court Act 1981, section 37, it can also co-exist with wider powers in the 1997 Order; and if the 1997 Order has the effect for which ETI contends, that may explain why the power to apply section 44 of the 1996 Act to ICSID arbitrations was never exercised: if the position is covered by section 25 there is no need.

## 4.    Expediency

*Judge's decision*

53.    The judge accepted the respondents' argument that if there had been jurisdiction to make the order, it could not be expedient to make the order because of the provision in Article 26 of the ICSID Convention that consent of the parties to an ICSID arbitration was deemed to be consent to the arbitration to the exclusion of any other remedy, subject to the power in Rule 39(6) of the Arbitration Rules for the parties to stipulate that there might be resort to a national court for provisional measures. It would not be expedient to exercise the jurisdiction under section 25, other than harmoniously with the regime and procedures of the court seised of the substantive proceedings: *Crédit Suisse Fides Trust S.A. v. Cuoghi* [1998] QB 818, at 827, 831-832.

54.    The judge dealt with ETI's point that it was not open to Bolivia to rely upon the arbitration regime when there was no constituted tribunal which could recommend protective measures as contemplated by Article 47, and when this came about through Bolivia's own failure to comply with the arbitration regime. The judge said that the ICSID Convention and Arbitration Rules applied before as well as after the tribunal had been constituted; ETI could have had the tribunal fully constituted long before these proceedings were brought, had it availed itself of procedures available to it under the ICSID machinery; ETI could not rely on the existence of the ICSID arbitration without accepting the limitation of the proceedings under the ICSID machinery, including the restriction on when provisional measures may be sought.

55.    That aspect could be dealt with summarily without consideration of all the other circumstances because in view of the arguments put forward about the nature and limitations of the ICSID regime, it was not right to maintain the order on the grounds that it should be made in relation to the ICSID arbitration.

*ETI's appeal*

56.    ETI challenges the judge's decision on the ground that the respondents' argument on expediency did not go to the jurisdiction of the court to make the order, and was heavily reliant upon the facts and circumstances of the case. It should not have been dealt with summarily.

57.    In any event, the judge was wrong. Due to its successful delaying tactics, Bolivia would have had ample opportunity to move the assets out of the jurisdiction before injunctive relief could be granted even if ETI had submitted an application for provisional relief to the ICSID arbitral tribunal. The judge was factually wrong in stating that ETI could have had the tribunal fully constituted long before. ETI did in fact operate the default procedures in relation to the setting up of the tribunal but was prevented from doing so by the delay caused by Bolivia and, in part, delay on the part of ICSID.

58.    There might have been an argument that the provisions of Rule 39 of the Arbitration Rules make it "inexpedient" to grant relief, if the ICSID tribunal were constituted and in a position to grant provisional relief. But it could not be "inexpedient" to grant relief prior to the tribunal even being constituted and being able to hear an application for provisional relief. Provisional relief by a national court pending any decision by the tribunal once constituted to grant or refuse relief, or require the release of national remedies, supports rather than undermines an ICSID arbitration.

59.    ETI was entitled to rely on Bolivia's conduct in delaying the formation of the tribunal as preventing Bolivia from raising the argument that it was inexpedient to make the order. There was no evidence submitted by Bolivia which indicates that it disputes the allegation that it has forcibly taken ETI's interest in Entel without compensation to Entel. Bolivia has refused to participate in the ICSID arbitration, and has violated ICSID's rules by refusing to respond to ETI's proposal to establish a procedure for constituting the tribunal. Consequently the respondents are estopped from invoking or have waived their right to invoke the provisions of the ICSID Convention and Rules. Having precluded ETI from exercising its right to seek relief in the ICSID proceeding, Bolivia could not now argue that the ICSID rules prevent ETI from seeking such relief from the English court.

5.    **State Immunity**

60.    ETI relied upon section 9 of the State Immunity Act 1978, under which a State is not
immune as respects proceedings "subject to any contrary provision in the arbitration
agreement". The judge decided that, although it was not necessary to decide on the
application of the State Immunity Act 1978 because of the conclusions he had reached
about the inapplicability of section 25, Bolivia was entitled to immunity: ETI could
not rely on section 9 of the 1978 Act because given the conclusion he had reached in
relation to the provisions of the ICSID Convention and Rules there was a "contrary
agreement" under section 9 of the 1978.

*ETI's argument*

61.    The argument on state immunity is that Bolivia has by the terms of the BIT agreed to
submit the dispute to arbitration. As a consequence, pursuant to section 9(1) of 1978
Act, Bolivia is not immune as respects proceedings in the courts of the United
Kingdom which relate to the arbitration. This would include any interim order made
in support of those arbitration proceedings pursuant to section 25 of the 1982 Act;
and/or in support of the proceedings in the SDNY (which themselves clearly relate to
the arbitration). Bolivia has not established for the purposes of section 9(2) that there
was a "contrary provision" in the relevant arbitration agreement which otherwise
prevented the operation of the provisions of subsection 9(1). Alternatively Bolivia
either could not rely or was prevented from relying on the provisions of the ICSID
Rules and Convention. In any event, even if there was no jurisdiction to make an
order against Bolivia by virtue of the provisions of the 1978 Act, that would not
prevent the court from making an order against Entel only.

**VII    Conclusions**

*Section 25 and the New York proceedings*

62.    The question on this point is whether the nature of the New York proceedings is such
as to engage the power of the English court to grant interim relief under section 25 of
the 1982 Act.

