UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

E.T.I. EURO TELECOM INTERNATIONAL
N.V.,

       Plaintiff,

  -v-                                          No.  08 Civ. 4247 (LTS)(FM)

REPUBLIC OF BOLIVIA, and EMPRESA
NACIONAL DE TELECOMMUNICACIONES
ENTEL S.A.,

       Defendants.

-------------------------------------------------------x

### MEMORANDUM OPINION AND ORDER

       Plaintiff E.T.I. Euro Telecom International N.V. ("ETI" or "Plaintiff") moves, pursuant to N.Y. C.P.L.R. § 6211, for an order confirming the <u>Ex Parte</u> Order of Attachment entered on May 5, 2008, pursuant to which monies belonging to Defendant Empresa Nacional de Telecomunicaciones Entel S.A. ("Entel"), held on deposit in various New York City bank accounts, have been attached for the purpose of satisfying any arbitral award that may be obtained by Plaintiff against Defendant the Republic of Bolivia ("Bolivia") in a separate arbitration action.

       Defendants oppose Plaintiff's motion, asserting, <u>inter alia</u>, that the Court lacks jurisdiction to attach Entel's assets, seeking dissolution of the levied attachments and seeking an order requiring Plaintiff to pay costs and damages sustained by reason of the attachments.

       The Court has considered thoroughly the parties' submissions.  For the following reasons, Plaintiff's motion is denied, the attachment is vacated and Defendants' request for an award of costs and damages is denied without prejudice.

BACKGROUND

The following material facts are undisputed for purposes of the instant motion practice unless otherwise noted.  Plaintiff ETI is a Dutch corporation.  In 1995, Defendant Entel, a Bolivian telecommunications company, was privatized, and ETI entered into a series of agreements with Defendants Bolivia and Entel whereby ETI obtained 50% ownership of Entel's shares, and Bolivia held approximately 47.5% of Entel's shares.

In September 2005, Entel distributed about $400 million in capital to its shareholders.  The distribution was not taxed.  In January 2006, Evo Morales took office as President of Bolivia and, in July of that year, Bolivia imposed $26 million in taxes on Entel for the September 2005 capital distribution and $30 million in penalties and interest.  Entel disputed these levies.  In March and April 2007, Bolivian officials accused Entel of not being in compliance with various contractual obligations in connection with Entel's privatization, and imposed additional taxes and penalties upon Entel.

At this time, a bilateral investment treaty ("BIT") between Bolivia and the Netherlands was in force.  It provided, inter alia, that Bolivia would "ensure fair and equitable treatment to the investments of" Dutch nationals.  The BIT included a dispute resolution mechanism whereby any investment disputes between a Dutch national and Bolivia (or vice versa) would be submitted for arbitration to the International Center for Settlement of Investment Disputes ("ICSID").  On October 12, 2007, ETI initiated arbitration proceedings before ICSID against Bolivia.  Bolivia objected to ICSID's jurisdiction of the action, and the arbitration proceedings are currently pending.

On May 1, 2008, President Morales announced that Bolivia was nationalizing ETI's interest in Entel, and he issued a decree that would purportedly transfer ETI's shares in Entel to

Bolivia. The Bolivian government also took over Entel's management operations. ETI asserts, as a matter of law, that it still owns 50% of the shares of Entel notwithstanding the decree, while Defendants assert that Bolivia now owns 97.5% of Entel's shares as a result of the decree.

Entel currently maintains funds in three banks in New York City. According to a declaration submitted by ETI, these funds have been used for various purposes, including the payment of taxes to Bolivia, the receipt of interconnection fees, and the payment of dividends. (See Decl. of Franco Bertone[1] dated June 23, 2008 ¶¶ 22-30.)

On May 5, 2008, soon after President Morales issued the nationalization decree, ETI filed a complaint against Defendants seeking the attachment of bank accounts in New York in aid of arbitration, and moved ex parte for the entry of an order of attachment of both Bolivia's and Entel's property located in the Southern District of New York. Judge Chin, sitting as Part I judge, denied ETI's motion to attach Bolivia's property, but granted ETI's application with respect to Entel's property, including Entel's New York bank accounts. Judge Chin also ordered that ETI deposit with the Clerk of Court a standby Letter of Credit or other undertaking in the amount of $250,000 as security. ETI subsequently moved to confirm the order of attachment and posted a Letter of Credit. It appears that approximately $36 million of Entel's assets in New York have thus far been attached.

DISCUSSION

Plaintiff asserts that the Court has subject matter jurisdiction of the underlying action pursuant to 28 U.S.C. § 1331 and 9 U.S.C. § 203 because the action falls under the New

---

[1] Mr. Bertone was the CEO of Entel from May 2006 to May 2008. (Bertone Decl. ¶ 2.)

