Michael Krinsky (MK4503)
Eric M. Lieberman (EL 4822)
RABINOWITZ, BOUDIN, STANDARD,
   KRINSKY & LIEBERMAN, P.C.
111 Broadway, 11th Floor
New York, New York 10006
Telephone: (212) 254-1111
Facsimile: (212) 674-4614

Terry Gross (TG 3249)
GROSS BELSKY ALONSO LLP
180 Montgomery Street, Suite 2200
San Francisco, California 94104
Telephone: (415) 514-0200
Facsimile: (415) 544-0201

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

E.T.I. EURO TELECOM
INTERNATIONAL, N.V.,

    Plaintiff,

    v.

REPUBLIC OF BOLIVIA, and EMPRESA NACIONAL
DE TELECOMUNICACIONES ENTEL S.A.,

    Defendants.

Case No. 08-cv-4247 (LTS)(FM)

---

**ENTEL S.A.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR COSTS, ATTORNEY'S FEES AND DAMAGES**

Dated: August 25, 2008
    New York, New York

# TABLE OF CONTENTS

**<u>Page</u>**

STATEMENT OF THE CASE ................................................................................... 1

ARGUMENT ............................................................................................................. 2

I.   COSTS (NOT INCLUDING ATTORNEY'S FEES) ......................................... 2

II.  ATTORNEY'S FEES ........................................................................................ 3

III. DAMAGES ...................................................................................................... 13

CONCLUSION ........................................................................................................ 14

Empresa Nacional De Telecomunicaciones Entel S.A. ("ENTEL") respectfully submits this memorandum of law in support of its motion for an award of costs, attorney's fees and damages pursuant to N.Y. C.P.L.R. § 6212 and the Court's Memorandum Opinion and Order dated July 30, 2008.

## STATEMENT OF THE CASE

In this action, plaintiff attached, *ex parte*, a total of $39,294,124.25 of ENTEL's funds at New York banks. After considerable litigation, this Court issued a Memorandum Opinion and Order on July 30, 2008 denying plaintiff's motion to confirm the attachments and vacating the *ex parte* order of attachment to the extent it authorized attachment of ENTEL's assets. ENTEL's funds have remained attached because of plaintiff's pending motion for reconsideration of the Court's July 30 decision and for a stay pending appeal.

In its July 30th Memorandum Opinion and Order, the Court instructed ENTEL and the Republic of Bolivia to file separate motions by August 25, 2008 detailing the costs, attorney's fees and damages each seeks pursuant to N.Y. C.P.L.R. § 6212(e). Plaintiff is to file separate papers in response by September 5 and each defendant is to file reply papers by September 12, 2008.

By the instant motion, ENTEL seeks an award as follows:

    For costs through August 22, 2008: $58,091.23

    For attorney's fees through August 22, 2008: $637,743.20

    For damages through August 20, 2008: $646,769.04

    Total through the respective dates: $1,342,603.47

*In addition*, ENTEL seeks (a) an award for any costs and attorney's fees that may be incurred subsequent to August 22, 2008 through the date on which the attached funds are

1

returned to ENTEL or final judgment dismissing this action is entered, whichever is earlier; and (b) for the period subsequent to August 20, 2008 through the date on which the attached funds are returned to ENTEL or final judgment is entered, whichever is earlier, an award for additional damages under the same measure of damages used by ENTEL in calculating damages through August 20, 2008.

## ARGUMENT

N.Y. C.P.L.R. § 6212(e) provides as follows:

Damages. The plaintiff shall be liable to the defendant for all costs and damages, including reasasonable attorneys fees, which may be sustained by reason of the attachment if the defendant recovers judgment, or if it is finally decided that the plaintiff was not entitled to an attachment of the defendant's property. Plaintiff's liability shall not be limited by the amount of the undertaking.

As the provision expressly provides, ENTEL is entitled as a matter of right to an award of all of its costs, including reasonable attorney's fees, and damages. *See also, e.g.*, Weinstein-Korn-Miller, *New York Civil Practice: CPLR* ¶ 6212.16; Practice Commentary, McKinney's CPLR Rule 7212, at C6212:8.