63.    The background to section 25 was the decision of the House of Lords in *The Siskina*
[1979] AC 210 that the English court did not have jurisdiction to grant interim relief
by way of *Mareva* injunction against a foreign defendant otherwise than in support of
a cause of action in respect of which the defendant was amenable to the jurisdiction.

64.    Article 24 of the Brussels Convention (now Article 31 of the Judgments Regulation)
provided:

> "Application may be made to the courts of a Contracting State
> for such provisional, including protective, measures as may be
> available under the law of that State, even if, under this
> Convention, the courts of another Contracting State have
> jurisdiction as to the substance of the matter".

65.    When *The Siskina* was decided in October 1977 the United Kingdom had not acceded
to the Brussels Convention, although negotiations were far advanced, and Lord

Diplock, delivering the only speech, refused to exercise what he described (at 260) as a legislative function in order to grant a remedy, similar to that available in other member states, in support of foreign courts which were adjudicating on the merits of the claim.

66.    The 1982 Act was enacted primarily (but not exclusively) to enable effect to be given in the United Kingdom to the Brussels Convention. The United Kingdom signed the Convention acceding to the Brussels Convention in 1978, although it did not come into force until 1987.

67.    The main purpose of section 25 was twofold: first, to give the English court jurisdiction to order provisional or protective measures where the courts of another Brussels Convention Contracting State had jurisdiction as to the substance of the matter; and second, to enable subordinate legislation to be enacted to reverse the effect of *The Siskina* so that interim relief could be granted in England where proceedings were pending abroad in non-Convention cases, or where there were arbitration proceedings.

68.    Section 25 was headed "Interim relief in England and Wales and Northern Ireland in the absence of substantive proceedings" and provided (in its original form as enacted in 1982):

"(1)    The High Court in England and Wales or Northern Ireland shall have power to grant interim relief where -

(a)    proceedings have been or are to be commenced in a Contracting State other than the United Kingdom or in a part of the United Kingdom other than that in which the High Court in question exercises jurisdiction; and

(b)    they are or will be proceedings whose subject-matter is within scope of the 1968 Convention as determined by Article 1 (whether or not the Convention has effect in relation to the proceedings).

(2)    On an application for any interim relief under subsection (1) the court may refuse to grant that relief if, in the opinion of the court, the fact that the court has no jurisdiction apart from this section in relation to the subject-matter of the proceedings in question makes it inexpedient for the court to grant it.

(3)    Her Majesty may by Order in Council extend the power to grant interim relief inferred by subsection (1) so as to make it exercisable in relation to proceedings of any of the following descriptions, namely -

(a)    proceedings commenced, or to be commenced, otherwise than in a Contracting State;

> (b)    proceedings whose subject-matter is not within the scope of the 1968 Convention as determined by Article 1;
>
> (c)    arbitration proceedings.
>
> …
>
> (5)    An Order in Council under subsection (3) which confers power to grant interim relief in relation to arbitration proceedings may provide for the repeal of any provision of section 12(6) of the Arbitration Act 1950 … to the extent that it is superseded by the provisions of the Order."

69.    Section 25 came into effect in 1987 at the same time as the Brussels and Lugano Conventions came into force for the United Kingdom (and it was amended in 1996 in a material respect to which I shall revert in the next section of this judgment), but the powers under section 25(3) were not exercised until 1997, when the 1997 Order was made. The 1997 Order came into force on 1 April 1997. By contrast with section 25 itself, the changes to the 1997 Order since it was first enacted are not material, since the changes are solely those consequential on the application of the Judgments Regulation. The current version of Article 2 is set out above, but is repeated here for convenience:

> "The High Court in England … shall have power to grant interim relief under section 25(1) of the Civil Jurisdiction and Judgments Act 1982 in relation to proceedings of the following descriptions, namely -
>
> (a)    proceedings commenced or to be commenced otherwise than in a Brussels or Lugano Contracting State or Regulation State;
>
> (b)    proceedings whose subject-matter is not within the scope of the Regulation as determined by Article 1 thereof".

70.    I am satisfied that the foreign proceedings to which section 25 and the 1997 Order are referring are proceedings on the substance of the matter. First, that appears from the legislative purpose of section 25 which was to implement Article 24 of the Brussels Convention, and to reverse the effect of *The Siskina*. Article 24 itself speaks of the case where the courts of another Contracting State have jurisdiction "as to the substance of the matter." In *The Siskina* Lord Diplock referred several times to the court in which the substantive relief was sought: [1979] AC at 254, 256 (as did Lord Denning MR in the Court of Appeal: at 234 ("the substantive case")). Secondly, the heading of the section refers to the jurisdiction of the English court to grant interim measures "in the absence of substantive proceedings" and legitimate assistance may be derived from that in construing section 25: Bennion, *Statutory Interpretation*, 5th ed 2008, pp 745 et seq.

71.    Thirdly, the application of section 25 to foreign substantive proceedings is confirmed by many references in decisions of this court on section 25 to the foreign court dealing with the "substantive proceedings" or the "substantive dispute": *Credit Suisse Fides Trust v Cuoghi* [1998] QB 818 at 825-829 Millett LJ), 831 (Lord Bingham CJ); *Refco Inc v Eastern Trading Co* [1999] 1 Lloyd's Rep 159 at 170-172 (Morritt LJ), 174 (Potter LJ), 174-175 (Millett LJ); *Motorola Credit Corp v Uzan (No.2)* [2003] EWCA Civ 752, [2004] 1 WLR 113, [2], [61], [65], [102], [110].