York Convention on the Recognition and Enforcement of Foreign Arbitral Awards. Defendants, however, assert that the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 et. seq., renders Defendants' property immune from the jurisdiction of this Court. The FSIA provides that the property of a foreign state or the property of an "agency or instrumentality of a foreign state" is immune from prejudgment attachment unless the immunity is explicitly waived, among other requirements. See 28 U.S.C. §§ 1603, 1609, 1610(d).[2]

It is undisputed that the attached New York bank accounts belong to Entel, not Bolivia. Defendants assert that Entel is nonetheless entitled to FSIA protection as an "agency or instrumentality" of Bolivia due to Bolivia's majority shareholder interest in Entel[3] and argue that,

---

[2] The FSIA provides, in relevant part, that "the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter." 28 U.S.C.A. § 1609 (West 2006).

The only exception to foreign sovereign immunity listed in sections 1610 and 1611 that concerns prejudgment attachment is listed in subsection 1610(d), which provides, in relevant part:

> The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States . . . if (1) the foreign state has explicitly waived its immunity from attachment prior to judgment, . . . and (2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

28 U.S.C.A. § 1610(d) (West 2006).

[3] The term "foreign state" also includes an "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). An "agency or instrumentality of a foreign state" is defined as follows:

> any entity (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a

because Entel has not explicitly waived its immunity from attachment, Entel's property is immune from prejudgment attachment under FSIA.  Plaintiff disputes Defendants' assertion that Entel is an agency or instrumentality of Bolivia, arguing that Bolivia does not currently own a majority of shares or other ownership interest in Entel, notwithstanding the nationalization decree.

      The Court need not resolve the question of whether Entel is an agency or instrumentality of Bolivia because, even if Plaintiff is correct that Entel is not an agency or instrumentality of Bolivia and that the FSIA therefore does not immunize its assets from prejudgment attachment, Plaintiff has failed to identify a valid basis for the attachment of Entel's New York bank accounts in connection with ETI's arbitration proceeding against Bolivia.[4]

      Plaintiff's original moving papers did not explain why it was proper to attach Entel's assets, given that Plaintiff's dispute was with Bolivia rather than Entel.  After Defendants argued in their opposition papers that FSIA barred this action, Plaintiff, in its reply, proffered for the first time the theory that Entel's bank account assets are attachable because they constitute debt that Entel allegedly now admits that it owes to Bolivia[5]– namely, the $60 million-plus in taxes and

---

      State of the United States . . . nor created under the laws of any third country.

28 U.S.C.A. § 1603(b) (West 2006).

[4]     For the same reasons, it is not necessary to address parties' arguments as to whether the ICSID Convention prevents the Court from ordering the prejudgment attachment of Entel's New York bank accounts.

    Defendants also argue that the Court lacks personal jurisdiction over them.  Because the Court concludes that there is no basis for the prejudgment attachment of Entel's New York bank accounts, see infra, the Court need not address Entel's personal jurisdiction arguments at this stage.  Similarly, because the property of Bolivia is not at issue in connection with the instant motion practice, it is unnecessary to address Bolivia's personal jurisdiction arguments here.

[5]     Plaintiff proffers evidence that, on May 2, Entel's bank accounts located in Bolivia were frozen by the government in connection with the tax debt Bolivia alleged was

penalties levied upon Entel by Bolivia.  See Fed. R. Civ. P. 64 (attachment governed by state procedural law); N.Y. C.P.L.R. § 7502(c) (attachment in aid of arbitration permissible, subject to provisions of Articles 62 and 63); id. §§ 6202, 5201 (debt is attachable).[6]

Plaintiff has failed, however, to provide any explanation as to how Entel's New York bank accounts can themselves constitute "debt" owed to Bolivia.[7]  Nothing suggests that they were in any way earmarked, pursuant to any agreement or law, to entitle Bolivia to their contents. Cf. Karaha Bodas Co., LLC v. Pertamina, 313 F.3d 70, 90-93 (2d Cir. 2002) (relying on Indonesian statutes and other written instruments to determine which portions of bank accounts belonged to or were owed to Indonesia).  Plaintiff's own evidence demonstrates that the funds in Entel's bank accounts in New York were used and managed at the discretion of Entel.  (See Bertone Decl. ¶¶ 22-30 (describing how Entel uses its New York accounts not only to pay taxes to Bolivia but also to

---

    owed to it by Entel but that, on May 29, Entel made a prepayment of approximately $8 million to Bolivia, which resulted in the suspension of the restraining order.  (See Reply Decl. of Robert L. Sills dated June 23, 2008 Ex. 13.)  Plaintiff argues that Entel's prepayment of $8 million after the nationalization decree was a virtual concession by Entel that it owed Bolivia $60 million-plus in taxes and penalties.  ETI now premises its motion to confirm attachment on the theory that the bank account assets somehow equate to Entel's tax debt to Bolivia because Entel has conceded the validity of the $60 million-plus debt to Bolivia.  (See Reply at 3 ("Thus, ETI is entitled to attach Entel's funds because Entel has an admitted indebtedness to the Bolivian government").)  Regardless of whether Entel has in fact conceded the existence of its debt to Bolivia, Plaintiff's theory premised on Entel's alleged concession of debt still does not, as the Court explains infra, provide a basis for prejudgment attachment of Entel's assets in connection with ETI's claim against Bolivia.