As has been repeatedly recognized, C.P.L.R. § 6212(e) "must be strictly construed against the party seeking to utilize this particularly severe provisional remedy" and "strictly construed in favor of those against whom it is employed," *Correspondent Services Corp. v. J.V.W. Investment Ltd.*, 524 F. Supp. 4121, 417-18 (S.D.N.Y. 2007) (Sweet, J.) (internal quotations and citations omitted).

### I.    COSTS (NOT INCLUDING ATTORNEY'S FEES)

ENTEL's costs, excluding attorney's fees, in this matter are $58,091.23, through August 22, 2008, as established by the Declaration of Michael Krinsky, Esq., ¶¶ 5, 6 and Exhibits A, Tables 1, 2 &, and B. The costs consist mostly of expenses incurred by Rabinowitz Boudin,

detailed on its bills to ENTEL (Krinsky Decl., Ex. B), principally for travel to La Paz, Bolivia to meet with ENTEL, gather information and documents, and prepare declarations; translations; and online legal research (Westlaw, Lexis/Nexis). In addition, ENTEL incurred fees for translations and interpretation done in La Paz and the fees of an expert on Bolivian law (Dra. Maria Cecilia Rocabado Tubert, who provided a declaration on the Bolivian law of nationalization); and accounting fees incurred in connection with the instant motion. These additional costs are established in the Krinsky Declaration, ¶ 6 and referenced exhibits.

## II.   ATTORNEY'S FEES

ENTEL has been represented in this matter by Rabinowitz Boudin. In addition to utilizing its attorneys and counsel to the firm (Terry Gross, and his firm, Gross Belsky Alonso LLP), Rabinowitz Boudin engaged Prof. Jules Lobel, of the University of Pittsburgh Law School, to assist it. Prof. Lobel began his professional career at Rabinowitz Boudin and frequently assists the firm in its litigation of matters such as this.

For the period ending June 30, 2008, the rates charged ENTEL ranged from $495 to $315 per hour for attorneys. This reflected a 10% courtesy discount for the period through June 30, 2008 from the agreed upon rates, which range from $550 to $350 per hour. The agreed upon rates, without discount, are applicable for the period subsequent to June 30. Krinsky Declaration ¶¶ 8-9. The attorney's fees incurred by ENTEL for this matter total $ 637,743.20 through August 22, 2008, Krinsky Decl., ¶ 10 & Ex. A, Tables 1 & 2, as set out in Rabinowitz Boudin's bills to ENTEL (Ex. B, Krinsky Decl.). The bills include itemized time sheets recorded contemporaneously by each attorney.

The rates and total fees charged ENTEL are reasonable.

1. With or without the courtesy discount, the rates charged ENTEL are considerably lower than rates normally charged by attorneys with experience and expertise comparable to, or significantly less than, Rabinowitz Boudin's. Krinsky Declaration ¶ 12. As summarized below and set out in greater detail in the Krinsky Declaration, ¶ 12, Rabinowitz Boudin's experience and expertise is substantial and distinctive in all respects relevant here.

Since 1960, a principal focus of the firm's practice has been the representation of foreign governments and their instrumentalitities and enterprises. Rabinowitz Boudin has represented the government of Cuba and Cuban instrumentalities and enterprises in all their-U.S. related matters for nearly fifty years; and currently represents as well the Republic of South Africa in pending litigation. The firm represented Bank Markazi Iran, the central bank of Iran, in scores of cases involving the attachment of the bank's considerable U.S. assets in litigation that arose in part out of Iran's nationalization of foreign-owned property; and represented the Republic of Chile and its instrumentalities in litigation involving attachments that arose out of Chile's nationalization of U.S.-owned property. Other foreign government clients have included, without limitation, the Republic of Haiti and Haitian President Aristide; and the Government of the Hellenic Republic (Greece) and Greece's Prime Minister Andreas Papandreau.

On behalf of these and other clients, the firm has litigated many of the leading cases concerning, *inter alia*, the separate status and liability of foreign state-owned corporations; sovereign immunity; the act of state doctrine; nationalizations; and foreign affairs. Among the more notable cases litigated by the firm in these and related areas have been *First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964); *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759 (1972); *Alfred of Dunhill, Inc. v. Republic of Cuba*, 425 U.S.