72.    Fourth, in *Refco Inc v Eastern Trading Co* this court laid down a two stage test, which was applied in *Motorola Credit Corp v Uzan (No.2)*. The first stage was to consider whether the English court would grant interim relief if the substantive proceedings were in fact being conducted in England. The second was whether the fact those substantive proceedings were abroad made it inexpedient for the purposes of section 25(2) to grant the relief. The first test would not be workable if the foreign proceedings were solely for interim relief in support of proceedings in a third country or in arbitration. The English court would simply not be able to apply the first test on the hypothesis that there were proceedings solely for interim relief in England. I accept that this point cannot be taken too far since the court in those cases was only considering the normal case of substantive proceedings abroad.

73.    As I have said, the judge accepted that section 25 was limited to giving the court jurisdiction to assist foreign substantive proceedings, provided the expression "substantive proceedings" was not understood too narrowly, citing the decision of this court in *Kensington International Ltd v Republic of the Congo* [2007] EWCA Civ 1128, [2008] 1 Lloyd's Rep 161. ETI says that this decision shows that it is not necessary that the foreign proceedings be substantive proceedings on the merits of the claim, because the foreign proceedings were in fact "interim attachment" proceedings. Such proceedings could be regarded as "substantive."

74.    The case was concerned with an attempt by Kensington to execute English judgments in Switzerland by attaching debts due to the Republic of the Congo. Kensington applied to the Court of First Instance in Geneva for an interim attachment of debts said to be owed by a third party company, Vitol SA, to the Congo. The Court of First Instance in Geneva granted an interim attachment order preventing Vitol SA from making certain payments to the Congo. The scope of that order was disputed between the parties. It was in respect of that order that the English court exercised its jurisdiction pursuant to section 25 of the 1982.

75.    It is important to emphasise again that the proceedings in Switzerland in that case were for enforcement of the English judgments; see para [6]. At first instance Cresswell J had held that section 25 applied to interim relief "in support of substantive proceedings taking place elsewhere" and that this phrase included proceedings concerned with the enforcement of judgments: [2006] EWHC 1712 (Comm) at [62]-[63]. The issue of whether the Swiss proceedings were substantive or not was not before the Court of Appeal. I accept Mr Gruder QC's submission that the fact that interim orders had also been obtained in Geneva pending a final third party debt order in full or partial satisfaction of English judgments against Congo did not derogate from the fact that the proceedings in Geneva were substantive proceedings to enforce a foreign judgment.

76.    But I would accept that the notion of substantive proceedings may have to be given a liberal interpretation to ensure international judicial co-operation. I do not derive much assistance from the words "in relation to" which appear in section 25(3) and the 1997 Order, but not in section 25(1), because it seems to me that they are not referring to the relationship between the interim relief sought in the English court and the foreign proceedings. Those words are simply indicating to what types of proceedings section 25(1) may be extended.

77.    As I have said, in his skeleton argument Mr Moss QC, for ETI, had said: "the New York court has (sensibly) not actually tried to exercise its jurisdiction extra-territorially over the accounts in London." But he ultimately accepted, in response to a question by the court prior to the hearing of this appeal, that as a result of the decision of the United States Supreme Court in *Grupo Mexicano de Desarrollo SA v Alliance Bond Fund Inc,* 527 US 308 (1999), a United States federal court has no power under federal law to make an *in personam* order restraining disposal of assets pending judgment/award, but does have power under Rule 64 of the Federal Rules of Civil Procedure to order attachment of debts under the law of the state in which it sits: *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 313 F 3d 70, at 83 (2d Cir 2002), cert den 539 US 904 (2003). The New York Court of Appeals has held that under New York law courts can only attach property located in New York: *ABKCO Indus., Inc. v. Apple Films, Inc.,* 39 N.Y.2d 670 (1976). See also *Motorola Credit Corp v Uzan (No.2)* [2003] EWCA Civ 75, [2004] 1 WLR 113, at [80].

78.    In my judgment, this ground of appeal fails because on any view the English proceedings are not in aid of, or related to, any substantive proceedings in New York, however liberally those expressions are interpreted. As I have said, the complaint in the SDNY describes the proceedings as an "an action for an order of attachment in aid of arbitration" and founds jurisdiction and venue on the fact that property belonging to Entel and/or Bolivia was situate in New York. The SDNY attachment proceedings constitute interim relief to protect assets pending the outcome of the ICSID arbitration. The New York proceedings are directed solely at assets in New York, and proceedings in England directed at assets in England cannot be ancillary to the New York attachment.

### *Section 25 of the 1982 Act and arbitration*

79.    ETI's contention is, essentially, that notwithstanding the repeal of the express power to extend section 25 to arbitration proceedings, the ICSID arbitration falls within the remaining categories in the 1997 Order because (a) they are proceedings commenced otherwise than in a Judgments Regulation state and/or (b) they are proceedings whose subject-matter is not within the scope of the Judgments Regulation because of the exclusion of "arbitration" in Article 1 of the Judgments Regulation.

80.    In my judgment, there is nothing in ETI's point that because the Judgments Regulation does not apply to "arbitration" (Article 1(2)(d), in the same terms as the Brussels and Lugano Conventions) arbitration proceedings are "proceedings whose subject matter is not within the scope of the Regulation as determined by Article 1 thereof."