[6]    The parties dispute whether debt owed to a foreign state constitutes "property" of the foreign state for FSIA-immunity purposes.  Even if Plaintiff is correct that debt owed to a foreign state is not immune from prejudgment attachment under FSIA, Entel's bank accounts in New York do not constitute such "debt."  See infra.

[7]    As Entel argued correctly in its Sur-Reply, "[a] party does not attach a debt simply by attaching property unrelated to the debt that might or might not be used to pay the debt."  (Entel's Sur-Reply at 18.)

receive revenues, safeguard converted currency, pay suppliers, etc.).)  The fact that monies from the New York bank accounts may or may not ultimately be used to pay Entel's tax debt to Bolivia does not automatically render such accounts equivalent to the debt.[8]

ETI has brought an arbitration action against Bolivia, not Entel, and the attached bank accounts in New York undisputedly belong to Entel, not Bolivia.  Plaintiff has made no proffer, other than the claim that Entel owes Bolivia $60 million-plus in taxes generally, as to how the monies in Entel's New York bank accounts constitute an attachable debt obligation of Entel to Bolivia.  The order of attachment will therefore be vacated.

The Court has considered thoroughly Plaintiff's remaining arguments for confirmation of the attachment and finds them to be without merit.  Therefore, Plaintiff's motion to confirm attachment is denied.

*Costs and damages*

In their opposition submissions, Defendants seek an award of all costs and damages, including attorney's fees.  Pursuant to N.Y. C.P.L.R. § 6212(e),

> The plaintiff shall be liable to the defendant for all costs and damages, including reasonable attorney's fees, which may be sustained by reason of the attachment if . . . it is finally decided that the plaintiff was not entitled to an attachment of the

---

[8]  To the extent that Plaintiff seeks to attach Entel's intangible debt obligations to Bolivia, such that any payment Entel might make towards its debt to Bolivia from its New York bank accounts would instead by directed to Plaintiff, see, e.g., LNC Investments, Inc. v. Republic of Nicaragua, No. 96 Civ. 6360 (JFK), 2000 WL 745550, *1 (S.D.N.Y. June 8, 2000) (restraining notice forbidding companies from paying any debt owed to Nicaragua, thereby implicating FSIA), Plaintiff has failed to demonstrate that Bolivia has in any way consented to prejudgment attachment of its debt obligations or of any other property, or that the intangible debt obligations constituted property used for a commercial activity in the United States.  See 28 U.S.C. § 1610(d).

> defendant's property.  Plaintiff's liability shall not be limited by the amount of the undertaking.

N.Y. C.P.L.R. § 6212(e) (McKinney 1980).[9]  However, the record is not clear as to what damages, including reasonable attorney's fees, may have been sustained by Entel and Bolivia by reason of the attachment of Entel's property.  Therefore, Defendants' request is denied without prejudice to renewal in accordance with the following briefing schedule:

Defendants Entel and Bolivia shall file and serve, with courtesy copies provided for chambers, separate motions, accompanied by evidentiary material and memoranda of law, detailing precisely what monetary amount each defendant seeks to recover pursuant to section 6212(e), no later than **August 25, 2008**.  Plaintiff ETI shall file and serve, with courtesy copies provided for chambers, separate responses to each defendant's papers no later than **September 5, 2008**, and each defendant may file and serve its reply no later than **September 12, 2008**.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion to confirm the attachment is denied and the Court's Ex Parte Order of Attachment dated May 5, 2008 (Docket Entry No. 10), is hereby vacated to the extent it authorizes attachment of the assets of Defendant Empresa Nacional de Telecommunicaciones Entel S.A.  The Letter of Credit posted by ETI with the Clerk of Court pursuant to the Ex Parte Order of Attachment shall not, however, be discharged without further order of the Court.  Defendants' requests for costs and damages are denied without prejudice to renewal in accordance with the procedures detailed above.  The briefing schedule in connection with Defendants' motions to dismiss the complaint shall remain in suspense pending further order of this

---

[9] Plaintiff does not respond to this request, either in its Reply or its Sur-Sur-Reply.

Court.

       The Clerk of Court is respectfully requested to terminate Docket Entry No. 3.

       SO ORDERED.

Dated:      New York, New York
              July 30, 2008

                                                           LAURA TAYLOR SWAIN
                                                           United States District Judge