682 (1976); *Dames & Moore v. Regan*, 453 U.S. 654 (1981); *Menendez v. Saks & Co.*, 485 F.2d 1355 (2d Cir. 1973); *French v. Banco Nacional de Cuba*, 23 N.Y.2d 46 (1968); *Banco Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d 875 (2d Cir. 1981); *Spacil v. Crowe*, 489 F.2d 614 (5th Cir. 1974); *Alejandre v. Telefonica Larga Distancia de Puerto Rico*, 183 F.3d. 1277 (11th Cir. 1999); *Bandes v. Harlow & Jones,, Inc.*, 852 F.2d 661 (2d Cir. 1988); and *Lafontant v. Aristide*, 844 F. Supp. 128 (E.D.N.Y 1994).

Several of the cases litigated by the firm figured prominently in the instant action, and were cited by one or more of the parties. These include *Bancec*, the Supreme Court case establishing a presumption in favor of recognizing the separate status and liability of state corporations and instrumentalities, and several of the leading decisions in this and other Circuits construing and applying *Bancec*; and *Sabbatino*, the Supreme Court decision establishing the modern "act of state" doctrine, and several of the leading cases construing and applying *Sabbatino*.

*Michael Krinsky* has served as lead counsel for ENTEL. He has practiced law for 39 years. Krinsky joined Rabinowitz Boudin in 1971, and he has fully participated in the firm's representation of foreign governments and instrumentalities since then. For more than two decades, Krinsky has been the firm's lead attorney in this area of its practice.

Krinsky argued the *Bancec* case in the United States Supreme Court. He also was lead counsel in several of the more important cases applying and refining the *Bancec* principle, including *Banco Nacional de Cuba v. Chemical Bank*, 782 F.2d 377 (2d Cir. 1986) and *Alejandre* in the 11th Circuit. Krinsky has served as lead counsel in several important act of state and sovereign immunity cases, including *Empresa Cubana v. Lamborn*, 652 F.2d 231 (2d

5

Cir. 1981); *Bandes v. Harlow & Jones*; and *Banco Nacional de Cuba v. Chemical Bank*, 658 F.2d 903 (2d Cir. 1981) and 822 F.2d 230 (2d Cir. 1987).

Several of the cases in which Krinsky served as lead counsel or otherwise participated concerned, like the instant action, the attachment of a foreign state or instrumentality's property, and have presented in that context issues similar to those presented here, including the separate status of government-owned enterprises, sovereign immunity and the act of state doctrine. Without limitation, these have included *Alejandre*, *Spacil v. Crowe*, the Iran litigation, and the Chile litigation.

*Eric M. Lieberman* has practiced law at Rabinowitz Boudin for more than 36 years, and is a member of the firm. Lieberman argued *Dames & Moore v. Regan* in the United States Supreme Court on behalf of Bank Markazi Iran, and was in charge of the firm's representation of Bank Markazi Iran in scores of cases litigated in district courts and courts of appeals across the country that culminated in *Dames & Moore*.

*David B. Goldstein* clerked for Judge Oakes of the Second Circuit after graduating from Harvard Law School; joined the firm in 1987; was an associate at Weil, Gotshal & Manges, LLP, 1992-96; taught law in Texas in 1996-99; served as an adjunct professor of law at Fordham Law School in 2000-01; and rejoined Rabinowitz Boudin as a member of the firm in 1999. He currently serves as lead counsel for the Republic of South Africa in pending litigation that raises sovereign immunity issues.

*Christopher J. Klatell* graduated from Yale Law School in 1999; clerked for Judge Sack of the Second Circuit; was a litigation associate at Debevoise & Plimpton, 2000-02; joined Rabinowitz Boudin in 2003; and is a member of the firm.

*Lindsey Frank* graduated Fordham Law School *magnum cum laude* in 2006 and was a member of the Fordham International Law Journal. He joined the firm in 2006.