81.     Article 1 of the Brussels Convention (like the Lugano Convention and the Judgments
        Regulation) is expressed to apply in civil and commercial matters "whatever the
        nature of the court or tribunal" but does not extend, in particular to revenue, customs
        or administrative matters, and does not apply to (*inter alia*) "arbitration".

82.     Although it is not necessary to decide the point for the purposes of this appeal, in my
        judgment the exclusion of "arbitration" from the scope of the Brussels Convention
        (and the Lugano Convention and the Judgments Regulation) is not an exclusion of
        arbitral proceedings as such at all, but of court proceedings relating to arbitration.  My
        reasons are as follows.  First, as the recitals state, the Brussels Convention was an
        implementation of "the provisions of Article 220" of the EEC Treaty.  Under Article
        220 the member states undertook to secure "the simplification of formalities
        governing the reciprocal recognition and enforcement of judgments of courts or
        tribunals and of arbitration awards."  The wording of Article 220 draws a distinction
        between "judgments of courts or tribunals" and "arbitration awards."  That indicates
        that the expression "tribunals" did not mean, or include, arbitral tribunals.  Second, it
        is clear from the Jenard Report that the exclusion of arbitration was designed to
        exclude jurisdiction of courts and tribunals in respect of litigation relating to
        arbitration.  The Report stated:

                "The Brussels Convention ... does not apply for the purpose of
                determining the jurisdiction of courts and tribunals in respect of
                litigation relating to arbitrations – for example, proceedings to
                set aside an arbitral award; and, finally, it does not apply to the
                recognition of judgments given in such proceedings." ([1979]
                OJ C59, p 14).

83.     Third, the Schlosser Report on the Accession Convention confirmed that the
        discussions concerning "arbitration" in the accession negotiations were concerned
        about court proceedings brought in breach of arbitration agreements: para 61 ([1979]
        OJ C59, p 93), and the whole of his discussion of the subject of arbitration is
        concerned with court proceedings relating to arbitration.

84.     The only possible indication to the contrary might be the statement by the European
        Court in Case C-190/89 *Marc Rich v Societa Italiana Impianti* [1991] ECR I-3855,
        para 18 (repeated in Case C-391/95 *Van Uden v Deco-Line* [1998] ECR I-7091, para
        31):

                "It follows that, by excluding arbitration from the scope of the
                Convention on the ground that it was already covered by
                International Conventions, the Contracting Parties intended to
                exclude arbitration in its entirety, including proceedings
                brought before national courts."

85.     But I do not consider that that statement, made in the context of court proceedings
        relating to the validity of an arbitration agreement, shows that Article 1 was intended
        to exclude the arbitral proceedings themselves.

86.     But it is not decisive whether arbitral proceedings themselves are "arbitration" for the
        purposes of Article 1 of the Judgments Regulation and therefore covered by the

phrase "whose subject-matter is not within the scope of the [Judgments] Regulation" in Article 2(b) of the 1997 Order.

87.    In my judgment, whether or not arbitral proceedings fall within that category, they are not, on a proper construction of section 25(3) and the 1997 Order, "proceedings." If there were any doubt on this aspect, it would be dispelled by the repeal of the provision for "arbitral proceedings" in section 25(3)(c), which is decisive.

88.    I have set out above section 25 as originally enacted in 1982. In particular section 25(3) provided that the power to grant interim relief in aid of foreign proceedings could be extended in three ways: (1) to States other than Contracting States (section 25(3)(a)); (2) to proceedings whose subject matter was not within the scope of the Brussels Convention (section 25(3)(b)); and (3) to arbitration proceedings (section 25(3)(c)).

89.    On 31 January 1997, Schedule 3 of the Arbitration Act 1996 came into force. This repealed section 25(3)(c) so as to remove arbitration proceedings from the description of the proceedings to which the power to extend section 25(1) could be applied by Order in Council. In addition to the repeal of section 25(3)(c), section 25(5) was removed in consequence.

90.    As I have said the 1997 Order was made shortly after the Arbitration Act 1996 was passed, and came into effect on 1 April 1997. Because of the repeal of section 25(3)(c) the 1997 Order provides (as amended) for the application of section 25(1) only to two categories of proceedings (a) proceedings commenced or to be commenced otherwise than in a Brussels or Lugano Contracting State or a Judgments Regulation State; and (b) proceedings whose subject matter is not within the scope of the Judgments Regulation as determined by Article 1 of the Judgments Regulation.

91.    The reason for the repeal of section 25(3)(c) was that the Arbitration Act 1996 made provision for the grant of interim relief by a court in support of arbitrations by section 44. By section 2(3) of the 1996 Act, the powers conferred by section 44 applied even if the seat of the arbitration was outside England or if the arbitration had no seat.

92.    I am satisfied that it is plain that arbitral proceedings are not "proceedings" for the purposes of the 1997 Order. The "proceedings" referred to in sections 25(3(a) and (b) were not intended to refer and did not refer to arbitration proceedings since these were specifically dealt with in section 25(3)(c). Sections 25(3) (a) and (b) referred to court proceedings which were not then within the ambit of section 25 either because of their forum or their subject matter. It could not have been intended in 1982 to include arbitration in section 25(3)(b) if an entirely separate sub-section (section 25(3)(c)) was devoted expressly to arbitration. In addition, the operation of section 25(5), dealing with the repeal of part of the Arbitration Act 1950, was limited to section 25(3)(c), and it is plain that arbitration was intended to be treated separately under section 25(3)(c) and 25(5) and not by way of section 25(3)(b).