*Terry Gross* is counsel to the firm. He graduated Boalt Hall Law School, University of California at Berkeley in 1980; clerked for Judge Skopil of the Ninth Circuit, 1980-1982; joined Rabinowitz Boudin in 1983, and worked there as an associate and firm member until 1993, when he relocated to San Francisco and opened his own firm. In addition to his work with Rabinowitz Boudin on international law and foreign affairs cases, Mr. Gross litigated *Af-Cap, Inc. v. Chevron (Cong), Ltd.*, 475 F.2d 1080 (9th Cir. 2007), a leading sovereign immunity and separate entity case.

*Prof. Jules Lobel* was an associate at Rabinowitz Boudin from 1978 to 1983, when joined the faculty of the University of Pittsburgh Law School; he has taught at the Law School for 25 years. Prof. Lobel's academic and scholarly work has focused on international law and foreign affairs law. He is the author of numerous scholarly articles and books on international law, foreign affairs law and constitutional law.

*Adam Belsky*. A member of Gross Belsky Alonso LLP, Mr. Belsky graduated from Boalt Hall Law School, University of California at Berkeley in 1989; clerked for Judge Weigel of the United States District Court for the Northern District of California; and was an associate at Morrisson & Forrester from 1990 to 1994, when he joined Mr. Gross in the practice of law.

2.  Rabinowitz Boudin reasonably expended substantial time in the litigation of this matter, both because of the significant sums at stake – nearly $40 million – and because of the need to carefully address the multitude of issues raised by this action and plaintiff's shifting litigation positions.

These issues included, without limitation:

Whether ENTEL is an FSIA "agency or instrumentality," protected by the FSIA's prohibition against prejudgment attachment, on any of three different grounds: that the Bolivian State owns a majority of ENTEL's shares; that the Bolivian State owns a majority of ENTEL's "other ownership interest;" and that ENTEL is an "organ" of the Bolivian government.

In connection with the foregoing and other issues, what is ENTEL's legal status under Bolivian law; its function and history; and its relation to the Bolivian State.

Whether the "act of state" doctrine requires recognition of the Bolivian government's acts purporting to transfer ownership of the shares in ENTEL formerly held by ETI to the Bolivian State (thereby making ENTEL an FSIA instrumentality because of the State's majority ownership of ENTEL's shares), and precludes the Court from entertaining plaintiff's claim that the Bolivian government's acts were ineffective and invalid under Bolivian law to transfer ownership.

Whether, assuming the "act of state doctrine" does not preclude such an inquiry, the Bolivian government's acts purporting to transfer ownership of the ETI shares were effective and valid under Bolivian law.

Whether the FSIA's prohibition against prejudgment attachment applies because plaintiff seeks to hold ENTEL responsible for a possible arbitration award against the Republic of Bolivia on the ground that ENTEL is the *alter ego* of Bolivia or ENTEL's assets are otherwise controlled by Bolivia.

Whether the FSIA's prohibition against prejudgment attachment applies because of plaintiff's alternative justification for the attachment of ENTEL's assets, that plaintiff is entitled to an attachment because ENTEL owes a tax debt to Bolivia.

8

Whether ENTEL or Bolivia waived the FSIA's protection against prejudgment attachment, including by Bolivia becoming party to three different treaties: the Bolivia-Netherlands BIT, the ICSID Convention and the New York Convention.

Whether the attached funds are used for commercial activities in the United States, a requirement for prejudgment attachment under the FSIA regardless of any waiver.

Whether, applying *Bancec* and its progeny, ENTEL's separate legal status under Bolivian laws must be respected, and efforts to hold it responsible for a possible arbitral award against Bolivia must be rejected on that ground.

Whether the ICSID Convention and Rules bars the pre-arbitral attachment of ENTEL's property by a national court.

Whether principles of waiver and estoppel bar ENTEL from relying on the ICSID Convention's prohibitions because of Bolivia's denunciation of the ICSID Convention and Bolivia's asserted refusal to cooperate in the ICSID arbitration commenced by plaintiff.

Whether the Court lacks subject matter jurisdiction.

Whether the FSIA's arbitration exception to immunity from jurisdiction is applicable.

Whether the FSIA's waiver exception to immunity from jurisdiction is applicable

Whether the FSIA's nationalization exception to immunity from jurisdiction is applicable.