93.    I should also mention, for completeness, an argument by ETI based on the failure by the government to exercise its powers to apply section 44 of the Arbitration Act 1996 to ICSID arbitrations.

94.    As I have said, the Arbitration Act 1996, section 107(1) and schedule 3, replaced
       section 3(1) of the Arbitration (International Investment Disputes) Act 1966 with a
       provision which enabled the Lord Chancellor to direct by order that (inter alia) section
       44 of the Arbitration Act 1966 should apply to ICSID arbitrations. No such order has
       been made.

95.    ETI submitted that the power to apply section 44 to ICSID arbitrations has not been
       exercised simply because it was not necessary to do so, since section 25 of the 1982
       Act and section 37 of the Supreme Court Act 1981 give the court sufficient powers.
       Just as the powers under section 37 of the Supreme Court Act 1981 remain available
       to the court whether or not section 44 of the 1996 Act is applicable (*Starlight
       Shipping Co v Tai Ping Insurance Co Limited* [2008] 1 Lloyd's Rep 230; *Russell on
       Arbitration*, 23rd ed., 2007, at 7-196), relief under section 25 of the 1982 Act may be
       available whether not the provisions of section 44 of the 1996 Act are applicable.

96.    I accept the respondents' submission on this point. The fact that the power to extend
       section 44 to ICSID arbitrations exists indicates, if anything, that the power does not
       exist elsewhere. It has not been exercised because there is no need for such a power in
       the light of Article 26 of the ICSID Convention and Rule 39(6) of the Arbitration
       Rules (which I have set out above); and the amendment to section 3 is simply a piece
       of legislative tidying up since the equivalent provisions in the 1966 Act had
       themselves not been implemented.

97.    Nor is it necessary to deal with ETI's arguments on the relationship between the
       powers under section 37 of the Supreme Court Act 1981 and section 44 of the
       Arbitration Act 1996. It has been held in decisions at first instance that section 37 of
       the Supreme Court Act 1981 may be employed in support of arbitration proceedings,
       whether or not section 44 of the Arbitration Act 1996 could also be brought into play:
       *Elektrim S.A. v Vivendi Universal S.A. (No 2)* [2007] 2 Lloyd's Rep 8, at [67]-[79];
       *Starlight Shipping Co v Tai Ping Insurance Co Ltd* [2007] EWHC 1893 (Comm),
       [2008] 1 Lloyd's Rep 230, at [18]-[19]. But it has been said in this court that the
       relationship between those statutory powers will at some stage require detailed
       consideration: *Cetelem SA v Roust Holdings Ltd* [2005] EWCA Civ 618, [2005] 1
       WLR 3555, at [74], per Clarke LJ. See also *Emmott v Michael Wilson & Partners Ltd*
       [2008] EWCA Civ 184, at [110] and [123].

98.    Consequently in my judgment "proceedings" in section 25(3) and the 1997 order does
       not encompass the ICSID arbitration, and this ground of appeal fails also.

*Expediency*

99.    The respondents' position is that it will always be inexpedient to grant interim relief
       in aid of an ICSID arbitration because the rules governing such arbitration exclude the
       possibility of such relief unless the parties have agreed otherwise, and those rules
       form part of the arbitration agreement to which the court will always wish to give
       effect. A "highly material" consideration was "the likely reaction of the court which
       is seised of the substantive dispute": *Credit Suisse Fides Trust v Cuoghi* [1998] QB
       818 at 829; *Refco Inc v Eastern Trading Co* [1999] 1 Lloyds Rep 159 at 174;
       *Motorola Credit Corp v Uzan (No.2)* [2003] EWCA Civ 752, [2004] 1 WLR 113 at
       [72].

100.    My conclusions on the inapplicability of section 25 to arbitration make it unnecessary to decide the question of inexpediency, which simply cannot arise if section 25 is inapplicable. But since the point was argued, I will set out the relevant considerations.

101.    Section 25(2) of the 1982 Act provides that on an application for interim relief under section 25(1) the court may refuse to grant that relief, if, in the opinion of the court, the fact that the court has no jurisdiction apart from section 25 in relation to the subject matter of the proceedings in question "makes it inexpedient for the court to grant it." The Court of Appeal in *Motorola Credit Corp v Uzan* (No.2) [2003] EWCA Civ. 752, [2004] 1 W.L.R. 113, at [115] said that, among the considerations which had to be borne in mind in relation to the question whether it was inexpedient to make an order under section were (adapting the language to a case such as the present) (1) whether the making of the order would interfere with the management of the case in the foreign tribunal; (2) whether it was the policy of the foreign tribunal not itself to make orders of the type sought in England; and (3) whether, in a case where jurisdiction was resisted and disobedience was to be expected, the court would be making an order which it could not enforce.