Whether the FSIA bars the attachment because the attached property would be immune from post-judgment execution.

Whether constitutional *in personam* jurisdiction over ENTEL is required, and whether it is lacking.

On plaintiff's debt theory of the case, whether ENTEL's asserted indebtedness for taxes is settled or has been conceded, or is still in dispute in Bolivia.

Whether plaintiff has made the showing required by CPLR § 7502 as to its "cause of action," irreparable harm, ineffectuality of the arbitral arbitral award without an attachment, and the balance of equities.

Whether CPLR § 7502(c) requires personal jurisdiction over ENTEL, and whether it is lacking.

Whether CPLR § 7502(c) requires personal jurisdiction over the Republic of Bolivia in order for plaintiff to maintain its "debt" theory of the case, and whether it is lacking.

On plaintiff's "debt" theory of its case, whether plaintiff did or could attach the debt assertedly owed by ENTEL to Bolivia by serving a writ of attachment on ENTEL's banks in New York and attaching ENTEL's bank accounts.

Whether plaintiff was entitled to attach ENTEL's bank accounts on plaintiff's theory that the funds were "earmarked" for payment of the asserted tax debt.

Whether ENTEL's purported tax obligation qualifies as an attachable "debt" under the CPLR given that it is subject to unresolved litigation in Bolivia.

Whether the asserted tax debt is subject to attachment under the CPLR given that Bolivia cannot assign its tax obligations.

Whether attachment of the asserted tax debt would violate the rule against U.S. courts' collecting a foreign state's taxes.

Whether ENTEL has the right to the attached funds and standing to seek their recovery given plaintiff's assertions that the Bolivian intervention and nationalization of ENTEL were contrary to international law and U.S. public policy.

Whether plaintiff is entitled to an attachment because it would bring a claim for recovery of ENTEL's bank accounts on the ground that the intervention and nationalization of ENTEL violated international law and public policy in the event that ICSID determined that it does not have jurisdiction over plaintiff's arbitration claim.

What is the import here of the judgment of the High Court in London vacating ETI's *ex parte* restraint on ENTEL's bank account in the parallel English action, and, similarly, what is the import here of the judgment of the English Court of Appeal dismissing ETI's appeal from the High Court's judgment.

3. In order to address these issues, and otherwise to address plaintiff's factual and legal contentions, it was necessary to investigate numerous matters of fact and Bolivian law; to present extensive declarations by a variety of ENTEL officials and employees; and to present a declaration by a Bolivian law expert, as well as to introduce numerous documents. This task was made substantially more difficult and time-consuming by the fact that all the relevant persons and documents were in La Paz, and by differences in language.

4. ENTEL's litigation of this action was made significantly more burdensome and time-consuming by plaintiff's conduct. The Court has observed that "plaintiff's original moving papers did not explain why it was proper to attach Entel's assets, given that Plaintiff's dispute was with Bolivia rather than Entel." Memorandum Opinion and Order, at 5. ENTEL's initial failure to explain its theory of the case required ENTEL to develop both facts and legal arguments in its opposition to plaintiff's motion to confirm the attachments without being able to narrow its focus.

In its opening brief, plaintiff advanced, or appeared to advance, the theory – asserted but not developed or substantiated – that ENTEL's assets may be held as security because ENTEL is

11

the *alter ego* of Bolivia or, to the same effect, Bolivia controls ENTEL's assets, including these bank accounts. *After* ENTEL spent considerable effort in presenting facts and law demonstrating that this theory was untenable for a variety of reasons – including sovereign immunity and the *Bancec* separate entity presumption – plaintiff, as the Court further observed, "proffered for the first time the theory that Entel's bank account assets are attachable because they constitute debt that Entel allegedly now admits that it owes to Bolivia." Memorandum Opinion and Order, at 5. This necessitated another whole round of inquiry into the facts and Bolivian law, another whole round of briefing, and another whole round of developing and submitting declarations and documents.