102.    I have set out above verbatim the provisions of Articles 26 and 47 of the ICSID Convention. The effect of Article 26 is that consent to ICSID arbitration is "deemed consent to such arbitration to the exclusion of any other remedy." Article 47 gives an ICSID tribunal the power to "recommend any provisional measures which should be taken to preserve the respective rights of either party." Although Article 47 uses the word "recommend" there is no doubt that "according to a well-established principle laid down by the jurisprudence of the ICSID tribunals, provisional measures 'recommended' by an ICSID tribunal are legally compulsory; they are in effect 'ordered' by the tribunal, and the parties are under a legal obligation to comply with them": *Tokios Tokeles v Ukraine* (2007) 11 ICSID Rep 307, para 4; also *Casado v Chile* (2001) 8 ICSID Rep 373, 380-382; *Occidental Petroleum Corp v Republic of Ecuador* (2007), para 58. *Cf LaGrand Case (Germany v United States)* 2001 ICJ Rep 3, at paras 98 et seq (binding character of orders made under Article 41 of the Statute of the International Court of Justice, which gives the Court power to "indicate" provisional measures).

103.    There is some doubt whether an order designed to have a similar effect to an attachment or freezing order is a provisional measure for the purposes of Article 47. In *Tanzania Electric Supply Co v Independent Power Tanzania Ltd* (1999) in (2005) 8 ICSID Rep 226 it was said by the tribunal (para 14) that provisional measures under Article 39 should not be recommended in order, in effect, to give security for the claim. Schreuer, *The ICSID Convention: A Commentary* (2001), p 777 seems to take the same view, but Friedland, *ICSID and Court-Ordered Provisional Remedies: An Update* (1988) 4 Arb Int 161, 164-165 suggests that an ICSID tribunal might recommend a freeze on transfers in exceptional circumstances.

104.    It would certainly be surprising if such an order could be made against a State solely as security for a claim in the arbitration. Mr Moss QC pointed to the broad language used by the tribunal in *Casado v Chile* (2001) 8 ICSID Rep 373, para 26: "... provisional measures are principally aimed at preserving or protecting the efficiency of the decision that is given on the merits; they are intended to avoid prejudicing the execution of judgment, or prevent a party, by unilateral act or omission, infringing the rights of the opposing party." But that was not a case in which the order sought bore

any resemblance to an attachment or freezing order. It is not, however, necessary to express even a provisional view on this question in the present case. The tribunal has not been constituted and no request for a recommendation has therefore been made.

105.   Rule 39 of the ICSID Arbitration Rules deals with the provisional measures procedure, and Rule 39(6) provides:

> "(6)    Nothing in this Rule shall prevent the parties, provided that they have so stipulated in the agreement recording their consent, from requesting any judicial or other authority to order provisional measures, prior to or after the institution of the proceeding, for the preservation of their respective rights and interests."

106.   What is now Rule 39(6) was introduced in 1984 as Rule 39(5). Prior to that date the prevailing view had been that the effect of Article 26 was that it was not possible for a private party to obtain an attachment in a national court in aid of an ICSID arbitration: see decisions in Belgium and Switzerland cited in Collins, *Essays in International Litigation and the Conflict of Laws* (1994), p 76; and Schreuer, *The ICSID Convention: A Commentary* (2001), pp 376 et seq. In *MINE v Guinea* (1986) 1 ICSID Review–FILJ 383, at 390), the Geneva court said:

> "Recourse to ICSID arbitration should be considered as an implied waiver of all other means of settlement….the state should not be exposed to other means of pressure or to other remedies".

107.   But in 1986 the French Cour de Cassation decided (in a case where the attachment pre-dated what is now Rule 39(6)) that Article 26 was not intended to prevent recourse to a judge for conservatory measures designed to secure the eventual execution of an award. The court held that the power to order conservatory measures could only be excluded by express consent of the parties, or by implied agreement resulting from the adoption of arbitral rules which required such a waiver, and the ICSID Convention and Rules did not amount to such a waiver: *Guinea and Soguipeche v Atlantic Triton Co* (1987) 26 ILM 373, 1987 Rev Crit 760, 1987 Clunet 125. The decision has been the subject of criticism: e.g. Collins, op cit, p 78.

108.   But the effect of Rule 39(6) is that provisional measures may be sought only from the ICSID tribunal itself, and not from national courts, unless the parties agree otherwise: Shihata (who was the former Secretary-General of ICSID) and Parra (the former deputy Secretary-General), *The Experience of the International Centre for Settlement of Investment Disputes* (1999) ICSID Rev 299, 324; Schreuer, op cit, p 384; Dicey, Morris & Collins, *Conflict of Laws* (14th ed 2006), para 16-179; Fouchard, Gaillard, Goldman, *International Commercial Arbitration* (1999, ed Gaillard and Savage), paras 1309 and 1319-20.

109.   Mr Moss QC suggested that Articles 26 and 47 of the ICSID Convention and Rule 39(6) had no application in England because the ICSID Convention was not incorporated in United Kingdom law. It is true that the Convention is not part of United Kingdom law, but in a case such as this the effect of these provisions taken together is that the parties have agreed not to seek interim measures in a national

court. Although there may be exceptional circumstances which might justify a national court in disregarding the agreement of the parties, in my judgment that agreement pursuant to the Convention and the Rules would of itself normally make an interim order under section 25 inexpedient, and also make it unnecessary to consider all the other circumstances.

### State immunity

110. I come to this point last, simply because it was treated in that way by the judge, and by the parties on this appeal. But it is in fact a matter of the greatest importance (as is made clear by the provision in section 1(1) of the State Immunity Act 1978 that the court must give effect to immunity even if the State does not appear) and would normally fall to be considered first. I am satisfied that Bolivia is entitled to immunity, and that the appeal on this ground fails.