Similarly, plaintiff did not address until its Reply many other issues with obvious import for this action, including sovereign immunity, personal jurisdiction, and the ICSID Convention's prohibition against national court's issuing pre-arbitral award relief. This required ENTEL to address in its opposition, both on the facts and the law, these issues without any narrowing of focus to the points in dispute between the parties, and then required to address plaintiff's positions, advanced in its Reply, in a sur-reply brief and sur-reply declarations and exhibits. For example, only in its reply papers did plaintiff advance its position that ENTEL was not an FSIA instrumentality because the Bolivian government's purported transfer of ownership of ETI's shares in ENTEL to the State was ineffectual and invalid under Bolivian law. Similarly, only in its reply papers did plaintiff argue that the ICSID Convention's prohibitions were inapplicable here on principles of waiver and estoppel.

5.   Plaintiff has continued this egregious pattern with its pending motion for reconsideration of this Court's Memorandum Opinion and Order, where plaintiff argues for

reconsideration on the basis of a supposed assertion in one of ENTEL's declarations that plaintiff had never before brought to the Court's attention.

### III.    DAMAGES

It is settled that, as damages under N.Y. C.P.L.R. § 6212(e), ENTEL:

> is entitled at a minimum to recover interest at the legal rate [9%, *see* N.Y. C.P.L.R. § 5004], reduced by the amount of the earnings on the attached funds during the period they are held.

*Byblos Bank Europe, S.A. v. Sekerbank Turk Anonym Syrketi*, 49 A.D.3d 288, 288; 853 N.Y.S.2d 51, 52 (1st Dept. 2008). *See also, e.g., Subin v. United States Fid. & Guar. Co.*, 12 A.D.2d 49, 52-53; 208 N.Y.S.2d 278 (1st Dept. 1960); *Richman v. Richman*, 52 A.D.2d 393, 395, 384 N.Y.S.2d 220, 222-3 (3rd Dept. Dept. 1976); *Dean v. James McHugh Construction Co.*, 56 A.D.2d 716, 717-18; 392 N.Y.S.2d 946, 947-48 (4th Dept. 1977). As these cases show, "actual loss" or "ability to invest the funds" at the legal rate is irrelevant. *Subin*, at 281.

Additionally, ENTEL is entitled to these damages through July 30, 2008, the date the Court issued its Memorandum Opinion and Order (the "July 30th amount), *plus* the amount derived by applying the same measure of damages to the July 30th amount through the release of the funds or the date of the entry of the final judgment in this action, whichever is earlier. *See* N.Y. C.P.L.R. §§ 5001, 5002; *Love v. State*, 78 N.Y.2d 540, 577 N.Y.S.2d 359 (1991); Siegel, New York Practice 4th Ed., § 411; Siegel, Practice Commentaries, McKinney's CPLR § 5002 (1977); Siegel, Practice Commentaries, McKinney's CPLR § 5004 (1977) ("Is Interest Compounded?").

The total amount of damages thus calculated *through August 20, 2008* is $ 647,743.20. *See* Krinsky Declaration ¶¶ 3, 14-21 & Exhibit A thereto.[1] ENTEL is also entitled to *additional*

---

[1] For purposes of the present motion, damages could only be calculated through August 20, 2008 because that was the latest date through which the Clerk of the Southern District had information on the interest

13

*damages* under this same measure of damages through the date that the attached funds are returned to it or a final judgment dismissing this action is entered, whichever is earlier.

## CONCLUSION

For the foregoing reasons, ENTEL's motion for an award of costs, attorney's fees and damages should be granted.

Of Counsel:
Jules Lobel
3900 Forbes Avenue
Pittsburgh, PA 15260

*/s/ Michael Krinsky*

Michael Krinsky (MK4503)
Eric M. Lieberman (EL 4822)
RABINOWITZ, BOUDIN, STANDARD,
  KRINSKY & LIEBERMAN, P.C.
111 Broadway, 11th Floor
New York, New York 10006
Telephone: (212) 254-1111
Facsimile: (212) 674-4614


Terry Gross (TG 3249)
GROSS, BELSKY & ALONSO LLP
180 Montgomery Street, # 2200
San Francisco, California 94104
Telephone: (415) 514-0200
Fax (415) 544-0201

---

earned on the attached funds at the Court Registry Investment System ("CRIS"). The Clerk obtains updated information from CRIS every Wednesday.