111. As I have said, the judge decided this point on the basis of section 9 of the 1978 Act, which provides:

> "(1)    Where a State has agreed in writing to submit a dispute which has arisen, or may arise, to arbitration, the State is not immune as respects proceedings in the courts of the United Kingdom which relate to the arbitration.
>
> (2)    This section has effect subject to any contrary provision in the arbitration agreement and does not apply to any arbitration agreement between States".

112. But section 13 of the 1978 Act provides:

> "(2) Subject to subsections (3) and (4) below—
>
> Relief shall not be given against a State by way of injunction or order for specific performance or for the recovery of land or other property; and
>
> The property of a State shall not be subject to any process for the enforcement of a judgment or arbitration award or, in an action in rem, for its arrest, detention or sale.
>
> (3)    Subsection (2) (b) above does not prevent the giving of any relief or the issue of any process with the written consent of the State concerned: and any such consent (which may be contained in a prior agreement) may be expressed so as to apply to a limited extent or generally; but a provision merely submitting to the jurisdiction of the courts is not to be regarded as a consent for the purposes of this subsection.
>
> (4)    Subsection (2)(b) above does not prevent the issue of any process in respect of property which is for the time being in use or intended for use for commercial purposes; ..."

113.    Consequently it is plain that there is nothing in section 9 which overrides the
        prohibition in section 13. Proceedings for a freezing order to preserve the position
        pending execution of an award are within section 13 and are not "proceedings which
        relate to the arbitration" for the purposes of section 9. The point can be tested by
        reference to commercial contracts. By section 3 a State is not immune "as respects
        proceedings relating to … a commercial transaction entered into by the State." It
        cannot be suggested that because of section 3, and notwithstanding section 1, the State
        could be enjoined from breach of the contract.

114.    This is confirmed by *Svenska Petroleum Exploration AB v Government of the
        Republic of Lithuania* [2006] EWCA Civ 1529, [2007] 1 Lloyd's Rep 293, in which
        this court held (at [117]) that the effect of section 9 was that state immunity did not
        prevent an application for leave to enforce an arbitral award as a judgment under
        section 101(2) of the Arbitration Act 1996, because that was one aspect of its
        recognition and as such is the final stage in rendering the arbitral procedure effective,
        but also: "Enforcement by execution on property belonging to the state is another
        matter, as section 13 makes clear."

115.    The position with regard to Entel on this aspect is more difficult because it is by no
        means clear on what basis the order was sought and obtained against Entel, and it was
        not the subject of the issues raised before the judge. On this aspect it does not matter
        because (as the judge said) if the order cannot stand against Bolivia because of its
        immunity, the injunction could not stand against Entel. But if the bank account which
        is the subject of the injunction is said to belong to Bolivia then the order would be
        contrary to section 13(2).

116.    The skeleton argument for ETI on the without notice application to the judge said:

> "Although the usual rule is that an injunction will only be
> granted against a party to an action or arbitration there is
> jurisdiction to make a freezing injunction against a third party
> where the there is good reason to suppose as against the third
> party that the assets of the third party would be susceptible to
> enforcement of a judgment against the defendant. Accordingly,
> if the defendant is a shareholder in a private company and were
> left free to deprive the company of assets to which it may be
> entitled, this could affect the value of the shareholding and so
> an injunction could be granted against the third party to
> preserve those assets: Gee, *Commercial Injunctions* (5th ed.)
> para 13.007."

117.    I find this passage in the skeleton hard to follow. The section from Gee, *Commercial
        Injunctions*, which is cited, includes this: "If the defendant is a shareholder in a
        private company and were left free to deprive the company of assets to which it may
        be entitled, this could affect the value of his shareholding and so an injunction can be
        granted against non-parties to preserve those assets." But the decision of Mummery J
        in *TSB Private Bank v Chabra* [1992] 1 WLR 231 which is cited in support of this
        statement refers to a more orthodox situation, namely where it is arguable that the
        assets of the company are beneficially owned by the defendant and not by the
        company in which he is a shareholder: see at 240, 242. Since it was not an issue
        before the judge on the application to discharge the order, it is not necessary for me to

do more than express doubt about the legal basis on which the order in relation to Entel was obtained.

### Disposition

118.    I would therefore dismiss the appeal.

### Lord Justice Stanley Burnton:

119.    I entirely agree with Lord Justice Lawrence Collins' account of the facts and issues and his, if I may say so, masterly exposition of the law and with his conclusion. I too would dismiss this appeal. I add only a few words of my own in view of the importance of the issues raised by this appeal.

120.    Dealing first with the issue whether section 25 of the 1982 confers power on the High Court to grant interim relief in relation to arbitration proceedings, it is quite clear that it does not and has never done so. It is of course correct that "proceedings" may include arbitration proceedings, as in the text of the original section 25(3)(c). But the section has to be read as a whole and in its context. Subsection (1) refers to proceedings that have been or are to be commenced in a State other than the United Kingdom. Arbitration proceedings are not naturally referred to as proceedings commenced in a State, and it may be impossible to identify the State in which arbitration proceedings have been commenced. ICSID arbitrations are a good example. They are quintessentially international. They are subject to a public international law Convention. It is for this reason that they are subject in this country to the Arbitration (International Investment Disputes Act) 1966 rather than the Arbitration Act 1996. An ICSID arbitration is commenced by addressing a request for arbitration under the Convention to the Secretary-General at the seat of the International Center for Settlement of Investment Disputes in Washington DC, but it would be inaccurate to say that the arbitration proceedings have been commenced in the USA or that the arbitration in the present case is "pending" (see section 25(4)(b)) in the USA.

121.    Arbitration proceedings under the Rules of Arbitration of the International Chamber of Commerce in Paris are commenced by a party submitting its request for arbitration to the Secretariat: Article 4 of the ICC Rules of Arbitration. Article 14 of the Rules provides that the place of the arbitration shall be fixed by the Court of Arbitration unless agreed upon by the parties. If the parties have not agreed the place of arbitration, in what country, I ask rhetorically, are the arbitration proceedings pending between their commencement and the decision as to the place of arbitration? If the place of arbitration is fixed as somewhere other than France, are the proceedings then pending in that place instead of France?

122.    The inapplicability of section 25 to foreign arbitration proceedings is confirmed by, among other things, the Brussels Convention and the Jenard Report. The Convention was concerned with court proceedings, as its title (the Convention on jurisdiction and the enforcement of judgments in civil and commercial matters), its recitals ("Considering that it is necessary … to determine the international jurisdiction of their courts, to facilitate recognition and to introduce an expeditious procedure for securing the enforcement of judgments, authentic instruments and court settlements") and perusal of its provisions as a whole makes clear. Article 24, to which section 25 gave

specific effect in our domestic law, refers to the courts of another Contracting State having jurisdiction as to the substance of the matter. Arbitral tribunals are not tribunals "of" another Contracting State. The exclusion of arbitration was subject matter exclusion, excluding court proceedings relating to arbitration.

123.    It is true that the 1982 Act provides in section 50 that "'court', without more, includes a tribunal", but this is because in Continental Europe institutions that we would call courts are called tribunals, as in the French "tribunal de première instance" and "tribunal de grande instance", and Parliament wanted to avoid arguments as to whether such bodies are courts for the purposes of the Act.

124.    I am also troubled by the appellant's application for an injunction against Entel, a company that was not a party to any arbitration agreement and against which the Appellant has no cause of action. As Lawrence Collins LJ has pointed out, *TSB Private Bank v Chabra* was a case in which there was a good arguable case that the assets in the name of the company third party in fact belonged to the defendant. Mummery J, as he then was, said at 238:

> "In brief, in the light of the plaintiff's evidence and the absence of any detailed evidence on the part of the defendants, I am of the view that there is a good arguable case that there are assets, apparently vested in the company, which may be beneficially the property of Mr. Chabra and therefore available to satisfy the plaintiff's claims against him if established at trial. I am also of the view that it is arguable that the company was, in fact, at relevant times the alter ego of Mr. Chabra and that its assets, or at least some of its assets, may be available to meet the plaintiff's claims against him if established."

125.    That was a very different case from the present. It may also have been relevant that the company had ceased to trade. In granting the injunction in that case, Mummery J referred to *Vereker v Choi* (1985) 4 NSWLR 277. That too was a case in which a good arguable case was established that moneys in the name of the third party were in reality those of the defendant, who was seeking to conceal them from the claimant.

126.    Issues as to the grant of a freezing injunction and its scope are always fact-specific. I do not think that the court could or should lay down specific rules as to when such injunctions may be made against parties against whom the claimant has no cause of action, particularly where as in the present case the parties have not made submissions on the point. However, the grant of such injunctions must be even more exceptional than the grant of freezing injunctions against defendants against whom a claimant has a cause of action. Applications for injunctive relief against a third party must be supported by clear evidence showing exceptional grounds, even on the initial application made without notice. The jurisdiction to grant such injunctions must be exercised with great caution.

127.    The basis of the appellant's claim for injunctive relief against Entel was particularly important in this case because of the issue of state immunity, which, as my Lord has said, the court is required to address even if it is not raised by the parties. Mr Moss veered between suggesting that moneys held by Entel were a debt due to Bolivia and that those moneys were or could be controlled by Bolivia through its control over

Entel. If the moneys were owed to Bolivia, there is debt that is the property of Bolivia to which section 13(1)(b) of the State Immunity Act 1978 applies; if the moneys are in the control of Bolivia, section 6(4) applies. Either way, Bolivia and those moneys are immune from enforcement proceedings, including interim injunctions, against the state. Put simply, the 1978 Act retains the distinction between the exercise of the adjudicatory jurisdiction against a state and the exercise of enforcement measures, as can be seen in the wording of section 13(3); and the appellant has not shown any basis for excluding Bolivia's immunity from enforcement.

128.   Lastly, I would wish to commend the judge's decision to hear the jurisdictional issues when he did. Any claimant who wishes to bring proceedings against a State must be in a position to address the issue as to the jurisdiction of the court when he seeks to invoke the jurisdiction of the court. If he seeks an injunction against the State on an application without notice, he must do so then. The court must then consider the question of State immunity, since it is required section 1(2) of the 1978 Act to give effect to the immunity even if the State does not appear. Where injunctive relief is sought, the claimant must deal both with the immunity from the adjudicative jurisdiction of the court and with the immunity from enforcement. It is simply not open to such a claimant to complain that he is not in a position to deal with such jurisdictional issues on its application without notice; and this is even more so on an application on notice. In a case such as the present, the court must consider and decide the question of State immunity at as early a stage on the proceedings as practicable. This is what the judge did.

129.   **Lord Justice Tuckey:**

130.   I agree that this appeal should be dismissed for the reasons given in both judgments.